**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**CASE NO.**

**A.R.**, by and through her next friend, Susan
Root; **C.V**., by and through his next friends,
Michael and Johnette Wahlquist; **M.D.**,
by and through her next friend, Pamela
DeCambra; **C.M.**, by and through his next
friend, Norine Mitchell; **B.M.**, by and
through his next friend, Kayla Moore; and
**T.F.**, by and through his next friend,
Michael and Liz Fauerbach; each
individually, and on behalf of all other
children similarly situated in the State of
Florida,

   Plaintiffs,

**v.**

**ELIZABETH DUDEK**, in her official
capacity as Secretary of the Agency for
Health Care Administration; **HARRY
FRANK FARMER, JR.**, in his official
capacity as the State Surgeon General and
Secretary of the Florida Department of
Health; **KRISTINA WIGGINS**, in her
official capacity as Deputy Secretary of the
Florida Department of Health and Director
of Children's Medical Services; and
**eQHEALTH SOLUTIONS, INC.**, a
Louisiana non-profit corporation,

   Defendants.

_____/

**COMPLAINT - CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

   Plaintiffs, A.R., C.V., M.D., C.M., B.M., and T.F. by and through their respective next

friends, on behalf of themselves and all other children similarly situated in the State of Florida,

sue the Defendants, ELIZABETH DUDEK ("DUDEK"), in her official capacity as Secretary for

the Agency for Health Care Administration ("AHCA"); HARRY FRANK FARMER, JR.

("FARMER"), in his official capacity as the State Surgeon General and Secretary of the Florida

A.R. et a., v. DUDEK et al.
COMPLAINT

Department of Health ("FDOH"); KRISTINA WIGGINS ("WIGGINS"), in her official capacity as Deputy Secretary of the FDOH and Director of Children's Medical Services ("CMS"); and eQHEALTH SOLUTIONS, INC. ("eQHealth"), and allege as follows:

### PRELIMINARY STATEMENT

1. A.R., C.V., M.D., C.M., B.M., T.F., and Plaintiff Class members are medically fragile children.  Many are on tracheotomies, gastrostomy tubes and ventilators.

2. A Medically Fragile Child is one who is

   > medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition (TPN), is ventilator dependant, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning.

   Rule 59G-1.010(165), Fla. Admin. Code.

3. Plaintiffs and Plaintiff Class members live at home.  They are members of families and communities.

4. Plaintiffs are being taken care of by loving and caring parents.

5. Nursing homes are segregated facilities, a congregation of strangers.

6. Plaintiffs and Plaintiff Class members need ongoing medical help to survive at home and to participate in a family and community.

7. Plaintiffs and Plaintiff Class members have been prescribed such medical help by their primary care physicians.

8. Plaintiffs and Plaintiff Class members have been prescribed private duty nursing care services, funded by Medicaid and administered by the Defendants.

9. The Plaintiffs and Plaintiff Class members are medically fragile children who receive private duty nursing in order to avoid unnecessary institutionalization in nursing facilities.

10. Private duty nursing services are "medically-necessary skilled nursing services that may be provided in a child's home or other authorized settings to support the care required by the child's complex medical condition." Agency for Health Care Administration, Home

Health Services Coverage and Limitations Handbook, 2008, at 2-17, incorporated by reference in Rule 59G-4.001, Fla. Admin. Code. (Hereinafter Handbook).

11. The Defendants have failed and continue to fail to provide medically necessary services to Plaintiffs and Plaintiff Class members in Florida in accordance with Federal law.

12. As of the date of the filing of this Complaint, there are approximately 250 child Medicaid recipients in Florida nursing facilities.

13. As of the date of this Complaint, there are approximately 3,300 child Medicaid recipients of private duty nursing at risk of being placed in Florida nursing homes.

14. Defendants have adopted uniform policies, practices, and regulations to reduce private duty nursing services.

15. Due to the Defendants' failure to provide those medically necessary services, the Plaintiffs and Plaintiff Class members are at risk of unnecessary institutionalization in nursing facilities.

16. The Plaintiffs and Plaintiff Class members seek a declaration that the Defendants' policies, regulations, actions and omissions are placing Plaintiffs at risk of being placed in segregated facilities, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); Medicaid Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"); Early and Periodic Screening, Diagnostic, and Treatment Services, 42 U.S.C. § 1396d(r) ("EPSDT Provisions"); and 42 U.S.C. § 1983.

17. The Plaintiffs and Plaintiff Class members seek for the court to enter a permanent injunction requiring the Defendants to provide for their medically necessary services and to provide such services in the most integrated setting appropriate.


## JURISDICTION AND VENUE

18. The Plaintiffs' and Plaintiff Class members' claims arise under the laws of the United States. This court has jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

19. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the district.

A.R. et a., v. DUDEK et al.
COMPLAINT

## PARTIES

### Named Plaintiffs

20.    A.R. is a medically fragile 10-year-old child Medicaid recipient of private duty nursing services diagnosed with traumatic brain injury. A.R. lives with her next friend and mother, Susan Root, and her brother and sister, in Edgewater, Florida.

