# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# FORT LAUDERDALE DIVISION

Case No. 0:12-cv-60460-CIV-ZLOCH

**T.H.**, by and through her next friend, Paolo
Annino; **A.C.**, by and through his next
friend,  Zurale Cali; **A.R.**, by and through
her next friend, Susan Root; **C.V.**, by and
through his next friends, Michael and
Johnette Wahlquist; **M.D.**, by and through
her next friend, Pamela DeCambra; **C.M.**,
by and through his next friend, Norine
Mitchell; **B.M.**, by and through his next
friend, Kayla Moore; **T.F.**, by and through
his next friend, Michael and Liz Fauerbach;
each individually, and on behalf of all other
children similarly situated in the State of
Florida,

        Plaintiffs,

**v.**

**ELIZABETH DUDEK**, in her official
capacity as Secretary of the Agency for
Health Care Administration; **HARRY
FRANK FARMER, JR.**, in his official
capacity as the state Surgeon General of the
Florida Department of Health; **KRISTINA
WIGGINS**, in her official capacity as
Deputy Secretary of the Florida Department
of Health and Director of Children's
Medical Services, and **eQHEALTH
SOLUTIONS, INC.**, a Louisiana non-
profit corporation,

        Defendants.

_____/

## STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States respectfully submits this Statement of Interest, pursuant to 28 U.S.C.

§ 517,[1] because this litigation implicates the proper interpretation and application of the integration mandate of Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et. seq. See Olmstead v. L.C.*, 527 U.S. 581 (1999). The Attorney General has authority to enforce Title II of the ADA, and pursuant to Congressional mandate, to issue regulations setting forth the forms of discrimination prohibited by Title II. *See* 42 U.S.C § 12134. Accordingly, the United States has a strong interest in the resolution of this matter.

Plaintiffs T.H., A.C., C.V., M.D., C.M., B.F., and T.F., by and through their next friends (collectively, "Plaintiffs"), bring this proposed class action for declaratory and injunctive relief under Title II of the ADA, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §794(a), the Medicaid Act, 42 U.S.C.§ 1396a *et seq.*, and the Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r. (*See* Pls.' Am. Consolidated Compl. ("Compl."), ECF No. 29, ¶¶ 1, 264-99.)[2] Plaintiffs are children, ranging in age from 5 years old to 18 years old, who have been diagnosed as medically fragile[3] and who are qualified for services through the State's Medicaid program, including home and community-based services that allow individuals with disabilities to live at home in the community. (*See* Compl. ¶¶ 3, 9-

---

[1] 28 U.S.C. § 517 permits the Attorney General to send an officer of the Department of Justice to any district in the United States "to attend to the interests of the United States in a suit pending in a court of the United States."

[2] Plaintiffs seek to represent a class of Florida Medicaid recipients under the age of twenty-one who are able to and want to live in the community with appropriate supports and who are currently institutionalized or at risk of institutionalization in nursing facilities. (*See* Compl. ¶ 254.)

[3] A "medically fragile child" is one who is "medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition, is ventilator dependent, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning." Fla. Admin. Code. R. 59G-1.010(165).

13, 109-10, 119, 127, 129, 132, 147, 152, 154, 163, 168, 170, 180, 183, 185, 192, 195, 197, 206, 209, 211, 220, 224).

T.H., a 16-year-old with ongoing medical complications due to experiencing shaken baby syndrome in her infancy, lives at Kidz Corner, a 72-bed children's wing of a 152-bed geriatric nursing facility. (Compl. ¶ 108). T.H. and other members of a proposed class of institutionalized children want to return home to their communities, but allege that they remain unnecessarily segregated in nursing homes because of the State's policies and practices limiting medically necessary services in the community. (*Id*. ¶¶ 6-7). They also allege Defendants have failed to properly administer a federally required screening prior to nursing facility admission, thereby causing them and others similarly situated to be unnecessarily institutionalized. (*Id*. ¶¶ 293-99).

A.C., A.R., C.V., M.D., C.M., B.M. and T.F. live at home with their families and have been prescribed medically necessary services, including private duty nursing services. They wish to remain at home with their families, but allege that Defendants' policies, procedures and practices, including the improper denial or reduction of medically necessary services place them at risk of unnecessary institutionalization. (*See* Compl. ¶¶ 5, 16, 17-20, 125-26, 127,135, 144-45, 147, 153, 160-61, 163, 177-78, 180, 190, 192, 203-04, 206, 217-18, 220, 231-32). Because Plaintiffs' Complaint properly alleges facts supporting each of their claims, the United States respectfully urges this Court to deny the State Defendants' motion to dismiss.[4]

---

[4] The United States solely addresses in this Statement of Interest the State Defendants' motion to dismiss.

