## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

### CASE NO. 12-60460-CIV-ROSENBAUM

**T.H.,** by and through her next friend, Paolo
Annino; **L.J.,** by and through his next
friend, Paolo Annino; **A.G.,** by and through
his next friend Gamal Gasser; **A.C.,** by and
through his next friend Zurale Cali; **A.R.,** by
and through her next friend, Susan Root;
**C.V.**, by and through his next friends,
Michael and Johnette Wahlquist; **M.D**.,
by and through her next friend, Pamela
DeCambra; **C.M.,** by and through his next
friend, Norine Mitchell; **B.M.,** by and
through his next friend, Kayla Moore; and
**T.F.,** by and through his next friend,
Michael and Liz Fauerbach; each
individually, and on behalf of all other
children similarly situated in the State of
Florida,

     Plaintiffs,

**v.**

**ELIZABETH DUDEK**, in her official
capacity as Secretary of the Agency for
Health Care Administration; **HARRY
FRANK FARMER, JR.**, in his official
capacity as the State Surgeon General and
Secretary of the Florida Department of
Health; **KRISTINA WIGGINS**, in her
official capacity as Deputy Secretary of the
Florida Department of Health and Director
of Children's Medical Services; and
**eQHEALTH SOLUTIONS, INC.**, a
Louisiana non-profit corporation,

    Defendants.

_____/

**SECOND AMENDED
CONSOLIDATED COMPLAINT -
CLASS ACTION FOR
DECLARATORY AND INJUNCTIVE
RELIEF**

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

Plaintiffs, T.H., L.J., A.G., A.C., A.R., C.V., M.D., C.M., B.M., and T.F. by and through their respective next friends, on behalf of themselves and all other children similarly situated in the State of Florida, sue the Defendants, ELIZABETH DUDEK ("DUDEK"), in her official capacity as Secretary for the Agency for Health Care Administration ("AHCA"); HARRY FRANK FARMER, JR. ("FARMER"), in his official capacity as the State Surgeon General and Secretary of the Florida Department of Health ("FDOH"); KRISTINA WIGGINS ("WIGGINS"), in her official capacity as Deputy Secretary of the FDOH and Director of Children's Medical Services ("CMS"); and eQHEALTH SOLUTIONS, INC. ("eQHealth"), and allege as follows:

## PRELIMINARY STATEMENT

1.    T.H., L.J., A.G., A.C., A.R., C.V., M.D., C.M., B.M., T.F., and Plaintiff Class members are medically fragile children or children who need skilled care services. Many are on tracheotomies, gastrostomy tubes and ventilators.

2.    A Medically Fragile Child is one who is

medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition (TPN), is ventilator dependant, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning.

Rule 59G-1.010(165), Fla. Admin. Code.

3.    A Child who needs Skilled Care Services is one who is

classified as requiring skilled nursing or skilled rehabilitative services in the community or in a nursing facility, [who is] 1.  Ordered by and remain under the supervision of a physician; 2.  Sufficiently medically complex to require supervision, assessment, planning, or intervention by a registered nurse; 3. Required to be performed by, or under the direct supervision of, a registered nurse or other health care professionals for safe and effective performance; 4.  Required on a daily basis; 5.  Reasonable and necessary to the treatment of a specific documented illness or injury; and 6.  Consistent with the nature and severity of the individual's condition or the disease state or stage.

Rule 56G-4.290(3), Fla. Admin. Code.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

**Institutionalized Plaintiffs and Sub-Class**

4.  T.H., L.J., A.G., and members of the sub-class of institutionalized Plaintiffs are children who have been placed in nursing facilities.

5.  As of the date of the filing of this Complaint, there are approximately 250 children Medicaid recipients in Florida nursing facilities.

6.  T.H., L.J., A.G., and members of the sub-class of institutionalized Plaintiffs want to return home and to their communities.

7.  T.H., L.J., A.G., and members of the sub-class of institutionalized Plaintiffs are unnecessarily institutionalized and segregated in nursing facilities because of the Defendants' decision to exclude them from any meaningful access to Florida's system of community-based services and supports that they need to be able to reside in the community.

8.  Due to the Defendants' failure to provide medically necessary services in the community, T.H., L.J. and A.G., and members of the sub-class of institutionalized Plaintiffs are forced to be unnecessarily institutionalized in nursing facilities in order to receive medically necessary services.

9.  The Defendants have failed and continue to fail to provide specialized services to T.H., L.J., A.G., and members of the sub-class of institutionalized Plaintiffs, to which they are entitled to receive in nursing facilities.

**At-Risk Plaintiffs and Sub-Class**

10. A.C., A.R., C.V., M.D., C.M., B.M., T.F., and members of the at-risk sub-class live at home. They are members of families and communities.

11. As of the date of this Complaint, there are approximately 3,300 child Medicaid recipients of private duty nursing at risk of being placed in Florida nursing homes.

12. A.C., A.R., C.V., M.D., C.M., B.M., T.F., and members of the at-risk sub-class are being taken care of by loving and caring parents.

13. A.C., A.R., C.V., M.D., C.M., B.M., T.F., and members of the at-risk sub-class need ongoing medical help, including private duty nursing services, to survive at home and to participate in a family and community.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

14.  Due to the Defendants' failure to provide those medically necessary services, A.C., A.R., C.V., M.D., C.M., B.M., T.F., and members of the at-risk sub-class are at risk of unnecessary institutionalization in nursing facilities.

**All Plaintiffs and Plaintiff Class Members**

15.  Plaintiffs and Plaintiff Class members have been prescribed medical services by their primary care physicians, including private duty nursing care services, funded by Medicaid and administered by the Defendants, that would allow them to live and continue to live at home and in their communities.

16.  Private duty nursing services are "medically-necessary skilled nursing services that may be provided in a child's home or other authorized settings to support the care required by the child's complex medical condition." Agency for Health Care Administration, Home Health Services Coverage and Limitations Handbook, December 2011, at 2-17, incorporated by reference in Rule 59G-4.130, Fla. Admin. Code. (Hereinafter *Handbook*).

17.  Plaintiffs and Plaintiff Class members are qualified for the Defendants' system of community-based services and supports for individuals with mental retardation and mental illnesses. Each of the Plaintiffs and Plaintiff Class members is able to, and want to reside in an integrated, community-based placement, such as a family home, or a medical foster home.

18.  The Defendants are denying Plaintiffs and Plaintiff Class members the Medicaid services, including private duty nursing services, that they need to live and continue to live at home and in their communities

19.  Defendants have adopted uniform policies, practices, and regulations to reduce private duty nursing services.

20.  The Defendants have failed and continue to fail to provide medically necessary services in home and community settings to Medicaid recipient children in Florida.

21.  The Plaintiffs and Plaintiff Class members seek a declaration that the Defendants' policies, regulations, actions and omissions are unnecessarily institutionalizing Plaintiffs and Plaintiff Class Members or placing Plaintiffs at risk of being placed in segregated facilities, in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

("Section 504"); Medicaid Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"); The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r ("NHRA");  Early and Periodic Screening, Diagnostic, and Treatment Services, 42 U.S.C. § 1396d(r) ("EPSDT Provisions"); and 42 U.S.C. § 1983.

22.    The Plaintiffs and Plaintiff Class members seek for the court to enter a permanent injunction requiring the Defendants to stop segregating medically fragile and medically complex children in nursing facilities and to provide these children medically necessary Medicaid services in the most integrated setting appropriate in the community and to provide for their medically necessary services and to provide such services in the most integrated setting appropriate.

## JURISDICTION AND VENUE

23.    The Plaintiffs' and Plaintiff Class members' claims arise under the laws of the United States. This court has jurisdiction over the claims pursuant to 28 U.S.C. §§ 1331 and 1343(a).

24.    Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the district.

## PARTIES

### Named Plaintiffs – Institutionalized Sub-Class

25.    T.H. is a medically fragile 16-year-old child who has medical complications resulting from shaken baby syndrome. T.H. is institutionalized at Kidz Corner, a 72 bed children's wing of a 152 bed geriatric nursing facility called Plantation Nursing and Rehab Center in Plantation, Florida ("Kidz Corner"). T.H. is represented by her next friend, Paolo Annino, an Attorney ad litem appointed by the Seventeenth Judicial Circuit Court of the State of Florida, who resides in Tallahassee, Florida.

26.    L.J. is a medically fragile 15-year-old child primarily diagnosed with infantile cerebral palsy and anoxic brain damage.  L.J. is institutionalized at Children's Center a 34 bed children's wing of Sabal Palms Health Care Center, a 233 bed geriatric nursing facility in Largo, Florida ("Sabal Palms"). L.J. is represented by his next friend, Paolo Annino, an Attorney ad litem appointed by the Tenth Judicial Circuit Court of the State of Florida, who resides in Tallahassee, Florida.

27.   A.G. is a 17-year-old child who requires Skilled Care Services as a result of a motor vehicle accident and a resulting traumatic brain injury when he was 15.  He currently is able to speak but is dependent on a g-tube to meet his nutritional needs.  Notwithstanding his abilities and improvement of his condition since recovering from his coma, A.G. is institutionalized at Lakeshore Villas Nursing Home in Tampa, Florida ("Lakeshore"). A.G. is represented by his next friend and father, Gamal Gasser, who resides in Tampa, Florida.

### Named Plaintiffs – At-Risk Sub-Class

28.   Plaintiff A.C. is a medically fragile five-year-old child who has medical complications resulting from a near drowning accident. A.C. lives with his next friend and mother, Zurale Cali, in Spring Hill, Florida.

29.   A.R. is a medically fragile 10-year-old child Medicaid recipient of private duty nursing services diagnosed with traumatic brain injury. A.R. lives with her next friend and mother, Susan Root, and her brother and sister, in Edgewater, Florida.

30.   C.V. is a medically fragile eight-year-old child Medicaid recipient of private duty nursing services diagnosed with Hurler Syndrome.  C.V. lives with his next friends and legal guardians, Michael and Johnette Wahlquist, and their children, in Bristol, Florida.

31.   M.D. is a medically fragile 14-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and Strider Syndrome.   M.D. lives with her next friend and mother, Pamela DeCambra, and her brother, in Tallahassee, Florida.

32.   C.M. is a medically fragile four-year-old child Medicaid recipient of private duty nursing services diagnosed with chromosome deletion syndrome, chronic respiratory failure and severe cerebral palsy. C.M. lives with his next friend and mother, Norine Mitchell, and his father in Tallahassee, Florida.

33.   B.M. is a medically fragile five-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and developmental delay.  B.M. lives with his next friend and mother, Kayla Moore, and his father in Fountain, Florida.

34.   T.F. is a medically fragile 18-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy, mental retardation, and chronic lung disease. T.F. lives with his next friends and legal guardians, Michael and Liz Fauerbach, and his sister, in Miami, Florida.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

**Defendants**

35.   DUDEK is the Secretary of AHCA, which is the single state agency responsible for administering the Medicaid program under Title XIX of the Social Security Act and for ensuring that the Medicaid program complies with federal law. *See* 42 U.S.C. § 1396a(a)(5); §§ 409.012(2), (14) & (15), Fla. Stat.; and § 409.902, Fla. Stat. As such, she has a duty to ensure that AHCA programs are administered in accordance with the law. DUDEK is sued in her official capacity only, as Secretary of AHCA.

36.   FARMER is the State Surgeon General and head of FDOH, which is the primary state agency responsible for administering the Children's Medical Services ("CMS") program for children who require long term care and which administers the Children's Multidisciplinary Assessment Team ("CMAT") program.  FARMER has the duty to ensure that FDOH programs are administered in accordance with the law.  FARMER is sued in his official capacity.

37.   WIGGINS is the Deputy Secretary of the Florida Department of Health and the Director of CMS.  CMS, a division of the Florida Department of Health, is the lead agency of CMAT. CMAT is an inter-agency coordinated effort comprised of representatives from AHCA, the Department of Children and Families, the Agency for Persons with Disabilities and CMS.  CMAT, under the leadership of CMS, makes recommendations for medically necessary services for children from birth to twenty-one who are medically fragile (65C-30.001, FAC).  WIGGINS, as director of CMS, the lead agency of CMAT, has the duty to respond to the needs of each child and family and to guarantee the efficiency and effectiveness of support and services. WIGGINS is sued in her official capacity.

38.   eQHealth is a Louisiana non-profit corporation with its principal place of business in Baton Rouge, Louisiana and is engaged in business in, and serves as an instrumentality of, the State of Florida.  eQHealth contracts with AHCA to provide services for Florida's Comprehensive Medicaid Utilization Management Program. (See Exhibit A, which is incorporated by reference into this Complaint).

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

## STATUTORY AND REGULATORY BACKGROUND AND FRAMEWORK
### The Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165

39.    In 1990, Congress enacted the Americans with Disabilities Act (ADA), which is the most comprehensive legislation geared toward the prohibition of discrimination based on disability. 42 U.S.C. §§ 12101-12213 (2000).  When enacting the ADA, Congress noted "the nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals."  *Id.* at 12101(a)(8).

40.    In signing the ADA into law, President George H.W. Bush stated:  "The Americans with Disabilities Act presents us all with an historic opportunity.  It signals the end to the unjustified segregation and exclusion of persons with disabilities from the mainstream of American life." Statement on Signing the Americans with Disabilities Act of 1990, 2 Pub. Papers 1070, 1071 (July 26, 1990).

41.    Congress found the following:   (1) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (2) discrimination against individuals with disabilities persists in such critical areas as housing, public accommodations, education and institutionalization; (3) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusions, overprotective rules and policies, and segregation. *See generally* 42 U.S.C. §§ 12131-12165 (2000).

42.    The ADA prohibits discrimination against individuals with disabilities by public entities and by instrumentalities of states:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

43.    Segregation of children with disabilities from their homes is discrimination under the ADA. *See* 42 U.S.C. § 12101(a)(5); *Olmstead v. L.C.*, 572 U.S. 581 (1999).

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

44.    As public entities and instrumentalities of a state, Defendants are required to administer their services, programs and activities in "the most integrated setting appropriate" to the needs of Plaintiffs and Plaintiff Class members. *See* 28 C.F.R. § 35.130(d).

45.    As public entities and instrumentalities of the state, Defendants are prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 C.F.R. 35.130(b)(1)(iii).

46.    As public entities and instrumentalities of the state, Defendants are prohibited from utilizing "criteria or methods of administration" that have the effect of subjecting Plaintiffs and Plaintiff Class members to discrimination on the basis of disability; or "that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities..." 28 C.F.R. § 35.130(b)(3).

**Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

47.    Section 504 provides:

No otherwise qualified individual with a disability in the United States…shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance ….

29 U.S.C. § 794(a).

48.    Regulations implementing Section 504 prohibit recipients of Federal financial assistance from:

[u]tiliz[ing] criteria or methods of administration… (i) [t]hat have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap [or] (ii) [t]hat have the …effect of substantially impairing accomplishment of the recipients' program with respect to handicapped persons.

45 C.F.R. § 84.4(b)(4).

49.    The Civil Rights Restoration Act of 1987 amends Section 504 to provide that if any part of a program or activity receives federal financial assistance, all of the operations of the program are subject to Section 504.  *See* 29 U.S.C. § 794(b)

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

50. Disability discrimination claims brought under Section 504 are evaluated similarly to ADA claims. *See Allmond v. Akal Sec., Inc*., 558 F. 3d 1312, 1316 n.3 (11th Cir. 2009).

**The United States Medicaid Act, 42 U.S.C. §§1396-1396v**

51. The Medicaid program is a cooperative federal/state program that provides health care services to specified categories of individuals meeting income and other criteria. *See* 42 U.S.C. §§ 1396-1396v.

52. Florida participates in the Medicaid program. *See* § 409.902, Fla. Stat.

*Medicaid's Early and Periodic Screening,*
*Diagnosis and Treatment ("EPSDT") Program*

53. Federal law lists 28 health care services which a state may provide through its Medicaid program. *See* 42 U.S.C. § 1396d(a)(1) – (28).

54. Some of these services are mandatory, meaning that if a state participates in Medicaid it must provide those services (*i.e.*, inpatient hospital services; outpatient hospital services; physician visits; lab & x-ray services; nursing home services; early and periodic screening, diagnosis, and treatment services for children; and family planning services). 42 U.S.C. § 1396a(a)(10)(A) (requiring states to provide the services listed at § 1396d(a)(1)–(5), (17) & (21)).

55. Most of the services are optional (*i.e.*, prescription drugs, hospice, dental services, vision/optometry services, hearing services, chiropractic services, and podiatric services).

56. The package of mandatory and optional health care services that are provided by a state are known as the "State Plan."

57. As part of its Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") Program, a state must provide all 28 health care services listed at 42 U.S.C. § 1396d(a)(1) – (28) to eligible children, which include private duty nursing services.

58. EPSDT requires screening, vision, dental, hearing and treatment services, and requires that such services include "such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services whether or not such services are covered under the State plan." 42 U.S.C. § 1396d(r)(5).

59. AHCA is required to

10

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

pay for early and periodic screening and diagnosis of a recipient under age 21 to ascertain physical and mental problems and conditions and all services determined by the agency to be medically necessary for the treatment, correction, or amelioration of these problems and conditions, including personal care, private duty nursing, durable medical equipment, physical therapy, occupational therapy, speech therapy, respiratory therapy, and immunizations.

§ 409.905(2), Fla. Stat.

60.    AHCA defines Medically necessary services as those that must:

1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;
3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;
4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; statewide; and
5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

Rule 59G-1.010(166)

61.    For inpatient hospital services to be deemed medically necessary, they cannot be services which, "consistent with the provisions of appropriate medical care, [could] be effectively furnished more economically on an outpatient basis or in an inpatient facility of a different type." Rule 59G-1.010(166)(b), Fla. Admin. Code.

62.    AHCA's policy regarding coverage of medically necessary services is found at Rule 59G-4.130 of the Florida Administrative Code, which incorporates by reference the Florida Medicaid Home Health Services Coverage and Limitations Handbook, December 2011 ("*Handbook*").

63.    The Handbook defines private duty nursing services as "medically-necessary skilled nursing services that may be provided in a child's home or other authorized settings to support the care required by the child's complex medical conditions."

64.    AHCA may authorize private duty nursing services where they are ordered by the child's attending physician, are documented as medically necessary, are provided by a registered

11

or licensed practical nurse, are consistent with the physicia[n] approved plan of care, and have been authorized before the services are provided.

65.   AHCA does not authorize private duty nursing Services "solely for the convenience of the child, the parents or the caregiver." (*Handbook*, at 2-18).

66.   AHCA will decrease private duty nursing services "over time as parents and caregivers are taught skills to care for their child and are capable of safely providing that care or as the child's condition improves." (*Handbook*, at 2-21).

67.   The Handbook defines personal care services as "medically necessary assistance with activities of daily living that support a recipient's medical care needs." (*Handbook*, at 2-23). Personal care services may be provided to a child with complex medical problems who requires more individual and continuous care than can be provided through a home health aide visit. The services include bathing and grooming, toileting and elimination, oral hygiene, range of motion and positioning, and oral feedings and fluid intake.

68.   The patient's physician has a role in determining what treatment is medically necessary, *see Moore ex rel. Moore v. Medows*, 324 Fed. Appx. 773, 774 (11th Cir. 2009), and for developing the plan of care for the Medicaid recipient.

69.   Pursuant to section 409.905(4)(b), Florida Statutes, Florida created a "comprehensive utilization management program" to review and assess the need for Medicaid recipients' private duty nursing services.

70.   Prior to 2011, Keystone Peer Review Organization ("KePRO") served as the State's "comprehensive utilization management program" pursuant to a contract with AHCA.

71.   On February 24, 2011, eQHealth entered a Contract with AHCA to serve as the State's "comprehensive utilization management program"

72.   As Florida's "comprehensive utilization management program," eQHealth makes medical necessity determinations on behalf of AHCA and acts as a witness for AHCA in all fair hearing proceedings resulting from decisions and actions made by eQHealth.

73.   Pursuant to its contract with AHCA, eQHealth agreed to comply with Federal civil rights laws, including the ADA and the Rehabilitation Act. (Exhibit A, Page 5).

74.   Pursuant to the contract, eQHealth is required to apply AHCA criteria, guidelines, policies, procedures and processes in making medical necessity determinations. (Exhibit A, Attachment I, Page 12-18).

75. Pursuant to the contract, eQHealth must have prior approval by AHCA for the clinical criteria it utilizes in reviewing prior authorization requests. (Exhibit A, Attachment I, Page 19).

76. Pursuant to the contract, eQHealth is to comply with AHCA staffing requirements. (Exhibit A, Attachment I, Page 7-12).

77. Pursuant to the contract, eQHealth received and receives federal financial assistance in excess of $100,000. (Exhibit A, Page 1 at I.B.1.-2).

78. eQHealth has received federal financial assistance from the Federal Centers for Medicare & Medicaid Services.

79. eQHealth has received federal financial assistance from the Federal Department of Health and Human Services.

80. Pursuant to the contract, eQHealth received and receives funding in an amount not to exceed $50,073,958 from AHCA. (Exhibit A, Page 10 at II.A.).

81. eQHealth is required to provide scheduled and periodic reporting on its services to AHCA.

82. eQHealth's services under the contract are services which are traditionally performed by the state.

83. eQHealth's services under the contract are performed as a state actor.

84. Each Medicaid recipient is provided services for a specific certification period.

85. A certification period is the period covered by the recipient's plan of care or the time period for which services are provided.  Services can be approved for up to 180 days (6 months). Thus, the review process takes place every six months.

86. The review process begins when a home health agency (the provider of the medical services), submits a request for services, such as private duty nursing services with a skilled nurse, home health aide services, personal care assistant services, or home health visit services. When a request is submitted, an eQHealth nurse reviewer determines if the information submitted is sufficient to approve the request based on the medical necessity guidelines, the Handbook, and other relevant statutes and regulations.

87. Nurse reviewers are not permitted to deny services; they are only permitted to approve services.

88.   If the information that is submitted is insufficient for a nurse reviewer to make an approval, the review then goes to a physician reviewer. The physician reviewer reviews the information and makes a judgment based on the information provided and based on the applicable rules and regulations. Once that decision is rendered, it goes to the family and the provider who can then accept the decision or request a reconsideration within ten days from the denial of services.

89.   If a reconsideration is requested, the provider then has an opportunity to provide additional information or clarification.  The reconsideration then goes through the same process and is again reviewed by a nurse reviewer and if not approved by the nurse reviewer, to a second physician reviewer who is different from the original physician reviewer. The second physician reviewer renders a decision and can either uphold the denial or partial denial, approve the request as originally submitted, or modify the request and approve or deny something different.

### Medicaid's Reasonable Promptness Requirement

90.   Federal Medicaid law provides that individuals eligible to receive medical assistance under the program shall receive it with "reasonable promptness." 42 U.S.C. 1396a(a)(8).

### Florida's Nursing Facilities

91.   A nursing facility is an institution that primarily provides:

   a.   Skilled nursing care;

   b.   Rehabilitation services for those who are sick, injured, or disabled;  and

   c.   Health related care and services to individuals who, because of their mental or physical condition, require care and services that can only be provided in an institutional setting.

   *See* 42 U.S.C. § 1396r(a)(1)(A-C).

92.   Nursing facility services are

   services which are … required to be given an individual who needs … on a daily basis nursing care (provided by or requiring the supervision of nursing personnel) or other rehabilitative services which as a practical matter can only be provided in a nursing facility on an inpatient basis.

   42 U.S.C. § 1396r(a)

### The Nursing Home Reform Amendments to the Medicaid Act

93.   The Nursing Home Reform Amendments of 1987 to the Medicaid Act, 42 U.S.C. § 1396r(e) ("NHRA"), are part of a comprehensive remedial statute designed to address the widespread problem of warehousing people with developmental disabilities in the nation's nursing facilities. Congress enacted the Pre-Admission Screening and Resident Review ("PASRR") provisions of the NHRA to prevent and remedy the unnecessary admission and confinement of people with psychiatric and developmental disabilities in nursing facilities. *See* 42 U.S.C. § 1396r(e)(7). The regulations implementing the PASRR requirements are found at 42 C.F.R. §§ 483.100 to 483.138.

94.   Under federal Medicaid law, the State is required to screen incoming nursing facility patients for mental illness and mental retardation, determine whether placement in a nursing facility is appropriate and if specialized services are needed, and to provide the specialized services that are necessary.

95.   The Children's Multidisciplinary Assessment Team (CMAT) is responsible for conducting PASRRs in Florida pursuant to 42 U.S.C. § 483.112.

96.   CMAT is an inter-agency coordinated effort comprised of representatives from AHCA, the Department of Children and Families, the Agency for Persons with Disabilities and CMS.  CMAT, under the leadership of CMS, makes recommendations for medically necessary services for children from birth to twenty-one who are medically fragile (65C-30.001, FAC).

97.   There are two levels of PASRR screening and review – Level I and Level II. *See* 42 C.F.R. § 483.128(a). The Level I screen determines whether individuals being considered for admission to a nursing facility have a mental illness or mental retardation. For those persons whose Level I screen indicates the existence of a mental illness or mental retardation, a Level II review is performed. This includes an assessment and evaluation to determine:

    a.  If they do, in fact, have a mental illness or mental retardation;

    b.  Whether they satisfy the nursing facility level of care criteria;

    c.  Whether their needs could be met in the community through the provision of appropriate supports and services; and

    d.  Whether they could benefit from the provision of specialized services designed to maximize their ability for self-determination and independence.

42 C.F.R. §§ 483.128(a) & 483.132.

98.    The Level II review must include a psychosocial evaluation that analyzes current living arrangements and medical and social supports. The review must also include a functional assessment of the individual's ability to engage in activities of daily living and must document the level of support that would be needed to assist the individual to perform these activities while living in the community. *See* C.F.R. § 483.134(b)(5). The assessment must determine whether it would be possible to meet the individual's needs through the provision of services and supports in the community as an alternative to nursing facility placement.

99.    If the Level II review determines that a resident does not require nursing facility services, but instead requires specialized services in a non-institutional setting, the Defendants must provide or arrange for the provision of such specialized services to the resident in an appropriate community setting.  *See* 42 U.S.C. §§ 1396r(e)(7)(C)(i)&(ii); 42 C.F.R. §§ 483.118(c) & 483.120(b).

100.   Specialized services consist of an active and continuous treatment program that includes aggressive, consistent implementation of specialized and generic training, treatment, and health services to allow the individual to function as independently and with as much self-determination as possible, and services designed to prevent or decelerate regression and loss of abilities. *See* 42 C.F.R. §§ 483.120 & 483.440(a). If an individual requires specialized services, under federal law, the state must provide those services with the frequency, intensity, and duration that meet the federal standard for active treatment. *See* 42 C.F.R. §§ 483.440(a)-(f).

101.   The PASRR reviewers must explain to the individual involved and, where applicable, his or her legal representative the results of the Level II evaluation, including information regarding the individual's ability to reside in a less restrictive community placement, and must provide the individual and legal representative with a copy of the PASRR report. *See* 42 C.F.R. §§ 483.128(k) & 483.130(l)(3).

102.   If the Level II review determines that an individual admitted to a nursing facility needs specialized services, it must then be determined if the nursing facility can provide all needed specialized services and active treatment. If the review concludes that the facility

cannot, the individual cannot be admitted to that nursing facility. *See* 42 C.F.R. § 483.126.

