## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

Case No. 0:12-cv-60460-CIV-ROSENBAUM

**T.H.**, by and through her next friend, Paolo
Annino; et al.,

     Plaintiffs,

**v.**

**ELIZABETH DUDEK**, et al.,

     Defendants.

_____/

### STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517,[1] in

opposition to Defendants' motions to dismiss for lack of subject matter jurisdiction due to

mootness (ECF Nos. 117 & 119), and in support of Plaintiffs' motion for class certification (ECF

No. 95).  In this case, Plaintiffs claim that they and members of their proposed class have been

discriminated against in violation of, *inter alia*, the Americans With Disabilities Act ("ADA"),

42 U.S.C. §§ 12101 *et seq.*, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation

Act"), 29 U.S.C. § 794, through policies and practices of the State of Florida that subject them to

unnecessary institutionalization and risk of institutionalization.  In their motions to dismiss for

mootness, Defendants claim that certain recent decisions they have made to take initial steps to

alter some of those policies moot Plaintiffs' claims.  They do not.  The policy revisions will not

grant full relief to Plaintiffs and their class members even if fully implemented, plus there are

strong reasons to doubt whether their implementation will be permanent at all or whether the

---

[1]     28 U.S.C. § 517 permits the Attorney General to send an officer of the Department of
Justice to any district in the United States "to attend to the interests of the United States
in a suit pending in a court of the United States."

policies are merely being voluntarily ceased in an attempt to divest this Court of jurisdiction.

Moreover, even if the revised policies are fully implemented, almost two hundred children will

remain institutionalized in nursing facilities throughout Florida.  Nearly two thousand others will

have no guarantee that they will receive the medically necessary nursing services to which they

are entitled under the Medicaid Act, and no guarantee that they will not be placed at risk of

institutionalization through further discriminatory administration of Defendants' programs.

Additionally, the facts of this case support class certification, especially in light of the

established precedent that class actions are appropriate mechanisms for resolving civil rights

violations, including those involving rights protected by the ADA,[2] as well as those  enforcing

the Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") requirements of the

Medicaid Act, 42 U.S.C. §1396 *et seq.*

### BACKGROUND

Plaintiffs T.H., L.J., A.G., A.C., A.R., C.V., M.D., C.M., and B.F.[3] are children who have

been diagnosed as "medically fragile,"[4] and who qualify for services through the State of

---

[2]   The ADA's implementing regulations provide that "a public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).  With respect to State Medicaid programs, Section 504 of the Rehabilitation Act is implemented by similar regulations issued by the Attorney General and the Secretary of the Department of Health and Human Services.  *See* 28 C.F.R. § 41.51(d); 45 C.F.R. § 84.4(b)(2).  In all ways relevant to this discussion, the ADA and Section 504 are generally construed to impose similar requirements.  *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316, n.3 (11th Cir. 2009); *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000).

[3]   The United States was notified by Plaintiffs' counsel on April 6, 2013 that Plaintiff T.F. had passed away.

[4]   A "medically fragile child" is one who is "medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition, is ventilator dependent, or is dependent on a heightened level of medical supervision to

*continued on next page...*

Florida's Medicaid program, including those services that allow individuals with disabilities to live at home in the community.  (*See* Pls.' Second Am. Compl., ECF No. 62, ("Compl.") (Filed Aug. 23, 2012) ¶¶ 1, 15-17.)  They allege that, despite being qualified for community-based services, they either have been, or are at risk of being, required to enter nursing facilities to receive necessary care. (*Id.* ¶¶ 7, 14)  They further allege that this is the direct result of State policies that do not ensure that medically necessary community-based services (specifically, in-home private duty nursing services) are appropriately offered or provided and that these policies violate the ADA and the Medicaid Act.  (*See id.* ¶¶ 4-14.)  They also allege that Defendants administer a federally mandated nursing home pre-admission screening program in a manner that both conflicts with federal law and results in inappropriate admissions to nursing facilities.  (*See id.* ¶¶ 329-335.)  Thus, Plaintiffs have brought the present action for declaratory and injunctive relief against State Defendants, the relevant State officials responsible for implementing these programs, and contractor eQHealth Solutions, Inc. (collectively, "Defendants").  Plaintiffs have also moved (ECF No. 95) to certify a class of all children who find themselves in Plaintiffs' present situation.

Defendants have responded to Plaintiffs' motion for class certification in two different ways.  First, they have moved to dismiss Plaintiffs' claims in whole or in part (ECF Nos. 117 & 119) on the ground that State Defendants have taken action that has "mooted" the case. Specifically, they contend that Plaintiffs have already received the relief they are seeking because (a) State Defendants have already initiated (though they have not yet concluded) the process of repealing or amending three State policies that have contributed to Plaintiffs' injuries,

---

continued from last page...
  sustain life, and without such services is likely to expire without warning."  Fla. Admin.
  Code. R. 59G-1.010(165) (2012).

and (b) Defendants are acting in the interim as if these "Policy Changes" have already been finalized.  (*See, e.g.,* ECF No. 117 at 3 (representing that the Florida Agency for Health Care Administration ("AHCA") has "published provider alerts implementing immediate . . . policy changes and clarifications [and] has initiated rule development pursuant to Florida's Administrative Procedures Act . . . to codify those policy changes and clarifications through promulgated rules").)  These three Policy Changes are: (1) revision of the State's Home Health Services Handbook to clarify that parents and guardians are not expected to provide skilled nursing services to their children (*id.* at 9-10)[5]; (2) revision of its Home Health and Prescribed Pediatric Extended Care ("PPEC") Services Handbooks to provide that a parent or legal guardian may choose between private duty nursing services, PPEC services, or both (*id.* at 10-11); and (3) preparation of a new administrative rule to streamline and clarify "Level II evaluations"  in the Pre-Admission Screening and Resident Review ("PASRR") process (*id.* at 11-13.)  Defendants also submit a declaration of AHCA's Chief of the Bureau of Medicaid Services, in which the Chief attests that "AHCA has no intention of reenacting any of the former rules, practices, or regulations which are being revised."  (Decl. of Shevaun Harris, ECF No. 118-1, at ¶ 13.)

