UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60460-CIV-ROSENBAUM

A.R., by and through her next friend,
Susan Root, *et al.*,

    Plaintiffs,

v.

ELIZABETH DUDEK, in her official capacity
as Secretary of the Agency for
Health Care Administration, *et al.*,

    Defendants.
_____/

## ORDER

This matter comes before the Court upon Defendants' Motion to Dismiss, Or, Alternatively, for Dismissal in Part, For Lack of Subject Matter Jurisdiction Due to Mootness ("Motion to Dismiss"). [D.E. 117, 119]. The Court has reviewed the Motion, the filings supporting and opposing the Motion, and the other materials in the case file. For the reasons that follow, the Motion to Dismiss is denied.

### *BACKGROUND*

**A.**    **Procedural Background and Nature of Claims**

Plaintiffs T.H., L.J., A.G., A.C., A.R., C.V., M.D., C.M., and B.M.[1] are children who have been diagnosed as "medically fragile" and who qualify for services through Florida's Medicaid

---

[1] Plaintiff T.F. passed away on April 6, 2013. *See* D.E. 147.

program.[2] Plaintiffs T.H., L.J., and A.G., are children who have been placed in nursing facilities,[3] while Plaintiffs A.C., A.R., C.V., M.D., C.M., and B.M. are children who live at home and claim that they are at risk of unnecessary institutionalization at nursing facilities. *See* D.E. 62 at ¶¶ 4, 14.

On March 13, 2012, Plaintiffs filed a class-action lawsuit against Defendants Elizabeth Dudek ("Dudek"), in her official capacity as Secretary for the Agency for Health Care Administration ("AHCA");[4] Harry Frank Farmer, Jr. ("Farmer"), in his official capacity as the State Surgeon General and Secretary of the Florida Department of Health ("FDOH"); Kristina Wiggins ("Wiggins"), in her official capacity as Deputy Secretary of the FDOH and Director of Children's Medical Services ("CMS"); and eQHealth Solutions, Inc. ("eQHealth").[5] On August 23, 2013, Plaintiffs filed their Second Amended Complaint, which is the operative pleading in this case.[6]

---

[2]A medically fragile child is one who is "medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition (TPN), is ventilator dependent, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning." *See* D.E. 62 at ¶ 2 (citing Rule 59G-1.010(165), Fla. Admin. Code).

[3]A nursing facility is an institution that primarily provides (a) skilled nursing care and related services for residents who require medical or nursing care; (b) rehabilitation services for the rehabilitation of injured, disabled, or sick persons; and (c) on a regular basis, health-related care and services to individuals who, because of their mental or physical condition, require care and services (above the level of room and board) which can be made available to them only through institutional facilities. *See* 42 U.S.C. 1396r(a)(1)(A-C).

[4]The AHCA is designated as "the single state agency authorized to make payments for medical assistance and related services under Title XIX of the Social Security Act." *See* Florida Statute § 409.902.

[5]eQHealth makes medical-necessity determinations on behalf of AHCA and acts as a witness for AHCA in all fair-hearing proceedings resulting from decisions and actions made by eQHealth. *See.* D.E. 62 at ¶ 72; D.E. 64 at ¶ 72.

[6]For ease of reference, this Order refers to the Second Amended Complaint simply as "Complaint."

The Complaint alleges that Defendants are denying Plaintiffs Medicaid services, including private-duty nursing ("PDN") services, due to the adoption of "uniform policies, practices, and regulations to reduce private duty nursing services." *See* D.E. 62 at ¶¶ 18-19. Plaintiffs further claim that Defendants "failed and continue to fail to provide medically necessary services in home and community settings to Medicaid recipient children in Florida." *Id.* at ¶ 20. Based on these allegations, Plaintiffs ask the Court to declare that Defendants' policies, regulations, actions, and omissions are unnecessarily institutionalizing Plaintiffs and Plaintiff class members or putting Plaintiffs at risk of being placed into segregated facilities, in violation of Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Medicaid Act, 42 U.S.C. §§ 1396-1396v ("Medicaid"); The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r ("NHRA"); Early and Periodic Screening, Diagnostic, and Treatment Services, 42 U.S.C. § 1396d(r) ("EPSDT Provisions"); and 42 U.S.C. § 1983. *Id*. at 21. Plaintiffs also seek a permanent injunction requiring Defendants to "stop segregating medically fragile and medically complex children in nursing facilities and to provide [Plaintiffs] medically necessary Medicaid services in the most integrated setting appropriate in the community and provide for their medically necessary services and to provide such services in the most integrated setting appropriate." *Id.* at ¶ 22.

