UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60460-CIV-ROSENBAUM

A.R., by and through her next friend,
Susan Root, *et al*.,

    Plaintiffs,

v.

ELIZABETH DUDEK, in her official capacity
as Secretary of the Agency for
Health Care Administration, *et al*.,

    Defendants.
_____/

## ORDER

This matter comes before the Court upon Defendants Elizabeth Dudek, Harry Farmer, and Kristina Wiggins's (collectively referred to as Defendants") Motion for Cease and Desist Order Regarding Plaintiffs' Improper and Misleading Communications With Putative Class Members ("Motion to Cease and Desist"). [D.E. 86]. The Court has reviewed the Motion, the filings supporting and opposing the Motion, and the other materials in the case file. For the reasons that follow, the Motion to Cease and Desist is denied.

### BACKGROUND

**A.    Procedural Background and Nature of Claims**

Plaintiffs T.H., L.J., A.G., A.C., A.R., C.V., M.D., C.M., and B.M.[1] are children who have been diagnosed as "medically fragile" and who qualify for services through Florida's Medicaid

---

[1] Plaintiff T.F. passed away on April 6, 2013. *See* D.E. 147.

program.[2]  Plaintiffs T.H., L.J., and A.G., are children who have been placed in nursing facilities, while Plaintiffs A.C., A.R., C.V., M.D., C.M., and B.M. are children who live at home and claim that they are at risk of unnecessary institutionalization at nursing facilities.  *See* D.E. 62 at ¶¶ 4, 14.

On March 13, 2012, Plaintiffs filed a class-action lawsuit against Defendants Elizabeth Dudek ("Dudek"), in her official capacity as Secretary for the Agency for Health Care Administration ("AHCA"); Harry Frank Farmer, Jr. ("Farmer"), in his official capacity as the State Surgeon General and Secretary of the Florida Department of Health ("FDOH"); Kristina Wiggins ("Wiggins"), in her official capacity as Deputy Secretary of the FDOH and Director of Children's Medical Services ("CMS"); and eQHealth Solutions, Inc. ("eQHealth").  On August 23, 2013, Plaintiffs filed their Second Amended Complaint, which is the operative pleading in this case.

The Second Amended Complaint alleges that Defendants are denying Plaintiffs Medicaid services, including private-duty nursing services, due to the adoption of "uniform policies, practices, and regulations to reduce private duty nursing services."  *See* D.E. 62 at ¶¶ 18-19.  Plaintiffs further claim that Defendants "failed and continue to fail to provide medically necessary services in home and community settings to Medicaid recipient children in Florida."  *Id.* at ¶ 20.  Based on these allegations, Plaintiffs ask the Court to declare that Defendants' policies, regulations, actions, and omissions are unnecessarily institutionalizing Plaintiffs and Plaintiff class members or putting Plaintiffs at risk of being placed into segregated facilities, in violation of Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131-12165 ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"); the Medicaid Act, 42 U.S.C. §§ 1396-1396v

---

[2] A medically fragile child is one who is "medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, *e.g.*, requires total parenteral nutrition (TPN), is ventilator dependent, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning."  *See* D.E. 62 at ¶ 2 (citing Rule 59G-1.010(165), Fla. Admin. Code).

("Medicaid"); The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r ("NHRA"); Early and Periodic Screening, Diagnostic, and Treatment Services, 42 U.S.C. § 1396d® ("EPSDT Provisions"); and 42 U.S.C. § 1983. *Id*. at 21. Plaintiffs also seek a permanent injunction requiring Defendants to "stop segregating medically fragile and medically complex children in nursing facilities and to provide [Plaintiffs] medically necessary Medicaid services in the most integrated setting appropriate in the community and provide for their medically necessary services and to provide such services in the most integrated setting appropriate." *Id.* at ¶ 22.

**B.      Defendants' Motion for Cease and Desist Order**

In the Motion now before the Court, Defendants allege that, in a last-minute effort to solicit support for their class-action claims, Plaintiffs' counsel and other representatives sent improper, disparaging, and misleading communications and proposed sworn declarations to families, parents, and caregivers of numerous children receiving Medicaid benefits from the Florida Medicaid programs. According to Defendants, the communications "are causing irreparable harm to the Defendants' reputations, and they are unreasonably interfering with Defendants' relationships with the Medicaid beneficiary children and their families." *See* D.E. 86 at 2. Defendants contend that these communications directly violate the rules of communications with putative class members.

