UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No.: 12-60460-CIV-ZLOCH/HUNT

A.R., by and through her next friend,
SUSAN ROOT, *et al.*,

     Plaintiffs,

v.

ELIZABETH DUDEK, in her official capacity as
Secretary of the Agency for Health Care
Administration, *et al.*,

     Defendants.
_____/

UNITED STATES OF AMERICA

     Plaintiff,

v.

STATE OF FLORIDA

     Defendant.
_____/

## **REPORT AND RECOMMENDATION**

This matter is before this Court on Defendants'[1] renewed motion to dismiss,
which was incorporated in Defendants' Response Opposing Plaintiffs' Renewed Motion
for Class Certification.  See ECF No. 237.  On September 9, 2014, this Court denied
Plaintiffs' Renewed Motion for Class Certification, without prejudice, pending the

_____

[1] "Defendants" refers to all Defendants except eQHealth Solutions Inc.

disposition of Defendants' renewed motion to dismiss.  ECF No. 263.  On October 9, 2014, the Honorable William J. Zloch referred to the undersigned United States Magistrate Judge all pretrial motions for report and recommendation or disposition. ECF No. 275; see also 28 U.S.C.A. § 636(b); S.D. Fla. L.R., Mag. R. 1.   Having carefully reviewed Defendants' motion, the response and reply thereto,[2] the entire case file, and the applicable law, and being otherwise duly advised in the premises, it is hereby recommended that Defendants' motion to dismiss be DENIED.

<u>BACKGROUND</u>

**A.      Procedural Background and Nature of Claims**

In this putative class action, Plaintiffs—A.R., C.V., M.D., C.M., B.M., T.F., A.C., A.G., L.J., and T.H.[3]—are children who have been diagnosed as medically fragile[4] or children who need skilled care services[5] through Florida's Medicaid program.  On March

---

[2] The United States filed a statement of interest in opposition to Defendants' renewed motion to dismiss that the undersigned has also considered.  <u>See</u> ECF No. 247.

[3] Since the commencement of this action, Plaintiffs T.F., L.J., and A.C. have died.  <u>See</u> ECF Nos. 147, 245, 260.

[4] "Medically Fragile" means a person

who is medically complex and whose medical condition is of such a nature that he is technologically dependent, requiring medical apparatus or procedures to sustain life, e.g., requires total parental nutrition (TPN), is ventilator dependent, or is dependent on a heightened level of medical supervision to sustain life, and without such services is likely to expire without warning.

Rule 59G-1.010(165), Fla. Admin. Code.

[5] Florida Administrative Code Rule 59G-4.290(3) provides as follows:

(3) Skilled Services Criteria.
    (a) To be classified as requiring skilled nursing or skilled rehabilitative services in the community or in a nursing facility, the recipient must require the type of medical, nursing or rehabilitative services specified in this subsection.
    (b) Skilled Nursing. To be classified as skilled nursing service, the service must meet all of the following conditions:
        1. Ordered by and remain under the supervision of a physician;
        2. Sufficiently medically complex to require supervision, assessment,

13, 2012, Plaintiffs filed the instant action against Defendants Elizabeth Dudek, in her official capacity as Secretary for the Agency for Health Care Administration ("AHCA");[6] Harry Frank Farmer, Jr., in his official capacity as the State Surgeon General and Secretary of the Florida Department of Health ("FDOH"); Kristina Wiggins, in her official capacity as Deputy Secretary of the FDOH and Director of Children's Medical Services; and eQHealth Solutions Inc. ("eQHealth").[7]   On August 23, 2012, Plaintiffs filed their Second Amended Complaint (hereinafter, the "Complaint"), which is the operative pleading in this case.   Plaintiffs seek injunctive and declaratory relief against Defendants.

At the time of the Complaint A.C., A.R., C.V., M.D., C.M., B.M., and T.F. were "at risk" Plaintiffs who live at home but were at risk of unnecessary institutionalization in nursing facilities.   T.H., L.J., and A.G. were institutionalized Plaintiffs who had been placed in nursing facilities.   However, no Plaintiffs are currently institutionalized.   ECF No. 237 at 13.

The Complaint alleges that Defendants are denying Medicaid services to Plaintiffs, including private-duty nursing ("PDN") services, due to the adoption of

planning, or intervention by a registered nurse.
3. Required to be performed by, or under the direct supervision of, a registered nurse or other health care professionals for safe and effective performance;
4. Required on a daily basis;
5. Reasonable and necessary to the treatment of a specific documented illness or injury; and
6. Consistent with the nature and severity of the individual's condition or the disease state or stage.

Rule 59G-4.290(3), Fla. Admin. Code.

[6] The AHCA is designated as "the single state agency authorized to make payments for medical assistance and related services under Title XIX of the Social Security Act." § 409.902, Fla. Stat. (2014).

[7] eQhealth makes medical-necessity determinations on behalf of AHCA and acts as a witness for AHCA in all fair-hearing proceedings resulting from decisions and actions made by eQHealth.

