**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 12-60460-CV-MIDDLEBROOKS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **AMENDED COMPLAINT** |
| **THE STATE OF FLORIDA,** | |
| **Defendant.** | |

## INTRODUCTION

1.      The United States brings this action against the State of Florida to enforce the requirement under the Americans with Disabilities Act of 1990 (ADA) that the State provide services to children with disabilities in their homes and communities when they can be served there, rather than providing them services in institutional nursing facilities.

2.      The State discriminates against children (*i.e.*, individuals under the age of twenty-one) with disabilities by failing to administer its services in the most integrated setting appropriate to their needs, in violation of the ADA.

3.      The result is that hundreds of children with disabilities have been subject to prolonged and unnecessary institutionalization in nursing facilities, while others are placed at serious risk of such institutionalization.

4.      The State administers a service system for children with disabilities.  Like all other states, Florida uses Medicaid money to fund long-term care services for children.  The State funds both facility-based services, where many children live away from their families and communities in hospital-like nursing facilities, and community-based services, where children live with their

families or in a Medical Foster Care home with another family while receiving the nursing and other care they need.

5.      Unnecessary institutionalization harms children by, among other things, denying them the opportunity to develop and maintain bonds with family and friends, impairing their ability to interact with peers without disabilities, and preventing them from having the life experiences that contribute to child development.

6.      More than 100 children with disabilities are currently unnecessarily institutionalized in nursing facilities in Florida.  A number of young adults who were admitted to these institutions as children and grew up in the facilities also remain there unnecessarily.  These children and young adults (collectively, the "Institutionalized Children") could live at home with their families or in another family home if provided the community-based services they need, such as in-home nursing services.  The families of many of the Institutionalized Children would choose for their children to live at home or in another family home if provided a meaningful opportunity to do so.  However, due to the State's discriminatory administration of its service system, the families and guardians of Institutionalized Children have no meaningful choice other than to place their children in institutions—where they spend their formative years separated from their families and segregated from their communities.

7.      Certain other children with disabilities, who receive State services in their homes and communities, are at serious risk of having to enter nursing facilities to access needed services (collectively, the "At-Risk Children").  The At-Risk Children are eligible for, but are unable to access, the home and community-based services they need to remain in their homes and communities.  In many cases, they cannot access the services or supports the State has acknowledged they need.  In others, the State has failed to accurately assess their need for

services or to inform their families about specific services and supports that could help them keep their children home.  As a result of their lack of services, families are left to fill in gaps in skilled care that their children are entitled to receive through Medicaid.  When this lack of needed services will likely result in declines in children's health, safety, or welfare, children are at serious risk of institutional placement.  As a result of having to provide full-time or constant skilled care, parents and caregivers have lost their jobs; have been unable to maintain the physical strain required by constant caregiving; and have been unable to care for other children in the home, situations in which families can become incapable of providing sustained long-term skilled care.

8.      As described further below, the State could make reasonable modifications to its service system that would avoid discrimination by enabling more children to live with their families and in their communities, and to access the services they need to remain there.

## JURISDICTION

9.      This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, because it involves claims arising under federal law.  *See* 42 U.S.C. §§ 12132, 12133.  The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201, 2202.  *See also* 42 U.S.C. § 12133.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to this action occurred in the Southern District of Florida.  28 U.S.C. § 1391(b).

## PARTIES

11.     Plaintiff is the United States of America and brings this action under 42 U.S.C. §§ 12131-12134 to enforce the rights of the Institutionalized and At-Risk Children, who are persons with disabilities under the ADA.

12.     Defendant, the State of Florida, is a "public entity" within the meaning of the ADA, 42

U.S.C. § 12131(1), and is therefore subject to Title II of the ADA, 42 U.S.C. §§ 12131-12134,

and its implementing regulation, 28 C.F.R. Part 35.

