# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60460-CV-MIDDLEBROOKS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

STATE OF FLORIDA,

      Defendant.

_____/

_____

## THE STATE OF FLORIDA'S MOTION FOR SUMMARY JUDGMENT

_____

## <u>TABLE OF CONTENTS</u>

TABLE OF CITATIONS ........................................................................................... iii

Introduction .......................................................................................................... 1

Legal Framework .................................................................................................. 2

     A.     Constitutional Standing. ................................................................ 3

     B.     Appropriateness of Community Placement. .............................. 3

     C.     The Wishes of Parents or Guardians. ........................................ 4

     D.     Reasonable Accommodation. ....................................................... 5

     E.     Request for Accommodation. ....................................................... 6

     F.     Necessity of the Accommodation. ............................................... 8

     G.     Causation. ....................................................................................... 8

     H.     Essential Eligibility Requirements. ............................................. 9

     I.     Widespread Individual Violations. .............................................. 9

Argument .............................................................................................................. 10

    I.     The United States Lacks Authority to Enforce the Rights of Children Who Never Initiated the Enforcement Process. .............................................. 10

    II.     The United States Cannot Establish That the Children's Homes—or Other Available Community Settings—Are Appropriate to Their Needs. ...................... 12

    III.     The United States Cannot Establish That Its Proposed Modifications Are Likely to Redress Any Person's Unlawful Institutionalization—Let Alone Widespread Violations. ................................................................................. 14

     A.     Proposed Modification No. 1: Increased Medicaid Reimbursement Rates for Private-Duty Nursing. ................................................... 14

     B.     Proposed Modification No. 2: Increased Reimbursement Rates for Medical Foster Parents. ............................................................. 17

     C.     Proposed Modification No. 3: Enhanced Recruitment of Medical Foster Parents. ..................................................................... 18

     D.     Proposed Modification No. 4: Extension of Medical Foster Care to Long-Term Placements of Children Not in State Custody. ............... 18

E.  Proposed Modification No. 5: Increased Limits on Enrollment in the iBudget Waiver Program. ............................................................................ 19

F.  Proposed Modification No. 6: More Effective Care Coordination for Medicaid-Recipient Children.............................................................................. 20

IV. The United States' Demand for Better Care Coordination Is Not Cognizable Under the ADA Because It Challenges the Quality of Care. ............................... 21

V.  The ADA Does Not Compel Modifications That Rewrite or Depart From Specific Terms of Other Federal Statutes or Federally Approved Programs. ....... 22

A.  Modifications That Rewrite or Depart From Specific Provisions of Other Federal Statutes Are Unreasonable As a Matter of Law.................................. 23

1.  The Medicaid Act Expressly Permits Limits on Enrollment in Waiver Programs. ................................................................................... 25

2.  CMS Approved Florida's Medicaid Reimbursement Rates for Private-Duty Nursing Services, and the Medicaid Act Establishes the Specific Standard That Governs Those Rates. ................................................... 26

B.  Modifications That Rewrite or Depart From Specific Provisions of Other Federal Statutes Are Also Unavailable As a Matter of Statutory Construction.............................................................................................. 27

VI. The ADA Does Not Compel Modifications to Medicaid Reimbursement Rates Because Congress Established an Exclusive Administrative Process for Medicaid Rate-Setting. ............................................................................... 30

VII. The ADA Does Not Compel an Expansion of Florida's Medical Foster Care Program in Violation of the Conditions of Spending Clause Legislation.............. 32

VIII. The United States Cannot Establish That Children Who It Claims Need Waiver Services Satisfy the Waiver Program's Essential Eligibility Requirements. ............................................................................................. 34

IX. The United States Cannot Establish That Individuals Whose Rights It Claims to Enforce Requested—or Were Refused—an Accommodation. .......................... 35

## TABLE OF CITATIONS

### Cases

*31 Foster Children v. Bush*,
    329 F.3d 1255 (11th Cir. 2003) ................................................................. 3

*A.L. v. Walt Disney Parks and Resorts United States, Inc.*,
    900 F.3d 1270 (11th Cir. 2018) ................................................................. 8

*A.R. v. Secretary Florida Agency for Health Care Administration*,
    769 F. App'x 718 (11th Cir. 2019) ........................................................... 10

*Alexander v. Choate*,
    469 U.S. 287 (1985) ............................................................................ 5, 21

*Alexander v. Mayhew*,
    451 F. Supp. 3d 1293 (N.D. Fla. 2020) ........................................ 24, 25, 34

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ..................................................................................... 2

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ............................................................................. 30, 31

*ASARCO Inc. v. Kadish*,
    490 U.S. 605 (1989) ..................................................................................... 3

*Association for Disabled Americans, Inc. v. Florida International University*,
    405 F.3d 954 (11th Cir. 2005) ................................................................. 23

*Beckert v. Our Lady of Angels Apartments, Inc.*,
    192 F.3d 601 (6th Cir. 1999) ................................................................... 29

*Bertrand ex rel. Bertrand v. Maram*,
    495 F.3d 452 (7th Cir. 2007) ................................................................... 25

*Bircoll v. Miami-Dade County*,
    480 F.3d 1072 (11th Cir. 2007) ................................................................. 6

*Bostock v. Clayton County*,
    140 S. Ct. 1731 (2020) ............................................................................... 8

*Boyd v. Steckel*,
    753 F. Supp. 2d 1163 (M.D. Ala. 2010) ........................................... 24, 25

*Bruggeman ex rel. Bruggeman v. Blagojevich,*
    324 F.3d 906 (7th Cir. 2003) ........................................................................ 21

*Buchanan v. Maine,*
    469 F.3d 158 (1st Cir. 2006) ........................................................................ 22

*Bulova Watch Company v. United States,*
    365 U.S. 753 (1961) ........................................................................................ 27

*Califano v. Yamaski,*
    442 U.S. 682 (1979) ........................................................................................ 10

*California State Foster Parent Association v. Wagner,*
    624 F.3d 974 (9th Cir. 2010) ........................................................................ 32

*Cash v. Smith,*
    231 F.3d 1301 (11th Cir. 2000) ...................................................................... 6

*Castle v. Eurofresh, Inc.,*
    731 F.3d 901 (9th Cir. 2013) .......................................................................... 6

*Celotex Corporation v. Catrett,*
    477 U.S. 317 (1986) .......................................................................................... 2

*Clapper v. Amnesty International USA,*
    568 U.S. 398 (2013) .......................................................................................... 3

*Cole v. National Collegiate Athletic Association,*
    120 F. Supp. 2d 1060 (N.D. Ga. 2000) ........................................................ 9

*Comcast Corporation v. National Association of African American-Owned Media,*
    140 S. Ct. 1009 (2020) ...................................................................................... 8

*Cummings v. Premier Rehab Keller, PLLC,*
    142 S. Ct. 1562 (2022) .................................................................................... 34

*D'Onofrio v. Costco Wholesale Corporation,*
    964 F.3d 1014 (11th Cir. 2020) ...................................................................... 7

*Dayton Board of Education v. Brinkman,*
    433 U.S. 406 (1977) ........................................................................................ 10

*Disability Rights Florida, Inc. v. Palmer,*
    No. 4:18-cv-00342, 2019 WL 11253085 (N.D. Fla. Aug. 29, 2019) ............ 15, 16

*Disability Rights New Jersey, Inc. v. Commissioner, New Jersey Department of Human Services*,
796 F.3d 293 (3d Cir. 2015) ................................................................................. 21

*Doe 1–13 by and through Doe, Sr. 1–13 v. Chiles*,
136 F.3d 709 (11th Cir. 1998) ............................................................................... 10

*Douglas v. Independent Living Center of Southern California, Inc.*,
565 U.S. 606 (2012) .............................................................................................. 31

*Frederick L. v. Department of Public Welfare of the Commonwealth of Pennsylvania*,
364 F.3d 487 (3d Cir. 2004) .................................................................................... 6

*Gaston v. Bellingrath Gardens and Home, Inc.*,
167 F.3d 1361 (11th Cir. 1999) ............................................................................... 7

*Georgia v. President of the United States*,
46 F.4th 1283 (11th Cir. 2022) ............................................................................. 10

*Gill v. Whitford*,
138 S. Ct. 1916 (2018) ........................................................................................ 10

*Goldberg v. Florida International University*,
838 F. App'x 487 (11th Cir. 2020) .......................................................................... 7

*Gonzaga University v. Doe*,
536 U.S. 273 (2002) ....................................................................................... 30, 31

*Halpern v. Wake Forest University Health Sciences*,
669 F.3d 454 (4th Cir. 2012) ................................................................................. 9

*Harrison v. Young*,
48 F.4th 331 (5th Cir. 2022) ...................................................................... 23, 24, 25

*Heartz v. Morton*,
No. 1:98-cv-00317, 1999 WL 1327398 (D.N.H. 1999) .......................................... 25

*Hoag Memorial Hospital Presbyterian v. Price*,
866 F.3d 1072 (9th Cir. 2017) ............................................................................. 26

*Holbrook v. City of Alpharetta*,
112 F.3d 1522 (11th Cir. 1997) .............................................................................. 6

*Holly v. Clairson Industries, LLC*,
492 F.3d 1247 (11th Cir. 2007) .............................................................................. 9

v

*Hunt v. Aimco Properties, L.P.*,

    814 F.3d 1213 (11th Cir. 2016).................................................................................... 7

*John B. v. Emkes*,

    852 F. Supp. 2d 957 (M.D. Tenn. 2012) ................................................................... 26

*Karantsalis v. City of Miami Springs*,

    17 F.4th 1316 (11th Cir. 2021) ................................................................................... 6

*L.C. by Zimring v. Olmstead*,

    138 F.3d 893 (11th Cir. 1998)..................................................................................... 5

*Lane v. Kitzhaber*,

    841 F. Supp. 2d 1199 (D. Or. 2012).......................................................................... 21

*Lewis v. Casey*,

    518 U.S. 343 (1996).......................................................................................... 9, 10, 35

*Lewis v. Governor of Alabama*,

    944 F.3d 1287 (11th Cir. 2019) (en banc)................................................................ 16

*Liese v. Indian River County Hospital District*,

    701 F.3d 334 (11th Cir. 2012)..................................................................................... 8

*Lujan v. Defenders of Wildlife*,

    504 U.S. 555 (1992)............................................................................................. 3, 15

*Mary Jo. C. v. New York State and Local Retirement System*,

    707 F.3d 144 (2d Cir. 2013)........................................................................................ 9

*McCarroll v. Somerby of Mobile, LLC*,

    595 F. App'x 897 (11th Cir. 2014) ............................................................................. 7

*MCI Telecommunications Corporation v. American Telephone and Telegraph Company*,

    512 U.S. 218 (1994).................................................................................................. 23

*McNely v. Ocala Star-Banner Corporation*,

    99 F.3d 1068 (11th Cir. 1996)..................................................................................... 8

*Morton v. Mancari*,

    417 U.S. 535 (1974)............................................................................................ 28, 29

*Nasello v. Eagleson*,

    977 F.3d 599 (7th Cir. 2020)............................................................................... 25, 27

*National Association of the Deaf v. Florida*,
    980 F.3d 763 (11th Cir. 2020).................................................................................. 5, 23

*O.B. v. Norwood*,
    838 F.3d 837 (7th Cir. 2016)....................................................................................... 31

*Olmstead v. L.C. ex rel. Zimring*,
    527 U.S. 581 (1999) ............................................................................................ passim

*Ombe v. Martinez*,
    No. 1:14-cv-00763, 2015 WL 13855233 (D.N.M. Sept. 3, 2015)................................ 22

*Owens v. Governor's Office of Student Achievement*,
    52 F.4th 1327 (11th Cir. 2022) ...................................................................................... 7

*Patel v. Quality Inn South*,
    846 F.2d 700 (11th Cir. 1988)....................................................................................... 28

*Pennhurst State School and Hospital v. Halderman*,
    451 U.S. 1 (1981) ........................................................................................................... 30

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) ................................................................................................... 6, 8

*Posadas v. National City Bank*,
    296 U.S. 497 (1936)....................................................................................................... 28

*Quality of Life, Corp. v. City of Margate*,
    805 F. App'x 762 (11th Cir. 2020) ................................................................................. 7

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012)....................................................................................................... 29

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)......................................................................................... 27, 28, 29

*Ramirez v. Young*,
    No. 4:22-cv-00733, 2022 WL 16919351 (N.D. Tex. Nov. 14, 2022).......................... 24, 25

*Regional Rail Reorganization Act Cases*,
    419 U.S. 102 (1974)....................................................................................................... 28

