**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No.:  12-cv-60460-MIDDLEBROOKS-HUNT

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**THE STATE OF FLORIDA,**

      **Defendant.**

_____/

**THE UNITED STATES OF AMERICA'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ................................................................................................................................. 3

I.        The Institutionalized and At-Risk Children ................................................ 3

II.       The State's Medicaid Program and Services for Children with Complex Medical Needs ............................................................................................................... 5

III.     The State Limits Access to Home and Community-Based Services Needed by Children with Complex Medical Needs ........................................................ 8

   A.   The State Controls Children's Access to Medicaid Services and Settings ...................... 8

   B.   The State Limits Access to Private Duty Nursing ........................................... 10

   C.   The State Limits Access to iBudget Waiver Services ...................................... 10

   D.   The State Limits Access to Medical Foster Care ........................................... 11

   E.   The State Limits Access to Home and Community-Based Services by Failing to Ensure Families are Provided Adequate Information about Options and Assistance with Obtaining Needed Community-Based Services ..................................................... 11

IV.    Children with Disabilities Are Unnecessarily Institutionalized and at Serious Risk of Unnecessary Institutionalization Because of the State's Limits on Home and Community-Based Services ....................................................................................................... 12

   A.   The State's Limits Have Caused Unnecessary Institutionalization and Serious Risk of Such Institutionalization ........................................................................... 13

   B.   Nursing Facilities Are Segregated Settings ................................................. 15

   C.   The Institutionalized and At-Risk Children Can Live in the Community with Appropriate Services and Supports ........................................................... 15

   D.   Children's Families Do Not Oppose Community Living ................................. 16

   E.   The State Can Make Modest Changes to Its Administration of Its Services to Adequately Serve Children with Complex Medical Needs in the Community ..... 17

PROCEDURAL HISTORY ................................................................................................ 19

ARGUMENT ..................................................................................................................... 20

I.        Summary Judgment Standard ................................................................... 20

II.       Legal Framework ...................................................................................... 20

III.     The State Is Violating Title II of the ADA ................................................. 22

   A.   Nursing Facilities Are Segregated Settings ................................................. 24

B.   The Institutionalized and At-Risk Children Can Appropriately Be Served in the
     Community ........................................................................................................... 24

C.   Parents and Guardians Do Not Oppose Community Placement .................................... 28

D.   The State Can Make Reasonable Modifications to Comply with the ADA ................... 30

CONCLUSION ....................................................................................................................... 33

## INTRODUCTION

"Our children are being forgotten. We're being left behind." – *Parent of an At-Risk Child*.[1]

The State of Florida discriminates against children with long-term care needs in violation of Title II of the Americans with Disabilities Act (ADA). This litigation was brought to enforce the civil rights of two intertwined populations—children who are in serious danger of falling through the cracks of the State's ineffective community-based service system (At-Risk Children), and those who have already been relegated to spending their childhoods in nursing facilities (Institutionalized Children). The Institutionalized Children, who are capable of living at home with their families or in non-institutional, homelike settings, instead spend their formative years in nursing facilities, without the opportunity to be nurtured by their parents, bond with their siblings and friends, or interact with the community outside the facility's walls. Throughout the State, the At-Risk Children and their families struggle invisibly, faced with the threat of unnecessary institutionalization due to the State's failure to provide reliable home nursing and effective care coordination. Without the benefit of nursing and other services to which their children are entitled by law, parents and guardians must devote themselves full-time to caring and advocating for their children, often at tremendous cost to their own physical, mental, and financial well-being.

It does not have to be this way. The State of Florida already has the program infrastructure in place to provide these children with the services they need to live in the community. By making only modest changes to its administration of services, the State could ensure that every child with long-term care needs has access to home and community-based services.

In *Olmstead v. L.C.*, the Supreme Court affirmed that Title II prohibits "undue institutionalization" as a form of disability discrimination by state and local governments. 527 U.S. 581, 598 (1999). The Supreme Court clarified that the ADA requires public entities to provide community-based services for persons with disabilities when: (a) such services are appropriate to their needs, (b) the affected persons do not oppose community-based treatment, and (c) community-based services can be reasonably accommodated, considering the resources

---

[1] Declaration of Lindsey Weinstock ("Decl.") ¶ 42; Ex. 39 at 34:12-32:13.

1

available to the public entity and the needs of other persons with disabilities. *Olmstead*, 527 U.S. at 607; *see* 42 U.S.C. § 12132.

The population of Institutionalized Children consists of approximately 140 children and young adults with disabilities currently living in nursing facilities in Florida, and receiving State Medicaid-funded services there. These individuals could live in more integrated settings, supported by services that already exist in the State's system. Their parents and guardians overwhelmingly do not oppose such placement—in fact, many desperately want to bring their children home. Yet the State limits the Institutionalized Children's access to the services necessary to make this a reality. The same State-imposed limits on access to services mean that hundreds of children living in the community who are eligible for home and community-based services (the At-Risk children) cannot access the services they need to remain with their families.

The State limits access to services the Institutionalized and At-Risk Children need to move to and remain in their homes and communities in several ways. First, the State limits access to private duty nursing (PDN) services, which are in-home nursing services. Though the State is required to provide Medicaid-eligible children with all PDN authorized as medically necessary for them, fewer than seven out of every 100 children in Florida receive all their medically necessary PDN, and over half receive less than 80% of their PDN. Families unable to access the in-home nursing services their children need have resorted to placing or keeping their children in nursing facilities so they can receive needed care. Families whose children remain in the community have lost jobs and foregone sleep in the absence of authorized nursing services for their children, in order to keep them at home.

Second, the State limits access for Institutionalized and At-Risk Children to its Medicaid waiver program for persons with developmental disabilities (the iBudget waiver). The purpose of this program is to help eligible people with disabilities, including children with complex medical needs, avoid institutionalization by providing them home and community-based services. But the State maintains a waitlist for this program of more than 22,000 individuals. Some children living in nursing facilities have waited for years for the opportunity to receive waiver services in their communities.

Third, the State fails to maintain sufficient capacity in its Medical Foster Care program to prevent the unnecessary institutionalization of children with disabilities. This program offers care in a family home to children with complex medical needs who are in the foster care system.

As a result of the State's failure to maintain sufficient capacity in this program to serve eligible children who would otherwise be institutionalized, children with disabilities are living in nursing facilities while waiting to access the program.  In addition, this family-based setting is only available to children who are in the custody of the State.  Families who are unable to have their child live at home with them cannot access Florida's family-based service alternative to institutional nursing facilities without surrendering custody.

Finally, the State fails to provide families with the information they need to understand their home and community-based service options, and the assistance they need to access those services for their children.  Without this critical information and assistance, families are left to navigate persistent service gaps in the community without meaningful help, and some have resorted to institutionalization as a result.

The State need only expand its existing services to address these failures and give families a meaningful choice as to whether their children will receive services at home or in nursing facilities.  The State does not contend that making such reasonable modifications would be infeasible or so expensive as to fundamentally alter its service system.  Nor does it have a plan to address any of the limitations it places on access to home and community-based services for children with complex medical needs.

In the decade since this litigation was initially filed, the State has had ample opportunity to make the changes that are required to prevent the unnecessary institutionalization—and serious risk of unnecessary institutionalization—of children with medical complexity. Without intervention, Florida's Institutionalized Children will continue to needlessly be admitted to, and grow up in, institutions, separated from their families and communities, and Florida's At-Risk Children will continue to live on the brink of institutionalization, at unthinkable financial and emotional cost to their families.  Accordingly, this Court should hold the State liable for its failure to provide services to children with complex medical needs in the most integrated setting appropriate to their needs.

## FACTS

## I.    The Institutionalized and At-Risk Children

This case is about the State's discriminatory administration of its service system for children with complex medical needs (also known as "children with medical complexity").  Children with medical complexity are under twenty-one years old and have disabilities resulting

in their need for medical services on a daily basis.  U.S. Statement of Material Facts ("SOMF") ¶
1.  Children with medical complexity may have different reasons that they need medical services,
but as a group, they have shared medical care needs and common patterns of health care service
use.  They typically rely on services from multiple service providers for health care and for
"activities of daily living" like bathing and dressing (ADLs).  *Id.* ¶ 2.  Children with complex
medical needs commonly use technology or equipment for communication, mobility, breathing,
eating, and other tasks, including feeding tubes, breathing tubes, ventilators, and wheelchairs.  *Id.*
¶ 3.  Nursing is a core health care service used by children with complex medical needs to
support their daily living.  *Id.* ¶ 4.  In addition to home nursing, children may also require
therapies, including physical, occupational, and speech therapies.  *Id.*

Because families of children with complex medical needs must navigate complex
systems of health care services and insurance coverage in order to obtain services and equipment
the children need, they also require care coordination services.  Care coordinators, or case
managers, inform families about available service programs and provider options, assist families
in applying for and obtaining needed services, create and maintain plans of care, and coordinate
communication with different care providers.  SOMF ¶ 5.

Children with medical complexity have a range of care and service needs, as described
above, which frequently render them eligible for medical insurance coverage through state
Medicaid programs.  *See* Declaration of Lindsey Weinstock ("Decl.") ¶ 9; Ex. 6.

