UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 12-60460-CIV-MIDDLEBROOKS/HUNT

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STATE OF FLORIDA,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the State of Florida's Motion for Summary Judgment, ECF No. 771, and the United States' Motion for Partial Summary Judgment, ECF No. 773.  The Honorable Donald M. Middlebrooks, United States District Judge, referred these Motions to the undersigned for disposition.  ECF No. 812; *see also* 28 U.S.C. § 636(b); S.D. Fla. Mag. R. 1.  Having carefully reviewed the Motions, the Responses, and Replies thereto, the argument of Counsel at an April 4, 2023 hearing, the entire record, applicable law, and being otherwise fully advised in the premises, the undersigned respectfully RECOMMENDS that Florida's Motion be GRANTED IN PART and DENIED in PART and the United States' Motion be DENIED for the reasons outlined below.

## BACKGROUND

This case concerns the United States' allegation that the State of Florida has violated Title II of the Americans with Disabilities Act ("ADA"). 42 U.S.C. §§ 12131-12134.  Specifically, the United States alleges that the State discriminates against

children with disabilities by failing to administer its services in the most integrated setting appropriate to their needs, in violation of the ADA.

The United States accuses Florida of discriminatory administration of its service system for children with complex medical needs, and requests that the Court find that Florida fails to provide appropriate state services to these children.  The children at issue here are children under twenty-one years old who have disabilities resulting in their need for medical services on a daily basis.  The children often qualify for Medicaid, and often require help with activities of daily living.  Necessary services include the use of technology or equipment for communication, mobility, breathing, eating, and other tasks, as well as the use and maintenance of feeding tubes, breathing tubes, ventilators, and wheelchairs.

There are two kinds of children involved:  those who are already institutionalized, and those who are at serious risk of institutionalization.  There are approximately 140 institutionalized children, while the number of at-risk children totals more than 1,800. Some of the institutionalized children have been deemed eligible for community-based services, such as private duty nursing, Florida's so-called iBudget waiver program, and medical foster care.  The United States alleges that all of these children have the ability to live in their homes and communities if they are provided with sufficient services.

Florida, on the other hand, asks this Court to find that its services are adequate. According to Florida, 99.8 percent of children in the state with complex medical needs live at home or in other settings besides nursing homes, at the cost of about $500 million per year.  Florida argues that the United States has not presented to this Court the necessary evidence to proceed on its claim.  Florida contends that the United

States' claim also fails as a matter of law, and that the claim threatens to establish a situation where a state is liable when *any* child is institutionalized.

This case, now more than ten years old, has a long procedural history behind it that need not be recounted here.  Both Parties make multiple arguments as to why their arguments should win the day at summary judgment.  Given the significant overlap between the Parties' respective arguments, the undersigned will address both Parties' Motions together.

## SUMMARY JUDGMENT STANDARD

For purposes of a motion for summary judgment, summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (stating that there is no "requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim").  If that burden has been met, the burden shifts to the nonmoving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  *Clark*, 929 F.2d at 608.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether there are any genuine issues of material fact, this Court may not weigh evidence or make any credibility determinations. *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992). Instead, this Court is required to resolve all reasonable doubts in favor of the non-moving party. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (citing *Williams v. City of Dothan*, 745 F.2d 1406 (11th Cir. 1984)). Summary judgment is not appropriate where "a rational trier of fact could find a verdict for the nonmoving party under the substantive evidentiary standard." *Tipton*, 965 F.2d at 999.

## DISCUSSION

a. <u>*Olmstead v. L.C. ex rel. Zimring*</u>

This case is governed by *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), which found that

> public entities must provide community-based services to persons with disabilities when (1) the services are appropriate; (2) the affected persons do not oppose the services; and (3) the public entity can reasonably accommodate the community-based services.

*Georgia Advoc. Off. v. Georgia*, 447 F. Supp. 3d 1311, 1322 (N.D. Ga. 2020) *(citing Olmstead, 527* U.S. at 597–98, 607).

