## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-cv-60460-MIDDLEBROOKS/HUNT

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**THE STATE OF FLORIDA,**

      **Defendant.**

_____/

## PRETRIAL STIPULATION

Pursuant to Local Rule 16.1(e) and this Court's Scheduling Order (D.E. 686), Plaintiff, United States of America, and Defendant, the State of Florida, through their respective counsel, submit this Pretrial Stipulation.

## I.    PLAINTIFF'S STATEMENT OF THE CASE

The State of Florida discriminates against children with long-term care needs in violation of Title II of the Americans with Disabilities Act (ADA).  This litigation was brought to enforce the civil rights of two intertwined populations—children who have been relegated to spending their childhoods in nursing facilities (Institutionalized Children), and children who are in serious danger of falling through the cracks of the State's ineffective community-based service system and risk institutional placement (At-Risk Children).

The Institutionalized Children, who are capable of living at home with their families or in non-institutional, homelike settings, instead spend their formative years in nursing facilities. Living in a facility means living in segregation.  Children have little opportunity to be nurtured by their parents, bond with their siblings and friends, or interact with their communities outside the facility's walls.  Meanwhile, throughout the state, the At-Risk Children and their families struggle invisibly, faced with the threat of unnecessary institutionalization due to the State's failure to provide reliable home nursing and other services.  Without the benefit of these

services, parents and guardians must devote themselves full-time to caring and advocating for their children, often at tremendous cost to their own physical, mental, and financial well-being.

It does not have to be this way. The State of Florida already has the program infrastructure in place to provide these children with the services they need to live in the community. By making only modest changes to its administration of services, the State could ensure that every child has access to home and community-based services.

In *Olmstead v. L.C.*, the Supreme Court affirmed that Title II prohibits "undue institutionalization" as a form of disability discrimination by state and local governments. 527 U.S. 581, 598 (1999). The Supreme Court instructed that the ADA requires public entities to serve persons with disabilities in community-based settings when: (a) those persons can appropriately be served there, (b) they do not oppose it, and (c) community-based services can be reasonably accommodated, considering the resources available to the public entity and the needs of other persons with disabilities. *Id.* at 587; *see* 42 U.S.C. § 12132.

The Institutionalized and At-Risk Children can appropriately live in the community if supported by services that already exist in the State's system. The State cannot show otherwise. Rather, the State turns to stereotyping and outdated assumptions about these children, claiming, without supporting facts, that it would be dangerous to discharge the Institutionalized Children to the community. Indeed, the State claims to already serve 99% of children with the same types of disabilities in the community; there is no reason that the Institutionalized Children could not use the same State services to live outside of nursing facilities. In fact, the State has already deemed many of them eligible for these very services.

The families of the Institutionalized Children overwhelmingly do not oppose community placement for them—in fact, the families often desperately want to bring their children home. Yet the State limits access to the services necessary to make this a reality. The State will argue that parents oppose community living who do not want to bring their children to a home where they cannot obtain adequate State services such as in-home nursing. But rather than demonstrating opposition to community living, this evidence will instead show that families want to, but cannot, access community living for their children.

The State need only expand its existing services to correct its failure to provide the Institutionalized and At-Risk Children adequate access to services in their communities. In doing so, it would give families a meaningful choice to bring their children home if they wish to

do so.  Specifically, the State can expand availability of in-home nursing as well as other home and community-based services such as home modifications and respite.  It can also expand children's access to community-based settings that are not institutional nursing facilities.  The State can also utilize its existing programs to ensure that families are provided with adequate information about community service options, as well as adequate assistance in obtaining needed services.

The State makes myriad legal arguments that it should be excused from making any changes to its services, with the common theme being the State's repeated and consistent denial of responsibility and shifting of blame: to the service providers whom the State pays and to the children's own families.  The State contends that there is nothing it can do to affect children's outcomes in receiving the services that the State's Medicaid system provides.  In the State's view, it is the independent actions of third parties that are responsible for causing children to live in institutions, and these results are outside the State's control.

But this is simply not a plausible position.  To the contrary, children have been institutionalized because of the way the State operates its program of services for them, which the State could resolve.  Parents have repeatedly stated that they want their children to live at home with them but feel unable to bring them home because of specific barriers, such as the unreliability of nursing coverage.  The State, which defines, structures, regulates, and pays for all relevant services in this case, and regulates or contracts with all of the entities that authorize and deliver those services, can address these barriers.  In short, the problems that parents have highlighted are solvable.  The obstacle to solving them is not the State's powerlessness but its unwillingness.

In sum, the Institutionalized and At-Risk Children are appropriate for community living, their parents and guardians do not oppose it, and community placement can be accomplished with reasonable modifications to the State's services.  Without such modifications, Florida's Institutionalized Children will continue to needlessly be admitted to, and grow up in, institutions, separated from their families and communities, and Florida's At-Risk Children will continue to live on the brink of institutionalization, at significant financial and emotional cost to their families.  This violates Title II of the ADA.

## II.    DEFENDANT'S STATEMENT OF THE CASE

The United States asserts one claim: a failure-to-accommodate claim under Title II of the ADA. It argues that 140 children needlessly reside in nursing homes because Florida has failed to make reasonable accommodations that would enable them to live at home. It seeks no child-specific relief—only a systemwide injunction.

