UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 12-60460-CV-MIDDLEBROOKS/Hunt

UNITED STATES OF AMERICA,

 Plaintiff,

v.

THE STATE OF FLORIDA,

 Defendant.

_____/

## ORDER OF INJUNCTION

 Plaintiff, the United States of America, commenced this action against the State of Florida on July 22, 2013, under Case No. 13-cv-61576.  The action was subsequently transferred to the present case number.  On June 15, 2022, the United States filed its amended complaint.  Trial was held from May 8–19, 2023.  Earlier today, the Court issued post-trial findings of fact and conclusions of law.  The Court enters this Order of Injunction in accordance with those findings and conclusions.  It is therefore **ORDERED** as follows.

**I.   DEFINITIONS**

 This Order incorporates the following capitalized defined terms:

 A. "Complex Medical Needs" (a/k/a "Medical Complexity"):  Complex Medical Needs are chronic conditions that are severe and/or associated with medical fragility, and that cause medical technology dependence and functional impairments that lead to disability.  In the State's Medicaid program, children with Complex Medical Needs who live in the Community are eligible to receive Private Duty Nursing.

 B. "Private Duty Nursing" ("PDN"):  Private Duty Nursing is a nursing service that is delivered to children with Complex Medical Needs in homes in the Community.

 C. "Provider":  A Provider is a State-licensed agency that employs nurses and delivers Private Duty Nursing.

 D. "Community":  A Community setting is a home in which a child with Complex Medical Needs can live and fully interact with a family that lives in the home with the child.  The

family must include a parent or guardian of the child, or another adult who has responsibility for caring for the child in the home but not solely in the capacity of a Provider employee.

E. "Nursing Facility": A Nursing Facility is a facility that provides skilled nursing services to children with Complex Medical Needs pursuant to Fla. Admin. Code R. 59G-4.200. Presently, there are three Nursing Facilities in Florida: Broward Children's Center, Plantation Nursing & Rehabilitation Center (d/b/a Kidz Korner), and Sabal Palms Health & Rehabilitation.

F. "NF Children": The NF Children are individuals who live in Nursing Facilities, have Complex Medical Needs, and either (1) are under 30 years of age and began living in a Nursing Facility before reaching 21 years of age, or (2) are under 21 years of age. A NF Child who is hospitalized remains, during the period of hospitalization, a NF Child.

G. "PDN Children": The PDN Children are individuals who live in Florida, have Complex Medical Needs, are under 21 years of age, do not live in Nursing Facilities, and are authorized to receive Private Duty Nursing through Medicaid. A PDN Child who is hospitalized remains, during the period of hospitalization, a PDN Child.

H. "Care Coordination": Care Coordination is the process through which the State ensures the proper coordination of the medically necessary services it delivers through its Medicaid program to children with Complex Medical Needs. It involves communication with these children's parents or guardians to ensure that they have informed choice of service setting for their children and that their choices are acted upon. The State delivers Care Coordination through "Care Coordinators." Presently, for children with Complex Medical Needs whose Medicaid services are delivered on a fee-for-service basis, their Care Coordinators are employed by Kepro, a State contractor. For children with Complex Medical Needs whose Medicaid services are delivered through the State's Statewide Medicaid Managed Care program, their Care Coordinators are employed by Managed Care Organizations as defined below.

I. "CMAT": A CMAT is the Children's Multidisciplinary Assessment Team defined in Fla. Admin. Code R. 65C-30.001(24).

J. "Managed Care Organization" ("MCO"): A Managed Care Organization is a private business entity that operates a health plan that is part of the State's Statewide Medicaid Managed Care program and serves NF Children and/or PDN Children.

K. "Parties": The Parties are the United States of America and the State of Florida.

  L. "PDN Ratio":  A PDN Ratio is a ratio calculated for a particular PDN Child over the course of a State Fiscal Year using the formula: (PDN hours delivered to the PDN Child) ÷ (PDN hours authorized for the PDN Child – PDN hours refused by the PDN Child's parents/guardians – PDN hours not delivered while the PDN Child was hospitalized).

  M. "PDN24 Children":  For a given State Fiscal Year, the PDN24 Children are those PDN Children who were authorized to receive 24 hours of PDN per day for at least one full 180-day authorization period within that State Fiscal Year.

  N. "Minimally Necessary PDN for Integration" ("MNPI"):  The Minimally Necessary PDN for Integration is defined as a PDN Ratio of at least 0.9.

