UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 12-60460-CV-MIDDLEBROOKS

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STATE OF FLORIDA,

    Defendant.
_____/

**<u>THE STATE OF FLORIDA'S MOTION FOR STAY PENDING APPEAL</u>**

Defendant, the State of Florida, respectfully moves for a stay of the Court's Order of Injunction (ECF No. 1171) pursuant to Federal Rule of Civil Procedure 62(d) pending the State's appeal to the Eleventh Circuit. In light of the Order of Injunction's fast-approaching deadlines, the State intends to file a motion to stay in the Eleventh Circuit on July 28, 2023, and therefore respectfully requests a ruling on this request within **seven days**.

## Legal Standard

In ruling on a motion to stay pending the appeal of an injunction, courts considers the following four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434 (2009). Ordinarily, "[t]he first two factors are 'the most critical.'" *Swain v. Junior*, 958 F.3d 1081, 1088 (11th Cir. 2020).

"[T]he movant may also have [its] motion granted upon a lesser showing of a substantial case on the merits when the balance of the equities identified in factors 2, 3, and 4 weighs heavily in favor of granting the stay." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) (marks and citations omitted); *accord Ruiz v. Estelle*, 650 F.2d 555, 565–66 (5th Cir. Unit A June 26, 1981) ("[O]n motions for stay pending appeal the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay.").

## Legal Argument

### I. The State Is Likely to Succeed on the Merits of Its Appeal.

The State is likely to succeed on the merits of its appeal due to the following legal errors: (i) the Order applies the wrong legal standard in evaluating the "appropriateness" factor under *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999); (ii) the Order also applies the wrong legal standard in evaluating the "non-opposition" factor under *Olmstead*, and the evidence on which the Order relies does not support a finding of non-opposition; (iii) the United States' trial evidence did not establish widespread violations of the ADA; (iv) the United States did not disclose the "modifications" it proposed and which the Court adopted—namely, the provision of a minimum of 90% of PDN hours to 100% of children—until after trial; (v) the United

1

States' challenge to the quality of care-coordination services is not cognizable under the ADA, and an injunction remedying a nonviable ADA claim is improper; (vi) the injunction does not redress, and is not intended to redress, an ADA violation as to any individual child; (vii) the injunction does not meet the requirements for injunctive relief against the State for several reasons, including that compliance with the injunction is factually impossible, and the scope of the injunction violates principles of federalism because it is not appropriately tailored in light of the United States' trial evidence; and (viii) the Order incorporates reversible evidentiary errors.

a. **Appropriateness Under *Olmstead*.**

In applying the "appropriateness" element of the United States' *Olmstead* claim, the Court did not consider whether the actual community setting in which a child would live is appropriate to the child's needs, rejecting this exercise as "unmanageable and overly subjective." ECF No. 1170 at 46. It concluded that the "appropriateness" element is satisfied whenever a child could appropriately live in a community setting of some kind—regardless of whether that setting is available to the child. The Court then concluded that every child satisfies this element. This conclusion was legal error, and turns this element of *Olmstead* into a ministerial box-checking exercise that ignores the real circumstances of children and families—and endangers children.

In determining whether any community-based placement (like a family home or group home) is "appropriate" to a child's needs, and thus determining whether the State is liable for violating the ADA by failing to make a reasonable accommodation that would enable the child to live in that setting, the Court should have considered the actual, real-life setting available to the child. This is the inquiry that *Olmstead* requires. *See infra*; *see also* ECF No. 868 at 38–40 (collecting citations).

Without this consideration, the circumstances of the actual setting to which a child would be discharged has no place in the *Olmstead* analysis. As a consequence, under this Court's interpretation, the appropriateness of community placement depends strictly on medical appropriateness, and is indistinguishable between a ventilator-dependent child who would transition to a non-smoking family home or apartment, and a child with the same needs who would be discharged to a homeless shelter. *See Olmstead*, 527 U.S. at 605 (plurality opinion) (recognizing that it is not "the ADA's mission to drive States to move institutionalized patients

2

into an *inappropriate setting*, such as a homeless shelter" (emphasis supplied)). This contradicts *Olmstead* as well as the United States' own regulation, which asks whether the "setting" is "appropriate to the needs" of an individual, 28 C.F.R. § 35.130(d)—not whether the *individual* is appropriate to community placement in the abstract.

The Court's interpretation likewise relieves the United States of the burden of identifying an actual placement to which any individual would be discharged as part of establishing an *Olmstead* violation—a luxury that an individual plaintiff would never enjoy, and that flips the burden of proof in ADA cases on its head. This is not the law, and the Court erred in determining that the appropriateness inquiry ignores the proposed alternative setting to which a child would transition.

