**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 12-60460-CV-MIDDLEBROOKS/Hunt

UNITED STATES OF AMERICA

    Plaintiff,

vs.

STATE OF FLORIDA,

    Defendant.

_____/

**<u>ORDER DENYING MOTION TO STAY</u>**

THIS CAUSE is before the Court on the State of Florida's Motion to Stay the Court's Order of Injunction, filed on July 21, 2023. (DE 1177). My 78-page Memorandum Opinion and Order contained detailed factual findings and legal conclusions and was docketed on Friday, July 14, 2023, in the evening. (DE 1170). By midday on Monday, when the State of Florida filed its Notice of Appeal (DE 1172), I question whether a single elected official or agency head had an opportunity to read the order. Now, the State has moved to stay the Injunction pending appeal. For the reasons set forth below, I will not grant a stay.

A stay of an injunction pending appeal constitutes "extraordinary relief" that carries with it a "heavy burden." *See Winston-Salem/Forsyth Cnty. Brd. of Educ. v. Scott*, 404 U.S. 1221, 1231 (1971). A stay is granted "only upon a showing of four factors: 1) that the movant is likely to prevail on the merits on appeal; 2) that absent a stay the movant will suffer irreparable damage; 3) that the adverse party will suffer no substantial harm from the issuance of the stay; and 4) that the public interest will be served by issuing the stay." *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986). With respect to the movant's ability to demonstrate likelihood of success on appeal,

the bar is set lower if the movant can demonstrate that the remaining three factors weigh heavily in favor of granting a stay. *Garcia-Mir*, 781 F.2d at 1453. In such a case, a movant need only show a "substantial case on the merits." *Id.; see also Florida v. United States*, No. 23-11528, 2023 WL 3813774, at *1 (11th Cir. June 5, 2023) (citation omitted) ("Where the balance of equities identified in the second, third, and fourth factors weighs heavily in favor of granting the stay, 'we relax the likely-to-succeed-on-the-merits requirement' of the first factor.").

The first factor is the most important. As to this factor, and the purported strength of its case on appeal, the State points to eight legal issues that it contends it can succeed on. However, the State cannot meet either the higher threshold of "likelihood of success," nor the lower threshold of a "substantial case" as to any of them.

Most of the Motion simply rehashes the same positions the State has taken throughout this litigation – arguments I have fully considered and soundly rejected for reasons already explained in the Memorandum Opinion and Order ("Opinion"). *See, e.g.*, Opinion at pp. 45-61 (proper interpretation of *Olmstead* elements); Opinion at pp. 36-37, 68 n.55 (explaining that the evidence supported a finding of widespread ADA violations, thereby warranting the specific injunctive relief ordered); Opinion at pp. 66-67 (rejecting State's argument that it was unfairly prejudiced by the United States' purported late disclosure of the precise PDN remedy it was seeking); Opinion at pp. 16-18 (rejecting State's arguments with respect to redressability).[1] Moreover, the Opinion

---

[1] I considered and rejected the State's cognizability argument with respect to the relief surrounding Care Coordination services (DE 1177 at 7-8), although I did not write on that issue in my Opinion. It is true that the basis of an *Olmstead* claim may not solely be an allegation that services for persons with disabilities are poor in quality. *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 n.14. (1999). But this was not a "quality of services" issue. The State's lapses in Care Coordination (such as not providing information to parents and caregivers) was resulting in a lack of access to services and benefits for the Institutionalized Children. I found that the State must administer the Care Coordination program in a manner that ensures that children can access required services in the most integrated setting appropriate to their needs. *See, e.g., Price v.*

sets out in exhaustive detail how the evidence supports the legal conclusions reached. I see no need to repeat any of that analysis here.

Aside from these issues, the State argues that I committed reversible error in ruling on certain evidentiary issues. Specifically, the States argues that (1) Dr. Houtrow's testimony was a conduit for hearsay statements of parents and caregivers; (2) that Kelsey Koehler was not timely disclosed, yet I allowed her to testify over the State's objection and then I relied upon her testimony regarding Care Coordination and PDN in my Opinion; and (3) that certain testimony of the parents about their conversations with others was improper hearsay. (DE 1177 at 11-13). I am not persuaded that I made the wrong call on any of the issues identified in the State's Motion. I ruled on these issues from the bench as contemporaneous objections were made, and I explained my reasoning on the record.[2] But even if the State is right, those errors would not be enough to turn the tide of the trial or change my findings regarding liability or the remedy.

The State further argues that the Order of Injunction is unlawful because the State's compliance with it is factually impossible,[3] and because it violates principles of federalism. (*Id*. at 8-11). I responded to the State's federalism concerns in my Opinion. As I explained, there will be

---

*Shibinette*, No. 21-cv-25, 2021 WL 5397864, at *11-12 (D.N.H. Nov. 18, 2021) (ineffective monitoring of services is not a "standard of care" issue but rather appropriately calls for "changes to the way in which [a state program] is administered").

[2] The State also points out that my Opinion cites expert reports that were not admitted into evidence. To the extent that the reports are cited in my Opinion, this was an oversight. In making credibility findings and ultimately rending my decision, I relied upon the trial testimony of the experts, not their reports.

[3] The State criticizes the PDN ratio formula as not "capturing the complete universe of reasons why not all authorized PDN hours are delivered." (DE 1177 at 10-11). To prove its point, the State puts forth a hypothetical case of a child that attends medical daycare 40 hours a week, thus realizing less PDN. I would not count such a case against the State and instead consider it to fall under parent refusals of PDN hours. Moreover, I note that were the State to engage constructively, it could bring these one-off issues to the Court's attention during the pendency of the Injunction.

