# Exhibit D

**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 23-12331

———————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

STATE OF FLORIDA,

*Defendant-Appellant.*

———————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:12-cv-60460-DMM

———————————————

Before JORDAN, BRASHER, and ABUDU, Circuit Judges.

JORDAN, Circuit Judge:

This appeal arises from over a decade of litigation between
the United States and Florida regarding the institutionalization

2                        Opinion of the Court                    23-12331

(and risk of institutionalization) of children with medically complex conditions.

In 2013, the U.S. Department of Justice filed suit against Florida on behalf of hundreds of medically complex children alleging discrimination under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134.  The United States alleged that Florida discriminated against these children in violation of the ADA by failing to provide care for them in the most integrated setting appropriate to their needs.  *See Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597 (1999) ("Unjustified isolation . . . is properly regarded as discrimination based on disability.").  In other words, the United States asserted that Florida was failing to provide families with the at-home or group-home care they needed, causing some children to be unnecessarily institutionalized and placing others at serious risk of institutionalization.  And once a child was institutionalized, the United States claimed, Florida's deficient care coordination and transition planning services made it difficult for their families to bring them back home.  *See id.* ("In evaluating a State's fundamental-alteration defense, [a] [d]istrict [c]ourt must consider, in view of the resources available to the state, not only the cost of providing community-based care to the [individual], but also the range of services the state provides others with mental disabilities, and the state's obligation to mete out those services equitably.").[1]

---

[1] For simplicity, we use the term "parents" for both guardians and parents.

23-12331                Opinion of the Court                        3

The lawsuit slowly made its way through the legal system, including one previous trip to this court, before reaching trial. *See United States v. Florida*, 938 F.3d 1221, 1244–45 (11th Cir. 2019) (*United States I*) (holding that the Attorney General of the United States had statutory authority to sue Florida for violations of Title II of the ADA). The district court laid out the case's procedural history in detail, and we won't repeat it here.

Following a two-week trial, the district court found that Florida's failure to provide adequate services to medically complex children constituted an *Olmstead* violation under the ADA. *See United States v. Florida*, 682 F. Supp. 3d 1172 (S.D. Fla. 2023) (*Florida*). The court separately entered a permanent injunction which, among other things, requires Florida to improve its care coordination and ensure that all medically complex children receive at least 90% of the at-home nursing services for which they qualify. Florida moved for a stay of the injunction pending appeal, and we granted that motion in part as to some aspects of the injunction.

After a careful review of the lengthy record, and with the benefit of oral argument, we hold as follows: (1) the United States has the authority to sue Florida for injunctive relief for violations of federal law (like the ADA) and can obtain relief that is not limited to individual children who filed administrative complaints or otherwise sued individually; (2) the district court generally did not err in finding that the United States established the required *Olmstead* elements; (3) the *Olmstead* violations were widespread and warranted a system-wide injunction; and (4) the permanent injunction

4                          Opinion of the Court                      23-12331

was within the court's discretion, with the exception of a few pro-visions. We therefore affirm the court's liability determinations and affirm in part and reverse in part the permanent injunction.

## I. BACKGROUND

In Florida, hundreds of low-income children under the age of 21 have disabilities or medically complex conditions that require daily medical services. These services include the use of equipment for communication, mobility, breathing, and eating, as well as the use and maintenance of feeding tubes, breathing tubes, ventilators, and wheelchairs. In order to receive such life-sustaining services, these children—whom we refer to as medically complex children or children with medical complexities—rely on Florida's Medicaid program.

Medicaid is a joint venture between the federal and state governments: both entities pay, the state administers, and the federal government regulates and oversees. In Florida, the Agency for Health Care Administration administers Medicaid. Individuals with disabilities as defined by the ADA are eligible to receive health care through Medicaid. Most children with medically complex conditions are covered by Medicaid.

The Medicaid Act's Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions require participating states like Florida to cover all services that: (a) are provided to recipients under 21 years of age; (b) the Medicaid Act permits or requires a state to cover under a Medicaid State Plan; and (c) are medically necessary to correct or ameliorate defects and physical and mental

illnesses and conditions.  States define when Medicaid services are "medically necessary."  If a state determines that a service is medically necessary, it must provide that service to Medicaid recipients.

Most Florida Medicaid recipients receive services through the AHCA-administered statewide Medicaid managed-care programs.  *See generally* Fla. Stat. § 409.965.  Florida contracts with private companies that provide managed care to enrolled Medicaid recipients.  It pays each managed-care plan a monthly amount for each enrollee based on per-member-per-month capitated rates, and managed-care plans pay enrollees' providers according to rates they negotiate with those providers.  Most children with medical complexities in Florida are covered by a managed-care plan.

Florida's contracts with managed-care plans require the plans to "take any and all necessary action to ensure that all medically necessary covered services are provided to enrollees with reasonable promptness, including . . . [u]tilizing out-of-network providers," and "[u]sing financial incentives to induce network or out-of-network providers to accept an enrollee as a patient/client and provide all medically necessary covered services with reasonable promptness."  D.E. 840 at Part VI ¶ 13.  They also set forth certain provider network requirements, including the minimum number of provider types, which is two home health agencies per county.  The managed-care plans negotiate contracts with service providers to ensure that members have access to providers in all categories of care,  though  AHCA  has  full  responsibility  for  the

6                         Opinion of the Court                    23-12331

implementation of managed-care plans.  Managed-care plans can raise their base rates to incentivize providers on an individualized basis.

AHCA can use several contractual mechanisms if managed-care plans do not fully comply, including a corrective action plan, liquidated damages, and sanctions.  AHCA also controls licensure requirements for at-home providers and establishes fee-for-services reimbursement rates for such providers.  *See* Fla. Stat. §§ 400.062, 400.464, 409.908; Fla. Admin. Code § 59G-4.002(3)(a).

Medicaid reimburses nursing facilities at a rate of up to $679.01 per day per child, whereas a managed-care plan reimburses at the same or higher daily rate.  Some Medicaid recipients receive services on a fee-for-service basis under which AHCA pays a flat rate to providers for each service.  In a managed-care plan the private company sets its own rates with AHCA's oversight, while in a fee-for-services program AHCA sets the provider reimbursement rate.

As relevant to this appeal, Florida's Medicaid program includes nursing facilities, private duty nursing, and care coordination.  We discuss each of these programs, and some of the district court's findings, below.

### A. NURSING FACILITIES

There are two options for medically complex children to receive required medical care: in a community setting (i.e., at home or in a group home), or in a state facility (i.e., an institution).

23-12331                    Opinion of the Court                    7

Children in assisted care facilities receive skilled nursing from facility staff.  Florida currently has three such institutions: Children's Center at Sabal Palms Health and Rehabilitation in Largo; Kidz Korner (Plantation Nursing and Rehabilitation Center) in Plantation; and Broward Children's Center (Children's Comprehensive Care Center) in Pompano Beach.  Approximately 140 medically complex children currently reside in one of these institutions.[2]

To admit a child to a nursing facility, Florida requires a Children's Multidisciplinary Assessment Team (CMAT)—comprised of representatives from AHCA, the Department of Health, the Agency for Persons with Disabilities, the Department of Children and Families, and any managed-care plan—to decide whether a child meets the admission care-criteria level and, if so, make a recommendation for admittance.  *See* Fla. Admin. Code § 59A-4.1295(3)(b).  Florida's internal procedures require CMATs to use a family-centered approach and to provide information about alternatives to nursing facilities.  Florida regulates care and discharge planning for children residing in nursing facilities.  *See* Fla. Admin. Code § 59A-4.1295.

---

[2] During the course of this lawsuit, three of the six state facilities shut down. *See Florida*, 682 F. Supp. 3d at 1191 (noting that the Justice Department was originally investigating six facilities); Carol Marbin Miller, *'Just Another Baby for Them.' Parents, Feds Fight for Kids Stuck in Florida Nursing Homes*, Miami Herald (May 7, 2023), *available at* https://perma.cc/8Z8W-LHJ8; Carol Marbin Miller, *Under Fire, Miami-Dade Nursing Home Closing Its Pediatric Unit*, Miami Herald (Jan. 31, 2013), *available at* https://perma.cc/DB8S-5KRC.

8                          Opinion of the Court                    23-12331

The living conditions and quality of care at these facilities vary.  For example, a number of parents described, in testimony and interviews, the neglect their children experienced at some of these institutions.  One parent reported that her child was abused, causing his leg to fracture, while at Kidz Korner.  Another parent said that her child almost died because the facility had failed to repair its generators in advance of a hurricane.  Another parent stated in an interview that her child was starved at the since-shuttered Westminster Care of Orlando facility.  Another parent alleged that her child developed bedsores due to neglect at the Broward Children's Center.  She sought to bring him home for fear that he would die if he remained at the facility.  Significantly, some parents also testified that they wanted to bring their children home but were prevented from (or delayed in) doing so due to the lack of care available.

## B. PRIVATE DUTY NURSING

Medically complex children who live at home or in community settings rely on Medicaid-funded nurses who come to the home and provide skilled care.  This program, called Private Duty Nursing (PDN), provides medically necessary, life-sustaining care that can include monitoring and maintenance of feeding tubes, breathing tubes, and ventilators, depending on the needs of the child.  Approximately 1,800 medically complex children currently live in home or community settings and rely on Medicaid-funded PDN.

23-12331                   Opinion of the Court                          9

Once a provider indicates that a child needs PDN, a managed-care plan reviews and authorizes the number of hours of PDN a child requires (up to 24 hours per day for medically complex children), and contracts with a home health agency to provide the PDN at home.

At trial, the United States' expert, Dr. Sara "Sally" Bachman, evaluated how Florida provided PDN to children with medical complexities by comparing the number of PDN hours children received versus the number of hours they were authorized to receive during the 2021 fiscal period.  Her evaluation showed that:

- Almost 94% of the children with medical complexity received fewer PDN hours than they were authorized to receive.

- Of the 1,956 children included in the data, only 6.5% (or 128 children) received all of their authorized PDN hours, while almost 1,800 received fewer PDN hours than authorized by the managed-care plans.

- On average, children received only 70–80% of their authorized PDN hours.

    o About 58% of the children received less than 80% of their authorized PDN hours.

    o About 25% of the children received less than 60% of their authorized PDN hours.

- Only 6% of children received 24 hours/day of PDN even though 22% of children were authorized for 24 hours/day of PDN.

- Only up to 40% of the children received 90% or more of their authorized PDN hours in a majority of counties.

- In two counties, 81–100% of the children received 90% or more of their authorized PDN hours.

According to Dr. Bachman, there were no discernible geographic patterns, and the county-by-county data indicated that "a national nursing shortage is not primarily responsible for the gaps in providing PDN." *Florida*, 682 F. Supp. 3d at 1211; D.E. 908 at 105–09. Florida's Medicaid expert, Gary Jessee, agreed with this conclusion. Dr. Bachman explained that not receiving medically necessary care places those nearly 1,800 children who received less than their authorized PDN "at risk" of institutionalization. *See* D.E. 909 at 100.

In addition to the fiscal-year-2021 reports, Dr. Bachman also examined some June 2022 data covering about 2,000 children to see if the COVID-19 pandemic had affected PDN provision. Her June 2022 analysis showed that:

- In a limited subset of counties, 80–100% of children received 80% or more of their authorized PDN hours.

- In two counties, some children received 0–20% of their authorized PDN hours.

23-12331              Opinion of the Court                    11

- Statewide, more than 50% of authorized PDN hours were not paid for.

Florida's expert, Mr. Jessee, obtained the same results.  *See* D.E. 1170 at 36; D.E. 912 at 36.

After hearing lengthy testimony from parents and experts from both sides, the district court made two overarching factual findings pertaining to PDN: (1) families of medically complex children are being denied access to adequate PDN; and (2) the problem is widespread.  *See Florida*, 682 F. Supp. 3d at 1210–13.  The court concluded that "the main impediment to children leaving nursing facilities is the lack of PDN . . . [and] the lack of PDN is a significant factor that places children with medical complexity who are living at home at risk of entering a nursing facility."  *Id.* at 1210.

### C. CARE COORDINATION

Care coordination is an essential service provided by a trained person—usually a nurse or social worker—to ensure that a child's care plan is delivered properly.  All Florida children who receive nursing care through Medicaid, whether in a facility or through PDN, receive care coordination.  Florida "relies on care coordinators to inform children's families about available services and how to access those services; assist families to transition their children out of institutions, with needed services in place; and assist families in accessing services necessary for their children to remain safely in the community."  D.E. 840 at Part VI ¶ 94.

12                    Opinion of the Court                    23-12331

The district court identified a number of problems with care coordination in Florida, including care coordinators' (1) inability to facilitate adequate PDN access; (2) failure to inform parents about alternatives to institutionalization; and (3) failure to effectively facilitate transition planning. *See Florida*, 682 F. Supp. 3d at 1213–14. We describe these below.

### 1. INABILITY TO FACILITATE ADEQUATE PDN ACCESS

A number of care coordinators testified that their clients consistently have staffing issues, and that they have few tools to address those issues beyond repeatedly calling agencies to try and fill open PDN shifts. The care coordinators also explained that paying better rates would mitigate the staffing issues. For instance, one care coordinator testified that, when she worked in home health and could not fill a shift for a patient for many weeks, "as soon as we started offering more money, the shifts would start to be covered." D.E. 908 at 113. She added that, "on a regular basis," children's families would need medical equipment, but could not get it due to insurance coverage problems. *See id.* at 107.

Another care coordinator, who testified as a witness for Florida, agreed that it is very difficult to get PDN and agreed that offering more money is a useful tool to solve shortages. She explained that low pay impacts PDN staffing because "most people are going to go where the money is unless they are extremely passionate about what they do." D.E. 899 at 116.

23-12331                 Opinion of the Court                        13

Based on this testimony, the district court found that care coordinators were unable to effectively facilitate the access of families to PDN.  *See Florida*, 682 F. Supp. 3d at 1214–15.

Multiple care coordinators further testified that they under-report parental dissatisfaction with PDN levels.  The district court found that the "reports do not accurately portray the extent of the failure."  *Id.* at 1214.

### 2. FAILURE TO INFORM PARENTS ABOUT ALTERNATIVES TO INSTITUTIONALIZATION

The district court found that "[t]here is a widespread failure to affirmatively inform families that they have alternatives to placing their children in a nursing facility."  *Florida*, 682 F. Supp. 3d at 1215.  The "[t]estimony at trial was replete with examples of parents and caregivers being given no information or misinformation[.]" *Id.*  For example, a number of parents testified that their care coordinators had never discussed housing or other community care settings, including the option of a group home.  *See id.* Florida's witnesses acknowledged that parents need more information.  *See id.*

Witnesses on both sides agreed that institutionalization should be a last resort.  The district court accordingly found that information about realistic alternatives is the first step to ensuring that children "are residing in facilities only because they need to be, or because their families made a knowing decision regarding their placement there."  *Id.*

14                         Opinion of the Court                    23-12331

### 3. FAILURE TO EFFECTIVELY FACILITATE TRANSITION PLANNING

Even in the best of circumstances, bringing a medically complex child home from an institution is not an easy task—it requires training, equipment, nursing, and arrangements for schooling and therapy. The district court determined, based on the families' testimony, that the transition process was "fraught with hurdles that should not exist." *Florida*, 682 F. Supp. 3d at 1216.

Parents seeking to bring their children home testified that they were discouraged or faced pushback. They were provided with inaccurate information about whether their homes would be suitable, and it was unclear to many how to effectively express their preference to bring their child home. In addition to feeling ignored, parents also lacked clarity about when and how the transition process begins. Florida attributed these concerns to parents' failure to make "formal requests" to transition home. But the district court rejected this contention, finding that "there was no indication that anyone ever explained to families what such a formal request looked like, what form it took, or to whom it needed to be communicated." *Id.* at 1216. According to the court, the process of training parents to provide care and safely operate equipment also posed a barrier because Florida does not have procedures in place to implement the training. *See id.*

The district court described parents' "desperation in trying to unite their family and bring their child with medical complexity home." *Id.* at 1179. Parents detailed how "[c]onfusing and inconsistent discharge requirements and [c]are [c]oordination, delays in

23-12331                Opinion of the Court                    15

obtaining necessary equipment, and most significantly, limited access to prescribed private duty nursing presented a maze almost impossible for parents to escape." *Id.*

Ultimately, the district court found that "Florida should do more to ensure that proper [c]are [c]oordination is delivered." *Id.* at 1216. The court found the care coordinators to be "dedicated, competent, and genuinely concerned about the children and families they serve." *Id.* at 1214. And it noted that the care coordinators generally "share the same frustrations as the parents and are powerless to address them in any meaningful fashion." *Id.*

### D. THE DISTRICT COURT'S ULTIMATE FINDINGS

By the close of the two-week trial—which included testimony from family members, pediatricians, nursing facility staff, Medicaid experts, and state officials—the district court was "convinced that the deficit of PDN in Florida is causing systemic institutionalization." *Florida*, 682 F. Supp. 3d at 1183. The court characterized this problem as systemic because the vast majority of "children with medical complexity (1,800 out of 1,956 children) received less than the PDN hours authorized by the managed[-]care plans," and the lack of access to PDN was the cause of institutionalization. *See id.* at 1183, 1243 n.55. Moreover, as to the 139 institutionalized children, the district court found—relying on the expert testimony and visit to one institution—that these children are "segregated from the community while they are institutionalized" *Id.* at 1227.

16                     Opinion of the Court                     23-12331

As discussed in greater detail below, the district court found that the United States had established the three *Olmstead* criteria necessary to show an ADA violation: (1) appropriateness; (2) non-opposition; and (3) reasonable accommodation.  *See Olmstead*, 527 U.S. at 601.  The court concluded that Florida "is violating the rights of children with medical complexity who rely upon the provision of vital Medicaid services and are trying, in vain, to avoid growing up in nursing homes." *Florida*, 682 F. Supp. 3d at 1180.

### E. THE INJUNCTION

In July of 2023, the district court issued a permanent injunction "focused on remedying the failures shown at trial." *Id.* at 1243. The court initially set an anticipated term of 24 months for the injunction, but for the most part it has remained in effect past that date.

Among other things, the injunction requires Florida to do the following:

1. Ensure that 100% of children receive the "minimally necessary PDN for integration"—90% of authorized PDN hours;

2. Set a maximum caseload for care coordinators, create a training curriculum, and ensure that care coordinators are adequately communicating with families and that families can file complaints;

3. Develop and document transition plans for each child currently residing in or who "may be admitted to a Nursing Facility" and regularly discuss barriers to discharge;

4. Collect data regarding PDN, care coordination, and nursing facility patients; and

5. Appoint and pay for a monitor to review compliance.

*See* D.E. 1171 at 4–10.