21.    C.V. is a medically fragile eight-year-old child Medicaid recipient of private duty nursing services diagnosed with Hurler Syndrome.  C.V. lives with his next friends and legal guardians, Michael and Johnette Wahlquist, and their children, in Bristol, Florida.

22.    M.D. is a medically fragile 14-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and Strider Syndrome.   M.D. lives with her next friend and mother, Pamela DeCambra, and her brother, in Tallahassee, Florida.

23.    C.M. is a medically fragile four-year-old child Medicaid recipient of private duty nursing services diagnosed with chromosome deletion syndrome, chronic respiratory failure and severe cerebral palsy. C.M. lives with his next friend and mother, Norine Mitchell, and his father in Tallahassee, Florida.

24.    B.M. is a medically fragile five-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and developmental delay.  B.M. lives with his next friend and mother, Kayla Moore, and his father in Fountain, Florida.

25.    T.F. is a medically fragile 18-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy, mental retardation, and chronic lung disease. T.F. lives with his next friends and legal guardians, Michael and Liz Fauerbach, and his sister, in Miami, Florida.

### Defendants

26.    DUDEK is the Secretary of AHCA, which is the single state agency responsible for administering the Medicaid program under Title XIX of the Social Security Act and for ensuring that the Medicaid program complies with federal law. *See* 42 U.S.C. § 1396a(a)(5); §§ 409.012(2), (14) & (15), Fla. Stat.; and § 409.902, Fla. Stat. As such, she has a duty to ensure that AHCA programs are administered in accordance with the law. DUDEK is sued in her official capacity only, as Secretary of AHCA.

27.    FARMER is the State Surgeon General and head of FDOH, which is the primary state agency responsible for administering the Children's Medical Services ("CMS") program

for children who require long term care and which administers the Children's Multidisciplinary Assessment Team ("CMAT") program. FARMER has the duty to ensure that FDOH programs are administered in accordance with the law. FARMER is sued in his official capacity.

28.     WIGGINS is the Deputy Secretary of the Florida Department of Health and the Director of CMS. CMS, a division of the Florida Department of Health, is the lead agency of CMAT. CMAT is an inter-agency coordinated effort comprised of representatives from AHCA, the Department of Children and Families, the Agency for Persons with Disabilities and CMS. CMAT, under the leadership of CMS, makes recommendations for medically necessary services for children from birth to twenty-one who are medically fragile (65C-30.001, FAC). WIGGINS, as director of CMS, the lead agency of CMAT, has the duty to respond to the needs of each child and family and to guarantee the efficiency and effectiveness of support and services. WIGGINS is sued in her official capacity.

29.     eQHealth is a Louisiana non-profit corporation with its principal place of business in Baton Rouge, Louisiana and is engaged in business in the State of Florida. eQHealth contracts with the Defendants to make medical necessity determinations.

### STATUTORY AND REGULATORY BACKGROUND AND FRAMEWORK
### The Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165

30.     In 1990, Congress enacted the Americans with Disabilities Act (ADA), which is the most comprehensive legislation geared toward the prohibition of discrimination based on disability. 42 U.S.C. §§ 12101-12213 (2000). When enacting the ADA, Congress noted "the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." *Id.* at 12101(a)(8).

31.     In signing the ADA into law, President George H.W. Bush stated: "The Americans with Disabilities Act presents us all with an historic opportunity. It signals the end to the unjustified segregation and exclusion of persons with disabilities from the mainstream of American life." Statement on Signing the Americans with Disabilities Act of 1990, 2 Pub. Papers 1070, 1071 (July 26, 1990).

32.   Congress found the following:  (1) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (2) discrimination against individuals with disabilities persists in such critical areas as housing, public accommodations, education and institutionalization; (3) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusions, overprotective rules and policies, and segregation. *See generally* 42 U.S.C. §§ 12131-12165 (2000).

33.   The ADA prohibits discrimination against individuals with disabilities by public entities:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

34.   Segregation of children with disabilities from their homes is discrimination under the ADA. *See* 42 U.S.C. § 12101(a)(5); *Olmstead v. L.C.*, 572 U.S. 581 (1999).

35.   As public entities, Defendants are required to administer their services, programs and activities in "the most integrated setting appropriate" to the needs of Plaintiffs and Plaintiff Class members. *See* 28 C.F.R. § 35.130(d).

36.   As public entities, Defendants are prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 C.F.R. 35.130(b)(1)(iii).

37.   As public entities, Defendants are prohibited from utilizing "criteria or methods of administration" that have the effect of subjecting Plaintiffs and Plaintiff Class members to discrimination on the basis of disability; or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities..." 28 C.F.R. § 35.130(b)(3).

### Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

38.   Section 504 provides:

A.R. et a., v. DUDEK et al.
COMPLAINT

> No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance ….

29 U.S.C. § 794(a).

39.    Regulations implementing Section 504 prohibit recipients of Federal financial assistance from:

> [u]tiliz[ing] criteria or methods of administration… (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) [t]hat have the …effect of substantially impairing accomplishment of the recipients' program with respect to handicapped persons.