## STATUTORY AND REGULATORY BACKGROUND

A.  <u>The Integration Mandate and *Olmstead*</u>

Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  *Id.* § 12101(a)(2).  For these reasons, Congress prohibited discrimination against individuals with disabilities by public entities:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

*Id.* § 12132.

One form of discrimination prohibited by Title II of the ADA is violation of the "integration mandate."  The integration mandate arises out of Congress's explicit findings in the ADA, the Attorney General's regulations implementing Title II,[5] and the Supreme Court's decision in *Olmstead*, 527 U.S. at 587.  In *Olmstead*, the Supreme Court held that public entities are required to provide community-based services to persons with disabilities when (a) such services are appropriate, (b) the affected persons do not oppose community-based treatment, and

---

[5] The regulations provide that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).  The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]"  28 C.F.R. § 35.130(d), App. A at 572 (2010). Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, contains an identical regulation issued by the Attorney General.  28 C.F.R. § 41.51(d).

(c) community-based services can be reasonably accommodated, taking into account the

resources available to the entity and the needs of other persons with disabilities.[6] *Id.* at 607.

The ADA's protections are not limited to those individuals who are currently

institutionalized.  The integration mandate also prohibits public entities from implementing

policies or practices that place individuals at serious risk of unnecessary institutionalization.  *See*

*M.R. v. Dreyfus*, 663 F.3d 1100, 1116 (9th Cir. 2011); *see also Fisher v. Oklahoma Health Care*

*Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (noting that "nothing in the *Olmstead* decision

supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's

integration requirements"); *Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1323-32 (M.D. Fla. 2011)

(denying defendants' motion to dismiss where plaintiff in community sued to prevent

unnecessary institutionalization).

B.  The Early and Periodic Screening, Diagnosis and Treatment Requirements of the
    Medicaid Act

Under the Early and Periodic Screening, Diagnosis and Treatment ("EPSDT")

requirements of the Medicaid Act, states must provide coverage to categorically Medicaid-

eligible individuals under the age of twenty-one for all medically necessary treatment services

described in the Medicaid Act at 42 U.S.C. § 1396d(a), which sets forth a number of services

that may be made available under a State Medicaid Plan.  42 U.S.C. § 1396a(a)(43); 42 U.S.C.

§ 1396d(a)(4); 42 U.S.C. § 1396d(r)(1)-(5).  The treatment to be provided for is defined by 42

U.S.C. § 1396d(r) and includes dental, hearing and vision services and "[s]uch other necessary

---

[6] In all ways relevant to this discussion, the ADA and Section 504 are generally construed to impose similar requirements.  *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316, n.3 (11th Cir. 2009); *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

health care, diagnostic services, treatment, and other measures described in [42 U.S.C. § 1396d(a)]. . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are [otherwise] covered under the State plan."  42 U.S.C. § 1396d(r)(5); 42 C.F.R. § 440.40.  Under § 1396d(r)(5), states must "cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a)," *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 590 (5th Cir. 2004), including private duty nursing services.  *See* 42 U.S.C. § 1396d(a)(8).

A state has discretion to develop a reasonable definition of "medical necessity," but the services provided must be sufficient in amount, duration, and scope to reasonably achieve their desired purpose, including providing treatment "to correct or ameliorate defects and chronic conditions" of EPSDT-eligible children.  42 C.F.R. § 441.50 (describing purpose of EPSDT services); *see Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255, 1261 (11th Cir. 2011). Imposing restrictions on the number of hours of skilled nursing care available to a child that are not based on the needs of that child is inconsistent with the EPSDT provisions of the Medicaid Act.  *See Moore ex rel. Moore v. Cook*, No. 1:07-CV-631-TWT, 2012 WL 1380220, at *10 (N.D. Ga. Apr. 20, 2012) (finding that reduction in nursing care hours provided to a child violated the EPSDT provisions of the Medicaid Act where his condition was not improving, and the reduction was based on a policy and practice to wean care and shift the burden of skilled care to the child's parent); *Royal ex rel. Royal v. Cook*, No. 1:08-CV-2930-TWT, 2012 WL 2326115, at *9 (N.D. Ga. June 19, 2012) (same).  States must ensure that each child receives all the covered services he is identified as needing, consistent with the EPSDT definition of medical necessity in §1396d(r)(5).

6

## FACTUAL BACKGROUND

Plaintiffs in the instant lawsuit are eight medically fragile children currently living in a nursing facility or at home with family. (*See* Compl. ¶ 1).  Defendants are Elizabeth Dudek, the Secretary of the Florida Agency for Health Care Administration ("AHCA"), Harry Frank Farmer, Jr., State Surgeon General and head of the Florida Department of Health ("DOH"), Kristina Wiggins, Deputy Secretary of DOH and Director of Florida Children's Medical Services ("CMS"), and eQHealth, a Louisiana non-profit corporation that contracts with the State of Florida to review determinations that health care services are medically necessary. (*See* Compl. ¶¶ 32-35).