103.   If the individual is admitted to a nursing facility, periodic reviews must be conducted whenever there is a change in the person's condition to determine whether the individual continues to need a nursing level of care and to require confinement in a nursing facility. Periodic Level II evaluations must also determine whether specialized services are necessary to provide habilitation and active treatment. *See* 42 U.S.C. §§ 1396r(b)(3)(F)(i) & 1396r(e)(7)(A)&(B); 42 C.F.R. §§ 483.128, 483.132, 483.134, & 483.136.

104.   The nursing facility may not admit individuals whose PASRR determined that the individual does not require nursing facility level services. *See* 42 C.F.R. § 483.118(a).

105.   If a resident of a nursing facility who has resided in the facility for at least 30 months is determined to require specialized services, but not to require nursing facility level services, the State must offer the resident the option of remaining in the nursing facility or receiving services from the State in an alternative appropriate setting. *See* 42 C.F.R. § 483.118(c)(1).

106.   If a resident of a nursing facility who has resided in the facility for less than 30 continuous months is determined to require specialized services, but does not require nursing facility level services, the State must arrange for the discharge of the resident and provide for and arrange specialized services for the mental illness or mental retardation. *See* 42 C.F.R. § 483.118(c)(2).

107.   For individuals with mental illness, if specialized services are required, they must be services which

combined with services provided by the [nursing facility], results in the continuous and aggressive implementation of an individualized plan of care that—(i) Is developed and supervised by an interdisciplinary team, which includes a physician, qualified mental health professionals and, as appropriate, other professionals. (ii) Prescribes specific therapies and activities for the treatment of persons experiencing an acute episode of serious mental illness, which necessitates supervision by trained mental health personnel; and (iii) Is directed toward diagnosing and reducing the resident's behavioral symptoms that necessitated institutionalization, improving his or her level of independent functioning, and achieving a functioning level that permits reduction in the intensity of mental health services to below the level of specialized services at the earliest possible time.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

42 C.F.R. § 483.120(a)(1).

108. For individuals with mental retardation, if specialized services are required, they must be services which

Include[] aggressive, consistent implementation of a program of specialized and generic training, treatment, health services and related services described in this subpart, that is directed toward--

(i) The acquisition of the behaviors necessary for the client to function with as much self determination and independence as possible; and

(ii) The prevention or deceleration of regression or loss of current optimal functional status.

42 C.F.R. §483.440(a)(1).

109. An individual with a mental illness or mental retardation may only be placed in a nursing facility

where the individual's needs are such that he or she meets the minimum standards for admission and the individual's needs for treatment do not exceed the level of services which can be delivered in the [nursing facility] to which the individual is admitted either through [nursing facility] services alone or, where necessary, through [nursing facility] services supplemented by specialized services provided by or arranged for by the State.

42 C.F.R. § 483.126.

110. National experience demonstrates that where PASRR reviews are properly performed, approximately 80 percent of individuals with mental illness or mental retardation who are referred for or temporarily admitted to nursing facility placement are determined to be able to reside in the community with appropriate services and supports and should, therefore, be diverted to a more integrated community placement prior to or shortly after admission to the nursing facility. In Massachusetts, where the state was required by court order to conduct comprehensive PASRR reviews of all individuals with developmental disabilities residing in nursing facilities, more than 90 percent of those individuals were found to need specialized services.

## FACTUAL ALLEGATIONS

### Institutionalized Plaintiff

#### T.H.

111.　T.H. is a 16-year-old child who has medical complications resulting from shaken baby syndrome. T.H. is institutionalized at Kidz Corner, a 72 bed children's wing of a 152 bed geriatric nursing facility called Plantation Nursing and Rehab Center in Plantation, Florida ("Kidz Corner").

112.　T.H. has medical complications resulting from Post-traumatic brain injury due to shaken baby syndrome.  She is a medically fragile child with diagnoses including extensive retinal and brain hemorrhage; blindness; spastic quadriparesis; severe psychomotor retardation; skull fracture; hypertension; reactive airway disease; apnea; seizure disorder; and developmental delay.  T.H. is on a gastrostomy tube (g-tube) and a tracheotomy tube and is ventilator dependent.  She is non-verbal and non-ambulatory.

113.　T.H. is a qualified person with a disability within the meaning of the ADA and Section 504.

114.　T.H. meets the criteria for mental retardation on a Level I PASRR screen.

115.　No Level II PASRR evaluation or review was ever performed.

116.　On February 25, 1996, T.H. was born.

117.　On November 16, 1996, at nine months old, T.H. suffered Shaken Baby syndrome, causing major brain damage.

118.　Subsequently, the Florida Department of Children and Families terminated T.H.'s parent's parental rights and T.H. became a foster child, a dependent of the State.

119.　On June 2, 1997, T.H. was placed in a Medical Foster Care home, pursuant to Florida Administrative Code Rule 65C-28.004(7)(f)3, where she resided with the same foster parents until 2006.

120.　On June 16, 2006, T.H. was hospitalized for the insertion of a tracheotomy tube and on July 25, 2006, T.H. was hospitalized again for the insertion of a ventilator.

121.　On August 1, 2006, T.H. was institutionalized at Kidz Korner, a 72 bed children's wing of a 152 bed nursing home facility, called Plantation Nursing and Rehab Center located in Plantation, Florida.

122.　On November 2, 2006, she was determined to be medically appropriate to continue in the Medical Foster Care program and her medical foster parents desired to have her return back home.  Skilled nursing was provided upon T.H.'s return home to assist with her medical needs.

123. Defendants failed to provide sufficient nursing services which directly resulted in T.H. being placed in a nursing facility.

124. On March 23, 2007, T.H. was again institutionalized to Kidz Korner due to the lack of sufficient private duty nursing care and has been placed there ever since.  T.H.'s medical foster parents were unable to care for T.H. at home because of the lack of nursing services available to them.

125. T.H. lives in a hospital like room with another medically fragile child and no curtain or other barrier between them.

126. Since institutionalized in March of 2007, T.H. has not been hospitalized nor had any major medical emergencies.  She has been stable for the last five years.  She is currently being weaned off her ventilator and is off of it for 8 hours a day.

127. T.H. needs Medicaid services such as private duty nursing in order to be placed at home or in a community setting.

128. T.H.'s former medical foster care parent would like to have T.H. back in her home.

129. T.H. is segregated and institutionalized in a nursing facility because of Defendants' current policies and practices that fail to provide medically necessary services in the community and force her to be institutionalized in a nursing facility in Florida.

**L.J.**

130. L.J. is a medically fragile 15-year-old child primarily diagnosed with infantile cerebral palsy and anoxic brain damage.  L.J. is institutionalized at the Children's Center a 34 bed children's wing of Sabal Palms Health Care Center, a 233 bed geriatric nursing facility in Largo, Florida ("Sabal Palms").

131. L.J. is a medically fragile child with primary diagnoses including infantile cerebral palsy and anoxic brain damage.  His secondary diagnoses include severe spastic quadriplegia, seizure disorder, and developmental delay.  L.J. is on a gastrostomy tube (g-tube), a tracheotomy tube, an apnea monitor and oxygen via mist collar.  He is non-verbal and non-ambulatory.

132. L.J. is a qualified person with a disability within the meaning of the ADA and Section 504.

133. L.J. meets the criteria for mental retardation on a Level I PASRR screen.

134. No Level II PASRR evaluation or review was ever performed.

135.   On December 3, 1996, L.J. was born.

136.   In March 1997, at three months old, L.J.'s mother and grandmother found him not breathing.  He was air lifted to the hospital and it was determined that he had suffered septic shock.

137.   Subsequently, on April 30, 1997, the Florida Department of Children and Families removed L.J. from his mother's custody because she was not able to adequately care for the child due to his numerous medical problems.

138.   On May 9, 1997, L.J. was placed at Sabal Palms and has remained there ever since.

139.   On October 29, 1997, L.J.'s mother's and father's parental rights were terminated due to medical neglect and L.J. became a foster child, a dependent of the State.

140.   Defendants failed to provide sufficient nursing services which directly resulted in L.J. being placed in a nursing facility and continuing to remain in a nursing facility.

141.   L.J. lives in a hospital like room.

142.   L.J. has not been hospitalized nor had any major medical emergencies in the past two years.

143.   L.J. needs Medicaid services such as private duty nursing in order to be placed at home or in a community setting.

144.   L.J. is segregated and institutionalized in a nursing facility because of Defendants' current policies and practices that fail to provide medically necessary services in the community and force him to be institutionalized in a nursing facility in Florida.

**A.G.**

145.   A.G. is a 17-year-old child who requires Skilled Care Services as a result of a motor vehicle accident and a resulting traumatic brain injury when he was 15.  He currently is able to speak but is dependent on a g-tube to meet his nutritional needs. Notwithstanding his abilities and his improved condition, he is institutionalized at Lakeshore Villas Nursing Home in Tampa, Florida ("Lakeshore").

146.   A.G.'s primary diagnoses is traumatic brain injury.  His secondary diagnosis includes hypoxic ischemic encephalopathy.  He requires skilled care services.

147.   A.G. was born in Cairo, Egypt on July 28, 1995.  He moved to the United States in 2010 and began attending Freedom High School in Tampa, where he was an "A" student.

148. In 2011, A.G. was in a car accident while riding in a vehicle with his older brother. He was in a coma at Tampa General Hospital for one and a half months after the car accident, and after waking was moved to Lakeshore.

149. A.G. has a manual wheelchair but is unable to self-propel and requires an electric wheelchair, which has not been provided for him.

150. A.G. requires all of his self-care and daily living needs to be met by his caregivers.

151. Though A.G. speaks English, his primary language is Arabic, and there are no other Arabic speakers at Lakeshore.

152. During the day, A.G. attends Gaither High School, but returns to Lakeshore in the afternoon.

153. A.G. has not been hospitalized nor had any major medical emergencies since his transfer to Lakeshore.

154. A.G. is a qualified person with a disability within the meaning of the ADA and Section 504.

155. A.G. meets the criteria for mental retardation or mental illness on a Level I PASRR screen.

156. No Level II PASRR evaluation or review was ever performed.

157. Due to A.G.'s improving condition and reduction of funds paid to Lakeshore from Medicaid, Lakeshore is denying needed services, such as physical and speech therapies.

158. A.G.'s primary language is Arabic, and contrary to Title VI of the Civil Rights Act of 1964, Lakeshore denied A.G. any language assistance with respect to its services, benefits, or encounters and as such, left A.G. further isolated and bereft of needed programs and services for any improvement.

159. A.G.. needs Medicaid services such as private duty nursing in order to be placed at home or in a community setting.

160. A.G. is segregated and institutionalized in a nursing facility because of Defendants' current policies and practices that fail to provide medically necessary services in the community and force him to be institutionalized in a nursing facility in Florida.

**Plaintiffs At Risk of Institutionalization**

**A.C.**

161.   Plaintiff A.C. is a five-year-old child who has medical complications resulting from a near drowning accident. At the time of the filing of the original complaint, A.C. lived at Lakeshore Villas Nursing Home in Tampa, Florida ("Lakeshore"). He now lives with his parents in Spring Hill, Florida.

162.   Plaintiff A.C. nearly drowned as an infant and suffered significant hypoxic injury. A.C. now requires assistance with his daily life activities. He requires a ventilator and g-tube. He also has a permanent tracheotomy and is frequently subject to pneumonia. A.C. requires frequent assistance with positioning.  A.C. requires at least 20 medications daily

163.   A.C. is a qualified person with a disability within the meaning of the ADA and Section 504 of the Rehabilitation Act.

164.   A.C. meets the criteria for mental retardation on a Level I PASRR screen.

165.   Even though A.C. was determined to be mentally retarded, no Level II PASRR evaluation or review was ever performed.

166.   On September 14, 2011, a plan of care was made for A.C. which included daily physical therapy, including passive range of motion exercises and placement in a stander at least once a day for up to one hour.  Lakeshore does not provide the physical therapy.  As such, A.C.'s mother attempted to do physical therapy with her son each day at Lakeshore.

167.   A.C. requires speech therapy in order to improve spontaneous oral/facial movement, saliva management, and voicing for prefeeding purposes and quality of life. He was not provided speech therapy at Lakeshore.

168.   While A.C. was institutionalized, his mother drove one hour from her home to Lakeshore every day. On Mondays to Fridays, she arrived at or about 9:30 a.m., and she stayed with A.C. until at or about 2:30 p.m. On weekends, she stays with A.C. in the afternoon.

169.   A.C.'s mother wants to provide her son with a home a family life; to ensure that her son receives public educational benefits including a free and appropriate education, and related physical and occupational therapies; and to provide social events such as going to the park or with similarly aged peers who do not have disabilities.

170.   In May 2011, A.C.'s family bought a new house to accommodate A.C. and to bring him home. This house has a bedroom and bathroom for A.C.

171.   On August 5, 2011, A.C.'s doctor signed discharge orders for A.C. in which he stated: "To be discharged with Nursing Care: 24 hours per day; 7 days per week to be provided by Home Health Agency."

172.   A.C. was scheduled to be discharged on September 14, 2011; however, on September 6, 2011, A.C.'s mother learned that A.C. had been approved for only eight (8) hours of private duty nursing care.  AHCA and eQHealth also granted eight (8) additional hours of private duty nursing per week for two weeks "for caregiver training."

173.   AHCA and eQHealth denied the requested hours even though it found that A.C. "has a complicated respiratory status and would benefit [sic] being at home with PDN to limit a possible exacerbation of his respiratory status."

174.   AHCA and eQHealth concluded that eight hours of nursing care was "reasonable … to allow the caregivers to sleep."

175.   As a basis for the denial, AHCA and eQHealth cited Fla. Admin. R. 59G-1.010(166), which defines "medical necessity" and states that services must be "furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider."

176.   A.C. requires more than eight (8) hours of private duty nursing each day.  Without the provision of more private duty nursing hours, A.C. cannot receive appropriate care at home and his health and safety would be further compromised.

177.   A.C. appealed the denial of services. Since the filing of the original complaint and after negotiations with AHCA, A.C. received the requested and prescribed hours for this current six month recertification period.

178.   Without continued medically necessary services, A.C. will be forced back into institutionalization because his family will no longer be able to care for him at home.

179.   A.C. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

180.   The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

**A.R.**

181.   A.R. is a medically fragile 10-year-old child Medicaid recipient of private duty nursing services diagnosed with traumatic brain injury. A.R. lives with her mother in Edgewater, Florida.

182.   A.R. is diagnosed with traumatic brain injury.

183.   On January 24, 2010, at the age of 8 years old, A.R. was riding her scooter in front of her home and was hit by a vehicle.  She was air lifted to Halifax Medical Center and it was found that she had severe brain trauma and that she was catastrophically injured.

184.   She also has hydrocephalus, increased fluid in the brain, and has a surgically implanted shunt in her brain. A.R.'s brain injury requires her to have a tracheotomy tube and a g-tube for feeding. She has severe seizures daily.

185.   A.R. cannot walk and is non-verbal. She uses a wheelchair for mobility.

186.   A.R. is a qualified person with a disability.

187.   A.R.'s single mother cannot work outside the home because she provides care to A.R., her nine-year- old son who has been diagnosed with post-traumatic stress disorder after witnessing A.R.'s accident, and her 17-year-old daughter. A.R.'s mother has anxiety attacks.

188.   Because of her health complications, A.R. has received Medicaid private duty nursing for approximately two years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

189.   A.R.'s treating physician has prescribed the medically necessary services for A.R.

190.   A.R.'s condition has not improved and her need for services has remained the same.

191.   Since 2010, eQHealth and AHCA has denied A.R.'s prescribed and requested services at least four times. Every certification period, eQHealth and AHCA has reduced services to A.R.

192.   On August 25, 2011, A.R. received notice that eQHealth and AHCA was reducing A.R.'s prescribed nursing services from 12 hours day of private duty nursing and 12 hours a day of home health aide to just 10 hours of private duty nursing for six days and 14 hours for one day a week for the certification period of June 23, 2011 through December 19, 2011.

193.   eQHealth and AHCA's attempt to reduce A.R.'s services is not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and

AHCA's decision to reduce the services.  This decision is not based on the individual need of A.R., is not justified by medical necessity, and does not reflect a professional judgment about A.R.'s condition.  Rather, it is an administrative action made to save money.

194.   Without medically necessary services, A.R. will be institutionalized because her family will no longer be able to care for A.R. at home.

195.   A.R. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

196.   The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

## C.V.

197.   C.V. is a medically fragile eight-year-old child Medicaid recipient of private duty nursing services diagnosed with Hurler Syndrome.  C.V. lives with his legal guardians in Bristol, Florida.

198.   C.V. was a foster child, but has been living with the same family since March 2005; those parents are now his legal guardians.

199.   C.V.'s Hurler Syndrome causes a multitude of medical complications for him, most notably that he cannot breathe without a tracheotomy tube. His other conditions include esophageal reflux, intestinal infection due to clostridium difficile, enteritis due to adenovirus, acute myocardial infarction, asthma, acute respiratory failure, hemorrhage of the gastrointestinal tract, spinal kyphosis, other respiratory distress insufficiencies, moderate corneal clouding, and anomalies of the skull and face bones.

200.   C.V.'s tracheotomy tube must be cleaned every five minutes.

201.   C.V. cannot speak and requires constant supervision.

202.   C.V. is a qualified person with a disability.

203.   C.V.'s legal guardians both work full time jobs. Mr. Wahlquist owns and operates his business and is on call 24 hours a day, seven days a week, and works no less than 40 hours a week. In addition to caring for C.V., Ms. Wahlquist cares for her blind father and works at least 40 hours a week.

204. Because of his health complications, C.V. has received Medicaid private duty nursing for approximately eight years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

205. C.V.'s physician has prescribed the medically necessary services for C.V.

206. C.V.'s condition has not improved and his need for services has remained the same.

207. Since June 2006, AHCA has denied C.V. prescribed private duty nursing ("PDN") care at least 13 times at certification reviews. Almost every request made to AHCA was originally denied and only after reconsideration or the fair hearing process, have the hours been approved.

208. Since June 2006, for almost every certification period, eQHealth and AHCA has attempted to decrease services by increasing the amount of nursing hours denied. (*e.g.*, for the certification period of March 31, 2008-September 26, 2008, eQHealth and AHCA denied 200 PDN hours; for the certification period of September 27, 2008-March 25, 2009, AHCA denied 696 PDN hours; for the certification period of March 26, 2009-September 9, 2009, AHCA denied 928 PDN hours).

209. On September 16, 2011, C.V. received notice that eQHealth and AHCA were reducing the prescribed hours from 24 hours per day to 16 hours per weekday and eight hours for the whole weekend for the certification period of September 12, 2011 through March 9, 2012. This is a reduction of 8 hours of private duty nursing per weekday.

210. eQHealth and AHCA's attempts to reduce C.V.'s services are not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of C.V., is not justified by medical necessity, and does not reflect a professional judgment about C.V.'s condition. Rather, it is an administrative action made to save money.

211. Without medically necessary services, C.V. will be institutionalized because his family will no longer be able to care for C.V. at home.

212. C.V. is at risk of institutionalization in a nursing facility based upon the current regulations, rules, policies, practices, acts, and omissions of the Defendants.

213. The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

**M.D.**

214. M.D. is a medically fragile 14-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and Strider Syndrome.   M.D. lives with her mother her brother in Tallahassee, Florida.

215. M.D.'s Strider Syndrome causes a multitude of medical complications; most notably she has problems with breathing and has frequent seizures. Her other conditions include: esophageal spasms; inability to swallow, walk or talk; and a long history of frequent pneumonia. Because of her esophageal spasms, M.D. cannot swallow saliva and it accumulates in her throat. She must be bent over or moved to her side so the build-up can be removed. If she is not moved into the proper position, M.D. will suffocate. This experience usually sends her into a seizure and happens at least once per day. She cannot be left alone for any length of time.

216. M.D. cannot speak and requires constant supervision.

217. M.D. is a qualified person with a disability.

218. M.D.'s mother is a single mother and works approximately 40-50 hours per week in a job which she has held for over 25 years.

219. Because of her health complications, M.D. has received Medicaid private duty nursing for approximately 11 years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

220. M.D.'s physician has prescribed the medically necessary services for M.D.

221. M.D.'s condition has not improved and her need for services has remained the same.

222. Since 2008, eQHealth and AHCA has denied M.D. the prescribed private duty nursing hours on five occasions. Every request M.D. made to eQHealth and AHCA was originally denied and only after reconsideration or the fair hearing process, have the hours been approved or services maintained.

223. On October 25, 2011, eQHealth and AHCA gave notice that they were reducing M.D.'s prescribed hours from 24 hours a day, seven days a week to 22 hours a day, seven days a week for the certification period of October 12, 2011 through April 11, 2012.  eQHealth and AHCA's attempts to reduce M.D.'s services are not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services.  This decision is not based on the individual need of

M.D., is not justified by medical necessity, and does not reflect a professional judgment about M.D.'s condition.  Rather, it is an administrative action made to save money.

224. Without medically necessary services, M.D. will be institutionalized because her family will no longer be able to care for her at home. M.D. is at risk of institutionalization in a nursing facility based upon the current regulations, rules, policies, practices, acts, and omissions of the Defendants.

225. The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

### C.M.

226. C.M. is a medically fragile four-year-old child Medicaid recipient of private duty nursing services diagnosed with chromosome deletion syndrome, chronic respiratory failure and severe cerebral palsy. C.M. lives with his mother and his father in Tallahassee, Florida.

227. C.M.'s diagnoses cause a multitude of medical complications for him; most notably he requires constant use of a ventilator and oxygen concentrator.  He also requires a tracheotomy tube and g-tube. His other conditions include epilepsy, dual sensory impairment, developmental delay, hypotonia, and hypothyroidism.

228. C.M.'s severe respiratory problems require that his tracheotomy tube must be cleaned every four hours; however, constant supervision is needed as it disconnects frequently. C.M. cannot speak and is not ambulatory. C.M. is currently taking over 25 medications which need to be administered in various dosages every two hours.

229. C.M. is a qualified person with a disability.

230. C.M.'s father works a full-time job. C.M.'s mother is an educated professional and was recently hired as a first grade teacher.

231. Because of his health complications, C.M. has received Medicaid private duty nursing for almost four years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

232. C.M.'s treating physician has prescribed the medically necessary services for C.M.

233. C.M.'s condition has not improved and his need for services has remained the same.

234. Since 2011, eQHealth and AHCA has denied C.M.'s requested and prescribed nursing hours at least once.

235. On July 14, 2011, eQHealth and AHCA gave notice that they were reducing C.M.'s prescribed hours from 12 hours a day to eight hours a day, Tuesday through Sunday, and

12 hours on Monday for the certification period of July 1, 2011 through December 27, 2011.

236.    eQHealth and AHCA's attempts to reduce C.M.'s services are not based on a change in the medical necessity of the services.  There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of C.M., is not justified by medical necessity, and does not reflect a professional judgment about C.M.'s condition.  Rather, it is an administrative action made to save money.

237.    Without medically necessary services, C.M. will be institutionalized because his family will no longer be able to care for C.M. at home.

238.    C.M. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

239.    The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

### B.M.

240.    B.M. is a medically fragile five-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy and developmental delay.  B.M. lives with his mother and his father in Fountain, Florida.

241.    B.M.'s Cerebral Palsy causes a multitude of medical complications, most notably he is dependent on a tracheotomy.  His other conditions include periods of apnea, deafness, tracheal stricture and immobility.

242.    B.M.'s tracheotomy tube must be suctioned out seven times a day and changed once a week. His apnea requires monitoring and supplemental oxygen.

243.    B.M. is a qualified person with a disability.

244.    B.M.'s father has a full-time job and is also on-call 24/7. B.M.'s mother has Lyme Disease, which prevents her from working; however, she provides B.M. with overnight care. The family's location is at least three hours away from the nearest hospital.

245.    Because of his health complications, B.M. has received Medicaid private duty nursing for approximately five years and is an ongoing Medicaid recipient of EPSDT Home Health Services.

246.    B.M.'s physician has prescribed the medically necessary services for B.M.

247. B.M.'s condition has not improved and his need for services has remained the same.

248. Since 2011, eQHealth and AHCA have denied B.M.'s requested and prescribed nursing hours at least once.

249. On August 3, 2011, eQHealth and AHCA gave notice that they were reducing B.M.'s prescribed hours from nine hours a day, Monday through Friday, and ten hours a day on the weekends to eight hours a day, Monday through Friday, and no hours on the weekends for the certification period of July 31, 2011 through January 7, 2012.

250. eQHealth and AHCA's attempt to reduce B.M.'s services is not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of B.M., is not justified by medical necessity, and does not reflect a professional judgment about B.M.'s condition. Rather, it is an administrative action made to save money.

251. Without medically necessary services, B.M. will be institutionalized because his family will no longer be able to care for B.M. at home.

252. B.M. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

253. The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

**T.F.**

254. T.F. is a medically fragile 18-year-old child Medicaid recipient of private duty nursing services diagnosed with cerebral palsy, mental retardation, and chronic lung disease. T.F. lives with his legal guardians and his sister in Miami, Florida.

255. T.F. was born with a variety of medical complications. T.F. has diagnoses of cerebral palsy, mental retardation, chronic lung disease, kyphoscoliosis, microcephalus, and gastroesophageal reflux. He has developmental delay, a seizure disorder, and cortical blindness. He requires the constant use of a ventilator and oxygen. T.F. has a g-tube and a tracheotomy tube.

256. T.F.'s ventilator must be checked hourly for proper function and deliverance of prescribed settings. Additionally, T.F. cannot be left alone because a disconnection from his ventilator will result in death. T.F. is unable to speak.

257.  T.F. also requires frequent mechanical suctioning to help remove any obstruction from his airway. Due to T.F.'s involuntary movements, at least two people are required for suctioning. This procedure also stimulates T.F.'s gag reflex causing him to become distressed, oxygen saturation decreases, intense coughing attacks occur, increased heart rate and respiration occur.

258.  T.F. is a qualified person with a disability.

259.  T.F.'s mother is studying for her Certified Personal Accountant exam and caring for another child with a chronic gastrointestinal medical condition. T.F.'s father works overtime to financially provide for his family.

260.  T.F.'s treating physician has prescribed the medically necessary services for T.F.

261.  T.F.'s condition has not improved and his need for services has remained the same.

262.  eQHealth and AHCA reduced T.F's requested and prescribed nursing hours from nine hours per weekday, eight hours on Saturday and no hours on Sunday to eight hours per weekday with no hours on the weekends. This is a reduction from 1,370 private duty nursing hours to 688 hours for the total certification period.

263.  On July 25, 2011, eQHealth and AHCA gave notice that they were reducing T.F.'s prescribed services from a Registered Nurse to a Licensed Practical Nurse for the certification period of July 3, 2011 through December 24, 2011.

264.  eQHealth and AHCA's attempt to reduce T.F.'s services is not based on a change in the medical necessity of the services. There is no clinically sound reason for eQHealth and AHCA's decision to reduce the services. This decision is not based on the individual need of T.F., is not justified by medical necessity, and does not reflect a professional judgment about T.F.'s condition. Rather, it is an administrative action made to save money.

265.  Without medically necessary services, T.F. will be institutionalized and his family will no longer be able to care for T.F. at home.

266.  T.F. is at risk of residing in a nursing facility based upon the current policies and practices of the Defendants.

267.  The cost of institutionalization in a nursing facility is more than the cost of providing at-home care.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

### GENERAL ALLEGATIONS

268.   The Individual Plaintiffs, and the Plaintiff Class are individuals with physical and mental impairments that substantially limit one or more major life activity, such as self-care and interaction with others. They also have a record of such impairments and are regarded by Defendants as having such impairments.

269.   The Plaintiff Class members are qualified persons with a disability within the meaning of the ADA and Section 504.