Second, Defendants argue that Plaintiffs' motion for class certification should be denied because of a supposed absence of commonality between the claims of the members of the proposed class.  (ECF Nos. 113 & 118)  This argument seems to be dependent on the Court ruling in their favor regarding mootness.  That is, Defendants appear to concede that there would be commonality (and thus, that class certification would be appropriate) if Defendants' recent

---

[5]     While the State is proposing this clarification to its Home Health Services Handbook, it is not proposing a corresponding change to its administrative code provision regarding medical necessity, which still indicates that parents and guardians are expected to provide these nursing services to their children.  *See* Fla. Admin Code R. 59G-1.010(166) (defining "medical necessity" to suggest that services are not necessary if they can be provided by parents and guardians).

steps toward effectuating policy changes did not moot the issues implicated by those policies, as the acceptability of those policies would then constitute a common issue.

The United States files this statement of interest to advance its strong interest in ensuring uniform enforcement of the ADA, including in cases in which the United States is not itself a party. For the reasons noted above and discussed in greater detail below, this case is not moot, and the proposed class meets the legal standard for class certification under Rule 23.

## ARGUMENT

I.    **Defendants' Recent Steps to Begin Altering Some of Their Policies Are Insufficient to Moot Plaintiffs' Claims and Allegations.**

Defendants' motions to dismiss based on mootness should be denied. Defendants' proposed (and still non-finalized) Policy Changes do not moot any of Plaintiffs' allegations because, as explained below, the timing and content of the Policy Changes do not support the conclusion that the Policy Changes are necessarily permanent or that the allegedly wrongful actions that Defendants took under preexisting State policies will not recur. To the contrary, the Policy Changes were proposed so recently and the proposals were so lacking in any articulated rationale that they appear to have been proposed simply as parts of a strategy to deprive this Court of jurisdiction.

Moreover, even if the proposed Policy Changes were to be found to moot certain of Plaintiffs' *allegations* regarding the relevant State policies, that still would not be a basis for dismissal, as the Policy Changes do not address the subject matter of all of Plaintiffs' *claims* (or even all of their class claims).

A.    Under the Doctrine of Voluntary Cessation, Defendants' Proposed Policy Changes Do Not Moot Any of Plaintiffs' Allegations.

As Defendants state (ECF No. 117 at 3), "[a] case becomes moot — and therefore no

longer a 'Case' or 'Controversy' for purposes of Article III — when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 726 (2013).  Defendants acknowledge that under the well-settled doctrine of "voluntary cessation," a federal defendant cannot manufacture a mootness defense simply by voluntarily ceasing its objectionable conduct once litigation has begun, unless it is "absolutely clear" that the conduct in question cannot reasonably be expected to recur.  (ECF No. 117 at 16); *see also Already*, 133 S.Ct. at 727.  Nevertheless, Defendants contend that because they are government actors, they are entitled to a presumption that they will not resume such voluntarily ceased conduct.  Thus, Defendants say, their in-progress Policy Changes moot any of Plaintiffs' allegations relating to the policies in question, notwithstanding the fact that those Policy Changes were first put into motion only several months ago.[6]

In support of this legal position, Defendants rely on Eleventh Circuit precedents suggesting that government actors may be subject to a rebuttable presumption that they will not resume objectionable behavior that they have ceased voluntarily.  *See Nat'l Advertising Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005); *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004).  However, Defendants fail to acknowledge more recent

---

[6]     Notably, AHCA announced this new set of policy changes via press release on the morning of February 11, 2013, the same day of State Defendants' original response deadline and hours before the Court granted Defendants' requested extension of time to respond to Plaintiffs' class certification motion.  *See* AHCA, Memo to the Media (Feb. 11, 2013), available: http://ahca.myflorida.com/ Executive/Communications/Press_Releases/archive/docs/2013/memo_to_the_media_han dbook_revisions_FINAL.pdf; Order (ECF No. 110).  An alert was sent to providers regarding the parental responsibility and PPEC policy changes on February 4, 2013, one week before the original briefing deadline.  *See* AHCA, Clarification of Parental Responsibility for Home Health Services (Feb. 4, 2013), available: http://portal.flmmis.com/FLPublic/ Provider_ProviderSupport/Provider_ProviderSupport_ProviderAlerts/tabId/43/Default.as px; (*see also* ECF No. 118-6).