More specifically, Counts I and II allege that Defendants have discriminated against Plaintiffs on the basis of their disability by

      a.    Segregating or placing Plaintiffs and Plaintiff class members at risk of segregation and by failing to provide Plaintiffs and Plaintiff class members with appropriate community based services;

      b.    Denying Plaintiffs and Plaintiff Class members medically necessary services resulting in Plaintiffs

3

    and Plaintiff Class members' institutionalization or risk of institutionalization;

  c. Denying Plaintiffs and Plaintiff class members access to existing community programs and requiring them to be confined in or to be at risk of being confined in segregated institutional settings in order to receive the care they require;

  d. Administering the PASRR[7] program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class have been inappropriately admitted to nursing facilities; and

---

[7] "PASRR" is short for Pre-Admission and Resident Review. Two levels of PASRR screening and reviews exist – Level I and Level II. Level I screening determines whether individuals being considered for admission to a nursing facility have a mental illness or mental retardation. *See* 42 C.F.R. § 483.128(a). Level II screening is performed on those individuals for which Level I indicates the existence of a mental illness or mental retardation. A Level II assessment is used to determine whether

> (1) The individual's total needs are such that his or her needs can be met in an appropriate community setting;
> (2) The individual's total needs are such that they can be met only on an inpatient basis, which may include the option of placement in a home and community-based services waiver program, but for which the inpatient care would be required;
> (3) If inpatient care is appropriate and desired, the [Nursing Facility] is an appropriate institutional setting for meeting those needs in accordance with § 483.126; or
> (4) If the inpatient care is appropriate and desired but the [Nursing Facility] is not the appropriate setting for meeting the individual's needs in accordance with § 483.126, another setting such as an [Intermediate Care Facility] (including small, community-based facilities), an [Institution for Mental Diseases], providing services to individuals aged 65 or older, or a psychiatric hospital is an appropriate institutional setting for meeting those needs.

*See* 42 C.F.R. § 483.132. According to Defendants, a PASRR Level II evaluation makes three specific determinations: (1) it confirms or rules out the presence of mental illness or intellectual disability; (2) it confirms the need for nursing facility services and the appropriateness of placement; and (3) it determines the need for specialized services. *See* D.E. 117 at 11-12. The Children's Multidisciplinary Assessment Team ("CMA Team") is responsible for conducting PASRRs in Florida pursuant to 42 U.S.C. § 483.112.

> e. Administering the PASRR program in such a way that the institutionalized Plaintiffs and members of the institutionalized sub-class are not provided the necessary specialized services to which they are entitled while residing in nursing facilities.

D.E. 62 at 41-43.

Further, Count III asserts that AHCA's definition of "medical necessity" (*i.e.*, Rule 59G-1.010(166))[8] is preempted by federal law and is invalid pursuant to the Supremacy Clause of the United States Constitution. D.E. 62 at ¶ 321. In Count IV, Plaintiffs complain that "Defendants' regulations, rules, policies, customs, and practices, which limit the provision of medically necessary community-based services and support, as well as medically necessary specialized services, result in extended delays and outright denials of medically necessary care to the Plaintiffs and members of the Plaintiff class." D.E. 62 at ¶ 326. Finally, in Count V, Plaintiffs allege that Defendants' PASRR program does not adequately screen applicants to nursing facilities to determine whether they have a mental illness or mental retardation. According to Plaintiffs, as a result, many children

---

[8] "Medical necessity" is defined as those services that must

> 1. Be necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain;
> 2. Be individualized, specific, and consistent with symptoms or confirmed diagnosis of the illness or injury under treatment, and not in excess of the patient's needs;
> 3. Be consistent with generally accepted professional medical standards as determined by the Medicaid program, and not experimental or investigational;
> 4. Be reflective of the level of service that can be safely furnished, and for which no equally effective and more conservative or less costly treatment is available; statewide; and
> 5. Be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.