In particular, the Motion to Cease and Desist complains about an e-mail dated October 23, 2012, and an e-mail dated October 29, 2012. The October 23, 2012, e-mail was sent by an individual named Mary Kathryn Van Kleunen ("Van Kleunen") and attached an e-mail from Ven Sequenzia, Jr., the president of the Autism Society of America, State of Florida Chapter. The subject line of Van Kleunen's e-mail states, "Class Action lawsuit by parents of medically fragile children — URGENT!! Please forward." D.E. 86-1 at 1. The e-mail also states, in pertinent part,

> You are being sent this email because you are in a position to influence the lives of the children of Florida.

3

> Please see the email below. This is referring to the systematic cutbacks in home nursing care and other services to children under 21 that are being made by the State of Florida. If you have a child who is medically fragile, please consider filling out the attached paperwork, if you haven't already. Please forward this to other families who may be threatened by these cutbacks in care.
>
> Carolyn DeVita, the attorney, welcomes phone calls to discuss your situation and to answer any questions. Her contact information is below. The deadline for certifying the class action is this Friday, unless a requested extension is granted, so *time is of the essence*. Instructions for filling out the form are outlined in this e-mail, which is sent from the Public Interest Law Center, one of the law firms representing the families.

*See* D.E. 86-1. (emphasis in original).

The attached e-mail from the President of the Autism Society of America, State of Florida Chapter, provides, in relevant part,

> There is a very important lawsuit that may affect your children if you are able to get involved. Currently a team of [] disability attorneys are attempting to keep the state from reducing nursing services for medically fragile children and trying to get the medically fragile children that are currently institutionalized out of nursing homes with appropriate nursing services at home and in the community. In order to protect your children, they need your help. You will not be a named plaintiff in the class action lawsuit but if they get class certification, your children would be protected by the class.
>
> <u>Now is your chance to help and ensure that they get class certification and that your child is protected by any outcomes in the case</u>. What they need is for you and absolutely everyone you know that is in a similar situation, is to fill out the attached declaration. The more declarations we can get and give to the court, showing that so many families are <u>affected by AHCA and eQHealth's policies of reducing your child's services</u>, the much more likely they can get certified and your child will be protected.
>
> Try to fill it out to the best of your ability and then send it to Carolyn DeVita at carolynqdevita@gmail.com with your telephone number. She will be calling you to review it together then you can sign it and send it back to her and then they will file it with the court. Please read through what I've attached and do your best with inserting your information. <u>This is going to be coming from you and you will be</u>

> swearing that everything you say in the declaration is true so please feel free to take out anything you don't want and add in as much as possible. You do not need to be so specific as to dates but just make sure you tell your story and what is happening to you, the more information and the more details, the better.
>
> Please forward this email to anyone else you know that is also in a similar situation of having their home health services reduced or limited in some way. The attached declaration is just a form that you can use to help get you started but feel free to modify it however you want.
>
> Also, it is very important that you include denials at the initial stage, even if you eventually get the services after reconsideration or a fair hearing. Just tell the whole truth, that you were originally denied and after going through their process, you got services, etc. or that you didn't get them. Again, these are just forms, the answers are up to you and it is your chance to tell the court what you have to go through to get or maintain your child's services. The more detail and information, the better.

D.E. 86-1 (emphasis added).

Also attached to the October 23, 2012, e-mail was a draft Declaration, to be filled out by families who sought to become members of the class. *See* D.E. 86-1 at 3-6. The Declaration contains blanks to be filled in by parents and caregivers of children, including details such as the child's date of birth, diagnosis, physician name, and the date the child began receiving services from AHCA. In addition, the Declaration suggests language relating to how AHCA "consistently" decreases the amount of services to children even though the children's conditions do not change. *Id.* at 4. The Declaration further prompts the family to insert dates and amounts of reductions of services for which the family has proof and provides an example of how to phrase reductions. *Id.* And it includes other language regarding reduction in services and suggests that the families utilize the following language:

> 8. In denying my child's services, AHCA and eQHealth cited AHCA's definition of Medical[] Necessity in 59G-1.010(166), Florida Administrative Code, stating that they were denying my

5

child's services because they were primarily intended for the convenience of the recipient's caretaker. [If there is any other reasoning they cited to deny/reduce services, please include it.]