"uniform policies, practices, and regulations to reduce [PDN] services."  ECF No. 62 at ¶¶ 18–19.  Plaintiffs further claim that Defendants "failed and continue to fail to provide medically necessary services in home and community settings to Medicaid recipient children in Florida."  Id. at ¶ 20.

Based on the pleaded facts, Plaintiffs ask this Court to declare that Defendants' policies, regulations, actions, and omissions are unnecessarily institutionalizing Plaintiffs and Plaintiff class members or putting Plaintiffs at risk of being placed into segregated facilities, in violation of Title II of the Americans With Disabilities Act, 42 U.S.C. §§ 12131–12165 ("ADA"); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Medicaid Act, 42 U.S.C. §§ 1396–1396v ("Medicaid"); The Nursing Home Reform Amendments to the Medicaid Act, 42 U.S.C. § 1396r ("NHRA"); Early and Periodic Screening Diagnostic, and Treatment Services, 42 U.S.C. § 1396d(r) ("EPSDT Provisions"); and 42 U.S.C. § 1983.  Id. at ¶ 21.  Plaintiffs also seek a permanent injunction requiring Defendants to (1) "stop segregation of medically fragile children who are unnecessarily institutionalized in nursing homes and to provide integrated community services;" and (2) "perform adequate Level I and Level II PASSR reviews to institutionalized children and to provide such services as determined by the Level II screening[.]"  ECF No. 62 at 46.  Furthermore, Plaintiffs ask this Court to order Defendants to (1) "provide [PDN] services that will allow the Plaintiffs and Plaintiff class members to live in their homes and communities;" and (2) "cease the practice of denying or reducing Plaintiff and Plaintiff Class members' services at recertification where there has been no change in the medical necessity of such of services[.]"  Last, Plaintiffs seek an "[a]ward of compensatory services . . . to ameliorate or remediate the

conditions resulting from the Defendants' failure to provide the medically necessary services," as well as attorneys' fees and costs.  ECF No. 62 at 46.

On February 19, 2013, Defendants filed a motion to dismiss the Complaint arguing that Plaintiffs' claims were moot based on Defendants' changes to the challenged policies.  ECF No. 117.  After full briefing on the issues, this Court denied Defendants' motion for two reasons.  First, this Court held that most of the changes on which Defendants relied were not final because the changes were still subject to an objection period before becoming finalized.  ECF No. 175 at 14–15.  Second, this Court determined that notwithstanding any changes that may become finalized, Defendants had not cured at least one important provision that was relevant to Plaintiffs' case. Specifically, this Court held that the State had not changed the regulatory definition of "medically necessary" or "medical necessity" as prescribed in Rule 59G-1.010(166)(a) of the Florida Administrative Code, which Plaintiffs argued as a basis for their claims. ECF No. 175 at 19.

On July 22, 2013, the United States filed an action against the State of Florida— challenging the same State policies and procedures—seeking injunctive and declaratory relief, as well as compensatory damages.[8]  United States v. Florida, No. 13-CV-61576, ECF No. 1.  On December 6, 2013, this Court consolidated Plaintiffs' action with the United States' case because both actions involved common questions of law and fact.[9] See ECF No. 214.

---

[8]  The United States' claim against the State is based solely on an alleged violation of Title II of the ADA.

[9]  For ease of reference, "Plaintiffs" refers to the named plaintiffs and the United States government will be referred to by proper name.

**B.      Defendants' Renewed Motion to Dismiss**

On March 3, 2014, in response to Plaintiffs' Renewed Motion for Class Certification, Defendants also renewed their motion to dismiss Plaintiffs' Complaint. ECF No. 237.   Sections I and IV of Defendants' response set forth their dismissal arguments.   Specifically, Defendants contend that the formerly pending rule changes have finalized, which moots Plaintiffs' claims, and further argue that Plaintiffs lack standing to bring the instant action.   ECF No. 237.   Plaintiffs argue, *inter alia*, that their claims are still justiciable because Defendants have failed to change the definition of "medically necessary" or "medical necessity," as set forth in this Court's prior ruling. Additionally, Plaintiffs—both institutionalized and at risk of institutionalization—argue that they have standing to bring their claims under Title II and the Rehabilitation Act. Defendants' reply does not specifically address this Court's prior reasoning for denying their first motion to dismiss, i.e., the unchanged definition of "medically necessary" or "medical necessity" set forth in Rule 59G-1.010(166)(a).

<u>ANALYSIS</u>

Defendants' renewed Federal Rule of Civil Procedure 12(b)(1) motion seeks dismissal of Plaintiffs' claims based on Plaintiffs' lack of standing as well as on the mootness of the claims—i.e., a lack of subject-matter jurisdiction.   <u>See</u> <u>Al Najjar v.</u> <u>Ashcroft</u>, 273 F.3d 1330, 1336 (11th Cir. 2001) ("[M]ootness is jurisdictional."). Specifically, Defendants argue that (1) Plaintiffs who are merely at risk of institutionalization do not have standing to bring this type of action under Title II or the Rehabilitation Act;[10] (2) Plaintiffs who were institutionalized at the beginning of this case

---

[10]   Both parties focus their standing/mootness arguments on Title II of the ADA and the Rehabilitation Act.   This Court can consider those two issues together because both claims include the

are no longer institutionalized and, thus, lack standing; and (3) the finalized policy changes have cured any alleged violations and have mooted Plaintiffs' claims. To put the arguments in proper context, a review of the applicable statutes and Supreme Court case law is necessary.