## STATUTORY AND REGULATORY BACKGROUND

13.     Congress enacted the ADA in 1990 "to provide a clear and comprehensive national

mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §

12101(b)(1).  It found that "historically, society has tended to isolate and segregate individuals

with disabilities, and, despite some improvements, such forms of discrimination against

individuals with disabilities continue to be a serious and pervasive social problem."  *Id*. §

12101(a)(2).

14.     For those reasons, among others, Title II of the ADA prohibits discrimination against

individuals with disabilities by public entities: "[N]o qualified individual with a disability shall,

by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity."  *Id*. § 12132.

15.     A "public entity" includes any state or local government, as well as any department,

agency, or other instrumentality of a state or local government.  42 U.S.C. § 12131(1).  Title II's

prohibition on discrimination applies to all services, programs, and activities provided or made

available by public entities, such as through contractual, licensing, or other arrangements.  *Id*. §

12132; 28 C.F.R. § 35.130(b).

16.     Congress directed the Attorney General to issue regulations implementing Title II of the

ADA.  42 U.S.C. § 12134.  The Title II regulations require public entities to "administer

services, programs, and activities in the most integrated setting appropriate to the needs of

qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

4

17.     Under that "integration regulation," 28 C.F.R. § 35.130(d), the most integrated setting is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible."  28 C.F.R. Pt. 35, App. B, at 703 (2021).

18.     Regulations implementing Title II of the ADA further prohibit public entities from, directly or through contractual or other arrangements, utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities . . . ."  28 C.F. R. § 35.130(b)(3).

19.     Title II's implementing regulation requires public entities to "make reasonable modifications in policies, practices, or procedures" to avoid discrimination on the basis of disability, unless the entity can show that "making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).

20.     In *Olmstead v. L.C.*, the Supreme Court held that Title II prohibits the unjustified segregation of individuals with disabilities.  527 U.S. 581, 597 (1999).  The Court explained that its holding "reflects two evident judgments."  *Id.* at 600.  "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.*  "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 601.

21.     Under *Olmstead*, public entities are required to provide community-based services when (a) such services are appropriate, (b) the affected persons do not oppose community-based

treatment, and (c) the provision of community-based services can be reasonably accommodated,
taking into account the resources available to the entity and the needs of other persons with
disabilities. *Id.* at 607.

### BACKGROUND: CHILDREN WITH COMPLEX MEDICAL NEEDS

22.     The Institutionalized Children and At-Risk Children have complex medical needs.  They
have disabilities as defined by the ADA, and they are qualified to participate in the State's
programs, services and activities, including home and community-based services.

23.     Children with complex medical needs have chronic medical conditions, which may be
congenital or acquired, that are considered by the medical community to be severe.  Children
with complex medical needs typically rely on services from multiple service providers for health
care and for "activities of daily living" like bathing and dressing (ADLs).  Many rely on special
technology or equipment for communication, mobility, breathing, eating, and/or other tasks.
Eyal Cohen et al., *Children With Medical Complexity: An Emerging Population for Clinical and
Research Initiatives*, 127 PEDIATRICS, no. 3, March 2011, at 529, 530-31.  Children with complex
medical needs include those whom the State defines as "medically complex" or "medically
fragile."

24.     Florida defines "[m]edically complex" as having "chronic debilitating conditions of one
or more physiological or organ systems that make the person dependent upon 24-hour per day
medical, nursing or health supervision or intervention."  Fla. Admin. Code R. 59G-5.020(1);
Florida Medicaid Provider General Handbook, at B-10 (July 2012), *available at*
https://ahca.myflorida.com/medicaid/review/General/59G_5020_Provider_General_REQUIREM
ENTS.pdf (incorporated by reference in Fla. Admin. Code R. 59G-5.020(1)).

25.     Florida defines "[m]edically fragile" as being "medically complex and technologically
dependent on medical apparatus or procedures to sustain life.  Examples are individuals who

require total parenteral nutrition, are ventilator dependent, or are dependent on a heightened level of medical supervision to sustain life, and without such services are likely to expire without warning." *Id.* at B-11.