*Rylee v. Chapman*,
    316 F. App'x 901 (11th Cir. 2009) ................................................................................. 7

*Sandison v. Michigan High School Athletic Association, Inc.*,
   64 F.3d 1026 (6th Cir. 1995) ................................................................. 23

*Schaw v. Habitat for Human. of Citrus County, Inc.*,
   938 F.3d 1259 (11th Cir. 2019) ............................................................... 6

*Schwarz v. City of Treasure Island*,
   544 F.3d 1201 (11th Cir. 2008) ............................................................... 7

*Silberman v. Miami Dade Transit*,
   927 F.3d 1123 (11th Cir. 2019) ............................................................. 28

*Smith v. Christian*,
   763 F.2d 1322 (11th Cir. 1985) ....................................................... 28, 29

*Sossamon v. Texas*,
   563 U.S. 277 (2011) ................................................................................ 4

*Stutts v. Freeman*,
   694 F.2d 666 (11th Cir. 1983) ............................................................... 28

*T.M. v. DeWine*,
   49 F.4th 1082 (6th Cir. 2022) ............................................................... 32

*Tennessee v. Lane*,
   541 U.S. 509 (2004) ...................................................................... 5, 9, 23

*Thorpe v. District of Columbia*,
   303 F.R.D. 120 (D.D.C. 2014) ................................................................ 9

*Tyndall v. National Education Centers, Inc. of California*,
   31 F.3d 209 (4th Cir. 1994) .................................................................... 9

*U.S. Airways, Inc. v. Barnett*,
   535 U.S. 391 (2002) ................................................................................ 6

*United States v. Arkansas*,
   794 F. Supp. 2d 935 (E.D. Ark. 2011) ................................................ 4, 5

*United States v. Florida*,
   938 F.3d 1221 (11th Cir. 2019) ............................................................. 11

*United States v. Hialeah Housing Authority*,
   418 F. App'x 872 (11th Cir. 2011) .......................................................... 7

*United States v. Secretary Florida Agency for Health Care Administration*,
  21 F.4th 730 (11th Cir. 2021) .............................................................. 11

*United States v. Welden*,
  377 U.S. 95 (1964) .......................................................................... 28

*University of Texas Southwestern Medical Center v. Nassar*,
  570 U.S. 338 (2013) .......................................................................... 8

*Vaughn v. Walthall*,
  968 F.3d 814 (7th Cir. 2020) ..................................................... passim

*West v. Davy*,
  No. 3:05-cv-03564, 2005 WL 2000202 (D.N.J. Aug. 16, 2005) ......................... 27

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) .......................................................................... 3

*Willis v. Conopco, Inc.*,
  108 F.3d 282 (11th Cir. 1997) ............................................................... 6

*Windham v. Harris County*,
  875 F.3d 229 (5th Cir. 2017) .............................................................. 35

*Wood v. Maryland Department of Transportation*,
  732 F. App'x 182 (4th Cir. 2018) ........................................................... 9

*Wood v. President and Trustees of Spring Hill College in City of Mobile*,
  978 F.2d 1214 (11th Cir. 1992) ............................................................. 7

*Wright v. New York State Department of Corrections*,
  831 F.3d 64 (2d Cir. 2016) ................................................................. 6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ............................................................... 29

**Statutes**

42 U.S.C. § 12131(2) ......................................................................... 9

42 U.S.C. § 12132 .......................................................................... 8, 9

42 U.S.C. § 12132(2) ........................................................................ 34

42 U.S.C. § 12133 ........................................................................... 11

42 U.S.C. § 1396a(a)(30)(A) ....................................................... 26, 27, 29, 30

42 U.S.C. § 1396a(a)(43) .................................................................................. 20

42 U.S.C. § 1396c ............................................................................................ 26

42 U.S.C. § 1396d(a)(4)(B) ............................................................................. 20

42 U.S.C. § 1396d(r)(5) ................................................................................... 20

42 U.S.C. § 1396n(c) ................................................................................. 25, 35

42 U.S.C. § 1396n(c)(9) ........................................................................... 25, 29

42 U.S.C. § 1981 ............................................................................................... 8

42 U.S.C. § 672(a)(2)(A)(i) .............................................................................. 32

42 U.S.C. § 672(a)(2)(A)(ii) ............................................................................. 32

42 U.S.C. § 672(a)(2)(B) .................................................................................. 32

42 U.S.C. § 672(e) ........................................................................................... 32

42 U.S.C. § 672(f) ............................................................................................ 32

Fla. Stat. § 393.063(12) (2022) ....................................................................... 35

Fla. Stat. § 393.065(1) (2022) ......................................................................... 35

Fla. Stat. § 393.065(5)(a) (2022) .................................................................... 20

## Rules

Fed. R. Civ. P. 65(d)(1)(C) ............................................................................... 18

Fla. Admin. Code r. 59A-8.0095 ...................................................................... 15

Fla. Admin. Code r. 65C-28.007(2)(b) ............................................................ 33

Fla. Admin. Code r. 65C-30.001(126) ............................................................ 33

Fla. Admin. Code r. 65G-1.047 ....................................................................... 20

Fla. Admin. Code r. 65G-4.015(1) ................................................................... 35

Fla. Admin. Code r. 65G-4.015(2) ................................................................... 35

Fla. Admin. Code r. 65G-4.015(3) ................................................................... 35

## Regulations

28 C.F.R. § 35.130(b)(7)(i) .................................................................. 5, 6, 8, 23

28 C.F.R. § 35.130(d) ........................................................................................ 3

42 C.F.R. § 430.10 ........................................................................................... 26

42 C.F.R. § 430.35 ........................................................................................... 26

42 C.F.R. § 441.303(f)(6) ................................................................................. 25

42 C.F.R. § 447.204 ................................................................................ 26

42 C.F.R. § 447.204(c) ............................................................................ 26

45 C.F.R. § 1356.21(c) ............................................................................ 32

45 C.F.R. § 1356.22(a) ............................................................................ 32

45 C.F.R. § 1356.22(b) ............................................................................ 32

45 C.F.R. § 84.12(a) ................................................................................ 28

## Other Authorities

Centers for Medicare and Medicaid Services, State Medicaid Manual

§ 4442.1 ............................................................................................... 20

Centers For Medicare and Medicaid Services, State Medicaid Manual

§ 4442.3A.3 ......................................................................................... 20

Ch. 2022-156, Laws of Fla. ...................................................................... 20

Consolidated Omnibus Budget Reconciliation Act of 1985,

Pub. L. No. 99-272, 100 Stat. 82 (1986) ................................................. 29

Methods for Assuring Access to Covered Medical Services,

80 Fed. Reg. 67,576 (Nov. 2, 2015) ....................................................... 26

Omnibus Budget Reconciliation Act of 1989,

Pub. L. No. 101-239, 103 Stat. 2106 (1989) ........................................... 29

Tribal Child Welfare,

77 Fed. Reg. 896 (Jan. 12, 2012) ........................................................... 33

U.S. Department of Health and Human Services, Child Welfare Policy Manual

§ 8.3A.12 .............................................................................................. 32

U.S. Department of Health and Human Services, Child Welfare Policy Manual

§ 8.3A.13 .............................................................................................. 32

U.S. Department of Health and Human Services, Child Welfare Policy Manual

§ 8.3A.14 .............................................................................................. 33

**INTRODUCTION**

The United States asserts one claim: a failure-to-accommodate claim under Title II of the Americans with Disabilties Act (the "ADA"). In *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), the Court construed Title II to require States to make reasonable accommodations when an individual wants to live in a non-institutional setting that is appropriate to his or her needs, and the accommodation would allow the individual to do so. The United States claims that more than 100 children needlessly reside in nursing homes and that Florida has failed to make reasonable accommodations that would enable them to live at home. ECF No. 700 ¶ 6.

In fact, these children receive care in nursing homes not because the State violated the ADA, but because their parents or caregivers made, and continue to make, the emotionally difficult decision—under practical, complicated, and individualized circumstances—that care in a nursing home is the best option for their children and families. *Olmstead* does not condemn all institutional care or deny parents a choice, or permit States to overrule the parents' wishes, but affirms the vital importance of institutional settings within the overall continuum of care.

To prove its case, the United States reduces *Olmstead* to an academic exercise. It argues that *Olmstead* is satisfied (1) whenever it is possible to *hypothesize* a home or community-based setting that would be "appropriate" to the child's needs, no matter whether the setting actually exists; and (2) whenever parents—when presented with a *hypothetical perfect world* in which all of their real-world concerns are fully resolved—indicate that, in that envisioned scenario, they would want their children to live at home or in some other ill-defined "community setting." The United States thus removes from the equation any consideration of the actual, real-world conditions faced by these families and their children. In doing so, it rigs *Olmstead* to ensure that its elements are *always* satisfied as to *every single person* who ever resides in a nursing home.

Then—without regard to principles of causation and redressability—the United States springboards to what this case has *really* been about from the start: its wish list of systemwide changes to Florida's Medicaid policies. It urges this Court to order Florida to (1) increase its Medicaid reimbursement rates for private-duty nurses, in the hope that higher rates will attract more nurses and thus make it easier for children to live at home; (2) increase reimbursement rates for medical foster parents, in the hope that increased rates will induce more people to become medical foster parents and dedicate their lives and homes to the care of children with complex medical needs; (3) enhance its efforts to recruit medical foster parents; (4) expand its

medical foster care program to allow children who are not in state custody to live in medical foster homes indefinitely; (5) increase the limits on enrollment in the iBudget waiver program to provide more people with access to waiver services; and (6) provide better or more effective care coordination services to Medicaid-recipient children, to furnish their families with more information about available service options and help them better navigate Florida's programs.

Each of these proposed modifications suffers from fatal flaws and misunderstandings of Florida's services and programs. For purposes of this motion, however, the State focuses on legal deficiencies and failures of proof that the United States cannot overcome. This Court should grant summary judgment as to each claim because the United States cannot show that the non-institutional settings to which children would transition are appropriate to their needs (since it never assessed those settings) or that its proposed modifications are likely to redress any violation (let alone enough violations to justify statewide relief). Its modifications are also unavailable to the extent they challenge the quality of services provided (as in the case of care coordination), deviate from the specific terms of other federal statutes (such as the Medicaid Act) or federally approved programs, or would place Florida out of compliance with Spending Clause legislation and compel it to fund its programs alone. Increases to reimbursement rates are unavailable because Congress established an exclusive Medicaid rate-setting procedure overseen by CMS. And the United States cannot show that the children who it claims need access to the iBudget waiver program meet the program's essential eligibility requirements, or that the parents of any children ever requested—or were ever denied—any accommodations.

For these reasons, this Court should enter final summary judgment in favor of Florida.[1]

## LEGAL FRAMEWORK

To establish entitlement to systemwide relief, the United States must prove pervasive and widespread violations founded on individualized, child-specific facts. After all, Title II of

---

[1] On a motion for summary judgment, the movant need not produce evidence to negate the non-movant's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Rather, the movant carries its burden by "pointing out" the absence of evidence to support the non-movant's case. *Id.* at 325. To survive summary judgment, the non-movant must respond with "significantly probative" evidence showing a genuine factual dispute for trial—that is, evidence sufficient to support a judgment in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). If the non-movant fails to "establish the existence of an essential element" on which it bears the burden of proof at trial, *Celotex*, 477 U.S. at 322, then the movant is entitled to summary judgment.

the ADA is a civil-rights statute that confers personal rights and individual entitlements, and does not create any cause of action with an aggregate or systemwide focus, such as a pattern-or-practice claim. Below, the State discusses the elements that the United States must prove. It then shows that the United States cannot prove key elements, and that a trial is unnecessary.