The State's discriminatory administration of its Medicaid service system impacts two
specific groups of children with complex medical needs in Florida: Institutionalized Children and
At-Risk Children.  The Institutionalized Children are the approximately 140 children and young
adults with complex medical needs residing in three pediatric nursing facilities in Florida.
SOMF ¶ 59.  The Institutionalized Children receive State Medicaid-funded nursing facility
services, but, as described further below, could live in more integrated settings.  The At-Risk
Children are the more than 1,800 children with complex medical needs who are eligible for but
unable to access, due to the State's failures described further below, the home and community-
based services they need to remain in their homes and communities.  *Id.* ¶ 63.

The undisputed facts regarding the Institutionalized and At-Risk Children are both
voluminous and child-specific.  The three expert physicians who evaluated the medical
appropriateness of Institutionalized Children to live in the community did so by collectively

reviewing the medical and psychosocial records of all 139 children who were residing in the three pediatric nursing facilities at the time of the record subpoenas.  Decl. ¶ 5; Ex. 2 at 1 n.1.  The medical experts further conducted outreach to the families of all Institutionalized Children and were able to conduct interviews of 44 families.  Decl. ¶ 6; Ex. 3 at 2.  Using qualitative research methods generally accepted and preferred in this type of health care research, the United States' experts concluded that the same themes they encountered in their 44 interviews would emerge in interviews with additional families of Institutionalized Children.  Decl. ¶ 5; Ex. 2 at 9-10; Decl. ¶ 6; Ex. 3 at 10-11; Decl. ¶ 7; Ex. 4 at 98:15-99:16.  The United States also obtained deposition testimony from ten families, including parents of Institutionalized Children, parents of At-Risk Children, and one individual who was herself, until very recently, an Institutionalized Child, and is now an At-Risk Child.  The United States also provided, in its interrogatory responses, voluminous citations to records and interviews containing facts specific to sixteen At-Risk Children as well as the entire population of Institutionalized Children.  Decl. ¶ 20; Ex. 17 at 25-161.  Finally, the United States produced a corporate designee who provided detailed, child-specific testimony based on the factual record about 137 Institutionalized Children.

## II.     The State's Medicaid Program and Services for Children with Complex Medical Needs

The State, through its Medicaid program, has created a system of services through which children with complex medical needs receive necessary health care, therapies, medical equipment, technology and adaptive equipment, and assistance with activities of daily living. Medicaid is a program that is jointly funded by the state and the federal government and provides medically necessary services to eligible recipients.  SOMF ¶ 6.  States that participate in the Medicaid program, as Florida does, must develop a State Plan, which details the nature and scope of the state's Medicaid program.  SOMF ¶ 7; 42 C.F.R. § 430.10.  A State Plan may include any or all of 29 Medicaid services listed in federal statute.  42 U.S.C. §§ 1396a(a), 1396d(a).

States are *required* by the Medicaid Act to provide all of these state plan services, when medically necessary, to all Medicaid-enrolled children (*i.e.*, individuals under 21 years old) in the state.  42 U.S.C. §§ 1396a(a)(43), 1396d(a), 1396d(r)(5); SOMF ¶ 8.  Each state defines its own "medical necessity" criteria and creates and administers procedures for Medicaid recipients to apply for services, and for the determination of whether such services are medically necessary.

*See* 42 U.S.C. § 1396a(a)(17); *see* SOMF ¶ 10.  If the State or its contracted entities determine services to be medically necessary, the services are authorized and must be provided.  SOMF ¶ 11.

Florida's Agency for Health Care Administration (AHCA) is responsible for administering the State's Medicaid program.  *See* Fla. Stat. §§ 20.42, 409.902; SOMF ¶ 12.  The State delivers Medicaid services to most Florida Medicaid recipients through its Statewide Medicaid Managed Care (SMMC) program, which AHCA administers.  *See* Fla. Stat. § 409.965.  Under the SMMC program, the State contracts with private managed care organizations to provide medical and long-term care services to eligible recipients.  SOMF ¶ 14.

One of the insurance plans under the SMMC program, the Children's Medical Services Health Plan (CMS Plan), is a "specialty plan" geared toward providing children with special healthcare needs with medical and long-term care services.  Decl. ¶ 66; Ex. 63 at FL11380063, FL11380084.  Children with medical complexity are children with special health care needs.  Decl. ¶ 66; Ex. 63 at FL11380062-63.  The Florida Department of Health partners with a private managed care organization to operate the CMS Plan.  SOMF ¶ 15.

The Florida Medicaid program covers services for children with complex medical needs in both institutional and non-institutional settings.  SOMF ¶ 19.  Three nursing facilities in the State provide Medicaid services, including nursing and therapies, to children with complex medical needs, reimbursed by Medicaid at a rate of up to $679 per day.  *Id.* ¶ 20.

Before a child is admitted to a nursing facility, and periodically thereafter, the State requires that a Children's Multidisciplinary Assessment Team (CMAT), which consists of representatives from a number of State agencies, including AHCA, APD, DOH, FLCMS, DCF, and (if applicable) the child's managed care plan, meet and make a recommendation regarding that child.  *See* Fla. Admin. Code R. 59A-4.1295(3)(b).  In particular, the CMATs determine whether each child meets the level of care criteria for nursing facility admission.  *See* Fla. Admin. Code R. 59A-4.1295(3)(a), (b); SOMF ¶ 22.  According to State internal procedures, CMATs must use a "family-centered" approach to "facilitate appropriate service delivery," and "provide information about alternatives."  SOMF ¶ 23.  There are 10 CMATs in the State.  Decl. ¶ 24; Ex. 21 at 63:2-15.

Florida Medicaid also covers services provided in children's homes and communities, when authorized as medically necessary.  Indeed, the State is *required* to provide all medically

necessary services covered by the Medicaid program to Medicaid-enrolled children with complex medical needs.  42 U.S.C. §§ 1396a(a)(43), 1396d(a), 1396d(r)(5); SOMF ¶ 25.  These services include in-home nursing services known as private duty nursing (PDN); durable medical equipment; physical, occupational, speech, and respiratory therapies; and, in Florida, Medical Foster Care (which is described further below).  42 U.S.C. §§ 1396a(a), 1396d(a), 1396d(r)(5); SOMF ¶ 26.

The State also offers care for children with complex medical needs in the community through its Medical Foster Care program.  The purpose of this program is to enable children with "medically-complex conditions whose parents cannot care for them in their own homes, to live and receive care in foster homes rather than in hospitals or other institutional settings."  SOMF ¶ 27.  The State's CMATs determine children's eligibility for Medical Foster Care.  *Id.* ¶ 28. Medical Foster Care is a program that benefits children with medical complexity by allowing them to live with families, and have foster parents who are consistent caregivers.  *Id.* ¶ 29.  DOH trains medical foster parents to provide medical care to their children with complex medical needs.  *Id.* ¶ 30.  Medical foster parents are reimbursed up to $76.99 per day by Medicaid for medically necessary services rendered to meet the medical needs of foster children in their care. *Id.* ¶ 31. Medical Foster Care enables children with medical complexity to live in a less restrictive setting than a nursing facility.  *Id.* ¶ 29 (citing Decl. ¶ 16; Ex. 13 at 13).

The State also offers home and community-based services through Medicaid waiver programs.  The federal Medicaid Act permits states to request waiver of certain of its requirements to offer a variety of community-based services to individuals with disabilities.  *See* 42 U.S.C. § 1396n(c).  The State's Agency for Persons with Disabilities (APD) administers the State's Home and Community Based Services (HCBS) waiver program for individuals with developmental disabilities, called the "iBudget" waiver.  *See* Fla. Stat. § 20.197.  This program enables individuals aged three and older with intellectual or other developmental disabilities to access long-term, flexible services outside of institutional settings, including a range of health and support services in the community.  SOMF ¶ 33.  Through this program, the State has chosen to provide services and supports to children with complex medical needs that are not accessible through other State programs, including home modifications for accessibility, respite care, and funding to support individuals who live in community-based settings other than their

family home.  SOMF ¶ 35.  Children with complex medical needs over the age of three who also have developmental disabilities are eligible for the iBudget waiver program.  SOMF ¶ 34.

### III.    The State Limits Access to Home and Community-Based Services Needed by Children with Complex Medical Needs

#### A.  The State Controls Children's Access to Medicaid Services and Settings

Because the State is responsible for structuring and administering its own Medicaid program, the State controls the level of access children with complex medical needs have to the Medicaid services they need to live in their homes and communities.  It exercises this control in a number of ways, including the following.