In essence, *Olmstead* requires that "if a state is found to have discriminated against disabled individuals through the administration of a program, it must modify the program to remedy the situation unless it can prove that any modification would fundamentally alter the program." *Makin ex rel. Russell v. Hawaii*, 114 F. Supp. 2d 1017, 1034 (D. Haw. 1999). The *Olmstead* ruling has been found to cover both

institutionalized individuals as well as those who are at risk of institutionalization.  *See, e.g., Hunter ex rel. Lynah v. Cook*, No. 1:08-CV-2930-TWT, 2011 WL 4500009, at *5 (N.D. Ga. Sept. 27, 2011) ("Title II of the ADA 'would be meaningless if plaintiffs were required to segregate themselves by entering an institution before they could challenge an allegedly discriminatory law or policy that threatens to force them into segregated isolation.'")  (quoting *Fisher v. Okla. Health Care Auth*., 335 F.3d 1175, 1181 (10th Cir. 2003)).

At issue in these Motions are four major failings alleged by the United States. According to the United States, Florida:

1) fails to adequately fund private duty nursing, despite being required to provide Medicaid-eligible children with all such services authorized as medically necessary;

2) limits access for both institutionalized and at-risk children to its Medicaid waiver program for persons with developmental disabilities (the iBudget waiver). According to the United States, 600 children with complex needs are on the waitlist, 19 of whom are institutionalized;

3) fails to maintain sufficient capacity in its medical foster care program to prevent the unnecessary institutionalization of children with disabilities; and

4) fails to provide families with the information they need to understand their home and community-based service options, and the assistance they need to access those services.

The United States contends that states are required by the Medicaid Act to provide all of these state plan services, when medically necessary, to all Medicaid-

enrolled children, and that Florida need only expand its existing services to address these failures and give families a meaningful choice as to whether their children will receive services at home or in nursing facilities.

Florida argues that the United States mischaracterizes *Olmstead* by suggesting that an *Olmstead* violation exists whenever it is possible to hypothesize a home or community-based setting that would be "appropriate" to the child's needs, regardless of whether the setting actually exists. Florida also contends that the United States wants to twist *Olmstead*'s requirements so they are met whenever parents, when presented with a hypothetical perfect world in which any real-world concerns are fully resolved, indicate they would want their children to live at home or in some other ill-defined "community setting." Florida argues that this characterization of *Olmstead* would ensure that its elements are always satisfied as to any disabled person who resides in institutionalized care.

b. <u>Procedural and general issues</u>

Before wading into the waters of what *Olmstead* requires, the undersigned first needs to address a number of procedural issues advanced by Florida, as well as other issues that generally apply to a substantial number of arguments. The first issue to be addressed is whether the United States has standing to bring this litigation. The undersigned finds that the standing issue in this case has already been decided by the United States Court of Appeals for the Eleventh Circuit.

As the Eleventh Circuit explained, "[t]he United States has brought suits to ensure compliance with the Rehabilitation Act, and each of those suits took place after the relevant agency had received a complaint and investigated." *United States v.*

*Florida*, 938 F.3d 1221, 1236 (11th Cir. 2019).   Further, "courts have routinely concluded that Congress's decision to utilize the same enforcement mechanism for Title II as the Rehabilitation Act, and therefore Title VI, demonstrates that the Attorney General has the authority to act 'by any other means authorized by law' to enforce Title II, including initiating a civil action. We agree with this reasoning."  *Id. at* 1248.

The Eleventh Circuit ultimately concluded that "[t]he express statutory language in Title II adopts federal statutes that use a remedial structure based on investigation of complaints, compliance reviews, negotiation to achieve voluntary compliance, and ultimately enforcement through 'any other means authorized by law' in the event of noncompliance. In the other referenced statutes, the Attorney General may sue. The same is true here." *Id.* at 1250.  As the United States explained in its briefing and at the hearing, it has received multiple complaints that, once investigated, led to this lawsuit. The undersigned sees no reason to doubt that the United States has standing to bring its claims.

Florida next argues that much of the United States' argument is based on inadmissible hearsay and therefore fails.  The United States responds that the hearsay objection is not well founded, as the statements in question are admissible under Fed. R. Evid. 703.