Yet the United States has not identified a single parent who today is ready and willing to bring her child home, but cannot do so because of the State. Not one. Nor has it identified a single child whom the State has denied the opportunity to live at home.

Accordingly, it has not begun to prove "widespread" violations—as it must to secure systemwide relief.

That is unsurprising. Florida's Medicaid program offers a comprehensive array of services to children with complex medical needs, including in-home nursing and a robust system of care coordination that informs parents of options and respects and effectuates their decisions—even if the United States disagrees with them.

Today, in Florida, more than 99 percent of children with complex medical needs live outside of nursing homes. Florida covers in-home nursing for 3,500 children annually, at a cost of nearly $500 million, while only 140 children receive care in three privately owned and operated nursing homes, for highly individualized reasons.

Florida is proud of the dedicated efforts of multiple agencies to serve children with complex medical needs. Florida is not perfect—no human institution is—but children are not "stuck" in nursing homes because of Florida, against their parents' wishes.

Children receive care in nursing homes not because Florida violated their civil rights, but because their parents made the impossibly difficult decision—under practical, complicated, and individualized circumstances—that nursing-home care was the right option for them.

Some parents find comfort in the care a facility provides. Some have inadequate space in the home to accommodate the child's hospital bed, supplies, equipment, and nurse. Some have unstable family circumstances or insufficient time because of work or obligations to other children. Some might be reluctant to permit providers or medical equipment into their homes. Some might fear that their children would suffer isolation at home, or anticipate the strain that in-home care might cause their families.

No matter the reason, the ADA respects parents' decisions. It does not deny parents a choice or permit States or the United States to overrule or explain away the wishes of parents.

*Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999), was a cautious and measured decision. It did not condemn all institutional care, but showed sensitivity to the challenges of providing care to disabled individuals. It affirmed the vital importance of institutional settings within the continuum of care.

The United States sees it differently. It takes an absolutist, institutions-are-never-appropriate position that restricts healthcare options and flies in the face of *Olmstead*'s practical, responsible, patient-centered approach. It sees a child's admission to a nursing home as an illegitimate choice that no parent would freely make—as proof that State-imposed "barriers" left the family no choice.

The United States rewrites *Olmstead* to eliminate its burden and ensure that the elements of its claim are always satisfied as to every person in a nursing home—regardless of age.

First, it maintains that the first element—whether community placement is appropriate to the child's needs—is satisfied whenever an expert reviews a child's medical records and determines, based on the child's medical profile, that it is possible to imagine a community setting appropriate to the child's needs, no matter whether such a setting actually exists and is available to the child in the real world.

Under this theoretical standard, the first element will always be satisfied. To avoid liability, States will be incentivized to force children with nowhere to go out of institutional settings. When the lives of children are at stake, the law demands a practical application—not academic exercises.

Second, it maintains that the second element—whether parents do not oppose community placement—is satisfied whenever parents indicate that, in a perfect world without practical limitations, they would want their children home. Its experts asked parents to disregard the very factors—such as unsuitable housing—that made them oppose community placement, and asked whether they would oppose community placement if their real-life concerns disappeared. In asking whether parents would still object if their objections were removed, the experts stacked the deck and asked a question with only one logical answer—the one the United States wanted to hear.

Under this theoretical standard, the second element will always be satisfied. Of course, when pressed to imagine a perfect home setting, parents will say they would want their children home. But envisioned scenarios are not the proper standard, and turning a blind eye to real-world conditions endangers children with complex medical needs. What matters is the wishes of parents under actual conditions that a reasonable accommodation cannot remove—not what their wishes would be under imaginary conditions.

Third, the United States divorces the third element—whether community placement can reasonably be accommodated—from redress for identifiable children and engages in an abstract legislative discussion about policy proposals to promote community living. It does not attempt to demonstrate that its proposed "accommodations" would prevent any child's unlawful institutionalization. It offers broad, vaguely defined policy proposals—not judicial remedies for violations of individual rights.

To prevail, the United States must establish that an *actual* community placement is appropriate to a particular child's needs, that the parents do not oppose that placement under *actual* conditions, and that a reasonable accommodation would afford redress and enable the child to transition home. And it must make that showing many times over—because systemwide relief is unavailable unless violations are "widespread."

Generalizations and incomplete anecdotes are insufficient to meet this burden. Florida serves children as *Olmstead* intended: it effectuates the wishes of parents even-handedly, without placing its thumb on the scale. The United States' claim is unfounded; Florida is fully compliant with the actual meaning of the ADA and *Olmstead*.

### III.    BASIS OF FEDERAL JURISDICTION

This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

### IV.    PLEADINGS RAISING THE ISSUES

The following pleadings frame the issues in these consolidated cases:

- United States' Amended Complaint (D.E. 700)
- State's Answers and Affirmative Defenses (D.E. 790)

### V.    UNDISPOSED OF MOTIONS OR OTHER MATTERS REQUIRING ACTION BY THE COURT

The following motions and other matters remain pending:

- State's Motion for Summary Judgment (D.E. 771)

- United States' Motion for Partial Summary Judgment (D.E. 773)[1]
- State's Motion in Limine to Exclude Opinions and Testimony of Dr. Foster (D.E. 800)
- State's Motion in Limine to Exclude Opinions and Testimony of Dr. Houtrow (D.E. 801)
- United States' Motion in Limine to Exclude Testimony of Drs. Allan Greissman, Richard Elliott, and Kristina Shampanier (D.E. 802)
- The parties anticipate jointly moving to request the following:
  - Modification of the Protective Order (D.E. 244) regarding use of documents in open court that contain confidential information, and parent-witness permission to use children's names;[2]
  - Leave to file under seal the coding scheme the parties have agreed to regarding confidential information pursuant to the Protective Order;
  - Leave to file certain exhibits under seal post-trial; for an extension of time to file exhibits post-trial; and to file certain non-PDF documents outside of CM/ECF; and
  - Permission for staff of the parties' counsel to bring technology, including cellphones and laptops, into the courthouse during trial.