  O. "Transition Planning Process":  The Transition Planning Process is the process required in Paragraph IV(A) for NF Children and for children with Complex Medical Needs who may be admitted to Nursing Facilities.  It is separate from, and in addition to, the process of preparing individual service plans through Care Coordination.  Participants in the Transition Planning Process include parent(s)/guardian(s), Care Coordinators, and staff at the NF Child's Nursing Facility.  The parent(s)/guardian(s) must also be offered the opportunity to invite a family advocate and/or primary care physician and must be provided language interpretation as needed.  Through the Transition Planning Process, parent(s)/guardian(s) must be provided complete, accurate, individualized information about, and outreach and engagement that provides a full opportunity to learn about and explore receipt of, available PDN and other community-based services and supports.  These other services and supports include home visits to other family homes where PDN Children are receiving PDN in the Community, as well as family to family peer support from a family that has received PDN for a child with Complex Medical Needs.  The Transition Planning Process results in a written document called a "Transition Plan," which must memorialize, in detail, what needs to be done to transition the NF Child to a home in the Community.  The needs identified in the Transition Plan must include, wherever applicable, the services and supports described above, as well as home or vehicle modifications needed for the NF Child to live at home.  The Transition Plan must also identify any barriers to transition and ways to overcome them.

## II. PRIVATE DUTY NURSING

  It is ORDERED that:

      A.      The State will cause 100% of all PDN Children to receive MNPI. Within 7 days of this Order, the State will file a proposed timetable reflecting how quickly it can reasonably achieve this outcome. The United States may respond 7 days after such filing. The timetable the Court will adopt will be incorporated into this Order. The proposed timetable will also specify how quickly the State can progress toward (1) providing MNPI for all PDN24 Children, and (2) causing all PDN Children, including all PDN24 Children, to have a PDN Ratio above 0.7.

      B.      For every month, the State will collect the following categories of data for each PDN Child: PDN hours authorized for the PDN Child, PDN hours delivered to the PDN Child, PDN hours refused by the PDN Child's parents or guardians (including the dates on which such hours were refused and the reason(s) for the refusal), PDN hours not delivered during a period of time when the PDN Child was hospitalized (including the dates when the PDN Child was hospitalized), and the reimbursement rate paid to the PDN Child's Provider. The data will also record the PDN Child's name, unique ID number, address, Provider's name, primary care physician's name, date of application for iBudget Waiver enrollment (if any), date of enrollment on the iBudget Waiver (if any), priority category (if on the wait list for the iBudget Waiver), managed care plan (if any), date of most recent discharge from a Nursing Facility (if any), and parent(s)'/guardian(s)' name(s) and contact information. If necessary, the State will require MCOs, other State contractors, or Providers to collect the data and turn it over to the State.

      C.      Quarterly (every three months), the State will collect data on nurses who provide pediatric PDN in Florida. The data will include, for each nurse, the Provider(s) with whom the nurse works, and the county or counties where the nurse is available to work.

      D.      To comply with Paragraph II(A), the State may utilize the following tools: (1) raising fee-for-service PDN reimbursement rates; (2) requiring MCOs to pay Providers minimum PDN reimbursement rates; (3) requiring MCOs to satisfy network adequacy standards that accurately reflect how many Providers and private duty nurses are needed to provide MNPI to all MCO-enrollee PDN Children with MNPI; (4) requiring Providers to pass PDN reimbursement rate increases on to their private duty nurses; and (5) incentivizing Providers to work together in delivering shares of the same PDN Child's PDN hours. If the State elects not to utilize any of these tools, then the State may not establish that compliance with the benchmarks was outside of its control or impracticable. The State is not prohibited from using other tools that are not

identified above.  If necessary, the State may move for a reasonable extension of the timetable on which it must comply with Paragraph II(A).

E.	The State and its MCOs shall continue to authorize services, including PDN, that have been demonstrated to be medically necessary pursuant to the State's medical necessity criteria.  In determining the medical necessity of Private Duty Nursing services, the State will continue not to apply Subparagraph (a)(5) of its medical necessity definition.  *See* Fla. Admin. Code R. 59G-4.261(3)(a), (4).

F.	For any NF Child who transitions to the Community after the date of this Order and thus becomes a PDN Child, the State will cause that PDN Child to receive MNPI in each and every subsequent State Fiscal Year until the PDN Child reaches twenty-one years of age.