### b. Non-Opposition Under *Olmstead*.

The Order also misapplies the "non-opposition" element of the United States' claim. The Order declares that all parents who are *not* presently ready to transition their children home—even for reasons outside the State's control—or who have expressly indicated that they *are* opposed to bringing their children home for the time being, are actually "unopposed" to community placement under *Olmstead*. ECF No. 1170 at 56–57, 61. The Court disagreed that "a parent who is not 'ready' to transition their child home is *opposed* to binging their child home, even if their unreadiness is due to personal circumstances and not the State's failure to provide adequate services," because "[t]hey may want to if they could, and that means they are non-opposed within the meaning of *Olmstead*." ECF No. 1170 at 61. Thus, under the Court's interpretation, if a parent wishes someday to bring a child home, but is not ready due to any number of reasons that have nothing to do with the State, then the "non-opposition" element of *Olmstead* is satisfied, and the State has discriminated against the child and violated the child's civil rights.

The State cannot be held liable for discrimination merely because parents express a one-day "goal" to bring a child home. The universal declaration that all children satisfy the appropriateness element, coupled with the virtually automatic satisfaction of the "non-opposition" element for every institutionalized child, renders the State strictly liable for violating the ADA every time a child—or, for that matter, an elderly adult—is admitted to a nursing home. Under this reading, the ADA would tolerate institutional placement only in the rarest cases: when the child (or adult) requires hospital-based acute care, or when the child's

3

parents (or the adult) unequivocally declares permanent, unrelenting, unconditional opposition to *any* community placement *ever*. In all other circumstances, under the Court's interpretation, the first two elements of *Olmstead* are always satisfied.

This is not the law; it bears no resemblance to *Olmstead*. *Olmstead*'s elements serve a real purpose in individual cases, and must serve an equally real purpose when the United States brings a systemic claim requiring proof of widespread and pervasive violations of the ADA. Moreover, *Olmstead* expressly preserved the necessity of institutional settings in the spectrum of care, 527 U.S. at 600–02, and nursing-facility services are mandatory under the Medicaid Act.

The Court's conclusion that parents who are presently opposed, and who do not request transition, should be considered "non-opposed" is also inconsistent with the Eleventh Circuit's reasonable-accommodation precedents, which uniformly require the individual to request an accommodation—and be refused—before an ADA claim accrues. *See, e.g., Goldberg v. Fla. Int'l Univ.*, 838 F. App'x 762, 770 (11th Cir. 2020); *Quality of Life, Corp. v. City of Margate*, 805 F. App'x 762, 770 (11th Cir. 2020); *see also L.C. by Zimring v. Olmstead*, 138 F.3d 893, 904 (11th Cir. 1998); *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997). Concluding that parents have no obligation to request transition or otherwise signal to the State their readiness to transition their children home requires the State to be clairvoyant and relieves the individual of his or her obligation under binding precedent to make a specific demand for an accommodation.

Finally, as a factual matter, the Court erred in relying on hearsay statements from an admittedly non-representative sample of parents funneled through an expert witness—Dr. Amy Houtrow—to establish that the parents of institutionalized children are "overwhelmingly not opposed" to transitioning their children out of nursing facilities, ECF No. 1170 at 61—even if they are not ready to transition their children home at present, even when their unreadiness is no fault of the State (for example, because of unstable housing), and despite some of those *same* parents' live testimony at trial that they *do* oppose transition. Dr. Houtrow's own summaries from her interviews with parents reveal the many reasons unrelated to the State why children live in nursing facilities. *See* United States' Exhibits 5192, 5194–5223, 5228–5237, 5240–5241, 5243. For example, 19 of 44 interviewees—nearly half—cite their own housing situations as a

4

reason why they oppose community placement.[1] It was error for Dr. Houtrow to count these parents as "not opposed," and it was error for the Court to reach the same conclusion.

### c. Evidence of Widespread Violations of the ADA.

#### i. The United States' Evidence Regarding PDN Did Not Establish Widespread Violations of the ADA.

The United States presented evidence that approximately seven children entered nursing facilities at some point in the last decade due in part to difficulties in obtaining PDN coverage. Even ignoring the State's counter-evidence with respect to these seven children, the Order improperly extrapolates the United States' limited evidence to find thousands of violations of the ADA; that is, that children are being subjected to unlawful institutionalization on a widespread and pervasive basis due to the State's failure to provide PDN.

The Order concludes that the few examples offered by the United States are representative of the *entire* population of approximately 140 nursing facility children and the 2,750 children who receive PDN in the community—even though the United States' hand-picked examples equates to less than one-quarter of one-percent of the total population of nearly 3,000 children—and declares that *every one of these children* is at "serious risk" of placement in a nursing facility due to lack of PDN. Thus, the Court concluded that based on the circumstances of fewer than ten children over the course of ten years, Florida today is violating the civil rights of nearly 3,000 children.