3

no "takeover" of Florida's Medicaid program. The Injunction is neither too intrusive nor too long, and the remedy ordered is specific and tailored to make essential changes quickly. (Opinion at p. 68). Additionally, federalism can hardly be implicated in a situation such as this, where the types of remedies ordered, particularly with respect to PDN delivery, require no more than what the State is already contractually obligated to provide, and where the Florida legislature itself has expressly recognized the need to improve the delivery of PDN and attempted to take steps to address it via a series of recent Policy Transmittals to ACHA. (Opinion at pp. 69-72); *see also Helen L. v. DiDario*, 46 F.3d 325, 338 (3d Cir. 1995) (finding modification reasonable because, *inter alia*, it "requires [the State] to fulfill its own obligations under state law.").

And with respect to its alleged inability to comply with the Order of Injunction, in particular the provisions regarding PDN, this was a matter that the State had a full and fair opportunity to raise within the context of the presentation of an affirmative defense, but it chose not to put on such a defense. Despite its suggestions to the contrary, the State was not blindsided. Indeed, the State's failure to provide adequate PDN was the cornerstone of this case from its inception. It was certainly foreseeable that a finding of liability would necessitate a plan for the State to fix that problem, *i.e.*, provide more PDN, and likely significantly more. That the State did not know what precise percentage of PDN hours it would eventually be ordered to deliver is irrelevant. It knew that some threshold amount would be set, and it was.

Now that the Injunction has been entered, the State claims that it cannot comply without an act of the legislature, or without diverting resources from others who are equally in need of State services. This strikes me as an alarmist response, for which there is little support in the record. And that lack of evidentiary support is a result of the State's litigation choices. The State only

4

vaguely touched upon these issues during the trial; it did not develop the factual record with the information it seeks to put before me now.

If there were any substance or merit to these arguments, the State could have attempted to rely upon a fundamental alteration defense. Such a defense contemplates exactly the theory the State is now seeking to advance, namely, that meeting the 90% PDN delivery threshold would shift priorities with respect to serving other populations of Medicaid recipients. The Court in *Olmstead* recognized that a State might be able to demonstrate a fundamental alteration if it could show that "in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the State has undertaken for the care and treatment of a large and diverse population of persons with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 604 (1999). Although I note that there would have needed to be clear evidence of inequitable allocation, and I doubt the State could have established that. *See, e.g., Frederick L. v. Dep't of Pub. Welfare of Com. of Pennsylvania*, 364 F.3d 487, 496 (3d Cir. 2004) ("[S]tates cannot sustain a fundamental-alteration defense based solely upon the conclusory invocation of vaguely-defined fiscal constraints."). Likewise, the State chose not to present evidence that requiring it to deliver a particular threshold percentage of PDN hours would necessitate a legislative appropriation. I am not convinced the State could have proven that anyway. But had it tried, that too perhaps may have been a relevant consideration in evaluating the merits of a defense or the scope of a remedy.

The State's post trial motion marks its first real effort to put these theories squarely before the Court. It failed to argue these things cogently at the bench trial, or to present specific evidence of any of it. And ultimately, the arguments are unavailing. The only reason additional legislative appropriations or a shift in the allocation of services would be necessary is if the amount of money

5

currently being paid to Sunshine Health or the other Managed Care Organizations is insufficient to provide the necessary and prescribed services that are already contractually required. The State's tacit understanding of any deficiency might explain its inaction, but it would represent an unseemly bargain with the Managed Care Organizations to deny service. The premise of my Order is that the State should enforce its contracts, collect the information necessary to do so, and require accountability on the part of the Managed Care Organizations.[4]

The State appears to have made a strategic choice to lie in wait, present none of this defensive evidence, and then attack the remedy that I ordered as being unlawful after the fact. The State cannot establish a likelihood of success on appeal premised upon a defense that it did not pursue at trial.

For the foregoing reasons, the State cannot demonstrate the first and most important factor to support a stay, as it has not identified any potentially winning arguments on appeal. And the remaining factors weigh heavily against granting a stay too: I am not persuaded that Florida will suffer irreparable damage without a stay, but I am firmly convinced that if compliance with the Injunction is delayed, the institutionalized children, and those at risk of imminent institutionalization, will suffer substantial harm. The public interest would not be served by issuing the stay.

Over its twelve-year history, this case has devolved into obstruction for obstruction's sake, without regard to the consequences for these children with medical complexity and their families. My Order directs the State to accomplish that which is required by federal and state law, as well as that which it has expressly contracted with Managed Care Organizations to provide. There is no

---

[4] I note the Florida Legislature's initiative to improve the provision of PDN involved *withholding* of funds from the Managed Care Organizations, not increasing them.

basis or reason for a stay. These children deserve better, as do those whose taxes are already paying for these services. I caution the State against foot-dragging in complying with the Injunction. This issue is too important. And for the families involved, the stakes are too high.

Those directing the litigation should reconsider. Failing that, I urge the Court of Appeals to allow the ordered relief to continue, and to expedite resolution of the appeal to the extent possible.

**SIGNED** in Chambers at West Palm Beach, Florida, this 25th day of July, 2023.

_____
Donald M. Middlebrooks
United States District Judge

cc: Counsel of Record