In February of 2024, we granted in part Florida's motion for a stay pending appeal, and stayed several provisions of the district court's permanent injunction: Parts III.D (training curriculum for care coordinators), III.E (reporting mechanism for failure to provide PDN hours), V.A.2 (data collection on care coordinators' curriculum completion and caseload), VI.C (enabling the monitor to hire staff/consultants, requiring Florida to produce certain data and facilitate production of documents by third parties, and enabling the monitor to interview parties), VI.D (enabling *ex parte* communication between the monitor and the parties), VI.E (requiring bi-monthly reports by the monitor), and VI.F (requiring Florida to pay for the monitor).[3]

### F. THE APPEAL

On appeal, Florida argues that the district court incorrectly interpreted and applied the three *Olmstead* criteria by making the inquiry more general and less individualized than it should have

---

[3] While the appeal was pending, we relinquished jurisdiction on the parties' motion to permit the district court to strike one of the permanent injunction's requirements—Part II.C, which required Florida to conduct transition planning meetings with parents of institutionalized children every three months for an indefinite period of time. That aspect of the injunction is therefore no longer at issue.

18                     Opinion of the Court                    23-12331

been.  First, Florida maintains that the district court inappropriately found that all children currently residing in institutions could be appropriately cared for in a community setting if Florida provided adequate services.  Second, Florida contests the court's finding that most parents are not opposed to bringing their children home, arguing that the court mistakenly looked to parents' "aspirations for the future" rather than the "actual conditions."  Third, Florida contends that the court ordered accommodations that were first disclosed after trial and thus not subject to evidentiary testing.

Florida also asserts that the district court's systemwide injunction is an inappropriate remedy because the United States failed to prove widespread unlawful institutionalization.  It claims that the injunction is overbroad, unachievable, and offends principles of federalism.

Finally, Florida submits that the United States lacks authority to enforce the rights of children who never initiated the ADA's administrative enforcement process, despite our decision in *United States I*, 938 F.3d at 1234–35.[4]

In an appeal from a bench trial resulting in a permanent injunction, we review findings of fact for clear error, determinations

---

[4] After a panel of this court held that the Attorney General could bring this action, *see United States I*, 938 F.3d at 1244–45, Florida sought en banc review. The court declined to take the case en banc.  *See United States v. Sec'y Fla. Agency for Health Care Admin.*, 21 F.4th 730 (11th Cir. 2021) (*United States II*).  Florida then filed a petition for certiorari, which the Supreme Court denied.  *See Florida v. United States*, 143 S. Ct. 89 (2022).

23-12331               Opinion of the Court                    19

of law *de novo*, and the provisions of the injunction for abuse of discretion.  *See U.S. Commodity Futures Trading Comm'n v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1322 (11th Cir. 2018).  Under the clear error standard, a factual "finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Cooper v. Harris*, 581 U.S. 285, 293 (2017).  The abuse of discretion standard is "deferential." *United States v. Tsarnaev*, 595 U.S. 302, 323 (2022). It therefore provides the district court with a "wide range of choice." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 217 (2025) (quotation omitted). We therefore will not reverse unless the court committed a "clear error of judgment." *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

### II. THE UNITED STATES' AUTHORITY TO SUE

When this case was previously before us, we held that the Attorney General of the United States had statutory authority to sue Florida to enforce the provisions of Title II of the ADA.  *See United States I*, 938 F.3d at 1244–45.  In its brief, Florida again reasserts its argument that the Attorney General does not have such authority to sue.  It does so to preserve that contention, understanding that we—as a later panel—are bound by the holding in *United States I*.  *See* Br. for Appellant at 51.  We therefore do not discuss the issue further.

Florida also argues that Congress "did not grant the United States an unbounded, freestanding right to enforce the rights of thousands of children." *Id.*  In its view, the United States cannot sue on behalf of those individuals who "never initiated the

20                    Opinion of the Court                    23-12331

enforcement process." *Id.* at 52.  It points out that only one child (C.M.) ever filed an administrative complaint, and says that his claim was resolved in a separate proceeding years ago. *See id.* (citing *A.R. v. Fla. Agency for Health Care Admin.*, 769 F. App'x 718 (11th Cir. 2019)).

Although this is one of the last arguments in Florida's brief, we address it first because it goes to the ability of the United States to maintain this action and obtain injunctive relief.  For a number of independent reasons, we reject Florida's contention.

First, Florida's characterization of C.M.'s previous claim is not quite correct.  C.M. was a plaintiff in a separate action in which the *Olmstead* claims were based on a different and narrow challenge to certain state policies that were subsequently changed.  As a result, those specific claims became moot. *See A.R.*, 769 F. App'x at 721 ("In dismissing the case in its entirety, the district court ruled that [Florida] had unambiguously terminated its use of the challenged policy—application of the 'convenience standard' in assessing whether private-duty nursing treatment was medically necessary—rendering the case moot, and that no remaining plaintiff had standing to challenge [Florida's] administration of its Pre-Admission Screening and Resident Review program.  After careful consideration and with the benefit of oral argument, we agree with the district court and therefore affirm.").

Here, C.M. is challenging other Florida policies and practices under *Olmstead*.  So C.M., who filed an administrative complaint, was a proper plaintiff in this case and the Attorney

23-12331                    Opinion of the Court                           21

General—even on Florida's view—could sue to enforce Title II of the ADA.  Indeed, in *United States I*, we held that the "legislative, regulatory, and precedential background of the statutes that Congress incorporated demonstrate that Congress intended to create a system of federal enforcement for Title II of the ADA."  938 F.3d at 1245.

Second, we are not persuaded by Florida's contention that the United States' enforcement authority is limited to suing on behalf of those individual children who filed administrative complaints.  When we held in *United States I* that the Attorney General could sue to enforce the provisions of Title II of the ADA, we did so in the same cause of action that is before us now—a suit in which the United States was suing for the benefit of a large group of medically complex children.  And although the administrative enforcement process may begin with the filing of a complaint by one or more individuals, *see United States II*, 21 F. 4th at 733 (Jill Pryor, J., concurring in the denial of rehearing en banc), nothing in our prior opinion limits the United States to enforcing federal law on behalf of only those individuals who submitted administrative complaints.  Congress "envisioned that, through the ADA, the federal government would take 'a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities,' and invoked 'the sweep of congressional authority, including the power to enforce the [F]ourteenth [A]mendment and to regulate commerce' to 'address the major areas of discrimination faced day-to-day by people with disabilities.'"  *United States I*, 938 F.3d at 1226 (citation omitted).

22                    Opinion of the Court                    23-12331

It is "perfectly competent for Congress to authorize the United States to be the guardian of th[e] public interest in a suit for injunctive relief." *United States v. Raines*, 362 U.S. 17, 27 (1960) (citing *United Steelworkers of Am. v. United States*, 361 U.S. 39, 43 (1959)). And when the United States sues in its governmental capacity to enforce federal law, the relief it can obtain is not limited to identifiable individuals whose experiences are used to prove the violations.

As we explained in an ADEA case, when the EEOC brings an action, it is "normally entitled to [broad] injunctive relief where it proves discrimination against one employee and the employer fails to prove that the violation is not likely to recur." *EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1253 (11th Cir. 1997). Indeed, "there would be little point in [the Commission] having the independent power to sue if it could not obtain relief beyond that fashioned for the individual claimant"; the "EEOC represents the public interest when litigating claims, and, through injunctive relief, seeks to protect not only the rights of the individual claimant, but those of similarly-situated employees by deterring the employer from future discrimination." *Id.* (citation omitted). The same is true here.

Third, in *United States I*, 938 F.3d at 1250, we held that Title II of the ADA adopts the remedial mechanisms of the Rehabilitation Act and Title VI. And under those federal laws, the United States is not limited to suing on behalf of, and seeking relief for, only those who have complained through administrative channels. *See* 14 Wright & Miller, Fed. Prac. & Proc. Juris. § 3652 (4th ed. 2017

23-12331                    Opinion of the Court                    23

& Sept. 2025 supp.) ("When the United States is seeking injunctive relief to restrain violation of a statute, it is recognized that the balancing of the equities is a different one from that of the court when weighing claims of two private litigants. . . . [T]he United States has broader rights vis-à-vis the states than would a private litigant.") (internal quotation marks omitted).

For example, in *United States v. Marion County School District*, 625 F.2d 607 (5th Cir. 1980), the United States filed suit under Title VI against a local school district to compel specific assurance that it would not continue its "policy of racial discrimination against [B]lacks in the assignment of students in [its] public schools." *Id.* at 608. The district court dismissed the complaint, ruling that the United States had no authority to institute the suit, but we reversed on that point. *See id.* at 609–13. In closing, we explained that the United States could seek broad remedies—like the busing of students—to prevent racial discrimination: "[W]e conclude that the United States is entitled to sue to enforce contractual assurances of compliance with Title VI's prohibition against discrimination in the operation of federally-funded schools, and that the United States is entitled to whatever relief is necessary to enforce such assurances, including 'transportation relief.'" *Id.* at 617.

And in *United States v. Board of Trustees*, 908 F.2d 740 (11th Cir. 1990), the United States filed suit under the Rehabilitation Act against the University of Alabama at Birmingham for denying auxiliary aids to certain handicapped students. Even though only one complaint against UAB had been filed with the Department of

24                    Opinion of the Court                    23-12331

Health, Education, and Welfare—by a deaf student whose request for services of a sign language interpreter at UAB's expense was initially denied—at the time of trial there were 175 handicapped students at UAB, and eight of them suffered from a severe hearing impairment. *See id.* at 742. The district court found that UAB violated the Rehabilitation Act by failing to "provide interpreter services to deaf students who were unable to procure such services elsewhere free of charge and who were not eligible for financial aid for such services[,]" and by failing to "provide any auxiliary aids to students in non-degree programs[.]" *Id.* at 743. Based on these liability findings, the court permanently enjoined "UAB from denying students auxiliary aids based on financial ability, and from refusing to grant auxiliary aids to non-credit or non-degree students," and "also ordered UAB to reimburse one family for money they spent on interpreter services." *Id.* at 743–44. Although the injunction provided relief to a number of handicapped students at UAB, and not just the single deaf student who had filed a complaint with the Department, we affirmed the broad grant of injunctive relief. *See id.* at 752. The scope of the injunction was not at issue in *Board of Trustees*, but the case is additional confirmation that when the United States sues as sovereign and proves a violation of federal law, the relief it obtains can benefit a group of persons, and not just those who have pursued administrative remedies or have filed individual actions of their own.

We note that the Supreme Court addressed the bounds of "the equitable authority that Congress has granted to federal courts" to award injunctive relief after this case was briefed and

23-12331                    Opinion of the Court                    25

argued.  *See Trump v. CASA, Inc.*, 606 U.S. 831, 837 (2025).  The district court did not have the benefit of the Supreme Court's decision, but the reasoning in *CASA* supports state-wide relief in this context because "[t]he equitable tradition has long embraced the rule that courts generally may administer complete relief *between the parties*."  *Id.* at 851 (emphasis in original) (internal quotation marks and citation omitted).  Thus, when the United States asserts its sovereign interest to remedy a state's violation of federal law, and proves state-wide violations, complete relief may be state-wide.  *See id.*

Fourth, Florida seems to misunderstand the general principles that govern the ability of the United States to sue in its sovereign capacity to enforce federal law.  The United States generally has standing to sue when it alleges an "injury to its sovereignty arising from violation of its laws[.]"  *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).  *See also United States v. Missouri*, 114 F.4th 980, 984 (8th Cir. 2024) ("The United States has a legally protected interest in enforcing federal law."); *Stauffer v. Brooks Bros.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) ("[A] violation of [the] [federal] statute inherently constitutes an injury to the United States . . . . The parties have not cited any case in which the government has been denied standing to enforce its own law."); *United States v. Arlington Cnty.*, 669 F.2d 925, 929 (4th Cir. 1982) ("The United States can sue to enforce its policies and laws, even when it has no pecuniary interest in the controversy.").  *Accord* 13B Wright & Miller, Fed. Prac. & Proc. Juris. § 3531.11 (3d ed. 2010 & Sept. 2025 supp.) ("Standing *to pursue the general interests of the public*

26                     Opinion of the Court                    23-12331

is easily recognized when federal officials responsible for enforcing specific statutory schemes bring suit under the aegis of the statute.") (emphasis added); *United States v. Brittain*, 319 F. Supp. 1058, 1060–61 (N.D. Ala. 1970) ("[T]his case is one brought by the United States as plaintiff—to protect and assert a substantial interest which it has in the invalidation of these [Alabama anti-miscegenation] laws— and in which the particular complaint of the Voyers [the mixed-race couple which was denied a marriage license] stands more as an example of the problems than as the source upon which general relief can be grounded . . . . A judgment will be entered, declaring null, void and violative of the Fourteenth Amendment of the Constitution the Alabama laws in question; enjoining the State of Alabama, its officers, agents, employees, and their successors, and all those acting in concert or participation with them from enforcing or giving any effect to such laws; and requiring the Attorney General of the State of Alabama to advise the Judges of Probate of the several counties of Alabama of the invalidity of Title 14, Section 361, 1940 Code of Alabama under the decision of this Court.").

### III. THE *OLMSTEAD* VIOLATIONS

#### A. GENERAL LEGAL STANDARD

The ADA's "sweeping purpose" is to "eliminate discrimination against disabled individuals, and to integrate them 'into the economic and social mainstream of American life.'" *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (first quoting S. Rep. No. 101-116, at 20 (1989), and then quoting H.R. Rep. No. 101-485, pt. 2, at

23-12331          Opinion of the Court          27

50 (1990), U.S. Code Cong. & Admin. News 1990, pt. 2, at 303, 332)). Historically, disabilities were stigmatized, and those with disabilities were regularly placed in institutions with little to no contact with the outside world. *See* 42 U.S.C. § 12101(a)(2). Congress therefore identified "isolat[ion] and segregat[ion]" of disabled persons by society as a "for[m] of discrimination," and noted that discrimination against the disabled "persists in such critical areas as . . . institutionalization[.]" 42 U.S.C. §§ 12101(a)(2), (3)–(5).

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. As Congress instructed, the Attorney General issued Title II regulations, including an "integration regulation," directing that "[a] public entity shall administer services, programs, and activities in the *most integrated setting* appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). The most integrated appropriate setting is the "setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. Pt. 35, App. B at 703.

*Olmstead*, the landmark Supreme Court case defining a state's obligation to provide care in the most integrated setting, involved two women with psychiatric conditions who had a history of treatment in institutional settings. *See* 527 U.S. at 593. The women's treating physicians had determined that a community

28                      Opinion of the Court                    23-12331

setting would be appropriate for each one.  *See id.*  Despite these medical determinations, both women remained in an institutional setting for an additional two to three years (and one was not moved to a community setting until after the district court issued judgment in the case).  *See id.*

A majority of the Supreme Court held in Part III.A that "[u]njustified isolation . . . is properly regarded as discrimination based on disability."  *Id.* at 597.  The Court explained that "institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life," and that "confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment."  *Id.* at 600–01.  Accordingly, these assumptions result in dissimilar treatment because "[i]n order to receive needed medical services, persons with mental disabilities must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without mental disabilities can receive the medical services they need without similar sacrifice."  *Id.* at 601.[5]

---

[5] In *Olmstead*, a majority of Justices joined Parts I, II, and III.A of the main opinion. Justices Stevens and Kennedy filed separate concurring opinions.

23-12331                  Opinion of the Court                        29

The Court concluded that a person with disabilities must be placed in a community setting if:

> (1) the state's "treatment professionals have determined that community placement is appropriate";
>
> (2) "the transfer from institutional care to a less restrictive setting is not opposed by the affected individual"; and
>
> (3) "the placement can be reasonably accommodated, taking into account the resources available to the [s]tate and the needs of others with mental disabilities."

*Id.* at 587.  These three *Olmstead* criteria are referred to as (1) appropriateness, (2) non-opposition, and (3) reasonable accommodation.

### B. DISCUSSION

Again, we review legal conclusions *de novo* and factual findings for clear error.  *See Jones v. Governor of Fla.*, 975 F.3d 1016, 1028 (11th Cir. 2020) (en banc).

### 1. RISK OF INSTITUTIONALIZATION

Florida challenges whether the 1,800 children in community settings—as opposed to the approximately 140 institutionalized children—suffer the sort of harm that Title II and *Olmstead* address. That is, before reaching the three *Olmstead* criteria to determine whether institutionalization is unjustified (and thus constitutes disability discrimination), Florida asks us to hold that a risk of unjustified institutionalization is not discrimination under the ADA.

30                 Opinion of the Court              23-12331

Although Florida advances this argument as its first challenge to liability in its reply brief, in its opening brief it frames this argument as going to the scope of the injunction.  As a result, the liability argument that Florida has reframed in its reply brief is not properly before us.  We have repeatedly declined to review issues or arguments raised for the first time in a reply brief.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).  Such "arguments come too late."  *Id.* (citations omitted).

We note, moreover, that Florida's argument as to children at risk of institutionalization, even if accepted, does not affect the district court's liability findings and conclusions as to the 139 children who are institutionalized.  The court specifically found an *Olmstead* violation based on the families which testified their children were institutionalized "as a direct consequence of lack of PDN."  *Florida*, 682 F. Supp. 3d at 1212.  That is, children eligible for medical foster care were unnecessarily institutionalized because of Florida's lack of effort "to match specific children now in nursing facilities with parents."  *Id.* at 1219.