45 C.F.R. § 84.4(b)(4).

40.    Disability discrimination claims brought under Section 504 are evaluated similarly to ADA claims. *See Allmond v. Akal Sec., Inc*., 558 F. 3d 1312, 1316 n.3 (11th Cir. 2009).

### The United States Medicaid Act, 42 U.S.C. §§1396-1396v

41.    The Medicaid program is a cooperative federal/state program that provides health care services to specified categories of individuals meeting income and other criteria. *See* 42 U.S.C. §§ 1396-1396v.

42.    Florida participates in the Medicaid program. *See* § 409.902, Fla. Stat.

### *Medicaid's Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") Program*

43.    Federal law lists 28 health care services which a state may provide through its Medicaid program. *See* 42 U.S.C. § 1396d(a)(1) – (28).

44.    Some of these services are mandatory, meaning that if a state participates in Medicaid it must provide those services (*i.e.*, inpatient hospital services; outpatient hospital services; physician visits; lab & x-ray services; nursing home services; early and periodic screening, diagnosis, and treatment services for children; and family planning services). 42 U.S.C. § 1396a(a)(10)(A) (requiring states to provide the services listed at § 1396d(a)(1)–(5), (17) & (21)).

45.  Most of the services are optional (*i.e.*, prescription drugs, hospice, dental services, vision/optometry services, hearing services, chiropractic services, and podiatric services).

46.  The package of mandatory and optional health care services that are provided by a state are known as the "State Plan."

47.  As part of its Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") Program, a state must provide all 28 health care services listed at 42 U.S.C. § 1396d(a)(1) – (28) to eligible children, which include private duty nursing services.

48.  EPSDT requires screening, vision, dental, hearing and treatment services, and requires that such services include "such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

49.  AHCA is required to

> pay for early and periodic screening and diagnosis of a recipient under age 21 to ascertain physical and mental problems and conditions and all services determined by the agency to be medically necessary for the treatment, correction, or amelioration of these problems and conditions, including personal care, private duty nursing, durable medical equipment, physical therapy, occupational therapy, speech therapy, respiratory therapy, and immunizations.

§ 409.905(2), Fla. Stat.

50.  AHCA defines Medically necessary services as those that must:

1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;
3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;
4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; statewide; and

A.R. et a., v. DUDEK et al.
COMPLAINT

     5. Be furnished in a manner not primarily intended for the convenience of
       the recipient, the recipient's caretaker, or the provider.

   Rule 59G-1.010(166)

51.   AHCA's policy regarding coverage of medically necessary services is found at Rule
59G-4.130 of the Florida Administrative Code, which incorporates by reference the
Florida Medicaid Home Health Services Coverage and Limitations Handbook, July 2008
(the "Handbook").

52.   AHCA may authorize private duty nursing services where they are ordered by the child's
attending physician, are documented as medically necessary, are provided by a registered
or licensed practical nurse, are consistent with the physicia[n] approved plan of care, and
have been authorized before the services are provided.

53.   AHCA does not authorize private duty nursing Services "solely for the convenience of
the child, the parents or the caregiver." (Handbook, at 2-17).

54.   AHCA will decrease private duty nursing services "over time as parents and caregivers
are taught skills to care for their child and are capable of safely providing that care or as
the child's condition improves." (Handbook, at 2-19).

55.   The patient's physician has a role in determining what treatment is medically necessary,
*see Moore ex rel. Moore v. Medows*, 324 Fed. Appx. 773, 774 (11th Cir. 2009), and for
developing the plan of care for the Medicaid recipient.

56.   Prior to June 1, 2011, AHCA contracted with Keystone Peer Review Organization
("KePRO") as the State's "comprehensive utilization management program." §
409.905(4)(b), Fla. Stat.

57.   The contract between AHCA and KePRO terminated on May 31, 2011.

58.   AHCA entered into a contract with eQHealth, beginning on June 1, 2011, as the State's
"comprehensive utilization management program," which assesses children's need for
additional services. *See* § 409.905(4)(b), Fla. Stat.

59.   Through its contract with AHCA, eQHealth has the authority to make medical necessity
determinations on behalf of AHCA and to act as a witness for AHCA in all fair hearing
proceedings resulting from decisions and actions made by eQHealth.

60.   Each Medicaid recipient is provided services for a specific certification period.

61.     A certification period is the period covered by the recipient's plan of care or the time period for which services are provided.  Services can be approved for up to 180 days (6 months). Thus, the review process takes place every six months.

62.     The review process begins when a home health agency (the provider of the medical services), submits a request for services, such as private duty nursing services with a skilled nurse, home health aide services, personal care assistant services, or home health visit services. When a request is submitted, an eQHealth nurse reviewer determines if the information submitted is sufficient to approve the request based on the medical necessity guidelines, the Handbook, and other relevant statutes and regulations.

63.     Nurse reviewers are not permitted to deny services; they are only permitted to approve services.

64.     If the information that is submitted is insufficient for a nurse reviewer to make an approval, the review then goes to a physician reviewer. The physician reviewer reviews the information and makes a judgment based on the information provided and based on the applicable rules and regulations. Once that decision is rendered, it goes to the family and the provider who can then accept the decision or request a reconsideration within ten days from the denial of services.