Plaintiff T.H. has traumatic brain injury and medical complications arising from shaken baby syndrome.  (Compl. ¶ 108).  She has been determined to be medically appropriate for, and has previously lived in, the community, but she is currently institutionalized on a children's wing of a large geriatric nursing facility.  (*Id*. ¶¶ 108, 119, 122, 126).  T.H. alleges that her medical foster care family wants to bring her home to them, but that Defendants' policies and practices have denied her sufficient medically necessary services at home such that she has been forced to live in a nursing facility for the past five years.  (*See id*. ¶¶ 119-26).

Like Plaintiff T.H., Plaintiffs A.C., A.R., C.V., M.D., C.M., B.M., and T.F. have medically complex diagnoses, but they currently live in the community with their families or legal guardians.  (Compl. ¶¶ 127, 147, 163, 180, 192, 206, 220).  Each of them alleges they require ongoing medical assistance, including private duty nursing services, which has been prescribed by their physicians.  (*See id.* ¶¶ 14, 137, 155, 171, 186, 198, 212).  Private duty nursing services are "medically-necessary skilled nursing services that may be provided in a

child's home or other authorized settings to support the care required by the child's complex medical conditions."  (*See* Compl. ¶ 15); *see also* Agency for Health Care Administration, <u>Home Health Services Coverage and Limitations Handbook</u>, at 2-17 (2008), incorporated by reference in Rule 59G-4.001, Fla. Admin. Code.

Pursuant to Defendants' policies, every six months, recipients of private duty nursing services must request re-authorization of services, and Defendants review those requests to (1) determine whether the services are medically necessary and otherwise allowable under Medicaid rules and (2) ensure the quality of the services meets professionally recognized standards. (Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 32, at 7).   Florida's definition of "medical necessity" includes the requirement that services must "[b]e furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider."  Fla. Admin. Code R. 59G-1.010(166).   Plaintiffs allege that, through application of this definition, Defendants have established a practice of routinely and improperly denying medically necessary services and that results in shifting to parents and caregivers the burden of providing skilled care, even though these caregivers do not have the ability to provide such care.  (*See* Compl. ¶ 243).

For example, A.R., a 10-year-old child with traumatic brain injury who lives at home with her mother and two siblings, alleges that she has had her requests for prescribed medically necessary services denied, and her services thereby reduced, during at least four reviews since 2010.  (Compl. ¶ 157).  These reductions have allegedly occurred without any change in A.R.'s medical condition and were not based on A.R.'s individual needs, or a reasonable determination of medical necessity.  (Compl. ¶ 159).   A.R. alleges that without sufficient medically necessary services, her family will no longer be able to care for her at home, and she will be forced to enter

a nursing home.  (Compl. ¶¶ 160-61).

The other named plaintiffs living at home allege that they have similarly faced reductions in medically necessary services at least one or more times, despite the lack of any improvement in their medical condition or increase in their caregivers' ability to provide care.  (*See* Compl. ¶¶ 127, 137-43, 147, 156-59, 163, 172-76, 180, 187-90, 192, 199-202, 206, 213-16, 220, 227-30).   They allege that they are thereby denied medically necessary services mandated under the EPSDT provisions of the Medicaid Act and placed at risk of unnecessary isolation in a nursing facility.  (*See id*. ¶¶ 144-45, 160-61, 177-78, 190, 203-04, 218, 231-32, 242-43).

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   The Court must take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiffs.  *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010) (citing *Rivell v. Private Health Care Sys., Inc.,* 520 F.3d 1308, 1309 (11th Cir. 2008)).   The Complaint must provide factual allegations that are "enough to raise a right to relief above the speculative level."  *Edwards*, 602 F.3d at 1291 (quoting *Rivell*, 520 F.3d at 1309 (internal citations omitted)).   The Complaint surpasses this threshold analysis as to each of Plaintiffs' claims.

A.   The Complaint Properly States A Claim Under Title II of the ADA and Section 504

Defendants argue that Plaintiffs have failed to state a claim that they are at risk of unnecessary institutionalization in violation of the ADA and Section 504 because they have

failed to identify "some kind of policy or financial barrier that makes services available in institutions, but not in the community." (Defs.' Mot. at 10). Contrary to Defendants' assertion, Plaintiffs have more than adequately identified a State policy that places them at risk of unnecessary institutionalization in violation of the ADA. They allege that the State has implemented and applied a medical necessity standard that deprives them of sufficient medically necessary services in the community, such that they are at serious risk of entering a nursing facility to obtain the services they need. (Compl. ¶ 7, 12-13, 285-86). Numerous courts have found a violation of the ADA's integration mandate where a state has offered services to Medicaid recipients in the community and in institutions, but has restricted services in the community to such an extent that it has placed persons at risk of unnecessary institutionalization.