270.   Plaintiffs and Class members are able to, and desire to, live in the community with the appropriate services and supports.

271.   It is the policy of the State of Florida to prevent the separation of children from their families and to reunify families who have had children placed in foster homes or institutions. *See* § 409.145, Fla. Stat.

272.   Defendants have available community-based services for children currently institutionalized in nursing facilities, including residential assistance services, habilitation services, and private duty nursing services, which would enable Plaintiffs and Class members to live and continue to live in their homes and in the community.

273.   Named Plaintiffs have been determined by healthcare professionals to be appropriate for community based services.

274.   The provision of appropriate services and supports in the community is a reasonable accommodation for the Plaintiffs and Class members.

275.   Nursing facilities are not integrated or appropriate settings for Plaintiffs and Class members.

276.   The Defendants have developed, implemented, and administered its community services programs in a manner that systematically or effectively denies children residing in nursing facilities access to those community based programs.

277.   Further, the Defendants have developed regulations, rules, customs, practices, policies, acts, and/or omissions of reducing the prescribed medically necessary services to medically fragile children to the point that the Plaintiffs' caregivers cannot provide safe and appropriate care to the Plaintiffs and Plaintiff class members. (*e.g.*, *Handbook* at 2-17 & 2-21; & Rule 59G-1.010(166)(a), Fla. Admin. Code). For example:

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

a.  "Florida Medicaid does not reimburse private duty nursing services provided solely for the convenience of the child, the parents or the caregiver." *Handbook* at 2-18.  This restriction is based on the regulatory definition of "medically necessary," found at Rule 59G-1.010(166)(a), Fla. Admin. Code, which states, in part, that medically necessary services must "[b]e furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider."  Defendants adopted and have applied this policy without the authority of any similar federal Medicaid policy, rule or statute, giving Defendants a basis to deny private duty nursing service hours that have been prescribed by Plaintiff and Plaintiff Class members' treating physicians. eQHealth and AHCA's application of this policy has forced and is forcing parents and caregivers to institutionalize their children.

b.  "Private duty nursing services will be decreased over time as parents and caregivers are taught skills to care for their child and are capable of safely providing that care or as the child's condition improves." *Handbook* at 2-21. Defendants adopted and have applied this policy without the authority of any similar federal Medicaid policy, rule or statute, giving Defendants a basis to deny private duty nursing services that have been prescribed by Plaintiff and Plaintiff Class members' treating physicians.  Plaintiff and Plaintiff Class members' conditions will not improve over time, yet eQHealth and AHCA have routinely denied services even where Plaintiff and Plaintiff Class members' needs have not decreased.  Instead, Defendants seek to force parents to provide life sustaining, medically necessary care, usually performed by licensed and trained nurses, to their own children.

c.  Parents and caregivers of Plaintiffs and Plaintiff class members are not capable of safely providing the required care because they are not medical professionals and/or are not available to provide the services at the required level or duration. Plaintiff and Plaintiff Class members have been placed in nursing homes and are at risk of being placed in a nursing home because Defendants have unlawfully shifted the burden for providing skilled nursing services to the parents or caregivers of children who are not skilled nurses.  In contrast, there are not similar

regulations, rules, customs, practices, policies, acts, and omissions utilized to deny benefits and to unnecessarily institutionalize and segregate similarly situated adults with disabilities. Defendants' implementation of a definition of "medically necessary" that takes into account the mere availability of caregivers, regardless of their lack of medical training or qualification, is unreasonable and violates Federal law.

d.    eQHealth and AHCA have a pattern and practice of denying or reducing services at each certification period without regard to the child's condition.

278.    On June 25, 2012, AHCA adopted an updated version of the Home Health Services Coverage and Limitations Handbook. Agency for Health Care Administration, Home Health Services Coverage and Limitations Handbook, 2011, incorporated by reference in Rule 59G-4.001, Fla. Admin. Code.. The Updates to the Handbook further Defendants' development of regulations, rules, customs, practices, policies, acts, and/or omissions of reducing services and creating barriers to obtain the prescribed medically necessary services for medically fragile children and children in need of skilled nursing services, and leading to their institutionalization.

a.    The updates to the Handbook further promote institutionalization by restricting private duty nursing services only to those children who "are unable to attend a Pediatric Prescribed Extended Care (PPEC) Center."[1] *Handbook* at 2-19. The Defendants explicitly require a child who is medically able to attend a PPEC to receive PPEC services instead of private duty nursing services. *See Handbook* at 2-20 ("A recipient who is medically able to attend a prescribed pediatric extended care (PPEC) center and whose needs can be met by the PPEC shall be provided with PPEC services instead of private duty nursing services."). These updates to the Handbook will force children who would otherwise remain in their homes and integrated communities to be placed in a segregated facility entirely composed of other medically fragile children. Further, if an attending physician of a child

---

[1] A PPEC is a "non-residential *facility*" that provides "short, long-term, or intermittent medical care" to medically fragile children. Agency for Health Care Administration, Prescribed Pediatric Extended Care Services Coverage and Limitations Handbook, 2007, at 1-2, incorporated by reference in Rule 59G-4.260, Fla. Admin. Code (emphasis added).

Medicaid recipient finds that it is medical necessary for a child to receive PDN services at home, then the agency cannot, on its own, determine that it is medically appropriate for the child to be in a PPEC. *See Moore ex rel. Moore v. Medows*, 324 Fed. Appx. 773, 774 (11th Cir. 2009) (The patient's physician has a role in determining what treatment is medically necessary, and for developing the plan of care for the Medicaid recipient).

b.    The updates to the Handbook also reduce the period during which Plaintiffs can appeal a denial of services from ten to five days. *See Handbook* at 2-33 ("A reconsideration review of the denial decision must be requested via the Medicaid QIO internet system within five business days of the date of the final denial or modified approval determination."). There can be no justification for the reduction of Medicaid recipients' review rights other than to make it more difficult to retain services.

c.    Further, the updates to the Handbook expand the definition of caregiver to include "family member who attends to the needs of a child." *Handbook* at 1-5. The physical availability of siblings, other children in the home, grandparents, and other family members of the Medicaid recipients, will play a role in the certification process. As discussed extensively above, reliance on parents and caregivers for medical services is improper and to expand this definition to include any family member is also improper and unreasonable as it could include such persons even less equipped (children and grandparents) to handle the needs of medically fragile children.

279.    The overall costs to institutionalize all of the Plaintiffs and Plaintiff class members in nursing facilities is more than the overall costs of providing at home care.

280.    Defendants have and continue to make cuts in Plaintiffs' and Class members' services which have forced them to be unnecessary institutionalized in nursing facilities in order to receive the medically necessary services or have placed them at risk of unnecessary institutionalization in nursing facilities.

281.    The Defendants have failed to operate the PASSR program in accordance with federal law, resulting in T.H., L.J., and members of the sub-class of institutionalized Plaintiffs

residing in nursing homes not receiving the specialized services to which they are entitled.

282. Most of the approximately 250 Plaintiff Class members with mental illness or mental retardation who are confined in nursing facilities should have been diverted to a more integrated community placement if their PASRR reviews had been properly performed.

283. Of the approximately 250 Plaintiff Class members who remain in nursing facilities, most of them could be appropriately transitioned to the community with appropriate supports and services.

284. The overwhelming majority of the sub-class of institutionalized Plaintiffs would, if properly assessed during the PASRR review, be identified as needing and qualifying for specialized services.

285. The Defendants' regulations, rules, customs, practices, policies, acts, and omissions of reducing the prescribed medically necessary services to medically fragile children below what the children require subjects them to and favors unnecessary institutionalization and is discriminatory under *Olmstead* and its progeny.

286. The Defendants' actions were taken under the color of law and the Defendants knew or should have known that the policies, practices, acts, and conditions alleged herein has resulted or would result in the unnecessary institutionalization of the Plaintiffs and Plaintiff class members in nursing facilities.

287. As a result of the Defendants' rules, regulations, policies, practices, customs, actions, and inactions, the Plaintiffs and the Plaintiff Class members remain unnecessarily institutionalized or are at risk of unnecessary institutionalization in segregated nursing facilities.

## CLASS ACTION ALLEGATIONS

288. Plaintiffs seek to bring this case as a class action, pursuant to Fed. R. Civ. P. 23(a) & (b)(2), and S.D. Loc. R. 23.1(b), on behalf of themselves and for similarly situated Florida children (birth through 21) who are Medicaid recipients and who are institutionalized or at risk of institutionalization.

289. The first proposed sub-class consists of all children who are Medicaid recipients that are currently institutionalized in a nursing home.  Such children are either medically fragile,

Case 0:12-cv-60460-DMM  Document 62  Entered on FLSD Docket 08/23/2012  Page 38 of 122

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

in need of skilled nursing care or intermediate care who are able and want to live in the community with appropriate supports and services,

290.   The second proposed sub-class consists of all children who are Medicaid recipients that are medically fragile and are at risk of unnecessary institutionalization in nursing facilities or Pediatric Prescribed Extended Care facilities due to the denial of medically necessary private duty nursing services.

## NUMEROSITY

291.   The proposed Class of medically fragile child Medicaid recipients is so numerous that joinder of all members is impractical.  On information and belief, more than 3,500 medically fragile child Medicaid recipients fall within the definition of the class.

## Institutionalized Sub-Class

292.   The proposed sub-class of institutionalized Plaintiffs is so numerous that joinder of all members is impractical.  On information and belief, approximately 250 children, who are medically fragile, or in need of skilled nursing or intermediate care, are unnecessarily institutionalized in Florida nursing facilities. Although the exact number is known to the Defendants and is ascertainable, the Plaintiffs do not know the exact number of individuals in the class.

## At-Risk Sub-Class

293.   The proposed sub-class of at-risk Plaintiffs is so numerous that joinder of all members is impractical. On information and belief, approximately 3,300 medically fragile children who receive private duty nursing fall within the definition of the class.

## COMMON QUESTIONS OF LAW AND FACT

294.   There are questions of law and fact common to the class including:

   a.   Whether Defendants violated Plaintiffs' and class members' rights under the ADA, in specific:

      i.   Whether the Defendants' uniform practices and policies have violated the ADA by segregating members of the sub-class of institutionalized Plaintiffs in nursing facilities and by failing to provide medically necessary services in an integrated community setting; and

      ii.   Whether the Defendants' uniform practices and policies have violated the ADA by placing members of the sub-class of at-risk Plaintiffs at risk of

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

being institutionalized in nursing homes or daytime institutionalization in Pediatric Prescribed Extended Care facilities by the denial of medically necessary private duty nursing services;

b.   Whether Defendants violated Plaintiffs' and class members' rights under Section 504 of the Rehabilitation Act, in specific:

    i.   Whether the Defendants' uniform practices and policies have violated § 504 of the Rehabilitation Act by segregating members of the sub-class of institutionalized Plaintiffs in nursing facilities and by failing to provide medically necessary services in an integrated community setting; and

    ii.  Whether the Defendants' uniform practices and policies have violated §504 of the Rehabilitation Act by placing members of the at-risk sub-class of Plaintiffs at risk of being institutionalized in nursing homes or daytime institutionalization in Pediatric Prescribed Extended Care facilities by the denial of medically necessary private duty nursing services;

c.   Whether Defendants violated Plaintiffs' and Plaintiff Class members' right under the Medicaid Act, in specific:

    i.   Whether the Defendants violated the institutionalized sub-class Plaintiffs' rights under the Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. §1396r, by failing to perform adequate PASRR reviews;

    ii.  Whether the Defendants' uniform practices and policies have violated Medicaid's EPSDT and reasonable promptness requirements by failing to provide Plaintiffs and members of Plaintiff Class with medically necessary private duty nursing services;

d.   Whether Plaintiffs and class members are entitled to declaratory and injunctive relief by virtue of Defendants' violations of law.

## TYPICALITY

295.   The Plaintiffs' claims are typical of the claims of the Plaintiff Class members because they are based on the same factual, legal and remedial theories as the claims of the Plaintiff Class, who qualify for supports and services to live in the community, but have been deprived or are being deprived such supports and services, and have been forced to be segregated in nursing facilities or are at risk of being segregated.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

296. The Plaintiff Class members are qualified persons with a disability under the ADA and Section 504 of the Rehabilitation Act.

## ADEQUACY OF REPRESENTATION

297. The Plaintiffs can and will fairly and adequately represent and protect the interests of the Plaintiff Class members because the Plaintiffs are similarly situated with, and have suffered similar injuries as, the members of the class the Plaintiffs seek to represent.

298. The Plaintiffs have no interests that conflict with or are antagonistic to the interests of the entire Plaintiff Class.

299. The Plaintiffs have retained attorneys who are skilled and knowledgeable about civil rights litigation, Medicaid law, the practice and procedures in federal courts and management of class action litigation, and who will vigorously prosecute this litigation.

## COUNT 1
### Title II of ADA
### (ALL DEFENDANTS)

300. The Plaintiffs repeat the allegations in paragraphs 1 through 299 of the Complaint as if fully set forth herein.

301. Count 1 is a claim under Title II of the ADA, 42 U.S.C. §§ 12131-12165.

302. Plaintiffs are qualified individuals with disabilities within the meaning of the ADA.

303. AHCA, FDOH, and CMS are public entities, and eQHealth is an instrumentality of a state within the meaning of the ADA.

304. The ADA requires that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

305. Further, the regulations implementing the ADA require that "a public entity shall administer services, programs and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

306. Public entities "shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." 28 C.F.R. § 35.130(b)(8).

40

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

307. As public entities and instrumentalities of the state, Defendants are prohibited  from providing "a qualified individual with a disability with an aide, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided others." 28 CFR 35.130(b)(1)(iii)

308. Defendants have discriminated against Plaintiffs and Plaintiff Class members in violation of the ADA on the basis of their disabilities by denying Plaintiffs and Plaintiff Class members medically necessary services in the community as a reasonable accommodation, resulting in Plaintiffs and Plaintiff Class members being unnecessarily institutionalized or at risk of unnecessary institutionalization in nursing facilities.

309. The Defendants have discriminated against the Plaintiffs and the Plaintiff Class members in violation of the ADA on the basis of their disabilities by:

   a. Segregating or placing the Plaintiffs and Plaintiff class members at risk of segregation and by failing to provide Plaintiffs and Plaintiff class members with appropriate community based services;

   b. Denying the Plaintiffs and the Plaintiff Class members medically necessary services resulting in the Plaintiffs' and Plaintiff Class members' institutionalization or placing them at risk of institutionalization;

   c. Denying the Plaintiffs and the Plaintiff Class members access to existing community programs and by requiring them to be confined in or at risk of being confined in segregated institutional settings in order to receive the care they require;

   d. Administering the PASRR program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class have been inappropriately admitted to nursing facilities;

   e. Administering the PASRR program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class are not provided the necessary specialized services to which they are entitled while residing in nursing facilities.

This violation entitles Plaintiffs and Plaintiff Class members to injunctive and declaratory relief under the ADA.

41

310. As a result of the Defendants' ongoing violations, the Plaintiffs and the Plaintiff Class members continue to be harmed.

## COUNT 2
### Section 504 of the Rehabilitation Act
### (ALL DEFENDANTS)

311. The Plaintiffs repeat the allegations in paragraphs 1 through 299 of the Complaint as if fully set forth herein.

312. Count 2 is a claim under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §. 794(a).

313. Plaintiffs are handicapped individuals under the Rehabilitation Act and are qualified to receive medically necessary services through Medicaid.

314. Defendants Dudek, Farmer and Wiggins are directors of agencies that receive federal financial assistance.

315. eQHealth receives Federal financial assistance.

316. The Defendants have discriminated against the Plaintiffs and Plaintiff Class members in violation of Section 504 of the Rehabilitation Act on the basis of their disabilities by denying the Plaintiffs and Plaintiff Class members medically necessary services, as a reasonable accommodation, resulting in the Plaintiffs and Plaintiff Class members being unnecessarily institutionalized or at risk of unnecessary institutionalization in nursing facilities.

317. The Defendants have discriminated against the Plaintiffs and the Plaintiff Class members in violation of Section 504 of the Rehabilitation Act on the basis of their disabilities by:

   a. Segregating or placing the Plaintiffs and Plaintiff class members at risk of segregation and by failing to provide Plaintiffs and Plaintiff class members with the appropriate community based services;

   b. Denying the Plaintiffs and the Plaintiff Class members medically necessary services resulting in the Plaintiffs' and the Plaintiff Class members' institutionalization or placing them at risk of institutionalization;

   c. Denying the Plaintiffs and the Plaintiff Class members access to existing community programs and by requiring them to be confined in or at risk of being confined in segregated institutional settings in order to receive the care they require;

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

    d.  Administering the PASRR program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class of Plaintiffs have been inappropriately admitted to nursing facilities;

    e.  Administering the PASRR program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class of Plaintiffs are not provided the necessary specialized services to which they are entitled while residing in nursing facilities.

This violation entitles Plaintiffs and Plaintiff Class members to relief under Section 504 of the Rehabilitation Act.

318.  As a result of the Defendants' ongoing violations, the Plaintiffs and the Plaintiff Class members continue to be harmed.

## COUNT 3
### 42 U.S.C. § 1983 – United States Medicaid Act – EPSDT Violations
### (ALL DEFENDANTS)

319.  The Plaintiffs repeat the allegations in paragraphs 1 through 299of the Complaint as if fully set forth herein.

320.  Count 3 is a 42 U.S.C. § 1983 claim against the Defendants for violation of Plaintiff's rights under the EPSDT provisions of the United States Medicaid Act, 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); and 42 U.S.C. § 1396d(r).

321.  AHCA's definition of "medical necessity", *see* Rule 59G-1.010(166) (incorporated through the Handbook), is preempted by federal law and is invalid pursuant to the Supremacy Clause of the United States Constitution. *See* U.S. Const. Art VI, § 2.

322.  Defendants' regulations, rules, policies, procedures, customs and practices for providing private duty nursing, below the level that is medically necessary, violate the EPSDT provisions of the federal Medicaid statute at 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); and 42 U.S.C. § 1396d(r). This violation entitles Plaintiffs to relief under 42 U.S.C. § 1983.

323.  As a result of the Defendants' violations, the Plaintiffs and Plaintiff class have been damaged.

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

## COUNT 4
### 42 U.S.C. § 1983 – United States Medicaid Act – Reasonable Promptness
### (ALL DEFENDANTS)

324.   The Plaintiffs repeat the allegations in paragraphs 1 through 299 of the Complaint as if fully set forth herein.

325.   Count 4 is a claim under 42 U.S.C. § 1983 against the Defendants for violation of Plaintiff's rights under the Reasonable Promptness provision of the United States Medicaid Act, 42 U.S.C. § 1396a(a)(8).

326.   Defendants' regulations, rules, policies, customs, and practices, which limit the provision of medically necessary community-based services and supports, as well as medically necessary specialized services, result in extended delays and outright denials of medically necessary care to the Plaintiffs and members of the Plaintiff class.

327.   The residential support, habilitation and other specialized services that Plaintiffs and the Plaintiff Class need are not provided with reasonable promptness, in violation of 42 U.S.C. § 1396a(a)(8).

328.   As a result of the Defendants' violations, the Plaintiffs and Plaintiff class have been damaged.

## COUNT 5
### 42 U.S.C. § 1983 –
### The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r
### (DUDEK, FARMER, WIGGINS)

329.   The institutionalized Plaintiffs reallege paragraphs 1 through 299 of the Complaint as if fully set forth herein.

330.   Count 5 is a § 1983 claim for the Defendants' violation of The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r.

331.   Under federal Medicaid law, Florida's CMAT is required to screen patients under the age of 21 for mental illness and mental retardation, determine whether placement in a nursing facility is appropriate and if specialized services are needed, and to provide the specialized services that are necessary. *See* 42 U.S.C. § 1396r(e)(7).

332.   The Defendants' PASRR program does not adequately screen applicants to nursing facilities to determine if they have a mental illness or mental retardation. As a result, many children with a mental illness or mental retardation that can be served in the

44

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

community are wrongfully admitted to nursing facilities and are never provided a Level II PASRR evaluation and determination, as required by federal law. 42 C.F.R. § 483.112.

333.   The Defendants' PASRR program does not adequately or appropriately assess whether a child with mental illness or mental retardation who needs an institutional level of services can be served in another specialized facility, as required by federal law. 42 C.F.R. § 483.118.

334.   The Defendants' PASRR program does not adequately or appropriately assess whether a child with mental illness or mental retardation needs any specialized habilitative services and, if so, what those specific needs and services are. 42 C.F.R. § 483.112(b).

335.   As a result of the Defendants' ongoing violations, the institutionalized Plaintiffs and members of the sub-class of institutionalized Plaintiffs continue to be harmed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

(1)   Declare that the Defendants violated the Americans With Disabilities Act when they refused to provide medically necessary services, and reasonable accommodations to the at risk Plaintiffs and members of the at-risk Plaintiff sub-class, resulting in the at risk Plaintiffs and members of the at-risk Plaintiff sub-class being at risk of unnecessary institutionalization in nursing facilities;

(2)   Declare that the Defendants violated the Americans with Disabilities Act when they segregated the institutionalized Plaintiffs and members of the institutionalized Plaintiff sub-class and failed to provide them with integrated community services;

(3)   Declare that the Defendants violated Section 504 of the Rehabilitation Act of 1973 when they refused to provide medically necessary services and reasonable accommodations to the at risk Plaintiffs and members of the at risk Plaintiff sub-class, resulting in the at risk Plaintiffs and members of the at-risk Plaintiff sub-class being at risk of unnecessary institutionalization in nursing facilities;

(4)   Declare that the Defendants violated Section 504 of the Rehabilitation Act of 1973 when they segregated the institutionalized Plaintiffs and members of the institutionalized sub-class and failed to provide integrated community services;

(5)   Declare that the Defendants have violated the Medicaid Act: 42 U.S.C. § 1396a(a)(43); 42 U.S.C. § 1396d(a)(4)(B); 42 U.S.C. § 1396d(r); and 42 U.S.C. 1396a(a)(8);

(6)     Declare Defendants deprived the institutionalized Plaintiffs and members of the institutionalized sub-class of their rights to be properly screened under the Nursing Home Reform Amendments to the Medicaid Act and of specialized services once they were placed in a nursing facility;

(7)     Order the Defendants to provide private duty nursing services that will allow the Plaintiffs and Plaintiff class members to live in their homes and communities;

(8)     Order the Defendants to cease the practice of denying or reducing Plaintiff and Plaintiff Class members' services at recertification where there has been no change in the medical necessity of such services;

(9)     Enter a permanent injunction requiring the Defendants to stop segregation of medically fragile children who are unnecessarily institutionalized in nursing homes and to provide integrated community services;

(10)    Enter a permanent injunction requiring the Defendants to perform adequate Level I and Level II PASSR reviews to institutionalized children and to provide such services as determined by the Level II screening;

(11)    Award compensatory services to the Plaintiffs and the Plaintiff Class members to ameliorate or remediate the conditions resulting from the Defendants' failure to provide the medically necessary services;

(12)    Award attorneys' fees and costs pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12133; and 29 U.S.C. § 794a; and

(13)    Grant such other and further relief as this court may deem just and proper.


Respectfully Submitted on this 15th day of August, 2012,

**Law Offices of Matthew W. Dietz, P.L.**

2990 SW 35th Ave.
Miami, FL 33133
Phone:  (305) 669-2822
Fax:      (305) 442-4181
Email: _Matthewdietz@usdisabilitylaw.com_
Lead Trial Attorney

By: s/ Matthew W. Dietz
     Matthew W. Dietz
     Fla. Bar No. 84905

**FSU College of Law Public Interest Law Center**

425 W. Jefferson Street
Tallahassee, FL 32306
Phone: (850) 644-9928/F: (850) 644-0879
Email: _Pannino@law.fsu.edu_

By:  s/ Paolo G. Annino
      Paolo G. Annino
      Florida Bar No. 0379166

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

**The North Florida Center For Equal Justice, Inc.**
2121 Delta Blvd.
Phone: (850) 701-3980
Fax:     (850) 701-3985
Co-counsel

By: s/ Jamie Ito
    Jamie Ito
    Fla. Bar No. 13553
    *jamie@nfcfej.org*
By: s/ Edward J. Grunewald
    Edward J. Grunewald
    Fla. Bar No. 612472
    *egrunewald@nfcfej.org*
By: s/ Jill B. Zaborske
    Jill B. Zaborske
    Fla. Bar No. 621005
    *jill@nfcfej.org*
    Tallahassee, FL 32303

T.H. et al., v. DUDEK et al.
SECOND AMENDED CONSOLIDATED COMPLAINT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that true and correct copies of the foregoing were served upon the following via CM/ECF and U.S. Mail on this 15th day of August, 2012.

BY:  s/ Matthew Dietz
Matthew W. Dietz

Stuart F. Williams
General Counsel
Andrew T. Sheeran
Assistant General Counsel
Beverly H. Smith
Assistant General Counsel
Agency for Health Care Administration
2727 Mahan Drive
Building 3, MS #3
Tallahassee, FL 32308

Jennifer A. Tschetter
General Counsel
Florida Department of Health
4052 Bald Cypress Way, Bin A02
Tallahassee, Florida 32399-1703

Lisa M. Raleigh
Special Counsel
Florida Bar No. 0858498
PL-01, The Capitol
Tallahassee, FL 32399-1050
Ph. (850) 414-3300
Fax (850) 414-9650
Email: lisa.raleigh@gmail.com

Lisa Scoles
Harry Osborne Thomas
Radey Thomas Yon & Clark, P.A.
301 S. Bronough Street
Suite 200
Tallahassee, FL 32301

Plaintiffs'

# Exhibit A

Contract No. MED128

## STATE OF FLORIDA
## AGENCY FOR HEALTH CARE ADMINISTRATION
## STANDARD CONTRACT

THIS CONTRACT is entered into between the State of Florida, **AGENCY FOR HEALTH CARE ADMINISTRATION**, hereinafter referred to as the "**Agency**", whose address is 2727 Mahan Drive, Tallahassee, Florida 32308, and **EQHEALTH SOLUTIONS, INC.** hereinafter referred to as the "**Vendor**", whose address is 8591 United Plaza Boulevard, Suite 270, Baton Rouge, Louisiana, 70809, a State of Louisiana non-profit corporation authorized to transact business in the State of Florida, to provide services for the Comprehensive Medicaid Utilization Management Program (CMUMP).

I.   **THE VENDOR HEREBY AGREES:**

   A.   **General Provisions**

      1.   To provide services according to the terms and conditions set forth in this Contract, **Attachment I**, Scope of Services, and all other attachments named herein which are attached hereto and incorporated by reference (collectively referred to herein as the "Contract").

      2.   To perform as an independent vendor and not as an agent, representative, or employee of the Agency.

      3.   To recognize that the State of Florida, by virtue of its sovereignty, is not required to pay any taxes on the services or goods purchased under the terms of this Contract.

   B.   **Federal Laws and Regulations**

      1.   This Contract contains federal funds, therefore, the Vendor shall comply with the provisions of 45 CFR, Part 74, and/or 45 CFR, Part 92, and other applicable regulations.

      2.   This Contract contains federal funding in excess of $100,000, therefore, the Vendor must, upon Contract execution, complete the Certification Regarding Lobbying form, **Attachment III.** If a Disclosure of Lobbying Activities form, Standard Form LLL, is required, it may be obtained from the Agency's Contract Manager. All disclosure forms as required by the Certification Regarding Lobbying form must be completed and returned to the Agency's Procurement Office.