Eleventh Circuit precedent on this topic, which explains how that presumption can be rebutted, and indeed indicates that under the circumstances of this case, it has been rebutted. *See Harrell v. Fla. Bar*, 608 F.3d 1241 (11th Cir. 2010); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents* ("*NABP*"), 633 F.3d 1297, 1310 (11th Cir. 2011).  In *Harrell*, for example, the standing committee of the State Bar (a government entity) prohibited an attorney from running a certain television advertisement, on the basis that the advertisement impermissibly created "unjustified expectations about results the lawyer [could] achieve" in violation of the Bar's rules of professional conduct.  608 F.3d at 1249.  The attorney filed a federal action, claiming, *inter alia*, that the Bar's action violated his First Amendment rights by prohibiting the advertisement.  *Id.* The Bar subsequently wrote to the attorney, informing him that its board of governors had taken up the matter of his advertisement and had reversed the standing committee's decision.  *See id.* at 1252.  On cross-motions for summary judgment the district court held, *inter alia*, that the attorney's claim was moot.  *See id.* at 1253.

On appeal, the Eleventh Circuit reversed this portion of the district court's decision, holding that the "rebuttable presumption in favor of governmental actors" that it had previously recognized in *Troiano* had, in fact, been rebutted.  *Id.* at 1266.  The Eleventh Circuit explained that the *Troiano* presumption only applies when the governmental policy in question "has been *unambiguously terminated*," *id.* (emphasis in original); and that "[c]onversely, where the circumstances surrounding the cessation suggest that the defendant is attempting to manipulate the court's jurisdiction to insulate a favorable decision from review, courts will not deem a controversy moot," *id.* (citation, quotation marks, and alteration marks omitted).  The Eleventh Circuit further explained that the "'timing and content' of a voluntary decision to cease a challenged activity are critical in determining the motive for the cessation and therefore 'whether

there is [any] reasonable expectation . . . that the alleged violation will recur.'" *Id.* (quoting *Burns v. Pa. Dep't of Corr.*, 544 F.3d 279, 284 (3d Cir. 2008)).  "As for timing . . . cessation that occurs late in the game will make a court more skeptical of voluntary changes that have been made."  *Harrell*, 608 F. 3d at 1266. (quotation marks omitted).  "With respect to content, [the court] look[s] for a well-reasoned justification for the cessation as evidence that the ceasing party intends to hold steady in its revised (and presumably unobjectionable) course."  *Id.*

Applying those principles to the case before it, the Eleventh Circuit found that the Bar's voluntary cessation did not allow it to raise a valid mootness defense.  The "timing" of the Bar's cessation was suspect, because, *inter alia*, the Bar's board of directors "took up the matter of [the attorney's] advertisement only at the urging of the Bar's counsel after this litigation had commenced . . . ."  *Id.* at 1267.  The "content" of the Bar's cessation was likewise suspect, because the Bar's decision had not been accompanied by any clearly stated justification, thus casting doubt on the Bar's motivation behind its cessation.  *Id.*  Accordingly, the Eleventh Circuit concluded that the Bar's objectionable conduct had not been "unambiguously terminated," that the Bar was thus not entitled to invoke the governmental presumption recognized in *Troiano*, and that the attorney's claim regarding his advertisement was not moot. *See id.* at 1267-68.

The factual differences between *Harrell* and *Troiano* are stark and illuminating.  In *Troiano*, the plaintiffs sued their county's supervisor of elections for failing to have voting machine components for individuals with visual impairments available in all voting precincts in time for the 2002 election, and the Eleventh Circuit held that their claim was moot because the defendant had already decided to make the components available in future elections. *Troiano*, 382 F.3d at 1285.  The "timing" of the defendant's "voluntary cessation" suggested an

8

unambiguous termination of objectionable conduct because she had made and implemented her decision in several elections before the plaintiffs had served her with process. *Id.* at 1281. Likewise, the "content" of the cessation suggested an unambiguous termination because her decision had been "well reasoned." *Id.* at 1285. The record reflected that she had decided to implement the changes prior to the litigation, and had not adopted the changes before then only because of uncertainty regarding the implementation of the new technology. *See id.* at 1281.

The present case is clearly more factually similar to *Harrell* than *Troiano*. Here, with respect to "timing," Defendants did not begin the process of implementing their Policy Changes until several months ago, long after this litigation was commenced last spring, and only slightly in advance of a deadline to respond to Plaintiffs' motion for class certification. (*See* ECF No. 118-1 at ¶¶ 4, 7, 8.) *Cf. NABP*, 633 F.3d at 1312 (finding that defendant changed policy "solely in response to the current litigation" where defendant first announced policy change at preliminary injunction hearing). Indeed, Defendants announced their proposed Policy Changes so recently that none of the Policy Changes has yet been completed: Defendants have only begun the process of altering their handbooks and regulations.[7] Moreover, with respect to "content," while Defendants issued alerts and notices in connection with their proposed Policy Changes, none of these documents appear to contain any explanations that might constitute "well-reasoned

---

[7]    Whether Defendants will actually be able to effectively implement these policies is also questionable. The rule changes themselves may be subject to administrative challenge, or oversight and potential reversal by the Florida Joint Administrative Procedures Committee. *See generally* Fla. Stat. Ann. § 120.536 (describing rulemaking authority of Florida agencies and oversight by Administrative Procedures Committee); Joint Administrative Procedures Committee Website, available: http://www.japc.state.fl.us/. Indeed, one of the proposed rules has already been administratively challenged. *See Fla. Children's First v. AHCA*, Case No. 13-001189RP (Fla. Div. of Admin. Hr'gs Apr. 1, 2013); *see also* http://www.japc.state.fl.us/results_detail.cfm?cn=R153291&ruleNo=59G-4.260.

justifications" for their actions.  Rather, Defendants simply announced their proposed changes

without articulating a rationale, other than that the changes resulted from the AHCA's

"continuing process of reviewing, and constantly improving" its Medicaid services, and that the

changes were meant to "clarify misunderstanding" of existing policies.[8]

In addition, aside from the absence of an articulated justification, whether the "content"

of Defendants' recently proposed Policy Changes evidences an unambiguous termination of the

practices that have allegedly harmed Plaintiffs and their proposed class members is suspect.