Rule 59G-1.010(166), Fla. Admin. Code.

with mental illness or mental retardation that can be served in the community are wrongfully admitted to nursing facilities and are never provided a Level II PASRR evaluation and determination, as required by federal law. D.E. 62 at ¶ 332.

**B.     Defendants' Motion to Dismiss**

In the Motion now before the Court, Defendants urge the Court to find moot the claims advanced by Plaintiffs and to dismiss the action for lack of subject matter jurisdiction. According to Defendants, the Counts in the Complaint are "generalized attacks [that] can fairly be categorized as directed to certain rules and policies that allegedly: (1) force parents to 'provide life sustaining medically necessary care' to their children; (2) force children into Pediatric Prescribed Extended Care ("PPEC")[9] centers; and (3) have resulted in the failure to operate the Pre-Admission Screening and Review ("PASRR") program in accordance with federal law." *See* D.E. 117 at 4. Because Defendants contend that they have voluntarily implemented policy changes to specific rules, practices, and regulations challenged by Plaintiffs, they posit that all counts of the Complaint are now moot.  In further support of their argument that Plaintiffs' claims have become moot, Defendants emphasize that they have no intention of reenacting any of the former rules, practices, and regulations that they have revised.

### 1.     Parents Are Allegedly Forced to Provide Life Sustaining Care

With respect to Plaintiffs' allegation that Defendants' policies force parents to provide life-sustaining medically necessary care to their children which are typically performed by private-duty nurses, Defendants point to two portions of the Florida Medicaid Home Health Services Coverage and Limitations Handbook (the "Home Health Handbook") upon which Plaintiffs rely for their

---

[9]A Pediatric Prescribed Extended Care center is a non-residential facility that provides short, long-term, or intermittent medical care to medically fragile children. *See* D.E. 62 at ¶ 278(a)n.1.

6

claims. First, Plaintiffs cite to the portion of the December 2011 Home Health Handbook that provides, "Florida Medicaid does not reimburse private duty nursing services provided solely for the convenience of the child, the parents or the caregiver." *See* D.E. 117 at 5 (citing to D.E. 62 at ¶ 277(a)). In the Complaint, Plaintiffs note that "[t]his restriction is based on [Florida's] regulatory definition of 'medically necessary' found at Rule 59G-1.010(166)(a), Fla. Admin. Code, which states, in part, that "medically necessary services must 'be furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider.'" *Id*. Plaintiffs contend that Defendants adopted this policy as a basis to deny private-duty nursing service hours.

Second, Plaintiffs take issue with the portion of the December 2011 Home Health Handbook that provides, "Private duty nursing services will be decreased over time as parents and caregivers are taught skills to care for their child and are capable of safely providing that care or the child's condition improves." *See* D.E. 117 at 6 (citing D.E. 62 at ¶ 277(b)). In other words, Plaintiffs express concern that Defendants will effectively force parents to provide life-sustaining medically necessary care that is usually and perhaps better performed by licensed and trained nurses. *Id.*

Defendants contend that AHCA has made changes that address both of Plaintiffs' concerns. More specifically, AHCA has "clarified that services will only be decreased if there is a documented change in the child's medical condition or social circumstances." *Id*. Furthermore, AHCA has "published a provider alert implementing immediate policy changes to eliminate any requirement that parents or legal guardians of Medicaid recipient children provide services other than those relating to Activities of Daily Living ("ADL") and Instrumental Activities of Daily Living ("IADL"), and only when the legal guardian is able and available to provide such services."[10] *Id*. at 6-7.

---

[10]Activities of Daily Living include eating, bathing, dressing, toileting, transferring, and maintaining continence. Instrumental Activities of Daily Living involve more complex life

Defendants have also changed the Home Health Handbook to omit any reference to the prior policy that "Medicaid does not reimburse private duty nursing services provided primarily for the convenience of the chid, the parents, or the caregiver." Based on these changes, Defendants suggest that Plaintiffs' challenges regarding the alleged forcing of parents to provide life-sustaining care are now moot.