9. AHCA and eQHealth are reducing my child's services to the extent that I am unable to care for myself, or my family, and I am not sufficiently skilled as a trained health care provider.

10. <u>AHCA and eQHealth routinely denies or refuses to provide to my child outside of our home the medically necessary services as prescribed by my child's primary care physician, which denies and prevents my child from community involvement</u>. [add details, for example: they won't assist you when you go to the park, a picnic, community event, doctor's office, travel, etc.  Please provide at least one specific example of this]

11. [if this applies to you, please insert when and what amounts/times AHCA and [eQHealth] have required your child to go to a PPEC] AHCA and eQHealth authorizes and requires the use of Pediatric Prescribed Extended Care (PPEC) Center, instead of placing a child in a school based, or otherwise integrated environment.  My child would benefit from socializing with peers [his/her] own age.

12. AHCA shortened the amount of time to request an appeal of the denial or reduction of services from ten to five days; further, despite the reduction in services, AHCA places the burden on me to continually appeal denial determinations while caring for my child.

13. <u>AHCA and eQHealth have overwhelmingly increased the amount of documentation required at every certification period</u> to substantiate that my child requires private duty nursing services even though my child's condition has not changed and my families' life situation has not changed and my child's primary care physician prescribes the same amount of services.

14. My child has been on the Medicaid Waiver wait list since [insert date] and currently receives no Medicaid Waiver services OR My child has been on the Medicaid Waiver since [insert date] and receives [insert services covered by Medicaid Waiver].

15. [If your child has been placed in a nursing facility, please describe the circumstances surrounding their placement in one. (For instance, they did not get enough nursing services, the services were inadequate, there was a medical emergency, etc.)  Please also provide the dates they went into one, got out, what services they received while there, if there was a PASSR review performed, if they received

> specialized services, etc.  If this does not apply to you, please delete this paragraph.]
>
> 16. <u>All of the aforementioned actions of the AHCA and eQHealth place my child at risk of institutionalization in a nursing facility</u>.

D.E. 86-1 (emphasis added) (statements contained in brackets in original).

Defendants characterize the draft Declaration as containing pre-written statements that are intended to "shape and form the beliefs of the putative class members and to unfairly influence the content of the requested sworn statements." *See* D.E. 86 at 4.  And, while Defendants acknowledge that the correspondence indicates that the potential putative class members may modify and omit suggested language from the proposed Declaration, they argue that it is clear that Plaintiffs' counsel were attempting to directly influence and shape the sworn statements.

Defendants also point to an e-mail dated October 29, 2012, from Carolyn DeVita[3] in which DeVita attempts to convince a family member of a putative class member to sign and submit a Declaration.  The October 29, 2012, e-mail states,

> Thank you so much for taking the time to talk with me.  I really appreciate you taking the time out to do this declaration.  Your story may very well persuade the court to get class certification.
>
> Please read through what I've attached and do your best with inserting your information.  Again, this is going to be coming from you and you will be swearing that everything you say in the declaration is true so please feel free to take out anything you don't want and add in as much as possible.
>
> ***
>
> When you are done writing about it, please send it to me and I will make sure it conforms with all of our formatting and that everything reads okay.

---

[3]According to Defendants, Carolyn DeVita is a graduate fellow at the Florida State University Public Interest Law Center, who is working with Plaintiffs' counsel Paolo Annino.

D.E. 86-3. The October 29, 2012, e-mail attached the same draft Declaration set forth above. Again, Defendants contend that the October 29, 2012, e-mail attempts to pressure the recipient to complete the Declaration.

As a result of the communications, Defendants state that they received a number of "concerned inquiries." According to Defendants, the communications have caused confusion and concern among the families of the child Medicaid recipients in Florida and have interfered with and disrupted Defendants' relationships with the families, caregivers, and parents of the Medicaid-covered children with whom Defendants' representatives must work on a routine basis in order to provide necessary medical care. As a result, Defendants ask this Court to enter an order directing Plaintiffs and their counsel to (1) cease and desist communications with putative class members that include misleading, inaccurate, and disparaging statements; (2) obtain approval from the Court or defense counsel before disseminating any further form declarations to potential putative class members and any corresponding communications instructing putative class members to complete such declarations; (3) prohibit Plaintiffs from using in support of their Motion for Class Certification or otherwise the declarations received thus far as a result of the allegedly improper communications; (4) send out remedial communications correcting the allegedly misleading, inaccurate, and deceptive statements made in the improper communications and the form declarations; and (5) produce all declarations they have obtained to this point in connection with this litigation.