## I.    ADA

In the opening provisions of the ADA, Congress described the purpose of the ADA, in pertinent part, as follows:

> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
>
> (3) discrimination against individuals with disabilities persists in such critical areas as . . . institutionalization . . .;
>
> . . . .
>
> (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices, . . . [and] segregation.

42 U.S.C.A. §§ 12101(a)(2), (3), (5) (2012).   "Congress then set forth prohibitions against discrimination in employment (Title I, §§ 12111–12117), public services furnished by government entities (Title II, §§ 12131–12165), and public accommodations provided by private entities (Title III, §§ 12181–12189)."   Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 589 (1999).   In sum, the ADA is intended "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C.A. § 12101(b)(1).   Here, Plaintiffs' action

---

same integration requirements.   Pashby v. Delia, 709 F.3d 307, 322 (4th Cir. 2013); M.R. v. Dreyfus, 663 F.3d 1100, 1117–18 (9th Cir. 2011) ("We consider their Title II and section 504 claims together because these provisions impose the same integration requirements."),   amended by, 697 F.3d 706 (9th Cir. June 18, 2012).

is based on Title II—public services provided by government entities.

Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42. U.S.C.A. § 12132. A "qualified individual with a disability" means

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aides and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

Id. § 12131(2). A "public entity" includes State and local governments, id. § 12131(1), and a State does not have Eleventh Amendment immunity from suits brought under Title II. Id. § 12202.[11]

"Congress instructed the Attorney General to issue regulations implementing Title II, including § 12132's discrimination proscription." Olmstead, 527 U.S. at 591 (citing 42 U.S.C.A. § 12134(a)). The Attorney General's regulations were directed to be "consistent with this chapter and with the coordination regulations . . . applicable to recipients of Federal financial assistance under [§ 504 of the Rehabilitation Act]." Id. (quoting 42 U.S.C.A. § 12134(b)) (internal quotation marks omitted) (alteration in opinion). Modeled on a similar provision of the Rehabilitation Act,[12] the Attorney General issued the following "integration regulation": "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the

---

[11] There is no dispute that Plaintiffs are qualified individuals with disabilities and that Defendants are public entities, so as to fall within the ADA.

[12] 28 C.F.R. § 41.51(d) (2012) ("Recipients shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons.").

needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d) (2012).

In 1999, the Supreme Court of the United States addressed Title II claims in the context of two mentally retarded women who were unnecessarily institutionalized by the State of Georgia.  Olmstead, 527 U.S. 581.  Specifically, the Court confronted the question of "whether the proscription of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions."  Id. at 587.  The Court held that unjustified isolation is discrimination based on disability, id. at 597, and that placement in community settings was required for mentally disabled persons provided that "the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  Id. at 587.  The Court opined that (1) "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life"; and (2) "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  Id. at 600–01.  Notably, the Court credited the Department of Justice's ("DOJ") position on the issue, as amicus curiae, because the DOJ is the agency directed by Congress to issue regulations implementing Title II.  Id. at 597–98. The Court stated that it did not have to determine the degree of Chevron[13] deference to

---

[13] See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844 (1984), stating:

afford the DOJ's views because "it [was] enough to observe that the well-reasoned views of the agencies implementing a statute 'constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" Olmstead, 527 U.S. at 597–98 (quoting Bragdon v. Abbott, 524 U.S. 624, 642 (1998)).

Here, Plaintiffs rely on Olmstead to assert their Title II claims against Defendants. The institutionalized Plaintiffs rely on the express holding of Olmstead because they are factually indistinguishable from the Olmstead plaintiffs; whereas the at-risk Plaintiffs argue, consistent with numerous jurisdictions, that Olmstead also permits claims brought by disabled individuals at risk of unjustified institutionalization. With the proper canvas now laid, the undersigned will analyze Defendants' arguments.

## II.     Article III Justiciability

Article III of the United States Constitution limits federal courts' jurisdiction to actual "cases" and "controversies"—otherwise known as "justiciability." See United States v. Rivera, 613 F.3d 1046, 1049 (11th Cir. 2010). "A claim is justiciable if it is definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character." Id. at 1049–50 (quoting Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240–41 (1937)) (internal quotation marks

---

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

Id. at 842–43.

omitted).  Justiciability defines the judicial role by requiring the judiciary to defer to other branches of government when appropriate.  Id. at 1050 (citing Erwin Chemerinsky, Federal Jurisdiction § 2.1, at 45 (5th ed. 2007)).