26.     As described further below, the State, through its Medicaid program, has created a system of services through which children with complex medical needs receive necessary health care, therapies, medical equipment, technology and adaptive equipment, and assistance with ADLs.

## THE STATE'S SERVICE SYSTEM

27.     The State administers and funds services for children with complex medical needs through various agencies, departments, and programs.

28.     Florida's Agency for Health Care Administration (AHCA) is responsible for administering the State's Medicaid Program under Title XIX of the Social Security Act (Medicaid Act), 42 U.S.C. §§ 1396-1396v. *See* Fla. Stat. §§ 20.42, 409.902.

29.     The Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions require AHCA to provide all Medicaid-eligible individuals under the age of twenty-one with all medically necessary services coverable under a Medicaid State Plan.  These include home health services needed and used by children with complex medical needs, such as in-home nursing services (private duty nursing) and in-home assistance with ADLs (personal care services); physical and occupational therapies; and other medically necessary services.  *See* 42 U.S.C. §§ 1396a(a)(43), 1396d(a), 1396d(r)(5).

30.     The State delivers Medicaid services to most Florida Medicaid recipients through its Statewide Medicaid Managed Care (SMMC) program, which AHCA administers.  Under the SMMC program, the State contracts with private managed care plans to provide medical and long-term care services to eligible recipients.

31.     The Florida Department of Health (DOH) partners with one private managed care plan to operate the Children's Medical Services Health Plan.  The Children's Medical Services Health Plan is a "specialty plan" geared toward providing children with special healthcare needs[1] with medical and long-term care services.  Children with complex medical needs are children with special health care needs.

32.     The State's Children's Medical Services Program (FLCMS), within DOH, has lead responsibility for facilitating collaboration with AHCA and the Florida Agency for Persons with Disabilities (APD) to arrange for long-term care services for children with certain special health care needs, including those with complex medical needs.  *See* Fla. Stat. §§ 20.43, 391.016, 391.021(2), 391.026.

33.     APD administers the State's Home and Community-Based Services (HCBS) waiver program[2] for individuals with developmental disabilities, called the "iBudget" waiver.  *See* Fla. Stat. § 20.197.  This program funds services that children with complex medical needs who have developmental disabilities can receive in their homes and communities.

34.     DOH and AHCA administer a number of other HCBS waiver programs for individuals with other specific diagnoses, including two that are open to children.  *See generally* Fla. Admin. Code R. 59G-13.

---

[1] Under Florida law, a child with "special health care needs" is any child "younger than 21 years of age who [has] chronic and serious physical, developmental, behavioral, or emotional conditions and who require[s] health care and related services of a type or amount beyond that which is generally required by children."  Fla. Stat. § 391.021(2).

[2] Section 1915(c) of the Medicaid Act permits states to request waiver of certain requirements of the Medicaid Act to offer a variety of community-based services and supports to individuals with disabilities.  *See* 42 U.S.C. § 1396n(c).

35.     Florida's Department of Children and Families (DCF) administers the State's foster care system, including determining the placement of children with complex medical needs who are in the custody of the State.  Fla. Stat. §§ 20.19, 39.811, 409.145.

36.     DCF, in coordination with AHCA and FLCMS, also funds and administers Medical Foster Care, a statewide program to provide family-based care for children with complex medical needs who are unable to safely receive care in their own homes.

## THE STATE'S VIOLATION OF TITLE II OF THE ADA

**A.      More Than One Hundred Children with Disabilities Reside in Segregated Nursing Facilities in Florida.**

37.     More than 100 Institutionalized Children currently reside in segregated, institutional nursing facilities in Florida.  This group includes young adults who entered the facilities as children and have remained there past the age of twenty-one.

38.     The Institutionalized Children spend most of their days residing in shared rooms with other individuals with disabilities, watching television, or doing no activities at all.  Some of the Institutionalized Children, including children who are able to walk, are kept in crib-sized enclosures with no opportunity to move, play, learn, or socialize for much of the day.  They cannot leave these enclosures without permission.