### A. Constitutional Standing.

Like all litigants, the United States must establish constitutional standing: an actual or imminent injury that is concrete and particularized, fairly traceable to the challenged conduct of the defendant (here, the failure to make an accommodation), and likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). The United States must therefore prove that a child presently suffers unlawful institutionalization—which is the harm that the ADA prohibits, *Olmstead*, 527 U.S. at 600 (recognizing "unjustified institutional isolation" as a "form of discrimination")—or that the child's unlawful institutionalization is "imminent" or "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409–10 (2013). "Imminence" implies a "substantial likelihood" of future injury and a "high degree of immediacy." *31 Foster Child. v. Bush*, 329 F.3d 1255, 1266 (11th Cir. 2003). A *risk* of injury is not enough. *Clapper*, 568 U.S. at 409 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

A plaintiff's burden to prove standing becomes much heavier when redress "depends on the unfettered choices of independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (plurality opinion)). In these circumstances, "much more is needed," and it is ordinarily "substantially more difficult" to establish standing. *Id.* When redress depends on the choices of non-parties, the plaintiff's weighty burden is "to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of the injury." *Id.*

### B. Appropriateness of Community Placement.

A plaintiff who alleges unlawful institutionalization must prove three core elements, each of which is highly individualized. *First*, the plaintiff must show that the alternative setting is "appropriate" to the individual's needs. *Olmstead*, 527 U.S. at 587; 28 C.F.R. § 35.130(d) (requiring public entities to provide services "in the most integrated setting appropriate to the needs" of the individual). Some individuals need institutional services while their symptoms stabilize; for others, "no placement outside the institution may ever be appropriate." *Olmstead*,

527 U.S. at 605 (plurality opinion).[2] The ADA does not compel States to move "patients into an inappropriate setting" or "phase out institutions, placing patients in need of close care at risk," *id.* at 604–05 (plurality opinion); *accord id.* at 610 (Kennedy, J., concurring) ("[I]t would be a tragic event . . . were the [ADA] to be interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision."). Thus, a court must consider the unique needs of the individual and whether the individual can "handle and benefit" from the community-based placement. *Id.* at 600 ("[I]nstitutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions . . . ."); *id.* at 601–02 ("We emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings.").

As the Magistrate Judge recognized, whether a community setting is "appropriate" to an individual's needs—or whether an individual can "handle and benefit from" a community setting—is a "highly individualized determination." ECF No. 501 at 26; *accord id.* at 31–32; *Sossamon v. Texas*, 563 U.S. 277, 286 (2011) ("[T]he word 'appropriate' is inherently context-dependent"). It requires a case-by-case consideration of the setting and the medical and other needs and circumstances of individual children. *See United States v. Arkansas*, 794 F. Supp. 2d 935, 974 (E.D. Ark. 2011) (noting that any "decision regarding the least restrictive placement appropriate for a developmentally disabled person must be based on that person's individual needs"). As the United States alleges, those needs are often acute. ECF No. 700 ¶ 23 (alleging that the children at issue have "severe" and "chronic" medical conditions and "typically rely on services from multiple service providers" and often on "special technology or equipment").

## C. The Wishes of Parents or Guardians.

*Second*, the plaintiff must establish that the individual (or here, the parents or guardians on the individual's behalf) does not oppose community placement. *Olmstead*, 527 U.S. at 587. The Supreme Court emphasized that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it." *Id.* at 602. This element is seldom at issue where the individual who seeks community placement is the plaintiff. Where, however,

---

[2] Only four Justices joined in Part III-B of the *Olmstead* opinion.

the United States sues as the purported enforcer of the rights of children, it cannot be assumed that this element will be uncontested. *Arkansas*, 794 F. Supp. 2d at 936 ("[T]he United States is in the odd position of asserting that certain persons' rights have been and are being violated while those persons—through their parents and guardians—disagree."); *accord* ECF No. 501 at 28 (noting that some parents "have opposed, or would oppose, more integrated settings"). The wishes of parents and guardians will "vary individual by individual." ECF No. 501 at 26.

It is easy to surmise why parents or guardians might prefer nursing-facility settings for children with complex medical needs. They might find comfort in the care and treatment that a facility can provide. They might have unstable family circumstances, inadequate space at home, or insufficient time as a result of work schedules or obligations to other children. They might be reluctant to permit providers into their homes unattended or to outfit their homes with durable medical equipment. They might fear that their children would suffer inattention or isolation in the home, or they might anticipate the strain that in-home care might place on their families or on their marriages. No matter the reason, the ADA and *Olmstead* respect the decisions of parents and guardians—even if the United States disagrees with those decisions.

### D. Reasonable Accommodation.

*Third*, the plaintiff must establish that the State can make reasonable modifications to its policies or practices to accommodate an individual's desire to reside in a more integrated setting. *See Olmstead*, 527 U.S. at 587; 28 C.F.R. § 35.130(b)(7)(i). The remedy that Congress selected is thus "a limited one." *Tennessee v. Lane*, 541 U.S. 509, 531 (2004). The ADA "does not require States to employ any and all means" to provide access to integrated services. *Id.* at 531–32. Instead, it "requires only 'reasonable modifications' that would not fundamentally alter the nature of the service." *Id.* at 532; *see also Alexander v. Choate*, 469 U.S. 287, 300 (1985) (noting the Rehabilitation Act does not require "fundamental or substantial modifications," but only "reasonable ones" (internal marks omitted)). The limited nature of Title II's remedy ensures the validity of the ADA, which was enacted to enforce the Fourteenth Amendment and must, therefore, be "congruent and proportional to its object" in each of its applications. *Lane*, 541 U.S. at 531; *Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 773–74 (11th Cir. 2020).

The plaintiff, therefore, bears the burden to identify an accommodation and establish its facial reasonableness. *See L.C. by Zimring v. Olmstead*, 138 F.3d 893, 904 (11th Cir. 1998), *aff'd in part*, *vacated in part on other grounds*, 527 U.S. 581. As in other failure-to-accommodate

contexts,[3] only after the plaintiff has satisfied this initial burden does the defendant assume any burden to prove as an affirmative defense that the accommodation would fundamentally alter the nature of its services, programs, or activities. *See id.*; *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002) (Title I of the ADA); *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1265 (11th Cir. 2019) (Fair Housing Amendments Act); *Frederick L. v. Dep't of Pub. Welfare of Com. of Pa.*, 364 F.3d 487, 492 n.4 (3d Cir. 2004) (Title II of the ADA); *Willis v. Conopco, Inc.*, 108 F.3d 282, 285–86 (11th Cir. 1997) (Title I of the ADA); *see also* 28 C.F.R. § 35.130(b)(7)(i) (directing public entities to "make reasonable modifications" when necessary to avoid disability-based discrimination "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity").

"The reasonable-modification inquiry in Title II–ADA cases is 'a highly fact-specific inquiry.'" *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1085 (11th Cir. 2007) (quoting *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1527 (11th Cir. 1997)). The reasonableness of a proposed modification turns on the "particular circumstances of the case" and "must be decided case-by-case based on numerous factors." *Id.* at 1086; *accord PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001) (holding, under Title III of the ADA, that "an individualized inquiry must be made to determine whether a specific modification for a person's disability would be reasonable under the circumstances"); *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 77–78 (2d Cir. 2016) (concluding that Title II mandates an "individualized inquiry into . . . reasonableness"); *Castle v. Eurofresh, Inc.*, 731 F.3d 901, 910 (9th Cir. 2013) (concluding that the reasonableness of any proposed accommodation under Title II hinges on a fact-specific, case-by-case examination).

### E.   Request for Accommodation.

The Eleventh Circuit also requires plaintiffs who bring failure-to-accommodate claims

---

[3] When construing the reasonable-accommodation requirement under one statute, the Eleventh Circuit looks to explications of the same requirement under other statutes. In *Schaw v. Habitat for Humanities of Citrus County, Inc.*, 938 F.3d 1259, 1264–67 & n.2 (11th Cir. 2019), for example, the court relied heavily on interpretations of the Rehabilitation Act and the ADA when applying the Fair Housing Amendments Act's reasonable-accommodation standard. A consistent interpretation and interconnection of precedents under reasonable-accommodation statutes promote harmony and predictability. In the same vein, courts have often noted that the substantive standards imposed by the Rehabilitation Act and the ADA are identical, and that precedents under one statute apply to the other. *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1321–22 (11th Cir. 2021); *Cash v. Smith*, 231 F.3d 1301, 1305 n.2 (11th Cir. 2000).

to establish that they actually requested an accommodation, which was refused. The Eleventh Circuit has uniformly adhered to the request-and-refusal rule in *every* failure-to-accommodate context—under the ADA, the Rehabilitation Act, or the Fair Housing Act.[4] It has applied the request-and-refusal rule at least three times under Title II of the ADA. *See Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492–93 (11th Cir. 2020); *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 770 (11th Cir. 2020); *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009).

The ADA does not impose liability on public entities that fail to intuit an individual's need or desire for an accommodation. The "duty to make a reasonable accommodation does not simply spring from the fact that [the individual] wants such an accommodation made." *Quality of Life*, 805 F. App'x at 770 (quoting *Schwarz*, 544 F.3d at 1219). "Simply put, a plaintiff must actually request an accommodation and be refused . . . ." *Id.* (quoting *Schwarz*, 544 F.3d at 1219). A public entity must be provided with "an opportunity to make a final decision with respect to a plaintiff's request," which "includes the ability to conduct a meaningful review of the requested accommodation." *Id.* (internal marks omitted). The individual who requires a reasonable accommodation must make a "specific demand," *Goldberg*, 838 F. App'x at 492 (quoting *Gaston*, 167 F.3d at 1363); *accord Hialeah Hous. Auth.*, 418 F. App'x at 876 ("[U]nder the Rehabilitation Act and the ADA, 'the duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" (quoting *Gaston*, 167 F.3d at 1363))—which means the individual must both request an accommodation and explain why the accommodation is needed and reasonable, *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333–36 (11th Cir. 2022); *Quality of Life*, 805 F. App'x at 770–71.

---

[4] *See Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1333–36 (11th Cir. 2022) (Rehabilitation Act); *Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 487, 492–93 (11th Cir. 2020) (Title II); *D'Onofrio v. Costco Wholesale Corp.*, 964 F.3d 1014, 1022 (11th Cir. 2020) (Title I); *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 770–71 (11th Cir. 2020) (Title II); *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225–26 (11th Cir. 2016) (Fair Housing Act); *McCarroll v. Somerby of Mobile, LLC*, 595 F. App'x 897, 899 (11th Cir. 2014) (Title I); *United States v. Hialeah Hous. Auth.*, 418 F. App'x 872, 875–76 (11th Cir. 2011) (Fair Housing Act); *Rylee v. Chapman*, 316 F. App'x 901, 906 (11th Cir. 2009) (Title II); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218–19 (11th Cir. 2008) (Fair Housing Act); *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999) (Title I); *Wood v. President & Trs. of Spring Hill Coll. in City of Mobile*, 978 F.2d 1214, 1222 (11th Cir. 1992) (Rehabilitation Act).

**F.      Necessity of the Accommodation.**

Under Title II regulations, an accommodation must be not only reasonable, but also necessary. 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures *when the modifications are necessary to avoid discrimination* on the basis of disability . . . ." (emphasis added)). If unlawful institutionalization can be avoided without modification of the State's policies, practices, or procedures, then the ADA does not compel a modification. Thus, in the Title III context, the Supreme Court observed that use of a golf cart might be a necessary accommodation for some golfers with disabilities, but not for others, for whom walking the course might be "uncomfortable or difficult, but not beyond their capacity." *PGA Tour*, 532 U.S. at 682, 683 n.38. This element is also individualized: Whether a proposed modification is necessary is an "inherently fact-intensive" question and "largely depends on context." *A.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1295 (11th Cir. 2018) (quoting *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 342–43 (11th Cir. 2012)).

**G.      Causation.**

Of course, a plaintiff must also plead causation. "It is 'textbook tort law' that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 347 (2013)). "That includes when it comes to federal antidiscrimination laws . . . ." *Id.* The but-for common-law causation standard "supplies the 'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action." *Id.* (quoting *Nassar*, 570 U.S. at 346–47). The Supreme Court has "often held" that phrases such as "by reason of"—which appears in Title II of the ADA, 42 U.S.C. § 12132—"indicate a but-for causation requirement." *Comcast*, 140 S. Ct. at 1015; *see also Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1739 (2020) (concluding that Title VII of the Civil Rights Act incorporates the common-law standard of but-for causation).

Thus, in *Comcast*, the Court examined the Civil Rights Act of 1866, 42 U.S.C. § 1981, and found no exception in the statute's text or history to suggest congressional intent to depart from the common-law rule of causation. 140 S. Ct. at 1013–16. To the same end, the Eleventh Circuit concluded long ago that the "ADA imposes a 'but-for' liability standard." *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996). And in the context of a failure-

to-accommodate claim, the Eleventh Circuit has explained the role of causation: the plaintiff must establish that, but for the failure to accommodate, the plaintiff would not have suffered discrimination. *Holly v. Clairson Indus.*, *LLC*, 492 F.3d 1247, 1263 n.17 (11th Cir. 2007). For example, in *Thorpe v. District of Columbia*, 303 F.R.D. 120, 137, 142 (D.D.C. 2014), the court noted that the plaintiffs might be unable to prove causation where their own lack of housing prevented their discharge from facility settings—no matter what accommodations were made.