First, the State is responsible for ensuring that its managed care plans fulfill the State's obligation to provide Medicaid-enrolled children with medical complexity with all medically necessary private duty nursing, durable medical equipment, therapies, and other services coverable under the State Plan.  SOMF ¶ 36; *see* Fla. Stat. § 409.967.  The State has elected to contract with private managed care plans to determine whether services will be authorized, using the State's medical necessity criteria, as well as to provide all such authorized services, by contracting with service providers such as home health agencies.  SOMF ¶ 37.  But the State determines the manner in which its contracted managed care plans will deliver services to children with complex medical needs, and has control over managed care plans' methods of ensuring capacity for community-based services, including by establishing standards for adequacy of managed care plans' service provider networks.  *See, e.g.*, Fla. Stat. §§ 409.963 (designating AHCA as the single state agency responsible for management, operation, and payment for services delivered through the SMMC program); 409.967(2)(c) (requiring AHCA to, *inter alia*, "establish specific standards for the number, type, and regional distribution of providers" delivering services to SMMC recipients); 409.973 (describing Medicaid services to be made available through managed care plans); 409.98 (describing Medicaid services to be made available through long-term care plans).  The State also commits, in its Medicaid State Plan, to monitor managed care plan performance to ensure access to care and services.  The State Plan and Florida's contracts with managed care plans provide mechanisms, including sanctions, that the State can use to ensure plans' accountability for complying with the contracts' terms.  Under these contracts, managed care plans must take any and all actions, including using financial incentives, to ensure access to care and an adequate provider network.  SOMF ¶ 46.

Second, AHCA also controls the Florida Medicaid program's ability to provide sufficient services in home and community-based settings through, among other things, licensing qualified providers and setting fee-for-service rates paid to reimburse them for services provided. *See, e.g.*, Fla. Stat. §§400.062 (establishing licensure requirements for nursing facilities through AHCA); 400.464 (establishing licensure requirements for home health agencies through AHCA); 409.908 (describing available reimbursement methodologies for Medicaid providers); Fla. Admin. Code R. 59G-4.002(3)(aa) (establishing fee schedule for private duty nursing services effective Jan. 1, 2022).

Third, the State controls the capacity of its iBudget waiver program to serve all eligible children with complex medical needs. The State, as permitted under federal law, has elected to cap the number of individuals who may receive services under the iBudget waiver. SOMF ¶ 49. The State manages the waiting list for the waiver program by setting and implementing categories of priority for enrollment from the waiting list. *See* Fla. Stat. 393.065(5); SOMF ¶ 50.

Fourth, the State controls whether it has sufficient non-institutional out-of-home placement settings available in which children with complex medical needs can receive needed care. Specifically, the State is responsible for ensuring sufficient capacity in its Medical Foster Care program. The State has responsibility both for setting Medicaid reimbursement rates for Medical Foster Care providers, as well as for recruitment efforts that enlist Medical Foster Care parents.

Finally, the State controls the programs and services through which families of children with complex medical needs learn about the options they have for where their children can live and receive needed services, and receive assistance in obtaining needed services for their children. Specifically, the State operates the CMATs, which conduct assessments of children's needs and serve as a point of contact between the State and families of children who have been or are about to be admitted to nursing facilities. The State also regulates and oversees the care and discharge planning for children residing in nursing facilities, and requires managed care plans to provide care coordination for these children as well as for children with complex medical needs living in the community. *See* Fla. Admin. Code R. 59A-4.1295; SOMF ¶¶ 54-55. The State is responsible for oversight and monitoring of this essential service so that it operates as intended, to allow families and children to receive the information they need to make informed decisions regarding care, and to get the services and support they need. SOMF ¶ 56.

### B.  *The State Limits Access to Private Duty Nursing*

Private duty nursing (PDN) is an essential service for children with medical complexity. It is also a service the State is required to provide when medically necessary.  SOMF ¶ 64.  Yet fewer than seven out of every 100 children in Florida receive all the PDN hours deemed medically necessary for them.  *Id.* ¶ 65.  Specifically, according to the most recent annual data that Florida's managed care organizations reported to the State, approximately 93.5%, or more than 1,800 children, are receiving less than their authorized amount of PDN.  *Id.* ¶ 67. Moreover, the data show that children are missing more than just a few hours here or there, with over half (approximately 58%) of children receiving less than 80% of authorized PDN, and over a quarter (approximately 27%) receiving less than 60% of authorized hours.  *Id.* ¶¶ 68-69.  In only six of Florida's 67 counties is the State providing children with medical complexity more than 80% of authorized PDN services.  *Id.* ¶ 71.  In only one of these six counties are more than 10 children being served.  *Id.* ¶ 72.

Home health agencies' difficulties staffing children's authorized PDN hours is a reason why children cannot receive all their authorized PDN.  SOMF ¶¶ 75-76.

The State has acknowledged its responsibility to ensure provision of all medically necessary services, including PDN, and its expectation that its managed care plans will fulfill their contractual obligation to provide all authorized PDN.  SOMF ¶¶ 8, 25; *see also* Decl. ¶ 31; Ex. 28 at 155:19-156:3.  The State has the authority and the tools to increase access to PDN, such as by setting standards to ensure an adequate network of service providers, increasing reimbursement to home health agencies providing the service, and effectively monitoring gaps in access to PDN and holding managed care plans accountable for failing to provide medically necessary services.  Yet it fails to use them.  SOMF ¶¶ 40-42, 45, 48, 77-78.

### C.  *The State Limits Access to iBudget Waiver Services*

The State renders its iBudget waiver program inaccessible to thousands of people with disabilities due to its waiting list.  The iBudget waiver has a waiting list of more than 22,000 individuals—people with disabilities who have been determined eligible to receive waiver services that prevent institutionalization, but who must wait to receive them.  *See* Fla. Stat. § 393.065(5); SOMF ¶¶ 81-82.  As of January 1, 2022, there were more than 9,500 children on the waiting list, and as of September 6, 2022, by one measure, more than 600 children with complex medical needs were waiting for waiver services.  SOMF ¶¶ 83-84.  As is typical for people on

the waiting list for the iBudget waiver, many eligible children with complex medical needs have spent years waiting to enroll in the program and receive needed services in their communities. *Id.* ¶ 85.

### D. The State Limits Access to Medical Foster Care

The State's policy preference is to place eligible children in Medical Foster Care rather than in institutions. SOMF ¶ 90. Despite this, and although the State identifies Medical Foster Care as an alternative to institutional settings for children whose families cannot care for them in their own homes, this option is limited in two ways. First, the State fails to maintain sufficient capacity in the program. The program thus carries a waiting list. *Id.* ¶ 91. An average of approximately 40 children in State custody have been determined to be eligible for Medical Foster Care and are waiting for an appropriate placement. *Id.* ¶ 92. AHCA pays Medical Foster Care parent providers a daily reimbursement rate to provide this critical service; before July 2022, these rates had not changed since the inception of the program in the early 1990s. *Id.* ¶ 95. In July 2022, after decades with no reimbursement change, an increase was implemented of up to $9.09 per day. *Id.* ¶ 96. And while the State is responsible for recruiting sufficient Medical Foster Care providers to meet the need for the service, the record evidence shows that the State has not thus far, and has no plans to, conduct recruitment that specifically targets providers who can meet the needs of the children waiting for the service. *Id.* ¶¶ 52, 94.

Second, the State limits access to Medical Foster Care such that parents and guardians who are unable to have their children live at home with them but who can and want to retain custody of their children, cannot use the program. SOMF ¶ 97.

### E. The State Limits Access to Home and Community-Based Services by Failing to Ensure Families are Provided Adequate Information about Options and Assistance with Obtaining Needed Community-Based Services

The State administers CMATs, in which State agency representatives meet for all children admitted to nursing facilities and invite their families to participate, and dictates that the CMATs use a "family-centered" approach to "facilitate appropriate service delivery," and "provide information about alternatives." *See* Fla. Admin. Code R. 59A-4.1295(3)(b); SOMF ¶¶ 21-23. Yet, CMATs assessing children for nursing facility services do not in practice provide individualized information about, or meaningful opportunities to explore, options other than nursing facility placement. SOMF ¶ 100.

The State has also failed to ensure that families receive adequate information about community service options and adequate assistance in obtaining needed community services through care coordination or through nursing facility discharge planning.  As an initial matter, despite its obligation to monitor the care coordination services provided to children with complex medical needs through managed care plans, SOMF ¶ 56, the State does not use data and information it collects and has access to in order to evaluate whether care coordination is fulfilling its function.  *Id.* ¶ 110.  Indeed, while DOH does review the reporting submitted by the private managed care organization operating the Children's Medical Services managed care plan, it does so only for a sample of children, and even with such limited review, it has found significant inadequacies in the records and reporting.  *Id.* ¶¶ 101-103.  In addition, despite its obligation to oversee nursing facility discharge planning, the State does not appear to impose any specific standards for, or oversee in any way, whether nursing facilities are providing adequate information and assistance to families to facilitate discharge and address any barriers to discharge.  *Id.* ¶¶ 104-106.

Families of children admitted to nursing facilities have frequently reported that they were not made aware, by care coordinators or nursing facility staff, of community-based service options.  SOMF ¶ 107.  Families of children admitted to nursing facilities, as well as families of children living in the community, also testified that care coordinators provide little assistance in identifying or applying for needed services, including identifying and arranging for services to facilitate nursing facility discharge, or in addressing gaps in medically necessary services in the community.  *Id.* ¶¶ 108-109.