Fed. R. Evid. 703 states:

An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

This "basis evidence" provision allows such statements to be considered at summary judgment so long these aspects of a party's expert reports could be reduced to admissible form at trial.  *See, e.g., Jones v. Coty Inc*., 362 F. Supp. 3d 1182, 1197 (S.D. Ala. 2018).  As "Defendants have advanced no persuasive argument that the 'basis evidence' provision of Rule 703 would not allow these aspects of plaintiffs' expert reports to be reduced to admissible form at trial, [they are] therefore . . .  properly considered on summary judgment."  *Id.*

Florida also argues that the evidence cited by the United States does not, in fact, support the United States' arguments.  Florida alleges that the United States generally mischaracterizes evidence and accuses the United States of blending the particular evidence of individual children into a common mass to suit a narrative.  Although the undersigned addresses the specific evidentiary claims of each *Olmstead* requirement below, it suffices to say at this stage that each side presents ample record evidence that it argues supports its contentions, and at times point to the same evidence to reach opposite conclusions.  As explained further in the following section, Florida now asks this Court to interpret such evidence in its favor.  Given the standard under which this Court operates in considering Florida's Motion for Summary Judgment, this is inappropriate.

Finally, Florida argues that the evidence the United States presents on Florida's alleged failures, though ostensibly characterizing "widespread" malfeasance, is only applicable to a handful of people and non-generalizable.  Florida contends that because of this supposedly low number of children allegedly harmed, the United States has not

met its burden to demonstrate widespread issues that would justify requiring a systemic response.

This Court has previously stated that "the United States' claim of a 'systemic' violation of the ADA by Florida, if statutorily authorized and proven, is particularly appropriate for redress through its claims for declaratory and injunctive relief." *A.R. v. Dudek*, No. 12-60460-CIV-ZLOCH/HUNT, 2016 WL 3221140, at *15 (S.D. Fla. June 9, 2016). Further, as discussed below, the United States has presented evidence that the vast majority of affected children in Florida are receiving less than 80 percent of the private duty care nursing hours they require. The United States has also presented evidence that the waitlist for the iBudget waiver contains roughly 600 at-risk children with complex medical needs, some of whom are institutionalized. Viewed in the light most favorable to the opposing party, the undersigned finds this to adequately establish a systemic violation for the purposes of summary judgment.

c. *Olmstead* requirements

The undersigned now turns to the heart of the Parties' arguments regarding *Olmstead*'s actual requirements. Each will be taken in order.

(1) *a community setting would be appropriate to an individual's needs*

Florida argues that the United States has not demonstrated beyond a genuine dispute that the institutionalized children can appropriately be served in their actual real world community settings. For instance, Florida's expert states many of these children's homes are "far from ideal living situations, making it unsafe, unhealthy, or unsanitary to provide care in the home environment." ECF No. 772-4 at 10. Florida argues that the United States did not properly evaluate whether the homes to which a child would be

discharged would be appropriate to the child's needs, and instead had its experts opine on the appropriateness of an abstract, undefined, hypothetical community setting. Florida insists that the appropriateness evaluation must take practical issues into account.

The United States contends that rather than respond with facts, Florida has demonstrated only immaterial differences and mere speculation. The United States contends that Florida ignores the fact that there is nothing about the children's disabilities that requires them to be institutionalized. The United States argues that to prove that community-based services are appropriate for people with disabilities, a plaintiff need only show that that there is "nothing *about their disabilities* that necessitates living in" nursing facilities, as there are services that could meet their needs in the community. *Disability Advocates, Inc. v. Paterson*, 653 F. Supp. 2d 184, 256 (E.D.N.Y. 2009) ("*DAI II*") (emphasis added) (vacated on other grounds). Whether a child has a safe home to come back to is a different consideration than the fundamental appropriateness of being cared for in a more integrated community setting under *Olmstead*, according to the United States. The United States contends that the record adequately demonstrates that the institutionalized children at issue can appropriately be served in community-based settings with proper services and support.