## VI.   UNCONTESTED FACTS THAT WILL REQUIRE NO PROOF AT TRIAL[3]

*Medicaid and the Florida Medicaid Program*

1.   The State of Florida participates in the Medicaid program.

---

[1] On April 11, 2023, Magistrate Judge Hunt issued a Report and Recommendation recommending denying the United States' Motion for Partial Summary Judgment and recommending granting in part and denying in part the State's Motion for Summary Judgment. D.E. 836.

[2] In this Pretrial Stipulation, "children" means individuals under the age of 21 and includes young adults who were admitted to nursing homes when they were children.

[3] Given that the parties' cross-motions for summary judgment are currently pending (*see supra* Section IV), this Section of the Pretrial Stipulation, as well as Sections VII-IX below, are composed assuming neither motion has been granted.

2.      Medicaid is a federal-state cooperative health care program that is jointly funded by the states and the federal government and administered by states subject to regulation and oversight from the federal Centers for Medicare & Medicaid Services (CMS).

3.      Medicaid recipients include individuals with disabilities within the meaning of the Americans with Disabilities Act (ADA).

4.      The Florida Agency for Health Care Administration (AHCA) is the single State agency designated to administer or supervise the administration of Florida's Medicaid program.

5.      As a state that participates in the Medicaid program, and as required by the federal Medicaid Act, Florida has developed a Medicaid State Plan that describes the nature and scope of its Medicaid program. CMS has approved Florida's Medicaid State Plan.

6.      The Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions require States that participate in the Medicaid program, including Florida, to cover all services that (a) are provided to recipients under 21 years of age, (b) the Medicaid Act permits or requires a State to cover under a Medicaid State Plan, and (c) are medically necessary to correct or ameliorate defects and physical and mental illnesses and conditions.

7.      Each state defines its own criteria to determine when Medicaid services are "medically necessary."

8.      Some Medicaid services require "prior authorization." If a service requires prior authorization, then the Florida Medicaid program will not reimburse the provider that renders the service unless the State or its contracted entities determine, before the service is rendered, that the service is medically necessary.

9.      The State delivers Medicaid services to most Florida Medicaid recipients through managed care—*i.e.*, through its Statewide Medicaid Managed Care (SMMC) program—while other Florida Medicaid recipients receive services on a fee-for-service basis.

10.     Under the SMMC program, the State contracts with managed-care plans to provide covered medically necessary services to eligible Medicaid recipients enrolled in those plans.

11.     The State pays each managed-care plan a monthly amount per enrollee based on per-member-per-month capitated rates, and managed-care plans pay enrollees' providers according to rates they negotiate with those providers.

12.     AHCA administers or supervises the administration of the SMMC program.

13.     The State's contracts with managed-care plans require the plans to "take any and all necessary action to ensure that all medically necessary covered services are provided to enrollees with reasonable promptness, including . . . [u]tilizing out-of-network providers . . . and . . . [u]sing financial incentives to induce network or out-of-network providers to accept an enrollee as a patient/client and provide all medically necessary covered services with reasonable promptness."

14.     Managed-care plans contract directly with service providers such as home health agencies to provide services to their enrollees. Home health agencies are State-licensed providers of home health services such as private-duty nursing.

15.     The State's monitoring system for managed-care programs must address the performance of managed-care plans with respect to accessibility of services.

16.     The reimbursement rates that managed-care plans contract to pay to providers vary.

17.     Under the SMMC program, managed-care plans have a contractual responsibility to provide care coordination for specified enrollees.

18.     One managed-care plan under the SMMC program is the Children's Medical Services Health Plan (CMS Health Plan) administered by the Florida Department of Health (DOH). DOH has contracted with Sunshine State Health Plan, Inc., to assist with the administration of the CMS Health Plan.

19.     The CMS Health Plan is a "specialty plan" geared toward providing medical and certain long-term care services to children with special health care needs. Eligible Medicaid-recipient children may, but are not required to, enroll in the CMS Health Plan.

20.     Medicaid-recipient children who are not enrolled in managed-care plans receive Medicaid services on a fee-for-service basis—*i.e.*, through Florida's Medicaid fee-for-service program—which means that AHCA pays providers for services rendered according to established fee schedules or reimbursement methodologies.

21.     AHCA establishes fee schedules and reimbursement methodologies for Medicaid-compensable services for the Medicaid fee-for-service program.

22.     AHCA has contracted with eQHealth Solutions, Inc. (eQHealth) to serve as the State's Quality Improvement Organization (QIO) for the Medicaid fee-for-service program. eQHealth performs care coordination for fee-for-service Medicaid recipients.