## III. CARE COORDINATION

It is further ORDERED that:

A.	The State will cause Care Coordination provided to NF Children's or PDN Children's families to be person-centered and individualized.

B.	The State will prevent any Care Coordinator's caseload from exceeding 15 NF Children or 40 PDN Children.  The State will monitor and enforce Care Coordinators' compliance with this requirement.

C.	The State will require Care Coordinators to communicate with the families of NF Children or PDN Children with at least the frequency described in Section VI(E)(5) of COQAA, its current contract with Sunshine Health.  The State will monitor and enforce Care Coordinators' compliance with these requirements.

D.	The State will establish a training curriculum for Care Coordinators, in a variety of multiple training modalities, emphasizing that all children with Complex Medical Needs are to be presumed currently capable of living in a Community home with appropriate services.  The training curriculum will cover such topics as: how to engage with the families of children with Complex Medical Needs; the array of services available to these children; removing barriers to community integration; cultural competency; and the mechanisms by which to liaise with Providers, schools, and CMATs. Care Coordinators will be required to receive such training when hired, and thereafter on a continuing basis.  In particular, the training will be required for Care Coordinators who serve NF Children or are responsible for any aspect of the Transition Planning Process in Paragraph IV(A) or the CMAT meetings in Paragraph IV(B).

E.     Beginning no later than September 1, 2023, the State must require that MCOs implement a method for parent(s)/guardian(s) to report provider failure to provide services in real time. In addition, when Care Coordinators receive knowledge of any failure to provide any authorized and requested PDN hours, the Care Coordinators must directly report that failure in real time to their supervisor, with a copy to a designated State agency and the Monitor.

F.     Beginning no later than October 1, 2023, the State will allow NF Children's or PDN Children's parent(s)/guardian(s) to submit complaints to a designated State agency regarding Care Coordinators, and the State shall ensure that the Monitor receives a copy of these complaints. These complaints will be investigated and adjudicated within 30 days of submission, and the results of that process must be documented and submitted to the Monitor on a monthly basis. The existence of and procedures for the complaint system must be disseminated by mail and e-mail to the parent(s)/guardian(s) of NF Children and PDN Children no later than October 1, 2023.

G.     Beginning no later than September 1, 2023, the State must develop clear lines of authority and communication—including outlining which Care Coordinator is required to perform what roles and functions and designing a system for information-sharing—between the MCO's Care Coordinator and that of the Nursing Facility, and disseminate that information to the MCOs and each Nursing Facility.

## IV. NURSING FACILITY ADMISSIONS AND TRANSITION PLANNING

It is further ORDERED that:

A.     Consistent with Paragraph I(Q) and without waiting for parent(s)/guardian(s) to request it, the State must initiate an individualized Transition Planning Process for every NF Child and every child with Complex Medical Needs who may be admitted to a Nursing Facility. For any NF Child who already resides in a Nursing Facility, the Transition Planning Process must begin by August 1, 2023 and a Transition Plan must be completed by September 1, 2023; for any newly admitted NF Child, the Transition Planning Process must have begun before admission and a Transition Plan must be completed within 30 days after admission. The State must then periodically reinitiate the Transition Planning Process so that the Transition Plan is updated at least once every three months and must ensure that any new circumstances or considerations relevant to transition are reflected in the update. If the parent(s)/guardian(s) indicate opposition to the NF Child's transition to the Community, then the State, every time the Transition Plan is updated, will

engage in a family-centered, accurate, and proactive discussion of choices and will continue to inquire about the parent(s)'/guardian(s)' desires and about any barriers discouraging them from pursuing transition; and the State will then work to overcome any such barriers. For every NF Child admitted to a Nursing Facility after the date of this Order, the Transition Plan must reflect a proposed discharge date that is no later than 90 days after the NF Child's admission. The State will ensure that parent(s)/guardian(s) are specifically aware that a federal court has ordered the State to provide reliable PDN to all NF Children who transition to the Community.

B. In every CMAT meeting held for any NF Child, the CMAT must, in a person-centered manner, provide the child's family with the same information and opportunities described in Paragraph I(Q). The CMAT must also address questions that the family has about any community service or program and shall discuss with the family how any barriers that any CMAT participant raises to Community living for the child can be addressed.