This conclusion disregards the testimony of two nursing facility case managers who explained the reasons why individual children live in nursing facilities today. Kelsea August, a case manager at Kidz Korner, testified to the following reasons for children's placements at Kidz Korner: a desire to wean children off of medical equipment before coming home (M.E., M.F., J.G., R.M., D.O.); an incarcerated parent (M.F.); a home destroyed by Hurricane Ian (C.D.); the parent's personal determination this it was "too much" to have her child home, and thus placing her child's transition on hold (T.G.); the parent's belief that his or her home setting was not appropriate for their child (L.H.); an unstable housing environment and a custody battle (J.P.); parents who reside in China (S.L.); a parent who lives with the child's grandmother, but

---

[1] Curiously, Dr. Houtrow's "thematic analysis" failed to identify unstable or inadequate housing as a "theme," even though nearly *half* of all interviewees cited housing as a significant factor.

5

who would like her "own situation" before she brings her child home (M.L.); and a parent who is training to care for the child, but is not yet comfortable enough to transition the child home (K.R.). *See* Tr. Vol. 7A at 111:10–157:5. The State also called multiple parent witnesses who testified first-hand regarding their personal, individualized reasons for choosing nursing facility care for their children—from unstable or inadequate housing, to discomfort with providing care in the home, to balancing the interests of other children in the home, and others.

The reasons presented at trial were diverse and, with few exceptions, had nothing to do with the State. But the Order instead relies on the few exceptional cases to support its conclusion that inaccessibility of services causes widespread institutionalization, and ignored the large majority of cases that contradicted that conclusion.

The Order also discounts the equal number of parent witnesses who testified for the State in defense of their decision to place their children in nursing facilities for reasons unrelated to the State. In other words, to satisfy the "widespread" standard that the United States' demand for systemwide relief required, the Court necessarily found that the United States' evidence from a handful of parents was generalizable to and representative of thousands and thousands of children, but the States' evidence from an equal number of parents (and evidence of even more examples from case managers and care coordinators) constituted anomalies and outliers to be explained away. This was error.

## ii. The United States' Evidence Regarding Care Coordination Did Not Establish Widespread Violations of the ADA.

The United States presented virtually no evidence of institutionalization—let alone widespread institutionalization—resulting from care-coordination failures. The United States offered a few parent witnesses who recounted their dissatisfaction with the quality of the care-coordination services they received, mostly in years past. But dissatisfaction with the quality, adequacy, or effectiveness of services is not a cognizable ADA claim at all, ECF No. 771 at 33–34 (collecting cases), and certainly evidence of five or six dissatisfied parents hand-selected by the United States after ten years of litigation does not prove that the State's provision of care-coordination services has caused widespread unlawful institutionalization of children in Florida. The Order does not conclude that care-coordination in fact caused a *single* child to be institutionalized.

### d. The United States' Post-Trial Disclosure of Reasonable Modifications.

The "modifications" to the State's Medicaid program mandated by the Court's injunction were not disclosed during the litigation until after trial, depriving the State of the opportunity to present a defense. Most significantly, the injunction's cornerstone—mandatory provision of at least 90% of PDN hours to each and every one of 2,750 children—was never disclosed during discovery, and was never introduced into this litigation before the United States filed its post-trial brief on remedies.

At trial, the principal remedy that the United States sought was an increase in PDN reimbursement rates—not a guaranteed utilization rate. The State had no opportunity to present evidence that meeting this 90% floor for 100% of children—a threshold that was plucked from thin air—is impossible in light of the current critical nursing shortage, and the vastly unique circumstances of many children's cases and home situations (beyond just parent refusal and hospitalization) that prevent the delivery of 90% of hours. Had an arbitrary PDN delivery benchmark been proposed as a modification before trial, the State could have presented expert testimony showing why that threshold is impossible, and that no state in the country provides this level of PDN.

The Order disagrees and reasons that, because PDN gaps have been a key issue in the case, the State should have known that the Court might impose a never-before-seen mandatory minimum utilization rate on the provision of PDN hours to all 2,750 recipient children in Florida—even though the United States never asked for this relief before or during trial, and instead focused on a mandatory increase to PDN rates. An injunction cannot lawfully impose sweeping changes to the State's Medicaid program that the State learned about for the first time after trial, and thus deny the State any opportunity to demonstrate that the proposed accommodation is infeasible or unreasonable, or to establish a fundamental-alteration defense.

### e. A Challenge to the Quality of Care Coordination Services is Not Cognizable.

The order and injunction make clear the intent of the Court's remedy: to improve the quality of care-coordination services. But quality-of-care claims are not cognizable under the ADA. ECF No. 771 at 33–34 (collecting cases). Just as a plaintiff cannot sue under the ADA for a "better" care from a doctor or dentist, the United States cannot sue under the ADA to provide "better" care coordination. The injunction's changes to the State's care-coordination

7

program intended to improve the quality of those services—untethered to evidence that existing care-coordination services cause widespread unlawful institutionalization—are improper.