We also alternatively reject Florida's untimely at-risk liability argument on the merits as set out below.[6]

---

[6] Florida also argues that allowing at-risk children to prevail on an *Olmstead* claim runs afoul of Article III's requirement that an injury be certainly impending.  To be clear, we reject all three versions of this argument and endeavor not to "confuse [Florida's claims of] weakness on the merits with absence of Article III standing."  *Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n,*

23-12331               Opinion of the Court               31

Six of our sister circuits have allowed similar ADA claims by individuals at risk of institutionalization (but not yet institutionalized). *See Davis v. Shah*, 821 F.3d 231, 263 (2d Cir. 2016); *Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 460 (6th Cir. 2020); *Steimel v. Wernert*, 823 F.3d 902, 911 (7th Cir. 2016); *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599, 608, 615 (7th Cir. 2004); *M.R. v. Dreyfus*, 663 F.3d 1100, 1118 (9th Cir. 2011), *amended by* 697 F.3d 706 (9th Cir. 2012); *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003).  One has not.  *See United States v. Mississippi*, 82 F.4th 387, 393 (5th Cir. 2023) (holding that the risk of institutionalization was not an *Olmstead* violation).[7]

---

576 U.S. 787, 800 (2015) (alteration adopted) (internal quotation marks omitted).

[7] Judge Brasher says that we have overstated the circuit split.  We fail to follow the line that he draws—that is between whether a plaintiff can bring a pre-institutionalization *Olmstead* claim and whether a plaintiff can proceed with an *Olmstead* claim for injunctive relief based on inadequate community care causing a serious risk of institutionalization.  *See, e.g., Steimel,* 823 F.3d at 914–18 (allowing the plaintiffs to proceed past summary judgment in a suit for injunctive relief because "the integration mandate is implicated where the state's policies have either (1) segregated persons with disabilities within their homes, or (2) put them at serious risk of institutionalization").  We also believe we have counted the circuits correctly, and scholars agree with our math.  *See* Craig Ismaili, Adrienne Langlois, & Bren Pramanik, *Defending* Olmstead*: Strategies for Combatting Institutional Bias to Improve Access to Mental Health Services in the Least Restrictive Setting*, 34 Annals Health L. 139, 169 (2025) ("Six different circuits have allowed ADA/*Olmstead* claims based on the risk of institutionalization."); Zachary E. Shapiro, Chaarushena Deb, Caroline Lawrence, Allison Rabkin Golden, Jaclyn Wilner, Allison Durkin, Zoe M. Adams, Wenqing

32                    Opinion of the Court                    23-12331

For example, analyzing injury in the context of assessing irreparable harm for a preliminary injunction, the Ninth Circuit concluded that a regulation resulting in reduced home care hours "exacerbate[d]" the risk of institutionalization and "therefore inflict[ed] cognizable irreparable injury[.]" *M.R.*, 663 F.3d at 1111. And the Sixth Circuit explained that the fact that none of the three plaintiffs had been institutionalized during the course of the litigation "sa[id] nothing about whether [they] have been compelled to forgo necessary medical services in order to remain in the community during that time." *Waskul*, 979 F.3d at 461 (citation omitted). "Nor does it reflect on the actual imminence of Plaintiffs' institutionalization—indeed, that could happen at any moment that Plaintiffs are unable to sustain their own care." *Id.* *See also M.G. through Garcia v. Armijo*, 117 F.4th 1230, 1244–45 (10th Cir. 2024) (ruling that "a continued shortage of allotted PDN hours will very likely subject M.G. and C.V. to medical harm, institutionalization, or death" for the medically vulnerable child plaintiffs in a Medicaid Act case). We agree with the reasoning in these cases and the others setting out the majority view.

Moreover, we disagree with Florida's rigid reading of the ADA. *See* Reply Br. for Appellant at 1 ("Nothing in the ADA's text

---

Zhao, Keturah James, Adam Pan, Megan S. Wright, & Joseph J. Fins, Olmstead *Enforcements for Moderate to Severe Brain Injury: The Pursuit of Civil Rights Through the Application of Law, Neuroscience, and Ethics*, 95 Tul. L. Rev. 525, 569 (2021) (grouping *Pasby*, 709 F.3d at 322, and *Fisher*, 335 F.3d at 1881–82 with *M.R.*, 663 F.3d at 1102, to support the proposition that *Olmstead*'s "holding also protects individuals at risk of institutionalization").

23-12331                    Opinion of the Court                    33

supports the 'at risk' theory."). In our view, the text and structure of Title II (and *Olmstead*) confirm its applicability to the children currently in community care here. *See* 42 U.S.C. § 12132. As the Supreme Court has explained, Congress' use of broad language in Title II "demonstrates breadth" in its reach. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted). *See also* A. Scalia & B.A. Garner, Reading Law: The Interpretation of Legal Texts 101, 104–05 (2012) (utilizing Title II as an exemplar of the general-terms canon—the "traditional" principle of interpretation that provides "the presumed point of using general words is to procedure general coverage—not to leave room for courts to recognize ad hoc exceptions").[8]

Further, the statutory and regulatory innerworkings of Title II impose an obligation to at-risk children; a public entity must continually "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities[,]" while also ensuring those individuals are not excluded from, denied the benefits of, and discriminated against by its services and programs. *See* 28 C.F.R. § 35.130(d). *See also* 42 U.S.C. § 12132. We thus decline to read Title II to exclude disabled children, who are continually participating in these covered services, from *Olmstead*'s protection against undue

---

[8] Judge Brasher attempts to distinguish *Yeskey*. But we do not suggest that *Yeskey* is on all fours with this case; we cite *Yeskey*, 524 U.S. at 212, only for the proposition that Title II is broad in its reach.

34                    Opinion of the Court                    23-12331

institutionalization, and hold that the risk of institutionalization may constitute discrimination.

We also disagree with the reasoning in *Mississippi*, 82 F.4th at 392–98.    The Fifth Circuit's fundamental premise—that "[n]othing in the text of Title II, its implementing regulations, or *Olmstead* suggests that a risk of institutionalization, without actual institutionalization, constitutes actionable discrimination"—assumes that there must be statutory or constitutional provisions that contain a specific "at risk" clause enabling prospective relief to address imminent harm.  *See id.* at 392.  That is not the case.  Injunctive relief, both preliminary and permanent, is meant to prevent the occurrence of harms that the relevant statute prohibits.  *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The purpose of an injunction is to prevent future violations[.]") (citing *Swift & Co. v. United States*, 276 U.S. 311, 326 (1928)).

Whether a statute has rights-imbuing language is a separate question from whether a particular plaintiff has submitted proof of a substantial risk of imminent harm.  In other words, once we (or the Supreme Court) determine that a statute creates a right and remedy, there is no legal basis for imposing a distinct requirement that the text must specifically protect plaintiffs "at risk" of an imminent statutory violation beyond the confines of Article III.  That is why the law generally allows pre-enforcement challenges to imminent violations of statutory rights.  *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 374 (1982) (holding that the Fair Housing Act allows plaintiffs lacking "any intention of buying or renting a

23-12331               Opinion of the Court                    35

home" to sue discriminatory realtors for injunctive relief based on the "statutorily created right to truthful housing information"); *Honig v. Doe*, 484 U.S. 305, 321 (1988) (under the EHA (now the IDEA), a court may grant prospective relief based on the risk of future statutory violations where "the lack of a state policy governing local school responses to disability-related misconduct had led to, and would continue to result in, EHA violations"); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1158 (11th Cir. 2008) (allowing a pre-enforcement challenge to a Florida voter registration statute based, in part, on "statutory claims" under § 303 of HAVA, § 2 of the Voting Rights Act of 1965, Title I of the Civil Rights Act of 1964, and the National Voter Registration Act, in addition to constitutional claims). *Accord Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002) (in the Title III public accommodations context, "a plaintiff who is threatened with harm in the future because of existing or *imminently threatened non-compliance with the ADA*" may bring a claim) (emphasis added); *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 926 (5th Cir. 2023) (allowing "an as-applied pre-enforcement challenge to how RFRA interacts with Title VII and *Bostock*" to proceed). Thus, it is plain to us that a family need not wait until a child is institutionalized to sue for prospective relief to prevent Title II discrimination under *Olmstead* when that family can prove substantial risk of imminent harm.[9]

---

[9] Additionally, *Mississippi* is factually distinguishable. There, the Fifth Circuit said that "a theory framed on the 'risk of unjustified institutionalization' [was] particularly inapt" because the "only way to be admitted to a state mental health hospital in Mississippi is through a judicial commitment proceeding."

36                        Opinion of the Court                        23-12331

Finally, we see no clear error in the district court's factual findings regarding the risk of institutionalization and its holding that the United States established the threshold injury (i.e., harm) in this case. *See Florida*, 682 F. Supp. 3d at 1185, 1219–20. The medically complex children in question are on Medicaid. Their families—whose income is necessarily below the Medicaid threshold—tend to be in a financially precarious situation and face housing insecurity. *See id.* at 1199–1206. When skilled care workers (like nurses) do not show up, the parents must fill these care gaps themselves. *See id.* For those in or near poverty, this can be a particularly heavy burden; parents may miss shifts at work or be forced to give up their jobs. *See id.* at 1201–02, 1214. The lost income in turn can affect a family's ability to make rent, therefore placing its members at risk of eviction. For example, one mother testified that due to persistent gaps in PDN, she was forced to care for her son herself, causing her to miss work, which ultimately reduced her income to such an extent that she lost her home—and her son had to be placed in a nursing home. *See id.* at 1204–05. Given this evidence, it is difficult for us to understand Florida's broad contention that there is a discernible and manageable line between institutionalization and the risk of institutionalization. If the child described above had been provided resources when he was at risk of

---

82 F.4th at 393. Here, "[t]o admit a child to a nursing facility, Florida requires that a Children's Multidisciplinary Assessment Team (CMAT) meet, decide whether a child meets the level of care criteria for admission to a nursing facility, and if so, make a recommendation to admit the child." *Florida*, 682 F. Supp. 3d at 1209. No judicial determination is required.

23-12331                Opinion of the Court                        37

institutionalization, he likely would not have been institutional-ized.  Florida's crabbed view ignores the realities of life on the ground.

Moreover, certain medically vulnerable children—for exam-ple, those who require specialized care like breathing tubes—re-quire around-the-clock care or they may sustain significant injuries and even die.  One witness testified regarding a baby who had a tracheotomy and was supposed to receive 24-hour PDN.  Because of PDN staffing gaps, the mother was left alone with her baby.  Ac-cording to the witness, the mother left the room to do laundry, and when she returned, the baby had pulled his trach out, causing him to die.  *See id.* at 1213.  Another parent described staying awake all night, setting alarms every 15 to 20 minutes, to ensure that her daughter's trach remains in place and that she is still breathing.  *See id.* at 1201.

That so many of these families have found ways to keep their children at home—often at great personal sacrifice—does not lessen the imminence of the future risk they face.  Placing one's child in an assisted care facility is not a choice that families take lightly.  And, as set out earlier, some parents may justifiably fear that their children will face neglect at such a facility.

With only three facilities now open in Florida, children may end up hundreds of miles away from their families, making it diffi-cult for parents and relatives to visit.  Many parents have therefore made incredible and Herculean efforts to keep their children at home with them.  *See id.* at 1182.  Thus, Florida's failure to provide

38                        Opinion of the Court                        23-12331

consistent coverage and services forces some families to make the untenable choice between losing income to fill PDN gaps (which as noted may result in eviction) and placing their children in institutions. *Olmstead* applies to the at-risk children in this case.

Florida also invokes Article III's injury-in-fact requirement as to at-risk children. We conclude that this requirement was met.[10]

In a lawsuit seeking prospective relief, "[i]t need not be 'literally certain' that the injury will come about" so long as there is a "substantial" risk. *See In re Equifax*, 999 F.3d 1247, 1262 (11th Cir. 2021). *See also Murthy v. Missouri*, 603 U.S. 43, 69 (2024) (explaining that "substantial risk" is the relevant standard); *Dream Defs. v. Gov. of Fla.*, 57 F.4th 879, 888 (11th Cir. 2023) (finding that the plaintiffs satisfied the injury-in-fact requirement by showing a "substantial risk" of future harm). Thus, in *In re Equifax*, 999 F.3d at 1262, we had "no hesitation" in finding a substantial risk of harm where hackers had obtained the consumers' personal information, even

---

[10] Again, we note that Florida's arguments tend to conflate the standing question with the resolution of the merits. Whether the United States proved that there was "institutional isolation of persons with disabilities" is the cornerstone of the *Olmstead* injury. *See Olmstead*, 527 U.S. at 600. We nevertheless take seriously a plaintiff's obligation to show "the irreducible constitutional minimum of standing" to sue: injury-in-fact, causation, and redressability. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1991). These elements are "an indispensable part of the plaintiff's case" that "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id*. at 561. And so we address Florida's Article III argument.

though it was not certain that each specific consumer would be the victim of identity theft.

Florida's actions place children who are at home or in community settings at substantial risk of institutionalization. This risk is not hypothetical, nor does it rely on the "highly attenuated chain of possibilities" the Supreme Court rejected in *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013). *See also Murthy*, 603 U.S. at 70 (finding no cognizable injury where the future harm alleged relied on a "speculative chain of possibilities"). Based on the district court's well-supported factual findings, the United States satisfied the substantial risk standard. Given the strong incentives for families to keep their children in community settings and the testimony describing their heroic efforts to do so despite the strain placed on them by PDN shortages, the risk is not insubstantial.

### 2.  APPROPRIATENESS

Having established that the district court did not err as to the threshold *Olmstead* showing of institutionalization or the substantial risk of institutionalization, we turn to the three *Olmstead* criteria. We begin with appropriateness.

The Supreme Court majority in *Olmstead* explained that, in determining whether community-based care is appropriate for an individual, the state "generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program." 527 U.S. at 602 (majority opinion). With a parenthetical, the Court cited *School Board of Nassau County*

40                           Opinion of the Court                    23-12331

*v. Arline,* 480 U.S. 273, 288 (1987), for the proposition that "[c]ourts normally should defer to the reasonable medical judgments of public health officials."  The Court "emphasize[d] that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings." *Olmstead*, 527 U.S. at 601–02 (majority opinion).

The Court also noted that appropriateness can change over time.  For example, some people may temporarily need institutional care to "stabilize," while for others "no placement outside the institution may ever be appropriate." *Id*. at 605 (plurality opinion).

In his concurrence, Justice Kennedy cautioned that the ADA must not be "interpreted so that States had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision." *Id*. at 610 (Kennedy, J., concurring in the judgment).  He agreed with the plurality that "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference." *Id*.

The district court ruled that "appropriateness" refers to whether community placement would be medically appropriate for children, based on the specifics of their conditions, rather than other practical concerns like the current housing available to their families. *See Florida*, 682 F. Supp. 3d at 1221–22.  The court found that many "of [the] barriers that might exist to home

23-12331          Opinion of the Court                    41

placement . . . are outside the families' control but often within the State's control." *Id.* at 1221 (emphasis omitted).

For example, Florida's iBudget program, which is intended to help people with disabilities obtain medical equipment and accessibility adaptations for their homes and vehicles, has years-long waitlists that render it "useless" to many families. *See id.* The district court found that Florida's failure to provide adequate resources through its existing programs has helped create the housing conditions that Florida now claims render community placement inappropriate for the medically complex children. The court reasoned that "[i]t would defeat the purpose of the law if a defendant could use the effects of its discriminatory conduct against a plaintiff who is suing for discrimination." *Id.* An appropriateness analysis that relies on practical issues like housing details would render the process "overly subjective" and "unfair" because "families with less means who live in smaller homes are more likely to find that their children are not appropriate to live in the community." *Id.*

Florida contends that appropriateness means that the "actual care setting" the child would be moved to is appropriate to her needs, not just a "paper review of medical records." Br. for Appellant at 18, 22. For example, Florida points to a child whose mother rented a single room without sufficient space to accommodate her daughter as an example of someone for whom community-based care should not be deemed appropriate. *See* Reply Br. for Appellant at 5.

42                    Opinion of the Court                    23-12331

A plurality of the Supreme Court in *Olmstead* warned in dicta against a state discharging patients to "inappropriate setting[s], such as a homeless shelter[.]"  527 U.S. at 605 (plurality opinion). And Justice Kennedy, in his concurrence, said it would be unreasonable and tragic if the ADA were interpreted in a way that states "had some incentive, for fear of litigation, to drive those in need of medical care and treatment out of appropriate care and into settings with too little assistance and supervision."  *Id.* at 610 (Kennedy, J., concurring in the judgment).  But that one line from the *Olmstead* plurality—directed at the state's previous attempt to discharge one of the plaintiffs into a homeless shelter against her express wishes—represents the only time where the Court mentioned housing details with respect to appropriateness.

As the district court correctly discerned, the rest of the *Olmstead* analysis focuses on "determining whether *an individual* meets the essential eligibility requirements for habilitation in a community-based program."  *Id.* at 602 (majority opinion) (emphasis added) (internal quotation marks omitted).  The analysis focused on "persons who can handle and benefit from community settings"—rather than on persons whose families are currently equipped to provide an adequate setting themselves.  *See id.* at 600 (majority opinion).  The Court explained that the state "generally may rely on the reasonable assessments of its own professionals," and clarified in a parenthetical that it was referring to the medical judgments of State public health officials.  *See id.* at 602 (majority opinion) (citing *Arline*, 480 U.S. at 288).

23-12331               Opinion of the Court                    43

The district court here heeded Justice Kennedy's warning against pressuring states to discharge patients into "settings with too little assistance and supervision." *Olmstead*, 527 U.S. at 610 (Kennedy, J., concurring in the judgment). But it also appreciated his emphasis that "[t]he opinion of a responsible treating physician in determining the appropriate conditions for treatment ought to be given the greatest of deference." *Id.*

We agree with the district court that, in assessing appropriateness under *Olmstead*, a court must look to determinations made by medical providers based on a child's medical conditions. Community placement is deemed appropriate under *Olmstead* if the individuals in question "could live in the community with sufficient services for which they would be eligible." *Florida*, 682 F. Supp. 3d at 1221. Although a family's actual living situation may be (and often will be) relevant, it is not determinative on the matter of appropriateness, and we share the court's concern that under Florida's proposed standard states could decline to provide adequate services to enable otherwise eligible children to live in community settings, then use the lack of services to establish that community placement is inappropriate. *See id.* Indeed, the record suggests that the transition planning process, when administered properly, is designed to assist families who wish to do so in addressing barriers to safely bringing their eligible children back into a community setting, including housing-related issues. *See* D.E. 906 at 157–58, 213. Significantly, community-based care can also be provided outside a family's personal home, for example in a group home. *See Florida*,

44                   Opinion of the Court                23-12331

682 F. Supp. 3d at 1223 n.38.  So a family's home situation is not and cannot be dispositive as to appropriateness.

The district court made the factual determination that the institutionalized children are capable of community living, based on evidence that such children do not receive significantly more frequent attention from doctors than in a home setting; that the skill level for nurses who serve institutionalized and home care patients is the same; that trained parents can handle medical emergencies; that institutionalized children would benefit from community-based care; and the expert testimony that all 139 institutionalized children could be treated in a community setting if appropriate accommodations were made.  *See id.* at 1223–27.  We find no clear error in these individual or overall factual determinations.

Based on its factual findings, the district court concluded that appropriateness under *Olmstead* had been established in two ways. First, a number of institutionalized children had already been deemed eligible for community care, and a number of them had previously lived in community settings (but were institutionalized because Florida failed to provide adequate PDN staffing).  *See id.* at 1227.  As for the group of children at risk of institutionalization, they are currently receiving community care, meaning that this type of care is appropriate for them.  *See id.* at 1228.  *See also Radaszewski*, 383 F.3d at 608 ("There is little doubt that [the plaintiff] *can* be cared for appropriately at home; he has been receiving care at home since 1994[.]").  Second, the institutionalized children could live in community settings if Florida provided adequate

23-12331            Opinion of the Court                    45

services. *See Florida*, 682 F. Supp. 3d at 1228. We agree with the district court's reasoning on the first ground, and need not reach the second ground (though we doubt it was error).

### 3. NON-OPPOSITION

Next, we address non-opposition under *Olmstead*, which is meant to ensure that "the affected persons do not oppose" the transfer. *See Olmstead*, 527 U.S. at 607 (plurality opinion). This requirement is based on an ADA provision stating that "[n]othing in this chapter shall be construed to require an individual with a disability to accept an accommodation . . . which such individual chooses not to accept." 42 U.S.C. § 12201(d). *See also* 28 C.F.R. § 35.130(e)(1). The Supreme Court in *Olmstead* explained that community-based treatment need not "be imposed on patients who do not desire it." 527 U.S. at 602 (majority opinion) (citation omitted). The choice to leave an institution is the individual's and he or she "must be provided the option of declining." *Id.* (quoting 28 C.F.R. § 35.130(e)(1) & Pt. 35, App. A, p. 450).