65.     If a reconsideration is requested, the provider then has an opportunity to provide additional information or clarification.  The reconsideration then goes through the same process and is again reviewed by a nurse reviewer and if not approved by the nurse reviewer, to a second physician reviewer who is different from the original physician reviewer. The second physician reviewer renders a decision and can either uphold the denial or partial denial, approve the request as originally submitted, or modify the request and approve or deny something different.

### *Medicaid's Reasonable Promptness Requirement*

66.     Federal Medicaid law provides that individuals eligible to receive medical assistance under the program shall receive it with "reasonable promptness." 42 U.S.C. 1396a(a)(8).

### **FACTUAL ALLEGATIONS**

### **A.R.**

67.     A.R. is diagnosed with traumatic brain injury.

A.R. et a., v. DUDEK et al.
COMPLAINT

68.  On January 24, 2010, at the age of 8 years old, A.R. was riding her scooter in front of her home and was hit by a vehicle.  She was air lifted to Halifax Medical Center and it was found that she had severe brain trauma and that she was catastrophically injured.

69.  She also has hydrocephalus, increased fluid in the brain, and has a surgically implanted shunt in her brain. A.R.'s brain injury requires her to have a tracheotomy tube and a g-tube for feeding. She has severe seizures daily.

70.  A.R. cannot walk and is non-verbal. She uses a wheelchair for mobility.

71.  A.R. is a qualified person with a disability.

72.  A.R.'s single mother cannot work outside the home because she provides care to A.R., her nine-year- old son who has been diagnosed with post-traumatic stress disorder after witnessing A.R.'s accident, and her 17-year-old daughter. A.R.'s mother has anxiety attacks.

73.  Because of her health complications, A.R. has received Medicaid private duty nursing for approximately two years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

74.  A.R.'s treating physician has prescribed the medically necessary services for A.R.

75.  A.R.'s condition has not improved and her need for services has remained the same.

76.  Since 2010, eQHealth and AHCA has denied A.R.'s prescribed and requested services at least four times. Every certification period, eQHealth and AHCA has reduced services to A.R.

77.  On August 25, 2011, A.R. received notice that eQHealth and AHCA was reducing A.R.'s prescribed nursing services from 12 hours day of private duty nursing and 12 hours a day of home health aide to just 10 hours of private duty nursing for six days and 14 hours for one day a week for the certification period of June 23, 2011 through December 19, 2011.

78.  eQHealth and AHCA's attempt to reduce A.R.'s services is not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services.  This decision is not based on the individual need of A.R., is not justified by medical necessity, and does not reflect a professional judgment about A.R.'s condition.  Rather, it is an administrative action made to save money.

79.    Without medically necessary services, A.R. will be institutionalized because her family will no longer be able to care for A.R. at home.

80.    A.R. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

81.    The cost of institutionalized in a nursing facility is more than the cost of providing at-home care.

## C.V.

82.    C.V. was a foster child, but has been living with the same family since March 2005; those parents are now his legal guardians.

83.    C.V.'s Hurler Syndrome causes a multitude of medical complications for him, most notably that he cannot breathe without a tracheotomy tube. His other conditions include esophageal reflux, intestinal infection due to clostridium difficile, enteritis due to adenovirus, acute myocardinal infarction, asthma, acute respiratory failure, hemorrhage of the gastrointestinal tract, spinal kyphosis, other respiratory distress insufficiencies, moderate corneal clouding, and anomalies of the skull and face bones.

84.    C.V.'s tracheotomy tube must be cleaned every five minutes.

85.    C.V. cannot speak and requires constant supervision.

86.    C.V. is a qualified person with a disability.

87.    C.V.'s legal guardians both work full time jobs. Mr. Wahlquist owns and operates his business and is on call 24 hours a day, seven days a week, and works no less than 40 hours a week. In addition to caring for C.V., Ms. Wahlquist cares for her blind father and works at least 40 hours a week.

88.    Because of his health complications, C.V. has received Medicaid private duty nursing for approximately eight years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

89.    C.V.'s physician has prescribed the medically necessary services for C.V.

90.    C.V.'s condition has not improved and his need for services has remained the same.

91.    Since June 2006, AHCA has denied C.V. prescribed private duty nursing ("PDN") care at least 13 times at certification reviews. Almost every request made to AHCA was originally denied and only after reconsideration or the fair hearing process, have the hours been approved.

A.R. et a., v. DUDEK et al.
COMPLAINT

92.    Since June 2006, for almost every certification period, eQHealth and AHCA has attempted to decrease services by increasing the amount of nursing hours denied. (*e.g.,* for the certification period of March 31, 2008-September 26, 2008, eQHealth and AHCA denied 200 PDN hours; for the certification period of September 27, 2008-March 25, 2009, AHCA denied 696 PDN hours; for the certification period of March 26, 2009-September 9, 2009, AHCA denied 928 PDN hours).

93.    On September 16, 2011, C.V. received notice that eQHealth and AHCA were reducing the prescribed hours from 24 hours per day to 16 hours per weekday and eight hours for the whole weekend for the certification period of September 12, 2011 through March 9, 2012. This is a reduction of 8 hours of private duty nursing per weekday.