In *Royal ex rel. Royal v. Cook*, No. 1:08-CV-2930-TWT, 2012 WL 2326115, at *10, (N.D. Ga. June 19, 2012), for example, a child with a medically complex condition sued the Georgia Medicaid agency, alleging that its reduction of in-home nursing services, which had been prescribed by his physician, placed him at risk of institutionalization in violation of the ADA. *See id.* at *1, *8-9. After receiving 84 hours of in-home nursing care per week for more than seven years, the child received notice from the agency informing him that his approved hours of in-home nursing had been reduced to 70 hours per week. *See id.* at *1. The notice stated, in part, "skilled nursing care services will be reduced when the medical condition of the member stabilizes *to give more of the responsibility of the care of the [recipient] to the parent(s) and or caregiver(s).*" *Id*. at *2 (emphasis added). After an evidentiary hearing, the court found the reduction of in-home nursing care would "deprive [the child] of essential services necessary to maintain his life and health[,]" and found that the child's caregiver would have to retire or quit

10

his job to meet the deficit in skilled care caused by the reduction.  *Id.* at \*7.  The court held that the state agency had violated the ADA, and enjoined the agency from implementing the reduction, finding that the reduction was unreasonable in light of the skill and availability of the caregiver and that it would place the child "at high risk of premature entry into institutional isolation."  *Id.* at \*9.

Here, Plaintiffs' claims are virtually identical—their physicians have prescribed an amount of in-home nursing services determined to be medically necessary, but the State has allegedly implemented a policy to reduce those services, not based on medically necessity, but based on an effort to shift care to plaintiffs' families.  (*See* Compl. ¶¶ 17-19, 144-45, 158-61, 173-78, 188-90, 200-04, 214-18, 228-32).   Plaintiffs allege that the attempted reductions are the product of a flawed policy and would result in the reduction of authorized hours to a level that does not accurately reflect the amount of care that their caregivers are able to safely supply.  (*See id.*)  They allege that these threatened reductions put them at serious risk of placement in a nursing facility in order to meet their care needs.  (*See* Compl. ¶¶ 264-74); *see also Hunter ex rel. Lynah v. Cook*, No. 1:08-CV-2930-TWT, 2011 WL 45000009, at \*5 (N.D. Ga. Sept. 27, 2011) (granting plaintiffs' motion to amend complaint to add ADA claim alleging plaintiffs "will be forced into institutional nursing facilities if they are denied the in-home duty nursing services requested by their physicians").

Similarly, in *Cruz v. Dudek*, this Court granted a preliminary injunction requiring AHCA to provide plaintiff Medicaid recipients sufficient home-based services to prevent their institutionalization where they had shown that they were at risk of institutionalization while receiving limited home-based services offered by the agency.  *See Cruz v. Dudek*, No. 10-23048-

11

CIV, 2010 WL 4284955, at *1 (S.D. Fla. Oct. 12, 2010), *adopted by* Order Adopting

Magistrate's Report & Recommendations, *Cruz v. Dudek*, No. 10-23048-CIV, ECF No. 57, at 2-

3 (S.D. Fla. Nov. 24, 2010).  The services they sought—assistance  from skilled and unskilled

personnel with their activities of daily living—were available through the State's Medicaid

program both in-home and in a nursing facility setting.  *See id*.  But the State's administration of

the home-based care program denied them access to a sufficient amount of personnel hours to

meet their needs, placing them at risk of institutionalization to receive the care they needed.  *See*

*id.; accord Haddad v. Dudek*, 784 F. Supp. 2d 1308, 1317 (M.D. Fla. 2011) (denying motion to

dismiss where plaintiff Medicaid recipient "alleged that denial of Medicaid funding for the

community-based services . . . [and] requirement conditioning receipt of [such] services on her

entering a nursing home for sixty days against her will, constitute unlawful discrimination in

violation of the ADA and the Rehab Act").

　　　Here, as in *Cruz* and *Haddad*, although the *type* of services Plaintiffs seek is available

both within and outside of institutional settings, including up to 24-hour nursing care,

Defendants' policies and practices effectively deny Plaintiffs access to services to the extent

necessary to meet their needs unless the services are provided in an institutional setting.  (*See*

Compl. ¶¶ 17-19, 144-45, 158-61, 173-78, 188-90, 200-04, 214-18, 228-32).[7]  The Complaint

---

[7] Defendants' assertion that Plaintiffs have not stated a claim for relief under the ADA or
Rehabilitation Act because the ADA does not require the State to provide transition or
replacement services, or to maintain a certain "level of services" is equally without merit.  (*See*
Defs.' Mot. at 9-10).  While the ADA does not mandate what specific services or level of
services a state must offer, it does require states to refrain from adopting policies or engaging in
practices that discriminate with respect to the services it actually provides.  *See Haddad*, 784 F.
Supp. 2d, 1284, 1301 (M.D. Fla. 2010) (holding that "[t]he ADA does not require states to
provide a level of care or specific services, but once states choose to provide certain services,
they must do so in a nondiscriminatory fashion") (citing *Olmstead* 527 U.S. at 603, n.14).

pleads ample facts alleging that Defendants' policies and actions threaten to reduce, or have resulted in the reduction of, community-based services in a manner that renders the services insufficient to sustain Plaintiffs in the community.  (*See id.*).