      3.   Pursuant to 45 CFR, Part 76, the Vendor must, upon Contract execution, complete the Certification Regarding Debarment, Suspension, Ineligibility, and Voluntary Exclusion Contracts/Subcontracts, **Attachment IV.**

   C.   **Audits and Records**

      1.   To maintain books, records, and documents (including electronic storage media) pertinent to performance under this Contract in accordance with generally accepted accounting procedures and practices which sufficiently

and properly reflect all revenues and expenditures of funds provided by the Agency under this Contract.

2. To assure that these records shall be subject at all reasonable times to inspection, review, or audit by state personnel and other personnel duly authorized by the Agency, as well as by federal personnel.

3. To maintain and file with the Agency such progress, fiscal and inventory reports as specified in **Attachment I** and other reports as the Agency may require within the period of this Contract. In addition, access to relevant computer data and applications which generated such reports should be made available upon request.

4. To ensure that all related party transactions are disclosed to the Agency Contract Manager.

5. To include these aforementioned audit and record keeping requirements in all approved subcontracts and assignments.

### D.   Retention of Records

1. To retain all financial records, supporting documents, statistical records, and any other documents (including electronic storage media) pertinent to performance under this Contract for a period of five (5) years after termination of this Contract, or if an audit has been initiated and audit findings have not been resolved at the end of five (5) years, the records shall be retained until resolution of the audit findings.

2. Persons duly authorized by the Agency and federal auditors, pursuant to 45 CFR, Part 74 and/or 45 CFR, Part 92, shall have full access to and the right to examine any of said records and documents.

3. The rights of access in this section must not be limited to the required retention period but shall last as long as the records are retained.

### E.   Monitoring

1. To provide reports as specified in **Attachment I**. These reports will be used for monitoring progress or performance of the contractual services as specified in **Attachment I**.

2. To permit persons duly authorized by the Agency to inspect any records, papers, documents, facilities, goods and services of the Vendor which are relevant to this Contract.

### F.   Indemnification

The Vendor shall save and hold harmless and indemnify the State of Florida and the Agency against any and all liability, claims, suits, judgments, damages or costs of whatsoever kind and nature resulting from the use, service, operation or performance of work under the terms of this Contract, resulting from any act, or failure to act, by the Vendor, its subcontractor, or any of the employees, agents or representatives of the Vendor or subcontractor.

**G.  Insurance**

1.  To the extent required by law, the Vendor will be self-insured against, or will secure and maintain during the life of this Contract, Workers' Compensation Insurance for all its employees connected with the work of this project and, in case any work is subcontracted, the Vendor shall require the subcontractor similarly to provide Workers' Compensation Insurance for all of the latter's employees unless such employees engaged in work under this Contract are covered by the Vendor's self insurance program.   Such self insurance or insurance coverage shall comply with the Florida Workers' Compensation law.    In the event hazardous work is being performed by the Vendor under this Contract and any class of employees performing the hazardous work is not protected under Workers' Compensation statutes, the Vendor shall provide, and cause each subcontractor to provide, adequate insurance satisfactory to the Agency, for the protection of its employees not otherwise protected.

2.  The Vendor shall secure and maintain Commercial General Liability insurance including bodily injury, property damage, personal & advertising injury and products and completed operations. This insurance will provide coverage for all claims that may arise from the services and/or operations completed under this Contract, whether such services and/or operations are by the Vendor or anyone directly employed by it.  Such insurance shall include a Hold Harmless Agreement in favor of the State of Florida and also include the State of Florida as an Additional Named Insured for the entire length of the Contract.   The Vendor shall set the limits of liability necessary to provide reasonable financial protections to the Vendor and the State of Florida under this Contract.

3.  All insurance policies shall be with insurers licensed or eligible to transact business in the State of Florida.    The Vendor's current certificate of insurance shall contain a provision that the insurance will not be canceled for any reason except after thirty (30) days written notice to the Agency's Contract Manager.

**H.   Assignments and Subcontracts**

To neither assign the responsibility of this Contract to another party nor subcontract for any of the work contemplated under this Contract without prior written approval of the Agency.  No such approval by the Agency of any assignment or subcontract shall be deemed in any event or in any manner to provide for the incurrence of any obligation of the Agency in addition to the total dollar amount agreed upon in this Contract.  All such assignments or subcontracts shall be subject to the conditions of this Contract and to any conditions of approval that the Agency shall deem necessary.

**I.   Return of Funds**

To return to the Agency any overpayments due to unearned funds or funds disallowed pursuant to the terms of this Contract that were disbursed to the Vendor by the Agency.   The Vendor shall return any overpayment to the Agency within forty (40) calendar days after either discovery by the Vendor, its independent auditor, or notification by the Agency, of the overpayment.

**J.   Purchasing**

1. **P.R.I.D.E.**

It is expressly understood and agreed that any articles which are the subject of, or required to carry out this Contract shall be purchased from the corporation identified under Chapter 946, Florida Statutes, if available, in the same manner and under the same procedures set forth in Section 946.515(2), and (4), Florida Statutes; and, for purposes of this Contract, the person, firm or other business entity carrying out the provisions of this Contract shall be deemed to be substituted for this Agency insofar as dealings with such corporation are concerned.

The "Corporation identified" is PRISON REHABILITATIVE INDUSTRIES AND DIVERSIFIED ENTERPRISES, INC. (P.R.I.D.E.) which may be contacted at:

P.R.I.D.E.
12425 28th Street North, Suite 300
St. Petersburg, FL 33716
E-Mail: info@pride-enterprises.org
(727) 556-3300
Toll Free: 1-800-643-8459
Fax: (727) 570-3366

2. **RESPECT of Florida**

It is expressly understood and agreed that any articles that are the subject of, or required to carry out, this Contract shall be purchased from a nonprofit agency for the blind or for the severely handicapped that is qualified pursuant to Chapter 413, Florida Statutes, in the same manner and under the same procedures set forth in Section 413.036(1) and (2), Florida Statutes; and, for purposes of this Contract, the person, firm, or other business entity carrying out the provisions of this Contract shall be deemed to be substituted for this Agency insofar as dealings with such qualified nonprofit agency are concerned.

The "nonprofit agency" identified is RESPECT of Florida which may be contacted at:

RESPECT of Florida
2475 Apalachee Parkway, Suite 205
Tallahassee, Florida 32301-4946
(850) 487-1471
Website: www.respectofflorida.org

3. **Procurement of Products or Materials with Recycled Content**

It is expressly understood and agreed that any products which are required to carry out this Contract shall be procured in accordance with the provisions of Section 403.7065, Florida Statutes.

**K.    Civil Rights Requirements/Vendor Assurance**

The Vendor assures that it will comply with:

1.  Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d et seq., which prohibits discrimination on the basis of race, color, or national origin.
2.  Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of handicap.
3.  Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. 1681 et seq., which prohibits discrimination on the basis of sex.
4.  The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 et seq., which prohibits discrimination on the basis of age.
5.  Section 654 of the Omnibus Budget Reconciliation Act of 1981, as amended, 42 U.S.C. 9849, which prohibits discrimination on the basis of race, creed, color, national origin, sex, handicap, political affiliation or beliefs.
6.  The Americans with Disabilities Act of 1990, P.L. 101-336, which prohibits discrimination on the basis of disability and requires reasonable accommodation for persons with disabilities.
7.  All regulations, guidelines, and standards as are now or may be lawfully adopted under the above statutes.

The Vendor agrees that compliance with this assurance constitutes a condition of continued receipt of or benefit from funds provided through this Contract, and that it is binding upon the Vendor, its successors, transferees, and assignees for the period during which services are provided. The Vendor further assures that all contractors, subcontractors, subgrantees, or others with whom it arranges to provide services or benefits to participants or employees in connection with any of its programs and activities are not discriminating against those participants or employees in violation of the above statutes, regulations, guidelines, and standards.

**L.    Discrimination**

An entity or affiliate who has been placed on the discriminatory vendor list may not submit a bid, proposal, or reply on a contract to provide any goods or services to a public entity; may not submit a bid, proposal, or reply on a contract with a public entity for the construction or repair of a public building or public work; may not submit bids, proposals, or replies on leases of real property to a public entity; may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a contract with any public entity; and may not transact business with any public entity. The Florida Department of Management Services is responsible for maintaining the discriminatory vendor list and intends to post the list on its website. Questions regarding the discriminatory vendor list may be directed to the Florida Department of Management Services, Office of Supplier Diversity at (850) 487-0915.

**M.   Requirements of Section 287.058, Florida Statutes**

1.  To submit bills for fees or other compensation for services or expenses in detail sufficient for a proper pre-audit and post-audit thereof.

2. Where applicable, to submit bills for any travel expenses in accordance with Section 112.061, Florida Statutes. The Agency may establish rates lower than the maximum provided in Section 112.061, Florida Statutes.

3. To provide units of deliverables, including reports, findings, and drafts, in writing and/or in an electronic format agreeable to both parties, as specified in **Attachment I**, Scope of Services, to be received and accepted by the Contract Manager prior to payment.

4. To comply with the criteria and final date, as specified herein, by which such criteria must be met for completion of this Contract.

This Contract shall begin upon execution by both parties and end on **June 30, 2014**, inclusive.

In accordance with Section 287.057(13), Florida Statutes, this Contract may be renewed for a period that may not exceed three (3) years or the term of the original Contract, whichever period is longer. Renewal of the Contract shall be in writing and subject to the same terms and conditions set forth in the initial contract. A renewal Contract may not include any compensation for costs associated with the renewal. Renewals are contingent upon satisfactory performance evaluations by the Agency, are subject to the availability of funds, and optional to the Agency.

Pursuant to Chapter 2010-151, Laws of Florida, Section 47, the Agency shall review existing contract renewals and re-procurements with the Vendor in an effort to reduce contract payments by at least 3 percent (3%), but not affect the level and quality of services.

5. The Vendor agrees that the Agency may unilaterally cancel this Contract for refusal by the Vendor to allow public access to all documents, papers, letters, or other material made or received by the Vendor in conjunction with this Contract, unless the records are exempt from Section 24(a) of Art. I of the State Constitution and Section 119.07(1), Florida Statutes.

6. To comply with Patents, Royalties, Copyrights, Right to Data, and Works for Hire/Software requirements as follows:

The Vendor, without exception, shall indemnify and hold harmless the Agency and its employees from liability of any nature or kind, including cost and expenses for or on account of any copyrighted, patented, or unattended invention, process, or article manufactured or supplied by the Vendor. The Vendor has no liability when such claim is solely and exclusively due to the combination, operation or use of any article supplied hereunder with equipment or data not supplied by the Vendor or is based solely and exclusively upon the Agency's alteration of the article.

The Agency shall provide prompt written notification of a claim of copyright or patent infringement and shall afford the Vendor full opportunity to defend the action and control the defense. Further, if such a claim is made or is pending, the Vendor may, at its option and expense procure for the Agency the right to continue the use of, replace or modify the article to render it non-infringing (if none of the alternatives is reasonably available, the Agency agrees to return the article on request to the Vendor and

receive reimbursement, if any, as may be determined by a court of competent jurisdiction).

If the Vendor brings to the performance of this Contract a pre-existing patent, patent-pending and/or copyright at the time of Contract execution, the Vendor shall retain all rights and entitlements to that pre-existing patent, patent-pending and/or copyright, unless this Contract provides otherwise.

If the Vendor uses any design, device, or materials covered by letter, patent, or copyright, it is mutually agreed and understood without exception that the proposed prices shall include all royalties or cost arising from the use of such design, device, or materials in any way involved in the work. Prior to the initiation of services under this Contract, the Vendor shall disclose, in writing, all intellectual properties relevant to the performance of this Contract which the Vendor knows, or should know, could give rise to a patent or copyright. The Vendor shall retain all rights and entitlements to any pre-existing intellectual property which is so disclosed. Failure to disclose will indicate that no such property exists. The Agency shall then have the right to all patents and copyrights which arise as a result of performance under this Contract as provided in this section.

If any discovery or invention arises or is developed in the course of, or as a result of, work or services performed under this Contract, or in any way connected herewith, the Vendor shall refer the discovery or invention to the Agency for a determination whether patent protection will be sought in the name of the State of Florida. Any and all patent rights accruing under or in connection with the performance of this Contract are hereby reserved to the State of Florida. All materials to which the Agency is to have patent rights or copyrights shall be marked and dated by the Vendor in such a manner as to preserve and protect the legal rights of the Agency.

Where activities supported by this Contract produce original writing, sound recordings, pictorial reproductions, drawings or other graphic representation and works of any similar nature, the Agency has the right to use, duplicate and disclose such materials in whole or in part, in any manner, for any purpose whatsoever and to have others acting on behalf of the Agency to do so. If the materials so developed are subject to copyright, trademark, or patent, legal title and every right, interest, claim, or demand of any kind in and to any patent, trademark or copyright, or application for the same, shall vest in the State of Florida, Department of State for the exclusive use and benefit of the state. Pursuant to Section 286.021, Florida Statutes, no person, firm, corporation, including parties to this Contract shall be entitled to use the copyright, patent, or trademark without the prior written consent of the Florida Department of State.

The Agency shall have unlimited rights to use, disclose, or duplicate, for any purpose whatsoever, all information and data developed, derived, documented, or furnished by the Vendor under this Contract.

All rights and title to works for hire under this Contract, whether patentable or copyrightable or not, shall belong to the Agency and shall be subject to the terms and conditions of this Contract.

The computer programs, materials and other information furnished by the Agency to the Vendor hereunder shall be and remain the sole and exclusive property of the Agency, free from any claim or right of retention by or on behalf of the Vendor. The services and products listed in this Contract shall become the property of the Agency upon the Vendor's performance and delivery thereof. The Vendor hereby acknowledges that said computer programs, materials and other information provided by the Agency to the Vendor hereunder, together with the products delivered and services performed by the Vendor hereunder, shall be and remain confidential and proprietary in nature to the extent provided by Chapter 119, Florida Statutes, and that the Vendor shall not disclose, publish or use same for any purpose other than the purposes provided in this Contract; however, upon the Vendor first demonstrating to the Agency's satisfaction that such information, in part or in whole, (1) was already known to the Vendor prior to its receipt from the Agency; (2) became known to the Vendor from a source other than the Agency; or (3) has been disclosed by the Agency to third parties without restriction, the Vendor shall be free to use and disclose same without restriction. Upon completion of the Vendor's performance or otherwise cancellation or termination of this Contract, the Vendor shall surrender and deliver to the Agency, freely and voluntarily, all of the above-described information remaining in the Vendor's possession.

The Vendor warrants that all materials produced hereunder will be of original development by the Vendor and will be specifically developed for the fulfillment of this Contract and will not knowingly infringe upon or violate any patent, copyright, trade secret or other property right of any third party, and the Vendor shall indemnify and hold the Agency harmless from and against any loss, cost, liability or expense arising out of any breach or claimed breach of this warranty.

The terms and conditions specified in this section shall also apply to any subcontract made under this Contract. The Vendor shall be responsible for informing the subcontractor of the provisions of this section and obtaining disclosures.

7. The financial consequences that the Agency must apply if the Vendor fails to perform in accordance with this Contract are outlined in **Attachment I,** Scope of Services.

## N.  Sponsorship

Pursuant to Section 286.25, Florida Statutes, any nongovernmental organization which sponsors a program financed partially by state funds or funds obtained from a state agency shall, in publicizing, advertising, or describing the sponsorship of the program, state:

"Sponsored by   **EQHEALTH SOLUTIONS, INC.** and the State of Florida, **AGENCY FOR HEALTH CARE ADMINISTRATION**".

If the sponsorship reference is in written material, the words "State of Florida, AGENCY FOR HEALTH CARE ADMINISTRATION" shall appear in the same size letters or type as the name of the organization.

**O.   Final Invoice**

The Vendor must submit the final invoice for payment to the Agency no more than **fifteen (15) days** after the Contract ends or is terminated.  If the Vendor fails to do so, all right to payment is forfeited and the Agency will not honor any requests submitted after the aforesaid time period.  Any payment due under the terms of this Contract may be withheld until all reports due from the Vendor and necessary adjustments thereto have been approved by the Agency.

**P.   Use Of Funds For Lobbying Prohibited**

To comply with the provisions of Section 216.347, Florida Statutes, which prohibits the expenditure of Contract funds for the purpose of lobbying the Legislature, the judicial branch or a state agency.

**Q.   Public Entity Crime**

A person or affiliate who has been placed on the convicted vendor list following a conviction for a public entity crime may not be awarded or perform work as a contractor, supplier, subcontractor, or consultant under a contract with any public entity, and may not transact business with any public entity in excess of the threshold amount provided in Section 287.017, Florida Statutes, for category two, for a period of 36 months from the date of being placed on the convicted vendor list.

**R.   Health Insurance Portability and Accountability Act**

To comply with the Department of Health and Human Services Privacy Regulations in the Code of Federal Regulations, Title 45, Sections 160 and 164, regarding disclosure of protected health information as specified in **Attachment II.**

**S.   Confidentiality of Information**

Not to use or disclose any confidential information, including social security numbers that may be supplied under this Contract pursuant to law, and also including the identity or identifying information concerning a Medicaid recipient or services under this Contract for any purpose not in conformity with state and federal laws, except upon written consent of the recipient, or his/her guardian.

**T.   Employment**

To comply with Section 274A (e) of the Immigration and Nationality Act.  The Agency shall consider the employment by any contractor of unauthorized aliens a violation of this Act.  If the Vendor knowingly employs unauthorized aliens, such violation shall be cause for unilateral cancellation of this Contract.  The Vendor shall be responsible for including this provision in all subcontracts with private organizations issued as a result of this Contract.

### U.   Work Authorization Program

The Immigration Reform and Control Act of 1986 prohibits employers from knowingly hiring illegal workers. The Vendor shall only employ individuals who may legally work in the United States – either U.S. citizens or foreign citizens who are authorized to work in the U.S. The Vendor shall use the U.S. Department of Homeland Security's E-Verify Employment Eligibility Verification system to verify the employment eligibility of:

> ➤ all persons employed by the Vendor, during the term of this Contract, to perform employment duties within Florida; and,
> ➤ all persons (including subcontractors) assigned by the Vendor to perform work pursuant to this Contract.

The Vendor shall include this provision in all subcontracts it enters into for the performance of work under this Contract.

## II.   THE AGENCY HEREBY AGREES:

### A.   Contract Amount

To pay for contracted services according to the conditions of **Attachment I** in an amount not to exceed **$50,073,958.00**, subject to the availability of funds. The State of Florida's performance and obligation to pay under this Contract is contingent upon an annual appropriation by the Legislature.

### B.   Contract Payment

Section 215.422, Florida Statutes, provides that agencies have five (5) working days to inspect and approve goods and services, unless bid specifications, Contract or purchase order specifies otherwise. With the exception of payments to health care providers for hospital, medical, or other health care services, if payment is not available within forty (40) days, measured from the latter of the date the invoice is received or the goods or services are received, inspected and approved, a separate interest penalty set by the Comptroller pursuant to Section 55.03, F.S., will be due and payable in addition to the invoice amount. To obtain the applicable interest rate, please contact the Agency's Fiscal Section at (850) 412-3901, or utilize the Department of Financial Services website at www.myfloridacfo.com/aadir/interest.htm. Payments to health care providers for hospital, medical or other health care services, shall be made not more than thirty-five (35) days from the date eligibility for payment is determined, and the daily interest rate is .0003333%. Invoices returned to a vendor due to preparation errors will result in a payment delay. Invoice payment requirements do not start until a properly completed invoice is provided to the Agency. A Vendor Ombudsman, whose duties include acting as an advocate for vendors who may be experiencing problems in obtaining timely payment(s) from a State agency, may be contacted at (850) 488-5516 or by calling the State Comptroller's Hotline, 1-800-848-3792.

III. **THE VENDOR AND AGENCY HEREBY MUTUALLY AGREE:**

A. **Termination**

1. **Termination at Will**

This Contract may be terminated by the Agency upon no less than thirty (30) calendar days written notice, without cause, unless a lesser time is mutually agreed upon by both parties. Said notice shall be delivered by certified mail, return receipt requested, or in person with proof of delivery.

2. **Termination Due To Lack of Funds**

In the event funds to finance this Contract become unavailable, the Agency may terminate the Contract upon no less than twenty-four (24) hours' written notice to the Vendor. Said notice shall be delivered by certified mail, return receipt requested, or in person with proof of delivery. The Agency shall be the final authority as to the availability of funds. The Vendor shall be compensated for all work performed up to the time notice of termination is received.

3. **Termination for Breach**

Unless the Vendor's breach is waived by the Agency in writing, the Agency may, by written notice to the Vendor, terminate this Contract upon no less than twenty-four (24) hours' written notice. Said notice shall be delivered by certified mail, return receipt requested, or in person with proof of delivery. If applicable, the Agency may employ the default provisions in Chapter 60A-1.006(4), Florida Administrative Code.

Waiver of breach of any provisions of this Contract shall not be deemed to be a waiver of any other breach and shall not be construed to be a modification of the terms of this Contract. The provisions herein do not limit the Agency's right to remedies at law or to damages.

B. **Contract Managers**

1. The Agency's Contract Manager's contact information is as follows:

**Lakia Daniels**
**Agency for Health Care Administration**
**2727 Mahan Drive, MS# 20**
**Tallahassee, FL  32308**
**(850) 412-4268**

2. The Vendor's Contract Manager's contact information is as follows:

**Cheryl Collins**
**eQHealth Solutions, Inc.**
**Suite 270**
**8591 United Plaza Blvd.**
**Baton Rouge, LA  70809**
**(727) 560-5604**

3. All matters shall be directed to the Contract Managers for appropriate action or disposition. A change in Contract Manager by either party shall be reduced to writing through an amendment or minor modification to this Contract by the Agency.

## C. Renegotiation or Modification

1. Modifications of provisions of this Contract shall only be valid when they have been reduced to writing and duly signed during the term of the Contract. The parties agree to renegotiate this Contract if federal and/or state revisions of any applicable laws, or regulations make changes in this Contract necessary.

2. The rate of payment and the total dollar amount may be adjusted retroactively to reflect price level increases and changes in the rate of payment when these have been established through the appropriations process and subsequently identified in the Agency's operating budget.

## D. Name, Mailing and Street Address of Payee

1. The name (Vendor name as shown on Page 1 of this Contract) and mailing address of the official payee to whom the payment shall be made:

   **eQHealth Solutions, Inc.**
   **Suite 270**
   **8591 United Plaza Blvd.**
   **Baton Rouge, LA 70809**

2. The name of the contact person and street address where financial and administrative records are maintained:

   **Patrick Tullier, CFO**
   **Suite 270**
   **8591 United Plaza Blvd.**
   **Baton Rouge, LA 70809**

## E. All Terms and Conditions

This Contract and its attachments as referenced herein contain all the terms and conditions agreed upon by the Parties.

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

**IN WITNESS THEREOF,** the Parties hereto have caused this seventy-three (73) page Contract, which includes any referenced attachments, to be executed by their undersigned officials as duly authorized. This Contract is not valid until signed <u>and</u> dated by both parties.

| EQHEALTH SOLUTIONS, INC. | STATE OF FLORIDA, AGENCY FOR HEALTH CARE ADMINISTRATION |
|---|---|
| SIGNED BY: | SIGNED BY: |
| NAME: **Gary L. Curtis** | NAME: **Elizabeth Dudek** |
| TITLE: **President & CEO** | TITLE: **Interim Secretary** |
| DATE: **02 - 24 - 2011** | DATE: |

**FEDERAL ID NUMBER (or SS Number for an individual):** 72-1081340

**VENDOR FISCAL YEAR ENDING DATE: December 31**

List of Attachments/Exhibits included as part of this Contract:

| Specify Type | Letter/ Number | Description |
|---|---|---|
| Attachment | I | Scope of Services (54 Pages) |
| Attachment | II | Business Associate Agreement (4 Pages) |
| Attachment | III | Lobbying Certification (1 Page) |
| Attachment | IV | Debarment Certification (1 Page) |

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

# ATTACHMENT I
# SCOPE OF SERVICES

**A.**     **Service(s) to be Provided:**

### 1. General Background

The Agency for Health Care Administration (Agency) is the single state agency responsible for administering the Medicaid program in Florida.

There are currently over 2.8 million recipients enrolled in the Florida Medicaid program, with over one-third of the population continuing to receive services on a fee-for-service basis. The other two-thirds of Medicaid recipients are enrolled in a Medicaid managed care plan. State Medicaid spending is estimated to be $18.8 billion in State Fiscal Year 2008-2009.

The Code of Federal Regulations, 42 C.F.R. 456, directs the States to implement appropriate utilization controls that safeguard against the unnecessary or inappropriate use of Medicaid services, protect against excess payments, and assess the quality of services. The Vendor, a federally designated Quality Improvement Organization (QIO), shall develop and implement a statewide comprehensive utilization management program of the Medicaid services identified below, and as outlined in AHCA ITN 1007, Addendum No. 1, the Vendor's response, including the Best and Final Offer (BAFO), which are hereby incorporated by reference and become a part of the Contract. In the event of a conflict between any provision of this Contract, AHCA ITN 1007, Addendum No. 1, and the Vendor's response, including the Best and Final Offer (BAFO), the Agency, at its sole discretion, shall make a determination as to which provision shall govern.

- Inpatient Medical and Surgical Services;
- Home Health Services;
- Prescribed Pediatric Extended Care (PPEC) Services; and
- Therapy Services.

### 2. Inpatient Medical and Surgical Services General Description

Section 409.905 (5) (a), Florida Statutes, directs the Agency to implement prior authorization of inpatient hospital medical services and reimbursement/utilization management reforms in order to achieve reductions in program costs. In addition, s. 409.905 (5) (e), Florida Statutes, directs the Agency to implement a comprehensive utilization management program for hospital neonatal intensive care stays in certain high-volume participating hospitals, select counties, or statewide in order to manage the lengths of stay for children being treated in the NICU.

Florida Medicaid reimburses hospital services based on an established per-diem rate. Medicaid reimbursement for inpatient hospital care for adults age 21 and older is limited to 45 days per fiscal year. The only exception to the 45 day cap is when a patient requires inpatient care due to an emergency condition that meets the criteria established in the Balanced Budget Act of 1997. There is no limit on the number of days of hospital services that Medicaid can reimburse for recipients under age 21.

The Medicaid hospital services program reimburses for emergency services provided to undocumented non-citizens (aliens) who meet all Medicaid eligibility requirements except for citizenship status. Eligibility can be established only for the duration of the emergency.

General acute care hospitals and comprehensive medical rehabilitation hospitals may participate in the Medicaid hospital services program. Freestanding psychiatric hospitals (Institutions of Mental Disease) cannot enroll in the Medicaid hospital services program.

### 3. Home Health Services General Description

Section 409.905 (4), Florida Statutes directs the Agency to implement a utilization management program, which includes prior authorization of home health services. Home health services are defined as home health visits, private duty nursing, and personal care services. In addition, Senate Bill 1986, passed in the 2009 Legislative Session requires the Agency to develop and implement a comprehensive care management pilot project for recipients receiving home health visits in Miami-Dade.

The purpose of the Medicaid home health program is to provide medically necessary care to an eligible Medicaid recipient whose medical condition, illness, or injury requires the delivery of care in his or her place of residence. Medicaid reimburses providers for the following home health services: home health visits, private duty nursing, and personal care services.

A home health visit is not limited to a specific length of time, but is defined as the length of time needed to provide the medically necessary nursing or home health aide service(s). Recipients are limited to four (4) intermittent visits per day with any combination of nursing and/or home health visits. Home health visits must be provided through a Medicaid enrolled licensed home health agency.