*Harrell*, 608 F.3d at 1266.  These Policy Changes stand in stark contrast to Defendants' prior,

unambiguous efforts to reduce the availability of in-home nursing services, and instead require

individuals to receive PPEC services.  For example, in a 2010 budget proviso, the Legislature

reduced funding for private duty nursing services by several million dollars, directed AHCA to

limit availability of the service to twelve continuous hours per day, and mandated parental

participation in care.[9]  In the same year, the Legislature added a budget proviso requiring AHCA

to "direct" beneficiaries to PPEC services instead of private duty nursing,[10] and to offer private

duty nursing as a supplemental service only.[11]  AHCA followed suit through implementing the

---

[8]　　　(*See* ECF Nos. 118-2 to 118-9); AHCA, Feb. 11 Memo to the Media, available:
http://ahca.myflorida.com/Executive/Communications/
Press_Releases/archive/docs/2013/memo_to_the_media_handbook_revisions_FINAL.pdf.

[9]　　　*See* House Bill No. 5001, 2010 General Appropriations Act, § 3-207, available:
http://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx?FileName=HB_5001
_Enrolled.pdf&DocumentType=Bill&BillNumber=5001&Session=2010).

[10]　　　By contrast, the 2009 General Appropriations Act directed AHCA to "encourage"
beneficiaries to attend PPEC services. *See* Senate Bill No. 2600, 2009 General
Appropriations Act, § 3-200, available:
http://www.myfloridahouse.gov/Sections/Documents/loaddoc.aspx?FileName=_s2600er.
docx&DocumentType=Bill&BillNumber=2600&Session=2009.

[11]　　　*See* House Bill No. 5001, 2010 General Appropriations Act, § 3-201.

policies that they now propose to change.[12]  There is thus a strong basis to suspect that the instant

Policy Changes, which are an abrupt about-face from prior policies, are driven not by the desire

to "improve" the Medicaid program or "clarify" existing policies, but instead to deprive the

Court of subject matter jurisdiction.

In sum, as in *Harrell* and in contrast with *Troiano*, the "timing and content" of

Defendants' Policy Changes here do not make it "absolutely clear" that Defendants have

effectuated an "unambiguous termination" of their objectionable policies.[13]  *Harrell*, 608 F. 3d at

1268; *NABP*, 633 F.3d at 1310.

      B.     Defendants' Proposed Policy Changes Would Not Support Dismissal Even If
            They Mooted Some of Plaintiffs' Allegations.

Even if the Policy Changes were fully effectuated and permanent, dismissal would still be

inappropriate.  As noted above, "[a] case becomes moot . . . when the issues presented are no

longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already,* 133 S. Ct.

at 726.  Here, the Policy Changes involve three State policies that are relevant only to some of

Plaintiffs' allegations, and do not cover the subject matter of all of Plaintiffs' claims.  Thus, even

---

[12]    *See* AHCA, Notice of Change/Withdrawal, Fla. Admin. Weekly, Vol. 37, No. 50 (Dec. 16, 2011) https://www.flrules.org/gateway/notice_Files.asp?ID=10774098 (adding limitations to private duty nursing services and requiring enrollment in PPEC).

[13]    The Policy Changes are not unambiguous.  Defendants' websites, including training materials, presentations, and other guidance available to providers, reflect conflicting guidance as to the policies Defendants purportedly intend to change.  *See, e.g.,* AHCA, Home Health Handbook Presentation, at 16, available: http://ahca.myflorida.com/ Medicaid/e-library/docs/Home_Health_Handbook_Presentation.pdf (still requiring parent work and/or school schedule and parental medical limitations for eligibility for private duty nursing); EQ Health, Inc., Home Health Services Provider Manual, at 33, available: http://fl.eqhs.org/LinkClick.aspx?fileticket=HgfuC8DE1VY%3d&tabid=263&mid=784 ("When PDN services are determined to be medically necessary, the nurse reviewer also will determine whether the child's needs can be met safely and appropriately through a PPEC center instead of through private duty nursing services.  If so, the nurse will work with the caregiver and the providers to facilitate the child's transition from PDN services to PPEC services.").

if those allegations were to be deemed moot, other issues presented by Plaintiffs would still be "live" in the case.

First, even if the proposed Policy Changes were deemed to be unambiguous terminations for purposes of the voluntary cessation doctrine, Plaintiffs T.H. and A.G. would still remain institutionalized in nursing facilities pursuant to State action,[14] and the remaining named Plaintiffs would still have no guarantee that they would not be subjected to future denials or reductions of medically necessary services to which they are entitled under the Medicaid Act, placing them at continued risk of institutionalization in violation of the ADA.  Indeed, the core of Plaintiffs' claims is not targeted by the Policy Changes: for example, while the Policy Changes mandate Level II PASRR screening for children in nursing facilities (*see* ECF No. 117 at 12), they will not ensure that the children will have or be presented with community-based options.