### 2. State Policies Allegedly Force Children Into PPECs

As for Plaintiffs' allegation that certain policies force children into PPECs, Defendants point to the following portion of the December 2011 Home Health Handbook upon which Plaintiffs rely:

> A recipient who is medically able to attend a prescribed pediatric extended care (PPEC) center and whose needs can be met by the PPEC shall be provided with PPEC services instead of private duty nursing services.

*See* D.E. 117 at 7 (citing D.E. 62 at ¶ 278(a)). Plaintiffs contend that this provision "will force children who would otherwise remain in their homes and integrated communities to be placed in a segregated facility entirely composed of other medically fragile children." *Id*. While the Complaint involves other claims, Defendants construe Plaintiffs' challenge as seeking that the Court "[o]rder the Defendants to provide private duty nursing services that will allow the Plaintiffs and Plaintiff class members to live in their homes and communities." *Id.* (citing D.E. 62 at ¶ 278(a); Prayer for Relief(7)).

In response, Defendants assert that, through certain policy changes, AHCA's rules are being amended to clarify that no preference will be given to PPEC over home-health services. Rather, parents and legal guardians will have the right to choose between private-duty nursing services or PPEC services, or a combination of both. *Id*. at 8. According to Defendants, this means that,

---

activities including personal hygiene, light housework, laundry, meal preparation, transportation, grocery shopping, using the telephone, medication management, and money management. *See* D.E. 117 at n.5.

8

assuming medical necessity, if the parent or legal guardian does not request PPEC, the medically complex child will receive private-duty nursing.

### 3. Alleged Failure to Operate the PASRR Program in Accordance With Federal Law

With respect to Plaintiffs' allegation that Defendants have failed to operate the PASRR program in accordance with federal law, Plaintiffs assert that "many children with a mental illness or mental retardation that can be served in the community are wrongfully admitted to nursing facilities and are never provided a Level II PASRR evaluation." *See* D.E. 117 at 8 (citing D.E. 62 at ¶ 332). Defendants characterize Plaintiffs' Complaint as requesting that the Court "[e]nter a permanent injunction requiring the Defendants to perform adequate Level I and Level II PASRR reviews (sic) to institutionalized children and to provide such services as are determined by the Level II screening." *Id*. (citing D.E. 62 Prayer for Relief (10)).

Defendants contend that recent policy changes clarify AHCA's rules to ensure that every individual whose PASRR Level I evaluation indicates that a suspicion of mental illness or intellectual disability exists will undergo an initial Level II evaluation. Additionally, Defendants claim that a Level II evaluation will take place whenever significant changes occur in the child's condition. *Id.* at 9. In this respect, Defendants appear to concede that AHCA's Nursing Facility Services Coverage Limitations Handbook previously included a PASRR checklist form that required a Level II evaluation if the individual had a severe illness, such as ventilator dependence, in which the individual could not be expected to benefit from specialized services. *See* D.E. 117 at 12. According to Defendants, however, "AHCA has prepared Rule 59G-1.040 as a new rule to streamline and clarify Level II evaluations." *Id.* The new rule provides that where a Level I review results in suspicion of a mental illness or intellectual disability, every individual will receive a Level II evaluation.

9

### C.    Response to Motion to Dismiss

Plaintiffs respond to the Motion to Dismiss, arguing that dismissal of the action is not appropriate because the claims advanced by Plaintiffs are not moot.  First, Plaintiffs assert that the rule changes proposed by Defendants are not yet final.  As a result, Plaintiffs suggest, Defendants cannot establish an "unambiguous termination" of the alleged offending policies.  Significantly, Plaintiffs emphasize that a challenge to one of the proposed rules has already been made.  According to Plaintiffs, this challenge, among other factors, raises doubt that the implementation of the policy revisions will be permanent.

Second, Plaintiffs contend that the timing and substance of the policy changes reveal that they were intended solely to manipulate jurisdiction.  In this regard, Plaintiffs point out that Defendants' change in behavior came only after the Complaint was filed, after the Department of Justice issued certain findings in the fall of 2012, and after Plaintiffs filed their Motion for Class Certification.  Under these circumstances, Plaintiffs posit, Defendants cannot show "substantial deliberation" on their part with respect to changing their policies.  Rather, Plaintiffs opine that Defendants' proposed policy changes are an attempt to divest the Court of jurisdiction.