Plaintiffs respond to the Motion to Cease and Desist, clarifying that the October 23, 2012, e-mail was sent by Van Kleunen, who is neither a party nor counsel to this action. Plaintiffs further emphasize that the e-mail attached an e-mail by Sequenza, who is also neither a party nor counsel to the action. Additionally, Plaintiffs point out that Van Kleunen's e-mail reveals only one recipient — "ven@autismfl.com."

8

As for the content of the communications, Plaintiffs argue that Defendants have neither offered concrete evidence to show impropriety nor described what about the draft Declaration is improper, aside from the general allegation that the Declaration contains false, misleading, and disparaging statements. Plaintiffs further characterize the challenged parts of the October 29, 2012, e-mail as out of context and note that it discloses no recipient. And, because the e-mail begins with, "[t]hank you so much for taking the time to talk to me[,]" Plaintiffs argue that the language indicates that the e-mail was a response to a verbal communication initiated by the e-mail recipient. Finally, Plaintiffs clarify that of the approximately forty declarations that were received, only three were received without prior verbal contact between the declarant and Plaintiffs' counsel.

Based on these contentions, Plaintiffs assert that Defendants have not made the requisite showing of threatened or actual abuse and instead have merely made general allegations that communications were improper, coercive, deceptive, and misleading. Moreover, Plaintiffs point out that Defendants themselves have contacted potential class members and have issued a press release to these families. As Plaintiffs note, Defendants' discovery responses included call records of communications with the parents and caregivers of more than one hundred putative class members residing in nursing facilities. According to Plaintiff, the communications between AHCA and prospective class members risk a higher likelihood of coercion due to the pre-existing relationship with AHCA. For all of these reasons, Plaintiffs argue that the Motion to Cease and Desist must be denied.

Upon review of the briefs submitted by the parties, the Court entered an Order noting that a question existed as to whether Plaintiffs had communicated with putative class members. Accordingly, the Court directed Plaintiff to submit a complete list of the recipients of the e-mails and draft Declaration at issue. The Court also instructed Plaintiff to indicate whether other similar

9

communications with putative class members had occurred, and, if so, Plaintiff was to provide the Court with copies of the communications. *See* D.E. 111. While the Court awaited receipt of the additional information from Plaintiffs, it instituted the following guidelines: (1) Any communication between the parties and the putative class members relating in any way to (a) the merits, status, or effect of the class action, or (b) a class member's participation in the action was required to be in writing and copied to the other parties at least 24 hours before it was made; and (2) If it was not clear from the writing to whom the communication was to be made, the party was to disclose the identity of all intended recipients. The requirement that the parties copy opposing counsel with communications did not apply to communications between counsel and their clients. *See id.*

In response to the Court's directive, Plaintiffs filed a Notice of Compliance [D.E. 122] in which they stated that they did not send the October 23, 2012, e-mail and did not know to whom the e-mail was sent. Similarly, because the October 29, 2012, e-mail was a partial copy, Plaintiffs noted that they were not certain about who received the e-mail but believed that it was sent to Deidra Rocker, an individual who did not ultimately submit a Declaration.

As for the draft Declaration, Plaintiffs clarified that they sent it to thirty-five putative class members but further stated that only seventeen of the recipients submitted executed Declarations. Plaintiff further revealed that e-mails similar to those challenged by Defendants were, in fact, sent to putative class members, and they attached the communications for the Court to review. Like the October 23, 2012, and October 29, 2012, e-mails, these additional e-mails attached the proposed draft Declaration, and many encouraged the recipient to forward the information to other individuals. *See* D.E. 122-1. Although Plaintiffs provided the additional information, they also sought clarification of the Court's prior Order, stating that they believed the prohibition applied to "any mass solicitation or mailings to putative class members, and not routine or ordinary communications

with putative class members, or communications with the press, or communications with other third part[ies]."[4]  D.E. 122 at 4.