Three important elements of justiciability are standing, mootness, and ripeness. See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167 (2000); see also Am. Civil Liberties Union v. The Fla. Bar, 999 F.2d 1486, 1489–90 (11th Cir. 1993).  Standing is the requisite personal interest that must exist at the commencement of the litigation.  Laidlaw, 528 U.S. at 189.  Mootness, on the other hand, addresses whether the personal interest that existed at the beginning of the case is still present at a later stage of the proceeding.  Id.  However, the "description of mootness as standing set in a time frame is not comprehensive."  Id. at 190.  Indeed, distinct from standing, there are exceptions to mootness that permit a court to retain jurisdiction over an otherwise moot case—e.g., allegedly unlawful activity that is "capable of repetition, yet evading review."  Id.

There is often confusion in the law between the justiciability doctrines of standing and ripeness.  Wilderness Soc'y v. Alcock, 83 F.3d 386, 390 (11th Cir. 1996).  Their distinction is as follows: "When determining standing, a court asks whether these persons are the proper *parties* to bring the suit, thus focusing on the qualitative sufficiency of the injury and whether the complainant has personally suffered the harm. When determining ripeness, a court asks whether this is the correct *time* for the complainant to bring the action."  Id. (citation omitted).  Thus, "[t]he ripeness doctrine keeps federal courts from deciding cases prematurely and protects them from engaging in speculation or wasting their resources through the review of potential or abstract

11

disputes." Rivera, 613 F.3d at 1050 (citations and internal quotation marks omitted).  To determine whether a case is ripe, a court primarily considers "the hardship to the parties of withholding court consideration and the fitness of the issues for judicial decision." Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1310 (11th Cir. 2002) (internal quotation marks omitted).

Here, Defendants focus their argument on standing and do not raise ripeness issues; however, as later discussed, the ripeness doctrine may be more appropriate to the justiciability determination of Plaintiffs' claims.

### A.    Challenge to Plaintiffs' Standing

When determining at the motion-to-dismiss stage if a plaintiff has Article III standing to bring suit on his or her own behalf (facial challenge), the court must take the facts of the complaint at the time of its filing as true.  Elend v. Basham, 471 F.3d 1199, 1208 (11th Cir. 2006); Bochese v. Town of Ponce Inlet, 405 F.3d 964, 975 (11th Cir. 2005).  "Moreover, in the context of a Rule 12(b)(1) challenge to standing, '[courts] are obliged to consider not only the pleadings, but to examine the record as a whole to determine whether [the court is] empowered to adjudicate the matter at hand.'"  Elend, 471 F.3d at 1208 (quoting Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003), reh'g and reh'g en banc denied, (Aug. 4, 2004)).  However, when determining if a plaintiff has standing to represent a putative class/sub-class, the court's analysis must consider standing at the time of the certification.  Prado-Steiman ex rel. Prado v. Bush, 221 F.3d 1266, 1279 (11th Cir. 2000) (discussing class-certification standing).  Here, this Court has denied Plaintiffs' renewed motion for class certification, without prejudice, to address Defendants' standing and mootness arguments raised in

Defendants' renewed motion to dismiss.   <u>See</u> ECF No. 263.   Accordingly, the undersigned's analysis is limited to Plaintiffs' individual standing, not standing to represent the putative class.

Defendants argue that (1) Plaintiffs who are alleging only a "risk" of institutionalization lack standing; and (2) Plaintiffs who once had standing based on their institutionalization have lost standing because they are no longer institutionalized.  Both of these arguments are made categorically, without reference to the specific allegations of each Plaintiff.

Defendants properly acknowledge that their argument against the institutionalized Plaintiffs' standing is actually an assertion of mootness—i.e., those Plaintiffs had standing at the time the Complaint was filed, but they are no longer institutionalized and, thus, their claims are moot.  <u>See</u> ECF No. 248 at 2 n.2.  Therefore, the undersigned will address the mootness argument against the institutionalized Plaintiffs <i>infra</i> section II.B.1.

### 1.   Plaintiffs at Risk of Institutionalization

As previously stated, Article III limits federal jurisdiction to "cases" and "controversies."  U.S. Const. art. III § 2, cl. 1; <u>Brooks v. Ga. State Bd. of Elections</u>, 59 F.3d 1114, 1118 (11th Cir. 1995).  There are two strands of standing analysis that a court must consider: "'constitutional limitations on jurisdiction and prudential limitations on its exercise.'"  <u>Elend v. Basham</u>, 471 F.3d 1199, 1205 (11th Cir. 2006) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498 (1975)).  Prudential requirements prohibit plaintiffs from raising (1) claims of third parties; (2) generalized grievances; and (3) claims that are not "within the zone of interest covered by a statutory conferral of standing."  <u>Id.</u>

(citing Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1203 n.43 (11th Cir. 1991)). Constitutional standing requires a plaintiff to have an injury-in-fact that is fairly traceable to the challenged conduct of the defendant, and for which redress is likely with a favorable decision.  Kurapati v. U.S. Bureau of Citizenship and Immigration Servs., 767 F.3d 1185, 1190–91 (11th Cir. 2014) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)); see also Elend, 471 F.3d at 1205 ("It is by now axiomatic that standing requires the plaintiff to demonstrate injury in fact, causation, and redressability.").