39.     When they are not in their rooms, the Institutionalized Children participate in activities with other individuals with disabilities and have only limited interaction with individuals without disabilities.  Some Institutionalized Children leave their rooms only for thirty-minute activity breaks, treatment and therapy, or educational services.  Many of the residents' families live in other areas of the State, leaving the children hundreds of miles from family and loved ones.

40.     Educational services for most of these children consist of classes in activity rooms within the nursing facilities, sometimes for only one or two hours a week.  Other children are

9

transported from their facilities to programs in their local school districts, but, because they are institutionalized, they are unable to fully enjoy the benefits of education in the community.

41.     The interiors of these facilities resemble hospitals.  Children are housed in rooms with at least one, and sometimes three or more, other individuals.

42.     Institutionalization does not provide the stimulation and variety of interactions that occur in the community—the kind of interactions that contribute to the full development of a child or young adult.  Residents' choices regarding how they spend their day are severely limited. School-aged children, including those who can talk and count, have little stimulation other than watching television.  The activities and television shows provided for residents are sometimes age-inappropriate; for example, teenagers are often placed in rooms with much younger children with no stimulation other than to watch cartoons.  Because their primary caregivers are shift-based employees, babies, children, and young adults living in nursing facilities do not have the opportunity to experience the nature and quantity of interactions provided by living in a family setting, and instead they may spend hours during each day alone in their rooms.

**B.      The State Has Created A Service System That Causes Unnecessary Segregation of Children in Nursing Facilities and Places Others At Serious Risk of Unnecessary Institutionalization.**

43.     The State has created a system that unnecessarily segregates the Institutionalized Children and places other children with complex medical needs at serious risk of unnecessary institutionalization.  Over the course of approximately the last two decades, the State has limited the availability of many community-based services for children with complex medical needs.  It has done so by: (1) enacting policies and engaging in practices that have resulted in the limitation of medically necessary in-home services and supports; (2) failing to ensure sufficient capacity in its HCBS waiver programs; and (3) failing to ensure sufficient capacity in non-institutional, family-based settings in which children with complex medical needs could receive needed

services.  It has also failed to effectively prevent inappropriate nursing facility admissions, and it has not offered Institutionalized Children real opportunities to return to the community.

      *i.*     *Failure to Provide Access to Medically Necessary In-Home Services and Supports*

44.    The State is independently obligated to provide medically necessary in-home services and supports, including in-home nursing services, to Medicaid-eligible children pursuant to the EPSDT requirements of the Medicaid Act.  42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4), 1396d(r)(1)-(5).

45.    Yet many children with disabilities in Florida have been unable to access the Medicaid in-home nursing services that would allow them to remain in their homes.

46.    Until 2016, a Florida regulation required Medicaid-reimbursed in-home nursing services to "[b]e furnished in a manner not primarily intended for the convenience of the recipient, the recipient's caretaker, or the provider."  Fla. Admin. Code R. 59G-4.261.

47.    Until 2013, the State's service manuals also instructed that in-home nursing services would be "reduced over time" as parents (or other members of the household, including siblings and grandparents) learned to perform skilled medical interventions on their children.

48.    Additionally, from 2010 until 2013, the State required eligible children with disabilities to enroll in Prescribed Pediatric Extended Care (PPEC) services (a congregate day program for children with disabilities) instead of private duty nursing, even though the children were qualified for in-home nursing.  The State offered private duty nursing as a supplemental service only.

49.    The State used the requirements described in Paragraphs 46-48 above to deny services that children's physicians prescribed and to compel parents, siblings, grandparents, and other family members to provide medically necessary care that should have been provided through State Medicaid services.

50.     The State changed the policies described in Paragraphs 46-48 above after the United States opened its investigation in 2011.

51.     Nevertheless, a number of children were placed in nursing facilities as a result of the State policies described in Paragraphs 46-48 above.  Families who tried to keep children at home were not provided in-home services that would have enabled them to do so.  As a result, they had no real choice but to place their child in a nursing facility to receive necessary care.  Some of these children remain in nursing facilities today.