### H.   Essential Eligibility Requirements.

Title II protects from discrimination only "qualified individuals with disabilities." 42 U.S.C. § 12132. A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id*. § 12131(2). The complaint must therefore plausibly allege that the individual in question is a "qualified individual with a disability"—that is, that the individual satisfies the "essential eligibility requirements" of the service or program that the individual seeks to access. *Wood v. Md. Dep't of Transp.*, 732 F. App'x 182 (4th Cir. 2018).

While the ADA might require States to modify their policies and practices, it does not force States to modify their essential eligibility requirements. *Lane*, 541 U.S. at 531–32 ("Title II does not require States . . . to compromise their essential eligibility criteria . . . ."). Whether an eligibility requirement is "essential" depends on the "importance of the requirement to the program." *Mary Jo. C. v. N.Y. State & Loc. Ret. Sys.*, 707 F.3d 144, 157 (2d Cir. 2013). To be "essential," an eligibility requirement must bear "more than a marginal relationship" to the program at issue. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (quoting *Tyndall v. Nat'l Educ. Ctrs.*, *Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)); *see also Cole v. Nat'l Collegiate Athletic Ass'n*, 120 F. Supp. 2d 1060, 1070–71 (N.D. Ga. 2000) (concluding that academic requirements are integral to the NCAA's purpose to promote scholarship and are thus essential). Unless a plaintiff proves that an individual satisfies all essential eligibility requirements of a service or program, it has not established that the ADA's protections apply.

### I.   Widespread Individual Violations.

The United States seeks only systemwide relief—not individualized relief. ECF No. 760 at 2–3; ECF No. 741 at 2; ECF No. 740 at 6. To secure systemwide relief, a plaintiff must show that individual violations are "widespread," *Lewis v. Casey*, 518 U.S. 343, 349 (1996), or

9

"pervasive," *Doe 1–13 by and through Doe, Sr. 1–13 v. Chiles*, 136 F.3d 709, 722 n.23 (11th Cir. 1998). This is so because an injunction must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established" and be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1303 (11th Cir. 2022) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)); *accord Califano v. Yamaski*, 442 U.S. 682, 702 (1979) ("The scope of injunctive relief is dictated by the extent of the violation established . . . ."). These limits on available remedies flow from "historical practice and traditional remedial principles" and ensure "fidelity" to the constitutional function of federal courts to decide cases and controversies. *Georgia*, 46 F.4th at 1303. Thus, in *Lewis*, 518 U.S. at 349, 359–60, two isolated violations were not "widespread enough" to support an injunction that overhauled a state prison system's law libraries, while in *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 417, 420 (1977), specific violations at three high schools were inadequate to support a remedial plan that spanned the school district. In contrast, in *Doe 1–13*, 136 F.3d at 722 n.23, the record indicated that "hundreds, perhaps even thousands" of individuals were denied services in violation of the federal Medicaid Act's reasonable-promptness provision—a number that was sufficient to warrant systemwide relief.

By disclaiming individualized relief, the United States has gone for broke and assumed the burden to establish that instances of unlawful institutionalization are "widespread." It has recognized its burden to establish "common and widespread" violations. ECF No. 760 at 5. Absent that showing, the United States is not entitled to the relief it seeks: systemwide relief.

<u>**ARGUMENT**</u>

I.  **THE UNITED STATES LACKS AUTHORITY TO ENFORCE THE RIGHTS OF CHILDREN WHO NEVER INITIATED THE ENFORCEMENT PROCESS.**

But first things first: the United States' authority to sue. The Eleventh Circuit held that the United States may enforce Title II, but it firmly tethered that authority to the enforcement of administrative complaints filed by individuals who seek to invoke the United States' aid in the vindication of their rights. Here, *one child* whose rights the United States claims to enforce ever filed an administrative complaint—and his claim was resolved in *A.R. v. Sec'y Fla. Agency for Health Care Admin.*, 769 F. App'x 718 (11th Cir. 2019). Because the United States does not have *carte blanche* to enforce the rights of more than 100 children who never enlisted its aid, it cannot satisfy the prerequisites to, and has no authority to maintain, this enforcement action.

Title II's enforcement provision provides rights and remedies "to any person alleging discrimination," 42 U.S.C. § 12133—which the United States is not, *United States v. Florida*, 938 F.3d 1221, 1228 (11th Cir. 2019). Earlier in this case, the Eleventh Circuit concluded that, while not mentioned in Title II, a federal enforcement action is among the rights and remedies that Title II confers on—and that belong to—a "person alleging discrimination." Specifically, the court held that Title II incorporates a system of federal enforcement that begins when a "person alleging discrimination" files an administrative complaint with the United States to enlist the United States' aid. *Id.* at 1234–35, 1239–42. That process allows the United States, after investigation of the administrative complaint, and as a backstop to negotiations, to bring an enforcement action to vindicate the individual's rights. *Id.*; *accord United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730, 733 (11th Cir. 2021) (J. Prior, J., respecting the denial of rehearing en banc) (explaining that the federal administrative enforcement process "may culminate in suit by the Attorney General on the person's behalf"). As the United States explained in its brief, its authority to file federal enforcement actions is part of a "package" of remedies, procedures, and rights that Title II grants to "persons alleging discrimination" who "complain to and enlist the aid of federal agencies," and who "decide to use the administrative enforcement process to vindicate their rights." ECF No. 672-1 at 23, 31–32. Thus, a federal enforcement action "vindicates individuals' personal rights." *United States*, 938 F.3d at 1238.

The United States claims to have brought this enforcement action "to enforce the rights of" more than 100 children. ECF No. 700 ¶¶ 6, 7, 11. But *only one* of those children—C.M.—ever filed an administrative complaint with the United States (directly or through their parents or guardians) to enlist its aid. SOF ¶ 57. None of these children or their parents or guardians asked the United States to bring or maintain this action, and the United States never informed them whose rights it asserts here or that it seeks to enforce their individual rights. *Id.* ¶ 58–60.

The United States does not enjoy an unbounded, freestanding right to sue, untethered to the rights of individuals and to the administrative-complaint process that was so central to the Eleventh Circuit's analysis. To allow the United States to parlay one complaint—which has been resolved—into this action to enforce the purported rights of more than 100 children who never invoked its aid would expand the United States' authority far beyond the reasoning that supports it. Nor does C.M.'s package of rights include an action to vindicate the rights of scores of other children. Because only one child at issue here filed a complaint, and because

11

one child's rights cannot justify systemwide relief, the Court should grant summary judgment.

## II.   THE UNITED STATES CANNOT ESTABLISH THAT THE CHILDREN'S HOMES—OR OTHER AVAILABLE COMMUNITY SETTINGS—ARE APPROPRIATE TO THEIR NEEDS.

The first element of an *Olmstead* claim requires the United States to establish that the home or community setting to which an institutionalized child seeks to transition would be "appropriate" to the child's needs. 527 U.S. at 587. But the United States never evaluated those settings and thus has no evidence that the home to which a child would be discharged is appropriate to the child's needs. Instead, it retained experts to opine that the children can appropriately reside in some *abstract*, *undefined*, *hypothetical* community setting that exists only in the expert's mind—a setting that the experts neither bothered to describe nor to find in the real world. A child cannot move into an expert's mind, however—only into a real-life setting actually available to the child—and the consequence of discharging children to inappropriate homes only because an expert was able to hypothesize an appropriate one can be disastrous. When the lives and health of children are at stake, the law demands a practical application— not academic exercises. And because the United States has no evidence of the appropriateness of an *actual setting* to the needs of any specific child, the State is entitled to summary judgment.

*Olmstead* was a cautious, measured, and practical decision. It showed sensitivity to the challenges of providing care to critical populations and did not condemn institutional settings categorically. The Court emphasized that "nothing in the ADA . . . condones termination of institutional settings for persons unable to handle or benefit from community settings," *id*. at 601–02, or "impel[s] States to phase out institutions, placing patients in need of close care at risk," *id*. at 604 (plurality opinion). Therefore, "it would be inappropriate to remove a patient from the more restrictive setting" unless medical professionals first assessed the individual's eligibility for community-based care. *Id*. at 602. Justice Kennedy echoed these admonitions, explaining that it would be "tragic" and "unreasonable" if the ADA were "interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id*. at 610. He cautioned that, unless *Olmstead* is applied with "caution and circumspection, States may be pressured into attempting compliance on the cheap, placing marginal patients into integrated settings devoid of the services and attention necessary for their condition." *Id*.

The United States takes a radical and dangerous turn from the cautious and measured

principles of *Olmstead*—one that would ultimately endanger the lives of children. The United States interprets the "appropriateness" element of *Olmstead* in a purely conceptual, theoretical way: if an expert can *imagine* a setting that would be appropriate to the child's needs, then the first element is satisfied, regardless of whether that setting in fact exists and is available to the child in real life. Under this theory, a State incurs liability under the ADA even if a child has *nowhere to go*—if no appropriate setting outside an expert's imagination has been identified. What's more, it would nullify the first element of *Olmstead* altogether, since it is *always* possible to *imagine* a community setting that would be appropriate to the needs of an individual. Once the appropriateness inquiry is transformed from a crucial, practical inquiry into an exercise of imagination, the ADA will force children out of institutional settings into any setting that is available—homes unsuited to their needs, or hospitals, or settings without the necessary care. *Olmstead*'s cautions will be brushed aside, and academic zeal will imperil the lives of children.

Home settings are not fungible. Florida's expert, Dr. Allan Greissman, is an attending physician at Joe DiMaggio Children's Hospital with nearly 30 years of experience in pediatric care. His testimony illustrates the many factors that determine—in real life—whether a home setting is appropriate to a child's needs. As Dr. Greissman explains: "Whether a home is a safe environment appropriate to the needs of a particular child with complex medical needs depends on many variables and the unique circumstances of each child." SOF ¶ 49. A home must have adequate space for the child, the child's nurse, and the equipment and supplies that the child requires. *Id*. ¶ 50. The child must have a room that allows the child to rest without interruption. *Id*. ¶ 51. The home must have a reliable power source (such as a generator) on which the child's equipment operates. *Id*. ¶ 52. The home must be clean and sanitary, *id*. ¶ 53; a home infested by mold or pests is not appropriate to the care of a child with complex medical needs. The home must be safe and protect the child from harm. *Id*. ¶ 54. It must include family members or others who are able and willing to assist in the child's care, if only as a second set of hands. *Id*. ¶ 55. The home's close proximity to emergency response teams, to hospitals or other acute-care facilities, or to doctors or respiratory therapists, might be critical to the child's care. *Id*. ¶ 56. These and innumerable other variables determine a home's "appropriateness."

The appropriateness element ensures that the *alternative* setting—the non-institutional setting to which the child will transition—is one that the child can "handle or benefit from." *Olmstead*, 527 U.S. at 601–02. The United States did not assess these alternative settings and

cannot therefore establish this element of its claim. It did not visit the homes of the children's parents (or other potential settings) to determine whether the children can appropriately reside and receive care in those settings. It is insufficient as a matter of law to say that an expert's imagination was resourceful enough to hypothesize an appropriate community placement for the child. *Olmstead* does not condemn institutionalization where no appropriate setting is in fact available to the child—no matter what an expert might conjure in her mind's eye. Because the United States has no evidence that appropriate, non-institutional settings are available to any specific child, it cannot satisfy its burden, and the State is entitled to summary judgment.

## III.   THE UNITED STATES CANNOT ESTABLISH THAT ITS PROPOSED MODIFICATIONS ARE LIKELY TO REDRESS ANY PERSON'S UNLAWFUL INSTITUTIONALIZATION—LET ALONE WIDESPREAD VIOLATIONS.

The United States proposes various modifications that it claims the ADA compels the State to make, but it cannot prove that these modifications are likely to redress any qualified person's alleged injuries. This is so because some features of redress depend on the unfettered future choices of independent non-parties, such as nurses and the home health agencies that employ them. And even if the United States could demonstrate an inference of likely redress in isolated cases, that would not be enough to warrant the only relief the United States seeks: systemwide relief. The United States' burden is to demonstrate that its proposed modifications are likely to redress pervasive or widespread violations under *Olmstead*—and this it cannot do.

### A.   Proposed Modification No. 1: Increased Medicaid Reimbursement Rates for Private-Duty Nursing.

The United States urges this Court to order the State to pay more money across the board to home health agencies for the private-duty nursing services they provide to children enrolled in Florida Medicaid. The additional money (the theory goes) will attract more nurses to seek employment as private-duty nurses with home health agencies—and therefore make private-duty nursing services more readily available to Medicaid-recipient children. This, the United States argues, is a "reasonable modification" that the ADA compels the State to make.