## IV. Children with Disabilities Are Unnecessarily Institutionalized and at Serious Risk of Unnecessary Institutionalization Because of the State's Limits on Home and Community-Based Services

The undisputed facts show the impact of the State's failures on families of children with complex medical needs.  Further, the undisputed facts show that nursing facilities are segregated settings; that the Institutionalized and At-Risk Children are appropriate for community placement; and that their families do not oppose community placement.  Finally, the undisputed facts in the record show that the State can make modest changes to its existing system of services for children with complex medical needs that would ensure children's access to adequate home and community-based services.

### A. The State's Limits Have Caused Unnecessary Institutionalization and Serious Risk of Such Institutionalization

Many parents of children with complex medical needs have resorted to nursing facility placement because their children could not access the nursing care they needed at home.  For example, one mother deposed by the State was asked, "what was the catalyst or . . . the factor or the decision that you made to put [your child] at Kidz Korner [a skilled nursing facility]?"  She responded, "Mostly unreliable nursing."  SOMF ¶ 116.  Other parents also found that inability to access approved PDN played a role in their children's institutionalization; staffing gaps meant they had to provide nursing care and coverage themselves, missing work and losing sleep as a result.  Facing job loss and adverse health effects, they resorted to nursing facility placement.  *Id.* ¶ 117.  The inability to access in-home nursing also acts as a barrier for families wishing to transition their children home from nursing facilities.  SOMF ¶ 119; Decl. ¶ 13; Ex. 10 at 45 ("The DOJ experts rightly noted the lack of reliable home nursing may be a barrier to discharge to a community setting for some families…").  Confirming these experiences, nursing facility representatives also testified that the difficulty of accessing in-home nursing services contributes to children's admission to nursing facilities, and serves as a barrier to children's discharge from nursing facilities.  SOMF ¶ 119.

The same barriers to accessing home nursing are experienced by children living in the community; their parents are missing work or losing or foregoing employment, and unable to sleep, while filling in gaps in approved Medicaid nursing services for their children.  SOMF ¶ 128.  These burdens are not sustainable for many in the long term, and if parents could no longer provide this care, their children risk institutionalization in lieu of services.  SOMF ¶ 129.

The State's failure to provide sufficient access to its Medical Foster Care program has also led to children's admission to nursing facilities, and stands as a barrier to discharge for some.  Though the State prioritizes Medical Foster Care placement for children in its custody who have complex medical needs, the State has resorted to institutionalizing some of these children.  *See* SOMF ¶ 120.  The State's CMATs have deemed these children eligible for Medical Foster Care, and the State has placed them on a waiting list for Medical Foster Care placements for them, but has not been able to find placements for them.  *Id.* ¶ 121.  The State's limits on access to Medical Foster Care also mean that families of Institutionalized Children who are unable to care for them in their own homes have not been given this option of a non-

institutional out-of-home placement for their children. *Id.* ¶ 123.  There are parents of Institutionalized Children who, when told about medical foster care, expressed interest in such a community placement for their children. *Id.* ¶ 122.

Likewise, there are children currently residing in nursing facilities who have been waiting for years to receive iBudget waiver services in their communities.  At least 19 children who currently reside in nursing facilities are on the iBudget waiver waiting list, and most have been waiting for years; in the last year, at least one child has died while institutionalized and on the waiting list for the waiver—he had been on the waiting list for 13 years.  SOMF ¶¶ 124-126.  Because iBudget is a "Home and Community-Based Services" waiver program, iBudget waiver services must be provided in homes and other community settings.  42 C.F.R. § 441.301(c)(4), (5).  This means that if an Institutionalized Child is on the waiting list, their parent or guardian has requested that the State serve the child in the community, and the State has determined the child is eligible to receive services in the community.  SOMF ¶ 82; *see also* Decl. ¶ 20; Ex. 17 at 357-364.  The waiting list is thus a barrier to these children's receipt of needed services in the community rather than in a nursing facility.  For At-Risk Children, the waiting list similarly serves as a barrier to receipt of services in the community that they cannot access through other State programs.  Decl. ¶ 20; Ex. 17 at 357-364; *see also* Decl. ¶ 9; Ex. 6 at 15-16.  For example, one 17-year-old child has been on the waiting list for iBudget waiver services since he was 6 years old.  Decl. ¶ 20; Ex. 17 at 358.  When the family was nearly evicted, they attempted to secure crisis enrollment for their child, but were unsuccessful; meanwhile, the family faces significant PDN staffing gaps. *Id.*

Finally, families of Institutionalized Children have expressed that if they had been made aware of community-based service options, or had been provided with assistance in addressing barriers to discharge, they could have avoided their children's nursing facility placement.  One mother testified: "I wish we would have known that we – that she didn't have to go to the nursing home in the first place. [. . . .] No one really sat us down and explained here are your options, your real options.  The state can provide this.  The insurance can do that.  That really wasn't our experience."  Decl. ¶ 46; Ex. 3 at 45:14-16, 50:19-22.  She testified about her years-long effort, once she became aware of the option, to bring her child home from the nursing facility: "Bringing [my child] home became a project and every milestone that we reached was out of my effort . . . months, weeks would go by without a text message, without a phone call, no

follow-up, and it's still that way.  That hasn't changed.  [. . . .] Parents shouldn't have to look for so much information.  If it's out there, it shouldn't be made harder.  We already have enough challenges."  *Id.* at 36:14-37:3, 51:16-18; SOMF ¶ 118.  Care coordination also fails to address the barriers that families of At-Risk Children face in accessing approved services for their children, such as inability to obtain all authorized in-home nursing, and in some instances, care coordinators have suggested the families consider nursing facility placement due to these barriers SOMF ¶ 129; Decl. ¶ 51; Ex. 48 at 37-38; Decl. ¶ 44; Ex. 41 at 41:15-17.

### B.  Nursing Facilities Are Segregated Settings

The nursing facilities that serve children in Florida, like nursing facilities generally, are hospital-like settings in which children live separately from their families and others without disabilities who are not paid staff.  *See, e.g.*, Decl. ¶ 4; Ex. 1 at 32-34.  Children living in nursing facilities lack the opportunity to be with their families on a daily basis, and fully develop parental and sibling relationships.  *See, e.g.*, SOMF ¶ 127.  They also lack opportunities for social interaction with peers and adults without disabilities.  *Id.*  One teenager testified about her years living in a nursing facility: "I was there by myself for four years without a family.  I didn't see them.  I only see them for a limited amount of time and then I remember seeing them two weeks later."  Decl. ¶ 47; Ex. 44 at 14:11-14.  On spending the Christmas holiday in a nursing facility: "You had no family.  It was spent in isolation."  *Id.* at 11:5-6.

### C.  The Institutionalized and At-Risk Children Can Live in the Community with Appropriate Services and Supports

The Institutionalized Children could live at home or in other community-based settings with sufficient services and supports.  The United States' experts, pediatricians who specialize in the care of children with complex medical needs over the long term, conducted a review of the medical records of all Institutionalized Children and determined that there is nothing about the children's medical conditions, needs, or disabilities that necessitates institutionalization.  Rather, the Institutionalized Children could live at home if provided with adequate services and supports, such as in-home nursing and durable medical equipment, that are typically made available in homes and communities across the country.  SOMF ¶¶ 131-132.  This fact is undisputed.  *See, e.g.*, Decl. ¶ 13; Ex. 10 at 17, 18 (stating that "[t]here is no doubt that anyone can be cared for in the community with sufficient resources," and "I do not categorically disagree that care for these

140 of the neediest of Florida's children with complex medical needs CAN be provided in family and similar community settings").

Confirming their appropriateness for community living, some of the Institutionalized Children have been deemed eligible for community-based services, such as PDN, the iBudget waiver program, and Medical Foster Care.  SOMF ¶¶ 134-135; *see also* Decl. ¶ 20; Ex. 17 at 22– 161, 356–64.  Some Institutionalized Children also lived at home prior to nursing facility admission. SOMF ¶ 133.  Likewise, the At-Risk Children have been deemed eligible for community-based services.  *Id.* ¶ 135.

This overlap in eligibility determinations for nursing facility services and home and community-based services is not surprising, as the level (or intensity) of care provided in nursing facilities does not materially differ from that provided through home and community-based services.  Decl. ¶ 5; Ex. 2 at 10-13, Decl. ¶ 4; Ex. 1 at 26, 27-28; Decl. ¶ 6; Ex. 3 at 10, 17.)  And the medical criteria for nursing facility admission and receipt of PDN services is similar.  SOMF ¶ 136.

### D.  Children's Families Do Not Oppose Community Living

Families of the Institutionalized Children overwhelmingly are not opposed to community living for their children.  The United States' experts interviewed 44 families of 45 Institutionalized Children to determine whether they were opposed or not opposed to community living for their children.  They identified themes expressed by the families throughout the interviews.  Specifically, there were families who were actively working to try to bring their children home from the nursing facilities; families who expressed a preference for their children to discharge to home but felt appropriate home and community-based services were not sufficiently available to make this preference a reality; families who were not opposed to their children transitioning to a community-based setting other than their own homes (such as a medical foster care-type setting); and one family that was opposed to transition.  SOMF ¶¶ 137-141.

Using qualitative research methods generally accepted and preferred in this type of health care research, the United States' experts concluded that the same themes would emerge in interviews with additional families of Institutionalized Children.  Decl. ¶ 4; Ex. 1 at 39-44; Decl. ¶ 5; Ex. 2 at 9-10; Decl. ¶ 6; Ex. 3 at 10-11; Decl. ¶ 7; Ex. 4 at 98:15-99:16.