The undersigned first addresses Florida's argument regarding the state of the children's homes. This argument appears to be a bit of a red herring. Although it is not Florida's responsibility to provide new housing for all claimants, the record now before the Court does not establish that the housing issue or other potential barriers to integration cannot be overcome. *See Day v. D.C.*, 894 F. Supp. 2d

1, 32 (D.D.C. 2012).  Further, the most integrated setting for the children at issue need not necessarily be their home.  The most integrated setting appropriate has been defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." *Stiles v. Judd*, No. 8:12-CV-02375-T-27, 2013 WL 6185404, at *2 (M.D. Fla. Nov. 25, 2013) (quoting 28 C.F.R. Part 35, App. B (2011)).  That their actual homes may not be appropriate for their care does not mean that there is not a more integrated setting, something short of institutionalization, that would be.  The United States has submitted evidence from its experts demonstrating that the institutionalized children can be appropriately served in community-based settings with proper services and support, and this is enough.

As this Court has previously observed in this case, however, "Florida has sufficiently shown that even if Florida's administration of services and policies result in 'undue institutionalization' for some children, there are others for whom community-based treatment is altogether inappropriate." *Dudek*, 2016 WL 3221140, at *12.  Still, a state "cannot deny the [integration] right simply by refusing to acknowledge that the individual could receive appropriate care in the community. Otherwise the right would, or at least could, become wholly illusory."  *Long v. Benson,* No. 08–0026-CIV, 2008 WL 4571904, at *2 (N.D. Fla. Oct. 14, 2008).

Clearly, the evidence demonstrates that there are some institutionalized children for whom a more integrated setting would be appropriate.  Likewise, there are some that simply cannot benefit from better community integration.  The undersigned finds that the above evidentiary conflict creates a genuine issue of material fact and is therefore not appropriate to be decided on summary judgment.

11

(2) *the individual does not oppose community placement*

Here, Florida argues that the parents of institutionalized children actually oppose community placement, because it was these same parents who initially chose to place their children in nursing homes.  Florida contends that the expert opinions relied on by the United States to demonstrate parental non-opposition are methodologically flawed, in that no parent would oppose bringing their children home if certain pie-in-the-sky conditions allegedly proposed by the experts are met.  However, according to Florida, in the real world many parents simply cannot bring their children home.  To bolster its argument, Florida points both to parental statements as well as to numerous Freedom of Choice Certification Forms stating parents oppose transition into the community or are unable to bring the child home.

The United States, relying on its experts' opinions and the parental interviews that informed those opinions, argues that the record evidence contradicts Florida's contentions.  Rather than being seduced by unrealistic "pie-in-the-sky" hypotheticals, the United States argues the parents expressed non-opposition to community placement if Florida would properly fulfill its obligations to their children.

As to the quality of the experts' methods, the undersigned finds that this is an issue better decided in a motion filed pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1992).  The Parties have pending motions before the District Court dealing with such matters, *see* ECF Nos. 800, 801, and 802, and the District Court will deal with them at the appropriate time.  What can be said for the purposes of summary judgment is that there are competing opinions on both sides.

The United States has provided multiple statements from parents and caretakers indicating that they would want their children out of institutionalized care.  Likewise, as Florida has demonstrated, and as this Court has already observed, "there are still others who have opposed, or would oppose, more integrated settings."  *Dudek*, 2016 WL 3221140 at \*12 (S.D. Fla. June 9, 2016).  Evaluating the veracity of witnesses and deciding between "dueling experts" fall within the purview of a finder of fact.  *Goshawk Dedicated Ltd. v. Am. Viatical Servs., LLC*, No. 1:05-CV-2343-RWS, 2013 WL 424891, at \*7 (N.D. Ga. Feb. 4, 2013).  The undersigned therefore recommends such issues be determined at trial.

(3) *a reasonable accommodation is necessary to avoid institutional placement*

Once a plaintiff has demonstrated that a disabled individual desires community-based treatment and a medical professional determines that such placement is appropriate, "[i]t is the state's burden to prove that the proposed changes would fundamentally alter their programs." *Steimel v. Werner*t, 823 F.3d 902, 914–16 (7th Cir. 2016); *see also Brown v. D.C.*, 928 F.3d 1070, 1078 (D.C. Cir. 2019) (collecting cases). Florida challenges both the reasonableness of the accommodations suggested by the United States, as well as whether the requested modifications would fundamentally alter the programs in which they exist.