*Nursing Facility Services for Children with Complex Medical Needs*

23.     The Florida Medicaid program covers services such as nursing and various therapies for children with complex medical needs in both institutional and non-institutional settings.

24.     Nursing facilities are institutional settings for purposes of the ADA.

25.     Three private nursing facilities in Florida provide nursing-facility services to Medicaid-recipient children: the Children's Center at Sabal Palms Health and Rehabilitation, which is located in Largo; Children's Comprehensive Care Center (d/b/a Broward Children's Center), which is located in Pompano Beach; and Plantation Nursing and Rehabilitation Center (d/b/a Kidz Korner), which is located in Plantation.

26.     Currently, the Florida Medicaid program covers nursing-facility services provided to approximately 140 Medicaid-recipient children with complex medical needs (including young adults who were admitted when they were children).

27.     Some families of these children have expressed to nursing facility staff that their goal is to discharge their children home or expressed interest in bringing their children home in the future.

28.     Nursing facilities employ nurses and provide nursing services and personal-care assistance to children with complex medical needs who reside in those settings.

29.     The State and the federal government regulate discharge planning for children who reside in nursing homes. The State conducts oversight activities related to those federal and state regulations.

30.     Before a child is admitted to a nursing facility, and periodically thereafter, the Children's Multidisciplinary Assessment Team (CMAT) operated by DOH makes a recommendation to the child's managed-care plan as to whether the child is eligible for Medicaid coverage of nursing-facility services.

31.     When a CMAT meets to make a recommendation regarding a child's eligibility for Medicaid coverage of nursing-facility services, the CMAT includes (among others) representatives of certain state agencies and, if applicable, a representative of the child's managed-care plan.

32.     The CMAT makes a recommendation to a child's managed-care plan as to whether the child meets nursing facility level of care criteria.

33.     CMATs conduct clinical and psychosocial assessments of children for whom they will make a recommendation as to eligibility for Medicaid coverage of nursing facility services.

*Community Services*

34.     When authorized as medically necessary, Florida Medicaid also covers, for Medicaid-recipient children, Medicaid services in non-institutional settings, such as children's homes and communities, including foster homes.

35.     These services include, if medically necessary, in-home nursing services known as private-duty nursing (PDN); durable medical equipment; physical, occupational, speech, and respiratory therapies; certain medical transportation; Prescribed Pediatric Extended Care (PPEC); and, in Florida, Medical Foster Care.

36.     A PPEC center is a non-residential setting that provides skilled nursing supervision and therapeutic interventions to medically dependent or technologically dependent children and offers services intended to meet the physiological, developmental, nutritional, and psychosocial needs of children with complex medical needs. The service provided at a PPEC center is sometimes called medical daycare.

*Private Duty Nursing (PDN)*

37.     PDN consists of medically necessary skilled nursing provided in the home or in other community settings.

38.     PDN is among the services that States must cover under the Medicaid Act's EPSDT provisions when medically necessary to correct or ameliorate defects and physical and mental illnesses and conditions of Medicaid-recipient children (*i.e.*, individuals under 21 years of age).

39.     Except in rare cases, PDN provided through the Florida Medicaid program is provided by nurses employed by licensed home health agencies.

40.     The State establishes standards for adequacy of managed-care plans' provider networks.

41.     AHCA's contracts with Medicaid managed-care plans require the plans to "maintain a region wide network of providers in sufficient numbers to meet the access standards for specific medical services for all plan enrollees."

42.     The contracts also require, at a "minimum," each plan's provider network to include two home health agencies in each region (regardless of which specific home-health services the home health agency provides).

43.     Federal law requires States that contract with Medicaid managed-care plans to establish numerical network-adequacy standards for certain provider types, "[a]t a minimum." 42 C.F.R. § 438.68(a), (b). It does not require States to establish numerical network adequacy standards for home health agencies. *Id*.

44.     AHCA's contracts with Medicaid managed-care plans do not establish numerical network-adequacy standards for home health agencies that specifically offer PDN, as opposed to other home health services.

45.     PDN requires prior authorization by the managed-care plan (or, in the case of a child enrolled in the fee-for-service program, eQHealth). That is, to receive Medicaid reimbursement, the home health agency that intends to provide the service must first establish the service's medical necessity.

46.     A prior authorization of PDN services may not exceed 180 days and will specify the number of hours authorized to be provided within the authorization period.

47.     The reimbursement rates for PDN services provided on a fee-for-service basis are established by a fee schedule adopted by AHCA.

48.     The fee schedule determines the reimbursement rates for PDN provided to children enrolled in the Medicaid fee-for-service program. Managed-care plans are not limited to the rates established by the fee schedule. Rather, managed-care plans negotiate the reimbursement rates they pay for PDN with the home health agencies that provide those services.

49.     A single-case agreement is an agreement between a managed-care plan and a provider under which the provider agrees to render services to a specific enrollee at a specific rate.

50.     Managed-care plans enter into single-case agreements with providers for various reasons—for example, when compensation in excess of the provider's network rates will secure services for their enrollees. A single-case agreement might secure the services of an out-of-network provider or allow extra compensation to a network provider to provide services to the enrollee.

51.     In its legislative budget request for Fiscal Year 2022–23, AHCA sought legislative appropriations to support an increase in fee-for-service rates for PDN.