C. The State will document when Transition Plans are created and updated, what information and educational opportunities are provided to NF Children's parent(s)/guardian(s) through the Transition Planning Process, any barriers the parent(s)/guardian(s) expressed, and what the State did to overcome such barriers.

D. The State will annually assign its External Quality Review Organization ("EQRO") to assess and report on the State's performance as to the obligations described in Paragraphs IV(A)–(C). The State will make available to the EQRO any information needed to make this assessment, including the NF Children's Transition Plans and CMAT documents and the documentation described in Paragraph IV(C).

E. A freedom of choice form should be created specifically for NF Children and PDN Children to also ask whether parent(s)/guardian(s) oppose transition of the child to a home or community setting.

## V. DATA COLLECTION

It is further ORDERED that:

A. The State will, in addition to any categories of data referenced above, collect and maintain the following categories of data. If necessary, the State will require MCOs, other State contractors, Providers, or Nursing Facilities to collect the data and turn it over to the State.

       1.      For each authorization or denial of PDN for a NF Child or PDN Child, data recording the child's name and unique ID number, the date of the authorization or denial, and the number of hours of PDN authorized or denied if any.

       2.      For each Care Coordinator who serves NF Children or PDN Children, data recording the dates on which the Care Coordinator completed any training curricula in Paragraph III(D); whether the Care Coordinator's caseload at any point exceeded either maximum in Paragraph III(B); and if so, then when and by how much the maximum was exceeded.

       3.      For each NF Child, the child's name, unique ID number, Nursing Facility of residence, date of Nursing Facility admission, date of planned discharge (if any), primary care physician's name, date of application for iBudget Waiver enrollment (if any), date of enrollment on the iBudget Waiver (if any), priority category (if on the wait list for the iBudget Waiver), managed care plan (if any), parent(s)'/guardian(s)' name(s) and contact information, and whether a NF Child's parents/guardians oppose the child's placement in the Community, and if so, the date(s) on which such opposition was expressed and the reasons for the expressed opposition.

     B.      The State will collect the data in Paragraph VI(A)(1)–(3) monthly.  Data collection for each month will be completed within 15 days after the month's end.

## VI. MONITOR

     It is further ORDERED that:

     A.      By August 15, 2023, the Parties will jointly select, and ask the Court to appoint, a Monitor to assist with implementation of this Order.  If the Parties are unable to jointly select a proposed Monitor, then each Party will, by September 1, 2023, nominate up to three individuals with expertise in the provision of home- and community-based services to children with medical complexity, and submit those individuals' names to the Court so that the Court may select a Monitor.

     B.      If the Monitor resigns or if the Parties agree that they wish to replace the Monitor, then the Parties will, within 15 days of such resignation or agreement, jointly select, and ask the Court to appoint, a replacement Monitor.  If the Parties are unable to do so, then each Party will, within 20 days of such resignation or agreement, nominate up to three individuals with expertise in the provision of home- and community-based services to children with medical complexity, and submit those individuals' names to the Court so that the Court may select a replacement Monitor.

      C.      The Monitor will regularly analyze the State's progress in complying with this Order. The Monitor may hire staff or consultants as necessary. The Monitor's authority extends to the Monitor's staff or consultants to the extent that they act at the Monitor's direction. To the extent the Monitor seeks documents or data in the possession, custody, or control of third parties, the State will, as much as possible, facilitate their production.

      1.      For each month, the State will provide the data described in Paragraphs II(B)–(C) to the Monitor and to the United States within 30 days after the month's end. The State will provide the monthly data described in Paragraphs VI(A)–(B) to the Monitor and to the United States within 30 days after each month's end. Data will be provided in a format that can be systematically analyzed across multiple software platforms (*e.g.*, .csv files), and may be produced in installments. If the Monitor requests, the State will provide, for a sample of PDN Children, Medicaid billing data or Provider staffing documents.

      2.      For analysis of compliance with Paragraphs III(A)–(F), IV(A)–(D), and V(A)–(D), respectively, the State will make available to the Monitor upon request: (a) Care Coordination notes for samples of NF Children and/or PDN Children, training curricula described in Section III(D), and complaints submitted to the State as described in Section III(E)–(F); (b) all information described in Paragraph IV(D); and (c) the documentation described in Paragraphs V(B).

      3.      To check accuracy of data or otherwise assist in analyzing compliance with the Order, the Monitor may interview families, Providers, and Care Coordinators of samples of PDN Children, and/or families, Nursing Facilities, and Care Coordinators of NF Children.