### f. Redressability.

Like the United States' trial evidence, the Court's ruling does not factually tie any of changes the injunction compels to the circumstances of any individual child. Rather, the injunction retools the State's Medicaid Program with the hope of improving some of the services it provides, and inserts the federal government into innumerable aspects of the State's service-delivery system, including service utilization rates, data collection, forms, trainings, complaints, contracts, transition planning, external reviews, and even care coordinators' communications with private providers and the care coordinators' own supervisors. That is the function of legislatures and executive agencies, rather than courts. Without any showing that the remedy will prevent any individual's unlawful institutionalization, the United States failed to establish either redressability under Article III or an effective accommodation under ADA principles.

The United States' evidence did not establish that the relief it sought—the "reasonable accommodations" it proposed as part of its ADA claim—would redress any individual child's *Olmstead* injury. The Order forgives the United States' failure by applying an incorrect legal standard to evaluate redressability, and therefore errs with respect to a necessary component of Article III standing.

The United States intentionally did not present evidence at trial showing how any one of its proposed modifications would redress any child's injury. In fact, the United States explicitly disavowed any obligation to show how its proposed modifications would result in a single child avoiding institutionalization or transitioning out of a nursing facility, let alone that this result would be achieved on a widespread basis. The United States' own expert could not say whether the modifications she proposed would help a single child avoid institutionalization or transition home. Nor did the United States show how the remedy in the Court's injunction—most significantly, the 90% minimum threshold for PDN for thousands of children—would redress any individual child's injury, because these remedies were disclosed in this litigation for the first time *after* trial.

There is *no evidence* in the record that so much as mentions the injunction's keystone remedy: a minimum 90% PDN utilization rate. Consequently, there is no evidence that the

8

imposition of this remedy, or any other remedy in the injunction, would redress an *Olmstead* injury—transition out of a nursing facility, or avoidance of imminent institutionalization—for a single child.

The Order lessens Article III's redressability requirements, explaining that the United States' burden was simply to show that a favorable decision would "significantly increase the likelihood" that some child might transition home someday. But even under this standard, the United States did not make this showing as to a single individual child, and instead claimed it did not have to tie its remedies to any real child. Nor does this reasoning address redressability as to thousands of allegedly "at-risk" children who reside in the community, and for whom the Court ordered sweeping relief. In the United States' view, policy proposals and intuition are sufficient to establish redressability, and the Order and injunction incorrectly endorse that view.

### g. The Injunction Does Not Meet Basic Requirements for Injunctive Relief Against the State.

#### i. Compliance With the Injunction is Impossible.

The injunction is inappropriate because compliance is unachievable. *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1532 (11th Cir. 1996) ("The injunctive relief issued by the district court . . . was improper not only because it was premised on an error of law, but also for the alternative reasons that the injunction lacked the specificity required by Rule 65(d), and compliance with its terms was impossible.").

Beyond the shadow of a doubt, the State will violate the injunction *through no fault of its own*, *and despite its best efforts*, because the provision of 90% of PDN hours to 2,750 children in the midst of a nursing shortage is simply impossible. If there is one fact that the parties, the Court, and the witnesses all agreed upon at trial, it is that a critical nursing shortage currently exists across the country. The Order and injunction do not deal with the undisputable nursing shortage that renders the 90% utilization rate flatly unachievable.

But even if there were an ample supply of nurses, a 90% minimum would be unachievable. The injunction's two carve-outs from the 90% PDN ratio calculation—parent refusals and hospitalizations—do not capture the complete universe of reasons why not all authorized PDN hours are delivered, and thus do not bring the 90% threshold into the realm of possibility. As Dr. Bachman testified, *many* reasons contribute to under-utilization of PDN hours. Tr. Vol. 4 at 173:12–14. For example, a child might attend PPEC (a medical daycare)

9

during the day but remain authorized for around-the-clock PDN; the parent might place specific conditions on the nurses accepted in the home (such as gender, age, or language); nurses might quit for any number of reasons (such as personality conflicts with parents, safety concerns with the home or neighborhood, or taking a different case); parents might be reluctant to switch home-health agencies; if a parent switches home health agencies, or if two home health agencies agree to cover the same case, then duplicate authorizations will be in place; COVID concerns impact staffing; nurses miss shifts for any number of reasons (childcare, sickness or surgery, flat tire, vacation, etc.); data anomalies sometimes reflect dual authorizations for a child that can never be delivered (*i.e.*, a child's data might reflect two 24/7 authorizations at a time).