The district court found that, in determining opposition or non-opposition, "[t]he relevant question is whether service recipients with disabilities would choose community-based services if they were actually available and accessible . . . not whether persons with disabilities (or, in this case, their parents or guardians) would accept discharge to the community today, with inadequate access to community-based services." *Florida*, 682 F. Supp. 3d at 1232. The court concluded that "[i]f a service recipient with disabilities would be open to choosing community based services if such

46                    Opinion of the Court                    23-12331

services were available and accessible, then that person is 'non-opposed' within the meaning of *Olmstead*." *Id.* at 1236.

In order to determine whether parents of currently institutionalized children generally opposed or did not oppose moving their children to community care settings, the district court relied on the testimony of three experts for the United States. Those experts conducted semi-structured interviews with 45 families of the 139 institutionalized children.[11]

Based on these interviews, the experts divided the families into four groups, finding that:

> (1) "many families [were] actively seeking to bring their children home" from the nursing facilities;

---

[11] Florida claims in a footnote that some of this expert testimony was hearsay because it presented a synthesis of out-of-court statements made by parents. But Florida does not cite any controlling or convincing authorities in support of its assertion, and caselaw explains that experts can rely on hearsay in forming their opinions. *See, e.g., Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1322–23 (11th Cir. 2022) ("Under Rule 703, an expert may rely on inadmissible evidence in forming his opinion, but the facts or data must be of the kind that 'experts in the particular field would reasonably rely on . . . in forming an opinion on the subject.'") (quoting Fed. R. Evid. 703); *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524–26 (5th Cir. 2013) (holding that the district court did not abuse its discretion in allowing an expert to testify relying on solely on an estimate made in an out-of-court statement). Florida does not explain why this principle is inapplicable here. Indeed, the district court overruled Florida's hearsay objection, explaining that the United States' expert applied her expertise to draw inferences from the families' statements. That evidentiary ruling was not an abuse of discretion.

23-12331                Opinion of the Court                    47

> (2) some families wanted their children home but felt appropriate home and community-based services were not sufficiently available to make this preference a reality;
>
> (3) some families were not opposed to their children transitioning to a community-based setting other than their own homes; and finally
>
> (4) one family was opposed to "transitioning their two children from a nursing facility[.]"

*See id.* at 1233 n.49 (internal citations omitted).  Thus, the United States' experts concluded that the institutionalized children's families "'overwhelmingly' do not oppose community placement for their children." *Id.* at 1233.

Florida asserted below that a number of parents who were interviewed signed Freedom of Choice forms indicating that they wanted their children to remain at a nursing facility.  The district court found this factual assertion unpersuasive, reasoning that checking a box on a form authorizing a child to remain in an institution does not constitute opposition, because this selection is motivated by the precise ADA violations being challenged here, including Florida's failure to provide adequate PDN and transition counseling.  *See id.* at 1235–36.

This factual finding was not clearly erroneous.  *See Messier v. Southbury Training Sch.*, 562 F. Supp. 2d 294, 331–32 (D. Conn. 2008) (finding that a survey asking parents if they would like their children to remain at a facility was not a proxy for opposition).  The district court reasoned that even if parents are not currently ready

48                         Opinion of the Court                    23-12331

to bring their child home due to personal circumstances outside of Florida's control, this does not mean that they are opposed to moving their child to community-based care. *See Florida*, 682 F. Supp. 3d at 1235–36. The court concluded that the "overall sentiment of the larger group of parents" constituted non-opposition to community-based care. *See id.* at 1236. And it noted that many families were actively in the process of getting their children discharged. *See id.*

We agree with the district court that if non-opposition required parents to accept immediate discharge to a home setting without adequate access to community-based services—the very violations asserted here—"it would defeat the purpose of the integration mandate." *Id.* at 1232. The ADA's implementing regulations require states to administer services in the most integrated setting appropriate to needs. *See* 28 C.F.R. § 35.130(d). If a state fails to provide adequate services to enable children to safely live at home, many families will understandably choose to keep their children in a nursing facility, even if they would prefer to bring them home.

These parents also cannot be deemed opposed to transfer because they would opt for community-based care if Florida were fully complying with the ADA—that is to say, if it were providing access to reliable PDN, effectively facilitating discharge, and providing complete and accurate information regarding community care options. *See* D.E. 907 at 203, 209, 229. As one district court has thoughtfully explained, "the *meaningful* exercise of a

preference will be possible only if an adequate array of community services are available." *Kenneth R. v. Hassan*, 293 F.R.D. 254, 270 n.6 (D.N.H. 2013) (emphasis in original).

We therefore concur with the district court that "[i]f a service recipient with disabilities would be open to choosing community based services if such services were available and accessible, then that person is 'non-opposed' within the meaning of *Olmstead*." *Florida*, 682 F. Supp. 3d at 1236. And we find no clear error in the court deeming unopposed those parents who would choose community care if adequate state services were available to them. That finding is plausible in light of the record. *See Cooper*, 581 U.S. at 293.

But we conclude that the district court clearly erred when it deemed unopposed those parents who, even if Florida provided adequate services, would still be opposed to transfer for unrelated, personal reasons. Although nearly all of the interviewed families expressed a desire to eventually discharge their children, three said they would still opt for their child to remain in a nursing home even if they had assurance that they would receive adequate community-based services. *See, e.g.,* United States' Ex. 5219; United States' Ex. 5229. The position of these families constitutes opposition, and the United States concedes this point. *See* Br. for Appellee at 20–21 ("[O]pposition is established when parents do not want their child transferred for personal reasons that would control even

50                     Opinion of the Court                 23-12331

if Florida provided all community-based services sought in a law-
suit.").[12]

     This leaves us with the question of whether, applying the
proper legal standard and deeming parents who would reject com-
munity care even if provided with adequate state services to be op-
posed, the non-opposition element is satisfied.  *Olmstead* provides
no guidance regarding group consensus, as that case involved just
two individuals, whereas this case involves 139 institutionalized
children and 1,800 children at risk of institutionalization.  *Compare
Olmstead*, 527 U.S. at 588, *with Florida*, 682 F. Supp. 3d at 1182.  Our
sister circuits have not addressed this question directly, for non-op-
position has been an uncontested issue in the majority of cases.  *See,
e.g.*, *Davis*, 821 F.3d at 263; *Pashby*, 709 F.3d at 322; *Waskul*, 979 F.3d
at 460; *Steimel*, 823 F.3d at 911; *M.R.*, 663 F.3d at 1118; *Fisher*, 335
F.3d at 1181.  Where circuits have discussed this issue, it has been
in the context of class certification.  *See Ligas ex rel. Foster v. Maram*,
478 F.3d 771, 775 (7th Cir. 2007) (analyzing a group where some
individuals opposed discharge and others did not in the context of
class certification); *Benjamin ex rel. Yock v. Dep't of Pub. Welfare of Pa.*,
701 F.3d 938, 949 (3d Cir. 2012) (same).

     District courts which have analyzed non-opposition in a het-
erogenous group have not required unanimity.  One example is
*Disability Advocates, Inc. v. Paterson*. 653 F. Supp. 2d 184, 262–63
(E.D.N.Y. 2009) (finding the non-opposition prong satisfied where

---

[12] Judge Brasher does not seem to acknowledge our ruling on this point.

23-12331                 Opinion of the Court                          51

56% of residents expressed a desire to move to community care
and the district court found that more would be deemed non-op-
posed if adequate services were provided), *vacated on other grounds
sub nom. Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Liv-
ing, Inc.*, 675 F.3d 149 (2d Cir. 2012). *See also Messier*, 562 F. Supp.
2d at 332–34, 339–42 (finding the plaintiffs not opposed to commu-
nity services where the majority, but not all, of the guardians ex-
pressed "interest" in, or would consider, community placement).

Looking to the group of children as a whole requires us to
consider the families of both currently institutionalized children
*and* children at risk of institutionalization. *Olmstead*, as noted, did
not address at-risk individuals. *See Olmstead*, 527 U.S. at 593. But
the central holding of *Olmstead* was that the ADA requires states to
provide community-based treatment *unless* any one of three situa-
tions applies (medical professionals deem community-based care
inappropriate; the affected individuals oppose community-based
treatment; or the care cannot be reasonably accommodated). This
holding therefore encompasses those children who receive some—
and whose families are seeking adequate provision of—commu-
nity-based treatment. Implicit in our sister circuits' overwhelming
affirmation that these at-risk individuals can bring an *Olmstead* chal-
lenge is the determination that these families can be deemed unop-
posed to community-based treatment. *See Davis*, 821 F.3d at 263;
*Pashby*, 709 F.3d at 322; *Waskul*, 979 F.3d at 460; *Steimel*, 823 F.3d at
911; *M.R.*, 663 F.3d at 1118; *Fisher*, 335 F.3d at 1181. *Contra Missis-
sippi*, 82 F.4th at 393. Were we to exclusively consider the families
of currently institutionalized children and find them opposed as a

52                    Opinion of the Court                    23-12331

group—a matter we need not address—we would deny relief for those families fighting to keep their children at home or in a community setting despite Florida's failure to provide adequate community-based treatment as mandated by the ADA—simply because those families had not yet ceded to the pressures to place their children in institutions.  This result would be both inconsistent with *Olmstead* and untenable.

The 1,800 families who have opted to keep their children in community care despite the many challenges (including inadequate and unreliable PDN) are properly deemed to "not oppose [community-based] treatment[.]" *Olmstead*, 527 U.S. at 607.  These families—along with the seven children who have been institutionalized due to inadequate in-home nursing, the families currently in the process of getting their children discharged, the two families amenable to placing their children in a "community dwelling" other than their own home, and the many families which would not oppose bringing their families home were they to receive adequate state services—constitute a majority.  The district court did not clearly err in concluding that the great majority of parents are not opposed to community-based treatment.  *See Florida*, 682 F. Supp. 3d at 1232.[13]

---

[13] The parties dispute the precise number of families which face personal barriers to transfer that would not be surmounted even if Florida were to provide adequate services.  The United States' expert, Dr. Amy Houtrow, identified—based upon her interviews of a sample of 45 families of institutionalized children—only one family that was opposed to its child receiving community-based care.  *See Florida*, 682 F. Supp. 3d at 1233 n.49.  Florida argues, however,

23-12331                    Opinion of the Court                         53

That the group of nearly two thousand families is not unanimous in its non-opposition does not concern us for purposes of *Olmstead*.  The non-opposition prong of *Olmstead* ensures that individuals not be forced out of institutions should they prefer to stay.  *See Olmstead*, 527 U.S. at 602 (majority opinion); *id*. at 610 (Kennedy, J., concurring in the judgment).  The majority's language reflects that the non-opposition element is met where "the transfer from institutional care to a less restrictive setting is not opposed *by the affected individual[s.]*"  *Id*. at 587 (majority opinion) (emphasis added).  *See also id*. at 607 (plurality opinion) (describing non-

---

that Dr. Houtrow erroneously deemed "un-opposed" 18 of the 45 families who cited housing—a factor Florida says is outside of its control—as their reason for not seeking to bring their children home.  *See* Br. for Appellant at 26; Reply Br. for Appellant at 7–8.  Assuming that Florida is correct that these families would oppose transfer even if they received adequate state services like housing assistance through Florida's iBudget program, this would mean that roughly 40% of families of the 140 institutionalized children were improperly deemed un-opposed.  These families, along with the one family that Dr. Houtrow deemed opposed for other reasons, *see Florida*, 682 F. Supp. 3d at 1233 n.49, would make 57 opposed families out of 140 (just over 40%).  This number is still less than 3% of the families affected by Florida's allegedly inadequate provision of community-based services (the families of the approximately 140 institutionalized children and over 1,800 children at risk of institutionalization at the time of trial), whose stances we must also take into account.  *See id*. at 1182.  So, even accepting Florida's contention, about 60% of families of currently institutionalized children and 97% of all affected families (of both currently institutionalized and at-risk children) remain unopposed to community-based care—a majority of the first group, and an overwhelming majority of the latter.  The district court's finding that most families were not opposed to community-based services is therefore plausible even if we accept Florida's contention.  *See Cooper*, 581 U.S. at 293.

54                     Opinion of the Court                23-12331

opposition as where "*the affected persons* do not oppose such treat-ment") (emphasis added).

To prove its case, the United States needed to show only that Florida is violating *Olmstead* for some families whose children are institutionalized or at risk of being institutionalized. The United States did not need to prove that Florida violated *Olmstead* with respect to every single family and/or individual.[14]

As the district court rightly noted, the decisions of families which choose to place their children in nursing facilities "should be honored and supported." *Florida*, 682 F. Supp. 3d at 1226. But providing relief for the majority of families who wish to care for their children in community settings would not require discharge for those who oppose community care. *See Benjamin ex rel. Yock*, 701 F.3d at 949 (finding that the relief enabling a choice of commu-nity placement to unopposed patients did not warrant intervention by those who were opposed); *Benjamin v. Dep't of Pub. Welfare of Pa.*, 432 F. App'x. 94, 98 (3d Cir. 2011) (same). Indeed, nothing in the court's decision or injunction requires such parents to transfer their children from nursing facilities if they prefer to keep them there.

One final note on the non-opposition element. Citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011), Judge Brasher contends that the United States' proof of non-opposition trans-formed this case into a "trial by formula." Florida, however, does

---

[14] Of course, the relative number of non-opposed families can impact the ap-propriate relief.

23-12331                Opinion of the Court                      55

not make this argument in its brief.  In our adversarial system, we decline to raise and address *sua sponte* a non-jurisdictional issue that a party has not presented to us.  *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025).  In any event, an expert may extrapolate information from qualitative samples and surveys.  *See U.S. Pat. & Trademark Off. v. Booking.com B.V.*, 591 U.S. 549, 561 n.6 (2020); *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, 716 F.2d 833, 844 (11th Cir. 1983).  Sampling is far different from the formula used to calculate class recovery described in *Dukes*, 564 U.S. at 367.

### 4. REASONABLE ACCOMMODATION

We now address the reasonable accommodation prong of *Olmstead*.  Public entities must make reasonable modifications when necessary to avoid discrimination (including unnecessary institutionalization), unless "the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).  "Sensibly construed, the fundamental-alteration component of the reasonable-modifications regulation . . . allow[s] the [s]tate to show that, in the allocation of available resources, immediate relief for the plaintiffs would be inequitable, given the responsibility the [s]tate has undertaken for the care and treatment of a large and diverse population of persons with mental [or physical] disabilities."  *Olmstead*, 527 U.S. at 604 (plurality opinion).

We begin by assessing whether the United States established reasonable accommodations that are necessary.  The United States' expert, Dr. Bachman, identified a number of possible accommodations to address gaps in PDN service—that Florida "(1) conduct

56                    Opinion of the Court                    23-12331

more robust data collection and analysis, (2) investigate what kinds of network adequacy standards would improve access to PDN, and (3) examine reimbursement rates." *Florida*, 682 F. Supp. 3d at 1237. The United States also suggested accommodations related to care coordination, the iBudget waiver program, medical foster care, and overall monitoring and accountability. *See id.* at 1239–40.

If a state "were to demonstrate that it had a comprehensive, effectively working plan for placing qualified persons with mental [or physical] disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the [s]tate's endeavors to keep its institutions fully populated, the reasonable-modifications standard would be met." *Olmstead*, 527 U.S. at 605–06 (plurality opinion). Like the D.C. Circuit, we think the *Olmstead* plurality's formation of the fundamental alteration defense "makes good sense," and we apply it here. *See Brown v. District of Columbia*, 928 F.3d 1070, 1077–78 (D.C. Cir. 2019). Once treatment professionals have determined that community placement is appropriate, and a less restrictive setting is not opposed by the affected family or individual, and the plaintiff proposes an accommodation to remedy the violation, the burden shifts to the state to show that the proposed accommodation is unreasonable. *See id.* at 1077–78.

The district court found that the United States had met its initial burden of establishing that its suggested accommodations were reasonable, because they "call for expanding access to State services that already exist, and for using existing State programs and tools of program administration to expand such access."

23-12331                  Opinion of the Court                       57

*Florida*, 682 F. Supp. 3d at 1241 (citing *United States v. Mississippi*, 400 F. Supp. 3d 546, 576 (S.D. Miss. 2019) (finding provision of community-based services reasonable where United States showed that the state "already has the framework for providing the[] services and can more fully utilize and expand that framework to make the services truly accessible")).  This determination was consistent with Justice Kennedy's observation in *Olmstead* that "a state may not be forced to create a community-treatment program where none exists." *Olmstead*, 527 U.S. at 613 (Kennedy, J., concurring in the judgment).

The district court found these proposed modifications to be inherently reasonable because they "comport with Florida's own standards and obligations[,]" including Florida's obligation under Medicaid law to "make medically necessary services accessible to all Medicaid-enrolled children with medical complexity[.]" *Florida*, 682 F. Supp. 3d at 1241 (citing 42 U.S.C. §§ 1396a(a)(43), 1396d(a), (r)(5)).  *See also Henrietta D. v. Bloomberg*, 331 F.3d 261, 280–81 (2d Cir. 2003) (finding that modifications that align with the jurisdiction's own stated plans and obligations are reasonable); *Messier*, 562 F. Supp. 2d at 344–45 (same).  As discussed in greater detail below in the context of the injunction, the court made numerous factual findings suggesting that each of these accommodations is necessary to prevent unnecessary institutionalization and facilitate discharge from institutions.[15]

---

[15] As discussed later, we express uncertainty as to whether the statutory provisions cited by the district court require delivery of 100% of PDN.

58                       Opinion of the Court                    23-12331

We agree with the district court that the United States met its initial burden to identify a reasonable, necessary accommodation—a burden that is not a "heavy one." *Henrietta D.*, 331 F.3d at 280.  And we concur with our sister circuits that where appropriateness and non-opposition are established, the requested accommodations are presumed to be reasonable unless the state establishes a fundamental alteration defense.  *See Brown*, 928 F.3d at 1077 ("[T]he State bears the burden of proving the unreasonableness of a requested accommodation once the individual satisfies the first two [*Olmstead*] requirements[.]"); *Steimel*, 823 F.3d at 914–16 (if a disabled individual desires community-based treatment and medical professional determines that such placement is appropriate, "[i]t is the state's burden to prove that the proposed changes would fundamentally alter their programs"); *Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003) ("Because [the State] does not allow [the disabled individual] to receive the services for which he is qualified in a community-based, rather than nursing home, setting, [the disabled individual] can prove that the [State] has violated Title II of the ADA, unless [the State] can demonstrate that provision of community-based services to [him] and members of the class would fundamentally alter the nature of the services [it] provides.").  We reserve a detailed analysis of whether each of the proposed accommodations is warranted for our discussion of the permanent injunction.