94.    eQHealth and AHCA's attempts to reduce C.V.'s services are not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of C.V., is not justified by medical necessity, and does not reflect a professional judgment about C.V.'s condition. Rather, it is an administrative action made to save money.

95.    Without medically necessary services, C.V. will be institutionalized because his family will no longer be able to care for C.V. at home.

96.    C.V. is at risk of institutionalization in a nursing facility based upon the current regulations, rules, policies, practices, acts, and omissions of the Defendants.

97.    The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

**M.D.**

98.    M.D.'s Strider Syndrome causes a multitude of medical complications; most notably she has problems with breathing and has frequent seizures. Her other conditions include: esophageal spasms; inability to swallow, walk or talk; and a long history of frequent pneumonia. Because of her esophageal spasms, M.D. cannot swallow saliva and it accumulates in her throat. She must be bent over or moved to her side so the build-up can be removed. If she is not moved into the proper position, M.D. will suffocate. This experience usually sends her into a seizure and happens at least once per day. She cannot be left alone for any length of time.

13

A.R. et a., v. DUDEK et al.
COMPLAINT

99.    M.D. cannot speak and requires constant supervision.

100.   M.D. is a qualified person with a disability.

101.   M.D.'s mother is a single mother and works approximately 40-50 hours per week in a job which she has held for over 25 years.

102.   Because of her health complications, M.D. has received Medicaid private duty nursing for approximately 11 years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

103.   M.D.'s physician has prescribed the medically necessary services for M.D.

104.   M.D.'s condition has not improved and her need for services has remained the same.

105.   Since 2008, eQHealth and AHCA has denied M.D. the prescribed private duty nursing hours on five occasions. Every request M.D. made to eQHealth and AHCA was originally denied and only after reconsideration or the fair hearing process, have the hours been approved or services maintained.

106.   On May 11, 2009 for the certification period of April 28, 2009-October 24, 2009, eQHealth and AHCA reduced private duty nursing hours from 24 hours a day, 7 days a week for a total of 4,320 hours to 3,468 hours for a reduction of 852 hours.

107.   eQHealth and AHCA's attempts to reduce M.D.'s services are not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services.  This decision is not based on the individual need of M.D., is not justified by medical necessity, and does not reflect a professional judgment about M.D.'s condition.  Rather, it is an administrative action made to save money.

108.   Without medically necessary services, M.D. will be institutionalized because her family will no longer be able to care for her at home. M.D. is at risk of institutionalization in a nursing facility based upon the current regulations, rules, policies, practices, acts, and omissions of the Defendants.

109.   The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

**C.M.**

110.   C.M.'s diagnoses cause a multitude of medical complications for him; most notably he requires constant use of a ventilator and oxygen concentrator.  He also requires a

tracheotomy tube and g-tube. His other conditions include epilepsy, dual sensory impairment, developmental delay, hypotonia, and hypothyroidism.

111. C.M.'s severe respiratory problems require that his tracheotomy tube must be cleaned every four hours; however, constant supervision is needed as it disconnects frequently. C.M. cannot speak and is not ambulatory. C.M. is currently taking over 25 medications which need to be administered in various dosages every two hours.

112. C.M. is a qualified person with a disability.

113. C.M.'s father works a full-time job. C.M.'s mother is an educated professional and was recently hired as a first grade teacher.

114. Because of his health complications, C.M. has received Medicaid private duty nursing for almost four years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

115. C.M.'s treating physician has prescribed the medically necessary services for C.M.

116. C.M.'s condition has not improved and his need for services has remained the same.

117. Since 2011, eQHealth and AHCA has denied C.M.'s requested and prescribed nursing hours at least once.

118. On July 14, 2011, eQHealth and AHCA gave notice that they were reducing C.M.'s prescribed hours from 12 hours a day to eight hours a day, Tuesday through Sunday, and 12 hours on Monday for the certification period of July 1, 2011 through December 27, 2011.

119. eQHealth and AHCA's attempts to reduce C.M.'s services are not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of C.M., is not justified by medical necessity, and does not reflect a professional judgment about C.M.'s condition.  Rather, it is an administrative action made to save money.

120. Without medically necessary services, C.M. will be institutionalized because his family will no longer be able to care for C.M. at home.

121. C.M. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

122. The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

A.R. et a., v. DUDEK et al.
COMPLAINT

**B.M.**

123.   B.M.'s Cerebral Palsy causes a multitude of medical complications, most notably he is dependent on a tracheotomy.  His other conditions include periods of apnea, deafness, tracheal stricture and immobility.

124.   B.M.'s tracheotomy tube must be suctioned out seven times a day and changed once a week. His apnea requires monitoring and supplemental oxygen.

125.   B.M. is a qualified person with a disability.

126.   B.M.'s father has a full-time job and is also on-call 24/7. B.M.'s mother has Lyme Disease, which prevents her from working; however, she provides B.M. with overnight care. The family's location is at least three hours away from the nearest hospital.