For the same reasons, this Court should reject Defendants' argument that the ADA is "not the appropriate vehicle for challenging the prudential judgment of medical practitioners." (Defs.' Mot. at 11)  Plaintiffs' Complaint does not seek to challenge any individual physician's determination of whether a service is medically necessary.  Rather, Plaintiffs challenge the State's policy and practice of denying medically necessary services based on a definition of medical necessity that causes discrimination by placing them at-risk of institutionalization.  (*See* Compl. ¶¶ 138, 141, 157-59, 173-76, 188-89, 200-02, 214-16, 228-30, 243).

B.  <u>The Complaint States Valid Medicaid Act Claims</u>

Plaintiffs have alleged that, through Defendants' unreasonable application of the State's definition of medical necessity, Defendants violate the EPSDT provisions of the Medicaid Act by failing to ensure the availability of medically necessary services and "shift[ing] the burden for providing skilled nursing services to [] parents or caregivers . . . who are not skilled nurses." (Compl. ¶ 243(c)).  The Complaint alleges that Defendants have denied authorization, sometimes repeatedly over several years, for the number of hours of in-home nursing services prescribed by Plaintiffs' physicians.  (Compl. ¶¶ 157-59, 173-76, 188-89, 200-02, 214-16, 228-30).  It further alleges that these denials are neither based on Plaintiffs' medical needs nor the ability of their caregivers to supplement necessary care in the absence of medically prescribed services. (Compl. ¶¶ 156, 172, 187, 199, 213, 227, 243(c)).

13

Defendants assert that their practice of reducing hours to shift care to Plaintiffs' caregivers is in keeping with a rule promulgated by the federal Centers for Medicare and Medicaid Services ("federal CMS") that restricts the categories of individuals eligible to receive payment for providing personal care services.  (Defs.' Mot. at 15) (citing *Medicaid Program; Coverage of Personal Care Services*, 62 Fed. Reg. 47896-01, 47897 (Sept. 11, 1997)).  The rule provides that parents and other legally responsible individuals are not eligible to receive financial reimbursement for providing personal care services to their children because they are "inherently responsible" for providing such care.  *See* 62 Fed. Reg. at 47899.  That rule has nothing to do with the facts at issue here.  Plaintiffs' parents and caregivers do not seek financial reimbursement for the natural supports they provide to their children.  They seek coverage for medically necessary services for their children.  Defendants cite no authority for the proposition that they can shift the burden of providing medically necessary services, mandated under the EPSDT provisions of the Medicaid Act, to parents and caregivers.  Indeed there is none.  Although a state may take into consideration natural supports provided to a Medicaid recipient, it may not compel such supports or require parents or caregivers to become skilled care providers. *Cf. Medicaid Program; Community First Choice Option*, 77 Fed. Reg. 26828-01, 26856-57 (CMS final rule regarding implementation of state plan home and community-based attendant services, noting that CMS "expect[s] that identification of [] natural, unpaid supports be taken into consideration with the purpose of understanding the level of support an individual has, and should not be used to reduce the level of services provided to an individual unless these unpaid supports are provided voluntarily to the individual").

14

Plaintiffs have thus stated a valid claim that Defendants have violated the EPSDT provisions of the Medicaid Act by unreasonably applying their definition of medical necessity. *See Moore*, 637 F.3d at 1258 (remanding case to district court for determination of whether "limits the state imposed on [plaintiff's] physician's discretion in reducing her hours from 94 to 84 hours a week are not reasonable").  The court in *Royal*, discussed *supra*, at 10-11, found that Georgia violated the EPSDT provisions of the Medicaid Act by reducing nursing hours prescribed by the treating physician of a child who was medically complex where it found that "the real reason [for the reduction] was not due to an individualized determination of medical necessity, but due to [defendant's] policy and practice . . . to wean nursing care and to shift more of the burden of skilled care to his parent caregiver over time."  *Royal*, 2012 WL 2326115, at *9. The Court found the application of that policy unreasonable, because the child's "condition was not improving and his father's competency to provide skilled care had not increased."  *Id.*; *see also Moore ex rel. Moore v. Cook*, 2012 WL 1380220, at *10 ("I am convinced that the real reason for reducing [plaintiff's] nursing care hours was an unreasonable application of the [defendant's] policy to wean nursing care and shift more of the burden to her caregiver").