Medicaid reimburses private duty nursing and personal care services for Medicaid eligible recipients under the age of twenty-one (21) who have complex medical problems and require more continuous care than can be provided through a home health visit (a minimum of 2 continuous hours of care). Private duty nursing services must be provided through a Medicaid enrolled licensed home health agency. Personal care services must be provided through a Medicaid enrolled licensed home health agency or a Medicaid enrolled unlicensed independent personal care provider.

Medicaid reimbursement for home health visits, private duty nursing, or personal care services does not include travel time to or from the recipient's place of residence.

### 4. Prescribed Pediatric Extended Care (PPEC) Services

The purpose of the Florida Medicaid PPEC services program is to enable children with medically complex conditions to receive medical care at a non-residential pediatric center. PPEC centers provide a cost effective and less restrictive alternative to private duty nursing or institutionalization, and reduce the isolation that homebound children may experience.

A PPEC facility serves three or more children under the age of 21 who require short, long-term, or intermittent medical care due to medically-complex conditions. A PPEC offers services that meet the child's physiological, developmental, nutritional, and social

needs. Medicaid reimburses a PPEC a fixed rate for providing medically-necessary basic services, which include: nursing services, psychosocial services, developmental therapies, caregiver training, and personal care during the recipient's stay at the center.

## 5. Therapy Services General Description

Section 409.912 (42), Florida Statutes, directs the Agency to develop and implement a utilization management program for Medicaid-eligible recipients for the management of occupational, physical, respiratory, and speech language pathology services. The Agency shall establish a utilization program that may require prior authorization in order to ensure medically necessary and cost-effective treatments.

The purpose of the therapy services program is to provide medically necessary physical therapy, occupational therapy, respiratory therapy, and speech-language pathology services to Medicaid recipients under the age of 21. Services include evaluation and treatment of the deficit.

## 6. Florida Medicaid Management Information System

The Agency maintains the Florida Medicaid Management Information System (FMMIS) that contains recipient and provider information, including benefit plans and claims data. The Agency's contracted QIO interfaces with the Agency's Fiscal Agent in order to generate a prior authorization number. The FMMIS contains information about each service provider that allows the system to generate a service authorization with service provider and recipient specific information necessary to the provision of services. Once providers receive these service authorizations, they are allowed to begin delivery of the services and are to provide the services in accordance with the schedule and units specified in the service authorization.

## 7. Purpose

The Vendor shall develop and implement a comprehensive utilization management program for inpatient hospital, home health, PPEC, and therapy services.

The primary purpose of the utilization management program is to safeguard against the provision of unnecessary medical services or inappropriate use of Medicaid services and to ensure appropriate care.

The goals of the Comprehensive Medicaid Utilization Management Program (CMUMP) are to cost-effectively provide at a minimum the following:

- Medical consultation in determining whether services are medically necessary, reasonable in scope, and consistent with Florida Medicaid policy and quality standards of health care;

- Data analyses and monitoring of selected cases to verify, through medical record review, the existence of problems or violations of provider obligations.

- Reduction in inappropriately billed services;

- Presentation of data to assist policymakers in developing strategies to address aberrant billing patterns;

- Recommendations for health care policy changes that have a positive impact on cost control and quality of care;

- Estimated cost savings to the State as a result of the Vendor's proposed solution;

- Use of criteria that are based on valid, evidence-based research and sound clinical reasoning;

- Timely response to prior authorization requests;

- A system that can successfully integrate with the FMMIS and other Medicaid contractors; and

- A web based data system that will allow for efficiencies, increases in administrative ease, and supports a seamless transition for Medicaid providers that will have to use the system.

**B.    Manner of Service (s) Provision:**

**1. Services Provided by the Agency**

The Agency shall provide the following to facilitate the Vendor meeting the requirements of this Contract:

a. A readiness review of the Vendor that shall include, at a minimum, one (1) on-site review. This review shall be conducted at a time agreed to by the Agency and the Vendor. The Agency shall provide the Vendor with specific items for each aspect of this Contract that shall be reviewed prior to the date of the readiness review. Execution of this Contract shall be contingent upon the Vendor's successful completion of the readiness review.

b. Access to the on-line Florida Medicaid Management Information System (FMMIS) that enables the Vendor to review provider and recipient information, enhance sampling, conduct research and analytical work, such as trend and pattern analyses required by this Contract. The Agency shall provide electronic data files via the Vendor's file transfer account which shall contain claims history.

c. Training in the appropriate use of the FMMIS.

d. Monitoring and evaluation of the Vendor's compliance with the requirements of this Contract.

e. Review inclusion and exclusion parameters, appropriate instructions, and submission timetables.

f. A determination of whether the Vendor has violated a contractual obligation which presents an imminent danger to the health, safety, or well-being of a recipient unnecessarily and assess liquidated damages when necessary.

g. Training/education related to Medicaid policy and utilization management expectations of the Vendor.

h. Notification to providers regarding the implementation of a comprehensive utilization management program.

i.   Program policy clarification as requested by the Vendor and technical assistance on updates to Medicaid policy changes.

j.   Timely review of all documents submitted by the Vendor, by approving, denying, or requiring revision.

## 2.   Services Provided by the Vendor

The Vendor shall provide all services required for development, implementation, and ongoing operation of the Comprehensive Medicaid Utilization Management Program (CMUMP). The Vendor shall demonstrate high quality administrative leadership as well as qualified professional knowledge regarding the Florida Medicaid program; health care management; medical claims data; and the capability to design and implement cost savings methodologies.

### a.   Comprehensive Medicaid Utilization Management Program (CMUMP)

The Vendor shall be responsible for the minimum responsibilities and duties listed below:

1.   Perform all emergency and non-emergency inpatient hospital medical and surgical admission and continued stay prior authorization reviews for fee-for-service and MediPass Medicaid recipients. This includes:

   *   All elective admissions for adults age twenty-one (21) and over, except for certain exclusions, as defined by the Agency.

   *   All inpatient hospital admissions, acute rehabilitation hospital admissions, elective surgical cases, facility to facility transfers, and retrospective reviews for Medically Needy recipients, or recipients with retroactively determined Medicaid eligibility.

2.   Perform inpatient medical and surgical emergent admissions and continued stay prior authorization reviews for Medicaid recipients who exhaust their 45-day inpatient benefit cap but are eligible for continued Medicaid coverage for emergency hospitalizations under the Balanced Budget Act of 1997. The Vendor shall review these cases to determine the point at which the emergency no longer exists and the recipient's condition is stable.

3.   Perform inpatient medical and surgical emergent admissions and continued stay prior authorization reviews for undocumented non-citizens who are eligible for Medicaid coverage for emergency hospitalizations under Section 1903(v) of the Social Security Act. The Vendor shall review these cases to determine the point at which the emergency no longer exists and the recipient's condition is stable.

4.   Develop an approach for managing the length of stay of newborns in the Neonatal Intensive Care Unit (NICU) in five (5) hospitals within a reasonable geographic distance of each other.

5.   Develop and implement a process for denying prior authorization requests for inpatient hospital continued stay resulting from a Hospital Acquired Condition (HAC), as defined by the Agency.

6. Perform prior authorization reviews of PPEC services for Medicaid eligible recipients under the age of 21.

7. Develop an approach for expanding the current home health program from a predominantly utilization review focus to a comprehensive utilization management strategy, which at a minimum shall include:

    a. Perform prior authorization reviews of all home health services. Home health services includes: home health visits, private duty nursing, personal care services.

    b. Develop a comprehensive approach for evaluating the needs of medically complex children receiving private duty nursing services and/or personal care services taking into consideration the family support and care supplements.

    c. Develop and implement a care coordination process that facilitates the transition of children receiving private duty nursing services to enrollment in a PPEC program.

    d. Develop and implement a comprehensive care monitoring program in Miami-Dade County for Medicaid recipients requesting home health visits. The program must include face-to-face assessments by a licensed nurse, consultation with the physician ordering the services, and on-site or desk reviews of recipients' medical records.

8. Perform prior authorization reviews of requests for physical, occupational, and speech-language pathology therapy services for recipients under the age of 21.

9. Conduct claims analysis of respiratory therapy services to determine if any aberrant utilization patterns exist among practitioners.

10. The Vendor shall perform a review of a selected number of medical records on an annual basis for auditing purposes.

11. The Vendor shall review and approve each hospital's utilization review plan, annually.

12. The Vendor shall have the capability to collect data and provide analysis to determine aberrant billing practices, evaluate utilization and practice patterns, and identify opportunities for intensified education and/or provider review. The Vendor shall identify policy and billing violations and report findings to the Agency, if applicable.

13. The Vendor shall conduct special studies/quality improvement projects, as approved by the Agency.

14. The Vendor shall provide training to providers and Agency staff on the use of the Vendor's proposed system and review procedures. The Vendor shall develop, maintain, and make available, educational materials/manuals that address the application of the prior authorization protocols, guidelines, and required procedures.

15. The Vendor must develop and implement a complaint resolution/customer service and tracking system that identifies and tracks clinical and non-clinical issues. The Vendor shall provide a U.S. based toll-free telephone number connected to a help desk staffed by English and Spanish-speaking staff who are qualified to address customer service inquiries.

16. The Vendor shall meet with Agency staff both face-to-face and via conference call throughout the implementation period concerning any issues and as required to fulfill the responsibilities of this Contract.

17. The Vendor shall verify the recipient's eligibility for Medicaid, include requests for prior authorization that are processed through the Vendor's automated rules system.

18. The Vendor shall comply with all reporting requirements established by the Agency.

19. The Vendor shall ensure professional staff availability, as needed, to testify and provide supportive documentation in connection with civil or administrative litigation arising from services provided under this Contract.

### b.  Office Location

The Vendor shall maintain the organizational and professional capability to assume responsibility for managing the volume of work contained in this Contract for twenty-four (24) hours per day/ seven (7) days per week. The Vendor shall establish a required state of Florida site/office location where all required Vendor responsibilities identified in this Contract will be performed for the duration of this Contract. The Agency must prior approve any changes to the Vendor office location or when any of the Vendor contractual obligations will be performed at a different site other than the designated office location. Staff availability must be from the hours of 8:00 a.m. to 5:00 p.m., Eastern Time, Monday through Friday, excluding the following State of Florida holidays:

- New Year's Day
- Martin Luther King Day
- Memorial Day
- Independence Day
- Labor Day
- Veteran's Day
- Thanksgiving Day
- Christmas Day

### c.  Staffing

The Vendor shall conduct all aspects of this Contract in a timely, efficient, productive, consistent, courteous, and professional manner (as defined by the Agency) as representatives of the State. The Vendor shall recruit highly qualified (as determined by the Agency) staff to implement all aspects of the services required by this Contract.

The Vendor shall employ a sufficient number of staff who are fluent in both English and Spanish and shall either employ or contract with an interpreter as needed in order to fulfill the requirements of this Contract.

AHCA Contract No. MED128, Attachment I, Page 7 of 54

The Vendor shall maintain copies of current licenses and board certifications for staff and subcontracted personnel in a centralized administrative file.

The Vendor shall provide the Agency with its staff "turn-over" rates at the request of the Agency. In the event the Agency determines the Vendor's staff or staffing levels are not sufficient to properly complete the services specified in this Contract, it shall advise the Vendor in writing. The Vendor shall have thirty (30) calendar days to remedy the identified staffing deficiencies.

The Vendor shall make its staff available to meet with Agency staff on a schedule, as agreed to by the Agency and the Vendor, to review reports and all other obligations under this Contract as requested by the Agency. The Vendor shall meet in person or by telephone at the request of the Agency, at least monthly, to discuss the status of this Contract, Vendor performance, benefits to the Agency, necessary revisions, reviews, reports, and planning.

The Vendor shall notify the Agency in writing of any key staff resignations, dismissals, or personnel changes within one (1) business day of the occurrence. Should the Contract Manager or Medical Director positions become vacant, the Vendor must notify the Agency immediately and provide information on the replacement within ten (10) business days. The Agency shall have the right to participate in the selection process and approve or disapprove the hiring of any key staff positions.

For administrative purposes, the Vendor shall have staff available at their office location during normal business hours. Normal business hours are defined as 8:00 AM to 5:00 PM, Eastern Time, Monday through Friday, excluding State observed holidays as described in the previous section. The Vendor shall maintain a sufficient (as defined by the Agency) percentage of clinical review staff who will perform their job function under this Contract in the designated office location. The Vendor must receive Agency approval in order to allow staff to telecommute. The Agency reserves the right to approve or disapprove the number of staff allowed to telecommute.

1.  **Contract Manager**

    a.  The Vendor shall employ, at a minimum, one (1) Contract Manager responsible for the development and management of the utilization management program. The Contract Manager shall coordinate all activities between the Agency and the Vendor. The Contract Manager shall be a full-time employee dedicated solely to this Contract for no less than forty (40) hours per week.

    b.  The Contract Manager shall possess, at a minimum, a bachelor's degree in a health or business related field and have a minimum of five (5) years of recent management experience in health care utilization management systems, including the development of clinical profiles, outcome measurement, and the assessment of community resources or other barriers to services.

    c.  The Contract Manager shall have the ability to recruit, select, and maintain experienced and qualified staff to conduct the utilization management program and report to the Agency the outcome of all activities performed by the Vendor as they pertain to this Contract. The Contract Manager shall possess the authority to revise processes or procedures and assign

additional resources as needed to maximize the efficiency and effectiveness of services required under this Contract.

d. The Contract Manager <u>shall not</u> work from a remote location. The Contract Manager shall be located in the required state of Florida site/office location, unless prior approved by the Agency.

2. **Project Manager**

a. The Vendor shall employ, at a minimum, one (1) Project Manager. The Project Manager shall carry out the tasks in this Contract, and shall serve as a back-up to the Contract Manager. The Project Manager shall be a full-time employee dedicated to this Contract no less than forty (40) hours per week.

b. The Project Manager shall possess, at a minimum, a bachelor's degree in a health or business related field and have a minimum of three (3) years of recent management experience in developing, implementing, and operating health care utilization management systems.

c. The Project Manager, with the Contract Manager's approval, shall have the ability to recruit, select, and maintain experienced and qualified staff and report to the Agency the outcome of all activities performed by the Vendor as they pertain to this Contract. The Project Manager, with the Contract Manager's approval, shall possess the authority to revise processes or procedures and assign additional resources as needed to maximize the efficiency and effectiveness of services required under this Contract.

d. The Project Manager <u>shall not</u> work from a remote location. The Contract Manager shall be located in the required state of Florida site/office location, unless prior approved by the Agency.

3. **Medical Director**

The Vendor shall employ at a minimum two (2) Medical Directors who are licensed in the State of Florida, board certified physicians of medicine or osteopathy in accordance with chapter 456, 458 or 459, F.S. who possess at least five (5) years of related medical experience. The Medical Directors shall be responsible for the Vendor's clinical policies and decisions. The Medical Directors shall provide oversight and direction to the physician reviewer panel and will recruit and maintain an adequate number of physician reviewers in the appropriate specialties to meet the needs of this Contract.

4. **Clinical Review Supervisors**

a. For the oversight of inpatient, home health, or PPEC services review activities, the Vendor shall recruit clinical review supervisors who meet the following minimum requirements:

- Are State of Florida licensed registered nurses with a bachelor's degree in nursing;

- Posses at least five (5) years of medical clinical experience in inpatient hospital services if supervising inpatient review activities or at least five (5) years of medical clinical experience in home health services if supervising home health and PPEC review activities; and

- Possess at least three (3) years of medical utilization review and/or quality assurance experience.

b. For the oversight of therapy services review activities, the Vendor shall recruit clinical review supervisors who meet the following minimum requirements:

- Are Florida licensed therapists with a master's degree in a therapy discipline;

- Possess at least five (5) years of medical clinical experience in outpatient therapy services; and

- Possess at least three (3) years of medical utilization review and/or quality assurance experience.

c. The Vendor shall designate specific review supervisors to be the liaison with Agency staff and providers for each of the following services reviewed: inpatient, home health, prescribed pediatric extended care, and therapy services. Each liaison must be knowledgeable in the specific service and be able to resolve issues with the Agency and providers.

## 5. Education Director

The Vendor shall employ at a minimum one (1) full time equivalent Education Director who is responsible for the oversight of all training and quality assurance activities performed under this Contract. The Education Director shall possess at a minimum a Bachelor's degree and three (3) years of experience in quality improvement processes.

## 6. Non-Clinical Managers

All other non-clinical managers shall have a minimum of a Bachelor's degree and four (4) years of experience in their job function.

## 7. Physician Peer Reviewers

a. The Vendor shall develop and implement a physician peer review process to review the care provided to Medicaid recipients by medical practitioners for the following: inpatient hospital, home health, PPEC, and therapy services. Only physician reviewers may make denial, modifications, and reconsideration determinations for the Vendor.

b. The Vendor's physician reviewers shall not review cases in the following circumstances:

- For recipients for whom they have provided medical care or consultation services;

- For facilities in which they have admitting privileges or a financial interest; or

- For any attending, admitting, treating, ordering, consultant or specialist physician involved in the care where the physician reviewer has a conflict of interest relationship.

c. As required in s. 409.9131, F.S., peer review physicians shall:

- Be State of Florida licensed physicians of medicine or osteopathy or physicians of dentistry.
- Be located in the State of Florida;
- Have been in active practice where they have regularly provided medical care and treatment to patients within the past two (2) years; and
- Be State of Florida licensed, board certified physicians in the appropriate specialty to make denial, modification, and reconsideration determinations for the Vendor.

d. Physician peer reviewers shall be on staff or have active admitting privileges in one or more hospitals in the State of Florida, as defined by 42 C.F.R. 476.98. Any exceptions to this requirement will require a written waiver from the Agency.

e. For all private duty nursing and PPEC requests, the Vendor shall recruit physician reviewers who are Florida licensed, board certified pediatricians in good standing with at least five (5) years of recent medical experience in the area of pediatric care.

8. **Clinical Reviewer Staffing Requirements**

a. In the performance of all first level review activities of inpatient hospital services, the Vendor shall utilize clinical reviewers who are State of Florida licensed registered nurses and have at least two (2) years of inpatient hospital experience.

b. In the performance of all first level review activities of home health visits, private duty nursing, personal care, and PPEC services, the Vendor shall utilize clinical reviewers who are State of Florida licensed registered nurses and have at least two (2) years of home health experience. Clinical nurse reviewers who perform review activities for private duty nursing, personal care, and PPEC services shall also possess at least two (2) years of pediatric care experience.

c. In the performance of all first level review activities of therapy services, the Vendor shall utilize reviewers who are State of Florida licensed and credentialed therapists or speech-language pathologists, who have at least two (2) years of therapy experience. The Vendor shall use a reviewer of the same specialty as the case under review. With prior Agency approval, the Vendor may also use State of Florida licensed registered nurses who posses at least three (3) years of therapy case management experience to perform first level review activities of therapy services.

9. **Neonatal Intensive Care Unit (NICU) Nurse Care Coordinators**

In the performance of all review activities for the NICU program, the Vendor shall utilize nurse care coordinators who are Florida licensed registered nurses and have at least two (2) years of experience in the NICU.

10. **Management Information Systems (MIS) Staffing:**

The Vendor shall have in-house Management Information Systems (MIS) capability. The Agency will not approve a subcontractor for this function.

The Vendor shall maintain a sufficient number of qualified MIS and technical staff to continue operation of the Vendor's systems, provide prompt, on-going system support and accurate data access to the Agency and its authorized agents and service providers.

11. **Subcontracting**

The Vendor shall not enter into any subcontract for services to be provided under this Contract without the express written prior consent of the Agency. The Vendor shall maintain full responsibility for all work to be performed under this Contract. Each approved subcontractor shall be subject to the same terms and conditions as the Vendor.

The Vendor must submit all subcontracts, and any amendment(s) to approved subcontracts, to the Agency no later than twenty (20) working days prior to the subcontract effective date. The Agency's Contract Manager shall approve subcontracts in writing.

d. **Prior Authorization Review Procedures**

1. **General Requirements**

The requirements in this section are applicable to all review functions described in this scope of services.

a. The Vendor shall apply Agency approved criteria, guidelines, policies, procedures, and processes to determine whether services are medically necessary or otherwise allowable under the respective Medicaid Coverage and Limitations Handbook and the Florida Medicaid Provider General Handbook, as incorporated in the Florida Administrative Code (FAC). "Medically necessary" or "medical necessity" shall mean health care services that a provider, exercising prudent clinical judgment, would provide to a patient for the purpose of evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and are:

- Necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;

- Individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;

**AHCA Contract No. MED128, Attachment I, Page 12 of 54**

- Consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;

- Reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide; and

- Furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

b. The Vendor shall determine whether the request is for duplicative services already authorized.

c. The Vendor shall determine whether the provider adhered to the review submission timeframes and the required documentation is complete, legible, current, and compliant with Agency policy.

d. When requesting prior authorization, the provider must supply the Vendor with the name, address, telephone number, and National Provider Identifier of the attending/treating physician.

e. Approved units or dates of service shall not exceed the provider's requested days, the ordering provider's prescription, or Medicaid policy.

f. There will be one (1) prior authorization number granted per request.

g. If the provider submits a request for authorization to the Vendor with inadequate or ambiguous information, the Vendor may seek clarification or request that the provider submit additional supporting clinical information. If the additional information supports the medical necessity of the services, the reviewer will issue an authorization. If the criteria are not met, the Vendor will refer the case to a physician reviewer, who has the authority to deny or to modify the authorization of the service.

h. All prior authorization requests processed by the Vendor shall be approved by one (1) of the following qualified professionals:

- A State of Florida licensed Registered Nurse (RN);
- A State of Florida licensed Advanced Registered Nurse Practitioner (ARNP);
- A State of Florida licensed physician of medicine or osteopathy;
- A State of Florida licensed physician of dentistry (only inpatient services); or
- A State of Florida licensed physical, occupational, or respiratory therapist or speech language pathologist licensed under Chapter 468 or 486, Florida Statutes (only therapy services).

i. If the recipient's condition changes prior to the end of the approval period, the provider must submit a modification request with additional clinical information in order for additional units to be added to the prior authorization number.

j.   The Vendor shall develop procedures for identifying review requests for Medicaid recipients who have Medicare to ensure that the Medicare benefit has been exhausted for the service requested, prior to approving the request.

k.   As approved by the Agency, providers without Internet capability may submit requests for authorization by telephone to the Vendor's toll-free number or by facsimile.

l.   A prior authorization review for inpatient, home health, and therapy services is not required for Medicaid beneficiaries who are enrolled in the following Medicaid managed care plans:

- Health Maintenance Organization;
- Provider Service Network; and
- Health plans operating under the Agency's 1115 Research & Demonstration waiver authorized under Section 409.91211, F.S.

2.   **Inpatient Medical and Surgical Services**

a.   The Vendor shall develop a utilization management program, which includes prior authorization of all emergency and non-emergency inpatient hospital medical and surgical admission and continued stay prior authorization reviews.

- The majority of prior authorization requests for inpatient services will come from hospital service providers. However, for all scheduled elective surgeries, the admitting physician will be responsible for obtaining the prior authorization from the Vendor. If the physician fails to obtain the prior authorization, the hospital must obtain it in order to receive inpatient hospital reimbursement.

- The Vendor shall have the capability to assign temporary identification numbers to cases where the patient is pending Medicaid eligibility. At this time, the Agency anticipates that this option will only be available for newborns requiring a separate prior authorization from the mother. The Vendor will not send the certification record to the fiscal agent until the provider obtains a valid Medicaid number and updates the Vendor's data file via a web entry input.

- There will be one (1) prior authorization number per hospitalization. All prior authorization numbers will be valid for 120 days from the date the approval is granted.

b.   The Vendor shall develop a procedure for reviewing inpatient medical and surgical emergent admissions and continued stay prior authorization requests for Medicaid recipients who exhaust their 45-day inpatient benefit cap during the State fiscal year (July 1 – June 30) but are eligible for continued Medicaid coverage for emergency hospitalizations under the Balanced Budget Act of 1997. The Vendor shall review these cases to determine:

- Whether it meets the criteria established for emergency or trauma admissions; and

**AHCA Contract No. MED128, Attachment I, Page 14 of 54**

- The point at which the emergency no longer exists and the recipient's condition is stable (with approved days limited to the period during the emergency).

c.   The Vendor shall develop an approach for managing the length of stay of newborns in the Neonatal Intensive Care Unit (NICU) in five (5) hospitals within a reasonable geographic distance of each other. The approach shall include periodic care coordination with the infant's treatment team. The Agency will make the final determination of the five (5) hospitals in which to conduct the NICU Comprehensive Utilization Program.

The Vendor shall recommend, for Agency approval, five (5) similar hospitals to be used as a control group for the program and develop measurable program indicators to evaluate the effectiveness of the program.

At a minimum, the Vendor shall utilize nurse care coordinators to follow the case from the point of notification of the birth through discharge and conduct all continued stay medical necessity reviews to certify the continuing need for NICU services.

The purpose of the program is to:

- Facilitate the earliest medically appropriate discharge to the child's home or other less costly treatment setting;
- Avoid unnecessary or inappropriate delays in transition from one level of care to the next most appropriate level;
- Promote a high quality of care by establishing collaborative working relationships with attending physicians and nurses;
- Coordinate optimal and appropriate use of community resources; and
- Avoid preventable complications and readmissions.

d.   The Vendor shall develop a process for identifying hospital acquired conditions (HAC) as defined by the Agency that occur in the inpatient level of care during the review of admission and concurrent stay prior authorization reviews. All inpatient acute care hospitalizations are subject to this review requirement with the exception of critical access hospitals and rehabilitation hospitals and units.

The objectives of this review process are to:

- Respond to the occurrence of those events by limiting the number of authorized days;
- Determine the frequency of preventable HACs occurring during inpatient hospitalizations of Medicaid recipients; and
- Provide the Agency with information that may be considered in the development of future reimbursement or other policy related to HACs.

e.   The Vendor shall develop and implement a process for performing inpatient retrospective reviews (once a Medicaid number has been assigned) on the following:

- Inpatient medical and surgical admissions for Medically Needy recipients and individuals pending Medicaid eligibility (including individuals who are determined to be Medicaid eligible after discharge) for all inpatient hospital services; and

- Inpatient medical and surgical emergent admissions for undocumented non-citizens (aliens) who are eligible for Medicaid coverage for emergency hospitalizations under 1903(v) of the Social Security Act. The Vendor shall review these cases to determine the point at which the emergency no longer exists and the recipient's condition is stable (with approved days limited to the period during the emergency).

  Medicaid will not pay for continuous or episodic services after the emergency has been alleviated. Medicaid coverage of inpatient services for undocumented non-citizens is limited to emergencies, newborn delivery, and dialysis services.

f. The Vendor shall develop a procedure for reviewing and approving each hospital's utilization review plan annually, using an electronic review instrument. The Vendor shall keep on file a current copy of the hospital utilization review plan reviewed by the Vendor. The Vendor shall ensure that each hospital utilization review plan meets the requirements under 42 C.F.R. 456.50-456.145.