Second, the proposed Policy Changes will not moot all of the class claims in this action, as the Policy Changes do not cover all of the State-wide policies behind the alleged injuries common to all members of the proposed class.  These State-wide policy issues that remain unaddressed by Defendants include the State's adoption of Children's Multidisciplinary Assessment Team pre-admission screening procedures that are ineffective in preventing nursing facility admissions, (*see, e.g.,* Compl. ¶¶ 95-104); and its continuing definition of "medical necessity" in its administrative code to deny coverage of services purportedly found to be "for the convenience of the caregiver," (*see, e.g., id.* ¶¶ 60-65; *see also id.* ¶¶ 276-277 (describing administration of community-based services programs that effectively deny children access to

---

[14]     Plaintiff L.J., who resided in a nursing facility from 1997 until 2013 while in the custody of the State, was moved after this litigation commenced and now lives in the community with a family who is seeking to adopt him.  *See* Defs.' Mot. at 13.  Although L.J. has moved to a community-based setting, he remains entitled to receive medically necessary services through Defendants' Medicaid program.

community-based services).  As such, even if the Court were to make a finding of mootness, it should not prevent aspects of this case from proceeding on a class basis.

## II.    Class Certification Is Appropriate in This Case.

It is well established that civil rights actions, particularly those that seek to vindicate the rights of persons with disabilities pursuant to the integration mandate of the ADA and the Supreme Court's opinion in *Olmstead v. L.C.*, 527 U.S. 581 (1999), may be well-suited for resolution on a class basis.  *See, e.g., Pashby v. Delia*, No. 11-2363, 2013 U.S. App. LEXIS 4516, at *14-*18 (4th Cir. Mar. 5, 2013) (upholding certification of class of all current or future North Carolina Medicaid recipients age 21 or older who have, or will have, coverage of personal care denied, delayed, interrupted, terminated, or reduced due to new eligibility requirements in violation of the ADA); *Lane v. Kitzhaber*, 283 F.R.D. 587, 594-602 (D. Or. 2012) (certifying class of individuals with intellectual or developmental disabilities who are in or have been referred to sheltered workshops and who are qualified for supported employment services, for claims arising under ADA and Rehabilitation Act)[15].  These actions frequently call for rulings on State policies and practices that simultaneously impact large numbers of citizens.  This case presents no exception.  Plaintiffs here seek declaratory and injunctive relief to change State policies and practices that either have resulted in the warehousing of large numbers of medically

---

[15]    Other courts have likewise continued to certify classes of plaintiffs in cases brought under civil rights laws, including Title II of the ADA.  *See, e.g.*, *Connor B. v. Patrick*, 278 F.R.D. 30, 33 (D. Mass. 2011) (denying defendants' motion to decertify class of foster children alleging harm due to systemic deficiencies in foster care system); *D.L. v. District of Columbia,* 277 F.R.D. 38, 45-46 (D.D.C. 2011) (denying defendants' motion to decertify class of children alleging denial of free appropriate public educations under the Individuals with Disabilities Education Act; *Oster v. Lightbourne*, No. 09-4668 CW, 2012 WL 685808, at *6 (N.D. Cal. Mar. 2, 2012) (certifying class of individuals with disabilities whose in-home support services would be reduced pursuant to recently enacted state policies).

fragile children into nursing facilities, or threaten to do so.  If Plaintiffs prevail in arguing that these State policies violate the ADA, then this Court can issue a single order commanding the State to change its policies, to refrain from employing discriminatory policies, and to institute policies to prevent discrimination.  Such an order would provide relief to the entire proposed class.

A.      Class Certification Allows for Efficient, Effective Resolution of Civil Rights Cases, Especially Those Involving Rights Protected by the ADA.

It has long been understood that "[c]ivil rights cases against parties charged with unlawful, class-based discrimination are prime examples" of appropriate class actions under Rule 23.  *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2557 (2011) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 614 (1997)).  Numerous courts have recognized that a class action for declaratory and injunctive relief under Rule 23, specifically under Rule 23(b)(2), is an appropriate vehicle for adjudicating *Olmstead*-based challenges to systemic denials of community services to persons with disabilities.  *See, e.g., Frederick L. v. Dep't of Pub. Welfare*, 364 F.3d 487, 498 (3d Cir. 2004) ("Appellants represent a class of mental health patients institutionalized … [and] who are qualified for and wish to be placed in a community-care setting."); *Long v. Benson*, No. 4:08cv26-RH/WCS, 2008 U.S. Dist. LEXIS 109917, at *7 (N.D. Fla. Oct. 14, 2008) (certifying class of nursing home residents who "could and would reside in the community with appropriate community-based services."); *Pitts v. Greenstein*, No. 10-635-JJB-SR, 2011 U.S. Dist. LEXIS 60138, at *8 (M.D. La. June 6, 2011) (certifying class of persons with disabilities challenging reductions to community services).[16]

---

[16]      For many of the same reasons, numerous courts, including this one, have similarly certified classes seeking relief on behalf of child Medicaid recipients who have been denied medically necessary services to which they are entitled under the Medicaid Act's

*continued on next page...*

The Supreme Court's recent decision in *Wal-Mart* does not alter these principles.  In *Wal-Mart*, named plaintiffs were female Wal-Mart employees who sued the company under Title VII of the Civil Rights Act of 1964, alleging that they and members of their proposed class had been wrongfully denied advancement within the company due to sex discrimination.  *See* 131 S. Ct. at 2547.  The named plaintiffs were unable to identify any particular Wal-Mart policies as the root causes of that discrimination.  Instead, they were only able to assert that the company had had a "corporate culture," which "infect[ed], perhaps subconsciously," the decision-making processes of many of its thousands of store managers, each of whom acted at his own discretion. *Id.* at 2548.  The Supreme Court held that this was insufficient to justify class certification, reasoning that there was a lack of commonality between the proposed class members' claims, as is required by Rule 23(a)(2).  The Court recognized that in analyzing commonality under Rule 23(a)(2), "even a single common question will do."  *Id.* at 2556 (quotation and alteration marks omitted).  It determined that commonality was lacking in *Wal-Mart* because the named plaintiffs could not identify any objectionable company-wide policies.  *See id.* at 2556-57.