Finally, Plaintiffs suggest that Defendants' policy changes fail to redress the harm stemming from the prior policies.  Put simply, Plaintiffs contend that the policy changes do not provide complete relief to medically fragile children.

### *DISCUSSION*

Article III of the Constitution grants courts the authority to adjudicate "cases" and "controversies."  *Already, LLC v. Nike, Inc.*, __ U.S. __, 133 S. Ct. 721, 726 (2013).  Courts lack jurisdiction to entertain cases that are non-justiciable.  As the Eleventh Circuit has explained,

> Article III of the Constitution limits the jurisdiction of the federal
> courts to the consideration of "Cases" and "Controversies."  In turn,

> the "case or controversy" constraint imposes on federal courts a "dual limitation" known as "justiciability." The doctrine of justiciability prevents courts from encroaching on the powers of the elected branches of government and guarantees that courts consider only matters presented in an actual adversarial context . . . .
>
> The doctrine of mootness derives directly from the case-or-controversy limitation because an action that is moot cannot be characterized as an active case or controversy. [A] case is moot when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome. As this Court has explained, put another way, a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief. If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed. Indeed, dismissal is required because mootness is jurisdictional. Any decision on the merits of a moot case or issue would be an impermissible advisory opinion.

*Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla.*, 382 F.3d 1276, 1281-82 (11th Cir. 2004) (quoting *Al Najjar v. Ashcroft,* 273 F.3d 1330, 1335-36 (11th Cir.2001) (*per curiam*) (citations and internal quotation marks omitted). The Supreme Court has further clarified, "The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Arizonans for Official English v. Arizona,* 520 U.S. 43, 68 n. 22 (1997) (quoting *United States Parole Comm'n v. Geraghty,* 445 U.S. 388, 397 (1980)).

Here, Defendants argue that this case is now moot and the Court lacks subject-matter jurisdiction because Defendants have voluntarily changed the alleged offending policies. A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Atheists of Fla., Inc. v. City of Lakeland, Fla.*, 713 F.3d 577, 594 (11th Cir. 2013) (citations and internal quotation marks omitted). Whether a case is moot is a question of law. *Troiano*, 382 F.3d at 1282.

A defendant cannot automatically moot a case simply by ending its unlawful conduct once sued. *Already*, 133 S. Ct. at 727 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)).  Indeed, the "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave 'the defendant . . . free to return to his old ways.'" *Troiano*, 382 F.3d at 1282-83 (citations and internal quotation marks omitted); *Sec'y of Labor v. Burger King Corp.,* 955 F.2d 681, 684 (11th Cir.1992) ("It long has been the rule that 'voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.,* does not make the case moot.'") (quoting *W.T. Grant Co.,* 345 U.S. at 632).  Because of this concern, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Atheists of Fla., Inc.*, 713 F.3d at 594 (citing *Already*, 133 S.Ct. at 727) (internal quotation marks omitted) .

Although a defendant typically bears a heavy burden of persuading the court that the alleged conduct cannot reasonably be expected to recur, this burden does not apply when the defendant is a government actor.  Rather, when the defendant is a government actor, a rebuttable presumption exists that the objectionable behavior will not recur. *See id.* (citations omitted); *Troiano*, 382 F.3d at 1283; *Nat'l Advertising Co. v. City of Miami*, 402 F.3d 1329, (11th Cir. 2005) (citing *Coral Springs St. Sys., Inc. v. City of Sunrise,* 371 F.3d 1320, 1328-29 (11th Cir. 2004) ("governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities.")).  In fact, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the claim when the actor is the government. *Troiano*, 382 F.3d at 1282-83(citations omitted); *Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.* ("*NABP*"), 633 F.3d 1297, 1310 (11th Cir. 2011).

Accordingly, an assertion of mootness by a government actor should be rejected "only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated." *Atheists of Fla., Inc.*, 713 F.3d at 594 (quoting *Beta Upsilon Chi Upsilon Chapter at the Univ. of Fla. v. Machen*, 586 F.3d 908, 916 (11th Cir. 2009)).