Pursuant to Plaintiffs' request, the Court issued an order clarifying its original Order. In the Order, the Court explained that "Plaintiff's understanding of the intent of the Order is correct. The instruction applies to any mass solicitation or mass mailings to putative class members; it does not apply to routine and ordinary communications with putative class members, communications with the press, or communications with any third party. The instruction applies to both Plaintiffs and Defendants." *See* D.E. 123.

### *DISCUSSION*

Rule 23, Fed. R. Civ. P., governs class actions in federal court. Because of the potential for abuse, "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Company v. Bernard*, 452 U.S. 89, 100 (1981). Put simply, the Court bears the responsibility under Rule 23(d) to preserve the integrity of the class action. *See, e.g., Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985). For this reason, Rule 23(d), Fed. R. Civ. P., provides the Court with the authority to issue orders to protect class members, impose conditions on the representative parties, and deal with similar procedural matters. The Court's discretion, however, is not unlimited. The authority provided to the Court by Rule 23(d) to exercise control over a class action must, instead, be exercised within the boundaries of the Supreme Court case of *Gulf Oil,* 452 U.S. 89.

In *Gulf Oil*, the Supreme Court upheld a Fifth Circuit decision that struck down a gag order in an employment-discrimination class-action case. 452 U.S. 89. The order entered by the trial court

---

[4]Plaintiffs noted, on the other hand, that Defendants believed that the restraint applied to <u>all</u> communications of Plaintiffs only, including any statements made on social-media platforms.

11

required prior judicial approval of all communications by parties and their counsel with any actual or potential class members. *Id.* at 103. The Supreme Court ruled that the trial court exceeded its authority in entering the order since the record revealed no grounds on which the court could have determined that it was necessary to impose an order that "involved serious restraints on expression." *Id*. at 103-104. Because, however, the Court recognized the possibility of abuses in class-action litigation that may be implicated by communications with potential class members, *Gulf Oil* acknowledged that courts may issue orders limiting certain communications.[5] *Id.* at 104.

Since *Gulf Oil*, courts have set forth the standard that must be met when a party seeks to restrict communication to putative class members. In so doing, courts have emphasized that the moving party must make an evidentiary showing of actual or threatened abuse by the party sought to be restrained. *See Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696 (S.D. Ala. 2003) and cases cited therein. In this regard, the moving party must satisfy a two-pronged test before a court may restrict communication. First, a communication must have occurred or must be threatened to occur. *Id.* at 697. Next, the form of communication at issue must be abusive in that "it threatens the proper functioning of the litigation." *Id.* at 698. Communications that have been found to be violative of the principles of Rule 23 include misleading communications to class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class

---

[5] Although *Gulf Oil* involved contact with a putative class by plaintiff's counsel, lower courts have applied the case to contact initiated by defendants and their counsel as well. *See Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985); *Great Rivers Cooperative of South-Eastern Iowa v. Farmland Industries, Inc.*, 59 F.3d 764 (8th Cir. 1995); *Cox Nuclear Medicine v. Gold Cup Coffee Services, Inc.*, 214 F.R.D. 696 (S.D. Ala. 2003).

counsel. *See Hampton Hardware, Inc. v. Cotter & Company, Inc.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994) (citations omitted); *Cox*, 214 F.R.D. at 698.[6]

Even if the two prongs of this test are met, any resulting order "limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101. The resulting order must be carefully drawn so that it interferes with free speech as little as possible. *Id.* at 102 (citing *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977), *cert. denied*, 434 U.S. 985 (1977) (court must give explicit consideration to the narrowest possible relief which would protect the respective parties)). "Nevertheless, a limited restriction — such as precluding a defendant from soliciting class members to opt out of the litigation — will sometimes be justified." *Great Rivers Cooperative of Se. Ia. v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th Cir. 1995) (quoting Manual for Complex Litigation, Second § 30.24 at 232 (citing *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985)).