"In order to satisfy the 'injury in fact' requirement of standing, a plaintiff need not wait for an injury to occur.  An allegation of future injury satisfies this prong of standing so long as the alleged injury is 'imminent' or 'real and immediate' and not 'conjectural' or 'hypothetical.'"  31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir. 2003).  "An injury is imminent if it is likely to occur, and likely to do so immediately."  Id.  However, systemic deficiencies in State policy alleged by individuals who cannot avoid exposure to the deficient policies may be sufficient to show injury in fact, provided that there is the requisite degree of immediacy.  See id. at 1266.  Though one cannot merely allege that an injury will be suffered at "some time" in the future, "a plaintiff need not demonstrate that the injury will occur within days or even weeks to have standing."  Id. at 1267.  "The court must make a qualitative inquiry into this question."  Id. (citing Alcock, 83 F.3d at 390).  Still, a court "'should not speculate concerning the existence of standing, nor should [it] imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none.'"  Elend, 471 F.3d at 1206 (quoting Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1229–30 (11th Cir. 2000)).

Here, Defendants argue that "mere risk" does not confer standing, "both because Title II of the ADA does not purport to confer statutory standing upon individuals at risk of institutionalization, and because constitutional standing requires an actual or imminent injury." ECF No. 237 at 21. Additionally, Defendants argue generally that there is no causal link between the challenged polices and the alleged injuries or imminent injuries.

The at-risk Plaintiffs, and the DOJ via their "statement of interest," argue that the rights afforded by Title II necessarily extend to the at-risk Plaintiffs because it would be unjust to force at-risk Plaintiffs to be institutionalized prior to seeking relief from the policies that caused the institutionalization. Though the at-risk Plaintiffs are not currently institutionalized, the Complaint alleges that each of the Plaintiffs is enrolled in the State's Medicaid program and have had their community-based services reduced based on the challenged policies, and that the reductions in community-based services is sufficient to cause the institutionalization of each Plaintiff because their medical needs will not be met.

First, the undersigned will quickly dispose of any argument that causation has not been sufficiently alleged. The Complaint sets forth in great detail Defendants' policies and the execution of those policies that have allegedly resulted in the injury or threat of imminent injury. See ECF No. 52 at ¶¶ 111–287.

Second, regarding injury-in-fact, neither the Supreme Court nor the Eleventh Circuit Court of Appeals has specifically addressed the issue of whether disabled persons at risk of institutionalization may pursue claims under Title II or the Rehabilitation Act; however, other circuit courts and district courts have made this

15

determination, which can be relied on as persuasive authority.

Plaintiffs cite cases that have permitted at-risk plaintiffs to pursue claims under Title II in order to prevent institutionalization.  See, e.g., Pashby v. Delia, 709 F.3d 307, 322 (4th Cir. 2013) ("In sum, individuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise successful Title II and Rehabilitation Act claims because they face a risk of institutionalization."); M.R. v. Dreyfus, 663 F.3d 1100, 1116 (9th Cir. 2011) ("An ADA plaintiff need not show that institutionalization is 'inevitable' or that she has 'no choice' but to submit to institutional care in order to state a violation of the integration mandate. Rather, a plaintiff need only show that the challenged state action creates a serious risk of institutionalization."), amended by, 697 F.3d 706 (9th Cir. June 18, 2012); Fisher v. Okla. Health Care Auth., 335 F.3d 1175, 1181–82 (10th Cir. 2003) ("[Title II] protections would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation. Second, while it is true that the plaintiffs in Olmstead were institutionalized at the time they brought their claim, nothing in the Olmstead decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements."); see also Cruz v. Dudek, No. 10-23048-CIV, 2010 WL 4284955, at *12–13 (S.D. Fla. Oct. 12) (Report and Recommendation concluding that Olmstead decision extends to persons at risk of institutionalization), adopted, No. 10-23048-CIV, ECF No.57 (S.D. Fla. Nov. 24, 2010).

Defendants, however, cite decisions that did not permit plaintiffs to sue based solely on being at risk of institutionalization.  See, e.g., Bill M. ex rel. William M. v. Neb.

16

Dep't of Health & Human Servs. Fin. & Support, 408 F.3d 1096, 1099 (8th Cir. 2005) ("The mere risk that Plaintiffs may be institutionalized due to the lack of adequate funding does not constitute an actual or imminent harm sufficient to satisfy the first element of standing."), vacated on other grounds, U.S. v. Nebraska Dep't of Health & Human Servs., 126 S. Ct. 1826 (2006); Dykes v. Dudek, No. 4:11-CV-116/RS-WCS, 2011 WL 4904407, at *3 (N.D. Fla. Oct. 14, 2011) ("Plaintiffs are incorrect in their standing analysis to the extent that they claim that the threat of institutionalization confers standing.").