52.     Families of Institutionalized Children were told that if they brought their children home they would face gradual reductions in hours of in-home services, or that their children would not have access to the same types of therapies or other services that their children received in nursing facilities.

53.     Although the State's written policies described in Paragraphs 46-48 above are no longer in effect, the State is still failing to ensure that the Institutionalized Children and At-Risk Children can access sufficient in-home nursing services.

54.     For example, even when the State has approved in-home nursing services, many children who live in the community are unable to access the full amount of approved hours of these services—hours the State has determined they need—leaving dangerous gaps in their care.

55.     For many Institutionalized Children, the State's failure to maintain a sufficient network of in-home nursing providers prevents them from leaving nursing facilities to live in the community with their families rather than in nursing facilities.

56.      The Medicaid reimbursement rate the State currently pays home health agencies for in-home nursing services provided by a registered nurse is lower than it was in 1989.  The hourly

rate the State pays for such services provided by a licensed practical nurse is only $1.40 higher than the State paid in 1989.

57.    In 2007 and 2008, AHCA reported that providers of home health services had indicated they would be unable to continue providing services to Medicaid beneficiaries because of low reimbursement rates.  A 2007 AHCA report stated that "many Medicaid beneficiaries state they are unable to access state plan [home health] services due to low rates."  In 2008, a similar request for increased funding noted that AHCA "has documented growing numbers of home health agency providers who have stated . . . they will be incapable of continuing to provide services to Medicaid beneficiaries" due to insufficient reimbursement rates.  Yet rates remained the same.

58.    In allocating funds, the State has failed to ensure sufficient capacity of community-based services for children with complex medical needs.  For example, the State reduced funding for private duty nursing services by approximately six million dollars in 2010.

59.    In 2022, AHCA again requested funding to increase reimbursement rates for private duty nursing providers, and it reported that "Florida faces a shortage of nurses that is projected to continue through 2030 and potentially beyond.  A rate increase could help expand the network of providers that are willing to provide [in-home nursing services to children] and will help providers recruit and retain sufficient nurses to meet the needs of the children."

60.    Insufficient reimbursement rates have contributed to shortages of nursing services in certain parts of the State and to the unnecessary institutionalization of children with complex medical needs.

61.    Shortages of nursing services have also caused some children currently living in the community to be at serious risk of unnecessary institutionalization.  When necessary services are

unavailable, parents must provide skilled care themselves, sometimes losing jobs or having to turn down employment in order to ensure their children can continue to live at home.  If these parents were to become ill or disabled themselves, their children would likely have to enter institutions to receive medically necessary services.  Meanwhile, children who are hospitalized face nursing provider shortages once they are medically ready to return home.  Without sufficient services available for them in the community, hospitals are forced to delay their discharge.

62.     Even as it has reduced or limited the availability of community-based services, the State has increased funding for nursing facility care for children with complex medical needs.

63.     Since January 2004, the daily supplemental rate paid to facilities serving medically fragile children has increased by more than 62%.  Using State and federal dollars, AHCA pays an enhanced rate of up to approximately $645 per day to nursing facilities for each of the Institutionalized Children.

64.     The State could increase access to in-home care through reasonable modifications that would make sufficient in-home services accessible.

       *ii.     Insufficient Capacity in HCBS Waiver Programs*

65.     Most of the Institutionalized Children and At-Risk Children are eligible for services in Florida's Medicaid waiver programs, including the HCBS waiver for persons with developmental disabilities (the iBudget waiver).  Services available through the HCBS waiver programs include services and supports not accessible through other State programs but that children with complex medical needs and their families nevertheless may require, such as home modifications for accessibility, respite care, and funding to support individuals who live in community-based settings other than their family home.  Some children need these waiver services so they can live at home.  For example, some families want to bring their children home

from nursing facilities but need home modifications to make their homes accessible for their children.  If that waiver service is not provided, it may frustrate efforts to serve the children at home.