One obvious flaw in this argument concerns redressability. The proposed modification assumes that independent actors who are non-parties will exercise their discretion to make decisions that produce redress. Yet the United States has no evidence to suggest that they will.

*First*, the argument presupposes that home health agencies will use the extra revenue they receive to increase the compensation of their nurses. That assumption is quite simply no

more than an assumption. Home health agencies provide a wide range of home-care services and employ a wide range of service providers. In addition to the nurses, home health agencies employ home health aides, certified nursing assistants, physical therapists, physical therapist assistants, speech pathologists, occupational therapists, occupational therapist assistants, respiratory therapists, social workers, dieticians, nutritionists, homemakers, and companions. Fla. Admin. Code r. 59A-8.0095. They also employ administrators and directors of nursing, *id.*, and, like any going concern, have other expenses to pay, including the cost of office space and information technology. Home health agencies might have many other more pressing priorities—including needs for other service providers, such as therapists—than hiring more nurses. The United States has no evidence that home health agencies in Florida will use any additional revenue they receive—and if so, how much—to hire additional private-duty nurses.

*Second*, redress assumes that any increased compensation that home health agencies offer to nurses would in fact persuade nurses to enter the home-health arena—an arena that nurses might find unattractive no matter the pay. Nurses might, for example, prefer to work in clinical settings, such as hospitals or doctor's offices, rather than in a house or apartment. Nurses might find a clinical setting more diverse, stimulating, dynamic, and educational than work in the home of a single patient. Nurses might prefer to work alongside teams of other nurses and medical professionals, rather than as the sole medical professional in a residential home. The sole responsibility that a nurse bears for a medically complex child's well-being in a home—in contrast to a hospital or doctor's office, where a team of professionals would rush to the scene of any emergency—might deter nurses from home care. Nurses might find home environments unsafe, unsanitary, and hazardous compared to clinical settings with familiar, well-developed protocols and procedures. The United States has no evidence to establish that, even if home health agencies increased their nurses' compensation, any appreciable number of nurses would decide to seek employment as private-duty nurses with home health agencies.

Because redress depends on the unconstrained, downstream decisions of independent non-parties, the United States bears a heavy burden to show those decisions will be made in a manner that produce causation and redressability. *Lujan*, 504 U.S. at 562. This it cannot do. It can only *hope* that additional money will trickle down and attract more nurses to home care.

Judge Hinkle granted summary judgment for the State on the same ground in *Disability Rights Florida, Inc. v. Palmer*, No. 4:18-cv-00342, 2019 WL 11253085 (N.D. Fla. Aug. 29,

2019). There, the plaintiffs insisted that the State's reimbursement rates for behavior-analysis services were insufficient to attract enough providers, and that the ADA obligated the State, as a "reasonable modification," to increase those rates to attract more providers. *Id.* at *2–4. The court concluded, however, that "causation is speculative, and redressability is absent." *Id.* at *7. "Reimbursement rates are one—but only one—of the many factors that a provider considers in deciding where and to whom to provide service." *Id.* "Increasing reimbursement rates might increase availability of behavior analysts in some areas, but might not—and the rate that would be required to make services available to an individual at a given location is unknowable." *Id.* The plaintiffs failed to carry their heavy burden to show that, if offered more money, behavior analysts would choose to provide the services that the plaintiffs sought. *Id.*

*Lewis v. Governor of Alabama*, 944 F.3d 1287 (11th Cir. 2019) (en banc), is also on point. In *Lewis*, two minimum-wage employees challenged a state statute that preempted all local ordinances that established a minimum wage greater than the federal minimum wage. *Id.* at 1292. The plaintiffs failed, however, to show how invalidation of the statute would redress their alleged injuries. The court explained that the plaintiffs' employers were not parties to the action, would not be bound by the district court's judgment, and would have strong practical incentives to maintain their consistent, statewide, minimum-wage policies and to challenge the local ordinance in a future action. *Id.* at 1303–05. Whether these independent actors would comply with the ordinance or challenge it was speculative. *Id.* at 1305. The plaintiffs failed to plead, therefore, that a favorable decision would "significantly increase the likelihood" that their employers would increase their pay, *id.* at 1301, 1305 (internal marks omitted), and the en-banc Eleventh Circuit affirmed the district court's dismissal of their complaint, *id.* at 1295.

As in *Palmer* and *Lewis*, the United States cannot satisfy the heightened standard that applies when redress depends on the unfettered choices of independent actors not before the Court. It has no evidence to show that, if paid more for private-duty nursing services, some or all home health agencies will increase their nurses' compensation. And even if some do, it is far from clear how much additional money would be required, how many additional nurses that money would attract to home care, and whether home health agencies would assign the new nurses to any specific children who allegedly face unlawful institutionalization. The mere *hope* that money will trickle down and induce countless independent actors—nurses and home health agencies across Florida—to make decisions that produce redress is insufficient to show

16

standing at this late stage. This Court should grant summary judgment as to the United States'
request for an increase in rates paid to home health agencies for private-duty nursing services.

> **B.**    **Proposed Modification No. 2: Increased Reimbursement Rates for Medical Foster Parents.**

The same failure dooms the United States' demand for an increase in payments made
to medical foster parents. The United States argues that more money will induce more people
to become medical foster parents and thus to dedicate their lives and their homes to the care
of foster children with complex medical needs. The United States also assumes that these new
recruits will take into their homes the children whom Florida's current medical foster parents
have not taken into theirs. If these assumptions hold, then (the United States argues) children
in Florida's custody who would otherwise reside in nursing facilities will live in home settings.

Once again, the United States has no evidence to suggest that more money will redress
the alleged injury. Redress depends on the unconstrained choices of numberless non-parties—
Floridians who might not be attracted by more money to become medical foster parents, or
who might not be any more willing than Florida's current medical foster parents to take into
their homes the specific children at issue here—those who reside in nursing facilities. Without
proof that these non-parties will voluntarily make the decisions the United States hopes they
make, the United States cannot carry its burden to establish a significant likelihood of redress.

*First*, redress assumes that more money will motivate people to become medical foster
parents and thus to dedicate their lives, their homes, and their families to the care of children
who are in the State's dependency system, who have been removed from troubled homes, and
who, on top of it all, have complex medical needs that often require around-the-clock medical
care and supervision. That is far from a safe assumption. To accept full-time responsibility for
the care (including medical care) of someone else's child, despite the child's personal history
and complex medical needs, is clearly a calling—not a financial strategy. The United States
has no evidence that more money will induce more people to become medical foster parents.

*Second*, redress assumes (improbably) that any new medical foster parents will choose
to care for the very children who have not found homes with Florida's current medical foster
parents. Currently, only nine children in state custody reside in nursing homes. SOF ¶ 39. At
the same time, there are 176 medical foster homes in Florida with a total capacity of 477 beds,
of which 314 are currently filled. *Id*. ¶ 38. Despite 163 potentially available beds, and despite

regular searches to find medical foster parents willing to care for the nine children who reside in nursing homes, *id.* ¶ 39, these children have not found medical foster homes. Many reasons might explain why. It is the United States' burden, however, to establish that new recruits to the medical foster program would do what Florida's current medical foster parents have not: open their homes to particular children who face institutionalization and thus make decisions that afford redress. Without that evidence, the United States has not established redressability, and the Court should enter summary judgment with respect to the United States' claim for a court-ordered increase in the reimbursement rates that Florida pays to medical foster parents.

### C. Proposed Modification No. 3: Enhanced Recruitment of Medical Foster Parents.

Similarly, the United States contends that the ADA requires the State to "enhance" its efforts to recruit medical foster parents. Here too, the United States cannot demonstrate that its proposed "modification" will afford redress. The United States has no evidence to show how Florida's recruitment efforts have been deficient, what Florida should do differently, or whether any enhanced recruitment efforts would in fact yield new recruits who will open their homes to specific children who would otherwise allegedly suffer unlawful institutionalization.

Rather than propose specific, new recruitment efforts, the United States plays armchair quarterback, insisting that the State's recruitment efforts must be inadequate and that the State can and must do more or do better. But vague commands to "do more" or "do better" do not "describe in reasonable detail . . . the act or acts restrained or required" and therefore are not appropriate remedies for a federal-court injunction. *See* Fed. R. Civ. P. 65(d)(1)(C). And given their vagueness, they afford no significant likelihood of redress. Without any explanation of the proposed remedy, this Court cannot determine its tendency to provide redress. Redress, moreover, still hinges on the unfettered choices of independent actors: each potential recruit. The United States has no evidence that "enhanced" recruitment will sway a single person to become a medical foster parent—let alone a medical foster parent to a child who otherwise will allegedly suffer unlawful institutionalization. Because the United States cannot show that undefined new recruitment efforts would redress an *Olmstead* violation, summary judgment is appropriate as to the United States' claim for enhanced recruitment of medical foster parents.

### D. Proposed Modification No. 4: Extension of Medical Foster Care to Long-Term Placements of Children Not in State Custody.

The United States also asks this Court to extend Florida's medical foster care program,

which ordinarily serves only children in Florida's custody, to children who are not in Florida's custody. Under this proposed modification, medical foster homes would serve not only as an element of Florida's dependency system for the benefit of children without custodial parents, but also as a long-term residential placement of indefinite duration for all children in the State.

Once again, in looking to revamp Florida's systems on a statewide basis, the United States overlooks its burden to establish that its proposed modifications would in fact redress the unlawful institutionalization of individual children. The United States has no evidence that, if the program were extended to children who are not in Florida's custody, any parents would choose to place their children in medical foster homes to avoid institutional placement. No parent has asked to place a child in a medical foster home; at most, a few parents politely told the United States' lawyers and experts that they would consider it. That is not enough. In fact, while the State permits children with custodial parents to live in medical foster homes on a time-limited basis—under an agreement known as a voluntary placement agreement— DCF has no record of any parent in Florida ever having utilized this arrangement. SOF ¶ 48.

Unless the United States can show that custodial parents—independent actors who are not before the Court—will choose to place their children with medical foster parents and not in nursing homes, the United States cannot show that its proposed expansion of the medical foster care program to children with custodial parents will redress a single *Olmstead* violation. Absent such evidence, summary judgment should be granted as to this proposed modification.

### E.     Proposed Modification No. 5: Increased Limits on Enrollment in the iBudget Waiver Program.

Next, the United States urges the Court to order Florida to increase enrollment in the iBudget waiver program, which provides home and community-based services to its enrollees. Florida currently limits enrollment in the program to 39,242 people, SOF ¶ 23, as federal law authorizes, *see infra* Part V.A.1. The United States maintains that children need these services to avoid institutionalization and that the enrollment limit denies them access to those services.

The United States cannot substantiate that claim, however, and therefore cannot show redressability. It cannot show that any child resides in a nursing home because the child was denied services provided by the iBudget waiver—or that the child's enrollment in the waiver and access to waiver services would enable the child to live at home or in a community setting.

There are several reasons why the United States cannot make this necessary showing.

*First*, the waiver provides few services to children. SOF ¶ 24. That is because, unlike adults, children are entitled to receive all medically necessary services through Medicaid, 42 U.S.C. §§ 1396a(a)(43), 1396d(a)(4)(B), (r)(5), and CMS will not approve a waiver program to the extent it duplicates Medicaid services—*i.e.*, to the extent it proposes to cover the same services for the same population as Medicaid does, CENTERS FOR MEDICARE & MEDICAID SERVICES, STATE MEDICAID MANUAL §§ 4442.1, 4442.3A.3., https://www.cms.gov/regulations-and-guidance/guidance/manuals/paper-based-manuals-items/cms021927. Because Medicaid does, the waiver does not provide children with medical services such as private-duty nursing.

*Second*, when a child's access to the limited services that the waiver program provides is truly necessary to avoid institutional placement, the State provides mechanisms that allow children to bypass the waiting list and enroll in the waiver program without delay. SOF ¶ 26. One is the crisis rule. Individuals "deemed to be in crisis" are afforded priority treatment and are automatically enrolled in the program, and are not placed on the waiting list, once a crisis determination is made. *Id.* ¶ 27–28; Fla. Stat. § 393.065(5)(a); Fla. Admin. Code r. 65G-1.047. Children who lived at home or in other community settings, and who needed waiver services to prevent institutionalization, have been enrolled in the waiver program under the crisis rule. SOF ¶ 29. A second no-wait mechanism is the transition proviso that recurs annually in the state budget. Each year, the Legislature has set aside funds to support waiver enrollment for individuals who need waiver services to transition from institutional settings. *Id.* ¶ 31; *see, e.g.*, Ch. 2022-156, at 72–73, Laws of Fla. The limits on enrollment in the waiver program do not, therefore, bar the enrollment of children faced with the alternative of institutional placement.