The documentary record evidence confirms that additional families do not oppose community placement for their Institutionalized Children. Some have expressed to nursing facility staff that their goal is to discharge their children home; some have expressed interest in bringing their children home in the future; some have expressed that they would like to transition their children home but cannot due to barriers such as an inability to obtain home nursing in their area. SOMF ¶¶ 139-140.

There is no dispute that parents and guardians of Institutionalized Children want to bring their children home and are interested in community services and alternative placements. Indeed, the State later deposed nine of the 44 families the United States' experts interviewed, and no family's deposition testimony differed from what they told the United States' experts in interviews. *E.g.*, *compare* Decl. ¶ 43; Ex. 40 at 26:24- 28:7 ("Let me ask a final question. At least with respect to your current situation, your current work situation, housing situation, is it accurate to say that you are currently opposed to [your child] coming to your home? A. No. Q. Okay. So you would accept her in your home and you'd prefer that even under your current circumstances? A. Yeah. As long as I was offered what I should be offered to care for her, absolutely.") *with* Decl. ¶ 93; Ex. 90 (finding parent does not oppose community placement), *and compare* Decl. ¶ 45; Ex. 42 at 20:6- 15:14-18; 29:8-20 *with* Decl. ¶ 84; Ex. 81.

Finally, families of At-Risk Children desire that their children remain in their homes with them. SOMF ¶ 142; *e.g.*, Decl. ¶ 51; Ex. 48 at 37:4-6, 80:2-4 ("That's [the idea of placing her child in a nursing facility] just devastating to me. It's terrifying. [My daughter] would not be the child she is today if she had been in a home before this stage." "It's [placing her child outside her home] not something I want to think about. And I hope I'm never forced to do that. I'm just praying that a nurse comes through."); Decl. ¶ 44; Ex. 41 at 38:2-7, 41:15-17 ("People think that because you have a disabled child or that, you know, and they see me tired or exhausted or they see me frustrated or whatever, that their solution is put him away. And that's not going to happen. As long as I got breath in me, that will never happen." "Yes, one of the [managed care plan care] coordinator one time recommended or suggested that maybe that [a nursing facility] would be an ideal place for him, and I said no.")

### E. The State Can Make Modest Changes to Its Administration of Its Services to Adequately Serve Children with Complex Medical Needs in the Community

The State can modify existing services and programs that would enable the Institutionalized and At-Risk Children to access needed services in their homes and communities. The State has the existing service framework to provide services in the most integrated setting appropriate (Decl. ¶ 9; Ex. 6 at 16; Decl. ¶ 14; Ex. 11 at 8-12), though it has no specific or measurable goals or benchmarks for addressing unnecessary institutionalization of children in nursing facilities. Decl. ¶ 19; Ex. 16 at 8-9. The State merely needs to expand the availability of those services and programs in order to avoid unnecessary segregation and risk thereof. Decl. ¶ 9; Ex. 6 at 2, 9. There is no evidence in the record suggesting that making the modifications described below would be infeasible or so expensive as to fundamentally alter its service system. *See* Decl. ¶ 19; Ex. 16 at 1-3; *see generally* Decl. ¶ 14; Ex. 11.

First, the State can expand availability of PDN. The State has acknowledged that both reimbursement rates paid to the home health agencies by the State and by managed care plans affect whether those agencies are able to provide authorized services. SOMF ¶¶ 79-80. The State could increase reimbursement by, for example, requiring managed care plans to meet a specific minimum reimbursement standard for PDN that is determined through analysis of unmet need for PDN and current payment rates. Decl. ¶ 9; Ex. 6 at 17, 18. In addition, the State can take steps to ensure that the network of home health agencies that provide PDN is adequate to prevent needless institutionalization of children with medical complexity by setting a PDN-specific standard that managed care plans must meet and that is based on demonstrated need for PDN across geographic areas of the state. *Id.* Currently, plans are not required under their contracts to meet a PDN-specific network adequacy standard or specifically to ensure that children with complex medical needs receive PDN when needed to prevent institutionalization. Decl. ¶ 66; Ex. 63 at FL11380193.

Second, the State can ensure Medical Foster Care service capacity. The State is already responsible for Medical Foster Care provider recruitment, and though there are approximately 180 vacant Medical Foster Care beds, there is still consistently a waiting list for the service. The State must better target its recruitment efforts to the needs of the children who are waiting for the service. Decl. ¶ 9; Ex. 6 at 19. In addition, the State could provide broader access to Medical Foster Care to children not in the custody of the State if Medical Foster Care was offered as a community-based service through its Medicaid program. *Id.* at 19-20.

18

Third, the State could address the barrier to accessing the iBudget waiver that children with complex medical needs face by both increasing the number of waiver slots by the number of children with complex medical needs who meet the criteria for waiver enrollment and need waiver services to avoid institutionalization, and by managing its waiting list to ensure that Institutionalized and At-Risk Children are not relegated only to the lowest priority tier, which is reserved for individuals under 21 years old, when they could be placed on a higher priority tier. *Id.* at 21-22.

Finally, the State could utilize its existing programs and mechanisms, and increase monitoring and oversight, to ensure that families are provided with adequate information about community service options and adequate assistance in obtaining needed services. The State could utilize its CMAT program, consistent with its own written program procedures, to provide families with individualized information about community service options that are alternatives to nursing facility placement. Decl. ¶ 58; Ex. 55 at FL12199328. Moreover, it could, consistent with its existing obligations in administering the state Medicaid program, require plans to submit usable reporting that would enable systematic oversight of plans' provision of services to children with complex medical needs, including care coordination and PDN, and it could use existing accountability mechanisms (such as sanctions) to ensure compliance with managed care plan contractual requirements. Decl. ¶ 9; Ex. 6 at 20-24; *see* Decl. ¶ 14; Ex. 11 at 24.

## PROCEDURAL HISTORY

After receiving complaints of disability discrimination, the United States initiated an investigation in December 2011. It found that the State was unnecessarily segregating children with complex medical needs in nursing facilities, and placing other children at serious risk of unnecessary segregation. Following attempts to obtain a resolution with the State, the United States filed this lawsuit in July 2013. After three years of discovery, and shortly before trial was to begin, this Court issued a *sua sponte* order dismissing the United States' claim on the basis that Title II does not authorize the United States to bring suit. On appeal, the Eleventh Circuit reversed and remanded. *United States v. Florida*, 938 F.3d 1221 (11th Cir. 2019), *cert. denied*, 143 S. Ct. 89 (2022).

On remand, this Court reopened discovery, and the United States filed an amended complaint (D.E. 700). Fact discovery closed on January 13, 2023, and expert discovery closed

February 15, 2023 (D.E. 730).  The parties exchanged well over a million pages of document and written discovery, took a total of 40 fact depositions, and served 14 expert reports.

## ARGUMENT

### I.       Summary Judgment Standard

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  If the moving party presents a properly supported motion for summary judgment, the non-moving party cannot rely on a "mere 'scintilla' of evidence" supporting its position to avoid summary judgment; nor can it rely on conjecture or unsupported assertions.  *Anderson*, 477 U.S. at 251; *see Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996).  Rather, the non-moving party must present admissible evidence sufficient to support a verdict in its favor.  *Anderson*, 477 U.S. at 249.  For issues on which the nonmoving party has the burden of proof at trial, the moving party may show that there is an absence of evidence to support the nonmoving party's case.  *Celotex*, 477 U.S. at 325; *Varnedoe v. Postmaster Gen.*, No. 21-11186, 2022 WL 35614, at *2 (11th Cir. Jan. 4, 2022).

### II.      Legal Framework

Congress enacted the ADA to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1). This "broad mandate" of "comprehensive character" has a "sweeping purpose," which is to "eliminate discrimination against disabled individuals, and to integrate them into the economic and social mainstream of American life."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (quotation marks and citation omitted).

Title II of the ADA prohibits disability discrimination by state and local governments.  42 U.S.C. §§ 12132, 12131(1).  The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Noting that discrimination "persists in such critical areas as . . . institutionalization, health services, . . . and access to public services," Congress explicitly classified "segregation" as one such form of discrimination.  42 U.S.C. §§ 12101(a)(3), 12101(a)(5).  Congress recognized in statutory findings that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  *Id.* § 12101(a)(2).

In *Olmstead v. L.C.*, the Supreme Court affirmed that Title II prohibits "undue institutionalization" as a species of discrimination by state and local governments.  527 U.S. at 598.  Such discrimination is effectuated by the manner in which public entities administer their services and programs, requiring people with disabilities "to relinquish participation in community life they could enjoy given reasonable modifications."  *Id.* at 601.  The Supreme Court explained that its holding "reflects two evident judgments."  *Id.* at 600.  First, "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life."  *Id.* at 600 (citations omitted).  Second, "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 601 (citation omitted).

To avoid this form of discrimination, the integration mandate of the ADA affirmatively requires state and local governments to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."  28 C.F.R. § 35.130(d).