As an initial matter, the undersigned addresses an issue common to many of the United States' proposals, namely that Florida be required to increase funding or program caps that have been previously approved by federal authorities.  Regarding waiver caps, the United States contends it is not proposing that Florida contravene any other federal statutes or authorizations, but is instead proposing that the State make

certain permissible changes to its Medicaid policies.  The undersigned, however, agrees with Florida that the law appears to favor the notion that requiring a state to increase or exceed a federally approved cap constitutes a fundamental alteration and is thus impermissible under *Olmstead*.   Other courts have found, for instance, that *Olmstead* does not require community-care services that would exceed the federally approved cost cap on a Medicaid program that provides an alternative to institutionalization.  *Harrison v. Young*, 48 F.4th 331, 342 (5th Cir. 2022). "In fact, other courts have rejected *Olmstead* claims that would exceed similar caps on Medicaid programs."  *Id.* (citing *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 620–22 (9th Cir. 2005)).  Waiver cap increases have also been found to be fundamental alterations. *See, e.g., Alexander v. Mayhew*, 451 F. Supp. 3d 1293, 1295 (N.D. Fla. 2020) ("[A]n injunction requiring the state to serve additional individuals through the waiver—to obtain an increase in or to exceed the cap—would fundamentally alter the state's program. This is so as a matter of law.")  The undersigned sees no reason to disagree with these rulings.

i.   <u>Private Duty Nursing</u>

As for the particulars of the proposed modifications, this Court first addresses the issue of changes suggested to increase the availability of private duty nursing care. The undersigned notes that the United States has presented evidence that a large number of affected children in Florida are receiving significantly fewer private duty care nursing hours than they require.  Florida, while not necessarily denying that this is the case, argues that the United States fails to explain *how* Florida limits access to private duty nursing, or *why* some authorized hours are unutilized.  Florida argues that there are

potentially many explanations, such as the pandemic, the current country-wide nursing shortage, the children's own vacations, or parental preferences, that could explain away the deficit in a manner that does not put the issue at Florida's feet.

"Private duty nursing ('PDN') services are skilled nursing services often provided in the recipient's home. They are intended for individuals 'who require more individual and continuous care than is available from a visiting nurse or routinely provided by the nursing staff of the hospital or skilled nursing facility.'" *C.V. by & through Wahlquist v. Senior*, No. 12-60460-CIV-ZLOCH/HUNT, 2017 WL 2730397, at *2 (S.D. Fla. Mar. 22, 2017), *report and recommendation adopted*, No. 12-60460-CIV, 2017 WL 11680165 (S.D. Fla. June 9, 2017) (citing 42 C.F.R. § 440.80).   "Under the Early and Periodic Screening, Diagnosis and Treatment ('EPSDT') provisions of the United States Medicaid Act, Florida is required to provide medically necessary PDN services that are 'sufficient in amount, duration, and scope' to all qualified children under the age of twenty-one." *Id*. (citing 42 C.F.R. § 440.230(b) (quoting *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011)).

It seems relatively clear that there is a genuine issue of material fact regarding the deficit of private duty nursing.  Bolstering this conclusion is Florida's own concession that full-time, round-the-clock nursing care might not be immediately available in all parts of the state.  Still, despite this concession, Florida argues that the United States has not adequately shown that under-utilization of this service causes systemic institutionalization, or that its proposed remedies would avoid any particular child's institutionalization.  Florida also argues that the United States' proposed modifications, which include increasing state reimbursement rates for private duty nursing, are unlikely

to ameliorate the issue.   Florida contends that the United States assumes, without reason, that agencies will use the extra funds to increase wages for nursing staff, and disputes the proposition that increased wages will lure more people into the field.

The United States responds that the sheer number of children who are not receiving the recommended number of hours demonstrates a widespread problem that Florida must address.   The United States contends that its burden is to show that the modifications suggested can *plausibly* address Florida's unnecessary segregation of children with disabilities and argues that it has met that burden for the purposes of summary judgment.

"[T]o plead a failure to make a reasonable accommodation, a plaintiff must assert that disabled individuals lack access to a given government resource and suggest a plausible method for remedying that lack of access."   *Meekins v. City of New York, N.Y.*, 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007).   As discussed previously, it is undisputed that the full private duty nursing hours authorized are not being used by a significant number of at-risk children.   Further, as Florida recognizes, at least seven children entered an institution because they were unable to receive adequate at-home nursing.   The only question that remains to be answered is whether the United States' recommendations plausibly remedy the issue.