52.     In Fiscal Year 2021–22, the State spent nearly $500 million in state and federal funds on PDN and provided PDN to approximately 2,750 children per month.

*Medical Foster Care*

53.     Florida has a Medical Foster Care program that enables children in the foster-care system with complex medical needs to live and receive care in foster homes.

54.     Florida's foster-care system serves children who have been removed from their parents and live in licensed foster homes.

55.     In foster homes, foster parents take dependent children into their homes and provide them with 24-hour care.

56.     The Florida Department of Children and Families (DCF) administers the State's foster-care system for children (with or without complex medical needs) in the State's custody.

57.     DCF is the placement authority for children (with or without complex medical needs) who are in the State's custody.

58.     The Medical Foster Care program enables children with complex medical needs to live in family homes and have foster parents who, during the foster-home placement, provide them with 24-hour care.

59.     Medical foster homes are family-based settings and are less restrictive than nursing facilities.

60.     It is the policy of DCF that children with complex medical needs who are in the custody of the State, including such children currently residing in nursing facilities, be placed in the least restrictive, most family-like, and most nurturing environment that is medically appropriate, together with the necessary supports and services to help them remain in the community, and that, when a child is in need of placement in a nursing facility on a temporary basis, DCF, as well as AHCA, DOH, and the Florida Agency for Persons with Disabilities (APD), will continually work to transition the child to a less restrictive, medically appropriate environment.

61.     One of the objectives of the Medical Foster Care program is to reduce the high cost of medical treatment associated with Medical Foster Care-eligible children by eliminating the need for long-term institutional care.

62.    The State's CMATs make recommendations to managed-care plans regarding children's eligibility for Medical Foster Care.

63.    DOH and DCF's contracted community-based care lead agencies (CBCs) recruit foster parents to the Medical Foster Care program.

64.    DOH trains medical foster parents to provide medical care to children with complex medical needs.

65.    Medical foster parents are Medicaid providers and receive reimbursement through the Florida Medicaid program according to a daily reimbursement rate.

66.    In the Medicaid fee-for-service program, the daily rate is established by a fee schedule adopted by AHCA. Currently, this rate is $44, $55, or $76.99, depending on the child's needs. The State's CMATs recommend the level of care that a child requires, which in turn determines the daily rate that a medical foster parent will receive for services provided to the child.

67.    In the SMMC program, managed-care plans may negotiate reimbursement rates different from those set forth in AHCA's fee schedules.

68.    Medical foster parents also receive a monthly room-and-board payment from DCF. These rates are increased annually. The CBCs may also negotiate case-by-case increases to the monthly room-and-board payment.

69.    DCF also makes a supplemental room-and-board payment to medical foster parents for providing independent life skills and normalcy supports to foster children between the ages of 13 and 17.

70.    The State receives federal financial participation under Title IV-E of the Social Security Act for room-and-board and supplemental room-and-board payments made to foster parents, including medical foster parents.

71.    As of February 15, 2023, there were 176 medical foster homes in Florida with total capacity of 477 beds. Of these, 315 beds were filled.

72.    Part of DOH's role in administering the MFC program is to match eligible foster children with medical foster parents through an individualized search process.

73.    A medical foster parent is not obligated to accept any particular child's placement in the medical foster parent's home.

74.     There is a waiting list of children for whom local or statewide searches for suitable placements in the Medical Foster Care program have been conducted.

75.     As of February 15, 2023, nine children in state custody resided in nursing homes. These children were eligible for Medical Foster Care, but no Medical Foster Care placement had been determined to be suitable for them.

76.     The State permits children who are not in state custody to live in medical foster homes on a time-limited basis under a written agreement known as a voluntary placement agreement.

77.     In general, under Title IV-E of the Social Security Act, a voluntary placement for medical foster care may not exceed 180 days. To continue a voluntary placement for a longer period, DCF must petition a court to review the child's status.

*The iBudget Waiver Program*

78.     The State also offers certain home and community-based services through a Medicaid waiver program known as the Developmental Disabilities Individual Budgeting (iBudget) waiver program.

79.     The iBudget waiver program is a Medicaid waiver program under section 1915(c) of the Social Security Act.

80.     Medicaid waivers are programs through which states can provide certain subsets of services to specific populations of limited size.

81.     To establish a waiver program, a State must submit a detailed waiver application to CMS for approval. The application may be renewed and amended with CMS approval.

82.     AHCA is responsible for Medicaid waiver applications, renewals, and amendments and has promulgated administrative rules, including incorporated manuals and handbooks, pertaining to the iBudget waiver program.

83.     APD provides programmatic management of the iBudget waiver program.

84.     The iBudget waiver program offers services outside of institutional settings to individuals with developmental disabilities (as defined in section 393.063(12), Florida Statutes) who are domiciled in Florida, are at least three years of age, and require at least the level of care provided in intermediate care facilities.

85.     The iBudget waiver program funds a finite number of specific services that eligible children (with or without complex medical needs) can receive in their homes and communities. These services are not available through EPSDT.