      D.      The Monitor (including staff or consultants) may communicate *ex parte* with either Party (including its counsel, agents, or staff) or the Court; convene meetings with the Parties as appropriate; contact Providers to ask about staffing challenges they may face and their ideas for addressing these challenges; testify in this case regarding the State's compliance with this Order; or provide technical assistance to anyone with a role in implementing this Order. The Monitor (including staff or consultants) will not be liable for any claim, lawsuit, or demand arising out of activities described in this Order; enter, while Monitor, into any new contract with either Party, unless the other Party consents in writing; be subject to formal discovery involving the activities in this Order; testify in any other litigation or proceeding regarding the activities in this Order; or serve as an expert regarding a subject learned through activities in this Order.

      E.      The Monitor will prepare a written report every two months evaluating the State's compliance with this Order and progress toward complying with future obligations in this Order. The report will also include recommendations for achieving or sustaining future compliance, including recommendations as to modifications that will provide the State more flexibility in ensuring compliance with this Order. The Monitor will send each report to the Court by the first of every other month, beginning on November 1, 2023.

      F.      The State will bear the costs of the Monitor subject to a reasonable annual budget that the Monitor will submit to the State. The State may enter into a contract with the Monitor requiring the Monitor to provide monthly statements.

**VII.  MISCELLANEOUS PROVISIONS**

It is further ORDERED that:

      A.      To the extent that the State decides to contract with or otherwise assign a third party to implement any actions relating to compliance with this Order, the State may not rebut an allegation of noncompliance by citing the third party's failures. The State will align the terms of any such contracts with its obligations under this Order and will require contractors and agents to take all actions necessary for the State to comply with this Order. Either Party may contact or speak alone with any third party involved in the implementation of this Order, including but not limited to Providers, Nursing Facilities, MCOs, and Care Coordinators.

      B.      The State will not retaliate against any individual who (1) opposes any act or practice that violates this Order, (2) has made or may make a complaint related to this Order, or (3) has testified or may testify, has assisted or may assist, or has participated or may participate in any manner in an investigation, proceeding, or hearing related to this Order. The State will also take all necessary measures to ensure that the NF Children's and PDN Children's families are not (1) pressured to choose nursing facility services, (2) pressured to decline community-based services, or (3) subjected to any form of retaliation by Nursing Facilities, hospitals, State staff, or State contractors, for seeking alternatives to facility-based care. The State will timely and thoroughly investigate any allegations of such retaliation or pressure, and will take any appropriate corrective actions. Unless prohibited by law, the State will promptly report to the Monitor any such allegations.

   C. The State will name and empower a State employee to coordinate the actions of the various State agencies whose cooperation is necessary for the State to comply with this Order.  If this position becomes vacant, the State will promptly name a replacement.

   D. If a dispute arises regarding this Order, the Parties must seek to resolve it through informal conferral, and may seek the Monitor's assistance.  If the United States believes that the State is out of compliance, and informal conferral is unsuccessful, then the United States may notify the State in writing of the alleged noncompliance.  Within 14 days, the State will respond to each written allegation of noncompliance either by accepting the allegation and proposing a curative action plan, or by denying the allegation.  Unless the United States believes that the alleged non-compliance relates to conditions or practices that pose an immediate and serious threat to the life, health, or safety of a child with Complex Medical Needs, the United States may not seek a judicial remedy for the alleged non-compliance until this process is exhausted, *i.e.*, until the State fails to respond within 14 days, denies an allegation of non-compliance, or proposes a curative action plan that the United States deems insufficient.  Failure to enforce any provision of this Order shall not be construed as a waiver of any enforcement rights.

   E. The Court shall retain jurisdiction of this matter while the State complies with this Order.  The anticipated term of this Order is 24 months, assuming reasonable progress is made to comply with this Order. The Court will also consider termination of the Monitor and this Order upon the achievement of Paragraph II(A), *i.e.*, the provision of MNPI to 100% of all PDN children on a rolling 12-month basis. The Court also reserves the right to modify this Order to impose more stringent requirements on the State if the original purposes of this Order are not being fulfilled in any material respect.

   **SIGNED** in Chambers at West Palm Beach, Florida this 14th day of July, 2023.

                      Donald M. Middlebrooks
                        United States District Judge

cc:  Counsel of Record