Unsurprisingly, there was no evidence at trial that a 90% minimum threshold would be feasible. Indeed, there was no evidence at trial related to the 90% minimum threshold *at all*, because this "modification" was never proposed until after trial. Gary Jessee testified that the *average* utilization rate around the country is approximately 65%. This testimony was not challenged or rebutted. The United States presented no evidence that an across-the-board, 90% person-by-person minimum could be reasonably achieved in Florida or anywhere else.

Finally, ordering the State to provide 90% of PDN hours to 100% of children is improper because complying with the injunction lies largely outside of the State's control. The injunction necessarily depends on the actions and decisions of third parties who were not before the court and are outside the State's control (namely, home-health agencies and individual nurses with whom the State has no contractual relationship). The 90% PDN utilization rate therefore establishes a performance goal for healthcare providers, while the injunction makes the achievement of that performance goal a court-ordered obligation of the State. This is improper, because injunctive terms must be within the power of the enjoined party to perform. *See*, *e.g.*, *Lake Short Asset Mgmt. Ltd. v. Commodity Futures Trading Comm'n*, 511 F.3d 762, 767 (7th Cir. 2007); *NLRB v. Bell Oil & Gas Co.*, 98 F.2d 405, 406 (5th Cir. 1938).

ii. **The Scope of the Injunction is Not Narrowly Tailored in Light of the Trial Evidence, and Violates Fundamental Principles of Federalism.**

The injunction does not comply with fundamental principles of injunctive relief against States. Comity and federalism limit the scope of injunctive relief against States. *Consumer Party v. Davis*, 778 F.2d 140, 146 (3d Cir. 1985). Every injunction must be limited in scope to remedy the violation proven at trial, and when an injunction targets a sovereign entity like the State,

federalism concerns demands that the fit between the remedy and the evidence of violations be even tighter. Thus, injunctive relief may "intrude into state affairs no more than is absolutely necessary." *Morrow v. Harwell*, 768 F.2d 619, 628 (5th Cir. 1985); *see also United States v. Missouri*, 535 F.3d 844, 851 (8th Cir. 2008) (injunctive relief against a state "should refrain from micromanaging the state and its agencies"). The injunction here is vastly disproportionate in light of the evidence presented at trial.

The United States presented evidence that approximately seven children entered nursing facilities at some point in the last decade due in part to difficulties in obtaining PDN coverage. As discussed above in Part I.C., the Order erroneously extrapolates the United States' limited evidence to find widespread violations and craft a remedy that is many times broader than the scope of the evidence. The Order and injunction therefore reflect a conclusion that Florida today is violating the civil rights of nearly 3,000 children based on the circumstances fewer than one-quarter of one-percent of that number of children over a ten-year period.

As a result of this extrapolation, the Court required, under threat of contempt, that the State make dozens of changes to its Medicaid program, including the imposition of a years-long monitor and the mandatory provision of Medicaid services (namely PDN) in excess of what the Medicaid Act requires. *See* 42 U.S.C. § 1396a(a)(30)(A) (requiring States to make services accessible at least to the same extent that those services are available to the general population in the same geographic area). And the Order reasons that the injunction need not actually remedy any individual child's *Olmstead* injury. The trial evidence and the scope of the injunction are grossly out of proportion in light of the basic tenets of Rule 65, and particularly in light of the federalism concerns that necessarily limit a federal-court injunction against the State.

h. **The Order Incorporates Reversible Evidentiary Errors.**

i. **Dr. Houtrow Was a Conduit for Hearsay.**

The Court allowed Plaintiffs' expert Dr. Amy Houtrow to serve as a conduit for hearsay, and relied principally on that hearsay in finding that parents were not opposed to community placement. This was reversible error. By Dr. Houtrow's own admission, during out-of-court conversations with parents, those parents made statements to Dr. Houtrow or her colleagues, and Dr. Houtrow then relayed those statements to the Court. That is simple, textbook hearsay.

11

Dr. Houtrow's testimony demonstrates exactly why the rule against hearsay exists. Dr. Houtrow testified to her recollection or interpretation of the statements parents made during out-of-court conversations, turning her testimony into nothing more than a game of telephone masquerading as expertise. Indeed, at least five of the parents whom Dr. Houtrow interviewed expressly testified at trial that they *oppose* transitioning their children home (which the Court accepted at least to some extent in footnote 45 of its Order), yet Dr. Houtrow, through her game of telephone, testified that these same parents were *not opposed*. This inconsistency invalidates Dr. Houtrow's opinions, demonstrates that Dr. Houtrow's "methodology" for determining non-opposition based on parent interviews is inaccurate, and underscores the serious problems with allowing experts to present the hearsay statements of others as their own opinions.

### ii. The Court Excluded Plaintiffs' Expert Reports on Hearsay Grounds But Cited and Relied Upon the Inadmissible Reports in its Order.