Next, we assess whether Florida established that these accommodations constituted a fundamental alteration.  Again, the fundamental alteration defense requires the state "to show that, in

23-12331                Opinion of the Court                    59

the allocation of available resources, immediate relief for the plain-tiffs would be inequitable, given the responsibility the State has un-dertaken for the care and treatment of a large and diverse popula-tion of persons with mental [or physical] disabilities." *Olmstead*, 527 U.S. at 604 (plurality opinion). The Supreme Court in *Olmstead* ex-plained that a state could, for example, establish a fundamental al-teration by showing a "comprehensive, effectively working plan," and "a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated[.]" *Id.* at 606–07 (plurality opinion). *See also Sanchez v. Johnson*, 416 F.3d 1051, 1067–68 (9th Cir. 2005) (concluding that California had estab-lished a fundamental alteration defense by demonstrating an "a comprehensive deinstitutionalization scheme" with "a reasonable rate" of deinstitutionalization); *Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 621 (9th Cir. 2005) (holding that Washington had es-tablished a fundamental alteration defense by demonstrating a "commitment to deinstitutionalization [that] is . . . genuine, com-prehensive and reasonable[.]") (internal quotation marks omitted); *Frederick L. v. Dep't of Pub. Welfare of Pa.*, 422 F.3d 151, 158–59 (3d Cir. 2005) (ruling that Pennsylvania had failed to establish a funda-mental alteration defense where its deinstitutionalization plan lacked metrics, was not being timely implemented, and the state offered only "general assurances and good faith intentions to effec-tuate deinstitutionalization").

At summary judgment, the district court found that the United States' requests that Florida seek additional iBudget waivers and eliminate the parental rights requirement for Medical Foster

60                    Opinion of the Court                    23-12331

Care constituted a fundamental alteration.  Significantly, Florida chose not to present a fundamental alteration defense at trial for the remaining modifications the United States sought.

In its post-trial briefing on remedies, Florida argued that the United States did not disclose the proposed modifications during discovery or trial, and thus denied it an opportunity to prove that these modifications would cause a fundamental alteration.  The district court, however, found that Florida had "ample opportunity to present a substantial modification defense" and chose not to do so, and alternatively concluded that none of the United States' proposed remedies fundamentally altered the State's programs.  *See Florida*, 682 F. Supp. 3d at 1242.  We discern no error in the district court's first conclusion and need not address the second.  "A defendant can forfeit an affirmative defense by failing to raise it, and '[a]n affirmative defense, once forfeited, is excluded from the case.'" *Patel v. Hamilton Med. Ctr., Inc.*, 967 F.3d 1190, 1195 (11th Cir. 2020) (quoting *Wood v. Milyard*, 566 U.S. 463, 470 (2012)).[16]

Florida complains that it did not know with sufficient specificity what the United States would be seeking in terms of a remedy.  Florida contends that several portions of the injunction—

---

[16] Florida has made no attempt to show "that one of our *Access Now* forfeiture exceptions applies." *United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc). *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1332 (11th Cir. 2004).  Moreover, if Florida views the fundamental alteration defense as a remedial defense rather than a liability defense, we note that Florida never asked to present evidence during the post-trial, remedial briefing stage to meet its burden.

23-12331                Opinion of the Court                61

including those relating to minimum PDN delivery, care coordina-
tion, and the transition planning process—were not mentioned at
trial. But, as the district court correctly noted, *see Florida*, 682 F.
Supp. 3d at 1242, Florida conflates the reasonable accommodation
issue with the analysis of the appropriateness of the specific injunc-
tive relief ordered.  The two are not equivalent.  In an ADA case,
the plaintiff first bears the burden of proposing a reasonable modi-
fication that is necessary to avoid discrimination on the basis of dis-
ability.  *See Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d
1259, 1266 (11th Cir. 2019); 28 C.F.R. § 35.130(b)(7).  If the request
is "facially reasonable," the burden shifts to the defendant (here
Florida) to prove that the accommodation would result in a funda-
mental alteration of its program.  *See Schaw*, 938 F.3d at 1266.  If the
court determines that the plaintiff has established a reasonable
modification and the state has not established that the accommo-
dation is a fundamental alteration, liability has been established and
the court may then craft an appropriate remedy.  *See Brown*, 928
F.3d at 1083 n.10.

The accommodations initially requested by the United
States addressed, albeit with less specificity than the ultimate in-
junction, all of the types of remedies ultimately addressed in the
injunction: gaps in PDN service, shortfalls in care coordination, and
overall monitoring and accountability.  And the central provision
of the injunction—the requirement to deliver 90% of authorized
and desired PDN—was a "central issue in the case from the begin-
ning." *Florida*, 682 F. Supp. 3d at 1242.  The district court correctly
observed that these initial requests provided sufficient information

62                    Opinion of the Court                    23-12331

"to put [Florida] on notice and enable it to plan its defense," even though the injunction was more detailed. *See id.*

We therefore conclude that Florida had ample opportunity to establish a fundamental alteration defense at trial, but opted not to do so, thereby forfeiting the defense. We also reject the argument that the United States was relieved of any evidentiary burden to establish the reasonableness of its proposed accommodations because it amply supported its proposals with trial testimony and evidence.

## IV. THE INJUNCTION

Next, we address the appropriateness of the injunction's various provisions. We primarily affirm the district court's injunction, but we vacate Part III.B, partially vacate Parts IV.A and V.A.2, and vacate a portion of the order appointing the monitor (the portion that modifies Parts VI.C and VI.D).

As noted, we review injunctions for abuse of discretion. *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1096 (11th Cir. 2004). "The abuse of discretion standard allows a range of choices for the district court, so long as any choice made by the court does not constitute a clear error of judgment." *Collegiate Licensing Co. v. Am. Cas. Co. of Reading*, 713 F.3d 71, 77 (11th Cir. 2013) (citation omitted).

### A. SYSTEM-WIDE INJUNCTIVE RELIEF

In order to prescribe system-wide injunctive relief, a court must find that the violations are widespread or pervasive. *See Lewis*

23-12331               Opinion of the Court                    63

*v. Casey*, 518 U.S. 343, 349, 359 (1996); *Doe 1–13 by & through Doe, Sr. 1–13 v. Chiles*, 136 F.3d 709, 722 n.23 (11th Cir. 1998). The district court here held that a "serious risk" of institutionalization is actionable and found Florida's ADA violations (including those as to institutionalized children) to be widespread. *See Florida*, 682 F. Supp. 3d at 1212–19.

Florida contends that its statutory violations were not widespread enough to justify systemwide relief under *Lewis*, 518 U.S. at 359. It argues that while unjustified institutionalization violates the ADA, placing children at risk of institutionalization does not. It reasons that because only seven to nine children have been institutionalized over the past ten years due to inadequate services, there is no widespread violation.

As discussed earlier, although we have yet to address this issue, six of our sister circuits have concluded that Title II and its accompanying integration regulation prohibit not only the unnecessary institutionalization of individuals with disabilities, but also the "serious risk" of such institutionalization. *See Davis*, 821 F.3d at 263; *Pashby*, 709 F.3d at 322; *Waskul*, 979 F.3d at 460–61; *Steimel*, 823 F.3d at 914; *M.R.*, 697 F.3d at 734–35; *Fisher*, 335 F.3d at 1181–82. Only the Fifth Circuit has broken from this consensus. *See Mississippi*, 82 F.4th at 392. We reiterate that we agree with the majority view that because states "shall administer services" in the "most integrated setting appropriate to the needs of qualified individuals with disabilities," 28 C.F.R. § 35.130(d), and this mandate does not require institutionalization as a prerequisite to

64                    Opinion of the Court                    23-12331

enforcement, this legal obligation extends to families regardless of
whether their children are in nursing facilities or community-based
care. *See Davis*, 821 F.3d at 263; *Radaszewski*, 383 F.3d at 607–08,
611, 614–15.[17]

The Supreme Court in *Olmstead* concluded that unnecessary
institutionalization is a form of unlawful discrimination because
"to receive needed medical services," individuals with disabilities
must "relinquish participation in community life they could enjoy
given reasonable accommodations," while persons without disabil-
ities "can receive the medical services they need without similar
sacrifice." 527 U.S. at 601 (majority opinion).  This is precisely the
prospect faced by families which do not receive adequate PDN. *See
Waskul*, 979 F.3d at 460 (explaining that children at serious risk of
unnecessary institutionalization face discrimination because, un-
like children without disabilities, they must "choose between for-
going necessary medical services while remaining in the commu-
nity or receiving necessary medical services while institutional-
ized").  The ADA's integration mandate's "protections would be
meaningless if plaintiffs were required to segregate themselves by
entering an institution before they could challenge an allegedly

---

[17] Some of our sister circuits' opinions relied in part on Department of Justice
guidance interpreting the ADA's integration mandate and accompanying reg-
ulations, *see, e.g.*, *Pashby*, 708 F.3d at 322.  We need not decide whether this
guidance is entitled to any deference, because we agree with other aspects of
our sister circuits' reasoning.

23-12331               Opinion of the Court                    65

discriminatory law or policy that threatens to force them into seg-regated isolation." *Fisher*, 335 F.3d at 1181.

Again, Florida contends that the violations are not wide-spread because the United States presented evidence of only seven to nine children (out of 1400) who have been institutionalized over the past ten years due to the inadequate services. Florida suggests that only those seven to nine families are entitled to relief because there is no evidence that other families face this same risk. But, as we explained when addressing standing, the fact that families have found ways to keep their children at home—often at great personal sacrifice—does not lessen their future risk. Florida's assertion that trained parents can provide a similar level of care as PDN nurses fundamentally misunderstands the reality that many of these par-ents face. When PDN nurses fail to show up, parents often need to call out of work in order to stay home and care for their chil-dren—causing them to lose income and even their jobs. *See Florida*, 682 F. Supp. 3d at 1199–1205, 1214. Inconsistent PDN places some families in the untenable position of choosing between continuing to miss work to supplement gaps in home care—thereby losing out on income and potentially facing eviction—and sending their child to a nursing home where state-funded care is more reliable. *See id.* We have no trouble in concluding that these children face a serious risk of institutionalization. *See* Section III.B.1.

The evidence demonstrated that 94% of families receive less PDN than authorized and 25% receive less than 60% of authorized hours. *See id.* at 1210–11. There was also the evidence that at least

66                          Opinion of the Court                    23-12331

seven to nine children have been institutionalized for this reason, and that at least two children's transfers to community-based care were delayed due to the lack of PDN.  This evidence, taken together, leads us to conclude the district court did not clearly err in finding these violations to be widespread and thus meriting system-wide relief.[18]

### B.  BREADTH OF THE INJUNCTION
#### 1.  PART II: PRIVATE DUTY NURSING

The first substantive section of the injunction (Part II) addresses gaps in PDN coverage.  As discussed above, the district court made a number of factual findings about how private duty nursing (PDN) impacts children with medical complexity.[19]

The district court credited expert testimony from the United States stating that almost 94% of the children with medical complexity received fewer PDN hours than they were authorized to receive—70–80% of their authorized hours on average, with 25% of

---

[18] Relatedly, Florida argues that as a "matter of Article III standing," the district court ordered the accommodations without evidence of redressability.  *See* Br. for Appellant at 30–34.  This contention simply reformulates the requirement that the court fashion the injunctive relief such that it is specifically tailored "to protect the interests of the parties."  *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (citing *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984)).  Thus, while we don't doubt the United States' satisfaction of the constitutional minimums for Article III standing, whether the ordered relief redresses the harms proved at the liability stage is encompassed by our discussion of each provision of the injunction and its evidentiary support.

[19] Part I of the injunction provides definitions.

23-12331  Opinion of the Court  67

the children receiving less than 60% of their authorized PDN hours. Four of the families who testified at trial had children who "were institutionalized for some period of time as a direct consequence of lack of PDN." *Florida*, 682 F. Supp. 3d at 1212. Two other children experienced delays in discharge from nursing facilities due to a lack of PDN. The director of nursing from one of the facilities, Sabal Palms, testified that three of the children were at the facility "as a direct result" of the lack of reliable PDN, and "confirmed that the lack of around-the-clock nursing was the biggest obstacle to discharging children with a medical complexity home." *Id.* Finally, one care coordinator recounted the story of a baby who had died as a consequence of inadequate PDN.

The district court concluded that inadequate PDN is both "a significant factor that places children with medical complexity who are living at home at risk of entering a nursing facility" and "the main impediment to children leaving nursing facilities[.]" *Id.* at 1210.

To remedy PDN gaps, Part II of the injunction requires Florida to:

A. Ensure that 100% of children receive 90% of authorized PDN hours, the "minimally necessary PDN for integration";

B. Collect data on PDN authorized, delivered, refused, not delivered due to hospitalization, and reimbursement rates;

68                     Opinion of the Court                  23-12331

   C. Collect data on nurses providing PDN, where they are lo-
      cated, and with whom they work;[20]

   D. Consider using the below optional tools to ensure the pro-
      vision of 90% of authorized PDN hours:

      (1) Raise fee-for-service PDN reimbursement rates;

      (2) Require managed-care organizations to pay providers
          minimum PDN reimbursement rates;

      (3) Require managed-care organizations to satisfy net-
          work adequacy standards that accurately reflect how
          many providers and private duty nurses are needed to
          provide 90 of PDN to all enrolled children;

      (4) Require providers to pass PDN reimbursement rate
          increases on to their private duty nurses; and

      (5) Incentivize providers to work together in delivering
          shares of the same PDN Child's PDN hours.

   E. Continue to authorize services deemed medically necessary
      under the existing definition;

---

[20] The district court struck this requirement on October 11, 2024, noting that
"[b]arely half of the providers responded, rendering the data virtually useless."
D.E. 1227 at 7.  The court expressed frustration that Florida lacked "strong
motivation or effort . . . to focus on better data collection procedures, despite
the very serious lapses that became apparent during trial" and concluded that
continuing to require Florida "to gather incomplete information that it ulti-
mately can't or won't utilize is wasteful." *Id.* at 8.

23-12331                Opinion of the Court                69

    F.  Extend the above requirements to any child in a nursing fa-
cility who is moved to a community setting during term of
injunction.

Florida contends that this provision as to PDN is overbroad
and violates federalism principles by improperly "coerc[ing] Flor-
ida into seeking appropriations" to increase pay for PDN nurses.
*See* Br. for Appellant at 45.  But the injunction allows Florida to use
any tools to attain the 90% benchmark, and provides a number of
possible methods, including incentivizing providers to work to-
gether in delivering shares of the same PDN Child's PDN hours.
Even if the injunction pressured Florida to seek an appropriation,
this would not necessarily violate federalism principles.  *See Milli-
ken v. Bradley*, 433 U.S. 267, 288–91 (1977) (holding that an injunc-
tion requiring a state to expend funds prospectively to comply with
federal law was consistent with federalism principles).  Nor do in-
adequate funds excuse a state's violation of federal law.  *See Doe 1-
13*, 136 F.3d at 722.  As the Seventh Circuit explained, in the context
of the fundamental alteration defense, allowing increased expendi-
tures alone to justify ADA noncompliance "would eviscerate the
integration mandate."  *Steimel*, 823 F.3d at 915.  *See also Fisher*, 335
F.3d at 1183 ("If every alteration in a program or service that re-
quired the outlay of funds were tantamount to a fundamental al-
teration, the ADA's integration mandate would be hollow in-
deed.").

Florida's legislature has already "recognized the need to im-
prove the delivery of [private-duty nursing] and attempted to take

70                    Opinion of the Court                    23-12331

steps to address it." D.E. 117 at 4. *See Florida*, 682 F. Supp. 3d at 1246. This portion of the injunction is therefore aligned with state goals, which reduces federalism concerns. *See Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 822 F.3d 1037, 1045 (9th Cir. 2016) (explaining that, in crafting injunctive relief, "federal courts have often looked to a state's own policies for guidance because 'appropriate consideration must be given to principles of federalism'") (quoting *Rizzo v. Goode*, 423 U.S. 362, 379 (1976)).

Florida also argues that the United States failed to establish that the mandate to provide children 90% of all authorized and desired PDN hours is achievable and failed to specify how it could achieve this goal. *See* Br. for Appellant at 48 (citing *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1532 (11th Cir. 1996)). Florida suggests that the injunction is not achievable because there is a nursing shortage. The problem for Florida is that the district court found that both sides' experts agreed that the national nursing shortage was not responsible for Florida's gaps in providing PDN. *See Florida*, 682 F. Supp. 3d at 1211; D.E. 908 at 105–09; D.E. 897 at 42.

Moreover, the district court did not abuse its discretion by leaving it up to Florida how to achieve the mandate and listing possible methods. Indeed, this flexibility demonstrates a respect for federalism principles. As for achievability, the district court noted that the state's own contracts already require 100% provision of PDN. *See Florida*, 682 F. Supp. 3d at 1242, 1246. *See also* D.E. 965-1 at 133 (providing that the Sunshine State Health Plan Inc. must meet certain network adequacy standards, including to "[t]ake

23-12331                    Opinion of the Court                    71

necessary action to ensure that all medically necessary covered services are provided to the enrollee with reasonable promptness"). Again, the district court credited Dr. Bachman's testimony (agreed to by Florida's expert) that "a national nursing shortage is not primarily responsible" for PDN gaps in Florida, and found that children with medical complexity already receive 70–80% of authorized private-duty-nursing hours on average.  *See Florida*, 682 F. Supp. 3d at 1211, 1243 n.55.  And as the United States notes, three managed-care plans have succeeded in delivering an average of 84–89% of authorized hours.  Florida has failed to convince us that compliance is unachievable.[21]

---

[21] The district court also stated that federal Medicaid laws require Florida to provide *all* medically necessary services to these children.  Although the parties stipulated that the statutory provisions cited by the court require Florida to "cover all" medically necessary PDN, *see* D.E. 840, Pretrial Stip., VI ¶ 6, we cannot readily identify a statutory requirement that the state ensure that *100%* of the PDN that the state covers (i.e., pays for) is ultimately delivered.  *See* 42 U.S.C. § 1396a(a)(43) (providing that, for children, a "State plan for medical assistance must . . . arrang[e] for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services"); § 1396d(a) (defining the term "medical assistance"); § 1396d(r)(5) (defining the term "early and periodic screening, diagnostic, and treatment services").  As Florida points out, 42 U.S.C. § 1396a(a)(30)(A), which applies to Medicaid recipients generally rather than children specifically, provides that the state must ensure "that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area[.]"  Because we find that Florida has failed to demonstrate that the 90% mandate

72                  Opinion of the Court                  23-12331

As for Part II.B's requirement to collect basic data on PDN delivery and reimbursement rates, this mandate is not onerous and is directly tied to Florida tracking and reporting its compliance with the 90% PDN delivery mandate.  We do not find it overly broad, and we note that the district court already struck the more onerous requirement to collect data on PDN nurses (Part II.C).