127.   Because of his health complications, B.M. has received Medicaid private duty nursing for approximately five years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

128.   B.M.'s physician has prescribed the medically necessary services for B.M.

129.   B.M.'s condition has not improved and his need for services has remained the same.

130.   Since 2011, eQHealth and AHCA have denied B.M.'s requested and prescribed nursing hours at least once.

131.   On August 3, 2011, eQHealth and AHCA gave notice that they were reducing B.M.'s prescribed hours from nine hours a day, Monday through Friday, and ten hours a day on the weekends to eight hours a day, Monday through Friday, and no hours on the weekends for the certification period of July 31, 2011 through January 7, 2012.

132.   eQHealth and AHCA's attempt to reduce B.M.'s services is not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services.  This decision is not based on the individual need of B.M., is not justified by medical necessity, and does not reflect a professional judgment about B.M.'s condition.  Rather, it is an administrative action made to save money.

133.   Without medically necessary services, B.M. will be institutionalized because his family will no longer be able to care for B.M. at home.

134.   B.M. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

135. The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

**T.F.**

136. T.F. was born with a variety of medical complications. T.F. has diagnoses of cerebral palsy, mental retardation, chronic lung disease, kyphoscoliosis, microcephalus, and gastroesophageal reflux. He has developmental delay, a seizure disorder, and cortical blindness. He requires the constant use of a ventilator and oxygen. T.F. has a g-tube and a tracheotomy tube.

137. T.F.'s ventilator must be checked hourly for proper function and deliverance of prescribed settings. Additionally, T.F. cannot be left alone because a disconnection from his ventilator will result in death. T.F. is unable to speak.

138. T.F. also requires frequent mechanical suctioning to help remove any obstruction from his airway. Due to T.F.'s involuntary movements, at least two people are required for suctioning. This procedure also stimulates T.F.'s gag reflex causing him to become distressed, oxygen saturation decreases, intense coughing attacks occur, increased heart rate and respiration occur.

139. T.F. is a qualified person with a disability.

140. T.F.'s mother is studying for her Certified Personal Accountant exam and caring for another child with a chronic gastrointestinal medical condition. T.F.'s father works overtime to financially provide for his family.

141. T.F.'s treating physician has prescribed the medically necessary services for T.F.

142. T.F.'s condition has not improved and his need for services has remained the same.

143. eQHealth and AHCA reduced T.F's requested and prescribed nursing hours from nine hours per weekday, eight hours on Saturday and no hours on Sunday to eight hours per weekday with no hours on the weekends. This is a reduction from 1,370 private duty nursing hours to 688 hours for the total certification period.

144. On July 25, 2011, eQHealth and AHCA gave notice that they were reducing T.F.'s prescribed services from a Registered Nurse to a Licensed Practical Nurse for the certification period of July 3, 2011 through December 24, 2011.

145. eQHealth and AHCA's attempt to reduce T.F.'s services is not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and

A.R. et a., v. DUDEK et al.
COMPLAINT

AHCA's decision to reduce the services.  This decision is not based on the individual need of T.F., is not justified by medical necessity, and does not reflect a professional judgment about T.F.'s condition.  Rather, it is an administrative action made to save money.

146.  Without medically necessary services, T.F. will be institutionalized and his family will no longer be able to care for T.F. at home.

147.  T.F. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

148.  The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

## GENERAL ALLEGATIONS

149.  Plaintiffs and Class members are able to, and desire to, live in the community with the appropriate services and supports.

150.  Defendants have available community-based services for medically fragile children, including residential assistance services, habilitation services, and private duty nursing services, which would enable Plaintiffs and Class members to live and continue to live in their homes and in the community.

151.  The provision of appropriate services and supports in the community is a reasonable accommodation for the Plaintiffs and Class members.

152.  Nursing facilities are not integrated or appropriate settings for Plaintiffs and Class members.

153.   The Defendants have developed regulations, rules, customs, practices, policies, acts, and omissions of reducing the prescribed medically necessary services to medically fragile children to the point that the Plaintiffs' caregivers cannot provide safe and appropriate care to the Plaintiffs and Plaintiff class. For example:

a.    "Florida Medicaid does not reimburse private duty nursing services provided solely for the convenience of the child, the parents or the caregiver." *Handbook* at 2-17.  This restriction is based on the regulatory definition of "medically necessary," found at Rule 59G-1.010(166)(a), Fla. Admin. Code, which states, in part, that medically necessary services must "[b]e furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker,

or the provider."  Defendants adopted this policy without the authority of any similar federal Medicaid policy, rule or statute, giving Defendants a basis to deny private duty nursing service hours that have been prescribed by Plaintiff and Plaintiff Class members' treating physicians.  eQHealth and AHCA's application of this policy is forcing parents and caregivers to institutionalize their children.

b.      "Private duty nursing services will be decreased over time as parents and caregivers are taught skills to care for their child and are capable of safely providing that care or as the child's condition improves." *Handbook* at 2-19. Defendants adopted this policy without the authority of any similar federal Medicaid policy, rule or statute, giving Defendants a basis to deny private duty nursing services that have been prescribed by Plaintiff and Plaintiff Class members' treating physicians.  Plaintiff and Plaintiff Class members' conditions will not improve over time, yet eQHealth and AHCA have routinely denied services even where Plaintiff and Plaintiff Class members' needs have not decreased.

c.      Parents and caregivers of Plaintiffs and Plaintiff class members are not capable of safely providing the required care because they are not medical professionals and/or are not available to provide the services at the required level or duration. Plaintiff and Plaintiff Class members are at risk of being placed in a nursing home because Defendants have unlawfully shifted the burden for providing skilled nursing services to the parents or caregivers of children who are not skilled nurses.  In contrast, there are not similar regulations, rules, customs, practices, policies, acts, and omissions utilized to deny benefits and to unnecessarily institutionalize and segregate similarly situated adults with disabilities.

d.      eQHealth and AHCA have a pattern and practice of denying or reducing services at each certification period without regard to the child's condition.