Like the plaintiffs in *Royal* and *Moore*, Plaintiffs have alleged that their caregivers are unable to safely perform many of the tasks provided by private duty nursing, either due to the caregiver's lack of skill, or unavailability due to responsibility for other members of the family or employment outside the home. (Compl. ¶¶ 153, 169, 184, 196, 210, 225, 243(c)).  Despite the limitations of their caregivers, and lack of changes in their medical needs, they allege that they have still been subject to repeated attempts by the State to reduce the number of hours authorized from that prescribed by their physicians as medically necessary.  (Compl. ¶¶ 137-41, 156-59,

172-75, 187-89, 199-201, 213-15, 227-30).   For this reason, the Court should deny Defendants'

motion to dismiss Plaintiffs' EPSDT claims.[8]   *See Moore*, 637 F.3d at 1259 ("When a state

Medicaid agency has exceeded the bounds of its authority by adopting an unreasonable

definition of medical necessity or by failing to ensure that a required service is 'sufficient in

amount, duration, and scope to reasonably achieve its purpose,' aggrieved Medicaid recipients

have recourse in the courts.").

Plaintiffs have also stated a valid claim for violation of the "reasonable promptness"

provision of the Medicaid Act, which requires that Medicaid-eligible individuals receive medical

assistance with reasonable promptness.   *See* 42 U.S.C. § 1396a(a)(8).   Defendants argue that a

"reasonable promptness" claim is available only where there has been an outright denial of all

services or extended delay in the provision of medically necessary services.   (Defs.' Mot. at 16).

State Medicaid programs must, however, provide all medically necessary services with

reasonable promptness.   *Boulet v. Cellucci*, 107 F. Supp. 2d 61, 79 (D. Mass. 2000) (holding that

medical assistance must correspond to the individual's needs and the requirement of reasonable

promptness is "not satisfied by other services the plaintiffs are receiving or might be offered").

---

[8] Defendants suggest that Plaintiffs' claims in this Court are improper because of the existence of
the Medicaid Fair Hearing process in Florida.  But Plaintiffs are not required to exhaust available
administrative remedies before filing suit under Title II of the ADA or under 42 U.S.C. § 1983
for violation of the Medicaid Act.  *See Bledsoe v. Palm Beach County Soil and Water
Conservation Dist.*, 133 F.3d 816, 823-24 (11th Cir. 1998); 28 C.F.R. Part 35, App. B (2011), at
685 ("Because [Title II] does not require exhaustion of administrative remedies, the complainant
may elect to proceed with a private suit at any time."); *Alacare, Inc.-North v. Baggiano*, 785 F.2d
963, 968 (11th Cir. 1986) (finding no requirement to exhaust administrative remedies prior to
filing suit under 42 U.S.C. § 1983 for violation of the Medicaid Act); *Moore ex rel. Moore v.
Medows*, No. 1:07-CV-631-TWT, 2007 WL 1876017, at *4 (N.D. Ga. June 28, 2007).
Moreover, the Plaintiffs allege that, despite repeated denials and successful appeals, the State has
persisted in applying its medical necessity definition unreasonably, leaving caregivers less able
to provide care while they are forced to proceed through reconsideration and appeals processes.

The provision of some services does not relieve Defendants of their duty to provide all medically necessary services with reasonable promptness.  *See id.*; *Rosie D. v. Romney*, 410 F. Supp. 2d 18, 27-28 (D. Mass. 2006) (finding that a violation of the requirement of reasonable promptness may occur where plaintiffs are denied access to services that correspond with their needs). Accordingly, the Court should deny Defendants' motion to dismiss Plaintiffs' EPSDT claims.

C.   Defendants Misstate the Requirements of the Nursing Home Reform Amendments to the Medicaid Act

Defendants assert that the facts alleged by Plaintiffs do not give rise to a violation of the Pre-Admission Screening and Resident Review ("PASRR") provisions of the Nursing Home Reform Amendments to the Medicaid Act.  PASRR requires state authorities to screen all individuals slated for admission to a nursing facility for mental illness or developmental disabilities, in order to prevent the admission of persons whose needs could be met in the community.  *See* 42 U.S.C. § 1396r(e)(7).  If a person seeking admission to a nursing facility is identified as having an intellectual or developmental disability or mental illness during what is known as a Level I Review, the individual must be assessed to determine, *inter alia*, whether "the individual's total needs are such that his or her needs can be met in an appropriate community setting."  42 C.F.R. § 483.132(a)(1).  The person must also be assessed to determine "[i]f specialized services are recommended," and if so, to "identif[y] the specific . . . services required to meet the evaluated individual's needs." 42 C.F.R. § 483.128(i)(5); *see also* 42 C.F.R. § 483.136.  This evaluation is referred to as the Level II PASRR review.  42 C.F.R. § 483.128(a). The Medicaid Act further requires that an individual must be promptly re-evaluated to determine whether her needs can be met in the community when there has been a significant change in physical or mental condition.  42 U.S.C. § 1396r(e)(7)(B)(iii).