3. **Home Health Services**

a. The Vendor shall develop procedures for implementing a comprehensive utilization management program strategy in order to reduce aberrant billing practices and ensure quality health care for Medicaid recipients receiving home health services.

b. The Vendor shall develop procedures for performing prior authorization reviews of home health visits. The Vendor shall review each request received with the supporting medical documentation, such as the physician's order, nursing assessment, and plan of care.

c. The Vendor shall develop and implement a comprehensive care monitoring program in Miami-Dade County for a sample of Medicaid recipients requesting home health visits in order to ensure that services are medically necessary and to verify the delivery of services. The program must include face-to-face assessments by a Florida licensed registered nurse in the recipient's place of residence, consultation with the physician ordering the services, and on-site or desk reviews of recipients' medical records, prior to approving services. The Vendor shall develop for Agency approval, a case sampling methodology to identify requests which warrant intensified review.

d. The Vendor shall develop procedures for performing prior authorization reviews of private duty nursing and personal care services. The Vendor shall review each request received with the supporting documentation, such as the physician's order, nursing assessment, plan of care, parent/legal guardian work and/or school schedules, and documentation that supports a parent or legal guardian's physical or mental limitations that prevents them from participating in their child's care to the fullest extent possible.

AHCA Contract No. MED128, Attachment I, Page 16 of 54

e.   The Vendor shall develop a comprehensive innovative approach for evaluating the needs of medically complex children receiving private duty nursing services and/or personal care services taking into consideration the family support and care supplements. The Vendor's approach should include a process for identifying high-risk and high-use recipients who may require more intense follow-up and interventions.

f.   The Vendor shall develop a care coordination model for reviewing requests for private duty nursing services in order to evaluate whether the child's needs can be met by a PPEC center instead of through private duty nursing services. The purpose is to successfully facilitate the transition of children receiving private duty nursing services to enrollment in a PPEC program.

Prior to considering a medically-complex child for private duty nursing services, the Vendor shall determine if:

• There is a PPEC within 1-hour of traveling distance from the child's home;
• There is available capacity at the PPEC;
• The PPEC is open during the time the services are needed;
• There is no diagnosis of an immune-suppressed condition that would endanger the child if exposed to other children; and
• Traveling to and from the PPEC in an appropriate vehicle or with the parent would not endanger the child.

Once PPEC services are established, private duty nursing services may be authorized as a wraparound when PPEC is not available.

4.   **Prescribed Pediatric Extended Care Services**

a.   The Vendor shall develop a procedure for reviewing prior authorization requests for PPEC services. The Vendor shall review each request received with the supporting documentation, such as the physician's order, nursing assessment, plan of care, parent/legal guardian work and/or school schedules, and documentation that supports a parent or legal guardian's physical or mental limitations that prevents them from participating in their child's care to the fullest extent possible.

b.   The Vendor shall evaluate PPEC services for Medicaid recipients who:

• Are medically complex or medically fragile, per Medicaid definitions;
• Are medically stable;
• Have no communicable disease or illness; and
• Require short, long-term, or intermittent continuous therapeutic interventions or skilled nursing supervision due to a medically-complex condition.

5.   **Therapy Services**

a.   The Vendor shall develop a procedure for reviewing prior authorization requests for physical, occupational, and speech-language pathology therapy services for recipients under the age of 21. The Vendor shall review each

request received with the supporting medical documentation, such as the physician's order, assessment, and plan of care.

b.    The Vendor shall develop procedures for conducting claims analysis of respiratory therapy services to determine if any aberrant utilization patterns exist among practitioners. Respiratory therapy pattern analysis will be included in each annual report along with any Vendor recommendations to require utilization review for certain practitioners, service codes, or other interventions based on identified trends.

c.    Requests for services will originate from outpatient hospital settings, private therapists, pathologists in the community who are enrolled as providers in the Medicaid program, and school based services not provided by the school district.

d.    Each type of therapy (physical, occupational, and speech-language pathology) is considered a separate prior authorization request, even if multiple therapies are requested for one recipient.

**6.    Medical Record Review**

The Vendor shall perform a retrospective review of a selected number of medical records on an annual basis for auditing purposes. Topics or services that may benefit from a retrospective review shall be identified and agreed upon by the Agency and the Vendor prior to the annual review.

**7.    Utilization/Data Analysis**

The Vendor shall have the capability to collect and analyze data to determine aberrant billing practices and evaluate the following:

- Utilization and practice patterns;
- The efficiency of service delivery;
- The appropriate use of health services;
- Opportunities to improve the quality of care; and
- Opportunities for intensified provider review.

The Vendor shall perform an in depth analysis of the utilization of high-cost and high-risk Medicaid recipients receiving inpatient medical, home health, PPEC, or therapy services.

The Vendor shall develop a process for identifying outliers and providers who may benefit from education regarding more appropriate service utilization.

**e.  Review Instruments**

The Vendor shall develop electronic review instruments for each the following services identified in this Contract:

- Inpatient Medical and Surgical Admissions and Continued Stays;
- Inpatient Admissions and Continued Stays Meeting the Balanced Budget Act criteria;
- Inpatient Admissions and Continued Stays for Undocumented Non-Citizens;

- NICU Admissions and Continued Stays;
- Medical Record Reviews;
- Home Health Visits;
- Private Duty Nursing and Personal Care Services;
- Prescribed Pediatric Extended Care (PPEC) Services;
- Physical Therapy Services;
- Occupational Therapy Services; and
- Speech Language Pathology Therapy Services.

The review instruments must allow for data input by the reviewing professionals.

The Vendor shall have the capability to develop an automated criteria/rules-based certification system. With Agency approval, the Vendor may perform up to 30% of inpatient reviews as criteria/rules-driven approvals. The Agency reserves the right to increase the percentage of criteria/rules-driven approvals performed by the Vendor's to meet the best interests of the State.

The Vendor's clinical reviewers shall manually review each prior authorization request received that is not certified by the Vendor's rules-based system, along with any required supporting documentation to support the need for services.

The Vendor shall make recommendations to the Agency annually, regarding what, if any, changes should be made to the review instruments. The recommendations shall be included in the Vendor's annual report.

f.  **Review Criteria**

In performing medical necessity reviews, the Vendor shall use nationally recognized standardized clinical criteria in reviewing each prior authorization request. The Agency shall have prior approval of the criteria. The criteria shall provide a clinically sound basis for professional determinations of the medical necessity for all services reviewed under this Contract. At a minimum, the Vendor shall use InterQual® Level of Care criteria for inpatient hospital medical necessity determinations.

The Vendor shall develop a sustainable (i.e., sustainable in litigation) methodology that will determine if treatment needs to continue or if the recipient has achieved the maximum medical improvement. This methodology must include a system that measures the recipient's performance against the goals and objectives set in the treatment plans.

The Agency shall have access to the criteria used by the Vendor to ensure that the most current criteria are being used to assure the most current criteria are being used.

The Vendor is responsible for any cost associated with the purchase of review criteria and shall provide the Agency with access to a complete set of materials associated with the criteria annually.

The Vendor shall maintain the capability to update the review criteria for each of the services reviewed under this Contract. The Vendor shall make recommendations to the Agency annually, regarding what, if any, changes should be made to the criteria that will be used for the following calendar year. The recommendations shall be included in the Vendor's annual report.

Any modifications to the criteria or guidelines must be prior approved by the Agency. Based on the best interest of the State and the review outcome, the Agency reserves the right to specify the use of different criteria/guideline products during this Contract.

### g. Review Completion Timeframes

Exhibit II, Vendor Review Completion Timeframe Requirements, summarizes the Vendor review completion timeframes for all services performed under this Contract. Timeliness calculations begin upon receipt of all required documentation.

A first level determination is one (1) of the following:

- Certification of services by the clinical reviewer;
- Certification through the automated rules system, when appropriate;
- Referral to a physician reviewer;
- Request additional information from the provider; or
- Technical denial of the request due to administrative policy rules, as defined by the Agency.

The following circumstances are considered acceptable reasons for completing reviews outside of the stated timeframes:

- Natural disaster beyond the Vendor's control, as pre-approved by the Agency;

- No one at home during the first attempted home visit or an incorrect address was provided for requests requiring a home visit by the Vendor;

- The physician reviewer requested that the case be reviewed by a physician of another specialty; and

- The Agency requested that the Vendor suspend the review of the case.

The Agency shall have access to any date stamped documents proving the date of receipt of each prior authorization request and the date of final processing for each prior authorization.

### h. Adverse Determinations

The Vendor shall develop procedures to ensure that all cases (including reductions) not meeting medical necessity criteria are reviewed by a physician of the same specialty as the case under review. The Vendor shall provide on-line notification of the determination to the provider within the timeframe listed in Exhibit II, Vendor Review Completion Timeframe Requirements, of this Contract for referrals to the physician reviewer.

The Vendor shall establish and maintain a procedure for the Vendor's physician reviewer to attempt to speak with the recipient's treating physician to obtain clarification or additional information prior to rendering an adverse determination.

The Vendor shall establish and maintain a procedure for the attending or treating physician to contact the Vendor's Medical Affairs Department to discuss cases that have been denied, modified, or considered for denial.

Only physician reviewers can make denial, modifications, and reconsideration determinations for the Vendor.

**i.   Notification Requirements**

1. The Vendor shall develop a procedure for notifying providers, physicians, and Medicaid recipients of the review determination in writing via U.S. mail within one (1) business day of the determination. The Vendor shall maintain the capability to provide review outcome notification by telephone and fax, when requested by the Agency. In addition, the written notification letter shall be made available on the Vendor's secure web system for download by the provider.

2. The Vendor shall post all review outcomes on its website for secure, immediate access by providers at the time the review determination is made.

3. Written approval notifications must include at a minimum:

   • The date of the notice;
   • A brief statement of the Vendor's authority and responsibility for review;
   • The provider name and Medicaid provider number;
   • From and through date(s) of service;
   • Service(s) approved;
   • Approved units of service (including the hours per day/week approved, when applicable for the service(s) under review);
   • Prior authorization number; and
   • The reason and basis for determination.

4. Written notifications for adverse determination must include at a minimum:

   • The date of the notice;
   • A brief statement of the Vendor's authority and responsibility for review;
   • The provider name and Medicaid provider number;
   • From and through requested date(s) of service;
   • Date(s) of service and procedure (s) that are approved, denied, or modified;
   • Prior authorization number, for partial approvals;
   • A clear and specific reason for the denial;
   • A statement informing the parties of their right to a reconsideration, the applicable time period within which such a request must be filed, and to whom to submit the request;
   • Name, address, telephone number, and fax number, of a person or office to contact; and
   • Recipient rights to a fair hearing and whom to contact for a hearing.

5. The Vendor shall obtain Agency prior approval for all review outcome notification templates and verbiage.

### j. Reconsiderations

Any provider, attending/treating physician, or recipient who is dissatisfied with an adverse determination made by the Vendor will be entitled to a reconsideration of such determination by the Vendor. Through the reconsideration process, physician peers of the same specialty objectively analyze and review an adverse determination that was previously rendered by the Vendor.

If the provider, attending/treating physician, or recipient agrees with the adverse determination, reconsideration rights are waived.

All reconsideration reviews shall re-examine any relevant evidence in the current record regarding services requested and any new documentation submitted by the provider. The Vendor shall make a determination upholding, modifying, or reversing the denial of requested services taking into consideration any additional new information that may be presented.

The Vendor shall have a written protocol for management of reconsideration requests which outlines the program structure and accountability and includes at a minimum the following requirements:

1. Procedures for reviewing the request for reconsideration and all relevant medical information in accordance with Agency policies and approved criteria.

2. Procedures for referring all reconsideration requests to a physician of the same specialty as the case under review. The physician handling the reconsideration must be a physician different from the one that performed the initial review.

3. The reconsideration process must be completed and parties notified within the following timeframes:

   - One (1) business day for an expedited inpatient reconsideration request. Expedited requests are acceptable only when the Medicaid recipient is still hospitalized;

   - Three (3) business days for reconsideration requests for home health, PPEC, and therapy services; and

   - Twenty (20) business days for inpatient reconsideration requests received after the Medicaid recipient has been discharged from the hospital.

4. All requests for reconsideration of the adverse determination (including denials) will be made via the Vendor's web-based system, by U.S. mail, facsimile, or by telephone to the Vendor within thirty (30) calendar days of the adverse determination. The Vendor shall deny all reconsideration requests received after thirty (30) calendar days of the determination.

5. Procedures for notifying the recipient or, if a child, the legal guardian, attending physician, and provider of the reconsideration decision in writing. A written notice of the reconsideration determination will be sent via U.S. mail to the attending

physician and the recipient (or legal guardian/parent) within one (1) business day of the reconsideration determination. The notice will be made available on the Vendor's secure web system for download by the provider.

6. All reconsideration notification templates and verbiage must be prior approved by the Agency. The Vendor shall include the rationale for the determination in the notification.

7. Once a review denial is upheld after reconsideration, additional requests for review will be denied, unless the recipient has not yet received services or there is a change in the recipient's clinical status and additional days/units of service are requested.

8. If the Vendor determines that the initial denial should be upheld, the decision will be final and binding unless further appeal is made to the Agency.

### k. Recipient Fair Hearings

The Vendor shall submit all requested medical information to the Agency for use in administrative and/or fair hearings within three (3) business days of the request.

For each case, the Vendor's Medical Director, Associate Medical Director(s), or a State of Florida licensed, board certified specialist in the specialty of the case under consideration shall be available to testify at the Agency and Department of Children and Families hearings and other legal proceedings regarding decisions and actions of the Vendor. This includes telephonic testimony at the hearings, depositions, and discussions with Agency attorneys and staff as needed.
The Vendor (including the physician consultant) shall be available for the duration of the hearing, unless excused by the Administrative Hearing Officer.
The Vendor shall coordinate with Area Medicaid Office staff for fair hearings related to actions performed by the Vendor under this Contract.

The cost for physician time related to professional and expert activities, (e.g., testifying, depositions, reviewing medical records in association with legal proceedings, discussions with Agency attorneys directly related to administrative hearings, or other legal proceedings) shall be the responsibility of the Vendor.

### l. Special Studies/Quality Improvement Projects

The Vendor shall develop a procedure for conducting special studies/quality improvement projects. The Vendor is required to recommend two (2) special studies/quality improvement projects on an annual basis. The Agency may initiate requests for special studies/quality improvement projects based on the Agency's needs and/or data analysis. The Vendor shall conduct one special study/quality improvement project each Contract year, as approved by the Agency.

### m. System Functionality

1. The Vendor shall have the capacity (hardware, software, and personnel) sufficient to access and generate all data and reports needed for this program.

2. The Vendor shall comply with the Health Insurance Portability and Accountability Act (HIPAA).

3. The Vendor shall have facsimile and scanning capability, internet mail capability, and provide the agency on-line access to the Vendor databases, reports, and other information related to the program at no cost to the Agency.

4. The Vendor shall have protocols and internal procedures for ensuring system security and the confidentiality of recipient identifiable data.

5. The Vendor shall also have the technical capability to provide accessibility through an enhanced Internet security communications system and an adequate number of phone and fax lines to interface with the Medicaid fiscal agent, the Agency's Decision Support System and FMMIS, the Agency, and providers. Accessibility shall be centralized, with no change in Internet address, telephone, or fax numbers for the duration of the Contract period.

6. The Vendor shall have the capability to assign a unique tracking number to each recipient review record.

7. The Vendor shall have the capability to provide electronic imaging and storage of all supporting review documentation.

8. The Vendor shall also have the capability to accept supporting documentation for prior authorization requests via facsimile transmission or via electronic upload through the web based system.

9. The Vendor shall have the capability to receive recipient eligibility data that includes Medicaid eligibility and Medicare Part A and Part B eligibility segment data.

10. The Vendor shall have the capability to receive and store eligibility, provider, and MMIS claims data from the Agency's fiscal agent. The Vendor shall work with the fiscal agent on any necessary file transfer changes.

11. The Vendor shall have the capability to transmit all data from their web based system or database to the Agency or to a third party designated by the Agency to receive the data.

### n. Web-Based Prior Authorization System

The Vendor shall develop and maintain a web-based system for all prior authorization review activity, as outlined in Exhibit IV, Web-Based Prior Authorization System. The web-based review application must allow the requesting provider to submit the electronic review instrument online.

The Vendor shall provide the Agency with direct read-only access to its web-based system. The Vendor shall provide training in the use of the web-based system, and the equipment required for Agency on-line access to the web-based system. Agency staff shall be given access to the Vendor's electronic system for the purpose of monitoring the prior authorization program (at no additional cost to the Agency.)
Administrative terminal functionality shall include multi-level access controls to ensure that only authorized individuals can process transactions or access recipient

information. The Vendor shall provide administrative terminal support through a browser based administrative terminal that conforms to Agency communications protocols.

The Vendor shall have the capability to identify review requests for Medicaid recipients that have Medicare and ensure that the Medicare benefit has been exhausted for the service requested. The Vendor's web entry system shall support provider submission of proof that the Medicare benefits for the given service have been exhausted for the benefit period. The Vendor's web entry system will allow entry of the Medicaid utilization request, if the provider supplies the information that the Medicare benefits are exhausted.

o. **System Modifications**

The Vendor shall have the capability to maintain, upgrade, and modify the web-based prior authorization system as specified by the Agency on an ongoing basis, at no additional charge direct or indirect to the Agency.

When the Vendor needs to upgrade or make changes to any part of the web based system that will affect a provider's ability to submit a prior authorization request or review status reports, the changes must be scheduled to occur after 10:00 PM, Eastern Time and before 6:00 AM, Eastern Time, unless a different time is agreed upon by both parties. Providers and Agency staff must be notified by e-mail twelve (12) hours prior to any scheduled maintenance.

The Agency may request system changes or modifications not otherwise specified or required in this Contract on an as needed basis. In the event that changes or modification requested by the Agency would require additional staff commitment by the Vendor, the Agency would allow the Vendor thirty calendar (30) days to provide a cost analysis of the changes and a timeline for completing the changes. The change or modification shall be reduced to writing in an amendment to this Contract.

p. **Database Creation**

The Vendor shall develop and maintain databases necessary to support the CMUMP. The database and data developed as a result of this Contract are the property of the Agency.

The Vendor is responsible for maintaining a comprehensive database that provides the current status of all review activity. The database should include historical data from an existing peer review database, which will be provided by the Agency.

The database shall be updated with all activity, at a minimum, on a daily basis. The database must include all review elements and provider and recipient service information. The data elements shall be approved by the Agency. The Vendor shall maintain a process by which the dates, history, and steps of each submitted prior authorization request are kept.

The Vendor shall provide the Agency with direct read-only access to its database. The Vendor shall provide training in the use of the database and the equipment required for Agency on-line access to the database. Agency staff shall be given access to the Vendor's database for the purpose of monitoring the prior authorization program (at no additional cost to the Agency.)

The Vendor shall operate a database which stores processed claim data against which a variety of analytic tools can be run. Based on the information stored in the data warehouse, the Vendor shall have the capability to analyze historical data, recommend program changes, and provide customized reports upon request.

The Vendor's database system shall maintain the required Medicaid confidentiality standards.

q. **Data Exchange**

The Vendor shall be able to receive data and other information necessary to maintain the web based prior authorization system, from the Agency or its designee, on a daily basis.

The Vendor shall work with the Agency's other contractors as needed to obtain any additional claims data to support the pattern analysis effort.

At a designated time each day, the Vendor shall electronically transmit files, via secure Internet link, to the Medicaid fiscal agent requesting prior authorization numbers for approved reviews. The fiscal agent shall return the approval list with the prior authorization numbers to the Vendor via Internet by the next business day.

Within 24 hours of receipt of the prior authorization numbers from the fiscal agent, the Vendor will update their data system so that the prior authorization numbers are available to providers via the Vendor's web based system.

The Vendor shall become knowledgeable of the field definitions related to the data being sent from the Agency and/or its agents. The Vendor shall develop the system to allow simple additions or modifications of the data received.

Upon the Agency's request, the Vendor shall make data samples available to the Agency or its designee. Criteria for inclusion in any data sample requested will be provided by the Agency. The data sample may include elements previously sent from the Agency or its designee and data collected by the Vendor. This data may be used for ad hoc reporting, program monitoring and quality assurance activities by the Agency. The Vendor shall provide the data in a format prescribed by the Agency.

r. **Reporting Requirements**

1. General Reporting Requirements

    a. At no additional cost to the Agency, the Vendor shall include real-time web interface reporting and screen display of prior authorization review activity. No additional payments will be made for access to this website. This access shall be secured in accordance with Medicaid federal and state regulations. In addition, the Vendor shall make reports or data downloads available to providers and to other parties as specified by the Agency.

    b. The Vendor shall submit three (3) copies of each report; one (1) electronic copy, and two (2) hard copies of the report. The Agency will coordinate with the Vendor to determine the reporting formats, instructions, and submission timetables when not specifically outlined in this Contract.

**AHCA Contract No. MED128, Attachment I, Page 26 of 54**

   c. Monthly activity reports are due by the 15th of each month.

   d. Unless otherwise specified, quarterly reports are due prior to the 15th of January, April, July, and October.

   e. An annual report will be submitted that includes a cumulative summary and analysis of all required reports and a summary of cost savings. This report is due by September 1st of each year and shall cover the previous state fiscal year (July-June). The Vendor's first annual report will be for the time period from the Contract start date through June 30, 2012 for all services (Inpatient Medical and Surgical, Home Health, Prescribed Pediatric Extended Care (PPEC), and Therapy Services).

   f. The Vendor shall include in the quarterly and annual reports, a review of its usage of best practices and the determination of cost savings.

   g. All reports must be separated by service type, (i.e., inpatient, home health, PPEC, or therapy services).

   h. The Vendor shall develop and maintain a secure web portal for the purposes of storing and sharing documents including deliverable and communication tracking logs. The Agency shall have access to the web portal and all documents.

2. Monthly Reporting

   a. The Vendor shall provide the following data related to prior authorization, retrospective, or reconsideration requests for inpatient, home health visits, private duty nursing, personal care, PPEC, and therapy services:

- Number and percentage of reviews requested, approved, and denied (partial approvals or reductions). The outcome of reviews shall include the number of approved days or units of service (broken down by procedure code for outpatient and community services);
- Timeliness of each review type with an average of overall timeliness;
- Number of modification requests, including the percentage of approvals and denials;
- Number of cases referred to a physician, including the overall percentage of referrals;
- A listing of all requests for reconsideration and the status of each request; and
- A list of quality of care concerns identified in reviewing prior authorization requests.

   b. The Vendor shall address the following additional reporting requirements in the relevant monthly activity report:

- Number of inpatient cases where continued stay has been required as a result of a hospital acquired condition that was not present on admission;
- Number of newborns that are care managed under the NICU pilot, including the number of approved and denied inpatient days;

- Number of home visits performed by the Vendor, including the outcome of each visit;
- Number of approvals for outpatient or community services provided in an alternative setting (i.e., school, assisted living facility, group home, etc.);
- Number of home health (visits, private duty nursing, and personal care services) and therapy prior authorization requests approved that are for services considered to be a "maintenance service" (i.e., extreme cases of medical fragility where services may be expected for two or more years); and
- Number of recipients who have successfully transitioned from receiving all private duty nursing (PDN) services to enrollment in a PPEC, including those children who continue to receive PDN as a wraparound service.

c. The Vendor shall report any changes made to key staff positions.

d. The Vendor shall develop and maintain a call log for the purpose of tracking the physician reviewers attempt to contact the treating provider prior to rendering an adverse determination. The call log should be submitted to the Agency monthly.

3. Quarterly Reporting

a. Quarterly reports shall include, but are not limited to, the following information for all services reviewed:

- Executive Summary;
- Technical problems requiring Agency assistance;
- Significant accomplishments achieved for the reporting period;
- List of the top ten (10) highest volume requestors by provider type (i.e., hospital, home health agency, therapy providers, etc);
- List of the top ten (10) attending physicians associated with denied requests for each service reviewed (home health visits, private duty nursing, inpatient, etc);
- A summary of each complaint received, and the length of time to reach resolution. This includes complaints received telephonically and in writing;
- Customer service information including: the average hold time for callers; the abandonment rate; and the blocked call rate;
- Number of fair hearing requests, including the total number of days or units of service (by procedure code) that were administratively continued pending the outcome of the hearing. The Vendor shall include the percentage of hearings where the final order was to uphold or overturn the Vendor reduction or denial; and
- Cumulative summary of the information required in the monthly activity reports for the previous quarter.

b. In addition to the above requirements, the Vendor shall provide the following data related to the NICU program:

- Report on NICU program indicators;
- Number of family interactions;
- Number and primary diagnosis of deceased infants;
- Number of cases discharged with home health services;

**AHCA Contract No. MED128, Attachment I, Page 28 of 54**

- Number of cases discharged with PPEC services;
- Number of cases discharged with PPEC and home health services; and
- Number of cases discharged home without further services.

c. The Vendor shall submit internal quality control (IQC) reports on a quarterly basis that include:

- Results from IQC monitoring efforts; and
- A corrective action plan for correcting deficiencies within thirty (30) calendar days of identification of the issue.

d. The Vendor shall submit a quarterly report which summarizes the status of the utilization/data analytic projects being conducted, including outcomes and recommendations.

4. Annual Report

The Vendor shall analyze data accumulated from reports to the Agency, services approved and denied, and available FMMIS data to determine patterns in diagnosis, age, condition, etc. of recipients who requested services.

Based upon this analysis, the Vendor will identify populations that appear to have patterns of high cost services, very long lengths of stay, over-utilization of services, and other trends identified from the analysis.

All monthly and quarterly reports for the respective Contract year shall be summarized in the annual report for the Agency.

The Vendor shall include recommendations for updates or modifications to the review instruments and review criteria.

The Vendor shall detail cost savings by service area (e.g., inpatient, home health, PPEC, and therapy services) that can be attributed to the activities performed under this Contract, methods for determining cost savings, a rationale for attributing the savings to the utilization management program, assumptions underlying the methodologies, and document the validity of the methodology.

The Vendor shall develop recommendations that will control costs in lieu of or in conjunction with prior authorization.

5. Provider Instructional Manuals

The Vendor must review and submit recommendations to the Agency regarding revisions (improvements) to provider instructional materials beginning January 1st of each Contract year.

The update must be completed, posted on the Vendor's website, and made available to providers, the Agency, and Vendor staff by February 1st of each year.

6. Ad Hoc Reports

The Vendor shall provide ad hoc reports on an as needed basis at no additional cost to the Agency. Ad hoc reports will be created on any aspect of the data

collected by the Vendor.

Ad hoc reports will be submitted to the Agency within fourteen (14) calendar days from the time of the request. The Vendor shall agree to process ad hoc reports as soon as possible understanding that the fourteen (14) day time frame is reserved for the most complicated requests.

At the Agency's request, the variables calculated as part of ad hoc reports may be required for inclusion in standard reports.

7. Special Study/Quality Improvement Project Report

The Vendor shall produce one (1) report of findings from the special study/quality improvement project completed on an annual basis. In addition, the Vendor shall provide two (2) project recommendations for the following year.

## s. Implementation Plan

The Vendor shall prepare a draft implementation plan outlining the steps necessary for the Vendor to be fully operational by the start of the Project. The Agency will meet with the selected Vendor after the notification of the successful award to discuss the Vendor's proposed implementation plan and anticipated time-frames and to determine information and other resources needed to complete the final implementation plan.

The Vendor shall develop and deliver a comprehensive final implementation plan no later than thirty (30) calendar days after the award of this Contract.

The final implementation plan shall detail the specific timeframes, tasks, responsibilities, and key milestones to ensure a successful transition. The final implementation plan shall describe any upgrades or additions to the Vendor's current System, if applicable, that are necessary to meet requirements of this Contract.