*Wal-Mart* is fully consistent with preexisting case law on the general appropriateness of class certification in *Olmstead*-based actions under the ADA for declaratory and injunctive relief. *Olmstead* actions customarily arise when state governments, in administering services to persons

---

continued from last page...

EPSDT requirements.  *See, e.g., Fla. Pediatric Soc'y v. Secretary of Fla. Agency for Health Care Admin.*, No. 05-23037, ECF No. 671 (S.D. Fla. Sep. 30, 2009); *Katie A., ex rel. Ludin v. L.A. County*, 481 F.3d 1150 (9th Cir. 2007), *rev'g and remanding on other grounds* 433 F. Supp. 2d 1065 (C.D. Cal. 2006); *Chisholm v. Hood*, 133 F. Supp. 2d 894 (E.D. La. 2001), *aff'd*, 391 F.3d 581 (5th Cir. 2004); *John B. v. Menke*, 176 F. Supp. 2d 786 (M.D. Tenn. 2001); *Emily Q. v. Bonta*, 208 F.Supp. 2d 1078, 1081 (C.D. Cal. 2001); *Hawkins ex. rel Hawkins v. Comm'r of N.H. Dep't of Health & Human Servs.*, 2004 WL 166722, at *4 (D.N.H. 2004);  *Memisovski ex rel. Memisovski v. Maram*, 2004 WL 1878332, at *1 (N.D. Ill. 2004); *Dajour B. v. City of N.Y.*, 2001 WL 1173504, at *10 (S.D.N.Y. Oct. 3, 2001).

with disabilities, violate or neglect their duties to enact statewide policies that do not result in discrimination.  Under *Olmstead*, discrimination is the unnecessary institutionalization of persons with disabilities.  *Olmstead*, 527 U.S. at 597-601.  Thus, these types of actions almost invariably involve situations in which state policy decisions impact vast numbers of persons with disabilities in a common way and in which a district court has the power to remedy improperly designed state policies with a single injunctive order.

Thus, plaintiffs in *Olmstead* class actions routinely satisfy the commonality requirement of Rule 23 because there is virtually always, at the very least, a "single common question" that can be resolved with "one stroke," which is sufficient to satisfy this requirement.  *Wal-Mart*, 131 S. Ct. at 2551, 56.  In such cases, as in the *Lane* case, outcomes do not turn on individual inquiries such as intent, but rather, involve the legality of common policies and practices by state governments.  283 F.R.D. at 595-96.  Where a state has one or more policies that allegedly violate the ADA-protected rights of persons with disabilities and where a named plaintiff seeks injunctive relief, those facts alone are sufficient to justify class certification under *Wal-Mart*. *See, e.g., Pashby*, 2013 U.S. App. LEXIS  at *14-*18; *Lane*, 283 F.R.D. at 594-602.

B.      Plaintiffs Have Identified Issues Common to the Members of Their Proposed Class and Have Satisfied the Requirements of Rule 23.

In this case, Defendants argue that class certification is inappropriate, mainly due to an alleged lack of commonality.  Specifically, Defendants maintain that the State's Policy Changes have mooted Plaintiffs' objections on any issues common to the proposed class; and they cite cases such as *Moore v. Reese*, 637 F.3d 1220 (11th Cir. 2011), in support of the proposition that cases involving Medicaid require many individualized factual determinations that render them

inapt for class treatment.[17]

This Court should reject Defendants' arguments and instead find that there is sufficient commonality to certify Plaintiffs' proposed class.  First, for the reasons already discussed above, Defendants' Policy Changes should not be deemed to have mooted Plaintiffs' claims regarding the supposedly changed policies.  Defendants' eleventh-hour attempt to moot these issues is an implicit acknowledgement of their own belief that there is enough commonality to justify class certification if the issues arising from these policies remain live in the case.  Thus, if the Court rejects Defendants' contention that Plaintiffs' allegations regarding these policies are moot, then the Court should reject Defendants' positions on commonality and class certification as well.

Second, the facts of this case show that the State, in fact, has employed other uniform policies and practices (whether officially codified or not), in addition to those that the Policy Changes supposedly amended, that have also contributed to the injuries described in Plaintiffs' motion.  This Court could also conceivably remedy these other policies with a single declaratory or injunctive order striking down unlawful policies or mandating that the State follow policies that the State is now wrongly neglecting.  As noted above, other policies that could be enjoined on a class basis include the State's adoption of ineffective nursing home pre-admission screening procedures and its continuing definition of "medical necessity" in its administrative code to deny

---

[17]     Defendants also contend that class certification should be denied on the ground that the proposed class, as defined in Plaintiffs' motion, is insufficiently ascertainable, as well as overbroad.  However, Plaintiffs' proposed class is a class under Rule 23(b)(2), and "Rule 23(b)(2) class actions were designed specifically for civil rights cases seeking broad declaratory or injunctive relief for a numerous and often unascertainable or amorphous class of persons . . . ."  1 Herbert Newberg & Alba Conte, Newberg on Class Actions § 4.11 (2001).  In any event, even if there were any deficiencies in the class definition, the Court would be free to remedy them either by exercising its own power to redefine the class, *see Johnson v. Int'l Paper Co.*, 270 F.R.D. 640, 645 (M.D. Ala. 2010), or by permitting Plaintiffs to amend their definition, *see Moore v. Walter Coke, Inc.*, No. 2:11-cv-1391-SLB, 2012 U.S. Dist. LEXIS 140207, at *46-*47 (N.D. Ala. Sept. 28, 2012).