In the Eleventh Circuit, courts evaluate three factors when determining whether voluntary cessation by a government actor moots a case. "First, we consider whether the termination of the offending conduct was unambiguous." *Rich v. Sec'y, Florida Dept. of Corr.*, 716 F.3d 525, 531-32 (11th Cir. 2013) (quoting *NABP,* 633 F.3d at 1310 (quotation marks omitted)). "Second, we look to whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction." *Id.* (citing *NABP,* 633 F.3d at 1310)). "Third, we ask whether the government has 'consistently applied' a new policy or adhered to a new course of conduct." *Id.*

In order for Defendants to invoke the presumption in favor of government actors, Defendants must have "unambiguously terminated" their prior alleged wrongful conduct. Here, although Defendants have initiated rule development regarding the changes in the policies and regulations, the rules are not yet final. With respect to the rules regarding changes to the PASRR process, the attachments to Defendants' Motion to Dismiss reveal that a proposal has been filed for rule-development workshops, but the rule is not yet finalized. Nor are the rules regarding PPECs yet final. To the contrary, they have been challenged. Indeed, during the comment period on the proposed PPEC rule, Florida Children's First, Inc., initiated a challenge seeking to invalidate the rule. Plaintiffs also emphasize that the State Defendants in this matter similarly attempted to moot the case in *Florida Pediatric Society v. Secretary of the Florida Agency for Health Care Administration*, Case No. 05-23037 (S.D. Fla.), but the Honorable Aldaberto Jordan denied the

13

request to dismiss the case as moot because the proposed state plan amendment had not yet been finally approved.

The rules at issue here include Florida Administrative Code Rule 59G-4.130, relating to home health care and private-duty nursing services; Rule 59G-1.040, relating to PASRR; and Rule 59G-4.260, relating to PPECs. A review of the Florida Administrative Code discloses that only Rule 59G-4.130, relating to home health care has become final. In contrast, the proposed rules relating to PASRR and PPECs remain subject to modification, despite Defendants' claim that they have made statewide changes that have already been implemented in these areas. Under these circumstances, where the requirements of the Florida Administrative Procedure Act §§ 120.54, Fla. Stat., *et seq.*, mandate extensive rule-making procedures that could result in changes to the pending non-final rules, the Court cannot find that Defendants "unambiguously terminated" the alleged offensive rules relating to PASRR and PPECs. Accordingly, the proposed rule changes embodied in Rule 59G-1.040 and Rule 59G-4.260 do not moot Plaintiffs' claims.

Defendants' reliance on *Beta Upsilon* and *Jacksonville Property Rights Association. v. City of Jacksonville*, 635 F.3d 1266 (11th Cir. 2011), is misplaced. While the Eleventh Circuit in *Beta Upsilon* found that the challenged discrimination policy was unambiguously terminated when the University of Florida modified the policy in its handbook, in that case, unlike here, no formal rule needed to be passed to implement the policy. *See* 586 F.3d at 915. Further, in *Jacksonville Property Rights Association*, the city passed legislation, amending the alleged violative portion of the municipal code at issue. As the court noted, the amendment to the municipal code became law, thus mooting the case. Likewise, the city passed an amendment to its plan, deleting reference to the offending language. Again, the court noted that the amendments took effect when the Florida Department of Community Affairs issued its order accepting the administrative law judge's

recommendations. In contrast, the rules at issue here are not final but instead remain subject to modification.

Defendants' argument that Plaintiffs cannot rely on "mere speculation" to argue that the alleged wrongful conduct was not unambiguously terminated and that it might possibly recur fares no better. Where, as here, the language of the rules relating to PASRR and PPECs have not yet become finalized, Plaintiffs raise more than mere speculation that the challenged conduct has not been unambiguously terminated. In fact, the rule relating to PPECs, Rule 59G-4.260, was already the subject of a challenge brought by Florida Children's First, Inc. Because there is no way at this time to know whether the rules, as proposed by AHCA, will become final, the Court does not find that Defendants have shown an unambiguous termination of the alleged wrongful conduct.