Here, there is no question that Plaintiffs have communicated with putative class members. The communications provided by Plaintiffs attached to their Notice of Compliance and the October 29, 2012, e-mail identify Carolyn DeVita, an attorney with the Florida State University Public Interest Law Center, as the author. And while the October 23, 2012, e-mail indicates that someone other than Plaintiffs sent the e-mail, the content is very similar to that in the other correspondence. This similarity suggests that a member of Plaintiffs' legal team either provided the language or directed others to deliver the e-mail. With respect to the e-mails authored by DeVita, however, it is equally clear that communications with putative class members have occurred. Defendants have

---

[6] Restrictions on the communication of settlement offers are subject to the same proof requirements. *See Cox*, 214 F.R.D. at 698 (citing *Bublitz v. E.I. duPont de Nemours and Co.*, 196 F.R.D. 545, 548 (S.D. Iowa 2000)).

thus satisfied their burden of showing that a particular communication has happened or is threatened to occur.

The real issue here is whether the communications submitted by Defendants are abusive in that they "threaten the proper functioning of the litigation." The Court finds that they do not. With respect to these communications, the Court agrees with Plaintiffs that they are not misleading or coercive. Although the e-mails contain phrases such as "systematic cutbacks in home nursing care," a closer reading of the communications as a whole reveals that these phrases were not used by Plaintiffs to be misleading or coercive. To the contrary, the e-mails also contain phrases such as "please feel free to take anything out you don't want," "feel free to modify [the Declaration] however you want," and "Just tell the whole truth." These phrases convey the idea that the Declarations should be accurate and contain only information that is truthful. In other words, while the Declarations suggest certain types of language, Plaintiffs' counsel emphasizes that the Declaration should accurately represent the facts as the signor knows them, and counsel points out that the content of the Declarations will vary from person to person.

Similarly, although the draft Declaration includes phrases such as "AHCA and eQHealth routinely denies or refuses to provide to my child outside of our home the medically necessary services as prescribed by my child's primary care physician" and "AHCA and eQHealth have overwhelmingly increased the amount of documentation required at every certification period. . ." Plaintiffs make clear that these phrases and others should be omitted if they are not applicable to a putative class member's situation.

Nor, as Defendants suggest, does *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F. 3d 999 (11th Cir. 1997), alter the analysis.[7] *Jackson* involved two consolidated cases in which plaintiffs alleged

---

[7]Likewise, Defendants' reliance on *Hamm v. TBC Corp.*, 597 F. Supp. 2d 1338 (S.D. Fla. 2009), *Bouder v. Prudential Financial, Inc.*, 2007 WL 3396303 (D.N.J. Nov. 8, 2007), and

14

that Motel 6 had a nationwide practice or policy of discriminating against its customers and its employees on the basis of race. After the cases were consolidated, the plaintiffs moved for an order allowing them relief from a Middle District of Florida local rule[8] that prevented counsel from communicating with potential or actual class members without prior approval from the court. *Id*. at 1002. The district court granted the relief sought, allowing communication with potential class members even though it had not yet ruled on the pending motions for class certification. *Id*. Thereafter, the defendant, Motel 6, sought a writ of mandamus vacating the order that allowed the plaintiffs to advertise their allegations to the public at large and to communicate with current and former Motel 6 employees through mass mailings. *Id*. at 1003.

The Eleventh Circuit found that the order authorizing class communications prior to class certification was an abuse of discretion. *Id.* at 1004. Although the court did not conclude that communications with potential class members could never precede certification, it noted that district courts must strive to avoid authorizing injurious class communications that could later prove to be unnecessary. *Id.* Ultimately, the court opined that an order authorizing class communications before class certification is "likely to be an abuse of discretion when (1) the communication authorized by the order is widespread and clearly injurious and (2) a certification is not imminent or it is unlikely

---

*Hobson v. Communications Unlimited, Inc.*, 2010 WL 3062505 (N.D. Ga. Aug. 2, 2010), is misplaced. These case all involve putative class actions for damages brought under the Fair Labor Standards Act ("FLSA"). FLSA class actions are brought pursuant to 29 U.S.C. 216(b), rather than under Rule 23, and involve a two-tiered certification process. Some of the cases cited by Defendants also involve direct solicitation through live telephone calls, an act prohibited by the Rules Regulating the Florida Bar.