In the cases cited by Defendants, while the courts did not permit ADA cases to proceed on mere risk, the courts permitted the suits to proceed based on the actual harms suffered, which were the plaintiffs' premise for their *risk* of institutionalization. For example, in Bill M. ex rel. William M., the court held that though it would not find standing for allegations of risk, plaintiffs had standing based on the alleged harm suffered by the State's refusal to fund home and community-based Medicaid-funded services. 408 F.3d at 1099. The State's refusal to fund services was the same harm that plaintiffs maintained was putting them at risk of institutionalization. Similarly, in Dykes, the court was determining standing for class certification purposes and interpreted the injury to be the fact that plaintiffs were on a waiting list for the enrollment on a waiver program where they "languish for years without services." 2011 WL 4904407, at *2. Thus, in both cases cited by Defendants, plaintiffs that were not institutionalized still were permitted to bring suit under the ADA and Rehabilitation Act for claims similar to Plaintiffs'.

Defendants argue that Plaintiffs focus solely on statutory standing and disregard

Defendants' Article III standing arguments.  Put differently, Defendants maintain that even if Title II can be read to protect individuals at risk of discrimination (unnecessary institutionalization)—as championed by the DOJ in its statement of interest—Plaintiffs still do not show how Article III's injury-in-fact requirement is met because being at risk of injury is not sufficient, and Congress cannot create Article III standing by statute. ECF No. 248 at 3 ("'Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise standing.'" (quoting <u>Raines v. Byrd</u>, 521 U.S. 811, 820 n.3 (1997)).  Defendants' argument is well taken, but it misses the mark.

Title II protects disabled individuals who receive public services against discrimination.  The Supreme Court has held that unjustified institutionalization is discrimination.  <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581, at 597 (1999). Institutionalized, disabled children, who are part of the State's Medicaid plan, have standing to bring a claim for unnecessary institutionalization seeking community-based services and changes to infringing policies.   This is because they are disabled children covered under the ADA and because they have suffered a recognized injury.  Likewise, to be consistent with Article III requirements, disabled children who are part of the State's Medicaid plan, and who are *not yet* institutionalized, have standing under Title II to prevent the recognized injury of unjustified institutionalization, provided that the threatened injury is real and immediate.  This analysis is in accord with the various other courts' reasoning that requiring plaintiffs to be institutionalized before bringing a claim would defeat the purpose of the ADA.

It appears that the question is not whether all disabled children in any Medicaid

system can bring generalized claims against abstract policies that may or may not result in unnecessary institutionalization—as seemingly advanced by the DOJ. Instead, the Article III question is whether the particular disabled children have alleged effects of the infringing policies that are real and concrete enough for a court to find a true threat of institutionalization. This review could be more appropriately considered a ripeness inquiry. Put differently, a disabled child's unnecessary-institutionalization claim must consist of facts that show the injury (institutionalization) has occurred, or that the challenged policies are also acting as a catalyst to imminent harm in a real and concrete way (the cutting of medically necessary services).

Here, the at-risk Plaintiffs have alleged that their community-based services have been cut (some on a repeated basis), failing to meet their prescribed and medically-necessary services. Plaintiffs allege that these cuts in medically necessary services will ultimately lead to institutionalization because the children's health will deteriorate or their needs will not be met without institutionalization. This type of future injury is not purely speculative or conjectural. Plaintiffs are medically fragile children who depend on sufficient medical services to keep them healthy and alive. Indeed, three Plaintiffs have already died from their conditions since the institution of this case. Moreover, the review process occurs every six months, so that every six months Plaintiffs are necessarily subjected to the allegedly deficient policies. ECF No. 62 at 13. Plaintiffs further assert systemic deficiencies in Defendants' policies that have already unnecessarily institutionalized other, similarly situated, medically fragile children.

Under the aforementioned circumstances, the undersigned concludes that the at-risk Plaintiffs have standing to bring their claims and that their claims are ripe for review.

This is not a situation where this Court must avoid premature adjudication by not delving into abstract disagreements over administrative policies.  Plaintiffs have allegedly been affected in a concrete and real manner by Defendants' policies, which create an immediate and not speculative threat of unjustified institutionalization.[14]

### B.    Mootness Challenges

Defendants raise two distinct mootness arguments.   First, as previously mentioned, Defendants argue that the institutionalized Plaintiffs' claims are moot because they are no longer institutionalized.  Second, Defendants reargue their position that Plaintiffs' claims are moot because Defendants have changed the policies that Plaintiffs allege as the basis of their claims.

"A moot case is nonjusticiable and Article III courts lack jurisdiction to entertain it."  Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla., 382 F.3d 1276, 1281 (11th Cir. 2004).   "[A] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.  If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed."  Id. (quoting Al Najjar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001)) (internal quotation marks omitted).  Unlike standing, there are exceptions to mootness.

---

[14] Defendants argue against deference to the DOJ's interpretation of Title II—that Title II protects at-risk plaintiffs.  However, though the undersigned considers the DOJ's position and respects it, it is not necessary for the undersigned to defer to the DOJ's interpretation of Title II.  Olmstead, 527 U.S. at 597–98 ("Because the Department is the agency directed by Congress to issue regulations implementing Title II . . . its views warrant respect.  We need not inquire whether the degree of deference described in [Chevron] is in order; it is enough to observe that the well-reasoned views  of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." (internal quotation marks omitted)); see also supra, n.12 (addressing Chevron deference).