66.     The iBudget waiver, Florida's largest waiver program, has a lengthy waiting list.  Since July 2005, the number of individuals on the waiting list for services under the iBudget waiver program has grown from 14,629 to over 22,000 in January 2022, and more than half of the individuals on the list have waited for five years or more.  At least 9,500—or over 40%—of the individuals on the waitlist are children.  Only individuals deemed to be in "crisis" are given priority for admission from the waiting list, but even these individuals are not always able to enroll in the waiver program due to lack of funding to pay for waiver services the State has committed to provide.

67.     Children who would benefit from waiver services have entered nursing facilities instead, due to the lengthy waiting list for services.

68.     Children have remained in nursing facilities for years while waiting to be enrolled in waiver programs.

69.     The State could reasonably modify its service system to increase access to its waiver programs for children with complex medical needs.

     *iii.*     *Lack of Sufficient Community-Based Alternatives*

70.     The State has also failed to provide access to settings other than institutional nursing facilities, such as family-based settings, in which children with complex medical needs can receive needed care.

71.     The State's Medical Foster Care (MFC) program offers care in a family-based setting. The purpose of the Medical Foster Care program is "[t]o enhance the quality of life and allow MFC children to receive home-based services specific to their medical needs that will enable

children to develop to their fullest potential, regardless of their prognosis . . . [and to] provide a family-based, individualized, therapeutic" environment. *See* DOH, DCF, & AHCA, *Medical Foster Care Statewide Operational Plan*, at 1-1 (2014).

72.     Medical Foster Care is not available to a child unless the child's parent or guardian has lost custody to DCF.  This means that, for a parent or guardian who is unable to have their child live at home, the only available options are to place their child in a nursing facility or to renounce their parental rights and surrender custody to the State.  Such families cannot access Florida's family-based service alternative to institutional nursing facilities.

73.     In addition, there are currently too few Medical Foster Care families to meet the need for the service.

74.     Florida has not raised the Medical Foster Care reimbursement rate in over 30 years.  The rates of reimbursement Florida has set for Medical Foster Care parents are not sufficient to enable them to provide care for children on a full-time basis or to recruit enough families to meet children's need for the service.  Medical Foster Care parents receive a monthly room-and-board payment rate that is less than or comparable to what Florida Medicaid pays a nursing facility for a single day for a medically fragile child.

75.     In the past, as many as 20% of children in nursing facilities were in the State's custody. Since 2007, over 65 children in the State's custody have been admitted to nursing facilities. Many were found eligible for Medical Foster Care but were nonetheless institutionalized for years in nursing facilities because of the State's administration of its Medical Foster Care program.

       *iv.     Deficient Admission and Transition Planning Processes, and Failure to Offer Meaningful Opportunities to Move to the Community*

76.     Before a child can be admitted to a nursing facility, Florida requires the recommendation of a Children's Multidisciplinary Assessment Team (CMAT).  *See* Fla. Admin. Code R. 59A-4.1295(3)(b).

77.     Collectively, a CMAT includes representatives from AHCA, APD, DOH, FLCMS, DCF, and (if applicable) the child's managed care plan, and meets for each eligible child identified as medically fragile or medically complex and needing continual medical, nursing, or health supervision.

78.     The State has failed to ensure that families of children who are entering nursing facilities have the time, information, and opportunity to consider other options.

79.     The CMAT does not provide families with meaningful opportunities to explore options other than placing their child in a nursing facility.

80.     State documents show that Institutionalized Children could be served in their family homes or Medical Foster Care homes.  But the State has failed to effectively connect these children to necessary services and supports so that they could transition out of nursing facilities and into the community.  In many cases, care coordinators for the Institutionalized Children have not told families about the specific services and supports that could help their children transition home.

81.     Many of the Institutionalized Children remain in facilities for very long periods of time, even when it is apparent that they could return to the community with appropriate supports.  This is the direct result of the State's failure to actively identify more integrated service options for them.