For these reasons, the United States cannot show that specific children needed specific waiver services to avoid unlawful institutionalization but were denied access to those services by the limits on enrollment. It cannot establish that any child needed waiver services to avoid institutional placement and that the mechanisms that allow children to bypass the waiting list in these circumstances failed. And therefore it cannot establish that any injury is traceable to the program's enrollment limits or that modification of those limits would redress any injury. This Court should accordingly grant summary judgment to the State as to the waiver program.

### F.   Proposed Modification No. 6: More Effective Care Coordination for Medicaid-Recipient Children.

The United States cannot show that any child's allegedly unlawful institutionalization

is fairly traceable to ineffective care coordination, or that any changes to the care-coordination service would redress any child's alleged injury. While the United States has vaguely alleged that the State's care coordinators have not "actively" or "effectively" identified service options for children and have failed to inform families of services, ECF No. 700 ¶¶ 80–81, the facts flatly contradict these broadsides. More to the point, the United States cannot show a causal connection between ineffective care coordination and a child's unlawful institutionalization.

Because it cannot show that ineffective care coordination caused any child's allegedly unlawful institutionalization, it also cannot show that a modification of the care-coordination program would prevent unlawful institutionalization and therefore redress any child's injury. Without evidence of specific deficiencies that have forced specific children into institutional settings in violation of *Olmstead*, the United States' demands that the State "do more" or "do better" will not suffice. Because the United States cannot show traceability or redressability, this Court should grant summary judgment to the State as to its program of care coordination.

## IV.  THE UNITED STATES' DEMAND FOR BETTER CARE COORDINATION IS NOT COGNIZABLE UNDER THE ADA BECAUSE IT CHALLENGES THE QUALITY OF CARE.

Next, to the extent the United States challenges the State's care-coordination services, it assails the *quality* or *effectiveness* of those services—which is not actionable under the ADA. This Court should grant summary judgment as to the claim that the State's care coordinators have not actively or effectively identified service options or informed families about services.

*Olmstead* made clear that the ADA does not impose on States a "'standard of care' for whatever medical services they render." 527 U.S. at 603 n.14. *Olmstead* does not, for example, permit a plaintiff to sue for a "better" doctor or "better" services. To permit such challenges would be to "transform the ADA from an antidiscrimination statute into a law regulating the quality of care the States provide to the disabled." *Disability Rts. N.J., Inc. v. Comm'r, N.J. Dep't of Hum. Servs.*, 796 F.3d 293, 307 (3d Cir. 2015). "The purpose of the [integration-mandate] regulation is not to constitute the federal courts the supervisors of the care and treatment of disabled persons." *Bruggeman ex rel. Bruggeman v. Blagojevich*, 324 F.3d 906, 913 (7th Cir. 2003). Thus, a claim must be dismissed if it "concerns the 'adequacy' of the services provided" and seeks the "forbidden remedy" of "adequate" services. *Lane v. Kitzhaber*, 841 F. Supp. 2d 1199, 1206–08 (D. Or. 2012); *see also Alexander*, 469 U.S. at 303 (noting that the Rehabilitation Act does not assure individuals with disabilities a certain level of care or "adequate health care").

In *Buchanan v. Maine*, 469 F.3d 158 (1st Cir. 2006), law-enforcement officers shot and killed a man with mental illness who repeatedly stabbed a deputy sheriff. The administrator of the decedent's estate sued the State under Title II of the ADA, alleging that the decedent's case manager for mental-health services failed to arrange adequate care and treatment. *Id.* at 161, 163. The administrator alleged that the case manager did not inform the decedent of his mental-health problems or enable him to secure needed services. *Id.* at 175. For example, the administrator argued that the case manager should have performed more check-ups, amended the decedent's service plan to reflect his increased needs, and provided assistance and crisis intervention upon learning of a disturbing incident shortly before decedent's death. *Id.* The First Circuit affirmed the district court's entry of summary judgment, however. It explained that the ADA "does not set a standard of care of services" or assure "adequacy of treatment." *Id.* at 174–75. Because the administrator did not allege that the State "did not provide mental health services"—only that services were inadequate—the ADA afforded no relief. *Id.* at 175.

Similarly, in *Ombe v. Martinez*, No. 1:14-cv-00763, 2015 WL 13855233 (D.N.M. Sept. 3, 2015), the plaintiff alleged that state employees who provided vocational assistance failed to recognize his needs and disabilities and thus failed to communicate effectively with him. *Id.* at *1. But the court dismissed the claim, explaining that the ADA did not create a "quality of care standard." *Id.* at *3. Because the plaintiff did not allege a denial of any services—only that those services "did not meet his expectations"—his complaint failed to state a claim. *Id.*

The United States' contention that Florida's care coordinators do not "effectively" or "actively" identify service options or inform families of available services fails to state a claim for the same reason. It challenges the standard of care—the quality or adequacy of services—rather than a discriminatory denial of services. Just as the ADA affords no cause of action for a "better" doctor, it affords no cause of action for a "better" care coordinator. Because the ADA does not entitle plaintiffs to a higher standard of care, this Court should enter summary judgment with respect to the United States' challenge to the State's care-coordination services.

## V.    THE ADA DOES NOT COMPEL MODIFICATIONS THAT REWRITE OR DEPART FROM SPECIFIC TERMS OF OTHER FEDERAL STATUTES OR FEDERALLY APPROVED PROGRAMS.

The ADA's general anti-discrimination provision does not compel modifications that rewrite or depart from specific provisions of other federal laws, including the federal Medicaid Act. For example, when the Medicaid Act *expressly* and *specifically* authorizes States to limit

enrollment in their waiver programs, the ADA's general anti-discrimination provision does not trounce that authorization and require States to set aside their enrollment limits. For this reason, several modifications that the United States seeks are unavailable as a matter of law.

The remedy that the ADA affords is a "limited one," *Lane*, 541 U.S. at 531; *accord Nat'l Ass'n of the Deaf*, 980 F.3d at 774 (explaining that Title II "provides an appropriately limited response" to disability-based discrimination), extending only to "reasonable modifications" that do not "fundamentally alter" a State's services or programs. 28 C.F.R. § 35.130(b)(7)(i). Tellingly, "the word 'modification' 'connotes moderate change.'" *Sandison v. Mich. High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1037 (6th Cir. 1995) (quoting *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994)); *accord MCI Telecomms.*, 512 U.S. at 225 ("Virtually every dictionary we are aware of says that 'to modify' means to change moderately or in minor fashion."). The limited nature of this remedy has long been integral to Title II's validity under the Fourteenth Amendment. *Lane*, 541 U.S. at 531–34; *Nat'l Ass'n of the Deaf*, 980 F.3d at 773–74; *Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ.*, 405 F.3d 954, 957–59 (11th Cir. 2005).

One of the limits that courts have recognized is that Title II does not rewrite and cannot compel departures from specific provisions of the federal Medicaid Act. Such modifications are not "reasonable" as a matter of law. Moreover, as a matter of statutory interpretation, it is axiomatic that, when they cannot be harmonized, specific provisions control general ones. When a general anti-discrimination provision purports to prohibit what a specific provision of federal law expressly permits, the two provisions conflict—and the general one must yield.

### A.   Modifications That Rewrite or Depart From Specific Provisions of Other Federal Statutes Are Unreasonable As a Matter of Law.

Time and again, courts have held as a matter of law that the ADA does not necessitate modifications that rewrite or depart from specific provisions of the federal Medicaid Act. For example, in *Harrison v. Young*, 48 F.4th 331 (5th Cir. 2022), the plaintiff argued that *Olmstead* required the State's waiver program to fund the around-the-clock nursing care she needed to avoid institutional placement, *id.* at 335–36, but the court disagreed. It noted that the federal Medicaid Act contained a cost-neutrality provision that required States to certify that the cost of home care provided to waiver enrollees would not exceed the cost of institutional care, and that, consistent with that provision, the State limited its annual, per-enrollee costs to $170,000. *Id.* at 336. The ADA did not require the State to ignore the Medicaid Act and modify its cost

limitations to prevent the plaintiff's institutionalization: "the plaintiff cites no case, nor could we find one, holding that *Olmstead* requires community-care services that would exceed the federally approved cost cap on a Medicaid program." *Id*. at 342. The court thus reversed the district court's entry of an injunction that compelled the State to fund around-the-clock care.

Similarly, in *Alexander v. Mayhew*, 451 F. Supp. 3d 1293 (N.D. Fla. 2020), the plaintiffs argued that, to prevent institutionalization, the ADA required the State to increase the limits on enrollment in a Medicaid waiver program that provides long-term care services primarily to elderly Floridians. Judge Hinkle, however, granted summary judgment in the State's favor. He explained that the Medicaid Act "explicitly authorizes" enrollment caps, *id*. at 1294, and that "an injunction requiring the state to serve additional individuals through the waiver—to obtain an increase in or to exceed the cap—would fundamentally alter the state's programs," *id*. at 1294–95. "This is so as a matter of law." *Id*. at 1295. Title II of the ADA compelled the State to make accommodations "only if [it] can do so without exceeding the waiver cap." *Id*.

The court in *Boyd v. Steckel*, 753 F. Supp. 2d 1163 (M.D. Ala. 2010), also expressed doubt that the ADA could force States to ignore limitations on waiver-program enrollment—limitations authorized by the Medicaid Act—thus "rendering the permissible caps illusory." *Id*. at 1177. The court was "not convinced that the intended interaction between the [ADA and the Medicaid Act] is such that States [must] provide . . . community-based services to all persons who could benefit from them even when the waiver programs are full." *Id*. at 1177 n.19; *see also Ramirez v. Young*, No. 4:22-cv-00733, 2022 WL 16919351, at *2 (N.D. Tex. Nov. 14, 2022) (refusing to issue a preliminary injunction where plaintiff sought to compel a State to exceed expenditure caps that the federal Medicaid Act expressly and specifically allowed).

In *Vaughn v. Walthall*, 968 F.3d 814 (7th Cir. 2020), a plaintiff who could not secure private-duty nursing because Medicaid reimbursement rates were too low was admitted to a nursing home. *Id*. at 817–18. The plaintiff requested a series of accommodations, including the right to hire and train her own providers and to pay them more than the State's approved Medicaid reimbursement rates. *Id*. at 820. The court held, however, that the ADA did not obligate the State to pay the plaintiff's providers "at rates above the approved Medicaid caps." *Id*. at 827. The State did not have "unilateral authority," without federal approval, to make those modifications, nor was it required to "depart from what CMS had approved for general use." *Id*. at 822. A State need not provide accommodations that do not "comport with federal

requirements for Medicaid service approval" or that "go outside its approved programs." *Id*. at 823; *see also Heartz v. Morton*, No. 1:98-cv-00317, 1999 WL 1327398, at *6 (D.N.H. 1999) (concluding that the ADA does not require a State to exceed federally authorized cost limits).

Finally, in *Nasello v. Eagleson*, 977 F.3d 599 (7th Cir. 2020), the plaintiffs claimed that the ADA required a State to modify the manner in which it determines eligibility for Medicaid coverage. *Id*. at 600, 602. The court disagreed. It explained that the ADA "might require some accommodations in the *implementation* of the Medicaid program, but [that] . . . a state need not depart from the *terms* of that program . . . in order to provide those accommodations." *Id*. at 602 (emphases added). Because the plaintiffs had not identified a modification that would "comport with the terms of the Medicaid Act," their claims were appropriately dismissed. *Id*.

### 1. The Medicaid Act Expressly Permits Limits on Enrollment in Waiver Programs.

These principles bar two of the modifications that the United States asks this Court to order. *First*, the United States argues that the ADA requires the State to increase its enrollment limits on the iBudget waiver program. The iBudget waiver program is a waiver program under section 1915(c) of the Social Security Act, SOF ¶ 22, which means that federal law specifically permits Florida to limit enrollment in the program, 42 U.S.C. § 1396n(c)(9) (recognizing that a waiver program under section 1915(c) may contain "a limit on the number of individuals who shall receive home and community-based services"); 42 C.F.R. § 441.303(f)(6) (requiring States to "indicate the number of unduplicated beneficiaries to which it intends to provide waiver services in each year," which "will constitute a limit on the size" of the program); *see also Bertrand ex rel. Bertrand v. Maram*, 495 F.3d 452, 457 (7th Cir. 2007); *Alexander*, 451 F. Supp. 3d at 1294. Florida in fact limits enrollment in the iBudget waiver program—currently to 39,242—and federal CMS expressly approved that limit on waiver enrollment. SOF ¶ 23.