Where people with disabilities are qualified for state services, and can appropriately be served in an integrated setting, they must be afforded the opportunity to be served there absent a fundamental alteration.  *See, e.g.*, *Olmstead*, 527 U.S. at 599-603, 607; *Brown v. District of Columbia*, 928 F.3d 1070, 1078 (D.C. Cir. 2019); *Frederick L. v. Dep't of Public Welfare*, 364 F.3d 487, 492 n.4 (3d Cir. 2004); *see also, e.g.*, 28 C.F.R. pt. 35, App. B, at 703 (2021) (discussing 28 C.F.R. § 35.130(d), (e)); *Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1297-98 (M.D. Fla. 2010) (plaintiff was likely to succeed on the merits of integration claim because Florida had affirmative duty "[t]o avoid the discrimination inherent in the unjustified isolation of disabled persons" by making "reasonable modifications to policies, practices, and procedures for services

they elect to provide")); *United States v. Mississippi*, 400 F. Supp. 3d 546, 554 (S.D. Miss. 2019) (states have affirmative obligation to avoid unnecessary institutionalization), *appeal pending*, No. 21-60772 (5th Cir.); *Guggenberger v. Minnesota*, 198 F. Supp. 3d 973, 1032 (D. Minn. 2016) ("[T]he alleged discrimination—undue isolation—stems from a failure to satisfy an affirmative duty.").

Indeed, people with disabilities need not subject themselves to institutionalization in order to trigger the integration mandate; such claims are cognizable on behalf of people at serious risk of institutionalization as well. *See, e.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 460-62 (6th Cir. 2020); *Davis v. Shah*, 821 F.3d 231, 262-64 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *M.R. v. Dreyfus*, 663 F.3d 1100, 1117-18 (9th Cir. 2011).

## III.     The State Is Violating Title II of the ADA

The undisputed facts in the record show that the State[2] limits access that Institutionalized and At-Risk Children have to specific home and community-based services.  As a result, families have resorted to placing their children in nursing facilities so they can receive needed services.  As one mother put it, "[w]hen it came down to not having any nursing coverage at all, it was a very difficult decision [to place her child in a facility].  Our backs were against the wall."  Decl. ¶ 48; Ex. 45 at 31:12-15; *supra* p. 13; SOMF ¶ 116.

Parents of At-Risk Children fill in service gaps themselves, their children at risk of institutionalization should their families be unable to continue to provide services while also working and caring for other family members.  One single-parent described her reaction to learning that her child would soon not have a nurse to cover her medically necessary night nursing shifts: "My reaction is one of panic, fear, because I know what the consequences are of not having a nurse . . . It's exhaustion for me.  Fear of losing employment, which, you know, I'm the – the sole provider for [my child] and I.  I – I have no choice.  I have to work.  But, again, it's my health that will end up . . . taking its toll because I cannot be awake all day and all night and be expected to perform at the level to receive income to support myself and my daughter."  If this mother's child were to lose this authorized, medically necessary nursing care, the child "wouldn't be able to remain with me because I wouldn't have anybody to care for her while I

---

[2] Defendant, the State of Florida, is a "public entity" within the meaning of the ADA and is thus subject to Title II.  42 U.S.C. § 12131(1); Decl. ¶ 16; Ex. 13 at 2.

worked. [. . .] I don't think I should be forced to have my child taken from my care just because I . . . have to work." Decl. ¶ 51; Ex. 48 at 36:5-16; *see supra* p. 13; SOMF ¶ 117. These are the real-world consequences of the State's failure to provide all authorized, medically necessary PDN. The child of the mother quoted above received only 52% of the PDN hours for which she was authorized in June 2022. Decl. ¶ 20; Ex. 17 at 31. Hundreds of others are in the same situation; according to data reported to the State by its managed care organizations, more than 500 children received less than 60% of authorized hours as of the end of State Fiscal Year 2021. Decl. ¶ 9; Ex. 6, App. IV.

This is the epitome of discrimination under Title II's integration mandate. The Supreme Court in *Olmstead* made clear that unnecessary institutionalization is discrimination by reason of disability because "[i]n order to receive needed medical services, persons with . . . disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without disabilities can receive the medical services they need without similar sacrifice." 527 U.S. at 601; *see also, e.g., Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1177-78 (10th Cir. 2003) (state's cap on prescription medications recipients of community services can access may violate integration mandate where state does not limit access to medications for nursing facility residents); *Townsend v. Quasim*, 328 F.3d 511, 516-20 (9th Cir. 2003) (state policy limiting community-based care to categorically needy excluded medically needy). Likewise, the At-Risk Children "have been compelled to forgo necessary medical services in order to remain in the community." *Waskul*, 979 F.3d at 461. Institutionalization "could happen at any moment that [their families] are unable to sustain" their children's care. *Id.*

Under Title II, public entities must "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Interpreting this requirement, the Supreme Court clarified that public entities must provide community-based services for persons with disabilities when: (a) they are appropriate for community placement, (b) the affected persons do not oppose community placement, and (c) community-based services can be reasonably accommodated, taking into account the resources available to the public entity and the needs of other persons with disabilities. *Olmstead*, 527 U.S. at 607; *see* 42 U.S.C. § 12132. A state's failure to provide services in the most integrated setting appropriate is excused only when the state can

demonstrate, as an affirmative defense, that the relief sought would result in a "fundamental alteration" of the state's service system.  *Olmstead*, 527 U.S. at 603.

### A.  *Nursing Facilities Are Segregated Settings*

As a threshold matter, nursing facilities are institutions.  *See* 42 U.S.C. § 1395i-3(a) (defining skilled nursing facilities as institutions); *see also, e.g.*, *Radaszewski v. Maram*, 383 F.3d 599, 601-02, 610 (7th Cir. 2004) (discussing "an institutional setting—whether it be a nursing home facility, a hospital, or another type of care facility"); *Fisher*, 335 F.3d at 1181-82, 1184-85 (people at risk of entering nursing facilities were at risk of entering institutions); *A.H.R. v. Wash. State Health Care Auth.*, 469 F. Supp. 3d 1018, 1031, 1044 (W.D. Wash. 2016) (individual at risk of entry into nursing home as a result of public entity's failure to ensure that all authorized hours of PDN were fulfilled was at risk of unnecessary institutionalization); *Cruz v. Dudek*, No. 10-23048-CIV, 2010 WL 4284955, at *16 (S.D. Fla. Oct. 12, 2010) (noting the high expense of providing "institutional care in a nursing home"); *Hunter v. Cook*, No. 1:08-CV-2930-TWT, 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) (noting that plaintiffs were not "required to segregate themselves by entering an institution"—in this case, a nursing facility—to state a Title II claim (quotation omitted)).

Indeed, living in institutional nursing facilities, the Institutionalized Children's interaction with nondisabled persons is minimal.  *See* 28 C.F.R. pt. 35, App. B at 703 (2021) (defining the most integrated setting as "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible").  The children live separately from their families, rarely leave the facilities, and seldom interact with others without disabilities who are not paid staff.  SOMF ¶ 127.  Children living in nursing facilities lack the opportunity to be with their families in a home environment, and lack opportunities for social interaction with peers and adults without disabilities.  *Id.*  One mother, who lives hundreds of miles from her child's nursing facility, testified: "His birthday is coming . . . I will not see him.  [ . . . ]  I'm going to send him something.  But it's terrible.  And I also worry about the example it sets for my other kids, too, to know that they have a brother somewhere else and he is not being celebrated in the same way or nurtured in the same way as them."  Decl. ¶ 48; Ex. 45 at 36:1-11.

### B.  *The Institutionalized and At-Risk Children Can Appropriately Be Served in the Community*

24

Title II of the ADA provides that "'qualified individual[s] with a disability' may not 'be subjected to discrimination.'" *Olmstead*, 527 U.S. at 602 (quoting 42 U.S.C. § 12132) (alteration in original).  People with disabilities[3] are "qualified" if, "'with or without reasonable modifications to rules, policies, or practices,'" they "'mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.'" *Olmstead*, 527 U.S. at 602 (quoting 42 U.S.C. § 12131(2)) (alteration in original).

Under the Supreme Court's analysis of these statutory provisions, individuals are considered "appropriate" for community placement if they could live in the community with sufficient services for which they would be eligible.  *See, e.g.*, *Olmstead*, 527 U.S. at 601-02, 607; *Cruz v. Dudek*, 2010 WL 4284955, at *13 (discrimination occurred where plaintiffs were "able to live in their own home[s] with adequate support services" but could not obtain adequate services); *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 994 (N.D. Cal. 2010) (appropriateness prong satisfied where plaintiffs' individual plans of care documented their need for specific community services that were "critical to their ability to avoid institutionalization").

The Institutionalized Children can appropriately be served in the community.  As the United States' experts, pediatricians specializing in the care of children with complex medical needs in the community in the long term, unanimously found through their review of the medical records of *all* of the Institutionalized Children, each of these children has medical needs that can be met with existing community services, such as in-home nursing and durable medical equipment.  *See supra* pp. 15-16; SOMF ¶ 131.  Indeed, "nothing about their disabilities necessitates living in" nursing facilities.  *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 256 (E.D.N.Y. 2009), *vacated on other grounds sub nom. Disability Advocates, Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149 (2d Cir. 2012).