This Court finds that they do.   It is practically axiomatic that increased wages lead to hiring.   Indeed, "[a] basic principle of supply-and-demand theory in economics is that in market economies, shortages signal that adjustments should be made to maintain equilibrium.   Therefore, if employers experience a shortage of available workers in a particular region or occupation, compensation should rise as needed to

attract workers." *Bayou Lawn & Landscape Servs. v. Johnson*, 173 F. Supp. 3d 1271, 1291 n.15 (N.D. Fla. 2016) (quoting 80 Fed. Reg. 24158–59).  The undersigned finds that the United States has made a plausible recommendation that could adequately address this issue, and that the recommendation should therefore survive Florida's request for summary judgment.

      ii.      <u>The iBudget Waiver</u>

Turning next to the iBudget waiver, Florida argues that the program only offers non-medical services, and that the United States has not identified what services the identified affected institutionalized children need to return home.  Also, according to Florida, the iBudget issue affects only a relatively small number of children and cannot be considered a systemic problem, and there is a no-wait crisis line that allows any child to jump the line should an emergency arise.  Further, Florida argues that the United States has not answered a fundamental question as to whether the children who it claims need access to the iBudget waiver program satisfy the program's essential eligibility requirements.  Florida also argues that *Olmstead* does not require modification when the Medicaid Act expressly and specifically authorizes states to limit waiver program participation.   As Florida has followed these federal authorizations regarding caps on participation, it argues that cap increases cannot be forced upon it.

The United States responds that iBudget waivers' massive, slow-moving waiting list affects not only institutionalized children, but also at-risk children, and that the crisis rule does not help these children because imminent institutionalization does not trigger the crisis rule.  The United States notes that several children's parents have indicated that the lack of home modifications is a barrier to them bringing their children home.  As

for the essential eligibility requirements, the United States simply points to Florida's own determinations as to the children's qualification for iBudget waiver eligibility.  Regarding waiver caps, the United States contends it is not proposing that Florida contravene any other federal statutes or authorizations but is instead proposing that the State make certain permissible changes to its Medicaid policies.

As previously discussed, this Court largely agrees with the *Alexander* court regarding requiring increases to federally approved caps.  Still, the *Alexander* court recognized that this finding "does not entitle the defendants to summary judgment across the board." *Id.*  That court noted that there remained "the possibility that the plaintiffs will be entitled to relief that can be provided under the waiver without exceeding the cap." *Id.*  So it is here, and therefore summary judgment on the entire issue of the iBudget waiver is improper.  Nonetheless, the undersigned agrees with the *Alexander* court's ultimate conclusion that "the state will be required to provide a service to a plaintiff who needs it to avoid institutionalization only if the state can do so without exceeding the waiver cap or through another existing program." *Id*

iii.   Medical Foster Care

Regarding Florida's handling of the medical foster care situation, Florida argues there are currently 160 unused beds, with only nine state custody children waiting to find housing in the program.  The United States argues that forcing parents to relinquish custody, as is required for participation in the medical foster care program, is an unreasonable stumbling block. Florida counters that deleting such requirements would not only alter the basic point of the program but would also cost the foster program

federal funding.  Put simply, according to Florida, foster parents cannot function as long-term care facilities for other parents' children.

The United States responds that its proposed modifications to medical foster care are reasonable and would not fundamentally alter the service.  The nine children currently eligible for the program that have not found placement demonstrate Florida's failure, according to the United States, because under *Olmstead* the state is *required* to find these children placements.  The United States points to what it characterizes as extensive record evidence that supports the conclusion that modifications such as raising the rates paid to medical foster parents would help to expand the pool of homes so as to better accommodate children in need.