86.     Specific services offered to children under the iBudget waiver include:

        a.      Environmental accessibility adaptations, which are physical adaptations to the home that (1) are required by the recipient's support plan; (2) are medically necessary to avoid institutional placement of the recipient; (3) enable the recipient to function with greater independence in the home; (4) do not add to the total square footage of the home; and (5) are not adaptations merely of general utility but of direct medical or remedial benefit to the recipient.

        b.      Respite care, which is supportive care and supervision provided while the recipient's primary caregiver is unable to perform the duties of a caregiver (*e.g.*, during a brief planned or emergency absence, or when the primary caregiver is available but temporarily physically unable to care for or supervise the recipient for a brief period of time);

        c.      Residential habilitation services provided to recipients who reside and receive services in APD-licensed facilities, including group homes;

        d.      To the extent not covered by Medicaid, durable medical equipment and consumable medical supplies, including van adaptations and portable ramps; and

        e.      Transportation to or from the recipient's waiver services, enabling the recipient to receive supports and services identified in the recipient's support plan and approved cost plan, when the recipient has no other means of transportation to or from those supports and services.

87.     Florida currently limits enrollment in the iBudget waiver program to 40,742 people. CMS approved that enrollment limit when it approved Florida's waiver renewal application in 2019.

88.     As of January 3, 2022, there were 22,759 individuals on the waiting list for enrollment in the iBudget waiver program.

89.     As of September 6, 2022, the waiting list included more than 600 children who (a) were living or, at some time since April 1, 2016, had lived in a nursing facility; or (b) were receiving or, at some time since April 1, 2016, had received PDN.

90.     Approximately 19 children residing in nursing facilities in Florida are on the waiting list for enrollment in the iBudget waiver program.

91.     The State sets and implements categories of priority for enrollment in the iBudget waiver program.

*Care Coordination*

92.     All Florida children who receive nursing-facility services or PDN through Medicaid receive care coordination through their Medicaid managed-care plans or, in the case of children in the Medicaid fee-for-service program, from eQHealth.

93.     A care coordinator's caseload may not exceed 15 children who reside in nursing facilities or 40 children who receive PDN (or a blended ratio in the case of a mixed caseload).

94.     The State relies on care coordinators to inform children's families about available services and how to access those services; assist families to transition their children out of institutions, with needed services in place; and assist families in accessing services necessary for their children to remain safely in the community.

95.     The State requires Medicaid managed-care plans to report monthly on enrollees under the age of 21 who receive nursing-facility services or PDN. This report is called the Enhanced Care Coordination (ECC) report.

96.     The CMS Health Plan offers care coordination to all of the more than 90,000 children who are enrolled in the plan, regardless of whether they receive nursing-facility services or PDN.

97.     DOH conducts a quarterly review of a sample of approximately 100 to 120 case-management files maintained by Sunshine, which assists with the administration of the CMS Health Plan. DOH also reviews a monthly Care Management Report that contains information about all of the plan's enrollees, including the dates of attempted and actual care coordination contacts with each enrollee's family. DOH also reviews the monthly ECC report that Sunshine provides with respect to children who receive nursing-facility services or PDN.

## VII.   ISSUES OF FACT THAT REMAIN TO BE LITIGATED AT TRIAL[4]

### A.   Issues of Fact Identified by Both Parties:

1.     Whether community placement is appropriate to the needs of the children at issue in this litigation. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).

---

[4] Given that the parties' cross-motions for summary judgment are currently pending (*see supra* Section IV), this Section of the Pretrial Stipulation, as well as Sections VIII-IX below, are composed assuming neither motion has been granted.

2.      Whether those children (or their parents and guardians on their behalf) are not opposed to community placement. *Id.*

3.      Whether the community placement of those children can be reasonably accommodated, taking into account the resources available to the State and the needs of others with disabilities, *id.*, or whether the accommodation would fundamentally alter the nature of the State's services, programs, or activities, *id.* at 603–06 (plurality opinion); 28 C.F.R. § 35.130(b)(7).

**B.      Issues of Fact Identified by the State:**

1.      Whether the United States has standing to maintain this action.

2.      Whether the United States has sufficient individualized evidence of appropriateness.

3.      Whether any parent or guardian is ready and willing today to transition his or her child home (or to another community setting) but cannot do so because of the State.

4.      Whether the children at issue in this litigation face actual or imminent unlawful institutionalization in violation of Title II of the ADA and, if so, whether they face actual or imminent unlawful institutionalization because of (a) an alleged unavailability of providers to render PDN services; (b) the alleged insufficient capacity of the Medical Foster Care program; (c) limits on enrollment in the iBudget waiver program; and (d) the alleged ineffectiveness of care coordination.

5.      Whether any actions or omissions of the State caused any of the children at issue in this litigation to be admitted to—or to remain in—a nursing home.

6.      Whether the United States has provided enough clarity and information about its proposed modifications to carry its burden of proof.

7.      Whether the children at issue in this litigation requested, and were denied, an accommodation.

8.      Whether the United States' proposed accommodations are necessary, reasonable, and likely to redress widespread violations.

9.      Whether any violations that the United States establishes are sufficiently widespread or pervasive to warrant systemwide relief.

**VIII.   ISSUES OF LAW ON WHICH THERE IS AGREEMENT**

1.      This Court has personal jurisdiction over the parties.

2.      Venue is proper in the Southern District of Florida.

4.      Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

5.      A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, . . . meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id*. § 12131(2).

6.      A "disability" means (A) a physical or mental impairment that substantially limits one or more major life activities of an individual, (B) a record of such impairment, or (C) being regarded as having such an impairment. *Id.* § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). "Major life activities" also include "the operation of a major bodily function" such as "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id.* § 12102(2)(B).