At trial, the Court sustained the State's hearsay objection to the admission of Plaintiffs' expert reports into evidence. But the Order explicitly relies on those reports, citing trial exhibits that even the United States did not include on its post-trial catalogue of admitted trial exhibits. *See* ECF No. 1170 at 58–59 n. 48–50. Plaintiffs' expert reports were *not* in evidence, but form the basis of the Court's ruling. This constitutes error.

### iii. Kelsey Koehler Was Not Disclosed, and the Court Shifted Burden to State to Cure the United States' Untimely Disclosure.

The Order relies on the testimony of Kelsey Koehler, in its findings and conclusions on both the PDN issue and the care-coordination issue, and both as to liability and remedy. But after ten years of litigation, the United States never disclosed Kelsey Koehler as a witness until it served its trial witness list after the close of discovery. At trial, Ms. Koehler testified that she had spoken to the United States *years* earlier, yet the United States did not identify her in its Rule 26 disclosures or during discovery.

The State objected to the presentation of Ms. Koehler's testimony at trial based on her untimely disclosure. The Court overruled the objection, reasoning that the State could have cured the United States' discovery violation by seeking leave after the close of discovery to reopen discovery and depose Ms. Koehler. Despite the automatic exclusion of undisclosed witnesses under Rule 37 absent a showing by the United States that its untimely disclosure was

substantially justified or harmless, the United States was not asked to justify its failure to comply with Rule 26.

### iv. Parents Were Permitted to Testify to Hearsay That Does Not Fall Within Any Exception.

Finally, during trial, the Court did not apply the hearsay rule or Rule 602's personal-knowledge requirement to any parent witnesses. Parent witnesses testified without exception to out-of-court conversations with care coordinators, nursing facilities, other parents, nurses, and others, over the State's objections. The Order shows that the Court accepted this testimony for its truth, and found the State liable as a result. In admitting this parent testimony, and without sustaining any State objections, the Court reasoned that all parent testimony related to their children fell within the narrow exception in Rule 803(4) for statements made for "medical diagnosis or treatment" that "describe[] medical history . . . symptoms . . . their inception; or their general cause," or alternatively, that the statements were offered for non-hearsay purposes, *i.e.*, not for the statements' truth (which is not supported based on the Order's reliance on the substance of parent testimony and the legal consequences the Order attaches to that testimony).

Likewise, parent witnesses were permitted to speculate about the state of mind and intent of others, including why certain individuals other than themselves did or did not take some action, over the State's personal knowledge objections. The Order and injunction then rely extensively on that testimony in both imposing liability and crafting a remedy. This was error.

## II. The State Will Be Irreparably Injured Absent a Stay Pending Appeal.

"In large measure, the injunction transfers the power to administer" significant aspects of the State's Medicaid Program "from public officials to the district court." *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020). On its own, the injunction's transfer of authority to administer scarce services to needy populations from the State to a federal court amounts to an irreparable injury justifying a stay. Indeed, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *BST Holdings, LLC v. Occupational Safety & Health Admin., United States Dep't of Labor*, 17 F.4th 604, 618 (5th Cir. 2021). Several practical consequences of the injunction, many of which cannot be undone in the event of a reversal, necessitate a stay pending the outcome of the State's appeal.

First, the administrative personnel and resources necessary to accomplish the sweeping programmatic changes that the injunction compels are staggering, and once expended, will never be recoverable even upon reversal. The injunction requires dozens of changes to the State's administration of its Medicaid Program, from the creation of new forms, to the development of a new data-collection infrastructure, to modifications of managed-care contracts in the middle of a statewide re-procurement for Medicaid managed care services, to coordination with other agencies and private parties, among many others.

AHCA, the State Medicaid agency responsible for implementing the injunction, already faces a staff vacancy rate of approximately 30%. The staff that AHCA does have is responsible for administering numerous healthcare programs for the State's most needy populations, a small percentage of which are PDN children and nursing-facility children. The State will be forced to divert extraordinary resources away from administering programs for needy children and adults alike, many with serious disabilities and medical hardships of their own, and instead favor the population that the United States deemed most fit for litigation. *Olmstead* itself condemned such favoritism. *See* 527 U.S. at 604–06 (plurality opinion) (cautioning against allocating finite resources in an "inequitable" way, and explaining that the ADA does not compel preferential treatment for those who "commenced civil actions" over those who did not, but who are equally deserving).