The district court did not clearly err in making its underlying factual findings regarding the inadequate PDN delivery and its effects on unnecessary institutionalization.  And given these factual findings, the court's remedies are sufficiently tailored to address the inadequate provision of PDN.  We conclude that the court did not abuse its discretion in ordering Part II's injunctive remedies.

### 2.  PART III: CARE COORDINATION

The second substantive section of the injunction (Part III) addresses care coordination.  As explained above, the district court found four main problems related to care coordination.  First, care coordinators have difficulty identifying and effectively delivering contracted services to families.  Second, care coordinators fail to provide families with information about alternatives to institutionalization.  Third, families face substantial barriers in understanding what is required for discharge.  And fourth, Florida fails to provide necessary tools and reporting to ensure delivery of services.  The court found the coordinators to be "dedicated, competent, and

---

is not achievable for other reasons, we need not definitively resolve this question of statutory interpretation.

23-12331                 Opinion of the Court                     73

genuinely concerned about the children and families they serve,"
but that they "share the same frustrations as the parents and are
powerless to address them in any meaningful fashion." *Florida*, 682
F. Supp. 3d at 1214.

One care coordinator reported that, in her experience, 90%
of her cases have staffing issues, and that families struggle "on a
regular basis" to get needed medical equipment because of difficul-
ties with insurance. *See id.*; D.E. 908 at 107. She also noted that
when more money was offered, shifts would be covered more eas-
ily. Another care coordinator discussed issues with pay and staffing
as it related to switching agencies, or having agencies work to-
gether to provide PDN, noting that she only reported parent dissat-
isfaction if it had reached the level of wanting to switch agencies
even though parents reported having trouble keeping their jobs
without adequate PDN. Consequently, the district court found
that "[t]he monthly reports do not accurately portray the extent of
the failure," and that care coordinators "lack[ ] a mechanism to re-
quire performance" by agencies. *Florida*, 682 F. Supp. 3d at 1214–
15.

Moreover, the district court found that "[t]here is a wide-
spread failure to affirmatively inform families that they have alter-
natives to placing their children in a nursing facility." *Id*. at 1215.
As the court highlighted, both parties agree that institutionaliza-
tion should be the last resort and therefore providing information
about "real and viable alternatives to institutionalization is the first
step in ensuring that the Institutionalized Children are residing in

74                    Opinion of the Court                    23-12331

facilities only because they need to be, or because their families made a knowing decision regarding their placement there." *Id.* Trial testimony was "replete" with evidence of parents and care-givers lacking information or being given misinformation, including the State's witness who was a nursing director and three parents who testified for the State that no one had ever mentioned the options available to them. *See id.*

Part III of the injunction requires Florida to:

A. Ensure that care coordination is "person-centered and individualized";

B. Set a maximum caseload for care coordinators that must not exceed 15 children residing in a nursing facility, or 40 children living in a community setting;

C. Ensure that care coordinators are communicating with families at the contractually agreed upon frequency;

D. Establish a training curriculum for care coordinators to help remove barriers to transitioning to community-based care;

E. Require managed-care organizations to create a path for parents to promptly report providers' failure to provide any authorized and requested PDN hours. Care Coordinators must share any reported failures with their supervisor, the designated State agency, and the court-appointed monitor;

F. Allow families to submit complaints about Care Coordinators to the State and ensure that the monitor receives a copy of these complaints. Any complaints must be investigated

23-12331               Opinion of the Court                    75

and adjudicated within 30 days of submission and the results must be submitted to the monitor every month;

G. Outline care coordinator responsibilities and develop clear lines of authority and communication between coordinators, facilities, and managed-care organizations.

Florida contends, generally, that the care coordination portion of the injunction is overly broad and offends federalism principles. But it does not elaborate on why the care coordination provisions go so far as to constitute an abuse of discretion, nor does it argue that the court plainly erred in any of the factual findings upon which it based Part III of the injunction.

We address each provision of Part III in turn. Parts III.A and C are narrowly tailored and require minimal action from Florida—they simply require care coordinators to fulfill existing responsibilities by providing individualized care and communicating with families at an agreed upon frequency. Parts III.E and F likewise require limited state effort. These provisions require Florida to enable parents to report undelivered PDN and submit complaints, and for any complaints to be communicated and investigated. Similarly, Part III.G requires the state to delineate responsibility and communication procedures between various actors, without ordering the state to adopt specific procedures. Each of these remedies is sufficiently and narrowly tailored to address the care coordination shortfalls identified by the district court.

Part III.D requires Florida to create and implement a training curriculum for care coordinators on a number of subjects. We

76                          Opinion of the Court                    23-12331

are wary of requiring a state to create entirely new programs where none exist. *See Olmstead*, 527 U.S. at 612–13 (Kennedy, J., concurring in the judgment) (cautioning against the judiciary reviewing a state's choices in "establishing or declining to establish new programs"). But requiring that certain topics be covered during training—for an existing, specialized role that undoubtedly already requires some amount of training—is not tantamount to the creation of a new program. We also note that injunctions requiring the creation of training curricula do not necessarily constitute an abuse of discretion. *See, e.g., Gluth v. Kangas*, 951 F.2d 1504, 1511 (9th Cir. 1991) (finding no abuse of discretion where the district court mandated the creation of a training program for prisoner legal assistants). Given the district court's findings that trial testimony was "replete" with evidence of parents and caregivers lacking information or being given misinformation regarding community care options, we find it within the court's discretion to order the State to implement a training curriculum focused on reducing barriers to de-institutionalization.

Part III.B sets a maximum caseload for care coordinators, presumably to ensure that they are able to fulfill their responsibility of providing individualized care. But the district court made no specific factual findings that case workers are currently understaffed or that high caseloads are contributing to shortfalls in care coordination. We therefore conclude that this provision constitutes an abuse of discretion. *See Swain v. Junior*, 961 F.3d 1276, 1292–93 (11th Cir. 2020) (explaining that an injunction must be supported by factual findings).

23-12331               Opinion of the Court                    77

We affirm Parts III.A and C–G of the injunction as within the district court's discretion.  We set aside Part III.B.

### 3.  PART IV: NURSING FACILITY AND TRANSITION PLANNING

Part IV of the injunction addresses transition planning to assist families in bringing their children with medical complexity home.  The district court found that "the 'transition planning' process at the nursing facilities is fraught with hurdles that should not exist." *Florida*, 682 F. Supp. 3d at 1216.  The court credited evidence that families were sometimes discouraged, faced pushback, provided with inaccurate information about the suitability of their homes, faced confusion about how to communicate to staff a desire to bring their child home, and felt ignored.  *See id.*  Florida asserted that families needed to make a formal request in order to initiate discharge, but the district court found that "there was no indication that anyone ever explained to families what such a formal request looked like, what form it took, or to whom it needed to be communicated." *Id.*

To redress shortfalls in the transition planning process, Part IV of the injunction requires Florida to:

A.  Develop an individualized transition plan for each child currently residing in or who "may be admitted to a Nursing Facility";[22]

---

[22] The injunction initially required Florida to update the transition plan for each child every three months.  The district court modified this requirement in its order of September 5, 2024, instead requiring Florida to reinitiate the transition planning process every three months until the parents had

78                           Opinion of the Court                    23-12331

B. In each meeting held for a child residing in a nursing care facility, the child's care team must discuss the above information regarding transition planning and how any barriers to returning to community-based care can be addressed;

C. Document transition plans;

D. Florida's performance will be assessed by its external quality review organization, to which Florida will provide any necessary information for review;

E. Create a form asking parents of children currently in nursing homes or in community-based care whether they oppose transitioning their child to community-based care.

Florida generally contends that Part IV violates federalism principles and is overly broad because it mandates more than the ADA requires. Florida focuses its federalism argument on the 90% PDN mandate but provides no specific reasons as to why the transition planning process would violate these principles. Nor does it provide an explanation of how the transition planning process, specifically, exceeds the remedy needed to comply with the ADA's reasonable accommodation requirement. *See* Br. for Appellant at 43. We therefore do not find that the injunction's requirements regarding transition planning exceed federalism principles.

---

participated in the process at least twice. Subsequently, the frequency of the transition planning would depend on parent preference and whether the parent's stated desire for their child to return to a community setting, to stay at a nursing facility, or to stay at the nursing facility for the time being but overcome barriers in order for their child to return to a community setting.

Nonetheless, we analyze Part IV's provisions to determine whether they are within the district court's discretion. We note that most families of institutionalized children expressed a desire to bring their children into community-based care—if not now, then eventually, *see Florida*, 682 F. Supp. 3d at 1233–36—and that a number of parents described difficulties and delays in bringing their children home due to misinformation and other issues with the transition planning process. *See id.* at 1215–16, 1196–98, 1201–05 & n.21. We find no clear error in the court's factual findings underlying this portion of the injunction. We therefore find it within the court's discretion to order Florida to develop and document transition plans, to consistently assess how to overcome barriers to receiving community-based care, determine whether parents are opposed to community-based care using a form, and have the state's existing external quality review organization assess performance.

We do, however, find overbroad the portion of Part IV.A requiring families of children currently in community care who "may be admitted to a Nursing Facility" to have a transition plan. A remedy requiring transition planning for families who may never ultimately move their child to a nursing facility is not sufficiently tailored to address the discharge delays and other shortfalls identified by the district court. Although families should have the option to plan in advance, we do not believe there is an adequate factual basis for mandating this planning for *all* families of at-risk children. Those residing in institutions must not be forced—or pressured—to leave the institutions if they do not wish to do so. *See Olmstead*,

527 U.S. at 602 (majority opinion); *id.* at 610 (Kennedy, J., concurring in the judgment).

The district court somewhat allayed this concern when it removed the requirement to conduct transition planning meetings with parents of institutionalized children every three months for an indefinite period of time—a process which would have required those parents who wish to keep their children in nursing homes for the foreseeable future to constantly justify this choice. We agree that these parents' choices must be respected. *See Florida*, 682 F. Supp. 3d at 1226–27. But Part IV of the injunction as it currently stands, with the exception of a portion of Part IV.A, is within the court's broad discretion to craft a remedy for the many shortfalls it identified in the transition planning process.

We therefore affirm Part IV of the injunction, except for the portion of Part IV.A requiring Florida to develop a transition plan for "every child with Complex Medical Needs who may be admitted to a Nursing Facility." D.E. 1171 at 6.

### 4. PART V: DATA COLLECTION

Part V of the injunction focuses on data collection. The district court found that "[o]nly with complete and accurate information can parents exercise their choice for where their child's care is provided." *Florida*, 682 F. Supp. 3d at 1248. The court noted that the current care coordinator report forms do not allow for examining population-wide trends, and concluded that Florida's "remarkably inadequate system of data collection renders it unable to

23-12331          Opinion of the Court               81

even meaningfully diagnose the problem, much less solve it." *Id.* at 1183. Part V requires Florida to:

  A.  Collect the following data:

      1.  The number of hours of PDN authorized or denied of for each child in community-based care or a nursing facility;

      2.  The date of training completion and any caseload exceeding the limits set in Part III.B for each case coordinator;

      3.  The nursing facility admission date, planned discharge date, primary care physician, iBudget Waiver enrollment date, and parents' stance on community placement for each child currently in a nursing facility;

  B.  Collect data monthly and complete data collection within 15 days after the months' end.

The data collection requirement is based on the district court's finding that Florida has failed "to track and analyze data that would help identify gaps in services" and "to provide sufficient monitoring and enforcement of contractual compliance." *See id.* at 1220. Mandating data collection regarding PDN authorization or denial (Part V.A.1) is essential to determining compliance with the injunction's central mandate that each child receive at least 90% of the PDN hours authorized and desired. And mandating data collection regarding the number of children in nursing facilities and

82                    Opinion of the Court                    23-12331

whether they oppose community placement (Part V.A.3) is essential to understanding if *Olmstead* violations persist, as it can identify whether there are children for whom community care is appropriate whose parents are not opposed to community placement. Nor has Florida explained why monthly data collection (Part V.B) would be overly onerous. We therefore conclude that Parts V.A.1, V.A.3, and V.B are adequately tailored to address ADA violations and within the ample discretion provided to the court.

But because we have determined that the provision setting a caseload limit for care coordinators constituted an abuse of discretion, the requirement to collect data on this mandate must also be struck. Accordingly, we vacate the portion of Part V.A.2 requiring data collection regarding caseload. We affirm the portion of Part V.A.2 requiring data collection on the training date of each coordinator.

### 5. PART VI: THE MONITOR

The district court decided to appoint a monitor "given that [Florida] has refused to engage in efforts to craft any meaningful solutions." *Florida*, 682 F. Supp. 3d at 1251. Part VI of the injunction appoints a monitor and provides that:

   A. The parties must select a monitor;

   B. The parties must replace the monitor if the monitor resigns or the parties agree to do so;

23-12331              Opinion of the Court                    83

C. Florida must provide certain data to the monitor and re-
spond to information requests.  The monitor may verify the
accuracy of the data, including by interviewing families;

D. The monitor may communicate *ex parte* with the parties or
the court;

E. The monitor must submit a report every two months;

F. Florida must pay the costs of the monitor.

Federal Rule of Civil Procedure 53(a)(1)(C) provides that "a
court may appoint a master only to . . . address . . . posttrial matters
that cannot be effectively and timely addressed by an available dis-
trict judge or magistrate judge of the district."  Given that assessing
compliance with the injunction requires ongoing data tracking and
analysis, the district court had the authority to appoint a monitor.
*See Loc. 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421,
481–82 (1986) (affirming as permissible a district court's "appoint-
ment of [a monitor] with broad powers to supervise [ ] compliance
with the court's orders"); *United States v. Philip Morris USA Inc.*, 566
F.3d 1095, 1150 (D.C. Cir. 2009) (per curiam) ("[A] monitor may re-
port on a defendant's 'compliance with the district court's decree
and help implement that decree[.]'") (alteration adopted).  We
therefore find Parts VI.A and B to be within its discretion.

As for Part VI.C, we find it reasonable (and not an abuse of
discretion) to require Florida to provide data to the monitor and
allow the monitor to verify its accuracy.  Similarly, we find the two-
month reporting requirement outlined in Part VI.E to be reasona-
ble.  And Part VI.F's requirement that Florida pay the costs of the

84                    Opinion of the Court                    23-12331

monitor is also within the district court's discretion.  *See Alberti v. Klevenhagen*, 46 F.3d 1347, 1363–64 (5th Cir. 1995) ("We find no authority, and the State cites none, for the proposition that the district court abused its discretion by holding the State responsible for ninety percent of the costs of the monitors[.]").

Nor did the district court abuse its discretion when it enabled the monitor to communicate *ex parte* with the parties or the court. Rule 53(b)(2)(B) directs the court to state "the circumstances, if any, in which the master may communicate *ex parte* with the court or a party"—and therefore contemplates the possibility of a court authorizing *ex parte* communications.  The advisory committee notes to Rule 53 note that while *ex parte* communications between a monitor and the court should "ordinarily . . . [be] prohibit[ed]," there may be circumstances in which they are beneficial.  Similarly, the advisory committee notes state that "[i]n most settings, . . . *ex parte* communications with the parties should be discouraged or prohibited" by the district court, but in some settings they "may prove useful."  Fed. R. Civ. P. 53.  So although a monitor may be disqualified for *ex parte* communications where her specific conduct causes her "impartiality . . . [to] reasonably be questioned," *see* 28 U.S.C. § 455(a), an injunctive provision enabling a monitor to communicate *ex parte* with the parties or the court is not per se an abuse of discretion.  *See, e.g., Howe v. City of Akron*, 17 F. Supp. 3d 690, 692 (N.D. Ohio 2014) (authorizing the monitor to communicate *ex parte* with the parties or the court), *aff'd on other grounds by Howe v. City of Akron*, 801 F.3d 718 (6th Cir. 2015); *Cobell v. Norton*, 334 F.3d 1128, 1141, 1144 (D.C. Cir. 2003) (analyzing whether a

23-12331                Opinion of the Court                    85

judicial officer previously authorized to engage in *ex parte* communications as a monitor ought to have been disqualified from his subsequent appointment as a special master based on his prior *ex parte* communications).   Florida has not explained why the district court's authorization of *ex parte* communications in this case constitutes an abuse of discretion, i.e., a clear error of judgment, and we see no reason to conclude that it does.

Nevertheless, we conclude that the district court abused its discretion when it granted the monitor "full access to persons, employees, facilities, buildings, programs, services, documents, records, and any other materials necessary to assess [Florida's] compliance with the injunction."  D.E. 1188.  Although it was within the court's discretion to require Florida to facilitate the production of certain data to assess compliance, unfettered access to staff and facilities goes beyond what is necessary for the monitor to accurately assess compliance and is therefore overbroad.

### 6.   PART VII: MISCELLANEOUS PROVISIONS

The final section of the injunction (Part VII) sets out miscellaneous provisions and provides that:

A. Florida may not allege noncompliance by third parties, and any contracts with third parties must align with the injunction;

B. Florida may not retaliate against families;

C. Florida must designate a state employee to coordinate compliance;

86                    Opinion of the Court                    23-12331

D. The parties must follow the provided dispute resolution pathway;

E. The anticipated term of the injunction was 24 months.[23]

Florida does not outline any specific contentions regarding Part VII in its brief.  We find these provisions, which facilitate overall compliance, within the district court's discretion.

## V. CONCLUSION

We generally affirm the district court's liability findings under *Olmstead* as to both children who are institutionalized and children who are at risk of institutionalization. We affirm Parts I, II, III.A, III.C–G, IV.B–E, V.A.1, V.A.3, V.B, VI.A–B, VI.E–F, and VII of the permanent injunction.  We vacate Part III.B, and we affirm in part and vacate in part Parts IV.A, V.A.2, and a portion of the order appointing the monitor (the portion that modifies Parts IV.C and VI.D).

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED**

---

[23] As noted, the injunction, which was issued in July of 2023, has remained in effect past the 24-month mark.

23-12331             BRASHER, J., Dissenting                    1

BRASHER, Circuit Judge, dissenting:

The United States brought this lawsuit on behalf of two groups of Medicaid-eligible children with complex, serious health needs. The first group is children who are receiving care outside of nursing homes who might be transferred to a nursing home in the future. The second group is children in nursing homes who do not want to be there. The majority opinion is wrong in the way it treats both groups.

As to the first group, the majority opinion puts this Court on the wrong side of a circuit split and adopts a legal standard as amorphous as it is atextual. The district court reasoned, and the majority opinion agrees, that a state Medicaid program violates Title II of the Americans with Disabilities Act whenever it fails to eliminate the "serious risk" that a disabled child may be sent to an institution at some point in the future. After setting such a low bar to liability, the district court found that Florida is committing nearly 2,000 Title II violations because children with complex medical needs—who currently live at home—may be unjustifiably transferred to an institutional setting at some point in the future if they don't use more than 70% of their approved private duty nursing hours. The district court proceeded to enter a system-overhauling injunction that would "go a long way" in reducing the "risk" of any such institutionalizations but would not remedy or prevent any identifiable statutory violation.