154.    The overall costs to institutionalize all of the Plaintiffs and Plaintiff class members in nursing facilities is more than the overall costs of providing at home care.

155.    Defendants have and continue to make cuts in Plaintiffs' and Class members' services which have placed them at risk of unnecessary institutionalization in nursing facilities.

156.   The Defendants' actions were taken under the color of law and the Defendants knew or should have known that the policies, practices, acts, and conditions alleged herein would result in the unnecessary institutionalization of the Plaintiffs and Plaintiff class members in nursing facilities.

## CLASS ACTION ALLEGATIONS

157.   Plaintiffs seek to bring this case as a class action, pursuant to Fed. R. Civ. P. 23(a) & (b)(2), and S.D. Loc. R. 23.1(b), on behalf of themselves and for all other medically fragile Florida children Medicaid recipients of private duty nursing services (birth through 21) who are at risk of institutionalization.

### NUMEROSITY

158.   The proposed class is so numerous that joinder of all members is impractical. On information and belief, approximately 3,300 medically fragile children who receive private duty nursing fall within the definition of the class.

### COMMON QUESTIONS OF LAW AND FACT

159.   There are questions of law and fact common to the class including:

a.   Whether Defendants violated Plaintiffs' and class members' rights under the ADA, in specific, whether the Defendants' uniform practices and policies have placed Plaintiffs and Plaintiff class members at risk of being institutionalized in nursing homes;

b.   Whether Defendants violated Plaintiffs' and class members' rights under Section 504 of the Rehabilitation Act, in specific, whether the Defendants' uniform practices and policies have placed Plaintiffs and Plaintiff class members at risk of being institutionalized in nursing homes;

c.   Whether Defendants violated Plaintiff's and class members' right under the Medicaid Act, in specific, whether the Defendants' uniform practices and policies have violated Medicaid's EPSDT and reasonable promptness requirements by failing to provide Plaintiffs and Plaintiff class members with medically necessary PDN services;

d.   Whether Plaintiffs and class members are entitled to declaratory and injunctive relief by virtue of Defendants' violations of law.

A.R. et a., v. DUDEK et al.
COMPLAINT

## TYPICALITY

160.  Plaintiffs' claims are typical of the claims of the class members because they are based on the same factual, legal and remedial theories as the claims of the class.

161.  Plaintiff class members are qualified persons with disabilities.

## ADEQUACY OF REPRESENTATION

162.  The Plaintiffs can and will fairly and adequately represent and protect the interests of the class members because the Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the class the Plaintiffs seek to represent.

163.  The Plaintiffs have no interests that conflict with or are antagonistic to the interests of the entire Class.

164.  The Plaintiffs have retained attorneys competent and experienced in class actions who will vigorously prosecute this litigation.

## <u>COUNT 1</u>
### Title II of ADA
### (ALL DEFENDANTS)

165.  The Plaintiffs repeat the allegations in paragraphs 1 through 164 of the Complaint as if fully set forth herein.

166.  Count 1 is a claim under Title II of the ADA, 42 U.S.C. §§ 12131-12165.

167.  Plaintiffs are qualified individuals with disabilities within the meaning of the ADA.

168.  AHCA, FDOH, and CMS are public entities within the meaning of the ADA.

169.  By virtue of its contract, eQHealth serves as a quasi-public entity within the meaning of the ADA.

170.  The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

171.  Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

172.   Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

173.   As public entities, Defendants are prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

174.   Defendants have discriminated against Plaintiffs and Plaintiff Class members in violation of the ADA on the basis of their disabilities by denying Plaintiffs and Plaintiff Class members medically necessary services in the community as a reasonable accommodation, resulting in Plaintiffs and Plaintiff Class members being at risk of unnecessary institutionalization in nursing facilities.

175.   As a result of the Defendants' ongoing violations, the Plaintiffs and the Plaintiff Class members continue to be harmed.

## COUNT 2
### Section 504 of the Rehabilitation Act
### (ALL DEFENDANTS)

176.   The Plaintiffs repeat the allegations in paragraphs 1 through 164 of the Complaint as if fully set forth herein.

177.   Count 2 is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §. 794(a).

178.   Defendants are directors of agencies that receive federal financial assistance.

179.   The Defendants have discriminated against the Plaintiffs and Plaintiff Class members in violation of Section 504 of the Rehabilitation Act on the basis of their disabilities by denying the Plaintiffs and Plaintiff Class members medically necessary services, as a reasonable accommodation, resulting in the Plaintiffs and Plaintiff Class members being at risk of unnecessary institutionalization in nursing facilities.