17

Defendants assert that they need not conduct a Level II PASSR evaluation of children who, like T.H., are ventilator dependent. Defendants are incorrect. The PASRR regulations enable states to expedite the admission of certain categories of individuals to nursing care by providing for advance categorical determinations. *See* 42 C.F.R. § 483.130(c). Included among the categories a state may use for advance determinations are those individuals who are identified, using sufficient current and accurate data, as having

> [s]evere physical illnesses such as coma, ventilator dependence, functioning at a brain stem level, or diagnoses such as chronic obstructive pulmonary disease, Parkinson's disease, Huntington's disease, amyotrophic lateral sclerosis, and congestive heart failure *which result in a level of impairment so severe that the individual could not be expected to benefit from specialized services.*

42 C.F.R. § 483.130(d)(3) (emphasis added); *see also* 42 C.F.R. § 483.132 (describing data to be relied on in making determination). The single fact that a child is ventilator dependent, however, does not permit a state to bypass or abbreviate the PASRR process. Instead, there must be a determination, based on current and accurate medical information, that an individual has "a level of impairment so severe that the individual could not be expected to benefit from specialized services."[9] Defendants do not suggest that such a determination was ever made with respect to T.H. or similarly situated proposed class members.

T.H. alleges a clear violation of PASRR. She has pled ample facts alleging that she lived in a community setting with medical foster parents for many years, and desires to and would benefit from return to that setting with appropriate services and supports. (*See* Compl. ¶¶ 116,

---

[9] Even where an individual meets the criteria for an advance categorical determination, she must still receive an abbreviated Level II evaluation. The categorical determinations are not exemptions from PASRR, nor can they be used inappropriately to avoid screenings. *See Medicare and Medicaid Programs; Preadmission Screening and Annual Resident Review*, 57 Fed. Reg. 56450-01, *56489-90 (Nov. 30, 1992).

18

125, 236).   These allegations do not suggest that her diagnosis has resulted "in a level of

impairment so severe that the [she] could not be expected to benefit from specialized services."

Nor do Defendants offer any evidence that they have made this individualized determination.

T.H. alleges, however, that she has neither been considered for placement in the community, nor

assessed for necessary specialized services, under a PASRR Level II evaluation since she entered

the nursing facility.  (*See* Compl. ¶¶ 111-12).   Defendants merely assert that Plaintiff T.H.'s

status as ventilator dependent permits Defendants to bypass their ongoing responsibility under

federal law to determine individually and specifically the appropriateness of nursing facility

services.  (*See* Defs.' Mot. at 18-19).  This is incorrect.  *Cf. Joseph S. v. Hogan*, 561 F. Supp. 2d

280, 305 (E.D.N.Y. 2008) (holding plaintiffs pled PASRR claim sufficiently where complaint

stated that defendants failed, *inter alia*, to "to conduct resident reviews when notified by the

nursing homes of significant changes in an individual's condition, . . . to ensure that an

appropriate evaluation is made as part of the resident review process, . . . [and] to provide

plaintiffs with copies of their evaluations and PASRR determinations") (internal citations

omitted).

Defendants also argue that Plaintiffs have not set forth sufficient factual allegations in

support of their claim that the PASRR program does not adequately assess "whether a child with

mental illness or mental retardation needs any specialized habilitative services."  (Defs.' Mot. at

20).  But Plaintiffs specifically allege that T.H. and A.C., as well as others similarly situated, did

not receive Level II evaluations to determine whether they need specialized services.  (*See*

Compl. ¶¶ 112, 131, 296, 298).  Moreover, Defendants themselves admit that they do no Level II

assessment of children like T.H. and A.C., who are ventilator dependent, to identify the

specialized services that they need.  (*See* Defs.' Mot. at 18, 20).  Thus, they cannot seriously

dispute that Plaintiffs have sufficiently alleged they received no adequate or appropriate PASRR

assessment.

Defendants further argue that there are no factual allegations in the complaint that would

support a reasonable inference that the private duty nursing, speech therapy and physical therapy

services identified by Plaintiffs are "directed toward the 'acquisition of the behaviors necessary

for the client to function with as much self-determination and independence as possible.'"

(Defs.' Mot. at 20 (citing 42 C.F.R. §§ 483.120(a)(2); 483.440(a)(i)).  Defendants improperly

shift the burden of identifying specialized services to the children in nursing homes.  Pursuant to

their obligations under PASRR, however, it is the Defendants' responsibility to conduct an

evaluation to identify "the specific . . . services required to meet the evaluated individual's

needs."  42 C.F.R. § 483.128(i)(5).  They admit they have not done so, and Plaintiffs therefore

state a valid claim for violation of the PASRR requirements of the Nursing Home Reform Act.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny

Defendants' Motion to Dismiss.  The United States additionally requests that, should the Court

hear oral argument on Defendants' Motion, the United States be permitted to participate.