At a minimum, the final implementation plan shall include:

- Tasks associated with the Vendor's establishment of a "project office" or similar organization with which the Vendor shall manage implementation activities;
- An itemization of activities that the Vendor shall undertake during the period between the successful award and the start date of this Contract. These activities shall have established deadlines and timeframes;
- Staff responsible for each activity/step;
- Identification of interdependencies between activities in the implementation plan; and
- Identification of Vendor expectations regarding participation by the Agency and/or its agent(s) in the activities in the implementation plan and dependencies between these activities and implementation activities for which the Agency and/or its agent(s) shall be responsible.

The Vendor shall implement the final implementation plan only after Agency approval.

Any deviation by the Vendor from the Agency approved final implementation plan shall be regarded by the Agency as a material breach and all remedies provided for in Section D.9., Performance Standards and Liquidated Damages, shall become

available to the Agency, except as due to reasons beyond the control of the Vendor and prior Agency approval has been provided in writing.

The Vendor shall participate in both face-to-face meetings and conference calls with the Agency and relevant parties prior to the start date of this Contract for purposes of coordinating implementation activities.

t. **Customer Service**

1.  The Vendor must develop and implement a complaint resolution/customer service and tracking system that identifies and tracks two (2) types of caller issues: clinical and non-clinical.

2.  The Vendor shall provide a toll-free customer service telephone system for all aspects of the services described in this Contract. Toll-free lines shall be operational 24-hours a day.

3.  The customer service telephone system shall be staffed with trained customer service representatives during normal business hours of 8:00 AM to 5:00 PM Eastern Time (ET), Monday through Friday, excluding the State observed holidays identified in Section B., Manner of Service(s) Provision, Item 2.b., Office Location.

4.  The Vendor shall provide a before and after business hours message advising the caller of the hours of operation and allowing them to leave a message. Callers shall not encounter a busy signal during normal business hours.

5.  The Vendor may use an interactive voice response system, provided that at each level, the callers can choose to speak with a "live" person, rather than continue through additional prompts. "Live" English and Spanish-speaking customer service representatives who are qualified to provide technical assistance shall be available during normal business hours.

6.  The customer service program shall adequately respond to inquiries received from non-English speaking people, as well as the hearing impaired or others who need special assistance.

7.  The Vendor shall be available to providers and recipients to discuss utilization management/prior authorization issues. All clinical questions, related to prior authorization reviews shall be returned by a licensed clinical reviewer, or qualified staff person.

8.  At a minimum, ninety percent (90%) of all calls made within normal business hours will be answered within thirty (30) seconds, with no more than ten (10) percent (10%) of the calls going unanswered, requiring the caller to leave a message for the Vendor. For calls received within normal business hours, all return calls must be made within one (1) hour.

9.  The Vendor shall return all telephone calls received after normal business hours on the following business day.

10. The Vendor shall respond to all written inquiries as soon as possible but no longer than ten (10) business days.

AHCA Contract No. MED128, Attachment I, Page 31 of 54

11. The Vendor shall develop a process to track inquiries and complaints by service and provider (i.e., inpatient, home health, PPEC, and therapy services), including how the inquiry or complaint was handled.

12. The Vendor shall document any procedural action that occurred as a result of a complaint. The Vendor shall have formal written and dated procedures regarding this process. The Vendor shall submit this documentation as part of the quarterly report.

**u. Training, Education, and Outreach**

1. Outreach Plan

   a. The Vendor shall develop an outreach plan, which at a minimum includes written communication, telephonic support, focus groups, webinars, and "live" face-to face training for all aspects of this Contract. Agency approval of the outreach plan is required prior to implementation by the Vendor.

   b. The Vendor shall implement an Agency approved outreach plan that shall be finalized no later than sixty (60) calendar days prior to the project implementation date.

   c. The Agency reserves the right to direct the Vendor to amend or update its outreach plan in accordance with the best interests of the State and at no additional cost to the Agency.

2. Instructional Materials and Manuals

   The Vendor shall develop and maintain training materials for use by providers and Agency staff, which shall include procedures for all areas of review activity addressed in this Contract. The material must describe all elements in the review process for inpatient, home health, PPEC, and therapy services.

   The Vendor shall develop in-house manuals to train all staff authorized to use on-line access to FMMIS. Each manual shall be written and organized to be usable by non-systems personnel and shall include sample screens. The Vendor shall provide updates to all user manuals as needed.

   All training materials, which includes manuals, brochures, handouts, agendas, and overheads shall be prior approved by the Agency. The material must also be posted on the Vendor's website after the Agency approves it for distribution.

   The material must be reviewed and updated on an annual basis.

   The Vendor shall review and submit recommendations to the Agency regarding revisions (improvements) to provider instructional materials beginning January 1st of each Contract year. The update must be completed, posted on the Vendor's website, and made available to providers, the Agency, and Vendor staff by February 1st of each year. Any deviation from the schedule must be prior approved by the Agency.

   The agency may produce and distribute any of the Vendor's training materials.

3.  General Training Requirements

   a.  The Vendor is responsible for preparing a comprehensive training plan that addresses the provider's initial and ongoing training needs for all aspects of the CMUMP (which includes activities related to inpatient, home health, PPEC, and therapy services) and for the purpose of orienting Medicaid providers to the Vendor's utilization review policies and procedures implemented in this Contract.

   b.  The location of any face-to-face seminars must be conducive to professional seminars. The seminars shall be conducted in urban areas such as Ft. Lauderdale, Miami, Orlando, Tampa, Tallahassee, Panama City, and Jacksonville. The location of trainings must be prior approved by the Agency.

   c.  Pre-implementation Training Requirements:

   •  The Vendor shall conduct at least six (6) "live" face-to face regional seminars for **each** of the services reviewed in this Contract (inpatient, home health, PPEC, and therapy services) across the state to introduce and train providers on the new requirements. These will be conducted jointly with the Agency.

   •  The Vendor shall make its customer service telephone line available at least sixty (60) calendar days before the Contract implementation date.

   •  The Vendor shall conduct at least fifteen (15) webinars (live trainings conducted via the Internet) within sixty (60) calendar days before the Contract implementation date for **each** of the services reviewed in this Contract (inpatient, home health, PPEC, and therapy services).

   •  The Vendor shall develop a pre "go-live" website that will be available at least sixty (60) calendar days before the Contract implementation date that contains at a minimum: information regarding the Vendor's corporate history, upcoming training opportunities, and useful informational materials as approved by the Agency.

   d.  Post-Implementation/Ongoing Training Requirements

   •  Annually, the Vendor shall conduct three (3) "live" face-to face regional utilization review seminars for **each** of the services reviewed in this Contract (inpatient, home health, PPEC, and therapy services) for the purpose of educating providers regarding appropriate utilization management procedures.

   •  The Vendor shall conduct webinars (live trainings conducted via the Internet) on a quarterly basis for **each** of the services reviewed in this Contract (inpatient, home health, PPEC, and therapy services).

**v.** Optional Services

If determined by the Agency that it is in the best interest of the State and funding is available, the Agency reserves the right to negotiate with the Vendor the below optional services and associated costs. Any optional services requested by the Agency shall be agreed to with the Vendor and reduced to writing in an amendment to this Contract.

**NICU**

Expansion of the NICU program into additional hospitals/counties.

**Respiratory Therapy**

Utilization review of respiratory therapy services based on the findings of the Vendor.

**Special Studies/Quality Improvement Projects**

Perform additional special studies/quality improvement projects.

**w. Information Technology**

The Vendor shall also have the necessary information technology needed to fully manage and report on the program described in this Contract.

**1. Hardware and Software Requirements**

The Vendor shall provide the Agency and providers with any specialized software required for use of the proposed web based system.

**2. Agency Information Technology (IT) Environment Standards**

If the use of Agency IT resources or development is needed the following environment and software development standards are customary.

**a.    Software Developing Environment**

- Web Server
  Web Servers are Server 2008 with IIS 7.

- .Net Frameworks
  Supported .Net Frameworks are 3.5, 2.0, 1.1. All new development in 3.5.

- Databases
  Oracle 10g
  SQL Server 2008

- Reporting Server
  SQL 2008 Reporting Service
  Software Developing Requirements

- Architecture Design Requirements

**AHCA Contract No. MED128, Attachment I, Page 34 of 54**

An "n" tier approach must be used. Presentation, Business Logic, and Data layers need to be separated.

Applications should be developed to be Database Independent

The architecture document needs to be presented to the Agency for review. This requires a personal presentation by the architect(s).

Any third party tool needs to be approved by the Agency prior to use.

- Coding Requirements

- .Net Language
  Coding should use Visual Studio.NET (Visual Basic.NET, ASP.NET, C#.NET)

- Use Comments in the Code
  All functions/Subs need to have comments on the top to explain the purpose and the usage of the function/Sub. The comments inside the function/sub should also be used to help other developers to understand the coding methodology/logic that was used.

- Database Access
  If the application is using Oracle as the main data store, Oracle Data Access Provider (ODP) should be used to access the database.

- Use Stored Procedures
  All access to the database needs to be through the use of stored procedures. Proper database role needs also be granted to the stored procedures.

- Exception Handling
  Proper exception handling is required.

- Logging
  Logging information when applicable should be stored in database.

- Usage of Session and Cache Should be Limited
  Excessive use of session is not allowed.
  Improper use of cache is not allowed.

- No Hard Coded Values are Allowed
  Hard coded values are not allowed for referencing the shared resource address and name. This includes: URL name, file path, email address,database connection string, etc.

- Web Site Look and Feel
  The web site needs to be Section 508 compliant.

  The web site needs to the Agency header and footer that are currently on ahca.myflorida.com or current Agency Intranet site.

The external web site should be working properly with Internet Explorer, Firefox, and Safari.

- Code Review
  All code should be submitted to the Agency for code review prior user testing. This code review requires a personal presentation by the coder(s)

**b. Software Development Document Requirements**

The documents listed below are required as part of the application development:

- Architecture design
- Security model
- Technical specifications
- Database entity relationship diagram
- Test plan
- Deployment plan
- Maintenance requirements

**x. Disaster Recovery Plan**

1. The Vendor shall develop and maintain a disaster recovery plan for restoring the application of software and current master files and for hardware backup in the event the production systems are disabled or destroyed. The disaster recovery plan shall limit service interruption to a period of seventy-two (72) clock hours and shall ensure compliance with all requirements under this Contract. The records back-up standards and a comprehensive disaster recovery plan shall be developed and maintained by the Vendor for the entire period of this Contract.

2. The Vendor shall maintain a disaster recovery plan for restoring day-to-day operations including alternative locations for the Vendor to conduct the requirements of this Contract. The disaster recovery plan shall limit service interruption to a period of seventy-two (72) clock hours and shall ensure compliance with all requirements of this Contract.

3. The Vendor shall maintain database backups in a manner that shall eliminate disruption of service or loss of data due to system or program failures or destruction.

4. The disaster recovery plan shall be finalized no later than thirty (30) calendar days prior to the Contract effective date. The Agency shall review the Vendor's disaster recovery plan during the readiness review.

5. The Agency reserves the right to direct the Vendor to amend or update its disaster recovery plan in accordance with the best interests of the state and at no additional cost to the Agency.

6. The Vendor shall make all aspects of the disaster recovery plan available to the Agency at all times.

**y. Quality Assurance/Internal Quality Control (IQC) Program**

1. The Vendor shall develop and provide a complete internal quality control program to ensure appropriate administration of all responsibilities specified in this Contract. The Vendor shall specify all components of its internal quality control program. The Vendor shall submit its IQC plan in accordance with the Agency approved implementation plan. The Vendor shall describe procedures for the following minimum administrative and clinical requirements of the IQC program.

2. The administrative requirements of the program shall include, at a minimum:

   a. How the Vendor shall ensure that all functions are timely performed in accordance with this Contract;

   b. Staff that shall be responsible for the internal quality control activities and the staff's qualifications; and

   c. A description of the performance improvement process.

3. The clinical requirements of the program shall include, at a minimum:

   a. The Vendor's plan for conducting orientation of new employees, on-going training, and monitoring of employees to include the review of work performed by physicians, therapists, and registered nurses;
   b. Periodic evaluation of inter-rater reliability assessment;
   c. Interventions when performance does not meet required scores;
   d. Monitoring of 1% of the total review volume, as outlined in Exhibit V, Anticipated Review Volumes, or ten (10) review cases (whichever is greater), per employee (includes work performed by clinical reviewers, physician reviewers, and temporary or contracted review staff), per month. This volume is excluding any reviews submitted using a rules-based system. The Vendor shall maintain a separate process for monitoring the accuracy and effectiveness of their rules based certification system;
   e. Evaluation of adherence to Medicaid policy, familiarity with the Agency approved medical necessity criteria, Agency business rules, and clinical knowledge. When variation is identified (a score of less than 90% in testing), the Vendor shall initiate training to address deficiencies; and
   f. Submission of the sample review cases and the evaluation criteria to the Agency for prior approval.

4. The Vendor shall submit to the Agency a quarterly report of its internal quality assurance activities and findings in accordance with this section of this Contract.

5. The Vendor shall have a written policy for escalation of technical problems or manpower problems or shortages that threaten to, or actually prevent, the meeting of the Vendor's quality and/or timeliness requirements. The policy shall require escalation of the problem within the Vendor organization if not resolved in a timely manner and shall call for disciplinary action for any staff that does not perform according to the escalation policy.

z. **Operational Policies and Procedures Manual**

1. The Vendor shall develop and maintain operational policies and procedures manual(s) for all aspects of this Contract to be approved by the Agency prior to implementation by the Vendor.

2. The draft operational policies and procedures manual(s) will be reviewed during the readiness review and shall be finalized and approved by the Agency. The operational policies and procedures manual(s) shall be based upon draft operational policies and procedure manual(s) developed by the Vendor.

3. The Agency reserves the right to direct the Vendor to amend or update its operational policies and procedures manual(s) at no additional cost to the Agency.

4. The operational policies and procedures manual(s) shall be a guide to assist the Vendor in conducting the requirements of this Contract. If situations arise whereby the Vendor must conduct an activity that is outside the approved operational policies and procedures, the Vendor shall submit a request to the Agency in writing and receive the Agency's approval before any alternative action is taken by the Vendor.

5. The Vendor shall make all aspects of the operational policies and procedure manual(s) available to the Agency at all times.

**C.  Method of Payment:**

a. This is a fixed price (unit cost) Contract not to exceed **$50,073,958.00**, subject to the availability of funds.

b. The Agency shall pay the Vendor a one-time, fixed price fee, in arrears, for implementation and a fixed monthly fee, in arrears, for the on-going delivery of services, as outlined in Tables A-D below and in accordance with the terms of this Contract. The State of Florida's performance and obligation to pay under this Contract is contingent upon an annual appropriation by the Legislature.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

| TABLE A – Implementation Cost | | Invoice Due Date |
|---|---|---|
| Proposed Fixed One-Time Implementation Cost for inpatient medical/surgical, home health, and PPEC services. **(Contract execution through May 31, 2011)** | $ 1,178,893 | 06/15/11 |
| Proposed Fixed monthly operations cost for services for One-Month of June 2011 (excludes therapy services) | $ 1,006,445 | 07/15/11 |

| TABLE B – Year One Operations | | Invoice Due Date |
|---|---|---|
| Proposed Fixed One-Time Implementation Cost for Therapy Services | $ 515,724 | 11/15/11 |
| Proposed Fixed Monthly Operations Cost for services for four months (excludes therapy services) **(July 1, 2011 – October 31, 2011)** | $ 1,006,445 *(monthly)* | 15th of each month |
| Proposed Fixed Monthly Operations Cost for all services (inpatient medical/surgical, home health, PPEC, and therapy) for eight months (November 1, 2011 – June 30, 2012) | $ 1,405,465 *(monthly)* | 15th of each month |

| TABLE C – Year Two Operations (July 1, 2012 through June 30, 2013) | | Invoice Due Date |
|---|---|---|
| Proposed Fixed Monthly Operations Cost for All Services (Inpatient Medical/Surgical, Home Health, PPEC, and Therapy) | $ 1,321,940 *(monthly)* | 15th of each month |

| TABLE D – Year Three Operations (July 1, 2013 through June 30, 2014) | | Invoice Due Date |
|---|---|---|
| Proposed Fixed Monthly Operations Cost for All Services (Inpatient Medical/Surgical, Home Health, PPEC, and Therapy) | $ 1,353,343 *(monthly)* | 15th of each month |

*The Agency, at its sole discretion, may expand the above mentioned existing services. The optional expansion(s) will be reduced to writing via an amendment.

## RENEWAL PERIODS

| TABLE E – Renewal Year One Operations (July 1, 2014 through June 30, 2015) | |
|---|---|
| Proposed Fixed Monthly Operations Cost | $1,387,526 *(monthly)* |

| TABLE F – Renewal Year Two Operations (July 1, 2015 through June 30, 2016) | |
|---|---|
| Proposed Fixed Monthly Operations Cost | $1,421,107 *(monthly)* |

| TABLE G – Renewal Year Three Operations (July 1, 2016 through June 30, 2017) | |
|---|---|
| Proposed Fixed Monthly Operations Cost | $1,454,033 *(monthly)* |

c. **Invoicing**

1. Invoices and all supporting documents shall be submitted on the Vendor's letterhead to the Agency's designated Contract Manager on a monthly basis within fifteen (15) calendar days following the previous month during which services were rendered.

AHCA Contract No. MED128, Attachment I, Page 39 of 54

2. Each invoice shall include, at a minimum:

- An invoice date;
- Invoice number;
- The Agency's Contract number;
- A description of the services rendered;
- The date(s) on which services were rendered;
- A payment remittance address; and,
- Other supporting documentation as requested by the Agency.

The Vendor shall not charge the state for any travel expenses related to any portion of this Contract.

d. **Late Invoicing**

All rights to payment shall be forfeited if the Vendor fails to submit invoices to the Agency within the specified time frame unless otherwise mutually agreed upon in writing by the Agency and the Vendor. If the Vendor is unable to meet the invoice submission deadlines specified in this Contract, the Vendor shall notify the Agency in writing explaining the circumstances and requesting an extension to the deadline.

Payments will be authorized only for services that are in accordance with the terms and conditions of this Contract. Appropriate documentation as determined by the Agency shall be submitted to support invoices. Invoices shall not be approved for payment by the Agency until reports from the Vendor are received as specified in this Contract.

**D.    Performance Standards and Liquidated Damages**

If the Agency finds the Vendor is in violation of the provisions of this Contract, the Agency, at its discretion, may impose liquidated damages. Liquidated damages may be applied to all required components of this Contract.

The Agency may impose liquidated damages as identified in Exhibit I, Summary of Performance Standards and Liquidated Damages, of this Contract when the Vendor has failed to meet a deadline or provide a deliverable as specified in this Contract.

**1.  General Liquidated Damages**

a.  The Agency may impose up to a one percent (1%) reduction of the total, monthly invoice amount for each incident in which the Vendor has failed to meet a deadline as specified in this Contract, not to exceed five percent (5%) per month.

b.  The Agency may impose upon the Vendor liquidated damages of five hundred dollars ($500) to five thousand dollars ($5,000), per incident per occurrence, depending upon the severity, if the Vendor inappropriately releases Protected Health Information. In addition, federal penalties may apply in accordance with the Health Insurance Portability and Accountability Act of 1996.

2. Corrective Action Plan (CAP)

   a. In the event the Agency identifies a violation of this Contract, or other non-compliance with terms of this Contract, the Agency shall notify the Vendor of the violation or non-compliance issue in writing.

   b. In the event the Agency determines the Vendor's staff or staffing levels are not sufficient to properly complete the services specified in this Contract, the Agency shall advise the Vendor in writing.

   c. The Vendor shall have thirty (30) calendar days to remedy the identified staffing deficiencies.

   d. If the Agency determines that the Vendor is out of compliance with any of the provisions of this Contract, the Agency may require the Vendor to submit a Corrective Action Plan (CAP) within a specified timeframe.

   e. The CAP shall provide an opportunity for the Vendor to resolve deficiencies without the Agency invoking more serious remedies up to cancellation of this Contract. The Agency shall provide the Vendor with a timeframe for corrections to be made.

   f. The Vendor shall respond by providing a CAP to the Agency within the timeframe specified by the Agency.

   g. The Vendor shall implement the CAP only after receipt of written Agency approval.

   h. The Agency may require changes or a complete rewrite of the CAP and provide a specific deadline.

   i. If the Vendor does not meet the standards established in the CAP within the agreed upon timeframe, the Vendor shall be in violation of the provisions of this Contract and shall be subject to liquidated damages.

   j. Except where otherwise specified, liquidated damages of up to five hundred dollars ($500) per day may be imposed on the Vendor for each calendar day that the approved CAP is not implemented to the satisfaction of the Agency.

E.  Special Provision(s)

1.  Performance Bond

   A performance bond in the amount specified in Table 1, Performance Bond Requirements, below shall be furnished to the Agency by the Vendor for the specified Contract term.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

AHCA Contract No. MED128, Attachment I, Page 41 of 54

| Table 1 | | |
|---|---|---|
| Performance Bond Requirements | | |
| Contract Term | "Estimated" Annual Contract Amount | Performance Bond Amount (10%) |
| Implementation plus Year 1 of Operations (Contract execution through 06/30/2012) | $17,970,562.00 | $1,797,056.00 |
| Year 2 of Operations (07/01/2012 through 06/30/2013) | $15,863,280.00 | $1,586,328.00 |
| Year 3 of Operations (07/01/2013 through 06/30/2014) | $16,240,116.00 | $1,624,011.60 |

The initial performance bond shall be furnished to the Agency's Procurement Office, Building 2, MS#15, 2727 Mahan Drive, Tallahassee, FL 32308, within thirty (30) calendar days after execution of this Contract and prior to commencement of any work under this Contract. The performance bonds for Years 2 and 3 shall be submitted no later than thirty (30) days prior to the start of the operational period and shall be submitted to the Agency's Procurement Office at the aforementioned address. Thereafter, the bond shall be furnished on an annual basis, thirty (30) days prior to the new contract year and be in the amount of ten percent (10%) of the new year's projected amount. A copy of all performance bonds shall be submitted to the Agency's Contract Manager.

No payments will be made to the Vendor until the performance bond is in place and approved by the Agency in writing. The performance bond shall remain in effect for the full term of this Contract, including any renewal. The Agency shall be named as the beneficiary of the Vendor's bond. The bond shall provide that the insurer or bonding company(s) pay losses suffered by the Agency directly to the Agency.

The cost of the performance bond will be borne by the Vendor.

Should the Vendor terminate this Contract prior to the end of the Contract period, an assessment against the bond will be made by the State to cover the costs of issuing a new solicitation and selecting a new vendor. The Vendor agrees that the Agency's damages in the event of termination by the Vendor shall be considered to be for the full amount of the bond. The Agency need not prove the damage amount in exercising its right of recourse against the bond.

## 2. Minority and Certified Minority Subcontractors

The Agency for Health Care Administration encourages the Vendor to use Minority and Certified Minority businesses as subcontractors when procuring commodities or services to meet the requirements of this Contract.

A minority owned business is defined as any business enterprise owned and operated by the following ethnic groups: African American (Certified Minority Code H or Non-Certified Minority Code N), Hispanic American (Certified Minority Code I or Non-Certified Minority O), Asian American (Certified Minority Code J or Non-Certified Minority Code P), Native American (Certified Minority Code K or Non-Certified Minority Code Q), or American Woman (Certified Minority Code M or Non-Certified Minority Code R).

3.  **MyFloridaMarketPlace Vendor Registration**

Each Vendor doing business with the State of Florida for the sale of commodities or contractual services as defined in section 287.012, Florida Statutes, shall register in MyFloridaMarketPlace, in compliance with Rule 60A-1.030, Florida Administrative Code, unless exempt under Rule 60A-1.030(3) Florida Administrative Code.

4.  **MyFloridaMarketPlace Transaction Fee**

The Vendor is exempt from paying the 1% MyFloridaMarketPlace transaction fee in accordance with Rule 60A-1.032(2)(a&b), Florida Administrative Code.

5.  **Transition of the Contract**

a.  At the conclusion of this Contract, the Vendor shall be obligated to verify the processing of all prior authorization requests received during the Contract period. At the time of Contract completion, the Vendor shall cooperate with the Agency in transitioning responsibilities of this Contract to the Agency or another Vendor.

b.  The Vendor shall deliver to the Agency, or its authorized representative, all contract-related records and data in a format specified by the Agency, within sixty (60) calendar days from the expiration or termination of this Contract.

c.  Prior to the ending or termination of this Contract, the Vendor shall agree to meet with the new Vendor or the Agency's designated representative(s) to develop a HIPAA compliant, written agreement that sets forth how the entities will cooperate to ensure a effortless transition. The agreement shall include, but not be limited to:

- Designated point of contact for each entity;
- A calendar of regularly scheduled meetings;
- A detailed list of data that will be shared;
- A mechanism and timeframe for transmitting records and data from the Vendor's system;
- A mechanism and timeframe for transmitting documents produced under this Contract, as requested by the Agency; and
- A clear description of the mutual needs and expectations of both entities.

d.  The Agency shall review and approve this agreement prior to its execution.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

EXHIBIT I

### SUMMARY OF PERFORMANCE STANDARDS AND LIQUIDATED DAMAGES

| PERFORMANCE STANDARD | LIQUIDATED DAMAGES |
|---|---|
| **Implementation** | |
| The Vendor shall submit a final implementation plan no later than 30 calendar days following the award of this Contract. | $1,000 per day for each day beyond the due date until submitted. |
| The Vendor shall have a 100% interface with the fiscal agent and providers in processing prior authorization requests on the date specified in the implementation plan. | $1,000 per day for each day beyond due date if delay is due to contractor error. |
| The Vendor shall implement prior authorization review on the date specified in the implementation plan. | $3,000 per day for each day beyond the due date until implemented. |
| Procedure manuals submitted to the Agency for approval by the date specified in the implementation plan. | $1,000 per day for each day beyond the due date until submitted. |
| Procedure manuals submitted to the providers and posted on the website by the date specified in the implementation plan. | $1,000 per day for each day beyond the due date until submitted. |
| Review criteria must be provided to the Agency on the date specified in the implementation plan. | $1,000 per day beyond the due date until submitted. |
| Trainings, including the submission of training materials are completed as specified in the implementation plan. | $1,000 per day for each day beyond the due dates. |
| Implementation of an internal quality control program as specified in the implementation plan. | $1,000 per day for each day after the due date. |
| **General** | |
| 98% of all reviews are completed within the contractual timeframes. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 95% of the physicians reviewing prior authorization, reconsideration, and retrospective requests shall be Board certified, Florida licensed physicians of the same specialty as the case under review. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 100% of clinical nurse reviewers are licensed by the State of Florida, and meet the minimum experience requirements, unless expressly waived by the Agency. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 100% of fair hearings are attended by a licensed physician in the appropriate specialty, and who participates in discussions with the Agency's General Counsel attorneys and staff, as needed. | Monthly payment reduced by 1% for any failure to meet this standard. |

| | |
|---|---|
| 95% of fair hearing packets submitted within ten (10) calendar days of the scheduled hearing date. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 95% of denial and reconsideration notices are mailed within one business day after the final determination. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 95% of notification letters state the correct number of denied/approved hours, units, or days. | Monthly payment reduced by 1% for any failure to meet this standard. |
| 90% of all phone calls and written complaints are responded to within the contractual time frames. | Monthly payment reduced by 1% for any failure to meet this standard. |
| **Reports** | |
| The Vendor shall submit accurate and complete internal quality reports and instructional manuals to the Agency within contractual timeframes. | $1,000 per day beyond the due date until submitted. |
| The Vendor shall submit accurate and complete monthly reports, quarterly reports, and annual reports to the Agency within the contractual timeframe. | $1,000 per day beyond the due date until submitted. |
| **Records** | |
| The Vendor shall submit to the Agency or its designee, all records and data generated by this Contract no later than sixty (60) calendar days following the expiration of this Contract. | The Agency may withhold the final monthly payment amount until all records are submitted. |

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

# EXHIBIT II

## VENDOR REVIEW COMPLETION TIMEFRAME REQUIREMENTS*

| Review Settings And Types | First Level Clinical Reviewer | If Referred to the Physician Consultant |
|---|---|---|
| **Inpatient Hospital Reviews** | | |
| Prior Authorization Reviews<br>• Elective –Pre-Admission<br>• Admission<br>• Continued Stay | Within 4 hours from receipt of the completed request | Within 1 business day from receipt of the completed request |
| Balanced Budget Act Reviews | Within 1 business day from receipt of the completed request | Within 2 business days from receipt of the completed request |
| Retrospective Reviews<br>• Post discharge<br>• Undocumented Non-Citizen Reviews<br>• Medically Needy or Retroactive Medicaid Eligibility | Within 20 business days (timeframe includes all levels of review) | |
| **Home Health Visits, Skilled Nursing and/or Aide Visits** | | |
| Initial Request  or Continued Services Request Without a Vendor Home Visit | Within 1 business day for 1st level reviewer | Within 2 business days if referred to a physician |
| Initial Request  or Continued Services Request With a Vendor Home Visit (Miami-Dade Pilot) | 5 business days (timeframe includes all levels of review) | |
| Retrospective Review<br>• Retrospective eligibility | 20 business days (timeframe includes all levels of review) | |
| **Private Duty Nursing and/or Personal Care Services** | | |
| Initial Request  or Continued Services Request Without a Vendor Home Visit | Within 1 business day for 1st level reviewer | Within 3 business days if referred to a physician |
| Retrospective Review<br>• Retrospective eligibility | 20 business days (timeframe includes all levels of review) | |
| **Prescribed Pediatric Extended Care (PPEC)** | | |
| Initial Request  or Continued Services Request | Within 1 business day for 1st level reviewer | Within 3 business days if referred to a physician |
| Retrospective Review<br>• Retrospective eligibility | 20 business days (timeframe includes all levels of review) | |
| **Therapies: Physical, Occupational and Speech** | | |
| Initial Request  or Continued Services Request | Within 1 business day for 1st level reviewer | Within 3 business days if referred to a physician |
| Retrospective Review<br>• Retrospective eligibility | 20 business days (timeframe includes all levels of review) | |
| **Reconsideration Review** | | |
| Inpatient Expedited Reconsideration | N/A | 1 business day |
| Inpatient Standard Reconsideration | N/A | 20 calendar days |
| Standard Reconsideration | N/A | 3 business days |

*All timeframes are contingent upon the Vendor's receipt of all required information.