coverage of services purportedly found to be "for the convenience of the caregiver."  The proposed Policy Changes do not moot Plaintiffs' claims regarding these other policies.[18]  If Plaintiffs prevail, remedying their injuries will require an order that enjoins not only the State policies relating to the proposed Policy Changes such as those resulting in denials of Level II review, but also the other State policies and practices that cause unnecessary institutionalization and reduce the availability of community-based services.  As such, even if Policy Changes in fact mooted issues relating to the affected policies (which they do not), there would still be issues here that are common to the proposed class members.

Third, Defendants are incorrect in arguing that any individualized determinations would be required to grant any of the relief that Plaintiffs request.  Plaintiffs seek to ensure that the State stops subjecting their proposed class members (*i.e.* medically fragile children who are in nursing facilities or at risk of entry into such facilities) to processes that fail to ensure medically necessary services are offered and provided in the community.  The Court will not need to determine, on an individual basis, whether each and every potential member of the proposed class is "at risk," and if so, what type of community placement he or she will receive in order to determine whether Plaintiffs are entitled to the declaratory and injunctive relief that they are seeking.  Similarly, the Court will not need to identify who the appropriate members of the class are, because if Plaintiffs prevail, any appropriate member of their class will be affected automatically by the ordered changes in the formerly violating processes.  Neither will the Court

---

[18]     Moreover, the Supreme Court's decision in *Olmstead* requires a State to have in place a comprehensive, effectively working plan to avoid such discrimination.  *Olmstead*, 527 U.S. at 605-06.  The absence of such a plan has been construed by courts to foreclose a public entity's ability to raise a fundamental alteration defense.  *See, e.g., Pa. Prot. & Advocacy, Inc. v. Dep't of Pub. Welfare*, 402 F.3d 374, 381 (3d Cir. 2005).  Plaintiffs here have the ability to demonstrate that the absence of a policy or set of policies gives rise to unnecessary institutionalization of Plaintiffs and proposed class members.

need to determine each individual class member's community placement: if the Court orders the

process changes that the Plaintiffs are seeking, then the community placement determinations

will be the results produced by that order via the State's implementation of those new processes.

Any individualized fact inquiries involved in determining those community placements will not

take place before this Court; rather, they will be made by the State after this litigation is over

pursuant to the new State-wide policies ordered by the Court.[19]  *C.f. J.W. v. Birmingham Bd. of*

*Educ.*, No. 2:10-cv-03314-AKK, 2012 U.S. Dist. LEXIS 124183, at *34-*35 (N.D. Ala. Aug. 31,

2012); *Lane*, 283 F.R.D. at 598-99.

Thus, this Court should find that there is sufficient commonality in this case to clear the

hurdles presented by Rule 23(a)(2).  Plaintiffs' action exemplifies the type of ADA action in

which class certification is appropriate, and accordingly, their motion should be granted.[20]

---

[19]    In any event, even if individualized inquiries were required in this case (which they are
not), Defendants cannot defeat class certification simply by showing that individual
issues are present.  Rather, they must demonstrate that common issues are absent.  *See,
e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 491 (7th
Cir. 2012) (ordering certification under Fed. R. Civ. P. 23(b)(2) of class of employees
allegedly injured by employer's racially discriminatory policies where, although
"hundreds of separate trials may be necessary to determine which class members were
actually adversely affected by . . . the [employer's] practices and if so what loss he
sustained," class certification would "at least [render it un]necessary in each of those
trials to determine whether the challenged practices were unlawful") *cert. denied* 133 S.
Ct. 338 (Oct. 1, 2012).

[20]    While Defendants' main argument centers around the requirement of commonality as
interpreted in *Wal-Mart*, they also contend that typicality and numerosity are lacking.
However, if Plaintiffs have properly raised issues concerning statewide policies that
govern the State's population of medically fragile children and that could be remedied
through a single order granting declaratory and injunctive relief, then this would also
naturally indicate that the impact of these policies on Plaintiffs would be similar to their
impact on the other Florida residents who comprise their proposed class, and that the total
number of affected persons would be substantial.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny

Defendants' motion to dismiss for mootness, grant Plaintiff's motion for class certification, and

permit the United States to participate in any argument that the Court may hear on either motion.