On the other hand, Rule 59G-4.130, relating to home health care services and private-duty nursing services, has become final. Accordingly, the Court must proceed to determine whether this rule change moots Plaintiffs' claims. Rule 59G-4.130, Fla. Admin. Code, incorporates the Home Health Handbook by stating, "All home health agency providers enrolled in the Florida Medicaid program must be in compliance with the Home Health Services Coverage and Limitations Handbook, March 2013." Consequently, the Court must examine the provisions of the Home Health Handbook.

Previously, the Handbook stated, "Florida Medicaid does not reimburse private duty nursing services provided solely for the convenience of the child, the parents or the caregiver." In their Complaint, Plaintiffs argue that the restriction was based on Florida's regulatory definition of "medically necessary," found in Rule 59G1.010(166)(a), Fla. Admin. Code. According to Plaintiffs, Defendants adopted and applied this policy "without the authority of any similar federal Medicaid policy, rule or statute, giving Defendants a basis to deny private nursing service hours that have been

15

prescribed by Plaintiff and Plaintiff Class members' treating physicians." *See* D.E. 62 at ¶ 277(a). Plaintiffs further contend that "Defendants' implementation of a definition of 'medically necessary' that takes into account the mere availability of caregivers, regardless of their lack of medical training or qualification, is unreasonable and violates federal law." *See* D.E. 62 at ¶ 277(e). The new policy, however, no longer precludes private-duty nursing services that are provided "for the convenience of" the child, parents, or caregiver. *See* D.E. 117-9 at 44.

Although Plaintiffs acknowledge Defendants' policy changes, they argue that the changes do not moot Plaintiffs' claims because Defendants "made no effort whatsoever to alter the overarching definition of "medically necessary," and attempt to codify the existing practice of using nursing homes to place children with disabilities." *See* D.E. 137 at 13. Plaintiffs emphasize that the definition of "medical necessity" contained in the Rule 59G-1.010(166)(5) of the Florida Administrative Code, which served as a basis for the Complaint, has not been changed.[11] *See id.* at 15. According to Plaintiffs, the "sole basis for each of the rules that Defendants are now in the process of changing was . . . the 'convenience of the caretaker' standard." *Id*. Plaintiffs find problematic the use of a subjective analysis by Defendants as to what services qualify as being "for the convenience of the caretaker."

Defendants respond, contending that under the policy change in effect, a medically complex child will never have private-duty nursing services reduced or denied on the basis of the "caregiver convenience" factor. According to Defendants, contrary to Plaintiffs' argument, the definition of "medically necessary" in the Florida Administrative Code is a general definition for all Medicaid

---

[11]The United States of America filed a Statement of Interest echoing Plaintiffs' concerns about Defendants' lack of attention to certain state-wide policies. For instance, the government noted that the definition of "medical necessity" continued to be used in the administrative code and could be relied upon to deny coverage of services found to be "for the convenience of the caregiver." *See* D.E. 136 at 12.

services, whereas the policy that the State has amended is what specifically applies when determining what private-duty nursing services to provide to medically complex children.

Defendants rely on *Beta Upsilon* in support of their argument that the Florida Administrative Code's definition of "medically necessary" need not be amended to moot Plaintiffs' claims. But *Beta Upsilon* is materially distinguishable from this case. In *Beta Upsilon*, the University of Florida denied a Christian fraternity, Beta Upsilon Chi ("Beta Upsilon"), official recognition because of its refusal to adhere to the university's non-discrimination policy. 586 F.3d at 910. Beta Upsilon brought an action for declaratory and injunctive relief claiming that the University of Florida, by requiring Beta Upsilon to comply with the non-discrimination policy as a condition of recognition, had "infringed on its First and Fourteenth Amendment rights of association, freedom of speech, and free exercise of religion." *Id*. Beta Upsilon filed a motion for preliminary injunction, seeking for the court to force the university to recognize it as a registered student organization. *Id.* After the district court denied the motion, Beta Upsilon filed an interlocutory appeal. *Id*. During the appeal, the university amended its non-discrimination policy and allowed Beta Upsilon to register as a registered student organization.[12] *Id.* at 915. The University of Florida then filed a motion to dismiss

---

[12]The University of Florida amended its policy as follows:

> Student organizations that wish to register with the Center for Student Activities and Involvement (CSAI) must agree that they will not discriminate on the basis of race, creed, color, religion, age, disability, sex, sexual orientation, marital status, national origin, political opinions or affiliations, or veteran status as protected under the Vietnam Era Veteran's Readjustment Assistance Act.
>
> *A student organization whose primary purpose is religious will not be denied registration as a Registered Student Organization on the ground that it limits membership or leadership positions to students who share the religious beliefs of the organization. The University has determined that this accommodation of religious belief does not violate its nondiscrimination policy.*

17

the appeal as moot, and Beta Upsilon objected, arguing that the case was not moot because the university had not changed the regulation from which the Handbook non-discrimination policy derived — UF Regulation 6C1-1.006(1) (the "Regulation"). *Id.* Beta Upsilon argued that unless the Regulation was amended, the university could "capriciously revoke [Beta Upsilon's registered student organization] status at any time." *Id.* at 916.

The Eleventh Circuit granted the university's motion to dismiss, finding that Beta Upsilon's claims had become moot as a result of the change in the policy. In doing so, the court rejected the fraternity's argument that the university was required to amend the underlying Regulation from which the policy was derived in addition to the handbook policy itself. *Id.* More specifically, the court noted that the university had modified the policy in the handbook, registered Beta Upsilon's chapter, and stated its intention to adhere to its modified policies. *Id*. at 917. In finding the case moot, the court observed that while Beta Upsilon's pleadings sought to enjoin the university from denying Beta Upsilon registered-student-organization status, the fraternity did not specify the manner in which the university should grant the relief. *Id.* Further, the court pointed out that Beta Upsilon had not mounted a facial challenge to the text of the Regulation, instead merely challenging the university's refusal to register Beta Upsilon as a registered student organization. *Id*.

Unlike the plaintiff in *Beta Upsilon*, who challenged only a handbook policy, Plaintiffs here not only take issue with the applicability of the Home Health Handbook, they also attack AHCA's definition of "medical necessity," as set forth in Rule 59G-1.010(166) of the Florida Administrative Code. For example, the Complaint alleges that AHCA and eQHealth relied on the definition of

---

*Beta Upsilon*, 586 F.3d at 915 (amendment set forth in italics). The statement is reflected in the CSAI Handbook of Activities and CSAI's registration and constitution guidelines and website. *Id.*

"medical necessity" contained in Fla. Admin. R. 59G-1.010(166) as a basis for denial of private duty nursing services to Plaintiff A.C. *See* D.E. 62 at ¶ 175. Additionally, the Complaint cites to Rule 59G-1.010(166)(a), as an example of how Defendants have developed regulations, rules, customs, practices and policies, and have engaged in acts and omissions of reducing the prescribed necessary services to medically fragile children. *See* D.E. 62 at ¶ 277(a). Plaintiffs emphasize that the restriction of provision of private duty nursing services is based on the regulatory definition of "medically necessary" found in the Florida Administrative Code. *Id.* Moreover, in Count III of the Complaint, Plaintiffs allege that "AHCA's definition of 'medical necessity', *see* Rule 59G-1.010(166) (incorporated through the Handbook), is preempted by federal law and is invalid pursuant to the Supremacy Clause of the United States Constitution." *See* D.E. 62 at ¶ 321.

Thus, in contrast to the defendant in *Beta Upsilon*, Defendants here have not provided all relief that Plaintiffs seek. Specifically, they have done nothing to modify the definition of "medical necessity" as set forth in Rule 59G-1.010(166), Fla. Admin. Code, and that definition still applies to Plaintiffs and allegedly deprives them of services and benefits that they seek through this litigation. As a result, Defendants' actions have not mooted this case.

## *CONCLUSION*

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion to Dismiss, Or, Alternatively, for Dismissal in Part, For Lack of Subject Matter Jurisdiction Due to Mootness [D.E. 117, 119] is **DENIED** for the foregoing reasons.

**DONE** and **ORDERED** at Fort Lauderdale, Florida this 6th day of August 2013.

 /s/ Robin S. Rosenbaum
 ROBIN S. ROSENBAUM
 UNITED STATES DISTRICT JUDGE

cc: counsel of record