[8]This Court's Local Rules also previously included language prohibiting counsel from communicating with class members. As the 1996 Comments to Local Rule 23.1, S.D. Fla., indicate however, the rule was amended to delete former Section B, which barred counsel for parties in class actions from communicating directly or indirectly with potential or actual class members without advance approval from the Court. Section B was deleted to conform with the Supreme Court's ruling in *Gulf Oil*.

that a class will in fact be certified." *Jackson*, 130 F. 3d at 1004. Because the advertisements were mass mailings that were nationwide in scope and were causing irreparable harm to Motel 6's reputation and its relationship with its employees, the court granted the mandamus.

*Jackson* is distinguishable from this matter because it involved a claim for monetary damages and sought class certification pursuant to Rule 23(b)(3), Fed. R. Civ. P. Here, Plaintiffs seek declaratory and injunctive relief pursuant to Rule 23(b)(2), Fed. R. Civ. P. More significantly, unlike in *Jackson*, the communications here were not widespread or nationwide "mass communications;" rather, the e-mails and draft Declaration were sent to a select group of individuals who, of need, already deal with Defendants on a regular basis. Indeed, Plaintiffs clarified that they sent the draft Declaration to only thirty-five putative class members and further stated that only seventeen of the recipients submitted executed Declarations. Therefore, whereas the *Jackson* Court had to be concerned about relatively unfamiliar Motel 6 customers who may have stayed at Motel 6 once before, receiving communications that painted Motel 6 in a bad light, in the pending matter, the putative Plaintiff class and Defendants must interact with each other on a regular and consistent basis. As a result, members of the putative Plaintiff class, unlike the putative *Jackson* class, should have firm views of Defendants outside of any communications from Plaintiffs' attorneys.

Further, the communications were not clearly injurious to Defendants. As noted above, although the draft Declaration includes phrases such as "AHCA and eQHealth routinely denies or refuses to provide to my child outside of our home the medically necessary services as prescribed by my child's primary care physician" and "AHCA and eQHealth have overwhelmingly increased the amount of documentation required at every certification period," the correspondence makes clear that these are proposed phrases that should be omitted if they are not applicable to a certain situation. In fact, the correspondence emphasizes, "This [declaration] is going to be coming from you and you

16

will be swearing that everything you say in the declaration is true so please feel free to take out anything you don't want and add in as much as possible." Moreover, the e-mails that attach the Declaration are not coercive because they contain language that states, "[P]lease consider filling out the attached paperwork, if you haven't already." Finally, unlike in *Jackson*, at this point, the Court is unable to draw any conclusion whether the class will be certified.

In addition, significantly, even in *Jackson*, the Eleventh Circuit let stand the portion of the district court's order that authorized Plaintiff's "inquiries and communication that would be allowable as a normal discovery matter, whether the . . . class is certified or not." *Jackson*, 130 F.3d at 1008 n. 19 (citations omitted). The court noted that these types of communications, when initiated by potential class members and not Plaintiff's counsel, are neither widespread nor injurious. Here, Plaintiffs indicated that of the approximately forty declarations that were received, only three were received without prior verbal contact between the declarant and Plaintiffs' counsel. As in *Abdallah v. The Coca-Cola Company*, 186 F.R.D. 672 (N.D. Ga. 1999), Plaintiffs and their counsel here are entitled to speak freely about this lawsuit with any potential class member who contacts them. In *Abdallah*, the Court permitted Plaintiffs to "(1) discuss the merits of the suit with potential class members who contact[ed] them; (2) determine whether potential class member possesse[d] any evidence relating to the Complaint allegations; (3) prepare affidavits or other testimony in support of class certification or the merits of the case; and (4) discuss with potential class members the possibility of representation by Plaintiffs' counsel and of providing legal services to them." *Abdallah*, 186 F.R.D. at 677.

For the foregoing reasons, the Court finds that the October 23, 2012, and October 29, 2012, e-mails do not offend the principles of the class-action lawsuit or Federal Rule 23. Nothing about the communications was particularly coercive or intimidating. In light of the phrasing of the

communications, they also cannot be construed to be misleading or confusing. Finally, the communications do not undermine the cooperation or confidence in class counsel. Overall, the communications, when taken as a whole and in context, do not threaten the proper functioning of the litigation.

### *CONCLUSION*

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Cease and Desist Order Regarding Plaintiffs' Improper and Misleading Communications With Putative Class Members [D.E. 86] is **DENIED** as set forth herein.

**DONE** and **ORDERED** at Fort Lauderdale, Florida this 19th day of September 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

cc:   counsel of record