Additionally, the undersigned has carefully considered Defendants' statutory-construction arguments, ECF No. 237 at 22, but concludes that Defendants' analysis of Title II's legislative history does not affect the analysis and ultimate conclusion of this Report and Recommendation.

One limited exception to the mootness doctrine is "when the action being challenged by the lawsuit is capable of being repeated *and* evading review." Id. (citing Dow Jones & Co. v. Kaye, 256 F.3d 1251, 1256 (11th Cir. 2001)).   However, this exception is narrow and can only be invoked when "(1) there is a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration."   Sierra Club v. Martin, 110 F.3d 1551, 1554 (11th Cir. 1997) (citing Murphy v. Hunt, 455 U.S. 478, 482–83 (1982)).   "The remote possibility that an event might recur is not enough to overcome mootness, and even a likely recurrence is insufficient if there would be ample opportunity for review at that time."  Id.

Another exception is the voluntary-cessation doctrine.  See Troiano v. Supervisor of Elections in Palm Beach Cnty., Fla., 382 F.3d 1276, 1282 (11th Cir. 2004) ("The doctrine of voluntary cessation provides an important exception to the general rule that a case is mooted by the end of the offending behavior.").   "Mere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." United States v. Concentrated Phosphate Exp. Ass'n, 393 U.S. 199, 203 (1968) (quoting United States v. W.T. Grant Co., 345 U.S. 629, 632 (1953)) (internal quotation marks omitted).  As such, normally "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  Atheists of Fla., Inc. v. City of Lakeland, Fla., 713 F.3d 577, 594 (11th Cir. 2013) (citing Already, LLC v. Nike, Inc., 133 S. Ct. 721, 727

(2013)).  An exception to this exception exists "when there is no reasonable expectation that the voluntarily ceased activity will, in fact, actually recur after the termination of the suit."  Troiano, 382 F.3d at 1283.  Moreover, when the defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will *not* recur."  Id. (citing Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004)).  "In cases where government policies have been challenged, the Supreme Court has held almost uniformly that voluntary cessation of the challenged behavior moots the claim."  Beta Upsilon Chi Upsilon Chapter at the Univ. Fla. v. Machen, 586 F.3d 908, 917 (11th Cir. 2009).

In determining whether voluntary cessation by a government actor moots a case, the Eleventh Circuit Court requires the district courts to evaluate the following factors: (1) "whether the termination of the offending conduct was unambiguous"; (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction"; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct."  Rich v. Sec'y, Fla. Dep't of Corr., 716 F.3d 525, 531–32 (11th Cir. 2013) (citing Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga., 633 F.3d 1297, 1310 (11th Cir. 2011)).

### 1.   Challenge to Institutionalized Plaintiffs' Claims

There is no dispute that three Plaintiffs (T.H., L.J., and A.G.) had an injury-in-fact at the outset of this action by means of their institutionalization.  However, L.J. has died and T.H. and A.G. are no longer institutionalized.  Thus, Defendants argue that the formerly institutionalized Plaintiffs' claims are moot.  Plaintiffs argue that their claims are

not moot because they are still susceptible to the policies that caused their harm and their institutionalization is "capable of repetition, yet evading review."[15]  The undersigned agrees.

As previously stated, the "capable of repetition, yet evading review" exception to the mootness doctrine can only be invoked when "(1) there [is] a reasonable expectation or a demonstrated probability that the same controversy will recur involving the same complaining party, and (2) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration."  Sierra Club, 110 F.3d at 1554 (citing Murphy, 455 U.S. at 482–83).

In the seminal ADA, unnecessary-institutionalization case, Olmstead, both plaintiffs were institutionalized when the complaint was filed, however, neither was institutionalized by the time of the direct appeal to the Eleventh Circuit Court, or during review by the Supreme Court.  The Supreme Court agreed with the Eleventh Circuit's determination that the case was not moot based on the parties' matriculation to community-based programs because the controversy was capable of repetition, yet evading review.[16]  Olmstead, 527 U.S. at 594 n.6.  A review of the case history indicates that the Eleventh Circuit cited factual reasons for why the exception applied in that case.

---

[15] A.G. and T.H. also argue that the "inherently transitory" exception to class-action mootness applies to their case.  See ECF No. 246 at 6.  The inherently-transitory exception relates to the mootness of class actions when the named plaintiffs' claims have become moot prior to certification.  See Genesis Healthcare Corp. v. Symczyk, 133 S. Ct. 1523, 1530–31 (2013).  However, because the undersigned concludes that Plaintiffs' personal claims are not moot, and this Court has postponed class-certification review until resolution of the instant motion, it is not necessary to determine class-certification issues and whether the inherently-transitory exception should apply to this class action.  ECF No. 263.