82.     Because the State fails to ensure the Institutionalized Children have opportunities to
move to their homes and communities with all necessary services and supports, many have spent
much or all of their childhoods in a facility and remain there into adulthood.

83.     Without meaningful transition planning and effective access to community-based
alternatives to institutional care, it is likely that many of the Institutionalized Children will
remain in nursing facilities for most or all of their lives.

**C.     The Institutionalized Children and At-Risk Children are Qualified to Receive
Services in More Integrated Settings, and in Many Cases, They and Their Families
Would Not Oppose Placement in Such Settings.**

84.     As explained in Paragraph 6, "Institutionalized Children" are (1) children with complex
medical needs who are unnecessarily institutionalized in nursing homes in Florida; and (2) young
adults admitted to these institutions as children who remain there unnecessarily.  The
Institutionalized Children could be served in more integrated settings with appropriate services
and supports.

85.     Many of the Institutionalized Children's families, if presented a meaningful opportunity
to do so, would choose to have their children grow up at home or in other settings that foster
their full development and that do not segregate them from the community.  Many of the young
adults who have grown up and remain in the nursing facilities would also choose to live in the
community.

86.     Families of many Institutionalized Children have made the difficult decision to place
their children in nursing facilities because they did not know about, or could not access,
sufficient home and community-based services to allow them to keep their children at home or in
another family setting.  If presented with individualized, realistic alternatives to nursing facility
placement, including the medically necessary in-home services to which their children are

entitled under Medicaid, or a family-based setting alternative to a nursing facility, many of them would be interested in community treatment for their children.

87.     The State has shown that it is possible to serve children with complex medical needs in the community through services that already exist within its system.  The Institutionalized Children's needs are generally no different than those of children and young adults receiving services in more integrated community-based settings.  With reasonable modifications, these services would permit the Institutionalized Children to be reunited with their families or live in other family settings.

**D.     Providing Services in Integrated Settings Can be Achieved Through Reasonable Modifications to the State's Existing Services.**

88.     The actions needed to remedy the State's ADA violations described in this Complaint could be achieved by making reasonable modifications to the State's service system.

89.     The array of services that already exist in the State's service system could, with reasonable modifications, meet the needs of the Institutionalized and At-Risk Children.  These services include private duty nursing; personal care services; home health services; respite services; home and environmental modifications; specialized medical equipment and supplies; intensive care coordination; transportation; nutrition counseling; dietary supplements; family training; behavioral/psychiatric services; habilitation services; and occupational, physical, speech and respiratory therapies.

90.     The State is independently obligated to provide most of these services to Medicaid-eligible children pursuant to the EPSDT requirements of the Medicaid Act.  42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4), 1396d(r)(1)-(5).

91.     Supporting children with complex medical needs in the community is a cost-effective alternative to institutionalization.  Nursing facility care is expensive, and the State has

acknowledged that providing nursing services to children with complex medical needs in the community is less costly than doing so in institutional settings.  For example, one purpose of the MFC program, according to the State, is to reduce the cost of long-term care for children with complex medical needs, since caring for children in foster homes is less costly than caring for them in institutions.  *See* DOH, DCF, & AHCA, *Medical Foster Care Statewide Operational Plan*, at 1-1 (2014)*.*

## UNITED STATES DEPARTMENT OF JUSTICE INVESTIGATION

92.     In December 2011, after receiving complaints of disability discrimination alleging that the State is unnecessarily institutionalizing children with disabilities and placing other children with disabilities at risk of unnecessary institutionalization, the Department formally opened an investigation.

93.     In a September 2012 Findings Letter, the Department reported that it had found the State in violation of the ADA because it planned, administered, and funded its service system for children with disabilities in a manner that results in the unnecessary institutionalization of hundreds of children in nursing facilities.  The Findings Letter identified numerous remedial measures the State could take to comply with federal law, and further advised the State that, in the event a resolution could not be reached voluntarily, the United States Attorney General may initiate a lawsuit pursuant to the ADA.