As a matter of law, courts have consistently concluded (as in *Harrison*, *Alexander*, *Boyd*, *Ramirez*, and *Heartz*) that the ADA does not compel modifications to the enrollment or cost limits that States impose on their waiver programs pursuant to authority that the Medicaid Act expressly and specifically affords them. Because States "need not depart from the terms" of their cooperative federal-state programs, *Nasello*, 977 F.3d at 602, or "go outside approved programs," *Vaughn*, 968 F.3d at 823, Florida is entitled to summary judgment as to the United States' claim that the State must give up its enrollment limits and increase waiver enrollment.

**2.    CMS Approved Florida's Medicaid Reimbursement Rates for
Private-Duty Nursing Services, and the Medicaid Act Establishes
the Specific Standard That Governs Those Rates.**

*Second*, while the United States argues that Florida's reimbursement rates for private-duty nursing are inadequate, ECF No. 700 ¶¶ 56–60, and that the ADA compels an increase in that rate, federal CMS expressly approved Florida's rate schedule for private-duty nursing effective July 1, 2016, when the rate schedule for private-duty nursing was incorporated by reference into the approved State Plan that governs Florida's administration of the Medicaid program. SOF ¶ 14. A State Plan is the "comprehensive written statement submitted by [the State] describing the nature and scope of its Medicaid program," 42 C.F.R. § 430.10, and the State is bound to follow the State Plan after federal CMS has approved the State Plan to serve as the basis for federal financial participation, 42 U.S.C. § 1396c; 42 C.F.R. §§ 430.10, 430.35. As in *Vaughn*, where the State was not required to pay more than what "CMS had approved for general use," 968 F.3d at 822, the ADA does not require Florida here to depart from its approved State Plan and pay nurses "at rates above the approved" Medicaid rates, *id.* at 827.

This is true for another reason as well: the Medicaid Act itself establishes the standard for determining Medicaid reimbursement rates. The ADA does not require a departure from that standard, nor can the United States demonstrate any non-compliance with that standard.

The Medicaid Act provides that Medicaid reimbursement rates must be "sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographical area." 42 U.S.C. § 1396a(a)(30)(A); *accord* 42 C.F.R. § 447.204; Methods for Assuring Access to Covered Medical Services, 80 Fed. Reg. 67,576, 67,587 (Nov. 2, 2015) (explaining that the Medicaid Act requires States to "assure that access is available to Medicaid beneficiaries to the extent that care is available to the general population in a geographic area"). The Medicaid Act does not require ubiquitous access to services, but rather the same level of access available to the general population. *Hoag Mem'l Hosp. Presbyterian v. Price*, 866 F.3d 1072, 1080 (9th Cir. 2017) (emphasis in original); *accord John B. v. Emkes*, 852 F. Supp. 2d 957, 985 (M.D. Tenn. 2012) (explaining that the Medicaid Act "expressly limits the State's obligation in establishing a provider network"). CMS oversees compliance with the Medicaid Act's requirements for reimbursement rates: it "may disapprove a proposed state plan amendment . . . for [a State's] failure to document compliance with statutory access requirements." 42 C.F.R. § 447.204(c).

The United States' contention that Florida's rates are insufficient to provide access to private-duty nursing services—and that the ADA compels an increased rate—runs headlong into the Medicaid Act's access provision. The ADA does not require States to "depart from the terms" of the Medicaid program, *Nasello*, 977 F.3d at 602, or offer accommodations that do not "comport with federal requirements for Medicaid service approval," *Vaughn*, 968 F.3d at 823. The ADA does not, therefore, rewrite or compel a departure from the provision of the Medicaid Act that governs the relationship between reimbursement rates and the availability of services. The ADA does not impose a higher standard and thus override the Medicaid Act.

Nor can the United States offer any evidence that Florida's rates violate the Medicaid Act's access provision. It cannot show that private-duty nursing services are not available "at least to the extent [they are] available to the general population in the geographical area." 42 U.S.C. § 1396a(a)(30)(A). In fact, CMS's approval of Florida's rate schedule for private-duty nursing confirms that the State fulfilled its obligation to prove compliance with that provision. Without proof of non-compliance, the United States cannot show that Florida must increase its rates. *See West v. Davy*, No. 3:05-cv-03564, 2005 WL 2000202, at *5 (D.N.J. Aug. 16, 2005) (concluding that, although the Medicaid reimbursement rate was insufficient to provide the plaintiff with full-time access to nursing, plaintiff's failure to present evidence of the "level of care and services available to the general population" doomed his request for injunctive relief).

### B. Modifications That Rewrite or Depart From Specific Provisions of Other Federal Statutes Are Also Unavailable As a Matter of Statutory Construction.

Rules of statutory interpretation lead to the same result: the ADA does not supplant the Medicaid Act. When two provisions conflict—one specific and one general—the specific provision controls. The Medicaid Act contains specific provisions that entitle States to limit enrollment in waiver programs and to set rates that provide the same access to services that is available to the general population. As a matter of statutory interpretation, the ADA's anti-discrimination provision does not displace the Medicaid Act's narrow and specific provisions.

A statute "dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976); *accord Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961) (explaining that a "specific statute controls over a general one without regard to priority of enactment" (internal marks omitted)). Once Congress has carefully considered a particular

subject and enacted specific provisions on that subject, courts do not presume that a later enactment couched in general terms and capable of coexistence with the earlier one was intended to "affect the more particular or positive previous provisions." *Radzanower*, 426 U.S. at 153. It is equally well-established that statutory repeals and amendments by implication are disfavored. *United States v. Welden*, 377 U.S. 95, 103 n.12 (1964). Courts assume that Congress gave careful consideration to its earlier enactments and would not intend to repeal or amend them without a clear and manifest indication of its intent to do so. *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 134 (1974); *Patel v. Quality Inn S.*, 846 F.2d 700, 704 (11th Cir. 1988).

Countless cases illustrate these principles—and their application to broadly worded civil-rights statutes such as the ADA. In *Smith v. Christian*, 763 F.2d 1322 (11th Cir. 1985), the plaintiff argued that the Navy violated the Rehabilitation Act when it rejected his application because he was missing a finger. *Id.* at 1323. The court noted that two federal laws specifically authorized the Secretary of the Navy to prescribe physical qualifications for service, so that the Rehabilitation Act's general bar did not apply. *Id.* at 1325. The specific statutes were not nullified by, but took "precedence over the general guidelines of the Rehabilitation Act." *Id.*

*Smith* is significant because the Rehabilitation Act's standards parallel those in Title II of the ADA. *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019). When it decided *Smith*, the Eleventh Circuit was well aware that the Rehabilitation Act required public employers to make reasonable accommodations for qualified individuals with disabilities. 45 C.F.R. § 84.12(a); *Stutts v. Freeman*, 694 F.2d 666, 668–69 (11th Cir. 1983). Even so, rather than require the Navy to make reasonable accommodations for a disability, the court held that the Rehabilitation Act's general anti-discrimination mandate did not override the Navy's right to enforce the physical qualifications prescribed under two earlier, more specific statutes.

In *Morton v. Mancari*, 417 U.S. 535 (1974), plaintiffs maintained that an employment preference accorded by the federal Bureau of Indian Affairs to American Indian employees contravened the anti-discrimination mandate in Title VII of the Civil Rights Act. The Court disagreed, concluding that Title VII's general prohibition against discrimination on the basis of race in federal employment did not nullify an earlier, specific enactment that authorized the challenged preference. *Id.* at 550–51. The Court relied on the "cardinal rule" that implied repeals are disfavored, and found no indication of an intent to repeal the earlier enactment. *Id.* at 550 (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)). The earlier statute

was "a specific provision applying to a very specific situation," while Title VII had a "general application." *Id.* The "specific statute will not be nullified by the general one." *Id.* at 550–51; *accord Beckert v. Our Lady of Angels Apartments*, *Inc.*, 192 F.3d 601 (6th Cir. 1999) (concluding that a sponsor of supportive housing may, under an earlier, more specific statute, limit tenancy in its housing units to the elderly and to individuals with *physical* disabilities, notwithstanding the Fair Housing Act's broad prohibition upon all disability-based discrimination in housing).

As in these cases, the rule of interpretation that raises specific provisions over general ones is often "applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission." *RadLAX Gateway Hotel*, *LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In *Smith*, *Morton*, and *Beckert*, civil-rights statutes established *general prohibitions* against discrimination. In each case, the prohibition did not apply because another federal statute granted the defendant a *specific permission* to engage in the challenged conduct. The Secretary of the Navy had specific permission to turn away applicants with disabilities, the Bureau of Indian Affairs had specific permission to discriminate in employment decisions, and the sponsor of supportive housing had specific permission to refuse certain individuals with disabilities. In each case, a specific provision was "an exception to the general one." *Id.*

The same is true here. The ADA establishes a *general prohibition* against discrimination. The Medicaid Act grants *special permission* on Florida to limit enrollment in its waiver program and to establish rates that provide a commensurate level of access to services that the general population enjoys. These specific permissions were in place before Congress ever enacted the ADA. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6402(a), 103 Stat. 2106, 2260 (1989) (codified at 42 U.S.C. § 1396a(a)(30)(A)); Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9502(i), 100 Stat. 82, 204 (1986) (codified at 42 U.S.C. § 1396n(c)(9)). The ADA covers a "generalized spectrum" that affects all services and programs of all state governments and thus extends well beyond these specific provisions. *Radzanower*, 426 U.S. at 153. The ADA's broad prohibition upon discrimination did not submerge the special permissions that Congress had granted to States in the Medicaid Act. Because the Medicaid Act specifically governs waiver enrollment limits and rates-setting, this Court should grant summary judgment for the States as to these proposed modifications.[5]

---

[5] Because the Medicaid Act is Spending Clause legislation, U.S. Const. art. I, § 8, cl. 1, it is particularly critical that its specific provisions not be subject to revision or displacement

**VI.  THE ADA DOES NOT COMPEL MODIFICATIONS TO MEDICAID REIMBURSEMENT RATES BECAUSE CONGRESS ESTABLISHED AN EXCLUSIVE ADMINISTRATIVE PROCESS FOR MEDICAID RATE-SETTING.**

The United States cannot compel an increase in Medicaid reimbursement rates in this forum for an additional reason: in 2015, the Supreme Court found that Congress established an exclusive administrative remedy for inadequate Medicaid reimbursement rates. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015). The United States' recourse to enforcement of the ADA in this civil action is no more than an end run around the exclusive administrative remedy that Congress created to govern rate-setting determinations in the Medicaid program. Because Medicaid rate-setting is not cognizable in this forum, the State is entitled to summary judgment to the extent the United States seeks an increase in Medicaid reimbursement rates.

In *Armstrong*, Medicaid providers of habilitation services sought an injunction ordering a State to increase its Medicaid reimbursement rates. *Id.* at 323–24. The providers argued that the State's rates were less than the Medicaid Act's access requirements demanded. *Id.* (citing 42 U.S.C. § 1396a(a)(30)(A)). The Court rejected their claim and held that Congress intended to foreclose equitable actions for increased Medicaid rates. *Id.* at 328. It explained that "the sole remedy Congress provided for a State's failure to comply with Medicaid's requirements— for the State's 'breach' of the Spending Clause contract—is the withholding of Medicaid funds by the Secretary of Health and Human Services." *Id.* at 328. Moreover, the Court found the text of the Medicaid Act's access requirements "judicially unadministrable." *Id.* By conferring enforcement of the "judgment-laden" rate-setting standard on the Secretary alone, Congress intended to commit rate-setting to "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking" and to avoid the "inconsistent interpretations and misincentives" of enforcement in a different forum. *Id.* at 328–29 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 292 (2002) (Breyer, J., concurring)). In light of these rate-setting complexities, Congress "wanted to make the agency remedy that

---

by the ADA's broad provisions. Legislation "enacted pursuant to the spending power is much in the nature of a contract," the "legitimacy" of which "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Any condition imposed on a grant of federal funds must be disclosed clearly and unambiguously to enable States to "exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* The United States may not resort to the ADA to alter the specific terms of what amounts to a contract between the United States and Florida.

it provided exclusive." *Id*. at 328 (quoting *Gonzaga*, 536 U.S. at 292 (Breyer, J., concurring)).