Moreover, a number of the Institutionalized Children have been deemed eligible for community-based services and programs, including PDN, Medical Foster Care, and the iBudget waiver, and some lived in the community while receiving PDN prior to nursing facility

---

[3] The Institutionalized and At-Risk Children have disabilities as defined by the ADA.  The Institutionalized and At-Risk Children are defined as children who have complex medical needs. D.E. 700 (Am. Compl.) ¶ 22.  Children with complex medical needs are persons with disabilities under the ADA because they have medical conditions that substantially limit one or more major life activities, including mobility, breathing, eating, and personal care.  42 U.S.C. § 12102(1)-(2); Decl. ¶ 4; Ex. 1 at 9-11; Decl. ¶ 5; Ex. 2 at 3-4; Decl. ¶ 6; Ex. 3 at 4-5.

admission.  *See supra* p. 16; SOMF ¶¶ 26, 134.  By approving and previously allowing receipt of community services, "the state's medical professionals have demonstrated that [community treatment] is both appropriate and possible."  *See Steimel v. Wernert*, 823 F.3d 902, 915-16 (7th Cir. 2016); *see also Radaszewski v. Maram*, 383 F.3d 599, 612-13 (7th Cir. 2004) (explaining that the fact that the young adult at risk of institutionalization had lived at home for years supported a finding that he could "handle and benefit from" community-based services); *A.H.R.*, 469 F. Supp. 3d at 1045 (medically complex infants and toddlers' authorization to receive PDN rendered their family homes the "most integrated setting appropriate" to their needs).

Likewise, the At-Risk Children already receive services in their communities, and this history of community living demonstrates that to continue living at home, with adequate services, would be appropriate.  *See, e.g.*, *Radaszewski*, 383 F.3d at 612-13; *Townsend*, 328 F.3d at 516; *Cota*, 688 F. Supp. 2d at 994.

The facts in the record demonstrating that the Institutionalized and At-Risk Children can live in their homes and communities with sufficient services are not disputed.  The State's experts did not review medical records (or any other child-specific facts or data) to determine whether *any* specific Institutionalized Child's needs could (or could not) be met in the community with appropriate services and supports.  *See generally* Decl. ¶ 10; Ex. 7; Decl. ¶ 13; Ex. 10.  Instead, the State's experts warn that some children *might* not be appropriate for community placement for potential reasons such as the possibility that their biological parents might not be willing or able to care for them in their own homes, or the potential physical unsuitability of biological parents' homes.  These hypothetical reasons are, however, irrelevant to whether the children's needs could be met in a community setting, as opposed to a nursing facility.

Even if these hypothetical reasons were facts related to specific Institutionalized Children, they would not be material.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Facts unrelated to whether an individual "'meets the essential eligibility requirements' for habilitation in a community-based program" or whether the individual can "handle and benefit from community placement" are not relevant to the appropriateness inquiry.  *Olmstead*, 527 U.S. at 600-02 (quoting 42 U.S.C. § 12131(2)).  Indeed,

26

these hypothetical reasons are not related to the children's service needs at all, but rather to their families or their families' environments.[4]

The State's experts also suggest that Institutionalized Children may not be appropriate for community placement because community services such as PDN may not always be available in the amount medically necessary for the child.  Decl. ¶ 13; Ex. 10 at 21, 45; *see* Decl. ¶ 10; Ex. 7 at 6; Decl. ¶ 12; Ex. 9 at 1-2.  But this understanding of the law is exactly backward.  *See, e.g.*, *Cruz*, 2010 WL 4284955, at *13 (discrimination occurred where plaintiffs were "able to live in their own home[s] with adequate support services" but could not obtain adequate services).  If a state's failure to provide adequate community services could render a person with a disability inappropriate for community placement under *Olmstead*, the integration mandate would be meaningless.

In sum, the undisputed facts show that each of the Institutionalized Children has medical needs that can be met with community services; "nothing about [the Institutionalized Children's] disabilities necessitates living in" nursing facilities.  *Disability Advocates*, 653 F. Supp. 2d at 256.  Rather, they could live in the community with sufficient services.  *Cruz*, 2010 WL 4284955, at *13.  Indeed, for some Institutionalized Children, the State has already approved their receipt of services in community settings by deeming them eligible for community-based

---

[4] Some of these considerations may be relevant to the determination of where a specific child should be discharged *to*, if discharge is what their parent or guardian desires, but this does not mean they are relevant to appropriateness, as a child can be served in a community setting that is not the home of their biological parents, such as medical foster care settings.  However, it should be noted that the State's experts attempt to sow doubt as to children's appropriateness for community placement by suggesting that they may not be adequately cared for if their families have low incomes, or if the children have single parents, or parents who lack education or have limited English proficiency.  Decl. ¶ 10; Ex. 7 at 6.  As an initial matter, it is demonstrably false that such families cannot care for children with complex medical needs in their homes.  Decl. ¶ 11; Ex. 8 at 5-6; *see generally* Decl. ¶ 51; Ex. 48 (working single mother caring for child with complex medical needs experiencing PDN staffing gaps); Decl. ¶ 44; Ex. 41 (single father living in a motel room with his child who has complex medical needs and is authorized to receive State community services).  But it is also nowhere in *Olmstead* or its progeny that because a person with a disability also happens to come from, for example, a home with a single parent or a low-income family, that they should be considered inappropriate for community placement.  To the contrary, *Olmstead* stands for the opposite proposition: people with disabilities should not have to "relinquish participation in community life they could enjoy given reasonable accommodations, while persons without disabilities can receive the medical services they need without similar sacrifice."  527 U.S. at 601.

services and programs, including PDN, Medical Foster Care, and the iBudget waiver, and by providing such services to some prior to nursing facility admission. *See, e.g.*, *Steimel*, 823 F.3d at 915-16.

### C.  Parents and Guardians Do Not Oppose Community Placement

The ADA requires that community-based services be provided to qualified individuals with disabilities who do not oppose such services.  *Olmstead*, 527 U.S. at 602, 607 (citing 28 C.F.R. § 35.130(e)(1), which provides that the ADA does not "require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept"); *see* 42 U.S.C. § 12201(d).

The undisputed facts show that, overwhelmingly, the parents and guardians of the Institutionalized Children do not oppose community placement.[5]  Some of the families are actively trying to bring their Institutionalized Children home.  Indeed, several described feeling desperate to be reunited with their children, including one parent who stated, "Pretty much short of robbing a bank, we'll do what we can to bring him home," Decl. ¶ 5; Ex. 2 at 19, and another who said, "There is no way I'm going to leave my baby there."  Decl. ¶ 4; Ex. 1 at 45; *see also supra* pp. 16-17; SOMF ¶ 138.  Some families would prefer to have their children home with them but are facing barriers to doing so.  *See, e.g.*, Decl. ¶ 40; Ex. 37 at 15:1-4 ("Q. And what was the catalyst or what – what was the . . . factor or the decision that made you to put [your child] at [the facility]?  A. Mostly unreliable nursing.").  SOMF ¶ 139.  There are other families who would not oppose transitioning their children to a community-based setting that is not their own home.  *Id.* ¶ 141.

Further, the parents or guardians of at least 19 children currently living in nursing facilities have applied for the iBudget waiver for their children (all of the children are on the waiver waiting list, most of them for multiple years).  Decl. ¶ 20; Ex. 17 at 357-364.  This means that these "parents or guardians wished to have their children at home [or in the community], took affirmative steps to have their children at home [or in the community], and due to the inadequacies of the State's services, were unable to do so."  *See* D.E. 768 (Report & Recommendation) at 7.

---

[5] As discussed above, the record evidence shows that families of At-Risk Children desire that their children remain in their homes with them.  *Supra* p. 17; SOMF ¶ 142.

The undisputed facts also establish that, with adequate information about community service options, adequate discharge planning services, and adequate community-based services in place, families of Institutionalized Children could have avoided nursing facility placement for their children.  SOMF ¶¶ 107-108.

While there may be some parents of Institutionalized Children who would prefer that their children remain in a nursing facility (*see* Decl. ¶ 4; Ex. 1 at 47; Decl. ¶ 5; Ex. 2 at 17; Decl. ¶ 6; Ex. 3 at 13), the United States need not demonstrate that *all* families of Institutionalized Children do not oppose community placement.  *See* 42 U.S.C. § 12201(d); *Olmstead*, 527 U.S. at 602.  The United States need only demonstrate that there are children residing in nursing facilities whose families do not oppose community placement.  *See Kenneth R. v. Hassan*, 293 F.R.D. 254, 269 (D.N.H. 2013) (certifying class of "unnecessarily institutionalized" individuals in integration case where some class members may prefer institutionalization, stating, "the existence of preference differences among class members does not change the fact that the State's practices with regard to community services have been shown . . . to affect all class members . . . . And, because preferences can change, class members who today might prefer institutionalization, can reasonably be thought to also have an interest in the availability of community-based treatment options should their preferences change tomorrow").  The undisputed facts in the record show that there are many.  *See, e.g.*, Decl. ¶ 20; Ex. 17 at 237-306 (discussing individual children).