The United States also contends that the proposed modifications would not be foster care *per se* but instead would be in-home placement with people who are not the children's custodial guardians. In *Alexander*, the court found in the context of waivers that "an order requiring the state to establish a new program outside the Medicaid system" would function as a fundamental alteration for the purposes of *Olmstead*. *Alexander*, 451 F. Supp. 3d at 1295.  The undersigned finds the logic of *Alexander* applies both to the request for increased federal funding as well as to the establishment of long-term medical foster care.  Requiring Florida to create something akin to foster care featuring in-home placement with people who are not a child's custodians would constitute a fundamental alteration under *Olmstead*.  Summary judgment should therefore be granted for Florida on this point.

This does not, however, foreclose any relief under the medical foster care recommendation.  As all Parties recognize, there are a not-insignificant number of

institutionalized children who qualify for medical foster care but are not currently placed in the program.  Certainly, there may be permissible means by which to address this gap in care.  Further, the reasons behind this gap may give rise to other issues that may be ripe for remedial action.  However, given the lack of a factual record, summary judgment for either party on the issue of those institutionalized children who qualify for medical foster care but are not receiving it would be improper.

    iv.    <u>Care Coordination and Outreach</u>

The undersigned now turns to the final suggested modification regarding Florida's efforts at care coordination and outreach.  Florida here primarily argues that the United States has simply not proven its case.  Florida claims that the United States established that only eight out of thousands of parents who have been part of the program were dissatisfied with the services they received. Further, according to Florida, the quality of state services is not actionable under *Olmstead*, and even if it were, the United States' meager evidence does not support a need for systemwide relief.

The United States responds that its claim is not about the quality of the care received, but is instead about the failure of Florida's program to adequately give parents information and perform its required duties under *Olmstead.* The United States argues that it is seeking changes to the way in which the care coordination program is administered, so as to ensure that children can access services in the most integrated setting appropriate to their needs, per *Price v. Shibinette*, No. 21-CV-25-PB, 2021 WL 5397864, at *12 (D.N.H. Nov. 18, 2021).  The United States contends there is ample evidence in the record establishing that Florida fails to ensure that families are provided

with adequate information about community-based services to help their children avoid institutionalization and fails to address barriers to community placement.

It is true that the *Olmstead* Court explicitly rejected the notion that "the ADA imposes on the [s]tates 'a standard of care' for whatever medical services they render[] or . . . requires [s]tates to 'provide a certain level of benefits to individuals with disabilities.'" *E.B. ex rel. M.B. v. Cuomo*, No. 16-CV-735, 2020 WL 3893928, at *5 (W.D.N.Y. July 11, 2020) (quoting *Olmstead* 527 U.S. at 603 n.14). However, as the undersigned reads the United States' proposal, it is "not argu[ing] that [the affected children] have an absolute entitlement to any particular services or program." *Wernert*, 823 F.3d at 913. Instead, the United States appears to be asking that the children and their guardians be given access to benefits—namely informational benefits—that have been granted to some persons with disabilities, but not to them. This is permissible. *Id.* "While 'a State is not obligated to create new services,' it 'may violate Title II when it refuses to provide an existing benefit to a disabled person that would enable that individual to live in a more community-integrated setting.'" *Id.* (quoting *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 609 (7th Cir. 2004)). The United States should be allowed to proceed with its case regarding this theory.

## RECOMMENDATION

Based on the foregoing, the undersigned **RECOMMENDS** that Florida's Motion for Summary Judgment, ECF NO. 771, be GRANTED IN PART and DENIED in PART. It should be granted to the extent that any modification that requires Florida to provide community-care services that would exceed the federally approved cost or participant cap on a Medicaid program is found to be a fundamental alteration to that program. It

should also be granted to the extent that any request to create a new program akin to foster care featuring in-home placement with people who are not a child's custodians is found to be an impermissible fundamental alteration to Florida's program.  The Motion should otherwise be DENIED.

The undersigned recommends that the United States' Motion for Partial Summary Judgment, ECF No. 773, be DENIED.

Within seven (7) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district.  28 U.S.C. § 636(b)(1); S.D. Fla. Mag. R. 4(b).  The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the District Court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3–1 (2018); *see Thomas v. Arn*, 474 U.S. 140 (1985).

DONE AND SUBMITTED at Fort Lauderdale, Florida this 11th day of April 2023.


_____
PATRICK M. HUNT
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Honorable Donald M. Middlebrooks
All Counsel of Record