7.      The State of Florida is a "public entity" within the meaning of Title II of the ADA. *Id.* § 12131(1)(A).

8.      Under Title II of the ADA, a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

9.      The most integrated setting appropriate to the needs of qualified individuals with disabilities is the "setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, app. B at 703 (2021).

10.      In *Olmstead*, the United States Supreme Court held that Title II of the ADA "may require placement of persons with . . . disabilities in community settings rather than in institutions" when "community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be

reasonably accommodated, taking into account the resources available to the State and the needs of others with . . . disabilities." 527 U.S. at 587.

11.     Under *Olmstead*, the plaintiff bears the burden to establish appropriateness and non-opposition and to articulate (in the United States' view) or establish (in the State's view) a reasonable accommodation. *Olmstead*, 527 U.S. at 587. If the plaintiff carries that burden, then the public entity may assert as an affirmative defense, and bears the burden to prove, that the proposed modification would constitute a "fundamental alteration" of its services, programs, or activities. *See, e.g.*, *id*. at 603–06 (plurality opinion).

12.     A reasonable modification must be available and reasonable. This is a fact-specific inquiry.

13.     Children with complex medical needs are "qualified individuals with disabilities" within the meaning of Title II of the ADA if they meet "the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

14.     The scope of injunctive relief is dictated by the extent of the violation established. *Lewis v. Casey*, 518 U.S. 343, 359 (1996). Systemwide relief requires establishing that individual violations are "widespread." *Id.*

## IX.     ISSUES OF LAW THAT REMAIN FOR DETERMINATION BY THE COURT

### A.     Issues of Law Identified by the United States:

Whether:

1.     The Institutionalized and At-Risk Children can appropriately be served in the community under *Olmstead*, as they are capable of living in a family-based home in the community as long as they are provided the services, such as private duty nursing, that they need.

2.     Parents and guardians of the Institutionalized and At-Risk Children do not oppose community placement under *Olmstead* where they indicate that they would not oppose services in the community that are actually, reliably, and sufficiently provided.

3.     Community placement for the Institutionalized and At-Risk Children can be accomplished with reasonable modifications to the State's existing services and programs.

4.     The ADA's integration mandate, as interpreted in *Olmstead*, is applicable both to people who are currently institutionalized and to people who are at serious risk of

institutionalization. *E.g.*, *Waskul v. Washtenaw Cty. Cmty. Mental Health*, 979 F.3d 426, 460-62 (6th Cir. 2020); *Davis v. Shah*, 821 F.3d 231, 262-64 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 321-22 (4th Cir. 2013); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181-82 (10th Cir. 2003).

5.      Serious risk of institutionalization is demonstrated where failure to provide community-based services will likely cause a decline in health, safety, or welfare leading to eventual institutional placement. *E.g.*, *Davis v. Shah*, 821 F.3d 231, 263-64 (2d Cir. 2016).

6.      Insufficient provision of community-based services that are necessary to avoid institutionalization leads to serious risk of institutionalization. *See, e.g.*, *Waskul*, 979 F.3d at 461; *Parrales v. Dudek*, No. 15-cv-424, 2015 WL 13373978, at *5 (N.D. Fla. Dec. 24, 2015).

**B.      Issues of Law Identified by the State:**

- **Constitutional Standing.**

1.      Whether, to establish standing, the United States must establish that any discrimination is fairly traceable to the State's actions or omissions and that a favorable decision will likely redress the injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992).

2.      Whether, to establish the redressability element of standing, the United States must establish that its proposed accommodations are likely to redress widespread violations.

3.      Whether, to establish standing, to the extent redress depends on the unfettered choices of non-parties, the United States must establish that those non-parties have made or will make choices so as to produce causation and permit redressability of an injury. *Id*.

4.      Whether people who live in non-institutional settings but who are at "risk" or "serious risk" of institutionalization have suffered an actual or imminent injury sufficient to establish Article III standing.

5.      Whether, to establish constitutional standing to enforce any rights of children who are not presently institutionalized, the United States must establish that the children face an "imminent" future injury (unlawful institutionalization), *id*. at 560—or whether the United States may simply show that the children face some indeterminate "risk" or "serious risk" of unlawful institutionalization.

- **Appropriateness**

6.      Whether, to establish the appropriateness of community placement, the United States must establish the appropriateness of the community setting in which the child would

actually reside—or whether it can satisfy the appropriateness element in the abstract, whenever its experts, based on a child's medical profile, can imagine a community setting that would be appropriate to the child's needs.

7.      Whether, to establish the appropriateness of community placement, the United States must show that an individual can "handle and benefit from" the community placement. *Olmstead*, 527 U.S. at 600.

- **The Wishes of Parents and Guardians.**

8.      Whether, to establish non-opposition to community placement, the United States must establish that parents are not opposed under actual, real-life conditions (including reasonable modifications to those conditions)—or whether it need only show that the parents would want their children to be home in a perfect world in which all barriers to community placement were removed (even those the State cannot remove through reasonable modifications).

- **Reasonable Accommodations.**

9.      Whether the United States bears the burden to establish the availability and reasonableness of a proposed modification.

10.     Whether the United States' challenge to the State's care-coordination program is a challenge to the quality or adequacy of services, and therefore not actionable. ECF No. 771 at 33–34.