Below are just a few examples of the resource-intensive projects that AHCA is presently managing, including several designed to serve needy children, that will be starved of resources and therefore harmed absent a stay:

- Re-procurement and implementation of new Statewide Medicaid Managed Care ("SMMC") contracts, which serve approximately 5 million people;

- Re-procurement and implementation of the SMMC pre-paid dental program, which serves approximately 5 million people;

- Procurement and implementation of a managed-care pilot program for individuals with intellectual and developmental disabilities, with a statutory implementation deadline of January 2024;

- Re-procurement and implementation of the managed care plan to serve children enrolled in the Children's Medical Services program;

- Re-procurement and implementation of a new electronic visit verification vendor before the expiration of the current contract in January 2024;

14

- Implementation of numerous other legislatively required programs and initiatives, including the recently enacted House Bill 391, entitled "Home Health Aides for Medically Fragile Children," Ch. 2023-183, Laws of Fla., and the creation of a new provider pathway for home health agencies solely providing PDN and attendant nursing care, Ch. 2023-243, § 7, Laws of Fla.

Carrying out the injunction's mandates will not only require the shifting of money and manpower within AHCA (away from the above and other urgencies), but because several injunctive terms pressure AHCA to request substantial appropriations from the Legislature and rework its managed-care contracts, the injunction will likely affect AHCA's ability to obtain legislative funding for other priorities impacting equally important populations. This injury is compounded by the impropriety of a federal-court injunction requiring or coercing a State Legislature to appropriate funds. *See Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 784, 789 (6th Cir. 1996). At bottom, just as the State cannot create more nurses out of thin air, the State cannot create the resources necessary to implement the injunction without short-changing the millions of other Floridians who depend on Medicaid services.

The Eleventh Circuit rejected precisely this type of litigation favoritism in *Swain v. Junior*, 958 F.3d 1081 (11th Cir. 2020). In *Swain*, the Court reversed an injunction that forced a county correctional department to divert limited resources to a particular facility involved in litigation, "at the expense of other county facilities," and "even though they may be more critical at another county facility." *Id.* at 1090. As in *Swain*, the injunction in this case causes irreparable harm to the State by forcing the State to divert public funds, its own limited staff, and managed-care organization personnel away from other critical programs and populations, to coordinate and implement this injunction, without regard to the needs of other programs and populations.

The similarities between this case and *Swain* do not end there. In *Swain*, the root problem that the unlawful injunction sought to remedy was the nationwide COVID-19 pandemic—a crisis that affected every State in the country. *See* 958 F.3d at 1090–91. A single injunction that imposed burdens on one agency and reallocated resources to one facility could not solve that root problem, and harmed both the enjoined parties and other would-be recipients of resources in the process. *Id*. The same is true here: every State in the country faces a critical shortage of nurses. The Court's injunction does not move the needle towards solving that crisis, but imposes extraordinary burdens on the State to overcome it in favor of one population while disregarding the needs of other vulnerable populations who are already impacted by the nursing shortage.

The injunction's rapid timeline for implementation compounds the irreparable injury to the State. On August 1, the State must begin implementing a new Transition Planning Process, and must conclude that process—including identifying and resolving barriers to transition and imposing a discharge date—for 140 children within 30 days. This timeline is logistically unworkable. The injunction also requires the State to advise the families of 140 children that this Court has ordered it to provide reliable PDN—a promise that, in the midst of a critical nursing shortage, the home health agencies that provide nursing services may be unable to deliver. ECF No. 1171 at 7. And while it forces the State to imply that all children will in fact receive all of their authorized PDN by order of this Court, the injunction prohibits the State from advising parents of the reality of the nursing shortage and the vast differences in staffing availability between different cases and communities, lest that truthful information be construed as "pressure" on families to decline community placement. ECF No. 1171 at 10. Once the State makes these mandatory representations to families, it cannot undo them. And if families make decisions based on those representations, without full information, then no appellate decision will turn back the clock. The certainty of irreparable injury weighs in favor of granting a brief stay to allow the Eleventh Circuit to review the Court's order and injunction before they take effect.

## III.    A Stay Will Not Injure the United States.

As to the third factor of the balancing inquiry, the United States will not be injured by a stay, because the injunction provides no relief to the United States. The unidentified population of children whom the injunction intends to benefit are not parties to this case. Only the risk of substantial injury to the parties—not third parties who may be impacted by the injunction—should be considered in weighing this factor. *See Swain v. Junior*, 958 F.3d 1081, 1090–91 (11th Cir. 2020) ("But the question is not whether COVID-19 presents a danger to the [non-party] inmates—we do not dismiss the risk of harm that COVID-19 poses to everyone, including the inmates at Metro West. The question is instead whether *the plaintiffs* have shown that *they* will suffer irreparable injuries that they would not otherwise suffer in the absence of an injunction." (emphasis supplied)).

Time and again throughout the long life of this case, the United States has denied that it is pursuing the rights of any individual child. It testified that it merely "hopes" individuals "may ultimately benefit from" its efforts to craft state healthcare policy through litigation. Tr.