In the Fifth Circuit, this kind of lawsuit would not fly. *See United States v. Mississippi*, 82 F.4th 387, 392–94 (5th Cir. 2023)

2                     BRASHER, J., Dissenting                  23-12331

(rejecting the "risk of institutionalization" theory of Title II violations). Title II provides that government programs may not discriminate against the disabled, 41 U.S.C. § 12132, and the Supreme Court has held that institutionalization, when community care is available, "is a form of discrimination." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600–01 (1999). The United States can sue to stop violations of Title II, but the United States did not file this lawsuit to remedy or prevent actual discrimination against any identifiable child. Instead, it sought to reduce the *risk* that any child might be transferred to an institution in the future by changing how Florida provides care to *all* Medicaid eligible children today—even those who are not, and may never be, institutionalized.

As to the second group of children, the 140 who are already in institutions, the majority opinion reasons that at least a majority of their families are unopposed to them receiving treatment in the community—a prerequisite to *Olmstead* liability—because experts testified that most of the 45 families that they interviewed out-of-court were unopposed. But that testimony recited hearsay from those 45 families. And it answered an individualized question about the remaining families, whether each family opposed community treatment, by extrapolating from a group statistic about other families' preferences. The Supreme Court forbade that kind of "Trial by Formula" to prove discrimination in *Wal-Mart Stores, Inc. v. Dukes*. 564 U.S. 338, 367 (2011).

Neither the statute nor *Olmstead* contemplates a lawsuit like this one. A "contention that [Medicaid beneficiaries] are 'at risk' of

23-12331                BRASHER, J., Dissenting                3

institutionalization is an insufficient basis for pleading violations of
the ADA" because "[t]he ADA's text simply does not reach that
far." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426,
468 (6th Cir. 2020) (Readler, J., dissenting). Indeed, "[n]othing in
the text of Title II, its implementing regulations, or *Olmstead* sug-
gests that a *risk of institutionalization*, without actual institutionali-
zation, constitutes actionable discrimination." *Mississippi*, 82 F.4th
at 392. Because the majority opinion approves a cause of action that
does not exist as a remedy for harms that are only hypothetical, I
respectfully dissent.

## I.

This case is about where Florida will provide Medicaid-
funded healthcare to children with complex medical needs. Care is
offered in two types of locations: community settings and institu-
tional settings. Community-based care is typically provided in the
child's own home but could also occur in a foster home or a group
home. Institutionalized care is provided in pediatric nursing
homes.

Florida law establishes a strong preference for providing
care in the community. Florida requires that every county contain
at least two home health agencies. Florida innovates within Medi-
caid by launching certain initiatives, such as its iBudget program
that provides supplemental services for medically complex children
so that they can live in their homes or other community settings.
Florida runs a medical foster care program, where foster parents
take in medically complex children so that those children do not

4                    BRASHER, J., Dissenting                    23-12331

have to be sent to a nursing home. Florida also mandates consideration of any available alternatives to a nursing facility before a child may ever be admitted to a nursing home. And all of those efforts are in addition to various legislative and regulatory measures passed by Florida during this litigation aimed at improving the provision of in-home care. *See* AHCA Statewide Medicaid Managed Care Policy Transmittals 2020-10 (Feb. 24, 2020), 2020-38 (June 26, 2020), 2020-42 (July 30, 2020), 2020-57 (Nov. 5, 2020), 2020-61 (Nov. 17, 2020), 2021-08 (March 4, 2021), 2021-39 (Dec. 20, 2021), and 2022-03 (March 21, 2022).[1]

To be sure, consistent in-home treatment is not the reality for all medically complex children in the state. At the time of the bench trial, there were about 140 children living in institutions. And about 1,800 children who live in community settings were not receiving all the care promised by Medicaid. For purposes of this litigation, the most important gap in care occurs with "private duty nursing." Private duty nursing allows children with complex medical needs to remain in the community while also receiving one-on-one attention from skilled nurses. Each child is allotted a certain number of authorized hours based on that child's medical needs, up to and including 24/7 private duty nursing.

---

[1] AHCA Policy Transmittals are available at https://ahca.myflorida.com/medicaid/statewide-medicaid-managed-care/plan-communications-prior-to-2022/agency-communications-to-smmc-plans-2018-2021-archive [https://perma.cc/HH5N-CCSB], and https://ahca.myflorida.com/medicaid/statewide-medicaid-managed-care/agency-communications-to-smmc-plans-fy2022-23 [https://perma.cc/6V7H-3MM4].

23-12331                 BRASHER, J., Dissenting                        5

Approximately ninety-three percent of the medically complex children served by Florida's Medicaid program are not receiving all their authorized private duty nursing hours. The United States says that the trend of unfulfilled private duty nursing hours puts children at risk of being sent to institutions in the future. The United States brought this suit to reverse that trend and eliminate that risk.

The United States' sole claim comes under Title II of the Americans with Disabilities Act. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In an implementing regulation often referred to as the "integration mandate," the Attorney General has said that a state "discriminate[s]" when it fails to "administer services . . . in the most integrated setting appropriate to the needs of qualified individuals," 28 C.F.R. § 35.130(d), with the most integrated setting being whatever location enables the most interaction between the disabled individual and the community at large, *see* 28 C.F.R. App. B. to pt. 35. In *Olmstead v. L.C. ex rel. Zimring,* the Supreme Court accepted the premise of the Attorney General's integration mandate and held that unjust institutionalization "is a form of discrimination" because persons with disabilities "must, because of those disabilities, relinquish participation in community life they could enjoy given reasonable accommodations, while persons without . . . disabilities can receive the medical services they need without similar sacrifice." 527 U.S.

6                    BRASHER, J., Dissenting                    23-12331

at 600–01.[2] Putting all those provisions together, Title II creates a default expectation that public services be provided to disabled individuals in community, as opposed to institutional, settings.

There are exceptions to the presumption of community-based treatment. Title II's protections are limited to "qualified individual[s] with a disability[.]" 42 U.S.C. § 12132. As relevant here, a disabled individual is considered "qualified" when a "reasonable modification[]" to the public entity's "rules, policies, or practices" would allow that individual to "meet[] the essential eligibility requirements for the receipt of" the public services at issue. *Id.* § 12131(2). A state is therefore required to make any "reasonable modifications" that are "necessary to avoid discrimination," but a modification is not "reasonable" if it "would fundamentally alter the nature of the service" at issue. 28 C.F.R. § 35.130(b)(7)(i). Additionally, a state is not required to move a disabled individual to a new setting if that person is happy with their current placement. 28 C.F.R. § 35.130(e)(1); *Olmstead*, 527 U.S. at 587, 603.

Courts use a two-phase analytical framework for deciding whether and to what extent a state must modify its services. There is first the liability phase, which involves a burden-shifting analysis similar to many other discrimination claims. A plaintiff must (1) prove that the disabled individual's medical condition is one that

---

[2] In *Olmstead*, the Supreme Court applied the "regulations with the caveat that" the Court was not "determin[ing] their validity" because the parties' dispute was limited to "the proper construction and enforcement of the regulations." 527 U.S. at 592. The same caveat applies today.

23-12331                  BRASHER, J., Dissenting                  7

can be adequately treated in a community setting, (2) establish that the patient is unopposed to placement in a community setting, and (3) propose a facially reasonable modification to existing practices or policies that will allow the state to provide services to the patient in a community setting. *See Frederick L. v. Dep't of Pub. Welfare*, 364 F.3d 487, 492 & n.4 (3d Cir. 2004). If a plaintiff checks all three boxes, then the state may argue that the facial reasonableness of the proposed modification is deceiving and, in fact, that modification would really be a "fundamental alteration" of the state's service or program. *See Olmstead*, 527 U.S. at 602–03; *Frederick L.*, 364 F.3d at 492 n.4; *Brown v. District of Columbia*, 928 F.3d 1070, 1088–89 (D.C. Cir. 2019) (Wilkins, J., concurring). If the state fails in that endeavor, the case moves to the remedy phase, where the court crafts an injunction. At this remedy phase, the district court is not limited to simply implementing whatever modification the plaintiff proposed at the liability stage. Injunctions are equitable remedies, and it is the district court's prerogative to fashion equitable relief as it sees fit. *See Brown*, 928 F.3d at 1083 n.10; *Steimel v. Wernert*, 823 F.3d 902, 918 (7th Cir. 2016).

Before the district court even reached the *Olmstead* two-phase framework, it had to resolve a dispute as to the scope of this litigation. Florida contended that, at most, *Olmstead* scrutiny was appropriate only as to the 140 children who lived in nursing homes. The United States disagreed, arguing that the children who live at home but do not receive all authorized private duty nursing hours could also be suffering *Olmstead* discrimination because they may be in jeopardy of being sent to nursing homes in the future. The

8                    BRASHER, J., Dissenting                    23-12331

district court sided with the United States, first concluding as a matter of law that Title II protects disabled individuals facing a "serious risk" of future institutionalization and then finding as a matter of fact that any child who does not receive all authorized private duty nursing hours faces such risk. *United States v. Florida*, 682 F. Supp. 3d 1172, 1182, 1185–86, 1210–11, 1243 n.55 (S.D. Fla. 2023). Because ninety-three percent of the children at home weren't receiving all authorized private duty nursing hours, the district court's adoption of the "serious risk" standard swept nearly all medically complex children living at home into this *Olmstead* action.

After giving this case a program-wide scope, the district court advanced to the *Olmstead* liability stage, where it had to decide if the United States carried its burden of proving the appropriateness, non-opposition, and reasonable modification elements.

As to the appropriateness element, the district court found that the United States had carried its burden of proving that all children within the Medicaid program at issue could be treated in a community setting. *Id.* at 1229–30. Florida contested that outcome based on the district court's articulation of the appropriateness standard; because I think the majority opinion does a good job of explaining why Florida is incorrect, I will not discuss the appropriateness element any further.

For the non-opposition element, the district court had to first, as a matter of law, define that element and then, as a matter of fact, decide whether the United States had carried its burden of proving that element by a preponderance of the evidence.

23-12331                BRASHER, J., Dissenting                    9

On the legal question, Florida argued that in order to prove an instance of *Olmstead* discrimination, the United States should have to prove that, at the time of the litigation, a disabled child's parents or guardians would opt for in-home treatment if the state were able to provide reliable private duty nursing. This was the correct definition, according to Florida, because it limited liability only to those circumstances in which Florida's alleged failures actually caused the present unjust institutionalization. Put differently, Florida did not think it could be held liable if a disabled child's parents would opt for institutionalized treatment no matter what happened in the litigation. The district court rejected that definition of non-opposition, instead concluding that a parent or guardian is unopposed for purposes of *Olmstead* so long as that parent or guardian is open to the idea of bringing the institutionalized child home someday. *Id.* at 1236. The district court's logic was that even if a parent or guardian doesn't want the child home right now, that may change in the future. Assuming that choice did change, and assuming Florida's Medicaid program stayed as is, the district court predicted that parents and guardians wouldn't be able to bring children home due to unreliable in-home Medicaid services. *See id.* at 1232, 1236. To the district court, *Olmstead* scrutiny of Florida's Medicaid program was appropriate now in order to give parents and guardians a meaningful choice later.

On the factual issue, the district court found that the United States had satisfied *Olmstead*'s non-opposition element for nearly all

10                          BRASHER, J., Dissenting                    23-12331

140 children in nursing homes.[3] Because the district court was pur-porting to make 140 discrete findings of fact—the mental state of each child's parent(s) or guardian(s)—Florida argued that the United States needed to present individualized evidence specific to each child. The district court considered that unnecessary, stating that it was sufficient to "discern the *overall* sentiment" or "the broader and more dominant sentiment of most" families. *Id.* at 1236. To that end, the district court allowed the United States to carry its burden by presenting the testimony of expert witnesses who had conducted qualitative surveys of a sample of parents and guardians. The experts' assessments of those sample interviews sat-isfied the district court that "the families of the [children in nursing homes] are overwhelmingly not opposed to community-based ser-vices." *Id.*

For the reasonable modification element, the United States first bore the burden of proposing changes to Florida's Medicaid program that would remedy or prevent *Olmstead* discrimination. The United States's proposal was to change nearly everything about Florida's Medicaid administration practices, from employee training to data collection methods and even contract negotiation strategies. Florida contended that the United States had not proven that its proposal would remedy or prevent even one instance of

---

[3] The non-opposition element was not seriously contested with respect to the children already living at home. And for obvious reason: There's no real basis to doubt that a child living at home has parents or guardians who are unop-posed to that child living at home.

23-12331                   BRASHER, J., Dissenting                   11

unjust institutionalization and that the program-overhauling proposal was too far-reaching to be considered a "modification." Florida relied on substantially similar arguments in an effort to convince the district court that the United States's proposed modification would really be a fundamental alteration under 28 C.F.R. § 35.130.

The United States didn't dispute that its proposals aren't sure to prevent or remedy any instances of institutionalization. But that didn't matter. Because the district court had already concluded a "serious risk" of institutionalization was itself discrimination, an *Olmstead* plaintiff's proposed modification was sufficiently effective at remedying or deterring discrimination as long as it lessened the risk of future institutionalization. And the district court decided that the United States's proposed modifications would lessen the risk of future institutionalizations. *See Florida*, 682 F. Supp. 3d at 1242, 1246–47. The district court likewise rejected Florida's argument that the program-overhauling proposals were too sweeping to be considered "modifications." As the district court saw it, this litigation was about fixing Florida's Medicaid program, not about helping any specific children. *See id.* at 1243, 1246–47. Finally, the district court found that the United States's proposal would not fundamentally alter Florida's Medicaid program because Florida would be providing the same services (just in a different location) and could implement the proposed modifications without incurring significant new costs. *Id.* at 1241–1242, 1246–47.

12                    BRASHER, J., Dissenting                    23-12331

Satisfied that Florida's entire pediatric Medicaid program was unlawful under Title II, the district court moved to the *Olmstead* remedy phase and set out to craft an injunction. Much of the injunction overlaps with the United States's liability phase proposed modifications, requiring the state to change the nuts and bolts of the programs that it uses to procure and administer healthcare for disabled children. The centerpiece of the injunction is more substantive and, in the district court's view, drives at the heart of the problem—Florida must ensure that ninety percent of all private duty nursing hours are utilized. *Id.* at 1242. The district court recognized that it could not be sure that its injunction, generally, and the ninety percent utilization mandate, specifically, would be enough to prevent "a specific child" from being institutionalized. *Id.* at 1246–47. But it was enough for the district court that those measures would "go a long way in helping children in nursing facilities transition to home or a community setting and reduce the risk that those already living at home would be forced to move into a nursing facility." *Id.* at 1247. To track Florida's progress in complying with the injunction, the district court appointed a special master to be compensated at Florida's expense. *See id.* at 1251–52.

## II.

In my view, the majority opinion makes two major errors. First, it approves the "serious risk" standard for Title II liability. This error transformed a case about 140 children in institutions into a case about thousands of children living in community settings.

23-12331                BRASHER, J., Dissenting                13

Second, and independent of the "serious risk" error, the majority opinion misapplies *Olmstead*'s non-opposition element as to the 140 children in institutions. Proving discrimination requires individualized evidence, but there isn't any here. Instead, the proceedings below were a trial by formula, based on speculation and hearsay. I'll address each issue in turn.

*A.*

Let's start with the roughly two thousand children who are not institutionalized and should not have been the focus in this case. The majority opinion provides two justifications for characterizing those children as victims of unjustified institutionalization, even though they are not institutionalized. Neither justification makes sense.

1.

The linchpin of the government's liability theory, the district court's injunction, and the majority opinion's reasoning is that Title II prohibits the "serious risk of institutionalization" in addition to actual institutionalization. As the majority opinion frames it, the government's theory is that Florida's policies caused "some children to be unnecessarily institutionalized and plac[ed] others at serious risk of institutionalization." Maj. Op. at 2. The majority opinion notes that "[t]he district court here held that a 'serious risk' of institutionalization is actionable." Maj. Op. at 64. And the majority opinion agrees: it says that there is no "discernible and manageable line      between      institutionalization      and      the      risk      of

14                    BRASHER, J., Dissenting                 23-12331

institutionalization." Maj. Op. at 37. Accordingly, it holds Florida liable under Title II because about 1,400 "children face a serious risk of institutionalization." Maj. Op. at 67.

This "serious risk" theory of liability is wrong.[4] Past or ongoing events violate Title II, not the risk of a future violation. Under the statute, a violation occurs when someone is "excluded from participation in" a public program, "denied the benefits of" a public service, or otherwise "subjected to discrimination" by a public entity. 42 U.S.C. § 12132. Similarly, the Attorney General's integration mandate does not speak of risk but instead focuses on where the disabled person is currently being treated. The regulation doesn't consider Title II to have been violated until the state fails to "administer services . . . in the most integrated setting appropriate[.]" 28 C.F.R. § 35.130(d).

The majority opinion acknowledges this statutory and regulatory language, but it then misapplies caselaw about different words in Title II to read 42 U.S.C. § 12132 too broadly. The Court in the majority opinion's primary supporting authority—*Pennsylvania Department of Corrections v. Yeskey*—analyzed the definitions of a "qualified individual with a disability" and a "public entity" in 42 U.S.C. § 12131 and held that their language covered state inmates

---

[4] The majority opinion argues that Florida waived whether Title II prohibits the risk of institutionalization by failing to address this issue in its initial brief, but that brief repeatedly asserted that only undue institutionalization–not a risk of institutionalization–is Title II discrimination. *See* Appellant's Br. at 31, 40–41.

23-12331                 BRASHER, J., Dissenting                 15

and prisons. 524 U.S. 206, 209–12 (1998) (citation modified). The *Yeskey* Court reasoned that Title II "demonstrates breadth" by reaching state inmates because Congress might not have "expressly anticipated" that it would cover them. *Id.* at 212 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 499 (1985)). The majority cites *Yeskey* as evidence that we should read "discrimination" in section 12132 broadly, in keeping with Title II's breadth, to include the risk of institutionalization. But *Yeskey* was about the breadth of individuals covered by Title II—not the contents of its prohibitions—so it does not suggest that Title II discrimination includes a risk of institutionalization. *Id.* at 208. And *Yeskey* gave section 12131 no greater scope than its text supports. *Id.* at 210. So *Yeskey* provides no basis for the majority to give section 12132 an atextually broad reach.

The majority opinion also misapplies *Olmstead* itself. The *Olmstead* Court reasoned that unjust institutionalization is discriminatory because a disabled person suffers discrimination when he or she is forced to "relinquish participation in community life" to receive a state-provided service. 527 U.S. at 601. The majority cites this reasoning as evidence that a "serious risk of unnecessary institutionalization" is discrimination under Title II. Maj Op. at 66. But that conclusion draws the wrong inference. *Olmstead*'s reasoning speaks of discrimination in present—not future—tense. A statutory violation does not occur under *Olmstead* unless and until the disabled person is put to the choice: exchange life in the community to get health care in an institution.