180.   As a result of the Defendants' ongoing violations, the Plaintiffs and the Plaintiff Class members continue to be harmed.

A.R. et a., v. DUDEK et al.
COMPLAINT

## COUNT 3
### 42 U.S.C. § 1983 – United States Medicaid Act – EPSDT Violations
### (ALL DEFENDANTS)

181.   The Plaintiffs repeat the allegations in paragraphs 1 through 164 of the Complaint as if fully set forth herein.

182.   Count 3 is a 42 U.S.C. § 1983 claim against the Defendant for violation of Plaintiff's rights under the EPSDT provisions of the United States Medicaid Act, 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); and 42 U.S.C. § 1396d(r).

183.   AHCA's definition of "medical necessity", *see* Rule 59G-1.010(166) (incorporated through the Handbook), is preempted by federal law and is invalid pursuant to the Supremacy Clause of the United States Constitution. *See* U.S. Const. Art VI, § 2.

184.   Defendants' regulations, rules, policies, procedures, customs and practices for providing private duty nursing, below the level that is medically necessary, violate the EPSDT provisions of the federal Medicaid statute at 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); and 42 U.S.C. § 1396d(r). This violation entitles Plaintiffs to relief under 42 U.S.C. § 1983.

185.   As a result of the Defendants' violations, the Plaintiffs and Plaintiff class have been damaged.

## COUNT 4
### 42 U.S.C. § 1983 – United States Medicaid Act – Reasonable Promptness
### (ALL DEFENDANTS)

186.   The Plaintiffs repeat the allegations in paragraphs 1 through 164 of the Complaint as if fully set forth herein.

187.   Count 4 is a claim under 42 U.S.C. § 1983 against the Defendants for violation of Plaintiff's rights under the Reasonable Promptness provision of the United States Medicaid Act, 42 U.S.C. § 1396a(a)(8).

188.   Defendants' regulations, rules, policies, customs, and practices, which limit the provision of medically necessary community-based services and supports, as well as medically necessary specialized services, result in extended delays and outright denials of medically necessary care to the Plaintiffs and members of the Plaintiff class.

A.R. et a., v. DUDEK et al.
COMPLAINT

189.   The residential support, habilitation and other specialized services that Plaintiffs and the Plaintiff Class needs are not provided with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8).

190.   As a result of the Defendants' violations, the Plaintiffs and Plaintiff class have been damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

(1)   Declare that the Defendants violated the Americans With Disabilities Act when they refused to provide medically necessary services, and reasonable accommodations to the Plaintiff and Plaintiff class members, resulting in Plaintiffs and Plaintiff class members being at risk of unnecessary institutionalization in nursing facilities;

(2)   Declare that the Defendants violated Section 504 of the Rehabilitation Act of 1973 when they refused to provide medically necessary services, and reasonable accommodations to the Plaintiff and Plaintiff class members, resulting in the Plaintiffs and the Plaintiff class members being at risk of unnecessary institutionalization in nursing facilities;

(3)   Declare that the Defendants have violated the Medicaid Act: 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C. § 1396d(r); and 42 U.S.C. 1396a(a)(8);

(4)   Order the Defendants to provide private duty nursing services that will allow the Plaintiffs and Plaintiff class members to live in their homes and communities;

(5)   Order the Defendants to cease the practice of denying or reducing Plaintiff and Plaintiff Class members' services at recertification where there has been no change in the medical necessity of such services;

(6)   Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12133; and 29 U.S.C. § 794a; and

(7)   Grant such other and further relief as this court may deem just and proper.

A.R. et a., v. DUDEK et al.
COMPLAINT

Respectfully Submitted on this 13th day of March, 2012,


**Law Offices of Matthew W. Dietz, P.L.**

2990 SW 35th Ave.
Miami, FL 33133
Phone:  (305) 669-2822
Fax:      (305) 442-4181
Email: *Matthewdietz@usdisabilitylaw.com*
Lead Trial Attorney


By: s/ Matthew W. Dietz
      Matthew W. Dietz
      Fla. Bar No. 84905

**The North Florida Center For Equal Justice, Inc.**
2121 Delta Blvd.
Phone: (850) 701-3980
Fax:      (850) 701-3985
Co-counsel


By: s/ Jamie Ito
      Jamie Ito
      Fla. Bar No. 13553
      *jamie@nfcfej.org*
By: s/ Edward J. Grunewald
      Edward J. Grunewald
      Fla. Bar No. 612472
      *egrunewald@nfcfej.org*
By: s/ Jill B. Zaborske
      Jill B. Zaborske
      Fla. Bar No. 621005
      *jill@nfcfej.org*
      Tallahassee, FL 32303

**FSU College of Law Public Interest Law Center**

425 W. Jefferson Street
Tallahassee, FL 32306
Phone: (850) 644-9928
Fax:      (850) 644-0879
Email: *Pannino@law.fsu.edu*
Co-counsel


By:  s/ Paolo G. Annino
      Paolo G. Annino
      Florida Bar No. 0379166