Dated June 28, 2012                                  Respectfully submitted,


WILFREDO A. FERRER                       THOMAS E. PEREZ
United States Attorney                          Assistant Attorney General
Southern District of Florida

20

EVE HILL
Senior Counselor to the Assistant Attorney General

ALISON BARKOFF
Special Counsel for Olmstead Enforcement
Civil Rights Division

/s/ *Veronica Harrell-James*
VERONICA HARRELL-JAMES
Assistant United States Attorney
99 N.E. 4th Street
Miami, FL 33132
Telephone:     (305) 961-9327
Facsimile:     (305) 530-7139
Veronica.Harrell-James@usdoj.gov

/s/ *Travis England*
GREGORY B. FRIEL
Acting Chief
SHEILA S. FORAN
Special Legal Counsel
ANNE S. RAISH
Deputy Chief
TRAVIS W. ENGLAND, Bar ID A5501768
BETH A. ESPOSITO, Bar ID A5501719
JOY LEVIN WELAN, Bar ID A5501767
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone:     (202) 307-0663
Facsimile:     (202) 307-1197
Travis.England@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 28, 2012, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the a true and correct copy of the foregoing document was served on June 28, 2012 on all counsel of record or parties identified on the Service List below in the manner specified below, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/ Travis W. England*
Travis W. England

**SERVICE LIST**

| | |
|---|---|
| Edward J. Grunewald<br>The North Florida Center for Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32306<br>Phone: 850-701-3980<br>Fax: 850-701-3985<br>Email: egrunewald@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF | Jamie Ito<br>The North Florida Center for Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32306<br>Phone: 850-701-3980<br>Fax: 850-701-3895<br>Email: jamie@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF |
| Jill B. Zaborske<br>The North Florida Center For Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32303<br>Phone: 850-701-3980<br>Fax: 850-701-3985<br>Email: jill@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF | Paolo G. Annino<br>FSU College of Law Public Interest Law Center<br>425 W. Jefferson Street<br>Tallahassee , FL  32306<br>Phone: 850-644-9928<br>Fax: 850-644-0879<br>Email: pannino@law.fsu.edu<br>Attorney for Plaintiffs<br>Service by CM/ECF |
| Matthew W. Dietz<br>2990 SW 35th Avenue<br>Miami, FL  33133<br>Phone: 305-669-2822<br>Fax: 305-442-4181<br>Email: matthewdietz@usdisabilitylaw.com<br>Attorney for Plaintiffs<br>Service by CM/ECF | Andrew T. Sheeran<br>Agency for Health Care Administration<br>Office of the General Counsel<br>2727 Mahan Drive, Building 3, MS #3<br>Tallahassee, FL  32308<br>Phone: 850-412-3630<br>Fax: 850-921-0158<br>Email: Andrew.Sheeran@ahca.myflorida.com<br>Attorney for Defendant Dudek<br>Service by CM/ECF |
| Beverly H. Smith<br>Agency for Health Care Administration<br>2727 Mahan Drive, MS 3<br>Tallahassee, FL  32308<br>Phone: 850-412-3630<br>Fax: 850-921-0158<br>Email: Beverly.Smith@ahca.myflorida.com<br>Attorney for Defendant Dudek<br>Service by CM/ECF | Stuart Fraser Williams<br>Agency for Health Care Administration<br>2727 Mahan Drive, Mail Stop 3<br>Tallahassee, FL  32308<br>Phone: 850-412-3630<br>Fax: 850-921-0158<br>Email: Stuart.Williams@ahca.myflorida.com<br> Attorney for Defendants Dudek, Farmer, and<br>   Wiggins<br>Service by CM/ECF |

| | |
|---|---|
| Nicholas William Romanello<br>Conrad & Scherer<br>633 S. Federal Highway, 8th Floor<br>PO Box 14723<br>Fort Lauderdale, FL  33302-4723<br>Phone: 954-462-5500<br>Fax: 954-463-9244<br>Attorney for Defendants Farmer and Wiggins<br>**Service by U.S. Mail** | Harry Osborne Thomas<br>Radey Thomas Yon & Clark<br>301 S. Bronough Street, Suite 200<br>PO Box 10967<br>Tallahassee, FL  32302<br>Phone: 850-425-6654<br>Fax: 850-425-6694<br>Email: Hthomas@radeylaw.com<br>Attorney for Defendant eQHealth Solutions, Inc.<br>Service by CM/ECF |
| Lisa Scoles<br>Radey Thomas Yon & Clark, P.A.<br>301 S. Bronough Street, Suite 200<br>Tallahassee, FL  32301<br>Phone: 850-425-6654<br>Fax: 850-425-6694<br>Email: lscoles@radeylaw.com<br>Attorney for Defendant eQHealth Solutions, Inc.<br>Service by CM/ECF | |