# EXHIBIT III

## DEFINITIONS AND ACRONYMS

### I. DEFINITIONS:

**Ad Hoc** - A report designed for a specific purpose, case, or situation.

**Admission Review** -- A review of medical information within 24 hours after a patient has been admitted to a hospital to determine medical necessity.

**Adverse Determination** -- A decision made by the Vendor to deny or reduce requested services based on Agency approved policies and/or medical necessity criteria.

**Agency** - Florida's Agency for Health Care Administration (AHCA).

**Agent** - A term that refers to certain independent contractors with the State that perform administrative functions, including but not limited to: Fiscal Agent activities; outreach, eligibility, and enrollment activities; Systems and Technical Support. The term as used herein does not create a principal-agent relationship.

**Centers for Medicare and Medicaid Services (CMS)** - The agency within the U.S. Department of Health and Human Services with responsibility for the Medicare, Medicaid, and State Children's Health Insurance Program.

**Continued Stay Review** -- A review of medical information while the patient is still hospitalized to determine the need for continuing the patient's stay at a hospital level of care.

**Contract** - The written agreement between the Agency and the Vendor comprised of the Contract, any addenda, appendices, attachments, or amendments thereto.

**Contract Manager** - An individual designated to be responsible for the management of the Contract.

**Elective Admission** -- Inpatient admission that can safely be deferred without substantial risk to the health of the individual.

**Elective Surgical Admission** -- Inpatient admissions for surgery which have been scheduled in advance of the admission.

**Emergency Situation** -- Occurs when a medical condition manifests itself by acute symptoms of sufficient severity, which may include severe pain or other acute symptoms, such that the absence of immediate medical attention could reasonably be expected to result in serious jeopardy to the health of a patient.

**Fair Hearing** -- A judicial proceeding before the Department of Children and Families, Office of Appeals requested by a Medicaid recipient to appeal an adverse decision made by the Agency, or its designee.

**Fee-For-Service** - Fee-for-service is a method of payment where the provider is paid a fee for each procedure performed and billed within the Medicaid policy limitations.

**Fiscal Agent** - A private corporation under contract with the Agency to process Medicaid claims and perform other functions.

**Florida Medicaid Management Information System (FMMIS)** - The information system used to process Florida Medicaid claims, and payments to health plans, and providers, and to produce management information and reports relating to Florida Medicaid program. This system is used to maintain Medicaid eligibility data and Provider Enrollment data.

**Health Maintenance Organization** - A managed care plan that is certified by the Florida Department of Insurance under the applicable provisions of Part I of Chapter 641, F.S.

**Home Health Services** - Medically necessary services, which can be effectively and efficiently provided in the place of residence of a recipient. Services include home health visits (nurse and home health aide), private duty nursing and personal care services.

**Home Health Agency** - Facility enrolled in the Medicaid program and renders services to Medicaid recipients and bills Medicaid for services.

**Home Health Visit** - A face-to-face contact between a medical professional (registered nurse, licensed practical nurse, or qualified home health aide), and the recipient at the recipient's place of residence for the purposes of providing medical related services.

**Hospital Acquired Condition** – A medical condition that a patient acquires while hospitalized which could have been reasonably prevented by following established evidence-based guidelines.

**Managed Care** - A comprehensive approach to healthcare delivery intended to improve access to and the quality of care while controlling costs.

**Medicaid** - The medical assistance program authorized by Title XIX of the Social Security Act, 42 U.S.C. s.1396 et seq., and regulations there under, as administered in this state by the Agency under s.409.900 et seq., Florida Statutes.

**Medicaid Recipient** - Any individual that the Florida Department of Children and Families (DCF), or the Social Security Administration, on behalf of DCF, determines is eligible, pursuant to federal and state law, to receive medical or allied care, goods or services for which the Agency may make payments under the Medicaid program, and who is enrolled in the Medicaid program.

**Medical Necessity** – Health care services that a provider, exercising prudent clinical judgment, would provide to a patient for the purpose of evaluating, diagnosing, or treating an illness, injury, disease or its symptoms, and are:

- Necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
- Individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;
- Consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;
- Reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available statewide; and

- Furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

**Medical Record Review (MRR)** - The review of a medical record to determine the medical necessity and appropriateness of care provided to a Medicaid recipient.

**Medicaid Provider Access System (MediPass)** - A Medicaid primary case management program designed to assure Medicaid recipients access to care, decrease inappropriate service utilization, and control costs.

**Medically Complex** - A person is medically complex if he has chronic debilitating diseases or conditions of one or more physiological or organ systems that make the person dependent upon continuous medical, nursing, or health supervision or intervention.

**Medically Needy** - A Medicaid coverage group that includes individuals who would qualify for Medicaid, except that their income or resources exceed the Medicaid's income or resource limits. On a month-by-month basis, the individual's medical expenses are subtracted from his income; and if the remainder falls below Medicaid's income limits, the individual may qualify for Medicaid for the day he became eligible until the end of the month.

**Modification Request** - A request to change a previously approved prior authorization request prior to the end of the certification period, generally to request additional services.

**Must** - Indicates a mandatory requirement or a condition to be met.

**Normal Business Hours** - Monday through Friday, 8:00 A.M. - 5:00 P.M., Eastern Time, excluding state observed holidays.

**Occupational Therapy** - The provision of services that addresses the developmental or functional needs of a child related to the performance of self-help skills; adaptive behavior; and sensory, motor, and postural development.

**Personal Care Services** - Medically necessary assistance with activities of daily living that support a recipient's medical care needs. Services may be provided in a child's home or other authorized settings.

**Physical Therapy** - Specifically prescribed program to develop, improve or restore neuro-muscular or sensory-motor function, relieve pain, or control postural deviations to attain maximum performance. Physical therapy services include evaluation and treatment of range-of-motion, muscle strength, functional abilities, and the use of adaptive and therapeutic equipment.

**Private Duty Nursing Services** - Skilled nursing services that may be provided in a child's home or other authorized settings to support the care required by the child's complex medical condition.

**Prior Authorization** - An administrative mechanism used to ensure that utilization of medical services and procedures is appropriate. Medical services and procedures are prior authorized based upon the requesting provider's ability to submit for consideration information that demonstrates the medical necessity of the requested service or procedure.

**Provider** - An entity, facility, person or group who is enrolled in the Medicaid program, renders services to Medicaid recipients and bills Medicaid for services.

**Provider Service Network** – An organized health system operated by health care providers offering integrated systems of care to Medicaid recipients.

**Quality Assurance** - The process of assuring that the delivery of health care meets professionally recognized standards of health care.

**Quality Improvement Organization (QIO)** – An organization certified through the Centers for Medicare and Medicaid Services, Office of Clinical Standards and Quality to perform medical and utilization review functions required by law.

**Reconsideration** – The review of an adverse determination previously rendered by the contracted QIO vendor, at the request of the provider or Medicaid recipient.

**Respiratory Therapy** - Treatment of conditions that interfere with respiratory functions or other deficiencies of the cardiopulmonary system.

**Shall** - Indicates a mandatory requirement or a condition to be met.

**Speech-Language Pathology** - services involve the evaluation and treatment of speech-language disorders. Services include the evaluation and treatment of disorders of verbal and written language, articulation, voice, fluency, phonology, mastication, deglutition, cognition, communication (including the pragmatics of verbal communication), auditory processing, visual processing, memory, comprehension and interactive communication as well as the use of instrumentation, techniques, and strategies to remediate and enhance the recipient's communication needs, when appropriate.

**State** - The State of Florida

**State Fiscal Year** - Refers to the State Fiscal Year beginning July 1 and ending June 30.

**Technical Denial** - A denial for reasons other than medical necessity. Examples of technical denials include, but are not limited to: ineligible Medicaid recipient, ineligible provider, lack of documentation, duplicate requests, Medicare eligible recipient, etc.

**Telecommuting** - An arrangement where an employee works either part or all of their workweek from home or a location other than the standard place of work (office).

**Urgent Situation** - Occurs when services are needed to immediately   relieve pain or distress for medical problems such as injuries, nausea, fever, infectious diseases, and other similar conditions.

**Vendor** - The entity that contracts directly with the Agency for the work specified herein.

**Violation of Obligations** - A violation of an obligation has occurred in one (1) or more instances, which presents an imminent danger to the health, safety, or well being of a Medicaid recipient or places the recipient unnecessarily in high-risk situations.

## II. ACRONYMS

**CFR** – Code of Federal Regulations

**CMS** - Centers for Medicare and Medicaid Services

**AHCA Contract No. MED128, Attachment I, Page 50 of 54**

**EFT** – Electronic Funds Transfer

**FMMIS** – Florida Medicaid Management Information System

**HMO** – Health Maintenance Organization

**QIO** – Quality Improvement Organization

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

# EXHIBIT IV

## WEB BASED PRIOR AUTHORIZATION SYSTEM
## (DESIGN, DEVELOPMENT, AND IMPLEMENTATION)

I.  **Design Phase**

   A.  The timeframes and deliverables from the Design Phase shall be based on tasks and deliverables identified within the implementation plan. The Design Phase shall commence with the successful award of the Contract and shall continue for the timeframe identified within the Vendor's proposed implementation plan which must be approved by the Agency.

   B.  The Vendor shall provide a written functional overview and a description of the operating environment, procedures, flow charts, and workflow of the proposed Web Based Prior Authorization System. This shall be updated within thirty (30) calendar days of any changes.

   C.  The Vendor shall develop a design operations document that shall address the System from the perspective of the various stakeholders (Vendor staff, providers, FMMIS/Agency Fiscal Agent staff, and Agency staff). The System design operations document should provide a detailed design and detailed description of each function that the System(s) needs to accommodate including flow charts of all processes. The design operations document is the primary guide for the System developers. This document shall be updated within thirty (30) calendar days of any changes.

   D.  The Vendor shall develop System test plans during the Design Phase which shall be approved by the Agency.

II.  **Development Phase**

   The Development Phase shall commence following the successful completion of the Design Phase. The Vendor shall notify the Agency in writing that all of the requirements of the Design Phase have been completed. During the Development Phase of the project, the Vendor shall configure and test the Web Based Prior Authorization System according to the system specifications previously defined and agreed upon. All deliverables for the Development Phase identified within the implementation plan are subject to Agency review and approval.

   System testing shall be performed on all components and functional areas of the Web Based Prior Authorization System and shall continue throughout the term of this Contract. System testing by Agency staff shall not begin until after the Vendor has completed thorough internal testing and all programming is completed.

   A.  Testing Approach

   Any changes made, whether it be the Vendor's system or the Agency's system, should be properly tested prior to being introduced into a production environment. It is therefore required that the Vendor's test system operate under the same system requirements as the production system. The plan shall address the nature and extent of integration testing that is to occur to ensure that all systems properly interface with each other and operate as designed.

**AHCA Contract No. MED128, Attachment I, Page 52 of 54**

B.   FMMIS/Agency Fiscal Agent Interface Testing

Tests shall be conducted between the FMMIS/Fiscal Agent systems and the Vendor's Web Based Prior Authorization System to ensure that all files/data sent between the two systems are properly received, accepted, and processed

C.   System Acceptance Tests

The System acceptance tests provide Agency representatives the opportunity to test the Web Based Prior Authorization System and ensure compliance with the System design requirements and is the final test required before System acceptance can be approved.

In addition, as part of the System acceptance testing, the Vendor must demonstrate the methods and processes for performing daily reconciliation between the Agency and Vendor interface and processing activities.

All testing will occur at a location chosen by the Agency.  The Vendor shall have adequate staff attend testing in order to support the Agency.  The Vendor shall support on-going testing in the same manner.

At a minimum, System acceptance requires 100% accuracy for all levels of the review submission/determination process.

D.   Performance Testing

The purpose of this test is to ensure that there is sufficient capacity within the Web Based Prior Authorization System to handle the expected review volume.  Test results from the performance test shall be used to formulate a System capacity model to determine the appropriate hardware and software requirements and configuration so that the Web Based Prior Authorization System can accommodate the anticipated review volumes.

E.   Test Reports

The Vendor shall provide documentation of its internal testing results.  The documentation shall describe the intended scope and results from the tests, and any system modifications that are identified as necessary to resolve system errors and deficiencies found during the testing.

III.   **Implementation/Start-Up Phase**

The activities within the Implementation/Start-Up Phase shall be geared towards ensuring that all subcontractors, providers, and Agency staff are adequately trained consistent with the requirements of this Contract and prepared for the implementation of this project.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

## EXHIBIT V

## ANTICIPATED REVIEW VOLUMES

| Description of Services | Anticipated Annual Review Volumes |
|---|---|
| A. Prior Authorization Inpatient Services | 510,000 |
| B. Prior Authorization Home Health Visits | 55,000 |
| C. Prior Authorization PDN/PC/PPEC Services | 11,000 |
| D. Prior Authorization Therapy Services | 140,000 |
| E. Claims Analysis- Respiratory Therapy | 1 |
| F. Retrospective Medical Record Reviews | 2,000 |
| G. NICU Care Monitoring Program | 700 |
| H. Home Health Comprehensive Care Monitoring Program | 4,000 |

\* At the beginning of each Contract year, the total review volume for the previous Contract year will be computed by the Agency. If the annual volume for the individual categories of service vary by a rate of 20% or more from the estimated volume listed in this exhibit, the Agency will amend the Contract to reflect the agreed upon volumes and pricing.

**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

# ATTACHMENT II

## BUSINESS ASSOCIATE AGREEMENT

The parties to this Attachment agree that the following provisions constitute a business associate agreement for purposes of complying with the requirements of the Health Insurance Portability and Accountability Act of 1996 (HIPAA). This Attachment is applicable if the Vendor is a business associate within the meaning of the Privacy and Security Regulations, 45 C.F.R. 160 and 164.

The Vendor certifies and agrees as to abide by the following:

1. <u>Definitions.</u>   Unless specifically stated in this Attachment, the definition of the terms contained herein shall have the same meaning and effect as defined in 45 C.F.R. 160 and 164.

   1.a.   <u>Protected Health Information.</u>   For purposes of this Attachment, protected health information shall have the same meaning and effect as defined in 45 C.F.R. 160 and 164, limited to the information created, received, maintained or transmitted by the Vendor from, or on behalf of, the Agency.

   1.b.   <u>Security Incident.</u>  For purposes of this Attachment, security incident shall mean any event resulting in computer systems, networks, or data being viewed, manipulated, damaged, destroyed or made inaccessible by an unauthorized activity. See National Institute of Standards and Technology (NIST) Special Publication 800-61, "Computer Security Incident Handling Guide," for more information.

2. <u>Applicability of HITECH and HIPAA Privacy Rule and Security Rule Provisions.</u>   As provided by federal law, Title XIII of the American Recovery and Reinvestment Act of 2009 (ARRA), also known as the Health Information Technology Economic and Clinical Health (HITECH) Act, requires a Business Associate (Vendor) that contracts with the Agency, a HIPAA covered entity, to comply with the provisions of the HIPAA Privacy and Security Rules (45 C.F.R. 160 and 164).

3. <u>Use and Disclosure of Protected Health Information.</u>  The Vendor shall not use or disclose protected health information other than as permitted by this Contract or by federal and state law. The Vendor will use appropriate safeguards to prevent the use or disclosure of protected health information for any purpose not in conformity with this Contract and federal and state law. The Vendor will implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of electronic protected health information the Vendor creates, receives, maintains, or transmits on behalf of the Agency.

4. <u>Use and Disclosure of Information for Management, Administration, and Legal Responsibilities.</u>  The Vendor is permitted to use and disclose protected health information received from the Agency for the proper management and administration of the Vendor or to carry out the legal responsibilities of the Vendor, in accordance with 45 C.F.R. 164.504(e)(4). Such disclosure is only permissible where required by law, or where the

Vendor obtains reasonable assurances from the person to whom the protected health information is disclosed that: (1) the protected health information will be held confidentially, (2) the protected health information will be used or further disclosed only as required by law or for the purposes for which it was disclosed to the person, and (3) the person notifies the Vendor of any instance of which it is aware in which the confidentiality of the protected health information has been breached.

5. <u>Disclosure to Third Parties</u>.   The Vendor will not divulge, disclose, or communicate protected health information to any third party for any purpose not in conformity with this Contract without prior written approval from the Agency. The Vendor shall ensure that any agent, including a subcontractor, to whom it provides protected health information received from, or created or received by the Vendor on behalf of, the Agency agrees to the same terms, conditions, and restrictions that apply to the Vendor with respect to protected health information.

6. <u>Access to Information</u>.  The Vendor shall make protected health information available in accordance with federal and state law, including providing a right of access to persons who are the subjects of the protected health information in accordance with 45 C.F.R. 164.524.

7. <u>Amendment and Incorporation of Amendments</u>.  The Vendor shall make protected health information available for amendment and to incorporate any amendments to the protected health information in accordance with 45 C.F.R. 164.526.

8. <u>Accounting for Disclosures</u>.  The Vendor shall make protected health information available as required to provide an accounting of disclosures in accordance with 45 C.F.R. 164.528. The Vendor shall document all disclosures of protected health information as needed for the Agency to respond to a request for an accounting of disclosures in accordance with 45 C.F.R. 164.528.

9. <u>Access to Books and Records</u>.  The Vendor shall make its internal practices, books, and records relating to the use and disclosure of protected health information received from, or created or received by the Vendor on behalf of the Agency, available to the Secretary of the Department of Health and Human Services or the Secretary's designee for purposes of determining compliance with the Department of Health and Human Services Privacy Regulations.

10. <u>Reporting</u>.  The Vendor shall make a good faith effort to identify any use or disclosure of protected health information not provided for in this Contract.

    10a.    <u>To Agency</u>.  The Vendor will report to the Agency, within ten (10) business days of discovery, any use or disclosure of protected health information not provided for in this Contract of which the Vendor is aware. The Vendor will report to the Agency, within twenty-four (24) hours of discovery, any security incident of which the Vendor is aware. A violation of this paragraph shall be a material violation of this Contract. Such notice shall include the identification of each individual whose unsecured protected health information has been, or is

reasonably believed by the Vendor to have been, accessed, acquired, or disclosed during such breach.

10b.     To Individuals.  In the case of a breach of protected health information discovered by the Vendor, the Vendor shall first notify the Agency of the pertinent details of the breach and upon prior approval of the Agency shall notify each individual whose unsecured protected health information has been, or is reasonably believed by the Vendor to have been, accessed, acquired or disclosed as a result of such breach.  Such notification shall be in writing by first-class mail to the individual (or the next of kin if the individual is deceased) at the last known address of the individual or next of kin, respectively, or, if specified as a preference by the individual, by electronic mail.  Where there is insufficient, or out-of-date contact information (including a phone number, email address, or any other form of appropriate communication) that precludes written (or, if specifically requested, electronic) notification to the individual, a substitute form of notice shall be provided, including, in the case that there are 10 or more individuals for which there is insufficient or out-of-date contact information, a conspicuous posting on the Web site of the covered entity involved or notice in major print of broadcast media, including major media in the geographic areas where the individuals affected by the breach likely reside.  In any case deemed by the Vendor to require urgency because of possible imminent misuse of unsecured protected health information, the Vendor may also provide information to individuals by telephone or other means, as appropriate.

10c.     To Media.  In the case of a breach of protected health information discovered by the Vendor where the unsecured protected health information of more than 500 persons is reasonably believed to have been, accessed, acquired, or disclosed, after prior approval by the Agency, the Vendor shall provide notice to prominent media outlets serving the State or relevant portion of the State involved.

10d.     To Secretary of Health and Human Services.  The Vendor shall cooperate with the Agency to provide notice to the Secretary of Health and Human Services of unsecured protected health information that has been acquired or disclosed in a breach.  If the breach was with respect to 500 or more individuals, such notice must be provided immediately.  If the breach was with respect to less than 500 individuals, the Vendor may maintain a log of such breach occurring and annually submit such log to the Agency so that it may satisfy its obligation to notify the Secretary of Health and Human Services documenting such breaches occurring in the year involved.

10e.     Content of Notices.  All notices required under this Attachment shall include the content set forth Section 13402(f), Title XIII of the American Recovery and Reinvestment Act of 2009, except that references therein to a "covered entity" shall be read as references to the Vendor.

10f.   Financial Responsibility.  The Vendor shall be responsible for all costs related to the notices required under this Attachment.

11. Mitigation.  Vendor shall mitigate, to the extent practicable, any harmful effect that is known to the Vendor of a use or disclosure of protected health information in violation of this Attachment.

12. Termination.  Upon the Agency's discovery of a material breach of this Attachment, the Agency shall have the right to terminate this Contract.

12a.   Effect of Termination.  At the termination of this Contract, the Vendor shall return all protected health information that the Vendor still maintains in any form, including any copies or hybrid or merged databases made by the Vendor; or with prior written approval of the Agency, the protected health information may be destroyed by the Vendor after its use.  If the protected health information is destroyed pursuant to the Agency's prior written approval, the Vendor must provide a written confirmation of such destruction to the Agency.  If return or destruction of the protected health information is determined not feasible by the Agency, the Vendor agrees to protect the protected health information and treat it as strictly confidential.

The Vendor has caused this Attachment to be signed and delivered by its duly authorized representative, as of the date set forth below.

Vendor Name:

_____          2 - 24 - 2011
Signature                          Date

Gary L. Curtis, President & CEO
_____
Name and Title of Authorized Signer

## REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

## ATTACHMENT III

### CERTIFICATION REGARDING LOBBYING
### CERTIFICATION FOR CONTRACTS, GRANTS, LOANS AND COOPERATIVE AGREEMENTS

The undersigned certifies, to the best of his or her knowledge and belief, that:

(1)     No federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a member of congress, an officer or employee of congress, or an employee of a member of congress in connection with the awarding of any federal contract, the making of any federal grant, the making of any federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, amendment, or modification of any federal contract, grant, loan, or cooperative agreement.

(2)     If any funds other than federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a member of congress, an officer or employee of congress, or an employee of a member of congress in connection with this federal contract, grant, loan, or cooperative agreement, the undersigned shall complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3)     The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and cooperative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000 and not more than $100,000 for each such failure.

_____          $2-24-2011$
Signature                          Date

_____          _____
Name of Authorized Individual      Application or Contract Number

_____
Name and Address of Organization

# ATTACHMENT IV

## CERTIFICATION REGARDING
## DEBARMENT, SUSPENSION, INELIGIBILITY AND VOLUNTARY EXCLUSION
## CONTRACTS/SUBCONTRACTS

This certification is required by the regulations implementing Executive Order 12549, Debarment and Suspension, signed February 18, 1986. The guidelines were published in the May 29, 1987, Federal Register (52 Fed. Reg., pages 20360-20369).

### INSTRUCTIONS

1.  Each Vendor whose contract/subcontract equals or exceeds $25,000 in federal monies must sign this certification prior to execution of each contract/subcontract. Additionally, Vendors who audit federal programs must also sign, regardless of the contract amount. The Agency for Health Care Administration cannot contract with these types of Vendors if they are debarred or suspended by the federal government.

2.  This certification is a material representation of fact upon which reliance is placed when this contract/subcontract is entered into. If it is later determined that the signer knowingly rendered an erroneous certification, the Federal Government may pursue available remedies, including suspension and/or debarment.

3.  The Vendor shall provide immediate written notice to the contract manager at any time the Vendor learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

4.  The terms "debarred," "suspended," "ineligible," "person," "principal," and "voluntarily excluded," as used in this certification, have the meanings set out in the Definitions and Coverage sections of rules implementing Executive Order 12549. You may contact the contract manager for assistance in obtaining a copy of those regulations.

5.  The Vendor agrees by submitting this certification that, it shall not knowingly enter into any subcontract with a person who is debarred, suspended, declared ineligible, or voluntarily excluded from participation in this contract/subcontract unless authorized by the Federal Government.

6.  The Vendor further agrees by submitting this certification that it will require each subcontractor of this contract/subcontract, whose payment will equal or exceed $25,000 in federal monies, to submit a signed copy of this certification.

7.  The Agency for Health Care Administration may rely upon a certification of a Vendor that it is not debarred, suspended, ineligible, or voluntarily excluded from contracting/subcontracting unless it knows that the certification is erroneous.

8.  This signed certification must be kept in the contract manager's contract file. Subcontractor's certifications must be kept at the contractor's business location.

---

## CERTIFICATION

(1)  The prospective Vendor certifies, by signing this certification, that neither he nor his principals is presently debarred, suspended, proposed for debarment, declared ineligible, or voluntarily excluded from participation in this contract/subcontract by any federal department or agency.

(2)  Where the prospective Vendor is unable to certify to any of the statements in this certification, such prospective Vendor shall attach an explanation to this certification.

_____          2-24-2011
Signature                                Date

Gary L. Curtis, President & CEO
Name and Title of Authorized Signer

*(signature present)*