Dated April 10, 2013

Respectfully submitted,

WILFREDO A. FERRER
United States Attorney
Southern District of Florida

THOMAS E. PEREZ
Assistant Attorney General

EVE HILL
Senior Counselor to the Assistant Attorney General

ALISON BARKOFF
Special Counsel for Olmstead Enforcement
Civil Rights Division

/s/ Veronica Harrell-James
VERONICA HARRELL-JAMES
Assistant United States Attorney
Fla. Bar No. 644791
99 N.E. 4th Street
Miami, FL 33132
Telephone:     (305) 961-9327
Facsimile:      (305) 530-7139
Veronica.Harrell-James@usdoj.gov

/s/ Travis W. England
REBECCA B. BOND
Chief
SHEILA S. FORAN
Special Legal Counsel
ANNE S. RAISH
Deputy Chief

TRAVIS W. ENGLAND, Bar ID A5501768
BETH A. ESPOSITO, Bar ID A5501719
VINCENT P. HERMAN, Bar ID A5501810
H. JUSTIN PARK, Bar ID A5501860
JOY LEVIN WELAN, Bar ID A5501767
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone:     (202) 307-0663
Facsimile:      (202) 307-1197
Travis.England@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 10, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the a true and correct copy of the foregoing document was served on April 10, 2013 on all counsel of record or parties identified on the Service List below in the manner specified below, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

<u>*/s/ Travis W. England*</u>
Travis W. England

**SERVICE LIST**

| | |
|---|---|
| Edward J. Grunewald<br>The North Florida Center for Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32306<br>Phone: 850-701-3980<br>Fax: 850-701-3985<br>Email: egrunewald@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF | Jamie Ito<br>The North Florida Center for Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32306<br>Phone: 850-701-3980<br>Fax: 850-701-3895<br>Email: jamie@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF |
| Jill B. Zaborske<br>The North Florida Center For Equal Justice, Inc.<br>2121 Delta Blvd.<br>Tallahassee, FL  32303<br>Phone: 850-701-3980<br>Fax: 850-701-3985<br>Email: jill@nfcfej.org<br>Attorney for Plaintiffs<br>Service by CM/ECF | Paolo G. Annino<br>FSU College of Law Public Interest Law Center<br>425 W. Jefferson Street<br>Tallahassee , FL  32306<br>Phone: 850-644-9928<br>Fax: 850-644-0879<br>Email: pannino@law.fsu.edu<br>Attorney for Plaintiffs<br>Service by CM/ECF |
| Matthew W. Dietz<br>2990 SW 35th Avenue<br>Miami, FL  33133<br>Phone: 305-669-2822<br>Fax: 305-442-4181<br>Email: matthewdietz@usdisabilitylaw.com<br>Attorney for Plaintiffs<br>Service by CM/ECF | Michael Garrett Austin<br>DLA Piper LLP (US)<br>200 South Biscayne Blvd. Suite 2300<br>Miami , FL  33131<br>305-423-8522<br>Fax: 305-437-8131<br>Email: Michael.Austin@dlapiper.com<br>Attorney for Defendants Dudek, Farmer, and<br>Wiggins |
| Stuart Fraser Williams<br>Agency for Health Care Administration<br>2727 Mahan Drive, Mail Stop 3<br>Tallahassee, FL  32308<br>Phone: 850-412-3630<br>Fax: 850-921-0158<br>Email: Stuart.Williams@ahca.myflorida.com<br>Attorney for Defendants Dudek, Farmer, and<br>Wiggins<br>Service by CM/ECF | Leslei Gayle Street<br>Agency for Healthcare Administration<br>Office Of The General Counsel 2727 Mahan<br>Drive, Ms #3<br>Tallahassee , FL  32308<br>850-412-3686<br>Fax: 850-921-0158<br>Email: Leslei.Street@ahca.Myflorida.Com<br>Attorney for Defendant Dudek<br>Service by CM/ECF |

| | |
|---|---|
| Andrew T. Sheeran<br>Agency for Health Care Administration<br>Office of the General Counsel<br>2727 Mahan Drive, Building 3, MS #3<br>Tallahassee, FL  32308<br>Phone: 850-412-3630<br>Fax: 850-921-0158<br>Email: Andrew.Sheeran@ahca.myflorida.com<br>Attorney for Defendant Dudek, Farmer, and<br>Wiggins<br>Service by CM/ECF | Jennifer Ann Tschetter<br>Florida Department of Health<br>4052 Bald Cypress Way Bin A-02<br>Tallahassee, FL  32399<br>8502454353<br>Fax: 8504101448<br>Email: Jennifer_Tschetter@doh.State.Fl.Us<br>Attorney for Defendants Farmer and Wiggins<br>Service by CM/ECF |
| Caryl Kilinski<br>Department of Health<br>Office Of The General Counsel<br>4052 Bald Cypress Way Bin A-02<br>Tallahassee, FL  32399<br>850-245-4398<br>Fax: 850-413-8743<br>Email: Caryl_Kilinski@doh.State.Fl.Us<br>Attorney for Defendants Farmer and Wiggins<br>Service by CM/ECF | Christopher Brian Lunny<br>Radey Thomas Yon & Clark<br>301 S Bronough Street Suite 200 Po Box 10967<br>Tallahassee, FL  32302<br>USA<br>850-425-6654<br>Email: Clunny@radeylaw.Com<br>Attorney for Defendant eQHealth Solutions,<br>Inc.<br>Service by CM/ECF |
| Harry Osborne Thomas<br>Radey Thomas Yon & Clark<br>301 S. Bronough Street, Suite 200<br>PO Box 10967<br>Tallahassee, FL  32302<br>Phone: 850-425-6654<br>Fax: 850-425-6694<br>Email: Hthomas@radeylaw.com<br>Attorney for Defendant eQHealth Solutions,<br>   Inc.<br>Service by CM/ECF | Thomas Ames Crabb<br>Radey Thomas Yon & Clark, P.A.<br>301 S. Bronough Street, Suite 200<br>Tallahassee, FL  32301<br>(850) 425-6654<br>Fax: (850) 425-6694<br>Email: Tcrabb@radeylaw.Com<br>Attorney for Defendant eQHealth Solutions,<br>   Inc.<br>Service by CM/ECF |