[16] At the time of the district court's order, only one of the plaintiffs was no longer institutionalized, L.C. ex rel. v. Olmstead, No. 1:95-cv-1210-MHS, 1997 WL 148674, at *2 (N.D. Ga. Mar. 26, 1997); however, both plaintiffs were no longer institutionalized by the time the Eleventh Circuit Court held that the exception to the mootness doctrine applied.  L.C. ex rel. v. Olmstead, 138 F.3d 893, 895 n.2 (11th Cir. 1998).

L.C. ex rel. v. Olmstead, 138 F.3d 893, 895 n.2 (11th Cir. 1998).  Indeed, the court cited to eighteen times that one plaintiff had been institutionalized and to multiple unstable placements of the other plaintiff.  Id.  The court also referred to the instability of the community placement based on inadequate funding and the potential for the State to revert back to its old practices.  Id.

The Complaint alleges that T.H. suffers from severe medical complications that resulted from post-traumatic brain injury due to shaken baby syndrome.  ECF No. 62 at 19.  T.H. was placed in a foster home in 1997, but was institutionalized in August 2006 after hospitalization for the insertion of a tracheotomy tube and ventilator.  Id.  In November 2006, T.H. returned to foster care and a skilled nurse was provided to assist with her medical needs.  Id.  After the State failed to provide sufficient nursing services, T.H. was again institutionalized in 2007.  Id. at 19–20.  T.H. has subsequently been returned to community-based treatment after the filing of her Complaint.  The undersigned concludes that the capable-of-repetition, yet-evading-review exception applies to T.H.'s claims.

However, though A.G. suffers from similarly complex medical issues as T.H., A.G. has not been in and out of institutions.  See ECF No. 62 at 22.  Instead, he was institutionalized for a continuous period following his traumatic injuries in 2011, but has since been released.  Thus, the undersigned cannot extend the same exception to A.G.  However, this does not end the mootness analysis for A.G. because A.G. has challenged not only his unnecessary institutionalization, but also the policies that caused his unnecessary institutionalization.  As more fully addressed infra section II.B.2., though Defendants have placed A.G. back in a community setting after the filing

of the instant action, Defendants have not unambiguously terminated the policies that A.G. alleges were the cause of his discriminatory segregation.  Thus, his claims are not moot.

*2.    Renewed Mootness Challenge Based on Changed Policies*

Defendants reargue that Plaintiffs' claims are moot because Defendants voluntarily changed the allegedly offending policies.  Plaintiffs maintain that Defendants' motion to dismiss should again be denied for the same reasons set forth in the order denying Defendants' first motion to dismiss on mootness.

As previously stated, a State actor's voluntary cessation of the alleged harm comes clothed with a presumption that the State will not revert back to its harmful ways. Troiano, 382 F.3d at 1283.  However, to determine whether the cessation moots the case, a court must evaluate: (1) "whether the termination of the offending conduct was unambiguous"; (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction"; and (3) "whether the government has 'consistently applied' a new policy or adhered to a new course of conduct."  Rich, 716 F.3d at 531–32.

The parties spend significant time arguing factors two and three set forth in Rich; however, this Court's analysis need not pass the first of the three factors. Specifically, though Defendants' rule changes, which address many aspects of the policies and procedures under attack, have become final, Defendants still have not addressed the "medically necessary" or "medical necessity" definition set forth in Rule 59G-1.010(166) of the Florida Administrative Code—as this Court already highlighted in the first Order denying Defendants' motion to dismiss on mootness.  ECF No. 175 at

17–19.  This Court expressly stated that Plaintiffs' claims were not moot because Defendants had not changed the challenged definition that permeates Plaintiffs' claims. Thus, even if it is presumed that Defendants would not return the now finalized rules to their prior language and applications, Defendants' purported termination of the offending conduct is still ambiguous because the challenged definition remains unchanged. Accordingly, the undersigned concludes that Plaintiffs' claims are not moot.

RECOMMENDATION

Based on the foregoing, the undersigned RECOMMENDS that Defendants' renewed motion to dismiss, located at sections I and IV in ECF No. 237, be DENIED. The parties will have fourteen (14) days after being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable William J. Zloch, United States District Judge.  See 28 U.S.C.A. § 636(b)(1) (providing procedure for review of magistrate judge report and recommendation).  Failure to timely file objections shall bar the parties from a de novo determination by Judge Zloch of any issue covered in the Report and shall bar the parties from challenging, on appeal, the factual findings accepted or adopted by this Court, except upon grounds of plain error or manifest injustice.  See Thomas v. Arn, 474 U.S. 140, 145–53 (1985) (holding that party waives appellate review of magistrate judge's factual findings that were not objected to within period prescribed by 28 U.S.C. § 636(b)(1)); see also Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013) (holding that under current Eleventh Circuit rule: "[T]he failure to object limits the scope of our appellate review to plain error review of the magistrate judge's *factual findings*[; however,] failure to object to the magistrate judge's

*legal conclusions* does not preclude the party from challenging those conclusions on appeal.").

DONE and SUBMITTED at Fort Lauderdale, Florida, this 13th day of November 2014.

_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Honorable William J. Zloch

All Counsel of Record

27