94.     The United States met multiple times with State officials in a good faith effort to achieve resolution of the violations identified in the Findings Letter.  The Department determined that compliance with the ADA could not be secured by voluntary means and filed this action in July 2013.

95.     Since the issuance of the Department's Findings Letter, and since the United States filed suit, the State altered some policies that have contributed to the segregation of children with

20

disabilities, but its violations of the ADA remain ongoing.  The State's processes and programs for helping children move from nursing facilities to their homes and communities are deficient, and barriers to community placement persist.

## VIOLATION OF TITLE II OF THE ADA, 42 U.S.C. §§ 12131-12134

96.   The allegations of Paragraphs 1 through 95 of this Complaint are hereby realleged and incorporated by reference.

97.   Defendant, the State of Florida, is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131(1).

98.   The Institutionalized and At-Risk Children are persons with disabilities covered by Title II of the ADA, and they are qualified to participate in the State's programs, services and activities, including home and community-based services.  42 U.S.C. §§ 12102, 12131(2).

99.   The State violates the ADA by administering its service system for children with disabilities in a manner that fails to ensure that the Institutionalized and At-Risk Children receive services in the most integrated setting appropriate to their needs, where they or their parents and guardians do not oppose community treatment, and by failing to reasonably modify policies, practices and procedures to avoid such discrimination and unnecessary segregation.  42 U.S.C. § 12132.

100.   The State's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. Part 35.

101.   Providing services to the Institutionalized and At-Risk Children in more integrated settings can be accomplished with reasonable modifications to the State's programs and services.

102.   All conditions precedent to the filing of this Amended Complaint have occurred or been performed.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that the Court:

(A)     Grant judgment in favor of the United States on its Amended Complaint and declare that the State of Florida has violated Title II of the ADA, 42 U.S.C. §§ 12131-12134, by failing to administer its services, programs, and activities for the Institutionalized and At-Risk Children in the most integrated setting appropriate to their needs, and by failing to make reasonable modifications to these services, programs, and activities to prevent unnecessary institutionalization and serious risk of unnecessary institutionalization of the Institutionalized and At-Risk Children;

(B)     Enjoin the State of Florida to

     1.     cease discriminating against the Institutionalized and At-Risk Children, by providing them appropriate, integrated community-based services and supports consistent with their individual needs;

     2.     cease discriminating against the Institutionalized and At-Risk Children by providing services and supports in the most integrated setting appropriate to their needs;

     3.     take such steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate the effects of the State's unlawful conduct;

(C)     Order such other appropriate relief as the interests of justice may require.

**Dated:** June 15, 2022                    Respectfully submitted,


JUAN ANTONIO GONZALEZ              KRISTEN CLARKE
United States Attorney                   Assistant Attorney General
Southern District of Florida

                                         REBECCA B. BOND
*/s/ Veronica Harrell-James*            Chief
VERONICA HARRELL-JAMES
Assistant United States Attorney         ANNE S. RAISH
Fla. Bar No. 644791                      Principal Deputy Chief
99 N.E. 4th Street                       ELIZABETH E. McDONALD
Miami, Florida 33132                     Deputy Chief
Telephone: (305) 961-9327
Facsimile: (305) 530-7139                */s/ Lindsey Weinstock*
Veronica.Harrell-James@usdoj.gov         JAMES FLETCHER, Bar ID A5502825
                                         H. JUSTIN PARK, Bar ID A5501850
                                         LAUREN LATTERELL POWELL, Bar ID A5502853
                                         LINDSEY WEINSTOCK, Bar ID A5502063
                                         Trial Attorneys
                                         Disability Rights Section
                                         Civil Rights Division
                                         U.S. Department of Justice
                                         950 Pennsylvania Avenue, N.W.
                                         Washington, D.C. 20530
                                         Telephone: (202) 616-2221
                                         Facsimile: (202) 307-1197
                                         lindsey.weinstock@usdoj.gov

                                         *Counsel for Plaintiff United States of America*