Justice Breyer reinforced the "the complexity and nonjudicial nature of the rate-setting task" in his concurring opinion. *Id*. at 334. He explained that, if federal courts were to engage in "such direct rate-setting," reimbursement rates would be established "outside the ordinary channel of federal judicial review of agency decisionmaking," causing "increased litigation, inconsistent results, and disorderly administration of highly complex federal programs that demand public consultation, administrative guidance and coherence for their success." *Id*. at 335.

The United States rightly argued in *Armstrong* that Medicaid rate-setting must be left to the "ongoing bilateral relationship" between a State and CMS. Br. for United States at 14, *Armstrong*, 575 U.S. 320 (No. 14-15). Judicial rate-setting, it insisted, "would require courts to make predictive and policy judgments in the first instance, supplant the expert role of CMS, and interfere with the flexibility that [the access provision] affords to the State and CMS." *Id*. It could also "defeat the uniformity that Congress intended by centralizing administration of the federal program" in CMS, *id*. (quoting *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 615 (2012)), which includes the Secretary's obligation to "ensure compliance with" the access provision, *id*. at 24. Judicial rate-setting proceedings would "move forward on different evidentiary records and would result in different factual findings"—subject to review under a clearly-erroneous standard—and risk the development of "different legal standards." *Id*. at 25.

Eight years after it successfully argued for CMS's exclusive cognizance over Medicaid reimbursement rates, the United States today wrongly asks this Court to jump into the rate-setting fray and, under the ADA's authority, establish new Medicaid reimbursement rates for Florida. *Armstrong* flatly forbids that remedy.[6] Congress intended to make the agency remedy exclusive and to foreclose alternative rate-setting mechanisms, including judicial rate-setting by equitable relief. And while *Armstrong* was a private action, its rationale applies all the same: CMS, with its expertise and responsibility in the administration of a complex federal program, is not present here, and the establishment of new rates requires the application of judgment-laden standards that, to avoid inconsistency, must be guided by agency expertise, uniformity,

---

[6] *O.B. v. Norwood*, 838 F.3d 837 (7th Cir. 2016) (concluding that a court may not order an increase in Medicaid rates in response to a shortage of nurses willing to work at state rates).

and consultation. Because Congress conferred sole authority and cognizance over Medicaid reimbursement rates on CMS—and no authority on the Department of Justice to superintend Medicaid rate-setting—this Court should grant summary judgment in favor of the State to the extent the United States claims the ADA compels the State to modify its reimbursement rates.

**VII.  THE ADA DOES NOT COMPEL AN EXPANSION OF FLORIDA'S MEDICAL FOSTER CARE PROGRAM IN VIOLATION OF THE CONDITIONS OF SPENDING CLAUSE LEGISLATION.**

Another of the United States' proposed modifications is unavailable as a matter of law: the proposed use of Florida's medical foster care program to provide *indefinite* placements to children who are not in its custody. Indefinite foster-care placements of children not in state custody are ineligible for federal funding. The ADA does not require modifications that would render federal funding unavailable and force States to shoulder the cost of the program alone.

Congress enacted Title IV-E of the Social Security Act to establish a federal framework for the state administration of foster-care programs. *T.M. v. DeWine*, 49 F.4th 1082, 1085 (6th Cir. 2022). Like other Spending Clause legislation, Title IV-E establishes the conditions upon which States receive federal financial support for foster-care programs. *Cal. State Foster Parent Ass'n v. Wagner*, 624 F.3d 974, 978 (9th Cir. 2010). As a general rule, federal funds for foster-care placements are available only with respect to children who were involuntarily removed from their homes pursuant to a judicial determination that continuation in the home would be "contrary to the welfare of the child." 42 U.S.C. § 672(a)(2)(A)(ii); 45 C.F.R. § 1356.21(c).

Title IV-E also provides federal funding with respect to a limited class of children who are *not* in state custody: children whose parents *voluntarily* requested the foster-care placement, and whose placements do not exceed 180 days. 42 U.S.C. § 672(a)(2)(A)(i), 672(e), 672(f); 45 C.F.R. § 1356.22(a), (b). In these cases, parents sign a "voluntary placement agreement" that defines their rights and obligations and the child's legal status. 42 U.S.C. § 672(f). While the parents retain custody, the State assumes responsibility for the child's placement and care. *Id.* § 672(a)(2)(B); U.S. DEP'T OF HEALTH & HUMAN SERVS., CHILD WELFARE POLICY MANUAL §§ 8.3A.12 Q&A 4, 8.3A.13 Q&A5, https://www.acf.hhs.gov/cwpm/public_html/programs/cb/laws_policies/laws/cwpm/policy.jsp. Beyond 180 days, federal funding is available as to the voluntary placement only if, within the 180 days, a court finds that a continuation of voluntary placement is in the child's best interest. 42 U.S.C. § 672(f); 45 C.F.R. § 1356.22(b).

Congress therefore viewed voluntary placements as "a temporary state of affairs." U.S. Dep't of Health & Human Servs., Child Welfare Policy Manual § 8.3A.14 Q&A 1. Consistent with congressional intent, voluntary placements are generally used only "when the family is in need of short term stabilization or experiencing a temporary crisis that renders them unable to care for the child," such as when a single parent is admitted to the hospital and has no other available help. Tribal Child Welfare, 77 Fed. Reg. 896, 915 (Jan. 12, 2012). Congress did not design voluntary foster-care placements to be long-term residential options.

Florida allows voluntary placements in its medical foster care program. In doing so, it follows to a tee the conditions imposed by Congress. In general, a voluntary placement may not exceed 180 days. Fla. Admin. Code r. 65C-28.007(2)(b). The placement may exceed 180 days only upon court review and a judicial determination that the child's best interest requires an extended placement. SOF ¶ 43. Like federal law, Florida's administrative rules consider voluntary placements to secure the "temporary care and supervision of a child." Fla. Admin. Code r. 65C-30.001(126). This way, Florida ensures that voluntary placements are eligible for federal funding. Florida's internal operating procedures expressly recognize that the State is entitled to claim federal funding under Title IV-E for only 180 days, and that, absent judicial intervention, the placement will be ineligible for such funding after that period. SOF ¶ 46–47.

The United States argues that the ADA requires the State to modify its medical foster care program to permit indefinite, long-term voluntary placements. It contends that Florida's time limitations on voluntary placements are too restrictive, and that, without them, medical foster homes might provide children with an alternative to institutional placement. But the time limitations are not Florida's—they are Congress's. Plainly, voluntary placements that do not comply with the time limitations established by Congress would not be eligible for federal funding. And the ADA does not require modifications that would deny States federal funding.

In *Vaughn*, a nursing-home resident who could not secure private-duty nursing at the State's reimbursement rates claimed that the ADA required the State to modify its programs to permit her to hire her own providers and to pay them more than the State's approved rates. 968 F.3d at 817–18, 820. The court noted that, because the requested accommodation did not comply with the State's federally approved program, it "could be implemented only with state funds." *Id.* at 822. The proposed accommodation was therefore unreasonable as a matter of law: "an accommodation that requires the state to provide care at its own expense, outside its

federally authorized and reimbursable Medicaid programs, is not a reasonable modification." *Id*. at 826. If plaintiff's services "cannot be reimbursed by Medicaid, then the accommodation would be unreasonable, because it would force the state to bear the full cost of her care," *id*., and "deprive [the State] of the ability to receive its share of federal reimbursement," *id*. at 827.

In *Alexander*, where the plaintiffs argued that the ADA required Florida to exceed the federally approved caps on enrollment in a waiver program, the court explained that the ADA did not require Florida to "establish a new program outside the Medicaid system" or *"*provide a service outside the Medicaid system that the state now provides only within the Medicaid system." 451 F. Supp. 3d at 1295. The State was not required to fund with state dollars alone services for which (but for the modification) a federal contribution would have been available.

The ADA does not require Florida to ignore the 180-day time limitation that Congress established and permit children who are not in its custody to live indefinitely in medical foster homes. Florida would then be out of compliance with Title IV-E and, as to those placements, would be ineligible for federal funding. Nothing can more fundamentally alter the nature of a Spending Clause program than a modification that denies the State federal funding. After all, federal funding is the hallmark of Spending Clause legislation such as Title IV-E. *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1570 (2022). Florida is entitled to adhere to the terms established by Congress. Nor does the ADA require Florida to "go outside" those terms and "relinquish federal reimbursement." *Vaughn*, 968 F.3d at 823. The Court should enter summary judgment to the extent the United States seeks voluntary placements in medical foster care beyond the time limitations on which Congress conditioned a federal contribution.

## VIII. THE UNITED STATES CANNOT ESTABLISH THAT CHILDREN WHO IT CLAIMS NEED WAIVER SERVICES SATISFY THE WAIVER PROGRAM'S ESSENTIAL ELIGIBILITY REQUIREMENTS.

Title II protects only individuals who satisfy the "essential eligibility requirements" of the service or program they seek to access. 42 U.S.C. § 12132(2). The United States contends that, to avoid nursing-home placement, children need access to the iBudget waiver program, and it seeks a compelled increase in the program's enrollment limits to assure that access. But the United States has never answered the preliminary question: whether the children who it claims need access to the iBudget waiver program satisfy the program's essential eligibility requirements. Absent evidence that they do, the United States cannot establish a right to relief.

To be eligible for the waiver program, an applicant must suffer from a "developmental

disability." Fla. Stat. § 393.063(12). A "developmental disability" is a "disorder or syndrome" that (1) "is attributable to intellectual disability, cerebral palsy, autism, spina bifida, Down syndrome, Phelan-McDermid syndrome, or Prader-Willi syndrome;" (2) "manifests before the age of 18"; and (3) "constitutes a substantial handicap that can reasonably be expected to continue indefinitely." *Id.*; *accord* Fla. Admin. Code r. 65G-4.015(3). The applicant must also be domiciled in Florida and be at least three years of age. Fla. Stat. § 393.065(1); Fla. Admin. Code r. 65G-4.015(1), (2). And like all enrollees in Medicaid waiver programs authorized under section 1915(c) of the Social Security Act, the applicant must "require the level of care provided in a hospital or a nursing facility or intermediate care facility." 42 U.S.C. § 1396n(c).

The United States cannot establish that specific children who it claims need access to the iBudget waiver program satisfy these essential eligibility requirements. And it certainly cannot prove that the number of any such children is large enough to warrant the systemwide relief that the United States seeks. Isolated instances will not do; violations must be pervasive to warrant a statewide remedy. *Lewis*, 518 U.S. at 349. This Court should consequently enter summary judgment as to the United States' demand for modifications of the waiver program.

## IX. THE UNITED STATES CANNOT ESTABLISH THAT INDIVIDUALS WHOSE RIGHTS IT CLAIMS TO ENFORCE REQUESTED—OR WERE REFUSED—AN ACCOMMODATION.

Finally, the United States has no evidence to show that any parent or guardian of any child at issue here ever asked the State to make an accommodation—or ever explained why the accommodation was necessary or reasonable. This telling omission is fatal to the United States' attempt to establish its entitlement to relief. The ADA does not impose strict liability on States that do not accommodate unexpressed wishes. In institutionalization cases, the duty to accommodate depends on the individual's wishes, *Olmstead*, 527 U.S. at 602 ("Nor is there any federal requirement that community-based treatment be imposed on patients who do not desire it."), and the ADA does not expect States to read minds or, from fear of liability, to make unsolicited and perhaps even unwanted accommodations, *Windham v. Harris Cnty.*, 875 F.3d 229, 236–37 (5th Cir. 2017) (explaining that "the ADA does not require clairvoyance" and that disabled individuals must therefore "request an accommodation in direct and specific terms" (internal marks omitted)). Without evidence of any requested accommodation that the State refused to provide, the United States cannot establish its failure-to-accommodate claim.

**WHEREFORE**, the State respectfully moves for summary judgment.

Dated February 15, 2023.                    Respectfully submitted,


                                            /s/ *Andy Bardos*
                                            Andy Bardos (FBN 822671)
                                            andy.bardos@gray-robinson.com
                                            James Timothy Moore, Jr. (FBN 70023)
                                            tim.moore@gray-robinson.com
                                            Ashley H. Lukis (FBN 106391)
                                            ashley.lukis@gray-robinson.com
                                            GRAYROBINSON, P.A.
                                            301 South Bronough Street, Suite 600
                                            Tallahassee, Florida 32301-1724
                                            Telephone: 850-577-9090
                                            *Attorneys for Defendant, the State of Florida*