Rather than elucidating facts disputing these findings, the State's expert suggests that the families who wish to have their children home with them but experience barriers to transitioning them from nursing facilities, should actually be considered to be opposed to community placement.  Decl. ¶ 13; Ex. 10 at 17.  He also concludes that families' expressed interest in or openness to out-of-home community placements "are not indications of nonopposition."  *Id.* at 44.  This is a dispute of law, not of fact, and the State is wrong on the law.  First, with respect to families' experiencing barriers to discharge, non-opposition can be established by showing that individuals likely would not oppose community placement if provided adequate community-based services and information about available options.  *See, e.g.*, 28 C.F.R. § 35.130(e)(1) ("Nothing in this part shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit provided under the ADA or this part which such individual chooses not to accept."); *Kenneth R.*, 293 F.R.D. at 270 n.6 ("[T]he *meaningful*

exercise of a preference will be possible only *if* an adequate array of community services are available…"); *see also Disability Advocates*, 653 F. Supp. 2d at 263 (people reporting "a preference to move out of their adult home is merely 'a floor' with regard to who would truly be willing to move if given" information and support in making a "true choice").  Second, with respect to families who expressed interest in out-of-home community placements, such interest in obtaining community-based services instead of institutional, nursing facility care *is* non-opposition.  *See, e.g.*, *Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 332-34, 339-42 (D. Conn. 2008) (finding plaintiffs not opposed to community services where guardians expressed "interest" in, or would consider, community placement).[6]

In sum, it is undisputed that there are many parents of Institutionalized Children who want to bring their children home from nursing facilities, and that many face barriers to doing so, and that some families are interested in alternative community placements for their children.  All of these constitute non-opposition.

### D.  The State Can Make Reasonable Modifications to Comply with the ADA

The final element to demonstrate a violation of the integration mandate is that the State can make reasonable modifications to its service system to accommodate placement in the community.  *Olmstead*, 527 U.S. at 607.  The plaintiff's *prima facie* burden of identifying reasonable modifications is not a "heavy one."  *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003) (affirming grant of injunctive relief after bench trial) (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).  The plaintiff need only suggest the existence of a plausible accommodation.  *Id.*; *see also Frederick L.*, 364 F.3d at 492 n.4 (in vacatur of judgment for defendant after bench trial, explaining that the plaintiff bears the initial burden only of "articulating a reasonable accommodation").

In short, the United States has proposed the following modifications, which are described in more detail *supra*, pp. 17-19: (1) expanding existing in-home nursing services (including by

---

[6] In addition, the State has an explicit preference for Medical Foster Care placement over institutional placement where appropriate.  SOMF ¶ 11.  The Institutionalized Children in the State's custody have been deemed eligible, and are thus appropriate, for Medical Foster Care. *Id.* ¶ 92.  The State is the placement authority for children in its custody.  Decl. ¶ 16; Ex. 13 at 11.  As a public entity subject to the obligation to provide services to people with disabilities "in the most integrated setting appropriate to their needs," the State may not "oppose" integrated placement where appropriate to the needs of the individual.  42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

meeting the State's existing obligation under federal Medicaid law to provide the community-based services the Institutionalized and At-Risk Children need to live at home); (2) expanding the capacity of the State's iBudget waiver program to meet the needs of Institutionalized and At-Risk Children eligible for that program; (3) enhancing access of Institutionalized and At-Risk Children to family-based settings by expanding the capacity and availability of the State's Medical Foster Care program; and (4) providing sufficiently individualized and effective care coordination services and assessments to help avoid unnecessary nursing facility placements and to help Institutionalized Children transition to the community.

These types of modifications—namely, expanding existing State services and programs—are routinely found to be both sufficient to meet a plaintiff's burden to articulate a plausible modification, and reasonable. *See, e.g.*, *Mississippi*, 400 F. Supp. 3d at 576 (finding provision of community-based services reasonable where United States showed that the state "already ha[d] the framework for providing [the] services and [could] more fully utilize and expand that framework to make the services truly accessible"); *Disability Advocates, Inc. v. Paterson* (*DAI I*), 598 F. Supp. 2d 289, 335-36 (E.D.N.Y. 2009) ("Where individuals with disabilities seek to receive services in a more integrated setting—and the state *already provides* services to others with disabilities in that setting—assessing and moving the particular plaintiffs to that setting, in and of itself, is not a 'fundamental alteration.'"); *cf. Haddad v. Arnold*, 784 F. Supp. 2d 1284, 1304-05 (M.D. Fla. 2010) (providing a service already in state's service system to additional individuals is not a fundamental alteration).

Not only do the modifications proposed here merely build on the State's existing service system to "more fully utilize and expand that framework to make the services truly accessible," *Mississippi*, 400 F. Supp. 3d at 576, but the proposed modifications also comport with Florida's own standards and obligations. For example, the State requires its managed care plans to ensure provision of all services deemed medically necessary, including PDN, and requires plans to use financial incentives where necessary to meet this obligation. Decl. ¶ 9; Ex. 6 at 17. This is consistent with the State's separate and independent legal obligation under federal Medicaid law to provide all medically necessary services to Medicaid-enrolled children. *See* 42 U.S.C. §§1396a(a)(43), 1396d(a), 1396d(r)(5). Modifications that align with the jurisdiction's own stated plans and obligations are reasonable. *See, e.g.*, *Henrietta D.*, 331 F.3d at 280-81 (upholding as a reasonable modification an order requiring agency to follow existing law and

procedures); *Messier*, 562 F. Supp. 2d at 344-45 (plaintiffs' requested service expansion, which was consistent with defendants' publicly stated plans, was reasonable).  Moreover, because the State already must make medically necessary services accessible to all Medicaid-enrolled children with medical complexity, 42 U.S.C. §§1396a(a)(43), 1396d(a), 1396d(r)(5), meeting this obligation is inherently reasonable.

A state is excused from having to make reasonable modifications only if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i); *see Brown v. District of Columbia*, 928 F.3d 1070, 1077-78 (D.C. Cir. 2019); *Frederick L. v. Dep't of Pub. Welfare* (*Frederick L. III*), 422 F.3d 151, 156-57 (3d Cir. 2005).

The United States is not seeking summary judgment on the issue of fundamental alteration, for which the State bears the burden of proof, if it asserts such a defense.  *Frederick L. II*, 364 F.3d at 492 n.4; *see* 28 C.F.R. § 35.130(b)(7)(i).  However, the United States notes that the State does not contend that making the reasonable modifications the United States has proposed would be infeasible or so expensive as to fundamentally alter its service system, and there are no facts in the record that would support a fundamental alteration defense on this ground.  Decl. ¶ 19; Ex. 16 at 2.  Moreover, there is no evidence in the record establishing that the State has a "comprehensive, effectively working plan for placing qualified persons with . . . disabilities in less restrictive settings" that the modifications would unduly disrupt.  *Frederick L. III*, 422 F.3d at 157.  While the State contends that it has a comprehensive, effectively working plan, it has admitted that it has no measurable goals or benchmarks for addressing unnecessary institutionalization of children in nursing facilities.  Decl. ¶ 19; Ex. 16 at 4.  The only evidence in the record of the State's supposed plan is its description, in response to an interrogatory response, of its existing Medicaid community-based services, and its unsupported assertion that its commitment to community integration is medically appropriate, genuine, comprehensive, and reasonable.  But the State's "announced commitment" to serving people in their communities is an "insufficient guarantor[]" of ADA compliance.  It cannot stand in place of "an adequately specific comprehensive plan."  *See Frederick L. III*, 422 F.3d at 158-59.  Accordingly, the State will not be able to establish that providing community-based services to the Institutionalized and At-Risk Children constitutes a fundamental alteration.

32

## **CONCLUSION**

For the above reasons, the United States respectfully requests that the Court enter partial summary judgment in favor of the United States, finding that the State of Florida fails to provide State services to the Institutionalized and At-Risk Children in the most integrated setting appropriate to their needs.

**Dated:** February 15, 2023                    Respectfully submitted,


JUAN ANTONIO GONZALEZ                REBECCA B. BOND
United States Attorney               Chief
Southern District of Florida
                                     ANNE S. RAISH
*/s/ Veronica Harrell-James*          Principal Deputy Chief
VERONICA HARRELL-JAMES               ELIZABETH E. McDONALD
Assistant United States Attorney     Deputy Chief
Fla. Bar No. 644791
99 N.E. 4th Street                   */s/ Lindsey Weinstock*
Miami, Florida 33132                 JAMES FLETCHER, Bar ID A5502825
Telephone: (305) 961-9327            H. JUSTIN PARK, Bar ID A5501850
Facsimile: (305) 530-7139            LINDSEY WEINSTOCK, Bar ID A5502063
Veronica.Harrell-James@usdoj.gov     Trial Attorneys
                                     Disability Rights Section
                                     Civil Rights Division
                                     U.S. Department of Justice
                                     950 Pennsylvania Avenue, N.W.
                                     Washington, D.C. 20530
                                     Telephone: (202) 616-2221
                                     Facsimile: (202) 307-1197
                                     lindsey.weinstock@usdoj.gov

                                     *Counsel for Plaintiff United States of America*

34