11.     Whether the United States' proposed modifications are unavailable under Title II of the ADA on the basis that they rewrite or depart from the specific terms of federal statutes or federally approved programs. ECF No. 771 at 34–41.

12.     Whether the Medicaid Act's exclusive administrative rate-setting process precludes civil actions to increase Medicaid reimbursement rates in Florida's fee-for-service program. ECF No. 771 at 42–44.

13.     Whether a modification that would render a State non-compliant with the conditions of Spending Clause legislation, and thus deny the State federal financial participation for services or programs for which such funding would otherwise be available, is a reasonable modification or a fundamental alteration.

14.     Whether a modification that requires a legislative appropriation can be a reasonable modification or a fundamental alteration.

15.     Whether the United States' proposed modifications are reasonable modifications or fundamental alterations.

16.     Whether Title II of the ADA is congruent and proportional to the injury to be remedied or prevented, and therefore constitutional, if it authorizes the systemwide remedies that the United States seeks.

- **Request and Refusal.**

17.     Whether, to establish a violation with respect to a particular child, the United States must demonstrate that the child (or parents and guardians on the child's behalf) made a specific demand for an accommodation and explained why the requested accommodation was necessary and reasonable—and whether the State refused to provide an accommodation when requested.

- **Necessity of an Accommodation.**

18.     Whether the United States must establish that its requested accommodations are necessary to avoid unlawful institutionalization. 28 C.F.R. § 35.130(b)(7)(i).

- **Causation.**

19.     Whether the United States must establish that the State's failure to make an accommodation is a but-for cause of unlawful institutionalization.

- **Essential Eligibility Requirements.**

20.     Whether the United States must establish that a child satisfies all essential eligibility requirements of the service or program the child seeks to access. 42 U.S.C. § 12131(2).

- **Statutory Authority.**

21.     Whether Title II of the ADA authorizes the United States to bring enforcement actions and, if so, whether it authorizes the United States to bring and maintain actions to enforce the rights of individuals who did not initiate the administrative enforcement process described in 42 C.F.R. part 35, subpart F.

## X.     TRIAL EXHIBITS

The United States' List of Trial Exhibits, with objections, if any, to each exhibit, is attached as Schedule A. The State's List of Trial Exhibits, with objections, if any, to each exhibit, is attached as Schedule B.

## XI.     TRIAL WITNESSES

The United States' List of Witnesses whom it expects to call and may call at trial, including expert witnesses and witnesses it intends to present by deposition testimony, is attached as Schedule C. The State's List of Witnesses whom it expects to call and may call at trial, including expert witnesses and witnesses it intends to present by deposition testimony, is attached as Schedule D.

## XII.    ESTIMATED TRIAL TIME

The United States anticipates that it will require approximately seven full days to present its case in chief. The United States anticipates that it will complete its presentation in fewer than seven days if it is able to admit its documentary exhibits in an efficient manner, without a large number of objections or custodial witnesses.

The State estimates that it will require five full days to present its defense. The State objects to an extension of the trial beyond the 10 days contemplated by the Court. *See* ECF No. 686 ¶ 15 ("The parties will endeavor to complete the trial within 10 days.").

## XIII.   ATTORNEY'S FEES

The United States and the State do not seek attorney's fees.

**Dated:** April 12, 2023                    Respectfully submitted,


JUAN ANTONIO GONZALEZ                REBECCA B. BOND
United States Attorney                       Chief
Southern District of Florida

                                             ANNE S. RAISH
*/s/ Veronica Harrell-James*                 Principal Deputy Chief
VERONICA HARRELL-JAMES               ELIZABETH E. McDONALD
Assistant United States Attorney             Deputy Chief
Fla. Bar No. 644791
99 N.E. 4th Street                           */s/ Lindsey Weinstock*
Miami, Florida 33132                         JAMES FLETCHER, Bar ID A5502825
Telephone: (305) 961-9327                    H. JUSTIN PARK, Bar ID A5501850
Facsimile: (305) 530-7139                    LINDSEY WEINSTOCK, Bar ID A5502063
Veronica.Harrell-James@usdoj.gov             Trial Attorneys
                                             Disability Rights Section
                                             Civil Rights Division
                                             U.S. Department of Justice
                                             950 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20530
                                             Telephone: (202) 616-2221
                                             Facsimile: (202) 307-1197
                                             lindsey.weinstock@usdoj.gov

                                             *Counsel for Plaintiff United States of America*

/s/ *Andy Bardos*

| | |
|---|---|
| John A. Boudet (FBN 515670) | Andy Bardos (FBN 822671) |
| john.boudet@gray-robinson.com | andy.bardos@gray-robinson.com |
| GRAYROBINSON, P.A. | James Timothy Moore, Jr. (FBN 70023) |
| 301 East Pine Street, Suite 1400 | tim.moore@gray-robinson.com |
| Orlando, Florida 32801 | Ashley H. Lukis (FBN 106391) |
| Telephone: 407-843-8880 | ashley.lukis@gray-robinson.com |
| | GRAYROBINSON, P.A. |
| | 301 South Bronough Street, Suite 600 |
| | Tallahassee, Florida 32301-1724 |
| | Telephone: 850-577-9090 |

*Attorneys for Defendant, the State of Florida*