16

Vol. 5 at 239:10–240:18 ("[W]e're not suing on behalf of an individual. We're suing to change the policies and practices of the State of Florida. To the extent that they may ultimately benefit from that . . . . [is] hopefully[] a result of our enforcement action. . . . [W]e can't sue on behalf of individuals."); *see also* ECF No. 679 at 7–9 (collecting United States' numerous representations that it is not litigating on behalf of or seeking relief for individual children).

Even if the risk of injury to unidentified, potential beneficiaries of the injunction were relevant to this Court's consideration of the third factor, a stay will not cause substantial injury to individual children. Both the Court and the United States take the position that the injunction need not, and is not intended to, actually redress the concrete of any individual child. *E.g.,* ECF No. 1170 at 16–18. The United States has repeatedly declined to explain, much less prove, how its requested relief would provide redress to any child. And adopting the same reasoning, the Court found no need to tie its injunction to redress for any individual child. In evaluating the third balancing factor, it would be patently inconsistent to rely on potential injury to individuals on whose behalf the United States did not sue, whose rights the United States did not seek to vindicate, and whose injuries this Court's injunction is not tailored to redress.

Finally, the United States has never shown any urgency to swiftly prosecute this case, or its previous appeal, over the past ten years. It never moved to expedite either the litigation or the interlocutory appeal, and sought multiple extensions of the discovery period before that appeal. Even after remand, the United States asked this Court for a year and a half for *discovery alone*, which the Court denied. ECF No. 1170 at 13. A stay will cause no injury to a party who has actively contributed to the long pendency of this lawsuit. This factor therefore weighs in favor of a stay.

## IV. The Public Interest Favors a Stay.

The public interest favors a stay because the State's interests are representative of the public's interest, and because States "have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach." *BST Holdings, LLC v. Occupational Safety & Health Admin., United States Dep't of Labor*, 17 F.4th 604, 618 (5th Cir. 2021).

Because the State is the party seeking a stay, the "balance-of-the-harms and public-interest factors . . . merge." *Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020). "[W]here the government is the party opposing the . . . injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 985 F.3d 1081, 1091 (11th Cir. 2020). The State and the public share

17

an equal interest in preventing the needless and unrecoverable expense of taxpayer dollars on compliance with a burdensome injunction, and shielding against the irreparable diversion of personnel and resources away from other needy populations and critical State programs.

As *Olmstead* recognized, the public also has an interest in maintaining the availability of nursing facility care—a mandatory Medicaid service—as an option for families who may need it. *See* 527 U.S. at 600–02. Indeed, several parent witnesses testified regarding their personal and legitimate reasons, not attributable to the State, for needing nursing facility placement as an option for their children. As explained above, the Order's interpretation of the *Olmstead* elements attaches strict liability under the ADA to the admission of any individual into a nursing facility, with only the rarest exception. *See supra* Part I.b. This puts the viability of these mandatory services, and the people who depend on them, at risk—contrary to *Olmstead*, 527 U.S. at 597 (recognizing "the States' need to maintain a range of facilities for the care and treatment of persons with diverse" disabilities).

The irreparable injury to the State, and thus to the public's interest, flowing from the extraordinary cost of compliance is more than enough to justify a stay in this case. In a recent case from the Fifth Circuit involving a stay of the federal government's vaccine mandate, the Court reasoned that a stay was warranted because *private* companies would "be irreparably harmed in the absence of a stay, whether by the business and financial effects of a lost or suspended employee, compliance and monitoring costs associated with the Mandate, the diversion of resources necessitated by the Mandate, or by OSHA's plan to impose stiff financial penalties on companies that refuse to punish or test unwilling employees." *BST Holdings*, 17 F.4th at 618. Here, rather than the private companies who bore the brunt of the injury in *BST Holdings*, in this case, the taxpayers of Florida will carry the burden of "compliance and monitoring costs," "the diversion of resources necessitated by" the injunction, and the risk of further fiscal exposure from blameless noncompliance. *See id*. This factor therefore favors a stay.

### CERTIFICATE OF GOOD-FAITH CONFERENCE

Pursuant to Local Rule 7.1(a)(3)(A), I certify that counsel for the movant has conferred with all parties or non-parties who may be affected by the relief sought in this motion in a good faith effort to resolve the issues. The United States opposes the requested relief.

Dated July 21, 2023.                    Respectfully submitted,


                                        /s/ *Ashley H. Lukis*
                                        Andy Bardos (FBN 822671)
                                        andy.bardos@gray-robinson.com
                                        James Timothy Moore, Jr. (FBN 70023)
                                        tim.moore@gray-robinson.com
                                        Ashley H. Lukis (FBN 106391)
                                        ashley.lukis@gray-robinson.com
                                        GRAYROBINSON, P.A.
                                        301 South Bronough Street, Suite 600
                                        Tallahassee, Florida 32301-1724
                                        Telephone: 850-577-9090
                                        *Attorneys for Defendant, the State of Florida*