16                        BRASHER, J., Dissenting                        23-12331

Other circuits have rightly rejected these kinds of claims. In *United States v. Mississippi*, the United States invoked *Olmstead* to attack Mississippi's "entire mental health care system." 82 F.4th at 388. The United States' theory of the case was that the structure of the program created a serious risk of institutionalization because there was a lack of reasonable community-based services for the mentally ill. *See id.* at 389–90. The district court adopted the serious risk theory and found that "every person with a severe mental illness" in Mississippi was "at risk of unjustified institutionalization" in a state hospital. *Id.* at 390.

The Fifth Circuit reversed. It held that the "serious risk" standard is contrary to the text of Title II. An unjust institutionalization, not the mere risk of it, is what makes a Title II violation. *See id.* at 392–94. The Fifth Circuit also repeatedly chastised the district court for relying on its own unsubstantiated predictions about future events to make factual findings that people currently living in community settings faced an impermissibly high risk of institutionalization. *See id.* at 392 (stating that Title II "refers to the actual, not hypothetical administration of public programs"); *id.* at 393 (discussing the "hubristic" assumption that federal courts can predict the outcome of state processes); *id.* at 394 ("The *Olmstead* case turns on actual 'unjustifiable institutionalization,' not on hypothetical future events. On that score alone, *Olmstead* does not support the federal government's theory of the case.").

The parallels between *Mississippi* and our case are striking. In neither case did the United States attack a specific policy or

23-12331            BRASHER, J., Dissenting            17

practice but instead lodged generalized claims that entire state programs were insufficiently structured. And in neither case did the United States prove imminent, unjustified institutionalizations that needed to be deterred. *See id.* at 388–89 & n. 2. Instead, the United States's goal was to compel changes to state programs to reduce the risk of hypothetical future violations. *See id. Olmstead* claims— which allow victorious plaintiffs to seek court-ordered modifications to state programs—were simply a convenient means to that end. To keep the cases going, the United States asked the district courts to read into Title II a prohibition against the mere risk of institutionalization and then speculate about the occurrence of future events to find that a critical mass of people within the challenged systems faced such a risk. The *Mississippi* district court and the district court here granted those requests. The Fifth Circuit rightly declined. We should too.

The majority opinion says it is following contrary decisions from our sister circuits. Specifically, it cites decisions from the Second, Fourth, Sixth, Seventh, Ninth, and Tenth Circuits, painting a picture of a lopsided circuit split with the Fifth Circuit on the losing end. But my review of the caselaw leads me to conclude that the split is quite narrow and that the Fifth Circuit's is the side to be on.

For starters, the Fourth, Seventh, and Tenth Circuit decisions don't belong in this discussion. The Seventh Circuit in *Radaszewski ex rel. Radaszewski v. Maram*, 383 F.3d 599 (7th Cir. 2004), agreed with my interpretation of Title II because it treated potential institutionalization as a threat of *future* discrimination. *Id.*

18                    BRASHER, J., Dissenting                    23-12331

at 608 (assessing whether the policy that might institutionalize the plaintiff "portends" discrimination). The remainder of the cases from the Fourth, Seventh, and Tenth Circuits answered a distinguishable question: whether a plaintiff can bring a pre-institutionalization *Olmstead* claim at all. There, defendants asked courts to dismiss *Olmstead* claims because the plaintiffs were not yet institutionalized. The courts rejected that argument, holding that a plaintiff currently living in the community could sue for injunctive relief to prevent institutionalization so long as that plaintiff faced a sufficiently high likelihood of institutionalization. *See Pashby v. Delia*, 709 F.3d 307, 322 (4th Cir. 2013) ("[I]ndividuals who must enter institutions to obtain Medicaid services for which they qualify may be able to raise successful Title II . . . claims because they face a risk of institutionalization."); *Fisher v. Oklahoma Health Care Auth.*, 335 F.3d 1175, 1182 (10th Cir. 2003) (explaining that disabled persons "imperiled with segregation" may bring an ADA claim); *Steimel*, 823 F.3d at 912 (explaining that the ADA and integration mandate's protections would be meaningless if plaintiffs were required to enter an institution before they could challenge a law or policy that "threatens to force them into segregated isolation" (quoting *Fisher*, 335 F.3d at 1181)).

None of these circuits held that an *Olmstead* plaintiff could maintain a suit for injunctive relief based on the "risk" that community-based care would prove to be inadequate. Indeed, they had no occasion to reach such a holding because there was no reason to doubt that the plaintiffs faced likely and imminent *Olmstead* institutionalization. As a straightforward example of this point,

23-12331                BRASHER, J., Dissenting                     19

consider the Tenth Circuit's decision in *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175 (10th Cir. 2003). There, although the state paid for prescription medications, beneficiaries in community settings had limitations on their prescriptions that beneficiaries in institutions did not. The result was that state law "d[id] not allow the plaintiffs to receive services for which they [were] qualified unless they agree[d] to enter a nursing home." *Id.* at 1182. So, the plaintiffs were already staring down the no-win scenario lamented by *Olmstead*. *See* 527 U.S. at 600–01. In *Fisher* and these other cases, the disabled individuals were at a fork in the road: stay in the community and lose public healthcare or move to an institution to receive healthcare.[5]

The real circuit split is thus far narrower than the majority opinion lets on: 3-1, with the Second, Sixth (over a dissent), and Ninth Circuits on one side and the Fifth on the other. The majority's opinion places us in league with the Second, Sixth, and Ninth Circuits, allowing *Olmstead* claims that launch attacks against state

---

[5] *See Steimel*, 823 F.3d at 913 (noting dispute of fact as to plaintiffs' eligibility for a certain "safeguard" program that could control whether plaintiff is eligible for community care or must receive care in a segregated setting); *Pashby*, 709 F.3d at 314–15 (plaintiffs would qualify for Medicaid service if institutionalized but did not qualify if living in the community); *Radaszewski*, 383 F.3d at 600 (program funding capped at insufficient amount to pay for necessary nursing in the home, but plaintiff would receive that nursing in an institution); *see also Amundson ex rel. Amundson v. Wisconsin Dep't of Health Servs.*, 721 F.3d 871, 873–74 (7th Cir. 2013) (inadequate-funding claims not ripe under Article III because no plausible allegation that the lack of funding created threat of imminent institutionalization).

20                    BRASHER, J., Dissenting                    23-12331

healthcare programs premised on nothing more than an unquantified "serious risk" that an unidentified person might be wrongly institutionalized at some point in the future. *See M.R. v. Dreyfus*, 663 F.3d 1100, 1116–17 (9th Cir. 2011) (citation modified) (explaining that a plaintiff need only establish a "serious risk of institutionalization" to prove *Olmstead* discrimination and that an "imminent risk of institutionalization is not required."), *amended by* 697 F.3d 706 (9th Cir. 2012); *Waskul*, 979 F.3d at 460–61 (citation modified) (explaining that it would be "unreasonable" to require individuals to wait to bring an *Olmstead* claim "until the harm of institutionalization is . . . imminent"); *Davis v. Shah*, 821 F.3d 231, 262–63 (2d Cir. 2016) (citation modified) (adopting view that a plaintiff need not wait until institutionalization is "imminent" to bring an ADA claim but instead may bring a claim based on the "risk of institutionalization").

2.

In addition to the "serious risk" standard, the majority opinion floats another theory to support its decision: that this is actually a run-of-the mill "imminent" injury case. Not so. This theory is inconsistent with the position the government advanced, the facts the district court found, and what the record supports.

True, a disabled individual does not need to wait until he is institutionalized to bring an *Olmstead* action. Title II authorizes injunctive relief. 42 U.S.C. §§ 12133, 2000d-7(a)(2). "The purpose of an injunction is to prevent future violations, and, of course, it can be utilized even without a showing of past wrongs." *United States*

23-12331                BRASHER, J., Dissenting                21

*v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (citation modified). So the majority opinion is right that individuals who are protected by Title II can bring challenges to prevent imminent future statutory violations.

But the threat of a statutory violation must, in fact, be *imminent*. Article III of the United States Constitution limits the "judicial Power" to "Cases" and "Controversies." U.S. Const. art. III, § 2. A case or controversy requires a concrete and particularized injury in fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The injury-in-fact requirement can be satisfied by a plaintiff who is anticipating a future violation only when that future violation is imminent and likely to occur. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 435 (2021). Otherwise, the harm is too speculative to create a true case or controversy. *See Lujan*, 504 U.S. at 564 n.2.

The record here says nothing about an imminent statutory violation. The key fact driving the district court's analysis was that the average medically complex child uses only about seventy percent of his authorized private duty nursing hours. *See Florida*, 682 F. Supp. 3d at 1210–11. The district court described the low level of hours usage as "the heart" of the case and "by far the most glaring and critical problem" with Florida's system. *Id.* at 1182–83. What is the connection between providing private duty nursing hours to children *outside* a nursing home and the alleged statutory violation of inappropriately moving children *into* a nursing home? The district court reasoned that, (1) because of the seventy percent statistic, parents and guardians must "fill[] in service gaps" in private

22                    BRASHER, J., Dissenting                    23-12331

duty nursing, (2) this extra work might leave them "unable to sustain their children's care" at home while also "working and caring for other family," and (3), if that happened, the parents would be forced to "plac[e] their children in nursing facilities" to provide them with needed services. *Id.* at 1220.

Not only does this logic chain fall apart, it also can't establish an imminent likelihood of unjustified institutionalization. Unused hours don't equal inadequate healthcare. Florida put on evidence that many authorized hours go unused simply because, during those hours, children are receiving care elsewhere—e.g., doctor's office visits and hospital stays. The United States's own expert echoed that point, acknowledging that "there are a variety of reasons why a child might not be receiving all of their [private duty nursing] hours." Doc. 1170 at 36. Moreover, private duty nursing hours have been underutilized for years, but the record doesn't reflect a spike in children being sent to nursing homes. The seventy percent statistic was calculated by expert witnesses reviewing data about the provision of private duty nursing for thousands of children across Florida in the years 2021 and 2022. But, at the time of the bench trial in 2023, only 140 children lived in institutions.

The majority opinion's imminent injury theory also ignores the district court's findings about the harm the roughly 2,000 children experience outside of group settings. Although the statute prohibits unjustified institutionalization, the district court expressly concluded that the "risk of institutional placement" is itself a *present* harm. *See Florida*, 682 F. Supp. 3d at 1185. It found as a

23-12331                     BRASHER, J., Dissenting                     23

matter of fact that all medically complex children who have not been institutionalized are currently harmed by that risk. *Id.* at 1220. And it expressly set out to remedy that harm—the risk itself—by enjoining Florida to provide at least ninety percent of all authorized private duty nursing hours. The district court conceded that it had no way of knowing whether its injunction would prevent any given child from being unjustly institutionalized. *See id.* at 1246–47. But, of course, preventing unjustified institutionalization—an actual statutory violation—was not the point.

For its part, the government never asked the district court to make an imminent injury finding. The United States has always argued, and still does, that all medically complex children are currently being harmed by the risk of institutionalization. Its evidentiary presentation aligned with its theory. The government's attorney made clear that the point of the litigation was to overhaul Florida's programs to reduce risk, not to stop an imminent injury: "[W]e're not suing on behalf of an individual. We're suing to change the policies and practices of the State of Florida. To the extent that [someone] may ultimately benefit from that . . . is a, . . . quite frankly, hopefully, a result of our enforcement action, but it is not . . . the genesis of our enforcement action." Doc. 910 at 246. To further emphasize this point, the government's health policy expert acknowledged that she could not identify "a single child" whose future institutionalization would be averted by the modifications that she proposed to Florida's programs. Doc. 909 at 219–20.

24                    Brasher, J., Dissenting                    23-12331

In short, the majority opinion cannot retcon this case as being a run-of-the-mill lawsuit to prevent an imminent statutory violation. The majority opinion, instead, rises and falls on its express adoption of other circuits' conclusion that, when it comes to Title II, a "serious risk" of institutionalization in and of itself violates the statute.

*B.*

Now let's talk about the 140 children living in nursing homes. They should have been the focus of this litigation. But, even as to those children, the majority opinion errs. The district court found that the parents and guardians of these children were not opposed to their being treated at home. But that finding was not supported by any meaningful evidence.

In most *Olmstead* cases, no one even disputes whether a child's parents want them to receive care at home because the affected individuals are the ones complaining about discrimination. In other words, if a plaintiff is suing to be transferred home then, obviously, the plaintiff is not opposed to a transfer home. But this is a very unusual *Olmstead* case. Here, the government is seeking relief on behalf of children and families with whom it has never interacted and who have no say in the litigation. And Florida had good reason to contest the non-opposition element. In discovery and at trial, there was evidence that many parents and guardians preferred to keep their children in their current settings for reasons entirely unrelated to the quality of Florida's programs.

23-12331              BRASHER, J., Dissenting                 25

With the non-opposition element in dispute, we must answer two questions. First, we must decide whether the district court correctly determined what it means to be "unopposed" for purposes of an *Olmstead* claim. Second, we must decide whether the district court's factual determination under that standard was clearly erroneous. The majority opinion gets the wrong answer to both questions.

At the outset, the majority opinion errs in rejecting Florida's articulation of the legal standard. Florida argues that the question under *Olmstead* is whether the disabled individual (or here, that individual's parent or guardian) would choose community placement now if the alleged shortcomings in the state's program were corrected. The majority opinion says that inquiry is too narrow. Although it deems opposed those parents who would keep their children institutionalized even if Florida altered its programs, it deems non-opposed other parents who might make the same choice after considering other options. In its words, a parent or guardian is non-opposed if he is "open to choosing community based services if such services were available." Maj. Op. at 50.

But Florida is right. The whole point of an *Olmstead* claim is to decide whether a disabled individual's institutionalization is unjustified. Part of that process requires a plaintiff to establish that the disabled individual is unopposed to community placement. If, at the time of the lawsuit, the disabled individual might choose to remain institutionalized regardless of any improvements to the state's program, then the plaintiff has failed to prove that the

26                   BRASHER, J., Dissenting                23-12331

institutionalization is unjustified. Just as it is not workplace discrimination to deny someone a job that they don't want, we can't say that Florida is violating the rights of children to get treatment in the community when they might prefer to be in an institution.

Having asked itself the wrong legal question, the majority opinion then compounds its error by answering the question based on hearsay and speculation. The majority opinion approves the district court's conclusion that most of the families of the 140 institutionalized children are unopposed to community placement. But that conclusion was based on the testimony of an expert witness for the United States that was doubly improper.

First, it mostly recited hearsay. Although an expert may base her opinion on inadmissible evidence, FED. R. EVID. 703, she may not act as a mere conduit for hearsay, *see Williams v. Illinois*, 567 U.S. 50, 80–81 (2012), *abrogated on other grounds by Smith v. Arizona*, 692 U.S. 779, 795 (2024); *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013). Out of court statements offered for their truth are classic hearsay. FED. R. EVID. 801(c). And here, the expert witness summarized the families' out-of-court statements about where they wanted their children placed and offered those summaries for their truths.

In her words, the expert shared "the things people t[old] her" and "actual quotes" to describe the "theme[s]" of non-opposition or opposition to community placement. Doc. 907 at 211–13, 220–21, 227, 231. Most significantly, she testified that the parents of 45 of the children directly told her whether they were "opposed or not

23-12331                    BRASHER, J., Dissenting                    27

opposed" to community placement. Doc. 908 at 11. And she re-
capped those out-of-court statements for their truths by explaining
that the parents were generally "not opposed" and that only one
couple "was opposed" to community placement. Doc. 907 at 200–
01. Those bare recitations of hearsay were improper.

Second, even if not hearsay, the government's proof of non-
opposition is a classic trial by formula.[6] The expert reasoned that
the families of 140 children were unopposed to community place-
ment because most of the 45 families that she interviewed were
unopposed. But the Supreme Court has held that, in discrimination

---

[6] The majority opinion argues that Florida did not raise the issue of trial by
formula in its brief. This is a close question, but I ultimately think Florida
raised the issue. Florida's brief did not use the words "trial by formula." But it
argued that the district court should not have "generalized from . . . few cases
[of non-opposition] to find widespread unlawful institutionalization." Appel-
lant's Br. at 29. And it asserted that the district court should not have relied on
the expert's testimony from 45 interviews to find unjust institutionalization.
Much of the oral argument was likewise dedicated to addressing Florida's
point that "this notion that all of these children, 140 children, who live in nurs-
ing homes today are there because of inadequate in-home nursing . . . is sup-
ported by generalizations based on a very small number of discrete cases."
Oral Argument at 4:30–5:07. "The nature of the evidence presented in this
case," Florida argued, "was homogenizing all of these children." Oral Argu-
ment at 6–6:05. The United States also recognized this issue at oral argument:
Judge Jordan asked whether "[y]ou can do that [prove nonopposition] through
a sampling analysis" and the United States responded "[t]here are a lot of dif-
ferent methods one could use, your honor, and sampling is certainly one
method . . . [Experts] surveyed . . . 45 out of 140 but they determined that
actually their analysis represented the views of the group as a whole." Oral
Argument at 21–22:50.

28                    BRASHER, J., Dissenting                    23-12331

cases, we cannot answer questions about one person by extrapolating from someone else's answers. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. at 367. And for good reason: to prove individual instances of discrimination requires individualized evidence. Instead of following the Supreme Court's admonition, the majority opinion approves of the district court's trial by formula. It says that at least "60% of families of currently institutionalized children . . . remain unopposed to community-based care" based on interviews with only a minority of those families. Maj. Op. at 53–54 n.13.

The majority opinion tries to distinguish *Dukes* by asserting that this case is about trial by sampling, a process that it contends is "far different" from trial by formula. Maj. Op. at 56. That conclusion is difficult to square with *Dukes*'s description of trial by formula: a process that begins by taking "[a] sample set" of the relevant population before generalizing findings from that sample to the whole group. 564 U.S. at 367. Whatever you want to call it, that is exactly what the United States's expert did here.[7]

---

[7] The majority opinion also argues that *United States Patent & Trademark Office v. Booking.com*, 591 U.S. 549 (2020), and *Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833 (11th Cir. 1983), establish that the United States's expert is allowed to extrapolate from qualitative surveys to reach her conclusions. But those cases address whether experts can use samples or surveys to answer *group* questions, not *individualized* questions like the inquiries at issue here. *See Booking.com*, 591 U.S. at 560–62 & n.6 (explaining that consumer survey data can suggest whether a company's mark is likely to confuse consumers in general); *Jellibeans, Inc.*, 716 F.2d at 844–45 (same).

23-12331                 BRASHER, J., Dissenting                 29

## III.

It seems likely to me that, somewhere in Florida, there is a child with serious medical needs who has a strong *Olmstead* claim. But the majority opinion doesn't vindicate the rights of that child. Instead, the majority opinion transfers governing authority away from Florida's Medicaid Agency and to a federal district court. And it does so even though we can't be sure the district court's remedy will prevent a single unjustified institutionalized placement. Because that result is inconsistent with the statute and the Supreme Court's caselaw, I respectfully dissent.